**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORHTERN DIVISION**

| | | |
|---|---|---|
| JALONDA JOHNSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 02:07-cv-101-MEF** |
| | ) | |
| ALABAMA STATE UNIVERSITY | ) | |
| and | ) | |
| ANWAR DIOP, | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>DEFENDANT, ALABAMA STATE UNIVERSITY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON CROSS-
CLAIM COMPLAINT</u>**

COMES NOW Alabama State University (hereinafter "Defendant" or "ASU"), Cross-Claim Defendant in the above-captioned matter, by and through its undersigned counsel of record and files its Memorandum of Law in Support of its Motion for Summary Judgment against each and every claim asserted in Cross-Claimant Anwar Diop's (hereinafter "Diop")Cross-Claim Complaint.

**STATEMENT OF UNDISPUTED FACTS**

ASU hired Diop as its Director of Physical Plant with a starting date of November 1, 2004. Ex. 1, Diop's Deposition , p.84, ll.18-20; Ex. 2, Notice of Employment, dated October 2004. ASU classifies the Director of Physical Plant as an Executive Status Employee. Ex. 1, Diop's Deposition , p.110, ll.8-19, p.112, ll. 10-23; Ex. 3, Non-Academic Staff Handbook, Section 1.0 Classification and Employee Service Status. An Executive Status Employee cannot obtain permanent employee status. Ex. 3, Non-Academic Staff Handbook, Section 1.0 Classification and Employee Service Status; Ex.

1, Diop's Deposition, p.112, ll. 10-23 . Further, only employees who have obtained permanent status are entitled to appeal a termination for disciplinary reasons. Ex. 3, Non-Academic Staff Handbook, Section 6.2, Termination for Disciplinary Reasons.

On January 31, 2005, Jolanda Johnson visited Diop at his home. Ex. 1, Diop's Deposition, pp.182-183, ll.21-5; Ex. 4, Johnson Deposition, p. 135, ll.111-16. Upon leaving Diop's residence, Johnson sought medical attention and informed the Montgomery Police Department that she had been raped by Diop at his home. Ex. 4, Johnson Deposition, p. 80, ll8-12, pp 82-83, ll. 21-7, pp. 85-86, ll 15-4; Ex. 5, Alabama Uniform Incident/Offense Report.

On February 10, 2005, Johnson filed a complaint against Diop alleging sexual harassment based upon her allegation that Diop raped her on January 31, 2005. Ex. 6, Letter to Olan Wesley from J. Johnson, dated February 10, 2005. Diop was promptly notified of the allegations against him and was advised of ASU's procedures for investigating sexual harassment complaints. Ex. 7, Letter to Diop from O. Wesley, dated February 11, 2005. In accordance with ASU policy, a committee was formed to investigate the allegations. Ex. 7, Letter to Diop from O. Wesley, dated February 11, 2005; Ex. 8, letter to Johnson from O. Wesley, dated February 11, 2005.

The Committee conducted witness interviews and issued findings and recommendations based upon its investigation. Ex. 9, Letter to O. Wesley from EEO Committee, dated April 19, 2005. Diop was terminated as a result of the Committee's findings, upon approval of ASU President Joe Lee. Ex. 10, Memo to President Lee from O. Wesley, dated April 21, 2005; Ex. 11, Notice of Termination, dated May 6, 2005.

**STANDARD OF REVIEW**

Summary Judgment is appropriate under Rule 56of the Federal Rules of Civil Procedure if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law*." Celotex Corp. v. Catrett*, 477 US 317, 322 (1986).  The moving party may meet its burden by presenting evidence which shows that there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence to support an element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-324.  In the present case, there is no genuine issue of material fact and Diop is unable to present evidence to support material elements of his claim.  Therefore, ASU is entitled to judgment in its favor as a matter of law.

**ARGUMENT**

ASU is entitled to judgment in its favor as a matter of law as to each and every count in Diop's Cross-Claim Complaint.  First, ASU enjoys absolute immunity from suit pursuant to both U.S. Const., amend. XI and Article I, §14 Alabama Constitution (1901).  Even if ASU were not completely immune from suit, it is still entitled to Summary Judgment as to each and every count of the Cross Claim Complaint because Diop cannot produce substantial evidence to create any material issues of disputed facts.

**I.      ASU is Entitled to Sovereign Immunity Against All of Diop's Claims Pursuant to the Eleventh Amendment of the United States Constitution**

Diop attempts to assert claims against ASU for indemnification, breach of contract, and violation of §1983 related to the termination of his employment.  It is apparent from the face of the Complaint that ASU is absolutely immune from suit as to each and every count in the Cross-Claim Complaint pursuant to U.S. Const., amend. XI.

The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  This immunity extends to include protection for States against federal court suits by its own citizens.  *Gomer v. Philip Morris, Inc., et al.*, 106 F.Supp.2d 1262, 1266 (M.D. Ala. 2000) (citing *Gamble v. Florida Dep't of Health and Rehabilitative Servs.*, 779 F.2d 1509, 1511 (11th Cir. 1986) and *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).

Diop's Cross-Claim Complaint requests this Court to award him various monetary damages which he describes as "attorney fees, litigation costs, and other expenses," "wages he would have earned under the contract, including back wages," "lost salary" and "compensatory damages" and "punitive damages."  This Court does not have the authority to award Diop the monetary damages he is requesting because according to clearly established legal precedent, federal courts are barred by the Eleventh Amendment from providing monetary relief payable from the state treasury to compensate for past harm.  *See, e.g., Papasan v. Allain*, 478 U.S. 265, 278 (1986); *Batisini v. Aquino*, 890 F.2d 535 (1st Cir. 1989)( award of back pay barred); *Hernandez-Tirado v. Artau*, 874 F.2d 866 (1st Cir. 1989) (back pay barred).  Plaintiff's claims for monetary damages cannot be sustained against a state agency and are due to be dismissed.

ASU is an institution of higher learning operating under the authority and supervision of the State Board of Education, dependant upon funding from the State Treasury and is an arm of the state.   As an "arm of the state" ASU enjoys the same immunity granted to the State of Alabama and its agencies under the Eleventh

Amendment.  *See, Morris v. Wallace Community College-Selma*, 125 F.Supp.2d 1315, 1335 (S.D. Ala. 2001).  As with Wallace Community College, ASU is subject to regulation by the Alabama State Department of Education, a state agency protected by sovereign immunity.  *See, Id*.  ASU is also heavily dependant upon State funding; any judgment against ASU on Diop's claims would ultimately be paid from the State Treasury.  *See, Id*.

Under both federal law and Alabama law, state universities have been conclusively determined to be agencies or instrumentalities of the State for Eleventh Amendment purposes.  *Helton v Hawkins*, 12 F.Supp.2d 1276, 1282 (M.D. Ala. 1998).  Therefore, ASU is absolutely immune from suit under Diop's state-law claims for indemnity and breach of contract.  Likewise, Diop's federal claims under §1983 are also due to be dismissed.

The Supreme Court has clearly stated that Eleventh Amendment immunity "is a specific constitutional bar against hearing even federal claims that otherwise would be within the jurisdiction of the federal courts."  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984).  It is also well-established that Congress did not abrogate the States' Eleventh Amendment immunity in its enactment of §1983.  *Quern v. Jordan*, 440 U.S. 332, 340-45 (1979); *Morris v. Wallace Community College-Selma*, 125 F.Supp.2d 1315, 1334 (S.D. Ala. 2001).  Consequently, Diop's claims pursuant to §1983 are also barred by Sovereign Immunity pursuant to the Eleventh Amendment and ASU is entitled to a judgment in its favor as a matter of law.

II.     **ASU is Entitled to Sovereign Immunity Against All of Diop's Claims Pursuant to Article I, Section 14 of the Alabama Constitution**

Article 1 **'** 14 of the Constitution of Alabama provides that Athe State of

Alabama shall never be made a defendant in any court of law or equity.@  The doctrine of sovereign immunity applies to the State as well as its agencies under established Alabama law.  *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989).  Sovereign immunity is an absolute immunity and a total bar to recovery against a plaintiff=s claims against the State.  As commonly quoted, Athe wall of immunity erected by ' 14 is nearly impregnable.@  *Alabama Department of Environmental Management v. Town of Lowndesboro*, 2005 WL 791239 at * 6 (Ala. Civ. App. 2005).

It is evident from Alabama jurisprudence that this immunity is extended to the State=s educational institutions.  *See Taylor v. Troy State Univ.*, 437 So. 2d 472, 474 (Ala. 1983); *see also Matthews v. Alabama A&M Univ.*, 787 So. 2d 691, 696-97 (Ala. 2000) (holding that summary judgment was properly granted to the university against an employee=s state-law tort claims because it was absolutely immune from suit based upon the doctrine of sovereign immunity).  In *Shoals Community College v. Colagross*, 674 So. 2d 1311, 1314 (Ala. Civ. App. 1995), the Alabama Court of Civil Appeals, stated that A[i]t is undisputed that Shoals was a post-secondary educational institution operating under the authority and supervision of the State Board of Education.  Therefore, it is clear that Shoals is entitled to absolute immunity from suit.  Accordingly, the action against Shoals is barred by sovereign immunity.@

In *Ex Parte Troy University*, 2006 WL 3759341 at *3-4 (Ala. 2006), the Alabama Supreme Court held that Troy University was entitled to immunity "because the University is a State institution of higher learning and entitled to the absolute immunity of § 14."  Likewise, ASU is an institution of higher learning operating under the control and supervision of the State of Alabama.  Any judgment obtained against ASU would be

satisfied from funds originating from the State's treasury.  Therefore, ASU is entitled to sovereign immunity pursuant to the Alabama Constitution against the Diop's claims, and summary judgment should be granted in its favor.

### III.   ASU Is Not Required to Indemnify Diop for Attorneys' Fees Incurred to Defend Against Criminal Charges or Intentional Torts

Agreements to indemnify another for the other's intentional conduct are void as a matter of public policy in the state of Alabama.  *Price-Williams Associates, Inc. v. Magna Bank of Madison County, Ill.*, et al., 631 So.2d 1016, 1019 (Ala. 1994) (*citing, City of Montgomery v. JYD Intern., Inc.*, 534 So.2d 592, 594 (Ala. 1988); *Pruet v. Dugger-Holmes & Associates*, 162 So.2d 613 (Ala. 1964)).  In *Price-Williams*, the Alabama Supreme Court held that even if defendant had authorized plaintiff to commit intentional wrongful acts, defendant would not be liable to indemnify plaintiff for such actions because of the intentional and wrongful nature of the acts.  *Id*.  In the present case, nothing in Plaintiff's employment contract, including the University's established policies and procedures, constitutes an agreement to provide indemnification to any of its employees for any acts or omissions committed outside of the line and scope of their authority for ASU.

In keeping with its obligations under Alabama common law, ASU generally pays the cost of defense and, if necessary, pays any judgments obtained against its employees for activities within the line and scope of their authorities as they advance the goals of ASU.  *See, Creel v. Crim*, 812 So.2d 1259 (Ala Civ. App 2001).  However, it is undisputed that the actions upon which the criminal charges and the civil allegations in this case were brought were not undertaken for the benefit of ASU.  Neither were the

alleged actions of Mr. Diop undertaken within the line and scope of his authority as Director of Physical Plant.

Johnson's criminal rape charges are based upon invents which allegedly occurred at Diop's private residence. Ex. 5, Alabama Uniform Incident/Offense Report. Diop testified that he invited Johnson to his home for his own personal reasons on January 31, 2005, the date of the alleged rape. Ex. 1, Diop's Deposition, p.184, ll. 10-21. Each of the allegations against Diop are based upon alleged intentional acts of misconduct. None of the alleged actions can be interpreted as an attempt by Diop to advance the goals of his employment with ASU. Diop does not and cannot contend that ASU authorized or directed him to invite Plaintiff to his home or to physically touch her in any manner. Id.

Any expenses Diop incurred in defending against criminal charges and civil liability were incurred for his own benefit and were not brought about by any action or inaction by ASU. Generally, indemnitee is precluded from recovering attorney fees where the indemnitee has been required to defend accusations which encompass his own separate wrongful acts. *Jack Smith Enterprises v. Northside Packing Co.*, 565 So.2d 745,746 (Ala. Civ. App. 1990) (citing, *Farr v. Armstrong Rubber Co.,* 288 Minn. 83, 179 N.W.2d 64 (1970); *Piedmont Equipment Co. v. Eberhard Mfg. Co.,* 99 Nev. 523, 665 P.2d 256 (1983)). All accusations in this case against which Diop has been required to defend are based on allegations of his own alleged misconduct; none of his expenses were incurred as a result of ASU's conduct. Therefore, because the defense costs were incurred for Diop's personal benefit, he is not entitled to indemnification. *Id*.

Diop's sole attempt to produce evidence in support of his contention that ASU is obligated to pay the costs of his defense is his unsubstantiated testimony that he heard

that ASU paid similar defense costs for other employees Ex. 1, Diop's Deposition , pp. 93 - 110, ll.10-7).  However, Diop's conclusory allegations do not provide the substantial evidence required to support his claims and defeat ASU's properly supported motion for summary judgment.  *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1551-1552 (11th Cir. 1990).  Diop has utterly failed to produce any evidence to establish that ASU is legally obligated to pay for the costs of his defense against criminal charges or civil liability for intentional torts.  Consequently, ASU is not liable for Diop's defense cost in either the criminal or civil actions against Diop and summary judgment is appropriate as to this Count I of the Cross-Claim Complaint.

## IV.    ASU Did Not Breach Its Employment Contract With Diop

Diop's employment at ASU was, at all times, subject to the terms and conditions set forth in the Non-Academic Staff Handbook.  Ex.2, Notice of Employment.  As Director of Physical Plant, Diop was an Executive Status Employee entitled to serve "at the pleasure of the President or Board of Trustees."  Ex. 3, Non-Academic Staff Handbook, Section 1.2, Employee Service Status.  Therefore, Diop was an at-will employee subject to termination at the will of the President or the Board of Trustees.  *See, Harper v. Winston County*, 892 So.2d 346, 351-352 (Ala 2004).

Under ASU policy, *any* employee, including Diop, is subject to termination for disciplinary reasons if "the employee has engaged in major misconduct involving, but not limited to, those forms of misconduct which are listed in [section 6.0] of the Handbook and which call for termination either for the initial offense or for successive offenses."  Ex. 3, Non-Academic Staff Handbook, Section 6.2, Termination for Disciplinary Reasons.  Contrary to Diop's assertions, ASU had the right to terminate his employment

without awaiting the final disposition of the criminal charges against him.  *See, e.g.,*
*Fowler v. Johnson*, 961 So.2d 122 (Ala. 2006) (finding that employee could be
terminated under "for the good of the County service," upon indictment for criminal
offense despite policy provision enumerating "felony conviction" as a specified ground
for dismissal).  As stated in the Handbook, ASU is especially sensitive to allegations of
sexual harassment involving students; a finding against an employee based upon
allegations of sexual misconduct with a student may result in termination of employment.
Ex. 3, Non-Academic Staff Handbook, Section 6.5, Policies Relating to Sexual
Harassment.

At the time of the EEO Committee's investigation of Plaintiff's allegations,
criminal charges were pending against Diop.  Although the Committee states that it could
not conclusively determine whether Plaintiff had been raped, the Committee clearly
found that Diop pursued and carried on an inappropriate relationship with a student. Ex.
9, Letter to O. Wesley from EEO Committee, dated April 19, 2005.  Further, the
Committee also determined that Diop should not be returned to work in the Physical
Plant Department.  Id.  President Lee received and reviewed the Committee's findings
and determined that Diop's employment should be terminated.  Ex. 10, Memo to
President Lee from O. Wesley, dated April 21, 2005.  Based upon the information
available to the EEO Committee and President Lee, there is ample evidence to support
the determination that there was "just cause" to terminate Diop's employment.
Consequently, Diop was appropriately terminated for disciplinary reasons and ASU did
not breach the parties' employment agreement and ASU is entitled to judgment in its
favor as a matter of law as to Count II of the Cross-Claim Complaint.

### V.    Diop Cannot Maintain a Cause of Action Under 42 USC 1983

#### a.    ASU is not a "person" under §1983

Diop's claims for violations of his Fifth and Fourteenth Amendment due process rights pursuant to §1983 are wholly without merit.  As set forth above, ASU is an arm of the State of Alabama and any suit against it is a suit against the State.  As a state agency, ASU is not a person as defined in 42 U.S.C. §1983 and may not be sued under its provisions.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).  Further, Diop asserts claims for compensatory and punitive damages which are clearly and unequivocally prohibited against the State under the Eleventh Amendment to the United States Constitution. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89,100 (1984); *Helton v. Hawkins*, 12 F.Supp.2d 1276, 1282 (M.D. Ala. 1998).  It is equally well established that Congress did not abrogate the states' sovereign immunity when it enacted §1983.  *Quern v. Jordan*, 40 U.S. 332, 340-345 (1979); *Edelman v. Jordan*, 415 U.S. 651 (1974).  Consequently, Diop's claims in Count II are frivolous and cannot survive on the face of his allegations.  ASU is clearly entitled to summary judgment in its favor as to Count II of the Cross-Claim Complaint.

#### b.    Diop Did Not Have a Property Interest in His Continued Employment

Even if the Court determines that ASU is subject to suit pursuant to §1983, Diop's claims are frivolous.  Section 1983 does not create any rights on its own; it merely provides for the enforcement of previously existing rights.  *Helton*, 12 F.Supp 1276 at 1281 (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Diop asserts that he was terminated without being provided adequate due process proceedings.  In order to state a claim for relief arising from the denial of due process, Diop must first establish that he

had a property interest in his job and thereby was entitled to the protections of due process. *See, Id*. at 1281-1282. The undisputed facts in this case demonstrate that Diop was not entitled to due process prior to the termination of his employment.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Further, this property interest must come from an independent source. *Id*. Merely being employed by a state agency does not establish a property interest in continued employment. *Helton*, at 1282. Indeed, a state employee who may be discharged at will does not have a property interest in continued employment and is not entitled to due process protections. *Id*. (citing *Blanton v. Griel Memorial Psychiatric Hosp.*, 758 F.2d 1540, 1542 (11th Cir. 1985)).

As set forth above, ASU policy is clear and consistent that Executive Status Employees do not have the right to acquire Permanent Employee status. Ex. 3, Non-Academic Staff Handbook, Section 1.0 Classification and Employee Service Status. Diop does not dispute that he was an Executive Status Employee. Ex. 1, Diop's Deposition , p.110, ll.8-19, p.112, ll. 10-23. Consequently, any expectation of permanent employment was a mere unilateral expectation which is wholly unsupported by ASU's policies. Diop cannot establish that he had a property interest in the Executive Status position of Director of Physical Plant; therefore, ASU is entitled to judgment in its favor as a matter of law as to Count III of Diop's Cross-Claim Complaint.

**CONCLUSION**

Diop's claims against Alabama State University are absolutely barred by the doctrine of Sovereign Immunity pursuant to the Eleventh Amendment to the United States Constitution and Article I, 14 of the Alabama Constitution of 1901. This Court lacks jurisdiction to grant Diop the requested monetary relief. Even if ASU is not immune from suit as to each and every claim asserted against it, Diop has not produced any evidence to support his claims.

ASU is not legally required to indemnify Diop for attorneys' fees incurred in his attempt to defend himself against criminal charges and charges of intentional misconduct. Further, Diop has failed to prove that ASU breached its employment agreement with him. Diop is not entitled to maintain an action against ASU under §1983 because ASU is not a person within the meaning of the statute. Additionally, Diop has failed to produce any evidence to prove that he had a property interest in continued employment with ASU and was entitled to due process protections.

Additionally, because Diop's claims pursuant to §1983 are without merit, Defendant is respectfully requests this Court to grant it an award of it's attorneys fees and costs as the prevailing party should this Court grant its motion for summary judgment pursuant to 42 USC §1988.

For the foregoing reasons, ASU is entitled to summary judgment in its favor as to each and every count of Diop's Cross-Claim Complaint.

Respectfully Submitted,


_/s/ LaTasha A. Meadows_____
**KENNETH L. THOMAS (THO 043)**
**LaTASHA A. MEADOWS (MEA020)**


**OF COUNSEL:**
**THOMAS, MEANS, GILLIS & SEAY**
3121 Zelda Court (36106)
P.O. Box 5058
Montgomery, Alabama 36103-5058
(334) 270-1033 (phone)
(334) 260-9396 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon the following via this Court's electronic filing system this the 30th day of May, 2008.

David Arendall, Esq.
Allen D. Arnold, Esq.
ARENDALL & ASSOCIATES
2018 Morris Avenue, Third Floor
Birmingham, AL 35203

Donald Gordon Madison, Esq.
Law Offices of Donald Gordon Madison
418 Scott Street
Montgomery, AL 36104

_/s/ LaTasha A. Meadows_____
**OF COUNSEL**

FREEDOM COURT REPORTING

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JALONDA JOHNSON,            )
                           )
          Plaintiff,       )
                           )
-vs-                       )     CASE NO.:
                           )
ALABAMA STATE UNIVERSITY ) 02:07-CV-101-MEF
                           )
and ANWAR DIOP,            )
                           )
          Defendants.      )

          S T I P U L A T I O N S

          IT IS STIPULATED AND AGREED, by

and between the parties through their

respective counsel, that the deposition of:

          ANWAR K. DIOP,

may be taken before Belinda S. Brewster,

Commissioner and Notary Public for the State

of Alabama at Large, on the 13th day of May,

2008, commencing at approximately 11:55 a.m.,

at the law offices of Thomas, Means, Gillis &

Seay, P.C., 3121 Zelda Court, Montgomery,

Alabama; said deposition taken pursuant to

the Federal Rules of Civil Procedure.

          IT IS STIPULATED AND AGREED, by

Exhibit

1

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING.

Page 2

1    and between the parties through their
2    respective counsel, that the reading of and
3    signature to the deposition by the witness is
4    waived, said deposition to have the same
5    force and effect as if full compliance had
6    been had with all laws and rules of Court
7    relating to the taking of depositions.
8         IT IS STIPULATED AND AGREED that
9    it shall not be necessary for any objections
10   to be made by counsel to any questions,
11   except as to form or leading questions, and
12   that counsel for the parties may make
13   objections and assign grounds at the time of
14   the trial, or at the time said deposition is
15   offered in evidence, or prior thereto.
16        In accordance with Rule 5(d) of
17   The Alabama Rules of Civil Procedure, as
18   amended, effective May 15, 1988, I, Belinda
19   S. Brewster, am hereby delivering to Kenneth
20   L. Thomas the original transcript of the oral
21   testimony of Anwar K. Diop taken on the 13th
22   day of May, 2008, along with exhibits.
23        Please be advised that this is

Page 4

1         A P P E A R A N C E S
2    DONALD GORDON MADISON, Attorney-at-Law, of
3         the LAW OFFICES OF DONALD GORDON
4         MADISON, 418 Scott Street,
5         Montgomery, Alabama 36104;
6         appearing as counsel for Anwar K.
7         Diop.
8    LaTASHA A. MEADOWS, Attorney-at-Law, of the
9         law firm of THOMAS, MEANS, GILLIS
10        & SEAY, P.C., 3121 Zelda Court,
11        Montgomery, Alabama 36106;
12        appearing as counsel for the
13        Defendant Alabama State
14        University.
15   ALSO PRESENT:
16   TAMARA T. VENICE, PARALEGAL, THOMAS, MEANS,
17        GILLIS & SEAY, P.C.
18
19
20
21
22
23

Page 3

1    the same and not retained by the Court
2    Reporter, nor filed with the Court.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1              I N D E X
2    Witness:                    Page
3    ANWAR K. DIOP
4         Examination by Ms. Meadows        8
5         Examination by Mr. Madison       298
6         Further Examination by Ms. Meadows  319
7    - - - - - - - - - - - - - - - - - - - -
8              E X H I B I T S
9    Exhibit No.   Description         Page
10   1    Notice of Deposition        13
11        Dated 5-6-08 (2 Pages)
12   2    Job Posting, Director of    80
13        Physical Plant
14   3    Application for Employment  82
15        Dated 5-20-04 (4 Pages)
16   4    Notice of Employment Dated  87
17        10-14-04
18   5    Excerpts from Nonacademic   110
19        Staff Handbook (15 Pages)
20   6    Budget Adjustment Request   129
21        Form
22
23

2  (Pages 2 to 5)

17249641-2df0-4c36-b999-32292148c606

Page 6

1          E X H I B I T S (Cont'd.)
2     Exhibit No.   Description          Page
3        7      Alltel Phone Records for   146
4               Linda Johnson, 12-04,
5               1-05 and 2-05 (25 Pages)
6        8      Cingular Phone Records    269
7               for Anwar Diop, 1-3-05
8               through 2-2-05 (4 Pages)
9        9      Letter Dated 2-11-05     222
10              with Attachment (2 Pages)
11       10     Letter Dated 2-11-05     223
12       11     Sign-In for Meeting with  224
13              Employee Dated 2-11-05
14       12     Memorandum Dated 2-25-05  239
15       13     Memorandum Dated 3-18-05  241
16       14     Letter Dated 5-6-05      264
17       15     Letter Dated 5-13-05     269
18              (3 Pages)
19       16     Letter Dated 6-22-05     270
20       17     Letter Dated 8-25-05     272
21       18     Letter Dated 9-8-05      280
22              (3 Pages)
23

Page 7

1             E X H I B I T S
2     Exhibit No.   Description          Page
3        19     Letter Dated 9-18-06     280
4               (3 Pages)
5        20     Letter Dated 9-30-05     282
6               (2 Pages)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1          I, Belinda S. Brewster, as
2     Commissioner and Notary Public for the State
3     of Alabama at Large, certify that pursuant to
4     Rule 30 of the Alabama Rules of Civil
5     Procedure and the foregoing stipulations of
6     counsel, there came before me at the law
7     offices of Thomas, Means, Gillis & Seay,
8     P.C., 3121 Zelda Court, Birmingham, Alabama
9     36106, on the 13th day of May, 2008,
10    commencing at approximately 11:55 a.m., Anwar
11    K. Diop, witness in the above cause, for oral
12    examination and the following proceedings
13    were had:
14             ANWAR K. DIOP,
15    a witness of lawful age, having sworn or
16    affirmed to tell the truth, the whole truth,
17    and nothing but the truth, was examined and
18    testified as follows:
19    EXAMINATION BY MS. MEADOWS:
20       Q.    Good afternoon, Mr. Diop.  How
21    are you?
22       A.    I'm good.  How are you?
23       Q.    I'm doing okay.  My name is

Page 9

1     LaTasha Meadows.  I'm one of the attorneys
2     for Alabama State University.  This is Ms.
3     Tamara Venia.  She's my paralegal, and she's
4     going to be observing today.
5              And we are here today to take
6     your deposition because you filed a
7     crossclaim lawsuit against my client, Alabama
8     State University.
9              Do you understand that to be
10    correct?
11       A.    Yes.
12             MR. MADISON:  Let me stop you.
13    He said uh-huh (affirmative) while ago.
14    Answer either yes or no.  Sometimes --
15             THE WITNESS:  No.  I said yes.
16             MR. MADISON:  Before that,
17    though, you said uh-huh (affirmative)
18    earlier.
19             THE WITNESS:  Oh.
20             MS. MEADOWS:  I'll cover that in
21    my instructions.  We'll get acquainted.
22       Q.    Have you ever given a deposition
23    before, Mr. Diop?

3  (Pages 6 to 9)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 10 | |
|---|---|
| 1 | A.    I have. |
| 2 | Q.    When was that? |
| 3 | A.    I really could not tell you the |
| 4 | exact date, but I've given a deposition. |
| 5 | Q.    Okay.  Give me an approximate |
| 6 | timeline. |
| 7 | A.    Ten years ago. |
| 8 | Q.    Okay.  What was that matter |
| 9 | regarding? |
| 10 | A.    An issue related to divorce and |
| 11 | settlement. |
| 12 | Q.    Well, as we move forward today, |
| 13 | it's very important that you speak loudly and |
| 14 | clearly enough for everyone to hear what |
| 15 | you're saying. |
| 16 |        I know I have a problem. |
| 17 | Sometimes I talk a little soft.  So, we'll |
| 18 | both remind each other to speak up.  If you |
| 19 | can't hear what I'm saying, just ask me to |
| 20 | repeat my question.  It's not a problem.  And |
| 21 | if I can't hear you, I'll ask you to repeat |
| 22 | yourself. |
| 23 | A.    Okay. |

| Page 11 | |
|---|---|
| 1 | Q.    If at any time you don't |
| 2 | understand a question that I've asked you, |
| 3 | please, let me know, and I will try to |
| 4 | rephrase the question so that you can |
| 5 | understand it. |
| 6 |        Otherwise, I will just assume |
| 7 | that you understand what I'm asking you. |
| 8 |        Is that okay with you? |
| 9 | A.    That's okay with me. |
| 10 | Q.    That sounds reasonable to you? |
| 11 | A.    Reasonable. |
| 12 | Q.    Also, it's very important that |
| 13 | you give verbal responses to the questions. |
| 14 | Although I can see you right now and I can |
| 15 | tell that if you say uh-huh (affirmative) and |
| 16 | nod your head that you mean yes or if you say |
| 17 | huh-uh (negative) and shake your head you |
| 18 | mean no. |
| 19 |        Later on on the record when |
| 20 | we're just looking at it on paper, it may not |
| 21 | be as clear.  So, try to answer a complete |
| 22 | yes or no answer. |
| 23 | A.    Okay. |

| Page 12 | |
|---|---|
| 1 | Q.    And, also, we will try to avoid |
| 2 | cutting each other off.  I know it's a habit |
| 3 | in normal conversation.  I do it.  Don does |
| 4 | it.  I'm sure you probably do it, too. |
| 5 |        We'll try to avoid talking over |
| 6 | each other today so that the record can |
| 7 | remain clear. |
| 8 |        Are you on any medication that |
| 9 | would keep you from being able to understand |
| 10 | my questions today? |
| 11 | A.    No. |
| 12 | Q.    And you are not on any |
| 13 | medications that would in any way inhibit |
| 14 | your ability to answer? |
| 15 | A.    No. |
| 16 |        MS. MEADOWS:  We'll pause for a |
| 17 | moment. |
| 18 |        (Brief recess.) |
| 19 | Q.    So, we covered that you're not |
| 20 | on any medication? |
| 21 | A.    Yes. |
| 22 | Q.    Okay.  Are you under the |
| 23 | influence of any drugs or alcoholic beverages |

| Page 13 | |
|---|---|
| 1 | today? |
| 2 | A.    No. |
| 3 |        (Whereupon, said document was |
| 4 |        marked for identification as |
| 5 |        Exhibit No. 1 to the deposition |
| 6 |        of Anwar K. Diop.) |
| 7 | Q.    I'm going to show you a copy of |
| 8 | a notice of deposition.  That's just a notice |
| 9 | requesting your presence here today, correct? |
| 10 | A.    That's my understanding. |
| 11 | Q.    And that notice is set for |
| 12 | today, May 13th, at 10:00 o'clock a.m., |
| 13 | correct? |
| 14 | A.    That's correct. |
| 15 | Q.    At the address where we're |
| 16 | presently located? |
| 17 | A.    At the address we're currently |
| 18 | located? |
| 19 | Q.    Right. |
| 20 | A.    Yes. |
| 21 | Q.    Thank you. |
| 22 | A.    However, for the record, this is |
| 23 | the first time I've seen that notice. |

4 (Pages 10 to 13)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 14

```
1      Q.    We're going to cover that.  Is
2  there any particular reason you were unaware
3  that your presence was requested today at
4  10:00 o'clock?
5      A.    Well, I think there was just a
6  misunderstanding as to the date and time.
7      Q.    What date and time were you
8  under the impression --
9      A.    I thought it was for the 14th.
10     Q.    You thought it was for the 14th?
11     A.    Yes.
12     Q.    Okay.  Mr. Diop, would you state
13 your full name and spell it for the record,
14 please.
15     A.    Anwar Diop.  A-N-W-A-R.  The
16 last name is D as in David, I-O-P as in Paul.
17     Q.    Do you have a middle name, Mr.
18 Diop?
19     A.    Kwesi, K-W-E-S-I.
20     Q.    Do you have a nickname or any
21 other name that you are known by?
22     A.    No, I don't.
23     Q.    Have you ever been known by any
```

Page 15

```
1  other name other than Anwar Diop?
2      A.    Andrew.
3      Q.    Okay.  When were you known by
4  Andrew?
5      A.    Prior to changing my name.
6      Q.    When was that?
7      A.    '91 roughly.
8      Q.    Did you -- when you were known
9  by Andrew, did you still have the same middle
10 name and last name?
11     A.    No.
12     Q.    Okay.  What --
13     A.    Hold it.  Excuse me.  Did I have
14 the same middle name?
15     Q.    Were you still --
16     A.    Oh, yeah.
17     Q.    Were you Andrew Kwesi Diop?
18     A.    No.
19     Q.    What was your full name?
20     A.    Andrew Gray.
21     Q.    Okay.  And you were known as
22 Andrew Gray from the time of your birth until
23 1991?
```

Page 16

```
1      A.    Yes.
2      Q.    Have you been known by any other
3  name other Andrew Gray or Anwar Diop?
4      A.    No.
5      Q.    Have you ever been known by the
6  name Andrew Gene?
7      A.    No.
8      Q.    Or Andrew Sean?
9      A.    No.
10     Q.    Or Andrew Sean Gray?
11     A.    Andrew Sean Gray.  Sean is my
12 middle name.
13     Q.    So, you did have a middle name
14 when you were --
15     A.    Yes.
16     Q.    -- Andrew Gray?
17          And you were known by Andrew
18 Sean Gray?
19     A.    Uh-huh (affirmative).
20     Q.    Have you ever been known by the
21 name John Oren?
22     A.    No.
23     Q.    Have you ever been known by the
```

Page 17

```
1  name John Gray?
2      A.    No.
3      Q.    Have you ever been known as
4  Johnny Lee Gray?
5      A.    No.
6      Q.    Or Jonathan Oren Gray?
7      A.    No.
8      Q.    Have you ever been known as Sam
9  Mitchell?
10     A.    No.
11     Q.    Have you ever been known by the
12 name Sean Andrew Watt?
13     A.    No.
14     Q.    Or Sean Mitchell?
15     A.    No.
16     Q.    Have you been known as Sean
17 Gray?
18     A.    Well, if somebody abbreviates
19 the name, but I've never been -- you know.
20     Q.    When you were known as Andrew
21 Sean Gray, would you spell your middle name
22 Sean?
23     A.    S-E-A-N.
```

5 (Pages 14 to 17)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 18

1    Q.    Have you ever been known by the
2    name Thomas Gray?
3    A.    No.
4    Q.    How old are you, Mr. Diop?
5    A.    Forty.
6    Q.    Forty?
7    A.    (Whereupon, the witness
8    indicated an affirmative response by nodding
9    his head up and down.)
10    Q.    What is your date of birth?
11    A.    July 14th.
12    Q.    What year?
13    A.    '67.
14    Q.    Have you ever used any other
15    date of birth?
16    A.    No.
17    Q.    Is your Social Security number
18    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?
19    MR. MADISON: Object to form. I
20    object to placing that on the record.
21    MS. MEADOWS: Are you
22    instructing him not to answer?
23    MR. MADISON: No. I'd prefer to

Page 19

1    give that answer to you under a protective
2    order in that I don't want his Social
3    Security number for privacy reasons published
4    in something that could become a matter of
5    record and available to the public.
6    MS. MEADOWS: I will agree that
7    -- if he will provide that information to me
8    following this deposition, I will agree that
9    that can be removed from the record.
10    MR. MADISON: You want to go off
11    the record? And we'll go ahead and give it
12    to you now.
13    MS. MEADOWS: That's okay. I
14    think I'll remember that.
15    Q.    What is the address of your
16    present residence, Mr. Diop?
17    A.    3026 Bryn.
18    Q.    Brent?
19    A.    Bryn, B-R-Y-N, Road.
20    Q.    What city and state is that
21    located in?
22    A.    It's in Montgomery.
23    Q.    Okay.

Page 20

1    A.    36111.
2    Q.    How long have you lived that
3    address?
4    A.    A year July 10th.
5    Q.    So, at least since July 10th,
6    2007?
7    A.    That's correct.
8    Q.    What is your current telephone
9    number?
10    A.    205-616-9018.
11    Q.    What was your address prior to
12    the Bryn Road address?
13    A.    3112 Wenonah, W-E-N-O-N-A-H.
14    And that's Drive. Birmingham, Alabama 35211.
15    Q.    And when did you move into that
16    residence?
17    A.    I can't tell you the specific
18    date. It's a family home. So, it's been
19    since I've been born.
20    Q.    Okay. How long did you live
21    there?
22    A.    Since 2004.
23    Q.    And you moved out on July 10th,

Page 21

1    2007?
2    A.    Correct. If you can call it
3    that.
4    Q.    Prior to 2004, where did you
5    reside?
6    A.    Florida.
7    Q.    And what was that address?
8    A.    416 East Magnolia Drive,
9    Tallahassee, Florida, 35211 -- I mean, 32301.
10    Q.    And how long did you live at
11    that address?
12    A.    Probably ten -- ten years or so.
13    Fifteen maybe. More like 15.
14    Q.    Where was your residence on
15    January 31st, 2005?
16    A.    416 -- hold on. 412 Hull.
17    Q.    And that's Hull Street in
18    Montgomery, Alabama?
19    A.    Correct.
20    Q.    What was your zip code at that
21    time?
22    A.    I think 36104.
23    Q.    When did you move into that

6 (Pages 18 to 21)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 22

1  address?
2     A.    It was actually an apartment
3  that I had for the times that I was here in
4  Montgomery, but my primary address was 3112.
5  So, I would spend about three days or so,
6  three or four days, from time to time at that
7  address.
8     Q.    Okay.  What I'm asking you now
9  is what were the dates that you -- when did
10 you first acquire a right to reside at 412
11 Hull Street?
12    A.    Probably around December.
13    Q.    December of?
14    A.    December 2004.
15    Q.    When did you terminate that
16 leasing arrangement?
17    A.    April 2005.
18    Q.    Did you have a home telephone
19 number at that address?
20    A.    No.
21    Q.    What was your cellular telephone
22 on number January 31st, 2005?
23    A.    I don't even remember.

Page 23

1     Q.    But it is different from your
2  present telephone number?
3     A.    My -- I had a work phone that I
4  used primarily.  I don't remember what that
5  number was.
6     Q.    So, the cell number that you had
7  on January 31st, 2005, was an Alabama State
8  University telephone?
9     A.    Correct.
10    Q.    And that was issued to you for
11 -- because you were director of physical
12 plant?
13    A.    Correct.
14    Q.    And you used that as your
15 primary telephone?
16    A.    That was my primary phone.
17    Q.    Okay.
18    A.    And I also maintained a personal
19 line as well.
20    Q.    What was your personal line
21 number on January 31st, 2005?
22    A.    386 is the area code, 546-0160.
23    Q.    Mr. Diop, are you presently

Page 24

1  married?
2     A.    Yes.
3     Q.    What is your spouse's name?
4     A.    Cynthia Diop.
5     Q.    When and where were you married?
6     A.    In Montgomery, Alabama, April
7  13th, 2007.
8     Q.    And your spouse resides with you
9  at the Bryn Road address?
10    A.    That's correct.
11    Q.    Is your spouse employed?
12    A.    Yes.
13    Q.    Where is she employed?
14    A.    The State of Alabama.
15    Q.    Which department?
16    A.    Cosmetology.
17    Q.    What's her job title?
18    A.    (Inaudible) or inspector.
19    Q.    Something like that?
20    A.    Yeah, something like that.
21    Q.    Do you know how long she's
22 worked there?
23    A.    About seven years.

Page 25

1     Q.    Have you been married
2  previously?
3     A.    No.
4     Q.    Do you have any children, Mr.
5  Diop?
6     A.    Yes.
7     Q.    How many?
8     A.    One.
9     Q.    You have a daughter, correct?
10    A.    Correct.
11    Q.    What's her name?
12    A.    Imani Diop.
13    Q.    Would you spell her name for the
14 record, please.
15    A.    I-M-A-N-I.  The last name the
16 same as mine.
17    Q.    How old is Imani?
18    A.    Eighteen.
19    Q.    And where does Imani reside?
20    A.    Tallahassee, Florida.
21    Q.    Do you have any relatives who
22 live in Montgomery, Alabama?
23    A.    I do, but I don't know them.

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1    Q.    Okay.  Do you know what relation
2  they are to you?
3    A.    They're my grandfather's --
4  they're on my grandfather's side.  I mean,
5  like first cousins, aunt.  We have just never
6  met.
7    Q.    Do you know their names?
8    A.    No.  One's name is Emma.
9    Q.    What is her last name?
10    A.    Robinson is the last name.
11    Q.    And is that the family last
12  name?
13    A.    My grandfather's side.
14    Q.    By that I mean your --
15    A.    Yeah.  On my granddad's side,
16  yes.
17    Q.    On your granddad's side, the
18  family last name is Robinson, correct?
19    A.    Correct.
20    Q.    So, there's a chance you could
21  be related to a number of Robinsons in the
22  area?
23    A.    That's a possibility.  That's a

Page 27

1  strong possibility.
2    Q.    Yeah.  I understand.  I have a
3  big family, too.
4    Q.    Where did you attend high
5  school?
6    A.    Chicago Vocational.
7    Q.    And that was in Chicago,
8  Illinois?
9    A.    Correct.
10    Q.    When did you graduate?
11    A.    That's been so long ago.  In
12  '84.
13    Q.    Now, I know you attended Florida
14  A&M University; is that correct?
15    A.    Yeah.
16    Q.    When did you attend Florida A&M?
17    A.    I started in '85.
18    Q.    I'm sorry.  Did you say '85?
19    A.    Yes.
20    Q.    And when did you finish?
21    A.    '91.
22    Q.    And when you finished, you
23  obtained a degree?

Page 28

1    A.    Yes.
2    Q.    What was your degree in?
3    A.    I obtained a degree in
4  accounting and in civil and construction
5  engineering.  A Bachelor of Science in both.
6    Q.    Right.  So, you received a dual
7  degree?
8    A.    Correct.
9    Q.    Other than FAM U., have you
10  attended any other colleges or universities?
11    A.    Yes, I have.
12    Q.    Okay.  One at a time, tell me
13  which university did you attend.
14    A.    I attended Southern University
15  Law School for a year and a half until my
16  daughter.
17    Q.    What year did you enroll in
18  Southern?
19    A.    I really don't remember.  I
20  really don't.  It was -- it had to be
21  sometime around '92, '93, something like
22  that.
23    Q.    And you said you decided to

Page 29

1  leave law school after your daughter was
2  born?
3    A.    Well, I had to come back to
4  Florida.  So, what I did was I transferred to
5  the University of Florida and --
6    Q.    So, the University of Florida
7  Law School?
8    A.    Yes.  And I attempted to
9  continue that course.  However, finances kind
10  of prevented it.
11    Q.    Do you know when you started at
12  the University of Florida?
13    A.    A year and a half after -- after
14  I attended Southern.  So, if it was between
15  -- I would say in '94 sometime, around that
16  year.
17    Q.    But you later withdrew for
18  financial reasons?
19    A.    That's correct.
20    Q.    Other than Florida A&M
21  University, Southern University Law School,
22  and the University of Florida School of Law,
23  did you attend any other college or

8  (Pages 26 to 29)

17249641-2df0-4c36-b999-32292148c606

Page 30

1    university?
2        A.    I did a special engineering
3    program at the University of Alabama.
4        Q.    When was that?
5        A.    Huntsville.  That was actually
6    in eighty -- '85 or so.  It was a summer.
7        Q.    And you said that was at the
8    University of Alabama in Huntsville?
9        A.    Right.
10        Q.    Did you receive any type of
11    degree or certificate?
12        A.    Certificate of completion.
13        Q.    And that was a sort of
14    precollege summer program?
15        A.    It was pre-engineering, yeah.
16        Q.    And that's offered to students
17    who are planning to major in engineering say
18    in the upcoming --
19        A.    Correct.
20        Q.    -- semester and enrolled as a
21    freshman in another university?
22        A.    Correct.
23        Q.    Were you ever disciplined or

Page 31

1    asked to leave any of the universities that
2    you attended?
3        A.    No.
4        Q.    Did you receive any honors or
5    awards?
6        A.    I mean, I've been on -- you
7    know, grade point average wise, I've been on
8    the honor roll, the Dean's list.
9        Q.    Where was that?
10        A.    Florida A&M.
11        Q.    Do you remember --
12        A.    Exactly when?  Now, that one --
13        Q.    Well, approximately when.
14        A.    -- I can tell you.  That was in
15    '89, yeah.
16        Q.    And that was an honor issued by
17    the university?
18        A.    Correct.
19        Q.    And recognized by the Dean's
20    office, correct?
21        A.    Correct.
22        Q.    Any other honors or awards?
23        A.    In school?

Page 32

1        Q.    Yeah.  Something you want to
2    tell me about.
3        A.    Well, I mean -- I mean, I've
4    received different type accolades, but -- you
5    know.
6        Q.    Okay.
7        A.    But nothing significant.
8        Q.    Let's talk about your employment
9    history.
10        A.    Okay.
11        Q.    Tell me about your employment
12    prior to coming to work at Alabama State
13    University.
14        A.    Well, I worked in the private
15    industry for a construction and design firm.
16        Q.    What construction --
17        A.    BE&K.
18        Q.    When did you start working at
19    BE&K?
20        A.    '91 or '92.
21        Q.    How long did you work there?
22        A.    Until taking the position at
23    Alabama State.

Page 33

1        Q.    So, until 2004?
2        A.    Yeah.
3        Q.    When you went to law school, did
4    you take a leave of absence from BE&K?
5        A.    No.  I actually -- I worked on a
6    project in Palatka, Florida.  I tried to kind
7    of maintain both, which is one of the reasons
8    I had problems because I couldn't do it.  And
9    it was actually something that I tried to do
10    in privacy.
11        Q.    Okay.  So, while you were
12    working for BE&K, when you went to the
13    University of Florida School of Law, you
14    worked on a project in Palatka, Florida?
15        A.    Initially, yeah.
16        Q.    What years were you working on
17    the project in Palatka, Florida?
18        A.    Hold up.  Let me see something.
19    What date did I say I started working at
20    BE&K?
21        Q.    You said 1991 or 1992.
22        A.    No.  That's incorrect.  That's
23    not correct.  That's not correct.  That's not

FREEDOM COURT REPORTING

Page 34

1 correct.
2    Q.    Okay.  Well, what is the correct
3 date?
4    A.    It had to be -- it had to be
5 probably around '94, I think, or something
6 like that.
7    Q.    Okay.
8    A.    And I would have to refresh my
9 memory of just the specific dates of things.
10   Q.    So, when were you working on the
11 Palatka project?
12   A.    That was immediately -- I was
13 immediately assigned to the Palatka project
14 when I left Louisiana.  So, that was around
15 -- it was around that time.  It was around --
16 it was around '94, something like that, more
17 or less.
18   Q.    And that would be the Georgia
19 Pacific Cluster Rules Project?
20   A.    Correct.
21   Q.    Where you were the field
22 engineer?
23   A.    Uh-huh (affirmative).

Page 35

1    Q.    Okay.
2          MR. MADISON:  And is that a yes
3 or --
4          THE WITNESS:  Yes.
5          MS. MEADOWS:  Thank you.
6    Q.    Who was your immediate
7 supervisor?
8    A.    My immediate supervisor would
9 have been the project superintendent, but my
10 -- but I reported to the construction
11 manager, which was Kenny Smith.
12   Q.    And as the engineer, were you
13 responsible for overseeing any employees?
14   A.    Yes.
15   Q.    How many employees did you
16 supervise?
17   A.    Direct supervision?
18   Q.    Yes.
19   A.    Probably around 15 or 20.
20 Indirect, probably about 200.
21   Q.    What were your duties and
22 responsibilities in that position?
23   A.    Project oversight, field issues,

Page 36

1 scheduling, budgetary, interfacing between
2 client and contractor, value engineering,
3 anything that related to project activities,
4 be it progression and scheduling, quality and
5 performance of work, reviewing of blueprints
6 and designs, any interferences, be it
7 fabrication or delivery or modifications.
8    Q.    And just so that I keep the
9 record clear, this was a project of BE&K that
10 you were working on.  So, BE&K was your
11 employer during this time, correct?
12   A.    That's correct.
13   Q.    Okay.  When did that project
14 terminate?
15   A.    Maybe 14 or 15 months after it
16 started.  I can't tell you an exact date.
17   Q.    So, sometime between --
18   A.    I cannot tell you an exact date.
19   Q.    You said you started working on
20 it in 1994 or thereabouts, correct?
21   A.    Roughly.
22   Q.    Roughly?
23   A.    Yeah.

Page 37

1    Q.    So, roughly the project ended
2 perhaps in 1996?
3    A.    Fourteen or 15 months later,
4 yeah.
5    Q.    Which could have been sometime
6 in 1996?
7    A.    It could have been.  It could
8 have been.
9    Q.    What did you do after that
10 project in 1996?
11   A.    West Virginia and Kentucky power
12 plant projects.  I did two for DINergy, which
13 was -- I was still employed by BE&K.
14 However, I performed the same duties on first
15 the Riverside Project and then the --
16 Foothills was the next.
17   Q.    So, when did you go to the
18 Riverside Project?
19   A.    Right after -- within days after
20 leaving Georgia Pacific.  As a matter of
21 fact, I think I had 72 hours or so.
22   Q.    So, you don't have an
23 approximate date?

10  (Pages 34 to 37)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 38

1    A.    Not really. I mean, I really
2   don't.
3    Q.    Okay.
4    A.    At best I would be guessing.
5    Q.    And you don't remember when you
6   began the DINergy Foothills Project?
7    A.    They were right next door. So,
8   they kind of overlapped as a matter of fact.
9   As a matter of fact, before I closed out the
10  Riverside, the Foothills Project had already
11  began.
12   Q.    I'm just trying to get the dates
13  when you --
14   A.    I understand. And I wish I -- I
15  mean, I just --
16   Q.    I understand. Over time the
17  dates run --
18   A.    Yeah. I mean, they just all run
19  together. Really.
20   Q.    But you were chief field
21  engineer representing BE&K on both projects,
22  correct?
23   A.    Correct.

Page 39

1    Q.    And is it fair for me to say
2   that you did basically the same job duties
3   that you had done at Georgia Pacific?
4    A.    Well, I was field engineer
5   initially at Georgia Pacific. I kind of --
6   actually, my duties increased on those two
7   projects, and there were several reasons for
8   that.
9    Q.    Okay. Would you consider, in
10  essence, that was a promotion then?
11   A.    I wasn't getting promoted money
12  wise. So, no. I don't consider --
13   Q.    Okay. It was an escalation of
14  responsibility?
15   A.    A tremendous escalation of
16  responsibility.
17   Q.    And what did you do after that,
18  after the Foothills Project?
19   A.    Well, I was involved -- it was
20  an accident. The turbine collapsed. So, I
21  was injured, had to go through surgery, had
22  to go through rehabilitation. Then I went to
23  the Birmingham office.

Page 40

1    Q.    What year was that that you were
2   injured?
3    A.    Sometime probably around
4   2001-2002, something like that.
5    Q.    And that was at the Foothills
6   Project?
7    A.    Correct. It was at -- yeah.
8    Q.    And you said following that you
9   moved to --
10   A.    Well, I was -- for a short
11  period of time I was considered on -- what we
12  call on the bench. And that was just a
13  courtesy that they gave me.
14   Q.    Okay.
15   A.    And then I went and moved --
16  they brought me into Birmingham, which is --
17  which is one of the reasons I ended up being
18  there full-time.
19   Q.    So, when did you -- for what
20  period of time were you on the bench as you
21  called it?
22   A.    Probably about -- I think I came
23  into Birmingham maybe sometime around May or

Page 41

1   June or something like that. Yeah. So,
2   maybe five or six months or something like
3   that.
4    Q.    Okay.
5    A.    Jefferson County would be the
6   next project.
7    Q.    Right. That was, again, a BE&K
8   project where you --
9    A.    That's correct.
10   Q.    And this time you were the
11  project engineer?
12   A.    Correct. That was over the
13  storm water and water treatment facilities
14  because Jefferson County was kind of out of
15  compliance.
16   Q.    Okay.
17   A.    And from there to Alabama State.
18   Q.    When were you over their
19  Circleville Ohio Project? When was that?
20   A.    I forgot all about Circleville.
21  That's DuPont. Yeah.
22   Q.    Yes, the DuPont project.
23   A.    I forgot all about that.

11 (Pages 38 to 41)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 42

1    You know what, before going to
2  Jefferson County I went to DuPont. But it
3  was only for -- it was only for a few months.
4  So, that's -- yeah. That was a captime
5  facility. Yeah. I forgot all about that.
6    Q.  Was that before or after you
7  were injured?
8    A.  That was right after. Right
9  after. Yeah. And then I went to Birmingham
10  and then Jefferson County. I totally forgot
11  about Circleville.
12    Q.  Okay. What was your reason for
13  -- well, what was your last day at BE&K?
14    A.  October. As a matter of fact,
15  it was either -- it was either the first of
16  November or the last of October.
17    I know it was within weeks -- a
18  week or so before I reported to Alabama
19  State. And that's 2004. That I know because
20  I was tired. I hadn't had a break.
21    Q.  What was your reason for leaving
22  BE&K?
23    A.  Well, I thought it would be -- I

Page 43

1  thought it to be a good opportunity. And one
2  of -- a major factor, too, I was just ready
3  to get off the road.
4    And, you know, I wanted to
5  transition myself, you know, to the point
6  where I could actually get married, have a
7  family, just be in one place. I was tired of
8  being on the road.
9    And in doing so, you really
10  don't have much control at all as to where
11  you're assigned, nor do you have a lot of
12  time to report to your next destination. So,
13  it was kind of -- it's rough.
14    Q.  Do you have your PE
15  certification?
16    A.  I have been certified as a PE.
17  My certification is not active.
18    Q.  When were you certified?
19    A.  In Florida.
20    Q.  Do you remember when?
21    A.  The same time I was at Georgia
22  Pacific. Now, those specific dates I can get
23  you. I just don't remember the exact date.

Page 44

1    Q.  What is your relation to Turner
2  Construction Company?
3    A.  I worked with Turner prior to
4  graduating.
5    Q.  Was that an intern type
6  position?
7    A.  No. I mean, it wasn't an
8  internship. I did intern with them, which is
9  how I was able to get that position.
10    So, I worked with Turner for a
11  short time and got quite a bit of experience
12  from Turner.
13    Q.  When did you start working at
14  Turner?
15    A.  From the Miami-Dade project.
16  The '90s, sometime around there. As a matter
17  of fact, that was my first big job.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  Who did you report to at Turner?
21    A.  Berry Fitzer, Ken Oaks. But
22  Berry Fitzer was my immediate supervisor.
23    Oh, Thaddeus Horn. I think that

Page 45

1  was -- no, Thaddeus Smith. Smith is the last
2  name. Sorry.
3    Q.  Take your time. You don't have
4  to feel like you have to rush. We'll wait
5  for you to think about it.
6    A.  Well, I appreciate that.
7    Q.  I do realize I'm asking you to
8  go back --
9    A.  Going back almost over my whole
10  life really. Well, a significant part of it.
11    Q.  Right. We're going to cover a
12  significant portion of time.
13    A.  That's not a problem.
14    Q.  So, I do understand that. And
15  at some point you worked for the
16  Tallahassee/Leon County Aquatic Center?
17    A.  No. That was one of my
18  projects.
19    Q.  That was a project. Oh, okay.
20    A.  I worked for Tallahassee
21  Department of Public Works.
22    Q.  Oh, okay. The City of
23  Tallahassee Public Works, is that --

12  (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1    A.   Yes, yes. And that was my --
2  assistant project manager was that. But,
3  yeah, that was one. That was a good project
4  going on. Yeah.
5    Q.   When did you work there?
6    A.   Oh, man.
7    Q.   You knew I was going to ask.
8    A.   It was sometime '89-'90,
9  something like that. '89-'90.
10   Q.   And were you still in school at
11 this time?
12   A.   Yes.
13   Q.   Briefly, tell me sort of what
14 your duties were for the City of Tallahassee?
15   A.   I was really more a less like
16 assistant to the project managers. I
17 primarily oversaw document control, maybe was
18 a liaison to do a lot of troubleshooting, I
19 would evaluate various milestones in the
20 schedule, I would organize and even direct
21 the owner and contractor meetings.
22       It was -- it was really just a
23 way I got familiar with a lot of practices in

Page 47

1  the industry.
2    Q.   And who was your supervisor?
3    A.   Steve. Steve Schaeffer was his
4  name. I think he's still with the City of
5  Tallahassee, too.
6    Q.   Okay.
7    A.   Steve Schaeffer.
8    Q.   And I didn't ask this. What was
9  your reason for leaving the City of
10 Tallahassee?
11   A.   Just career advancement. Just
12 trying to, you know, gain more experience,
13 better pay, things like that.
14   Q.   And what was your reason for
15 leaving Turner Construction Company?
16   A.   My opportunity with -- with
17 BE&K.
18   Q.   Do you remember when you left
19 your employment with Turner Construction
20 Company?
21   A.   Not really.
22   Q.   Were you employed while you were
23 at law school at Southern University in

Page 48

1  Louisiana?
2    A.   I took a -- I was employed, I
3  think. But I took a leave if I'm not
4  mistaken. If I'm not mistaken, I did.
5    Q.   Where were you working at that
6  time?
7    A.   If I'm not mistaken, I was right
8  between -- that was the City of Tallahassee.
9  If I'm not mistaken, that was the City of
10 Tallahassee.
11   Q.   So, you took a leave from the
12 City of Tallahassee?
13   A.   Yeah, because I didn't formally
14 -- I hadn't formally quit. But for all
15 practical purposes, I was not working.
16       But I didn't know at the time
17 what I was going to do, what I was going to
18 have to do. So, I tried to keep some avenues
19 open.
20   Q.   Is it your understanding that at
21 that time the City of Tallahassee still
22 considered you an employee?
23   A.   I know my position hadn't been

Page 49

1  formally vacated, I don't think. I don't
2  think so. I don't think it had been if my
3  memory serves me correctly.
4    Q.   Were you paid by the City of
5  Tallahassee during this time?
6    A.   No, I wasn't paid, period. I
7  really just tried to keep some things open
8  just to be able to fall back in the event
9  things didn't go how I wanted them to go.
10   Q.   Have you had any other
11 employments that we have not covered?
12   A.   I may have. I just -- I can't
13 really think -- I couldn't tell you right
14 now.
15   Q.   Well, I may get some of the
16 names wrong, but are you familiar with --
17 what is this, The 512 Social Club of America,
18 LLC?
19   A.   512?
20   Q.   I'm not sure. You may call it
21 something else, but it's the Social Club of
22 America LLC, and it had some Roman numerals
23 preceding the name.

13  (Pages 46 to 49)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 50 | Page 52 |
|---|---|
| 1    A.  I don't know nothing about that. | 1    A.  Probably just time and energy. |
| 2    Q.  Okay. So, you were never the | 2  As a matter of fact, I'm sure. Time and |
| 3  manager of that business? | 3  energy. |
| 4    A.  Not to my knowledge. | 4    And just -- it's the kind of |
| 5    Q.  And you would have no reason why | 5  business you kind of have to -- you have to |
| 6  someone with your name and Social Security | 6  -- it's a lot of foot work and just a matter |
| 7  number is listed as their manager? | 7  of keeping in contact with people and maybe |
| 8    A.  If it is, I sure would love to | 8  going -- you know, it's not something that |
| 9  know about it. | 9  generated business just on its own. It was |
| 10    Q.  Are you familiar with a business | 10  something I had to actively pursue. |
| 11  called Well Suited? | 11    Q.  Well, you let me know when you |
| 12    A.  Yeah. | 12  find one that you don't have to do that to |
| 13    Q.  Were you the owner of that | 13  and I'm going to get into it. |
| 14  business? | 14    A.  Well, I'm sure some clients walk |
| 15    A.  Yes. | 15  in your door, right? |
| 16    Q.  What type of business was this? | 16    Q.  I'm going to tell you, we have |
| 17    A.  It's a business I started while | 17  to hustle to get clients to walk in the door. |
| 18  I was in school, and it's a tailoring and | 18    A.  Oh, okay. |
| 19  design clothing line. Believe it or not, I | 19    THE WITNESS: I walked in your |
| 20  used to could sew a little bit. So, shirts, | 20  door, didn't I? |
| 21  things like that. Plus I did cuff links. It | 21    MR. MADISON: You did. |
| 22  was just a little side hustle I had. | 22    MS. MEADOWS: Because he did |
| 23    Q.  Okay. When did you start the | 23  some hustling to get you to come. |

| Page 51 | Page 53 |
|---|---|
| 1  business? | 1    Q.  Did you have any employees other |
| 2    A.  I don't even remember. I don't | 2  than yourself? |
| 3  remember, but it's been years ago. | 3    A.  No. My grandmother maybe. |
| 4    Q.  How long did you operate the | 4    Q.  Oh, your grandmother was an |
| 5  business? | 5  employee? |
| 6    A.  It was probably -- you know, | 6    A.  My grandmother helps me quite a |
| 7  active operation, probably till sometime | 7  bit. That's my partner and everything. |
| 8  around ninety something. | 8    Q.  You actually were able to manage |
| 9    Q.  Did you stop operating it before | 9  your grandmother as an employee? |
| 10  you went to law school? | 10    A.  No. She really managed me. |
| 11    A.  No. I think I had it still | 11    Q.  Okay. I was just wondering |
| 12  then. I had it around then if I'm not | 12  because -- is your grandmother the one who |
| 13  mistaken. | 13  taught you to sew? |
| 14    Q.  And did you start it in | 14    A.  Yeah. As a matter of fact, she |
| 15  Tallahassee? | 15  did. |
| 16    A.  Yeah. It was definitely started | 16    Q.  I just want to be clear because |
| 17  in Tallahassee. No question about that. | 17  I think I have that name wrong. You weren't |
| 18    Q.  Do you remember when you ceased | 18  affiliated with any type of social club as a |
| 19  to operate the business? | 19  manager? |
| 20    A.  No, I don't. It just kind of | 20    A.  Not to my knowledge that I can |
| 21  went defunct. | 21  remember. I mean, I've done a lot of things. |
| 22    Q.  What was the reason you ceased | 22  I mean, is it maybe like a student |
| 23  to operate the business? | 23  organization or something like that or -- I |

14 (Pages 50 to 53)

17249641-2df0-4c36-b999-32292148c606

mean, because I did a lot of activities in school, you know. But, I mean, nothing -- not to my knowledge.
Q. Okay. That's just not ringing a bell for you?
A. No.
Q. I can tell you that it's located in Tallahassee, Florida.
A. Huh-uh (negative).
Q. I don't have the address with me now.
A. No. But if it is, I mean --
Is it still active?
Q. It appears to still be active.
A. Because if it is, I sure would love to know.
Q. It does appear to still be active.
A. I sure would love to know.
Q. Okay.
A. Definitely.
Q. Okay.
A. Are they making money? That

would be the first thing I want to know.
Q. I did not check that.
A. Now, that would be a good -- I would love to know that, though.
Q. Let's talk about your present employment. You're presently employed at Tuskegee University, correct?
A. Correct.
Q. Which department are you employed with there?
A. Construction and planning.
Q. Construction and planning?
A. Yeah. As a matter of fact, do -- I don't necessarily want my employment, current employment status, being divulged either.
And the reason being, it's just been -- my experience here in Alabama has not been good as far as that's concerned.
Q. Well, I've got to ask you questions about your present employment.
MR. MADISON: She has a right to ask you questions about your employment.

THE WITNESS: Well, I understand that, but if it -- if you can -- now, as far as duties and things like that. It's just that -- well, just my locale and things. People can be pretty destructive. This is the only reason I'm saying that.
Q. (By Ms. Meadows) Okay. Well, I'm not going to send them a transcript or anything.
A. Oh, well, that wouldn't matter. They got -- that wouldn't matter.
Q. When did you --
A. I'm not talking about that.
Q. -- first become employed at Tuskegee University?
A. January.
Q. Of this year?
A. Yes.
Q. What is your position or your title?
A. Project manager.
Q. And are you a salaried employee, or are you an hourly employee?

A. Salaried.
Q. Okay. About how many hours per week are you required to work in your present job?
A. Technically, 37.5, which has not been the case. Ever, never. Since the day I started, it has not been the case.
Q. Yeah. I'm sort of asking what it actually takes.
A. How many hours I actually put in?
Q. Yeah. How many hours you actually put in.
A. Probably about 60.
Q. Okay.
A. And that's not including what I take home.
Q. Who is your immediate supervisor?
A. Clifford Wesson.
Q. Clifford?
A. Wesson, W-E-S-S-O-N.
Q. And what is Mr. Wesson's

FREEDOM COURT REPORTING

Page 58

1  position?
2      A.    Construction manager.
3      Q.    What are your present duties and
4  responsibilities?
5      A.    Oversee capital projects for the
6  university. It's new facilities,
7  renovations, infrastructure.
8      Q.    Do you supervise any employees
9  directly?
10     A.    Fortunately, no.
11     Q.    Okay. Following your
12 termination from Alabama State University and
13 prior to your employment with Tuskegee
14 University in January --
15     A.    Unemployed.
16     Q.    You have not been employed?
17     A.    Unemployed.
18         MS. MEADOWS: Okay. All right.
19 I'm going to take about five minutes, please.
20         (Whereupon, the taking of the
21 deposition was recessed from approximately
22 12:58 a.m. to approximately 1:03 p.m., after
23 which the following proceedings were had and

Page 59

1  done:)
2      Q.    Mr. Diop, how many times have
3  you been arrested?
4         MR. MADISON: Object to the
5  form.
6         THE WITNESS: Three, four,
7  something like that.
8      Q.    (By Ms. Meadows) When was the
9  first time?
10         MR. MADISON: Object to the
11 form. Go ahead.
12         THE WITNESS: What?
13         MR. MADISON: You can answer. I
14 made an objection.
15         THE WITNESS: You mean time
16 wise?
17     Q.    (By Ms. Meadows) Yeah. I mean
18 the very first time. I want to know when it
19 was.
20     A.    I was 15 years old.
21     Q.    Where were you?
22     A.    Chicago.
23         MR. MADISON: Object to the

Page 60

1  form.
2      Q.    (By Ms. Meadows) And why were
3  you arrested at that time?
4         MR. MADISON: Object to the
5  form. Go ahead and answer.
6         THE WITNESS: With the wrong
7  people.
8      Q.    (By Ms. Meadows) Okay. I get
9  that, but what I want to know is why the
10 police arrested you.
11         MR. MADISON: Object to the
12 form. I'm just going to have a continuing
13 objection to your questioning regarding his
14 criminal history.
15         MS. MEADOWS: Okay.
16         THE WITNESS: Do I need to
17 answer?
18         MR. MADISON: Yeah.
19         THE WITNESS: This person I was
20 with took somebody's watch.
21     Q.    (By Ms. Meadows) So, you were
22 arrested for theft?
23     A.    Correct.

Page 61

1      Q.    Did you ever go to court for
2  that?
3      A.    Once.
4      Q.    For that incident when you were
5  15?
6      A.    Correct.
7      Q.    What happened?
8      A.    It was -- it was resolved prior
9  to any kind of trial or anything like that.
10     Q.    Okay. Were the charges
11 dismissed?
12     A.    Not in its entirety.
13     Q.    Okay. Well, tell me what the
14 disposition of it was.
15         MR. MADISON: Object to the
16 form.
17         THE WITNESS: I don't remember.
18     Q.    (By Ms. Meadows) You don't
19 remember how it was resolved?
20     A.    I mean, I don't remember what
21 the final -- what they -- because it was like
22 reduced to something, but I don't remember.
23     Q.    You got some sort of reduced

16 (Pages 58 to 61)

17249641-2df0-4c36-b999-32292148c606

# FREEDOM COURT REPORTING

Page 62

1  charge?
2  A.  Correct.
3  Q.  Did you receive a sentence in
4  connection with the reduced charge?
5  A.  Well, actually, I had to do like
6  probation, and it was thrown out after
7  probation if I did the probation
8  satisfactorily. As a matter of fact, you
9  know what, I was in juvenile so -- yeah.
10  Q.  And you started juvenile
11  probation?
12  A.  Yeah.
13  Q.  And you successfully completed
14  that probation?
15  A.  Yes.
16  Q.  And the charges were dismissed?
17  A.  Correct.
18  Q.  When was the second time that
19  you were arrested?
20  MR. MADISON: Object to the
21  form.
22  THE WITNESS: Maybe about five
23  years later, something like that.

Page 63

1  Q.  (By Ms. Meadows) Do you
2  remember what year that would have been?
3  A.  No.
4  Q.  Well, where were you at that
5  time? And by where --
6  A.  Florida.
7  Q.  Where in Florida?
8  A.  Tallahassee.
9  Q.  Why were you arrested?
10  A.  Dealing with --
11  MR. MADISON: Object to the
12  form.
13  THE WITNESS: Dealing with
14  stolen property.
15  Q.  (By Ms. Meadows) And by dealing
16  with stolen property, explain what you mean
17  by that.
18  A.  Well, I bought a computer that
19  was stolen.
20  Q.  Were you charged with that crime
21  following the arrest?
22  A.  I think initially. And that
23  also was the same. As a matter of fact, I

Page 64

1  was -- initially, I was. And I think they
2  was -- somehow it was reduced some kind of
3  way as well.
4  Q.  Would that have been an incident
5  on or about June 4th of 1996?
6  A.  June 4th, 1996. Yeah. That
7  might have been it, yeah.
8  Q.  You think that might have been?
9  A.  That may have been.
10  Q.  Well, let me ask you this. Did
11  you go to court -- did you have a trial for
12  the receiving stolen property charge?
13  MR. MADISON: Object to the
14  form.
15  THE WITNESS: No, I didn't go to
16  trial on any -- anything.
17  Q.  (By Ms. Meadows) Okay. But all
18  you remember is that you were in Tallahassee,
19  Florida?
20  A.  Correct.
21  Q.  And it was for purchasing a
22  stolen computer?
23  A.  Correct.

Page 65

1  MR. MADISON: Object to the
2  form.
3  Q.  (By Ms. Meadows) Okay. Tell me
4  about the third time.
5  MR. MADISON: Object to the
6  form.
7  THE WITNESS: Like a -- for
8  fraud, bank fraud.
9  Q.  (By Ms. Meadows) When was that?
10  A.  Around the same time.
11  Q.  So, you were approximately 20
12  years of age at that time?
13  A.  No. I might have been about 22,
14  something like that.
15  Q.  Was that also in Tallahassee,
16  Florida?
17  A.  Yeah.
18  Q.  What was the final outcome of
19  that matter?
20  MR. MADISON: Object to the
21  form.
22  THE WITNESS: Dismissed. I
23  don't recall another instance.

17 (Pages 62 to 65)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 66

1    Q.    (By Ms. Meadows)  You don't
2  recall what?
3    A.    I don't recall any other
4  instances.
5    Q.    So, just those three times is
6  all you recall?
7    A.    (Whereupon, the witness
8  indicated an affirmative response by nodding
9  her head up and down.)
10   Q.    Okay.  Do you recall an incident
11 on April 24th, 1996, where you were charged
12 with aggravated assault on a law enforcement
13 officer or --
14   A.    The same instance.  That was
15 completely thrown out.
16   Q.    That was which incident?
17        MR. MADISON:  Object to the
18 form.
19        THE WITNESS:  The same instance
20 with the bank.  As a matter of fact, that's
21 how that happened.  I was leaving the bank,
22 and they tried to stop my car.
23   Q.    (By Ms. Meadows)  Okay.

Page 67

1    A.    Yeah.  But that was thrown out.
2  I didn't know who they were from Adam.
3    Q.    So, you don't recall entering a
4  plea of nolo contendere?
5        MR. MADISON:  Object to the
6  form.
7        THE WITNESS:  Not on that
8  charge.  Never.
9    Q.    (By Ms. Meadows)  And you don't
10 recall being sentenced for one year of
11 probation for that offense?
12   A.    It wasn't for that.  It was for
13 the bank thing.  That's what I'm saying.
14 That charge was completely thrown out.
15   Q.    Were you represented by an
16 attorney regarding that matter?
17   A.    Yeah.
18   Q.    Who was your attorney?
19   A.    Dean LeBoeuf.
20   Q.    Would you happen to know how to
21 spell his last name?
22   A.    L-E-B-O-U-F.
23   Q.    Were you employed at the time of

Page 68

1  this incident?
2    A.    Yeah.
3    Q.    Where were you employed?
4    A.    Mind -- mind -- it was with --
5  I'm trying to think of where I was at that
6  time.  If I'm not mistaken, that was sometime
7  around the time I was doing my Well Suited
8  and City of Tallahassee.
9    Q.    According to the records, the
10 incident was on April 24th, 1996.
11   A.    Okay.
12   Q.    According to your earlier
13 testimony, at that time you were employed by
14 BE&K.  Is that --
15   A.    In '96?
16   Q.    Yes.
17   A.    And that incident occurred in
18 '96?
19   Q.    This incident took place on
20 April 24th, 1996.
21   A.    Are you sure, or is that the
22 disposition?
23   Q.    No.  According to court records,

Page 69

1  the disposition --
2    A.    I don't think that's --
3    Q.    -- was in 2001.
4    A.    The disposition is 2001?
5    Q.    Uh-huh (affirmative).
6    A.    Okay.  That could be it.  But
7  1996 it couldn't have been.  It didn't happen
8  in '96.
9    Q.    What year was it?
10   A.    I know it couldn't have been
11 1996.
12   Q.    Okay.
13   A.    It had to be -- it had to be in
14 '91 or something like that.
15   Q.    So, you believe it was in 1991?
16   A.    Yeah.  Or '92 or something like
17 that.  It was a long time ago.  I can tell
18 you that.  Fifteen years ago.
19   Q.    And you believe that you were
20 employed at that time with the City of
21 Tallahassee?
22   A.    If I'm not mistaken.  As a
23 matter of fact, I had two jobs I think.

18  (Pages 66 to 69)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 70

1    Q.    Okay.
2    A.    I think I was doing my Well
3  Suited and I was at the City of Tallahassee.
4  If I'm not mistaken.
5    Q.    Was Dean LeBoeuf a
6  court-appointed attorney?
7    A.    No.
8    Q.    You paid Dean LeBoeuf?
9    A.    Yeah.
10    Q.    Did your employer pay your
11  attorney's fees?
12        MR. MADISON:  Object to the
13  form.
14        THE WITNESS:  No, no.  My
15  grandmomma probably paid them.
16    Q.    (By Ms. Meadows)  Did you
17  request that your employer pay your
18  attorney's fees.
19    A.    Quite possibly.  I may have.  I
20  mean, I may have requested anybody who would
21  pay them at that time.
22    Q.    No.  I mean --
23    A.    I mean, not to -- I don't

Page 71

1  remember formally.  No, I know I've never
2  made any kind of formal request for that.
3    Q.    Did you expect that they should
4  pay your attorney's fees?
5        MR. MADISON:  Object to the
6  form.
7        THE WITNESS:  I mean, I can't
8  tell you.  I can't speak to my state of mind
9  at that time.  I really can't.  I know it was
10  a frustrating period.  I can tell you that.
11    Q.    (By Ms. Meadows)  And you
12  were charged with the grand theft of property
13  during that time?
14        MR. MADISON:  Object to the
15  form.
16        THE WITNESS:  I don't know what
17  the -- what it was reduced to.  I know the
18  charge was bank fraud.  That's what it was.
19    Q.    (By Ms. Meadows)  And it was an
20  attempt at theft of property of $300 -- more
21  than $300 but less than $5,000.  Does that
22  sound right?
23        MR. MADISON:  Object to the

Page 72

1  form.
2        THE WITNESS:  If that's -- if
3  that's the parameters.  Is that the
4  parameters of it?  It had to be then.
5    Q.    (By Ms. Meadows)  Okay.  And you
6  say that this was in 1991 or 1992 perhaps?
7    A.    It wasn't in '96 if I -- you
8  know.
9    Q.    Okay.  That's -- that's why I'm
10  asking you.
11    A.    Yeah.  I'm sure I can find out
12  the exact date.
13    Q.    What were you accused of
14  stealing?
15        MR. MADISON:  Object to the
16  form.
17        THE WITNESS:  It was
18  administrative stuff.  It was dealing with
19  paperwork.  I don't even remember.
20    Q.    (By Ms. Meadows)  When you say
21  dealing with paperwork, what do you mean it
22  was dealing with paperwork?
23    A.    It was dealing with stuff

Page 73

1  related to my company.
2    Q.    To Well Suited?
3    A.    Uh-huh (affirmative).
4    Q.    And you entered a nolo
5  contendere plea to this charge?
6        MR. MADISON:  Object to the
7  form.
8        THE WITNESS:  No.  I entered in
9  a plea to another charge, but it was reduced
10  or something like that because I was the --
11  the company was mine.  I don't even remember
12  all of the parameters of it.
13        But, you know, it was something
14  that could have went either way.  And because
15  I didn't have money, I thought it was
16  probably easier.  I probably took the easier
17  way out.
18    Q.    (By Ms. Meadows)  Did you serve
19  four years of probation for this offense?
20        MR. MADISON:  Object to the
21  form.
22        THE WITNESS:  Not to my
23  knowledge, no.  I've never served four years.

19 (Pages 70 to 73)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 74

1    Q.    (By Ms. Meadows) Do you recall
2  serving four years of probation for any
3  offense?
4    A.    I never recall serving four
5  years probation, period.
6    Q.    Okay.
7    A.    Now, it could have been that it
8  was four years, but if you serve a certain
9  amount of it, then it would terminate. That
10  could have been.
11    Q.    So, you say that you may have
12  been sentenced to four years of probation?
13    A.    That's possible, yeah.
14        MR. MADISON: Object to the
15  form.
16    Q.    (By Ms. Meadows) And it's your
17  contention that perhaps --
18    A.    But I've never served four years
19  probation. That's my contention.
20    Q.    Okay. So, it is your contention
21  that perhaps you were released from your
22  probation early?
23    A.    I don't recall ever having the

Page 75

1  requirement of four years probation.
2    Q.    Okay. Did you have probation --
3    A.    I'm only speculating based upon
4  your question so -- but I -- to my knowledge,
5  no four years of probation.
6    Q.    Did you have a probation
7  officer?
8    A.    Yeah.
9    Q.    What was your probation
10  officer's name?
11    A.    I cannot even tell you. It
12  probably changed every month.
13    Q.    So, you had a variety of
14  probation officers?
15    A.    It probably changed. I know it
16  changed regularly due to admin -- you know.
17    Q.    I understand --
18    A.    They had turnover.
19    Q.    -- they may have had some
20  turnover.
21    A.    No. They had lots of turnover.
22    Q.    Do you recall any of their
23  names?

Page 76

1    A.    No. As a matter of fact, I
2  don't think I ever even --
3    Q.    Do you recall meeting --
4    A.    -- attempted. As a matter of
5  fact, I may have only met them one time.
6    Q.    One time each or one time,
7  period?
8    A.    I may have only met a probation
9  officer one time.
10    Q.    Okay. I just want to make sure
11  that I don't misunderstand what it is you're
12  trying to say.
13    A.    That's what I'm saying.
14    Q.    So, I'm going to repeat it for
15  you, and you tell me if I'm understanding you
16  correct.
17    A.    I don't recall seeing the
18  probation officer during the term that I had
19  probation but once.
20    Q.    Okay. Thank you.
21        Have you ever had occasion to
22  reside in Hardee County, Florida?
23    A.    Not to my knowledge.

Page 77

1    Q.    Do you recall being arrested for
2  a family offense in Hardee County, Florida?
3    A.    Never.
4    Q.    Okay. Have you ever been --
5    A.    I've never been -- I never
6  recall being arrested for a family offense,
7  period.
8    Q.    I'm just trying to sort out
9  who's you from who's not you.
10    A.    I understand. I understand.
11    Q.    Okay.
12    A.    A good start would be the
13  incidents that I discussed with you. If they
14  don't fit that, then it's probably not me.
15    Q.    And are you stating you only
16  have the one charge of theft of property?
17        I'm not talking about your
18  charge as a juvenile. I'm talking about as
19  an adult.
20        MR. MADISON: Object to the
21  form.
22        THE WITNESS: Yeah, that's what
23  I'm saying.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 78

1    Q.    (By Ms. Meadows)  Other than the
2  present lawsuit, have you ever been involved
3  in any other lawsuit?
4    A.    I've been in mediation for a
5  proposed lawsuit, yes, with BE&K.
6    Q.    Were you the plaintiff or the
7  defendant?
8    A.    The plaintiff.
9    Q.    When was that?
10    A.    I can't tell you the exact date,
11  but it was some -- as a matter of fact, I
12  remember working on the job at Alabama State
13  while this was -- while we were in discussion
14  with that.
15    Q.    That was in 2004?
16    A.    Correct, sometime around there.
17    Q.    And why were you suing BE&K?
18    A.    Money.  Because of incentive
19  bonuses that were a part of a contractual
20  agreement for the two power plant projects
21  that I worked on that I was entitled to.
22    Q.    Were you represented by an
23  attorney at that time?

Page 79

1    A.    Yes.
2    Q.    And who represented you?
3    A.    I cannot remember the firm's
4  name.  If you hadn't asked me that question,
5  I could have told you.  I think Pantazis and
6  Childs or -- I don't remember the firm's
7  name.
8    Q.    Do you remember the individual
9  lawyer who worked on your case?
10    A.    Yeah, I do.  Rod Cook.
11    Q.    Rod Cook?
12    A.    Yes.
13    Q.    And what was the outcome?
14    A.    Privately negotiated.
15    Q.    You were able to negotiate a
16  settlement?
17    A.    Yeah.
18    Q.    How did you learn about the job
19  opening at Alabama State?
20    A.    Probably the same as I learned
21  about the job at Tuskegee.  On the Internet.
22  As a matter of fact, the job that I was
23  applying for was not -- was not even -- it

Page 80

1  was just a totally different position.
2    Q.    Well, I'm going to show you the
3  job posting.
4    A.    Okay.
5    Q.    This is not -- this is the
6  posting for director of physical plant.
7    A.    Okay.  Which I didn't apply --
8  which was not the initial response that I
9  gave.
10         It's just that when I responded
11  to another position, I guess this immediate
12  position was open.  Because I interviewed for
13  two positions.
14    Q.    Do you recall what the other
15  position was?
16    A.    Yes.  It was for construction
17  manager.
18         MS. MEADOWS:  Okay.  I'm going
19  to go ahead mark this as Exhibit 2.
20         (Whereupon, said document was
21         marked for identification as
22         Exhibit No. 2 to the deposition
23         of Anwar K. Diop.)

Page 81

1    Q.    You said you didn't apply for
2  this job posting?
3    A.    I wouldn't have applied to this
4  job posting.
5    Q.    Although, it is for the position
6  of director of physical plant?
7    A.    It may have been for --
8  previously, but this wasn't even posted
9  during the time that I even interviewed for
10  that position.  This is from June to July.
11    Q.    Okay.  And --
12    A.    I mean, this could have been at
13  some point, but I've never seen that.
14    Q.    Now, it's my understanding that
15  you did apply for a position.
16    A.    Okay.
17    Q.    And you later received a letter,
18  which indicated that the position was being
19  reposted or reopened and asking you if you
20  wish to leave your application on file.
21         Do you recall that?
22    A.    No.  I recall -- no.  I never
23  recall a letter to that regard.

21 (Pages 78 to 81)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 82

1     (Whereupon, said document was
2   marked for identification as
3   Exhibit No. 3 to the deposition
4   of Anwar K. Diop.)
5     Q.    Okay. Let me show you
6   Defendant's Exhibit 3.
7     A.    That's my application.
8     Q.    You recognize this as the
9   application for employment that you submitted
10  to Alabama State University?
11    A.    Yeah.
12    Q.    And you submitted this on May
13  20th of 2004; is that correct?
14    A.    Yes.
15    Q.    And that was prior to the
16  posting date of June 29th, 2004, correct?
17    A.    Correct.
18    Q.    However, on the front page of
19  the application, what position does it say
20  you are applying for?
21    A.    Director of physical plant.
22    Q.    And is that the same position
23  title of the posting dated June 29th, 2004?

Page 83

1     A.    Yeah. Uh-huh (affirmative).
2     Q.    Is that a yes?
3     A.    Yes, it is.
4     Q.    So, you did apply for the
5   position of director of physical plant,
6   correct?
7     A.    I think I -- I don't remember
8   the full parameters of what -- what -- how it
9   happened, but I did -- I was requested to
10  apply for that position.
11    Q.    Who requested that you apply for
12  this position?
13    A.    I interviewed for another
14  position. The same committee actually dealt
15  with this position.
16          And I guess they saw that
17  someone with my qualifications were similar
18  to what they were seeking, and they asked me
19  about that at that time.
20    Q.    Do you know the name?
21    A.    It was several people.
22    Q.    Do you know the name of any of
23  the individuals on that committee?

Page 84

1     A.    Freddie Gallot; Thaddeus Horn,
2   who was over the committee; Vickie Arrington,
3   who was the police chief; Leon Frazier. I
4   can't remember. It was about three others.
5     Q.    Do you have any reason to
6   disagree that your application was processed
7   at Alabama State University?
8     A.    None at all.
9     Q.    And you will admit that you met
10  with the committee and were interviewed for
11  this position?
12    A.    Yes.
13    Q.    And that you were eventually
14  offered the position?
15    A.    Yes.
16    Q.    Which you accepted, correct?
17    A.    Yes.
18    Q.    And you started working in
19  November of 2004, correct?
20    A.    Yes.
21    Q.    Do you remember the date you
22  started?
23    A.    I don't remember the exact date.

Page 85

1     Q.    Okay.
2     A.    Maybe -- I don't remember the
3   exact date.
4     Q.    What were your job duties at
5   Alabama State?
6     A.    Well, the position was director
7   of physical plant. It was -- oversight
8   duties was housekeeping, operations and
9   maintenance. Those two areas.
10    Q.    Okay. And your work, as you
11  stated, involved general oversight of the
12  campus, the grounds, the buildings, the
13  maintenance, things related to ASU's campus,
14  correct?
15    A.    Yeah.
16    Q.    You were in a supervisory
17  position, correct?
18    A.    Yes.
19    Q.    How many employees did you
20  supervise?
21    A.    A hundred and eight.
22    Q.    Okay. Was one of the employees
23  you supervised Ms. Linda Johnson?

22 (Pages 82 to 85)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 86

1    A.    No.
2    Q.    What department did Ms. Linda
3  Johnson work in?
4    A.    Transportation.
5    Q.    And although transportation is
6  located in the same building as physical --
7  well, let me back up.
8         Is transportation located in the
9  same building as physical plant?
10   A.    Yes.
11   Q.    Okay.  So, although she worked
12  in that building, she was not one of your
13  subordinates, correct?
14   A.    That's correct.
15   Q.    As director of physical plant,
16  did you have the authority to hire
17  individuals to work for you -- or I should
18  say to work for Alabama State University?
19   A.    I had the authority to
20  recommend, but I never used it.
21   Q.    You had the authority to
22  recommend someone to be hired, correct?
23   A.    Yeah.

Page 87

1    Q.    But you did not have the
2  authority to actually hire any individual,
3  did you?
4    A.    I -- to be quite honest, I
5  never, ever had to entertain that issue.
6    Q.    You never attempted to hire
7  anybody, did you?
8    A.    That's correct.
9    Q.    And you never told anybody you
10  had hired them, correct?
11   A.    That's correct.
12         (Whereupon, said document was
13         marked for identification as
14         Exhibit No. 4 to the deposition
15         of Anwar K. Diop.)
16   Q.    I've marked this as Exhibit No.
17  4 to your deposition.  Do you recognize this
18  document?
19   A.    It's the employment contract.
20   Q.    And it says it's a notice of
21  employment there at the top, correct?
22   A.    Correct.
23   Q.    Is this the document that you

Page 88

1  consider to be your employment contract with
2  Alabama State University?
3    A.    Yeah, yeah.
4    Q.    And this --
5    A.    And it -- yes.
6    Q.    And that does contain your
7  signature down there on signature line five?
8    A.    Yes.
9    Q.    Okay.  Are there any other
10  documents that you contend make a contract
11  between yourself and Alabama State
12  University?
13   A.    Besides position, specific
14  salary, tenure, status of employment.
15   Q.    Okay.  I'm asking you anything
16  other than this piece of paper right here.
17  Is there another document?
18   A.    That I would have signed?
19   Q.    That you constitutes a
20  contract between yourself and Alabama State
21  University, correct.
22   A.    I don't recall.
23   Q.    Does your -- do you need a

Page 89

1  minute?
2    A.    No.
3    Q.    Does your employment contract
4  contain any other terms other than those set
5  forth here?
6    A.    Yeah.
7    Q.    What are the other terms?
8    A.    As it relates to vacation, pay,
9  comp time, the accrual of that.
10   Q.    This document says that you're
11  subject to the policies and regulations of
12  the University?
13   A.    Correct.
14   Q.    Those other things you've named
15  are policies and regulations of the
16  University, correct?
17   A.    I guess they could be considered
18  that.
19   Q.    So, they would be incorporated
20  by reference in this document, correct?
21   A.    Not necessarily.
22   Q.    Okay.  So, we've got -- tell me
23  any other terms then that you feel were

23  (Pages 86 to 89)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 90

1  included in your contract, but that are not
2  reflected here.
3      A.    Other things like the use of
4  University vehicle, reimbursement for any
5  incidentals, as well as any extracurricular
6  activities that pertain to the execution of
7  my duties.
8      Q.    Explain what you mean by
9  extracurricular activities.
10     A.    Well, I was on call 24 hours a
11 day. So, the cell phone would be one of
12 those.
13        In the event that there was an
14 emergency situation that arose that required
15 my presence and I was in Chicago, for
16 example, visiting my family, but it required
17 me to commute back, then the stipulations by
18 which that would be necessary.
19     Q.    And the stipulation was that
20 what would occur on that occasion -- in the
21 event of that?
22     A.    Full reimbursement and then the
23 time frame in which I had to report back.

Page 91

1      Q.    Any other terms or conditions of
2  employment?
3      A.    Not that I could, you know,
4  think of offhand.
5      Q.    Is there a term or condition of
6  your employment in this contract -- well,
7  what documents are those other terms located
8  in?
9      A.    There are other documents that
10 you review and sign during your
11 pre-employment human resources orientation
12 that discloses those particular --
13     Q.    That tell you what those terms
14 and conditions are?
15     A.    Yeah.
16     Q.    So, it's in documentation that
17 you get from human resources?
18     A.    They would come through human
19 resources just like this one.
20     Q.    Okay. And you signed those
21 documents?
22     A.    To my knowledge, yeah.
23     Q.    So, I will find signed documents

Page 92

1  that indicate that --
2      A.    Yeah, I'm sure you will find
3  that.
4      Q.    -- the University is going to do
5  those things that you just named?
6      A.    You should, yes.
7      Q.    Do you have a copy of those
8  documents?
9      A.    I'm sure I had. I don't -- I
10 could probably find them.
11     Q.    You believe you do have them?
12     A.    I know I have other documents.
13     Q.    Okay. If you have other
14 documents, I am going to request that they be
15 provided.
16     A.    Okay. If I can locate them.
17     Q.    Do any of those documents state
18 that Alabama State University will pay your
19 legal fees in the event that you are arrested
20 for a crime or accused of a crime?
21     A.    No.
22          MR. MADISON: Object to the
23 form.

Page 93

1      Q.    (By Ms. Meadows) Is there any
2  term of contract with Alabama State
3  University that provides that they will pay
4  your attorney's fees in the event that you
5  are charged with a crime?
6          MR. MADISON: Object to the
7  form.
8          THE WITNESS: Other than that
9  being the customary practice?
10     Q.    (By Ms. Meadows) Where is that
11 the customary -- what documentation do you
12 have that it's the customary practice for
13 Alabama State University to pay your
14 attorney's fees if you're charged with a
15 crime?
16     A.    Well, I'm stating that based
17 upon my -- my personal knowledge of that
18 being the direct practice.
19         In addition to, if we refer to a
20 recent situation, with a person who was just
21 recently in an incident at Alabama State who
22 were similarly situated. Legal fees were
23 paid.

24  (Pages 90 to 93)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 94

1    Q.    Who is that person?
2    A.    A person that was in the budget
3  office. There's another person who --
4    Q.    I want the name of that person.
5    A.    I can get the name for you, but
6  I can give -- if you want one person -- as a
7  matter of fact, if you have to have a name,
8  then Dr. Bradley, who was director at
9  Southern Normal.
10   Q.    Okay.
11   A.    Okay. Who was charged with
12  inappropriately mishandling University
13  property and initially theft. The University
14  not only paid her legal fees, but they
15  subsidized her husband's as well. And he's
16  not even an employee at the University.
17   Q.    What attorney did Alabama State
18  University hire for Dr. Bradley and her
19  husband?
20   A.    I don't think you guys had come
21  on board as of yet.
22   Q.    I'm asking -- I'm not asking if
23  it was me. I'm asking for the name of the

Page 95

1  attorney, whoever it was.
2    A.    I can't give you the attorney's
3  full name. I can't give you the name of the
4  attorney.
5    Q.    Give me any portion of the name
6  that you have.
7    A.    I don't have the name.
8    Q.    What is the basis for your
9  assertion that Alabama State University paid
10  the attorney's fees?
11   A.    It's printed in a public
12  document.
13   Q.    It's your contention it's a
14  matter of public record that the --
15   A.    Yeah.
16   Q.    -- University paid her
17  attorney's fees?
18   A.    As a matter of fact, it is.
19   Q.    And they paid her attorney's
20  fees in relation to her criminal charges?
21   A.    Yes. And there are others.
22   Q.    Give me the names of those
23  others.

Page 96

1    A.    Leon Frazier, Kenneth Arrington.
2    Q.    Who is Kenneth Arrington?
3    A.    He's a physical plant employee.
4    Q.    And what was Mr. Arrington
5  charged with?
6    A.    Inappropriately dealing with a
7  student some kind -- some kind of way. She
8  was at the physical plant or something, and
9  she charged him with rape, I think,
10  initially.
11   Q.    And it's your contention that
12  ASU paid his attorney's fees?
13   A.    Yes.
14   Q.    Which attorney did Alabama State
15  University --
16   A.    I can't give you --
17   Q.    -- retain for Mr. Arrington?
18   A.    -- an attorney's name.
19   Q.    And what is the basis of your
20  knowledge --
21   A.    And I wouldn't have used Alabama
22  State's attorney. I would have used my own
23  attorney. However, I would require them to

Page 97

1  pay my fee.
2         But the director of the Acadome.
3    Q.    Okay. I'm asking -- my
4  question, I think I asked you a question
5  about Mr. Arrington, which attorney was
6  retained for Mr. Arrington.
7    A.    I'm not sure. I don't know his
8  name.
9    Q.    And I also asked you what is the
10  basis of your knowledge that Alabama State
11  University paid his attorney's fees?
12   A.    Because I was present in the
13  courtroom when it was disclosed.
14   Q.    And it was disclosed -- which
15  courtroom was it disclosed in?
16   A.    Montgomery County.
17   Q.    Who was the judge?
18   A.    I can't tell you the judge's
19  name.
20   Q.    What was the date of this
21  disclosure?
22   A.    Probably two years ago or a year
23  and a half ago.

25 (Pages 94 to 97)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 98

1    Q.    Do you have a --
2    A.    I really don't know.
3    Q.    What type of proceeding was it?
4    A.    I don't know the name.
5    Q.    And who made the disclosure?
6    A.    It was a general statement when
7   it was discussed about counsel --
8    Q.    Who made --
9    A.    -- that he was being provided
10  counsel.
11   Q.    What was the exact --
12   A.    From the University.
13   Q.    Was was the exact statement that
14  was made?
15   A.    I can't tell you the exact
16  statement, but I do recall that.
17   Q.    Was the --
18   A.    That he was being provided
19  counsel by the University.
20   Q.    Was that statement made by his
21  attorney?
22   A.    No. I think it was made by the
23  state, by the district attorney.

Page 99

1    Q.    That statement was made by the
2   district attorney?
3    A.    Yeah. The director of the
4   Acadome would be another person.
5    Q.    Give me that name.
6    A.    Can I get back with you with
7   that name?
8    Q.    Well, tell me the date.
9    A.    I think he's -- as a matter of
10  fact, his current -- that's a current legal
11  situation, but it's been going on for about
12  two and a half years now.
13   Q.    What is the situation?
14   A.    Just inappropriate dealings as a
15  director with use of funds and travel with
16  secretary, things like that.
17   Q.    And is that a criminal matter?
18   A.    Yeah.
19   Q.    And he's been charged
20  criminally?
21   A.    Yeah.
22   Q.    Which attorney has Alabama State
23  University hired to represent him?

Page 100

1    A.    I can't tell you the attorney.
2    Q.    What is the basis of your
3   knowledge that Alabama State University has
4   hired -- is paying his legal fees?
5    A.    The basis of meetings that I was
6   in attendance.
7    Q.    And which meetings were these?
8    A.    Well, when we had to deal with
9   who was going to -- when this situation came
10  about, who was actually going to take on some
11  of his duties.
12   Q.    Okay. And --
13   A.    And a lot of it would have
14  fallen under my tutelage as the physical
15  plant director.
16   Q.    Give me the date of the first
17  meeting where this was discussed.
18   A.    Probably May 5th.
19   Q.    May 5th of what year?
20   A.    2005.
21   Q.    And what was the -- who told you
22  at that meeting that his attorney's fees were
23  being paid for by the University?

Page 101

1    A.    It was discussed as a matter of
2   protocol or -- well, just in random
3   discussion because the VP of fiscal affairs
4   and everybody was there and just how we were
5   juggling.
6    Q.    Okay. Give me the names of the
7   individuals who were present at the meeting.
8    A.    Leon Frazier; Freddie Gallot;
9   Mr. Arrington, who is over budget; Angela
10  Dickson, who was the comptroller; Mr. Horn,
11  who was the assistant VP of administration.
12  That's all I can recall.
13   Q.    And what specifically was said
14  concerning the representation of the director
15  of the Acadome?
16   A.    Well, what -- how it was
17  specifically brought up was that a
18  determination would have to be made on -- you
19  know, how far they would pursue it without
20  trying to resolve it due to insurance
21  purposes.
22         It was a matter of the insurance
23  being paid or insurance payments being

26 (Pages 98 to 101)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 102 | Page 104 |
|---|---|
| 1 appropriated to cover these legal fees. I | 1   A.   Is paying. |
| 2 can't tell you exactly how it was stated, but | 2   Q.   Is currently paying his legal |
| 3 it was in relation to that. | 3 fees? |
| 4   Q.   Was the discussion in relation | 4   A.   Yeah. |
| 5 to civil charges being brought against the | 5   Q.   And this is in connection with a |
| 6 University or the criminal charges against -- | 6 criminal matter? |
| 7   A.   There were no civil charges | 7   A.   This is in connection with |
| 8 being brought against the University in his | 8 legal, yeah, dealings. |
| 9 situation. | 9   Q.   No, no, no. Is this in |
| 10   Q.   To your knowledge, the | 10 connection with a criminal matter? |
| 11 conversation was regarding insurance being | 11   A.   Yeah. As a matter of fact, it |
| 12 available to cover his criminal charges? | 12 is. |
| 13   A.   No. It was -- the statement -- | 13   Q.   Dr. Frazier is facing criminal |
| 14   Q.   His criminal -- | 14 charges, and the University is paying his |
| 15   MR. MADISON: Object to the | 15 legal fees? |
| 16 form. Go ahead. | 16   A.   To my knowledge, yes. |
| 17   THE WITNESS: It was in relation | 17   Q.   To your knowledge. Which |
| 18 to how much we're paying as a result of these | 18 attorney have they retained for Dr. Frazier? |
| 19 legal matters being, you know, thrown on the | 19   A.   I can't tell you that. |
| 20 University and insurance premiums going up. | 20   Q.   When did they retain counsel for |
| 21   Q.   (By Ms. Meadows) How much money | 21 Dr. Frazier? |
| 22 was paid -- | 22   A.   I can't tell you that. |
| 23   A.   I can't tell you all that. | 23   Q.   When did the criminal charges |

| Page 103 | Page 105 |
|---|---|
| 1   Q.   -- as his legal fees? | 1 against Dr. Frazier arise? |
| 2   What was said at the meeting | 2   A.   I can't tell you that. |
| 3 regarding how much money was being paid? | 3   Q.   Who is the alleged victim in the |
| 4   A.   A lot of money. | 4 crime that Dr. Frazier is alleged to have |
| 5   Q.   How much is a lot of money? | 5 committed? |
| 6   A.   I can't -- | 6   A.   I can't tell you that. |
| 7   Q.   Who was the money being paid to? | 7   Q.   What crime is Dr. Frazier |
| 8   A.   I can't tell you that either. I | 8 charged with? |
| 9 didn't cut checks. | 9   A.   I can't tell you that. How do I |
| 10   Q.   And can you -- | 10 know? |
| 11   A.   And I -- like I'm saying, I was | 11   Q.   What is the basis of your |
| 12 present at the meeting. So, I mean as far as | 12 knowledge that the University is paying his |
| 13 some of the specifics are concerned, I can't | 13 criminal legal fees? |
| 14 really tell you that because, I mean, I don't | 14   A.   He told me. |
| 15 want to get it incorrect. | 15   Q.   Dr. Frazier told you that? |
| 16   Q.   And you can't tell me the name | 16   A.   Yes, ma'am. |
| 17 of the person for whom this large sum of | 17   Q.   How much has the University paid |
| 18 money was being paid? | 18 in -- |
| 19   A.   Coach Parker. | 19   A.   I can't tell you that. |
| 20   Q.   And I think we got jumbled up. | 20   Q.   -- legal fees for Dr. Frazier? |
| 21 Let me take you back to Leon Frazier. You | 21   A.   I can't tell you that. |
| 22 stated that the University has paid his legal | 22   Q.   Who at the University is paying |
| 23 fees? | 23 Dr. Frazier? |

27 (Pages 102 to 105)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 106

1    A.    Who at the University is paying
2    Dr. Frazier?
3    Q.    Yeah.
4    A.    I don't know that anybody's
5    paying Dr. Frazier.
6    Q.    Who's paying his legal fees?
7    A.    Well, I think if it's a
8    University payment, it would come through the
9    University's comptroller's office.
10    Q.    When did Dr. Frazier tell you
11    this?
12    A.    I can't think of the specific
13    date. But I can attest to you that it was a
14    conversation that was held between he and I,
15    and it did happen.
16    Q.    Give me -- where were you when
17    this conversation took place?
18    A.    Probably at the auditor
19    general's office when I was being questioned.
20    Q.    So, that was sometime in --
21    A.    Not too long ago.
22    Q.    Can you give me a year when this
23    conversation took --

Page 107

1    A.    2007.
2    Q.    Can you give me the approximate
3    month when this took place?
4    A.    October or November.
5    Q.    What else did you discuss in
6    this conversation with Dr. Frazier?
7    A.    Nothing.
8    Q.    The only thing you discussed in
9    that conversation was that Dr. Frazier told
10    you that the University was paying his legal
11    fees based upon his criminal charges?
12    A.    That was pretty much the extent
13    of it.
14    Q.    How did Dr. Frazier come to
15    share that information with you?
16    A.    I asked him.
17    Q.    What did you ask him
18    specifically?
19    A.    I asked him why wasn't the
20    University covering my legal fees for the
21    situation that happened with me and they
22    seemed to be covering everybody else's.
23    Q.    And what was his response?

Page 108

1    A.    That y'all obviously made --
2    they obviously made the judgment call or
3    mistake. And, basically, because I was not
4    considered to be, you know, amongst their
5    peers or a counterpart, so to speak.
6          And a lot of people thought I
7    was guilty of that crime. So, they were
8    going to try and make it easy for me.
9    Q.    So, it's your contention that
10    Alabama State University pays the legal fees
11    for employees that they think are not guilty
12    of the crimes with which they are charged?
13    A.    I think that some of those --
14          MR. MADISON: Object to the
15    form. Go ahead.
16          THE WITNESS: I think that some
17    of those decisions are biased.
18    Q.    (By Ms. Meadows) And who is
19    making those decisions?
20    A.    I can't say that. I just know
21    that that's my feeling.
22    Q.    What is the process for
23    requesting that the University pay your legal

Page 109

1    fees?
2    A.    What is the process?
3    Q.    Yes.
4    A.    I can't tell you the full
5    process.
6    Q.    How did these other people apply
7    to have their legal fees paid?
8          MR. MADISON: Object to the
9    form.
10          THE WITNESS: I can't tell you
11    that. But I think -- I mean, they may have
12    made a request.
13    Q.    (By Ms. Meadows) Are there any
14    other people other than Dr. Bradley and her
15    husband, Dr. Leon Frazier, Mr. Kenneth
16    Arrington and Coach Parker whose criminal
17    legal fees are being paid by the University?
18    A.    I'm sure there were many others.
19    I just can't tell you who they are. But I'm
20    sure there are many others.
21    Q.    Those are the ones that you are
22    aware of?
23    A.    That I'm personally

28 (Pages 106 to 109)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 110

1  knowledgeable of.
2      Q.   And, again, these are criminal
3  charges?
4      A.   Yeah.
5      Q.   That the University is paying
6  their legal fees for?
7      A.   Yes.
8      Q.   Okay.  Let's look back at
9  Exhibit 4.  I want you to look down at where
10 it says employment status -- it says status.
11 According to the notice of employment, what
12 was your employment status?
13     A.   Where -- I mean, what are you
14 referring to?
15     Q.   I'm on Exhibit 4, which is your
16 notice of employment.
17     A.   Okay.
18     Q.   The line where it says status.
19     A.   Okay.  Executive.
20          (Whereupon, said document was
21          marked for identification as
22          Exhibit No. 5 to the deposition
23          of Anwar K. Diop.)

Page 111

1      Q.   This has been marked as Exhibit
2  No. 5.  These are various excerpts from the
3  Alabama State University Nonacademic Staff
4  Handbook.
5      A.   Uh-huh (affirmative).
6      Q.   You received a copy of this
7  handbook when you were first employed at
8  Alabama State?
9      A.   Yes.
10     Q.   And you recall receiving that?
11     A.   Yeah.
12     Q.   And signing saying that you had
13 received a copy of it, correct?
14     A.   Uh-huh (affirmative).
15     Q.   And that was your handbook to
16 read at your leisure, correct?
17     A.   Correct.
18     Q.   Okay.  If you would turn to
19 Section 1.2, Employee Service Status.
20     A.   What page is that?
21     Q.   That's Page 23.
22     A.   Okay.
23     Q.   At the bottom of the page.  If

Page 112

1  you would review -- and you can read it to
2  yourself -- what an executive status employee
3  is.
4      A.   Okay.  You want me to read it?
5  Is that what you said?
6      Q.   I want you to have an
7  understanding of it because we're going to
8  talk about it.
9      A.   Okay.
10     Q.   Now, according to your contract,
11 you are an executive status employee,
12 correct?
13     A.   Correct.
14     Q.   Which means that, according to
15 the handbook, you were not entitled to
16 permanent employee status, correct?
17     A.   Correct.
18     Q.   And do you agree that under the
19 terms of Section 1.2, Employee Service
20 Status, permanent employees and executive
21 status employees are treated as two different
22 employee classifications?
23     A.   Yeah, I'm familiar with that.

Page 113

1      Q.   And do you agree that because
2  you were not a permanent employee, you were
3  not entitled to the benefits reserved only
4  for permanent employees?
5          MR. MADISON:  Object to the
6  form.
7          THE WITNESS:  No, I don't.  No,
8  I don't.
9      Q.   (By Ms. Meadows)  Is it your --
10     A.   Because you -- I mean, based
11 upon that statement, you would insinuate that
12 that's a lesser degree of privileges.  And
13 it's not.
14     Q.   I'm not saying it's a lesser
15 degree of privileges.  What I am saying is
16 that --
17     A.   They're different?
18     Q.   -- that there is a difference --
19     A.   Yeah, there is a difference.
20     Q.   -- in permanent employee status
21 and executive status employee, correct?
22     A.   There is a difference.
23     Q.   Okay.  And permanent --

29 (Pages 110 to 113)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 114

1    A.    The real difference on it is in
2  terminology.
3    Q.    Permanent employees don't have
4  all of the rights and privileges of executive
5  status employees, correct?
6    A.    Correct.
7    Q.    And executive status employees
8  may not necessarily have all of the benefits
9  and privileges of permanent status employees,
10  correct?
11    A.    Only one.
12    Q.    What's that one?
13    A.    The designation of permanent.
14    Q.    Okay. And --
15    A.    And permanent means whether
16  you're on the job or not.
17    Q.    Permanent means what?
18    A.    Whether you're on the job or
19  not.
20    Q.    Okay. I want you to read
21  Section 1.2, Employee Service Status, and
22  familiarize yourself with what permanent
23  status employee means.

Page 115

1    A.    Okay. It's just the designation
2  of permanent, other than at the discretion of
3  the President or the Board.
4    Q.    Executive status employees are
5  what at the discretion of the President or
6  the Board?
7    A.    Their employment tenure.
8    Q.    Is at the direction of the
9  President or the Board, correct?
10    A.    At the pleasure. Not
11  discretionary. At the pleasure of the Board.
12  And is not eligible for permanent status.
13    Q.    So, just to be clear, it states
14  persons appointed to positions as executive
15  status employees -- and it says see below --
16  serve at the pleasure of the President or
17  Board of Trustees and are not eligible to
18  achieve permanent employee status, correct?
19    MR. MADISON: Object to the
20  form. Go ahead.
21    Q.    (By Ms. Meadows) Correct?
22    A.    That's what it says, yeah.
23    Q.    And what does it mean to serve

Page 116

1  at the pleasure of the President or the
2  Board?
3    MR. MADISON: Object to the
4  form.
5    THE WITNESS: Well, it means
6  that you don't have the flexibility to move
7  between various positions or vacancies that
8  are open at the University.
9    Like I said, the legal or the
10  terminology as it pertains to permanent is
11  not afforded a person of executive status.
12  It's not -- the same flexibility does not
13  exists.
14    Q.    (By Ms. Meadows) Okay.
15  Permanent employees are eligible to obtain a
16  form of tenure. Is that your understanding
17  of it?
18    A.    To a certain degree.
19    Q.    Permanent employees have the
20  right to continuing employment?
21    A.    Correct.
22    Q.    Executive status employees have
23  the right to employment, subject to the

Page 117

1  pleasure of the Board of Trustees or the
2  President?
3    A.    Correct.
4    Q.    Okay.
5    A.    Barring the confines of their
6  agreement.
7    Q.    What's the confines of the
8  agreement?
9    A.    That your employment -- your
10  employment status is renewable on an annual
11  basis.
12    Q.    At the discretion of the
13  President and the Board of Trustees, correct?
14    A.    That's correct.
15    Q.    How did you meet Ms. Johnson,
16  Jalonda Johnson, Mr. Diop?
17    A.    Through her mother.
18    Q.    And her mother is Linda Johnson?
19    A.    Correct.
20    Q.    How did her mother introduce --
21  come to introduce her daughter, Jalonda, to
22  you?
23    A.    Well, they invited me to their

30 (Pages 114 to 117)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 118

1  house for dinner during Christmas.  However,
2  I was visiting with my family in Chicago.
3       I thought Ms. Johnson to be a
4  nice lady.  She had helped me and was less
5  resistant than most of the other employees
6  that I had encountered since being there, and
7  I thought it to be a very nice gesture.
8       However, since I was not able to
9  accept their invitation, I did accept their
10  invitation for dinner around the 5th of
11  January when I returned.
12     Q.   You accepted an invitation from
13  them for dinner?
14     A.   That's correct.
15     Q.   Around the 5th of January.  And
16  is that where you met Jalonda?
17     A.   Yes.  And I also met her father
18  and her sister and her nephew.
19     Q.   So, prior to January 5th, 2005,
20  you had never met Jalonda Johnson?
21     A.   Never.
22     Q.   And you had never talked to
23  Jalonda Johnson on the phone prior to --

Page 119

1     A.   Never.
2     Q.   -- January 5th, 2005?
3     A.   Never.
4     Q.   How did you come to get
5  Jalonda's cell phone number?
6     A.   Actually, she -- because she
7  called me.
8     Q.   Jalonda called you?
9     A.   Correct.
10     Q.   How would you describe your
11  relationship with Jalonda?
12     A.   Acquaintance.
13     Q.   As acquaintances?
14     A.   That's correct.
15     Q.   When did you become -- you
16  became acquainted January 5th of 2005?
17     A.   That was our initial
18  acquaintance, yeah.
19     Q.   And did you continue to be
20  acquainted with Ms. Johnson following January
21  5th, 2005?
22     A.   We had communications.
23     Q.   What type of communications did

Page 120

1  you have?
2     A.   Phone conversations.
3     Q.   Okay.  How often did you talk on
4  the phone?
5     A.   Very infrequent.
6     Q.   Define very infrequently for me.
7     A.   I would say between January 5th
8  and January 25th we might have talked 25
9  times at most.
10     Q.   Between January 5th and January
11  25th?
12     A.   Right.
13     Q.   Which is approximately 20 days?
14     A.   Uh-huh (affirmative).
15     Q.   You may have talked 25 times?
16     A.   Yes.
17     Q.   Okay.  Was that a conversation
18  per day or multiple conversations on some
19  days?
20     A.   It could have been one or two on
21  the same day.  As a matter of fact, more than
22  likely, it didn't take place over the 20-day
23  period.  It might have been one or two in the

Page 121

1  course of a day maybe.
2     Q.   So, for approximately 20 days
3  you may have talked once or twice a day?
4     A.   May have talked once.
5     Q.   You may have talked to her once
6  a day for 20 days?
7     A.   Possibly.
8     Q.   What did you talk about?
9     A.   Hello and goodbye.
10     Q.   How long did your conversations
11  generally last?
12     A.   Maybe less than a minute.
13     Q.   Did you have any conversations
14  with Ms. Johnson that lasted longer than
15  that?
16     A.   Maybe five.
17     Q.   Did you have any conversations
18  with Ms. Johnson that lasted longer than five
19  minutes?
20     A.   If so, I don't recall them.
21     Q.   You don't recall any
22  conversations you had with Ms. Johnson
23  between --

31 (Pages 118 to 121)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 122 | Page 124 |
|---|---|
| 1   A.  That lasted longer than five | 1  Johnson on the 31st? |
| 2  minutes? No. | 2   A.  It wasn't serious. Probably 60 |
| 3   Q.  And that's any time between | 3  seconds or less. |
| 4  January 5th -- | 4   Q.  You talked to Ms. Johnson for |
| 5   A.  And the 25th. | 5  one minute or less on January 31st? |
| 6   Q.  -- and January 25th? | 6   A.  Correct. |
| 7   A.  That's correct. | 7   Q.  Did you have any -- did you have |
| 8   Q.  After January 25th, did you have | 8  more than one conversation with Ms. Johnson |
| 9  conversations -- | 9  on the 31st? |
| 10   A.  There was no communication, | 10   A.  Yeah. She called me several |
| 11  period. | 11  times. |
| 12   Q.  You never talked to Ms. Johnson | 12   Q.  And how long did you talk on the |
| 13  after January 25th, 2005? | 13  other occasions when she called you? |
| 14   A.  Maybe one other day. | 14   A.  I mean, I said -- like I said, |
| 15   Q.  And what day was that? | 15  less than five minutes. I mean, you know, we |
| 16   A.  I think that may have been -- | 16  -- we never had any kind of long, drawn out |
| 17   THE WITNESS: What day did that | 17  conversations. |
| 18  incident happen? | 18   Q.  And you never had a conversation |
| 19   MR. MADISON: I can't answer | 19  that lasted more than five minutes? |
| 20  your question for you. | 20   A.  To my knowledge. |
| 21   THE WITNESS: Huh? | 21   Q.  And it's your contention that |
| 22  That would be the only day. | 22  Ms. Johnson called you on each of those |
| 23   MR. MADISON: I said I can't | 23  occasions on which you spoke? |

| Page 123 | Page 125 |
|---|---|
| 1  answer your question for you. | 1   A.  It's a fact that Ms. Johnson |
| 2   THE WITNESS: Oh, okay. | 2  called me. |
| 3  No, I'm asking you a question. | 3   Q.  And you never called Ms. |
| 4   MR. MADISON: I'm not taking the | 4  Johnson? |
| 5  deposition. You've got to provide the | 5   A.  I returned her calls, yeah. |
| 6  answers. | 6   Q.  Okay. You -- |
| 7   THE WITNESS: One other day, the | 7   A.  Now, whether we connected during |
| 8  31st. | 8  those times is a different story. |
| 9   Q.  (By Ms. Meadows) And that was | 9   Q.  You never initiated any |
| 10  the 31st? | 10  telephone calls to Ms. Johnson? |
| 11   A.  Uh-huh (affirmative). | 11   A.  No. |
| 12   Q.  So, from January 26th, 2005, up | 12   Q.  And you never talked to her for |
| 13  until let's say -- | 13  longer than five minutes? |
| 14   A.  No other conversations. | 14   A.  No. |
| 15   Q.  -- through January 30th, there | 15   Q.  Generally, what time of day did |
| 16  were no other conversations? | 16  you talk to Ms. Johnson? |
| 17   A.  No. | 17   A.  Early in the day. |
| 18   Q.  And you next talked with Jalonda | 18   Q.  Early in the day? |
| 19  Johnson on January 31st, 2005? | 19   A.  Yeah. |
| 20   A.  Uh-huh (affirmative). | 20   Q.  And by early in the day, what |
| 21   Q.  Is that a yes? | 21  time frame do you mean? |
| 22   A.  Yes. | 22   A.  2:00, 3:00 maybe or maybe 6:00. |
| 23   Q.  How long did you talk to Ms. | 23   Q.  2:00 to 3:00 in the morning? |

32 (Pages 122 to 125)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 126

1    A.    No, in the afternoon.
2    Q.    2:00 to 3:00 in the afternoon or
3  perhaps 6:00 in the afternoon?
4    A.    Yeah.
5    Q.    Did you have any conversations
6  with Ms. Johnson that took place after 10:00
7  p.m.?
8    A.    Not to my knowledge.
9    Q.    To your knowledge, you never had
10  a conversation with Ms. Jalonda Johnson that
11  took place after 10:00 p.m. --
12    A.    No.
13    Q.    -- and prior to 6:00 a.m.?
14    A.    Not to my knowledge, no.
15    Q.    And to your knowledge, you never
16  would have had a conversation with Ms.
17  Johnson that took place after 10:00 p.m. up
18  until prior to 6:00 a.m. that lasted for more
19  than five minutes?
20    A.    Not to my knowledge, no.
21    Q.    When you and Ms. Johnson would
22  talk at 2:00 or 3:00 in the afternoon and
23  have your conversations, what did you talk

Page 127

1  about during that time?
2    A.    She might call and say hello and
3  ask how my day was going, something like
4  that.
5    Q.    Did you ever inquire into Ms.
6  Johnson's day?
7    A.    I might say, yeah, my day has
8  been fine or, you know, I've had a terrible
9  day. How is yours?
10    Q.    Okay.
11    A.    We've -- it's always been
12  cordial.
13    Q.    Would you -- you said you were
14  friendly acquaintances --
15    A.    Yeah.
16    Q.    -- or cordial acquaintances?
17    A.    We had no reason to be otherwise
18  initially.
19    Q.    And the general subject of your
20  conversation was just making conversation,
21  being friendly?
22    A.    Basically.
23    Q.    In January of 2005, did you make

Page 128

1  any effort to assist Ms. Johnson in finding
2  employment at Alabama State University?
3    A.    No.
4    Q.    In January of 2005, did you ask
5  Stratford Moore if he wanted to hire Ms.
6  Johnson to work for him --
7    A.    No.
8    Q.    -- as a 20-hour student?
9    A.    No.
10    Q.    Did you suggest to Mr. Moore an
11  hourly rate that he should pay Ms. Johnson to
12  work for him?
13    A.    No. I mean, Stratford is over
14  his own department. He makes that
15  determination.
16    Q.    In January of 2005, did you
17  offer to transfer funds from your account to
18  Mr. Moore's account to allow him to pay Ms.
19  Johnson to work for him?
20    A.    Never.
21    Q.    In January of 2005, did you ever
22  complete paperwork to request a budget
23  adjustment for funds to be transferred?

Page 129

1    A.    Never.
2          MS. MEADOWS: Okay. This is
3  going to be Defendant's Exhibit 6.
4          (Whereupon, said document was
5          marked for identification as
6          Exhibit No. 6 to the deposition
7          of Anwar K. Diop.)
8    Q.    Mr. Diop, did anyone present
9  this form to you and request your signature
10  on it?
11    A.    I've seen it.
12    Q.    Okay.
13    A.    Yes.
14    Q.    You have seen it?
15    A.    Yes.
16    Q.    Did anyone present this to you
17  and request that you sign this form?
18    A.    I don't remember exactly who,
19  but it -- it originated somewhere around --
20  it originated between Mrs. Johnson and maybe
21  my office manager or something like that,
22  which is one of the reasons I had a major
23  issue with this form.

33 (Pages 126 to 129)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 130

1    Q.    Who was your officer manager at
2  that time?
3    A.    Geraldine. I know her first
4  name is Geraldine. Lampkin.
5    Q.    Okay.
6    A.    Lampkin.
7    Q.    I couldn't think of it either.
8    A.    But, yeah. I had a major -- a
9  major problem with this.
10   Q.    This was presented to you, but
11 you did not sign this?
12   A.    Absolutely not.
13   Q.    So, there will not be a signed
14 version of this form --
15   A.    Absolutely not.
16   Q.    -- anywhere that I search, will
17 there?
18   A.    If it is, it's forged.
19   Q.    Okay.
20   A.    To my knowledge, I don't think
21 they went that far.
22   Q.    And you never submitted this to
23 any vice president?

Page 131

1    A.    Never.
2    Q.    You never submitted it to Mr.
3  Willie Thomas?
4    A.    Never.
5    Q.    You never made any attempt --
6    A.    Never.
7    Q.    -- to make this happen?
8        MR. MADISON:  Let her finish her
9  question.
10       THE WITNESS:  This form was
11 never submitted by me to any higher or
12 appropriate authority for processing or
13 consideration.
14   Q.    (By Ms. Meadows)  And because
15 you never requested the funds, to your
16 knowledge, no funds were ever transferred
17 from your account?
18   A.    To my knowledge, no.
19   Q.    You never received a notice from
20 internal audit verifying that funds had been
21 transferred?
22   A.    Absolutely not.
23   Q.    You never received any

Page 132

1  indication that this budget transfer had been
2  approved, did you?
3    A.    Absolutely not.
4    Q.    And you would have had no reason
5  to expect to receive notification since you
6  did --
7    A.    That's correct.
8    Q.    -- not submit this?
9    A.    That's correct.
10       MR. MADISON:  Let her finish her
11 question.
12       THE WITNESS:  Okay. I'm sorry.
13       MR. MADISON:  You're answering
14 before she's finished, and it makes it
15 difficult for the court reporter to take down
16 both.
17       THE WITNESS:  I understand.
18   Q.    (By Ms. Meadows)  And I know
19 that -- you probably talk like I do. I tend
20 to do that, too.
21       It just makes it really hard
22 later on to piece together what you said in
23 response to my question because what's going

Page 133

1  to happen is there's going to be part of an
2  answer and part of the question, the rest of
3  the answer.
4    A.    I understand.
5    Q.    Okay. At any point during your
6  acquaintance, your brief acquaintance with
7  Jalonda Johnson, did you express to her any
8  romantic interest?
9    A.    Never.
10   Q.    Did you at any point express to
11 her parents that you had a romantic interest
12 in Ms. Jalonda Johnson?
13   A.    No, but it did come up.
14   Q.    How did the subject come up?
15   A.    Because this was something that
16 Mrs. Johnson sort of orchestrated, and I
17 think that was her initial intention. And I
18 made it very clear during our dinner that --
19       First of all, I had never spoken
20 or met her before that day. I wouldn't even
21 -- I couldn't be infatuated and like anyone I
22 don't even know. Okay.
23       And I made it very clear to her

34  (Pages 130 to 133)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 134

1   father that that was the case and that he
2   didn't have to worry about anything like
3   that. I mean, I told him I had a daughter of
4   my own and I understood.
5       Q.    Just to be clear, what you
6   expressed to her -- when did you express this
7   to her parents?
8       A.    When her father asked me.
9       Q.    And when did he ask you?
10      A.    During dinner.
11      Q.    During that dinner on January
12  5th?
13      A.    Correct.
14      Q.    And what was her father's
15  response when you assured him that he had
16  nothing to be concerned about?
17      A.    I mean, he seemed to be, you
18  know, okay with that.
19      Q.    And what --
20      A.    He seemed to be okay with that.
21  And then the baby started having some medical
22  -- well, I think the baby had just gotten out
23  of the hospital.

Page 135

1       So, he asked me if it was okay,
2   you know, if they just ordered their food and
3   leave. I told him I didn't have no problem
4   with that at all.
5       Q.    Okay. So, you --
6       A.    And that's exactly what they
7   did.
8       Q.    So, you-all did not finish
9   eating together on that evening?
10      A.    Not between the mother, the
11  father and the two -- Jalonda and her sister
12  stayed. I waited for my food because I took
13  my food to go as well.
14      Q.    Okay. They asked me if I would
15  drop them at their car, which I did, which
16  was probably about three or four blocks away.
17      Q.    And just for clarification, when
18  you say "they," who did you drop at the car?
19      A.    Jalonda and her sister.
20      Q.    And when did you drop them at
21  the car?
22      A.    After my food arrived, they --
23  and they ordered dessert, we immediately

Page 136

1   left. But their parents had already gone.
2       Q.    Was that before or after the
3   dessert arrived?
4       A.    I mean, we couldn't leave until
5   after they got dessert.
6       Q.    So, you didn't -- you waited
7   while they finished eating dessert?
8       A.    They ate their dessert there. I
9   took my food to go.
10      Q.    And you arrived late to this --
11  did you arrive late to this dinner?
12      A.    Yes.
13      Q.    So, that's why your timing on
14  eating was off because --
15      A.    Right. They had already ordered
16  and everything.
17      Q.    So, when you arrived, had her
18  parents and Jalonda and -- you said her
19  sister?
20      A.    Yes.
21      Q.    Had they all already ordered
22  their food when you got there?
23      A.    Yes.

Page 137

1       Q.    What restaurant was this at?
2       A.    Outback.
3       Q.    Who paid for the dinner that
4   evening?
5       A.    I paid for my portion of the
6   dinner, and I paid for -- I paid for the
7   desserts I know. And that was it.
8       Q.    Who paid for the other meals?
9       A.    I think Mr. Johnson paid for
10  Mrs. Johnson.
11      Q.    Who paid for Jalonda and her
12  sister?
13      A.    Well, they -- the only bill that
14  I paid for was for my meal and the desserts.
15      Q.    You don't have any idea who paid
16  for Jalonda and --
17      A.    I don't know which one of them
18  paid.
19      Q.    Do you know if Mr. Johnson paid
20  with cash or with a credit card?
21      A.    I have no idea.
22      Q.    Do you see Mr. Johnson pay?
23      A.    No, I did not.

35 (Pages 134 to 137)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 138

1    Q.    Did you pay with cash or with
2  credit card?
3    A.    I probably paid with cash.
4    Q.    And just to be clear, Mr. Diop,
5  at no point -- well, let me back up.  That
6  wasn't coming out right.
7          You did not ask Jalonda's
8  parents for permission to date her?
9    A.    Never.
10   Q.    And you never indicated to her
11 parents that you were romantically interested
12 in her?
13   A.    Never.
14   Q.    And you never told them that you
15 wanted to pursue a relationship with her?
16   A.    As a matter of fact because her
17 father -- I really thought we kind of made --
18 I thought the communication went well.  I
19 mean, that was my thoughts.
20         But, no, there was no suggestion
21 or even offer on my part for that.
22   Q.    And you testified earlier that
23 you thought that Mrs. Johnson, meaning Linda,

Page 139

1  may have had intentions of --
2    A.    I know she did.
3    Q.    What I'm trying to get to, can
4  you share with me the things that made you
5  believe she was trying to set you up with
6  Jalonda?
7    A.    Because her father asked me at
8  dinner.  I mean, that's really what struck
9  the whole conversation, you know, because
10 evidently it was something that they had
11 already discussed between them.
12         And, you know, he asked me if I
13 had any, you know, interest in his daughter,
14 you know.  And I told him then that I had
15 never -- had not met her, nor communicated
16 with her at any point before that very
17 instance.  And those were my exact words.
18   Q.    Prior to January 31st, 2005, had
19 you invited Ms. Jalonda Johnson to your
20 house?
21   A.    No.
22   Q.    To your knowledge, before
23 January 31st, 2005, did Ms. Jalonda Johnson

Page 140

1  know where you lived?
2    A.    I believe she did, yeah.
3    Q.    How do you believe she acquired
4  that knowledge?
5    A.    I don't know.  She could have
6  followed me or she could have asked --
7  everybody knew really where I lived because I
8  lived a couple of blocks from the University.
9    Q.    Okay.
10   A.    I mean, it just seemed to be
11 something that interest her.
12   Q.    Do you recall an afternoon where
13 -- well, let me back up.
14         Do you recall seeing Ms. Jalonda
15 Johnson in the physical plant building
16 visiting with her mother on any occasions
17 prior to the January 5th meeting with her?
18   A.    No, not prior to that.  After
19 that.  I mean, I wouldn't have really paid
20 attention, but only after I -- you know,
21 became acquainted would I have -- did I even
22 notice.  She may have.
23   Q.    After --

Page 141

1    A.    But I was -- well, go ahead.
2    Q.    If you're not finished, go
3  ahead.
4    A.    No.  Go ahead.
5    Q.    After January 5th when you knew
6  who she was at least -- and she had started
7  calling you, correct?
8    A.    Probably about three or four
9  days later, yes.
10   Q.    Okay.
11   A.    At least three or four days
12 later.
13   Q.    Did you begin to notice seeing
14 her visiting her mother at the physical plant
15 building after your meeting?
16   A.    Yeah.
17   Q.    Did you speak to her on these
18 occasions?
19   A.    If our paths crossed.
20   Q.    And what would you say on those
21 occasions?
22   A.    Hello.
23   Q.    Do you recall an occasion where

36 (Pages 138 to 141)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 142

1  Ms. Jalonda Johnson may have been visiting
2  with her mother, Linda, and you invited
3  Jalonda to follow you to see your house on
4  Hull Street?
5      A.    Never.
6      Q.    Do you recall when you got the
7  property on Hull Street?
8      A.    Sometime around December. I've
9  got to take this call.
10     MS. MEADOWS: We'll take a
11  break.
12     (Whereupon, the taking of the
13  deposition was recessed from approximately
14  2:31 p.m. to approximately 2:48 p.m., after
15  which the following proceedings were had and
16  done:)
17     MS. MEADOWS: Belinda, where was
18  I when we left?
19     (Whereupon, the requested portion
20  was read back.)
21     Q.    After you got that property, did
22  you invite Jalonda back to see where you were
23  staying?

Page 143

1      A.    No.
2      Q.    Did you ever tell Jalonda you
3  wanted to take her to see your apartment?
4      A.    No.
5      Q.    Prior to January 31st, 2005, you
6  had never invited Ms. Johnson to your
7  apartment?
8      A.    No.
9      Q.    On January 5th, the evening of
10  the dinner, do you remember about what time
11  that dinner was scheduled?
12     A.    About 6:00 or 7:00 o'clock.
13     Q.    And you said you were running
14  late?
15     A.    Significantly late.
16     Q.    Do you recall making telephone
17  conversations -- telephone calls to Ms.
18  Johnson and her family on that evening?
19     A.    I recall them making at least 12
20  to me.
21     Q.    Okay. They called you
22  repeatedly?
23     A.    Yes.

Page 144

1      Q.    Okay.
2      A.    Asking me if I was going to
3  come, you know.
4      Q.    And they called you on the cell
5  phone that you had for Alabama State
6  University, correct?
7      A.    That's correct.
8      Q.    Do you have any reason to
9  dispute that that number was 334-202-3473?
10     A.    No. 3473?
11     Q.    Yes.
12     A.    I really don't remember. I
13  thought it was like 0203 or something like
14  that. That could be the number. I'm not
15  sure.
16     Q.    But that could be the number?
17     A.    I still have it in my Blackberry
18  phone as a matter of fact.
19     Q.    Do you have that with you?
20     A.    No, but I could get it.
21     Q.    Okay.
22     A.    I don't live that far.
23     Q.    Well, let's not do that. How

Page 145

1  about we do this. For purposes of your
2  deposition -- and we will use it going
3  forward -- we will say that that number was
4  334-202-3473.
5      I will submit a discovery
6  request to your attorney requesting that he
7  verify the phone number. And unless he gives
8  me a different number, we will presume that
9  334-202-3473 was your Alabama State
10  University issued cell phone number.
11     THE WITNESS: Is that all right
12  with you?
13     MR. MADISON: Yeah. And Alabama
14  State ought to have those records.
15     THE WITNESS: I don't mind.
16     Q.    (By Ms. Meadows) You also
17  stated that Jalonda began calling you after
18  the dinner on January the 5th, correct?
19     A.    Three to four days after, yes.
20     MR. MADISON: Speak a little bit
21  louder so the court reporter can hear you.
22     THE WITNESS: Three to four days
23  after.

37 (Pages 142 to 145)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 146

1    Q.    (By Ms. Meadows)  Do you recall
2  making a phone call to Jalonda the following
3  evening?
4    A.    I recall her calling me the
5  following evening.  Yeah, that's right.
6        MS. MEADOWS:  Okay.  I'm going
7  to mark this as the next exhibit.
8        (Whereupon, said document was
9        marked for identification as
10       Exhibit No. 7 to the deposition
11       of Anwar K. Diop.)
12   Q.    Mr. Diop, these are -- this next
13 set of documents have been marked as Exhibit
14 7 to your deposition.  I want you to turn to
15 the page --
16   A.    Is this supposed to be my phone?
17   Q.    This is not your phone records.
18 These --
19   A.    Oh, okay.
20   Q.    -- have been submitted as the
21 phone records of Linda Johnson.
22   A.    Oh, okay.  Yeah.  Because I was
23 going to say this is definitely not my phone

Page 147

1  record.
2    Q.    Okay.  And these are telephone
3  calls -- a record of calls to and from the
4  cell phone used by Jalonda Johnson.
5    A.    Okay.  And what number is her
6  cell phone number supposed to be?
7    Q.    That phone number is, according
8  to Page 23 -- well, it says Page 3, but --
9    A.    1819?
10   Q.    It is 334-303-1819.  Okay.
11   A.    Okay.
12   Q.    I'm going to direct your --
13 well, Mr. Diop, what documents are you
14 reviewing?
15   A.    I'm reviewing my phone.
16   Q.    Those are your telephone
17 records?
18   A.    This is my personal phone.
19   Q.    I'm going to direct you to Page
20 33.
21   A.    Excuse me?
22   Q.    It's at Page 33.  I want you to
23 look at the second column.

Page 148

1    A.    Okay.
2    Q.    And I want you to look at what
3  is call number 229 at 9:40 p.m.
4        Do you see that?
5    A.    Uh-huh (affirmative).
6    Q.    On January the 5th?
7    A.    On January the 5th at 9:40 p.m.?
8    Q.    Yes.  Did you call Ms. Johnson
9  that evening?
10   A.    I guess I did.
11   Q.    Do you remember why you called
12 Ms. Johnson that evening?
13   A.    No, I don't.
14   Q.    I want you to look down at call
15 number --
16   A.    Unless I was returning her call.
17   Q.    Okay.
18   A.    Oh, hold up.  Yes, I do.  I
19 think I do.  Yeah.
20   Q.    Why did you call Ms. Johnson
21 that evening?
22   A.    Because she called me and asked
23 me if I would -- you know, she said, well,

Page 149

1  you know, I know the discussion between you
2  and my dad, you know.  But, you know, we
3  could still -- we could at least be friends.
4        And, you know, I -- I told her
5  that I didn't have a problem with that.
6    Q.    She called you on January 5th?
7    A.    Yeah.  That was the initial
8  call, yeah.
9    Q.    And said that.  What time did
10 she place that call to you?
11   A.    I'm really not sure.  It was
12 late -- it was -- it was in the afternoon or
13 early evening, something like that.  I don't
14 really recall.
15   Q.    Look at the list of calls prior
16 to that one because you say that this call at
17 9:40 is where you called her.
18   A.    Uh-huh (affirmative).
19   Q.    Were you calling her back?
20   A.    Probably.
21   Q.    And that's when she said -- is
22 that when you had the conversation when you
23 called her back?

38 (Pages 146 to 149)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 150 | Page 152 |
|---|---|
| 1    A.    Well, I think the initial | 1    now it kind of -- now, I could -- I kind of |
| 2    conversation I probably didn't -- I probably | 2    could construe a lot in that, but -- you |
| 3    didn't give her a call. And I returned her | 3    know, and they -- I thought about that that |
| 4    call. That's how it was usually. That's how | 4    night and I -- it just didn't make sense. |
| 5    it usually happened. | 5    But I did drop them off down there. |
| 6    Q.    So, it's your contention that | 6    Q.    Okay. And call number 237 -- |
| 7    Ms. Johnson called you sometime prior to the | 7    A.    And then I immediately rushed |
| 8    9:40? | 8    back to the restaurant. |
| 9    A.    Yeah. I'm sure. | 9    Q.    After -- |
| 10    Q.    And you didn't answer? | 10    A.    Yeah. When I dropped them at |
| 11    A.    That might have been a second | 11    their car because I left my -- I got my food |
| 12    call. I really don't know, but I think she | 12    to go, but I left it. |
| 13    called me at least -- probably around 6:00 or | 13    Q.    Okay. What time was it when you |
| 14    7:00, something like that. | 14    returned to the restaurant? |
| 15    Q.    The dinner you said was | 15    A.    I went -- I dropped them at |
| 16    scheduled to be 6:00 or 7:00 o'clock, | 16    their car and came -- and went right -- and |
| 17    correct? | 17    came right back. And I think that's probably |
| 18    A.    That was on the 5th. This is -- | 18    one of the reasons that I called, just to |
| 19    Q.    That call is on the 5th. | 19    make sure that they was able to get off. |
| 20    A.    -- the 6th. | 20    Q.    Okay. |
| 21    Q.    Call number 229 is on the 5th. | 21    A.    But I -- I dropped them and I |
| 22    A.    Oh, okay. Okay. Well, then, | 22    left right back. And then there was a major |
| 23    this has to be either after that or right | 23    discrepancy at the restaurant because they |

| Page 151 | Page 153 |
|---|---|
| 1    when I -- either shortly after I dropped them | 1    threw away my food. But I had never eaten |
| 2    at their car or something like that. | 2    and everything. And so -- but they had to |
| 3        I may have -- I don't know. I | 3    give me new food, but they didn't do it till |
| 4    might have called to see if they made it or | 4    the next day. |
| 5    something because I dropped them in a parking | 5    Q.    So, you arrived back at the |
| 6    lot, which I kind of thought was unusual that | 6    restaurant sometime after 9:30? |
| 7    -- you know, why they would be parked there | 7    A.    I mean -- yeah. |
| 8    in the first place. But that's where I | 8    Q.    I'm just trying to figure out |
| 9    dropped them for their car. So, that -- that | 9    what time it was when all this was taking |
| 10    probably was what it was. | 10    place. |
| 11    Q.    What parking -- where was this | 11    A.    I guess it was around that, |
| 12    parking lot that they were parked in? | 12    something like that. |
| 13    A.    Winn-Dixie. It was a Winn-Dixie | 13    Q.    Do you know what time it was |
| 14    parking lot further down the Boulevard. | 14    when you dropped Jalonda and her sister off |
| 15    Q.    You-all went to the Outback | 15    at the Winn-Dixie parking lot? |
| 16    restaurant -- | 16    A.    Not really, no. |
| 17    A.    Yeah. | 17    Q.    Approximately how long did it |
| 18    Q.    -- on the Boulevard, correct? | 18    take you to drive from the Outback to the |
| 19    A.    Correct. But then her parents, | 19    Winn-Dixie? |
| 20    they asked me to drop them off at their car, | 20    A.    Five -- ten minutes. Five |
| 21    which was parked down there. That's -- | 21    minutes. You know, that's not -- I mean, |
| 22    Q.    At the -- | 22    it's -- it's not that far. It's past |
| 23    A.    Yeah. And that -- you know, and | 23    Wal-Mart, I think. |

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 154

1    Q.    How long did you-all stay at the
2  restaurant after the girls' parents had left?
3    A.    Just enough time for them to eat
4  their dessert.
5    Q.    Approximately how long was that?
6    A.    Ten minutes. See, I didn't get
7  there until like 8:00 maybe, 8:30, or
8  something like that.
9    Q.    You got there at 8:00 or 8:30?
10   A.    Yeah. It was after 8:00. I
11 know that.
12   Q.    How long did her parents stay
13 after you arrived?
14   A.    Thirty minutes maybe.
15   Q.    So, her parents left at about
16 8:30. Okay. What time did you return home
17 that evening?
18   A.    I don't remember.
19   Q.    Was it before 10:00 o'clock?
20   A.    I don't remember because I had
21 to stay in the restaurant for a long time.
22 And as a matter of fact, I stayed there and I
23 ended up waiting for the manager to come back

Page 155

1  dealing with that whole instance, the
2  situation with my food.
3    Q.    Now, let's take a look at call
4  number 237. That call was on January the
5  6th.
6    A.    Okay.
7    Q.    According to the phone record,
8  what time was that call?
9    A.    1:42 a.m., I guess.
10   Q.    Well, it says 1:42, and it has
11 an A by it, correct?
12   A.    Correct.
13   Q.    And there are other calls that
14 have Ps by them, correct?
15   A.    Correct.
16   Q.    So, that would be 1:42 in the
17 morning?
18   A.    Uh-huh (affirmative). I would
19 assume.
20   Q.    And you called Ms. Johnson at
21 1:42 in the morning, correct?
22   A.    I don't recall calling her at
23 1:42.

Page 156

1    Q.    Did someone else have access to
2  your phone at 1:42 in the morning?
3    A.    No.
4    Q.    Okay. So, according to the
5  record --
6    A.    This was on the 6th. That's
7  possible.
8    Q.    And you-all talked for how long
9  at that time?
10   A.    Thirteen minutes.
11   Q.    Thirteen minutes?
12   A.    Uh-huh (affirmative).
13   Q.    That's longer than the five
14 minute maximum you gave me earlier, isn't it?
15   A.    Yeah.
16   Q.    What did you talk about for 13
17 minutes with Ms. Johnson at 1:42 in the
18 morning?
19   A.    The fact that I had already
20 discussed with her father -- I mean, she --
21 she really wanted to, you know, continue to
22 pursue some kind of a romantic type of
23 relationship, you know. And, I mean, I'm a

Page 157

1  grown man. I'm not fixing to go behind
2  nobody's back and do anything that I could
3  do. You understand what I'm saying?
4        So, that's -- I mean, I wasn't
5  going for that.
6    Q.    When did you have a conversation
7  with Ms. Johnson where she indicated that she
8  wanted to continue to pursue a relationship?
9        Was that in-person conversation
10 or over the telephone conversation?
11   A.    Over the telephone if I'm not
12 mistaken.
13   Q.    When did that conversation --
14   A.    I told her, you know, I didn't
15 mind being her friend, you know.
16   Q.    Was that a call that Ms. Johnson
17 made to you?
18   A.    I think initially, yeah.
19   Q.    When did Ms. Johnson call you?
20   A.    I don't remember -- it may have
21 been the same day. It might have been the
22 same day.
23   Q.    Okay. I want you to look

40  (Pages 154 to 157)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 158 | Page 160 |
|---|---|
| 1 between the calls that are recorded between | 1    A.    I said it could have been. |
| 2 call numbers 229, which we previously | 2    Q.    Okay. |
| 3 reviewed, which start January the 5th at 9:40 | 3    A.    And if I didn't make that very |
| 4 p.m. -- | 4 clear initially, that's what I'm saying. |
| 5    A.    Okay. | 5    Q.    And you also gave me specific |
| 6    Q.    -- all the way up through call | 6 information regarding what Ms. Johnson said |
| 7 number 237, which is the call we're | 7 to you in the call that you were responding |
| 8 discussing now, which was made on January 6th | 8 to? |
| 9 at 1:42 a.m. where you called Ms. Johnson. | 9    A.    Oh, yeah. |
| 10    Do you see any calls from Ms. | 10    Q.    So, what I'm trying to figure |
| 11 Johnson to you reflected there? | 11 out -- |
| 12    A.    Yeah. | 12    A.    Certain things I have to keep -- |
| 13    Q.    Which call? | 13 well, I've had to keep her, you know, pretty |
| 14    A.    Call number 238. | 14 much implanted in my mind. |
| 15    Q.    No, no, no. Okay. Call number | 15    Q.    And what I want you to take from |
| 16 238 was made on the 6th. What time was that | 16 your mind and implant on the record is when |
| 17 call made? | 17 Ms. Johnson made that call to you and when |
| 18    A.    2:11. | 18 you had that conversation. |
| 19    Q.    2:11 a.m., correct? | 19    A.    Well, I would have to get some |
| 20    A.    Uh-huh (affirmative). | 20 other records, I think. But if you would |
| 21    Q.    So, that call was made after the | 21 notice, there was a dillydally in how they -- |
| 22 call at 1:42 a.m., correct? | 22 how the sequence of these calls came about. |
| 23    A.    Correct. | 23    We only communicated on one |

| Page 159 | Page 161 |
|---|---|
| 1    Q.    So, the call at 1:42 a.m. could | 1 particular phone that they -- that I |
| 2 not have been a return call from the call | 2 communicated with her, but they called three |
| 3 made at 2:11 a.m., could it? | 3 different phones of mine and they did that |
| 4    A.    Yeah, it could have. | 4 strategically. |
| 5    Q.    You could have called Ms. | 5    Q.    Okay. So, we -- |
| 6 Johnson back before she called you? | 6    A.    Now, if -- and if you would |
| 7    A.    Yes. As a matter of fact, yeah. | 7 notice -- I don't know if you have copies of |
| 8 Because there is such a thing as voice mail. | 8 my personal phone records as well, but a lot |
| 9    Q.    She could have called you at | 9 of her -- and I -- and one of the reasons, I |
| 10 2:11 a.m.? | 10 think, is because they knew that my office |
| 11    A.    Uh-huh (affirmative). | 11 phone did not keep track of -- it was either |
| 12    Q.    And in response to her 2:11 a.m. | 12 the incoming or outgoing calls. So, on |
| 13 call where you talked for two minutes, you | 13 certain instances they'll call me on my |
| 14 called her at 1:42 a.m.? | 14 personal phone. |
| 15    A.    I mean, I don't remember the | 15    Q.    Okay. |
| 16 sequence and exactly how it went. But I know | 16    A.    And on other instances it will |
| 17 that generally our phone calls were initiated | 17 be on my business phone. |
| 18 by Ms. Johnson. As a matter of courtesy and | 18    Q.    Okay. |
| 19 no reason to be in a defensive posture we had | 19    A.    And then on other instances it |
| 20 cordial conversations. | 20 may be on my office phone. That's just what |
| 21    Q.    And I understand that. What I'm | 21 was done. |
| 22 getting to is you told me that this call at | 22    Q.    Call number 238, it looks like |
| 23 1:42 a.m. was a return call. | 23 at 2:11 a.m., correct? |

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 162

1    A.    That's what it looks like.
2    Q.    And it looks like Ms. Johnson
3  called you?
4    A.    (Whereupon, the witness
5  indicated an affirmative response by nodding
6  his head up and down.)
7         MR. MADISON:  Verbalize your
8  response.
9         THE WITNESS:  Yes.
10   Q.    (By Ms. Meadows)  And this
11 appears to be shortly after your call?
12   A.    Yes.
13   Q.    Do you recall what you-all
14 talked about at 2:11?
15   A.    No, I don't.
16   Q.    Okay.
17   A.    But it was short in duration.
18   Q.    Yes, it was very short in
19 duration.
20   A.    Which is the case in most of our
21 calls.
22   Q.    And then you called her back at
23 2:45 a.m.?

Page 163

1    A.    Yeah.  I probably couldn't talk
2  or something like that.  I don't -- I don't
3  really specifically remember, but there was a
4  reason for it I'm sure.
5    Q.    And you talked for about a
6  minute then?
7    A.    Right.  Like I said, most of our
8  calls were less than five minutes.
9    Q.    Is there a reason that these
10 calls took place between 1:00 and 3:00 a.m.?
11   A.    Like I say, that was the
12 instance I recall when there was an interest
13 in her of having a romantic relationship.
14   Q.    There was?
15   A.    Yeah, there was.
16   Q.    Interest on whose part?
17   A.    On her part, and she pursued
18 that.
19   Q.    And is that what she was
20 pursuing in these phone conversations between
21 1:00 a.m. and 3:00 a.m.?
22   A.    It may have came up, but then
23 there was the nature of another -- it may

Page 164

1  have came up.
2    Q.    And I asked you earlier, but
3  you-all -- you said that you do not normally
4  talk -- you did not normally talk to her --
5    A.    That's correct.  I --
6    Q.    -- after 10:00 p.m.?
7    A.    This, I'm sure, is a very
8  unusual circumstance.  I'm sure.  And without
9  even looking at the rest of this bill I can
10 say emphatically that that was not the normal
11 nature of our conversations -- or time of our
12 conversations rather.
13   Q.    And you would emphatically deny
14 that you would have had an extended
15 conversation with her that took place after
16 10:00 p.m.?
17   A.    When?
18   Q.    On a date after January --
19   A.    I said I would emphatically deny
20 that that's something that happened.  If it
21 -- if it happened more than once, I would be
22 very surprised.
23   Q.    If what happened?  If you talked

Page 165

1  to her after 10:00 p.m. more --
2    A.    That's correct.
3    Q.    -- than once, you would be
4  surprised?
5    A.    That's correct.
6    Q.    Okay.
7    A.    And if we had conversations
8  longer than five minutes, I would be
9  surprised.
10   Q.    If a conversation was longer
11 than five minutes --
12   A.    Maybe -- I mean, it could be one
13 more, you know.
14   Q.    -- it would surprise you?
15   A.    But that was not the general
16 nature.
17   Q.    Well, turn the page, Mr. Diop,
18 and --
19   A.    Okay.
20   Q.    -- let's prepare to be
21 surprised.
22   A.    Thirteen minutes, this other
23 conversation?

42 (Pages 162 to 165)

FREEDOM COURT REPORTING

Page 166

1    Q.   You talked to her -- call number
2  275 on the 7th, what time was that call made?
3    A.   12:30.
4    Q.   12:37 what?
5    A.   12:37 a.m.
6    Q.   Okay. That's after 10:00 p.m.,
7  isn't it?
8    A.   Uh-huh (affirmative).
9    Q.   And you called her?
10   A.   Yeah, but it was only after she
11 called me at 11:56 p.m.
12   Q.   And you talked to her at 11:56
13 p.m. for three minutes, correct?
14   A.   That's what it appears to be,
15 yeah.
16   Q.   It appears that you had a
17 conversation at 11:56 --
18   A.   How much of a conversation, I
19 can't say.
20   Q.   Well, what did she say at 11:56
21 that made you need to return the call at
22 12:37?
23   A.   I have no idea. I could have

Page 168

1    Q.   And tell me exactly what you
2  told Ms. Johnson.
3    A.   There is no interest. I don't
4  even know her.
5    Q.   And that took you 13 minutes to
6  explain to her?
7    A.   Obviously, we were on the phone
8  to that -- you know.
9    Q.   And it took you 13 minutes and
10 several different conversations over several
11 days to say that there is no interest?
12   A.   It appears that that was the
13 case, yeah.
14   Q.   Turn the page, Mr. Diop. Let's
15 look at call number 481 on January the 14th.
16 What time was that call made?
17   A.   12:05 a.m.
18   Q.   And here it appears that Ms.
19 Johnson called you, correct?
20   A.   Uh-huh (affirmative).
21   Q.   How long did you talk to Ms.
22 Johnson?
23   A.   Forty-two minutes.

Page 167

1  made another call or had to make another
2  call. My daughter could have called me. I
3  don't know.
4    Q.   Okay. And --
5    A.   But in any event, the
6  conversation was ended and...
7    Q.   And you called her back and
8  talked for 13 minutes. What was your
9  conversation about when you talked for 13
10 minutes?
11   A.   I don't know. I don't know.
12   Q.   Okay.
13   A.   And this day was on the 6th and
14 the 7th. I know during those -- during that
15 time frame I probably just had to establish
16 some parameters.
17   Q.   And what parameters were you
18 establishing during that time frame?
19   A.   The nature of specific interest.
20   Q.   And explain that to me. I want
21 you to explain it to me just like you
22 explained it to Jalonda.
23   A.   There is no interest.

Page 169

1    Q.   For 42 minutes Ms. Johnson talks
2  to you. What did you talk about for 42
3  minutes?
4    A.   I don't know. And I'm not sure
5  that that was all conversation.
6    Q.   You're not sure that it was
7  what?
8    A.   All conversation.
9    Q.   What would it have been?
10   A.   Well, there were several
11 instances -- and that even is the case now --
12 where I would have to put you on hold for
13 extended periods of time.
14   Q.   So, it's --
15   A.   Or answer another phone. I
16 can't really say specifically, but it would
17 not be uncommon.
18   Q.   So, how long -- when you say
19 extended periods of time on hold --
20   A.   It could be ten minutes, it
21 could be fifteen.
22   Q.   Well, what did you talk about
23 the other 25 to 30 minutes of the

43 (Pages 166 to 169)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 170

1  conversation?
2      A.   I don't know.
3      Q.   And do you have any specific
4  recollection of putting Ms. Johnson on hold
5  --
6      A.   I mean --
7      Q.   -- for ten or fifteen minutes?
8      A.   -- I'm sure anybody who talks to
9  me, I would put them on hold.  She would not
10  be an exception.
11      Q.   I'm talking about this
12  conversation on the 14th.
13      A.   I can't even speak to the
14  conversation itself.  And the only reason I
15  remember or could say that I had a
16  conversation with her is because of the phone
17  log.
18      Q.   Is there any --
19      A.   But it's not as a result of my
20  memory.
21      Q.   Call number 483 also on the
22  14th.  What time was that call made?
23      A.   12:56.

Page 171

1      Q.   And you called Ms. Johnson?
2      A.   Uh-huh (affirmative).
3  Thirty-six minutes.
4      Q.   Is that a yes?
5      A.   Yes.
6      Q.   And you talked for 36 minutes
7  that time?
8      A.   Uh-huh (affirmative).
9      Q.   Is that a yes?
10      A.   Yes.
11      Q.   What was that conversation
12  about?
13      A.   I have no idea.  And what day
14  was that?
15      Q.   That was January the 14th.
16      A.   Okay.
17      Q.   On the 14th between -- starting
18  at 12:05, you and Ms. Johnson -- we're on
19  Page 35, the second column.
20          MR. MADISON:  Page 35, right?
21          MS. MEADOWS:  Yes.
22          MR. MADISON:  Yeah.  Something
23  doesn't make sense.

Page 172

1          THE WITNESS:  You're absolutely
2  right.  You're absolutely right.
3      Q.   (By Ms. Meadows)  You and Ms.
4  Johnson were on the phone for a total of 78
5  minutes.
6      A.   Seventy-eight minutes?
7      Q.   Yeah.
8      A.   And when was this?
9      Q.   That's call numbers 481 and 483
10  combined.
11          MR. MADISON:  Object to form.
12      Q.   (By Ms. Meadows)  That actually
13  --
14      A.   I don't know how it would have
15  been -- I don't...
16      Q.   Do you know what you and Ms.
17  Johnson talked to for an hour and 18 minutes
18  -- what you talked about?
19      A.   Not specifically, no.
20      Q.   Do you recall having any
21  conversations with Ms. Johnson that lasted an
22  hour?
23      A.   From the record, I stated that I

Page 173

1  don't recall talking to her more than five
2  minutes.  And this was the typical case
3  during most of our conversations.  And that's
4  just the truth.
5      Q.   And these calls were between
6  1:00 and -- I'm sorry -- between 12:05 a.m.
7  and let's say 1:30 a.m., correct?
8      A.   Yes, it appears.
9      Q.   So, clearly this is an exception
10  to your no calls between 10:00 p.m. and 6:00
11  a.m., correct?
12      A.   Yeah, that's an exception.  But
13  there -- but there really is something
14  evidently wrong with this log.
15      Q.   Are you saying that the phone
16  company log is inaccurate?
17      A.   That's what I'm saying.  It's
18  something wrong with it.
19      Q.   And what do you base that on?
20      A.   Well, it says that I spoke from
21  12:05 to -- at 12:05 a call was initiated for
22  42 minutes.
23      Q.   Uh-huh (affirmative).

44  (Pages 170 to 173)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 174

1    A.   Okay.  How could another call
2  come in on the same line on the same day that
3  was at 12:49 for 44 minutes and then a call
4  at 12:56 for 36 minutes?
5    Q.   I actually believe I know the
6  answer to that, but you're not asking me.
7    A.   I'm just -- you know, I'm
8  wondering how it's possible.
9    Q.   Would you turn to the next page.
10   A.   (Complies).
11   Q.   It may actually be two pages
12  over.  I'm actually on Page 37.
13   A.   All right.
14   Q.   Look at call number 714.
15   A.   Okay.
16   Q.   That's on January 24th.
17   A.   Okay.
18   Q.   What time was that call?
19   A.   It was at 12:54.
20   Q.   Okay.
21   A.   And that was a return call as
22  well.
23   Q.   And you were returning her call?

Page 175

1    A.   Correct.  After she had called
2  me on the same day maybe one, two, three,
3  four different times.
4    Q.   So, you were returning her
5  telephone call?
6    A.   Yeah.
7    Q.   What did you speak about for 11
8  minutes?
9    A.   I'm not sure.
10   Q.   And you returned her telephone
11  call at 12:54 a.m., correct?
12   A.   I return calls when I get the
13  opportunity.  I mean, I -- I work 24 hours a
14  day.
15   Q.   Okay.
16   A.   So, it was customary.
17   Q.   Okay.
18   A.   But my --
19   Q.   So, are you now saying it was
20  customary for you to call Ms. Johnson after
21  10:00 p.m.?
22       MR. MADISON:  Object to the
23  form.

Page 176

1        THE WITNESS:  It's customary for
2  me to return calls at late -- late hours.
3  However, I just did not recall it being a
4  customary practice.
5    Q.   (By Ms. Meadows)  Okay.  And
6  call number 715 on January 24 at 1:05 a.m.
7    A.   Okay.
8    Q.   You called her again?
9    A.   Right.  I probably had to call
10  back from our previous -- from the previous
11  phone call.
12   Q.   And this time you talked for 15
13  minutes, correct?
14   A.   Uh-huh (affirmative).
15   Q.   What did you and Ms. Johnson
16  talk about for a total of 26 minutes?
17   A.   I really don't -- I can't
18  recall.
19   Q.   No idea what the two of you were
20  talking about?
21   A.   I mean, I can't really --
22   Q.   What did you usually talk about
23  in your conversations with Ms. Johnson that

Page 177

1  lasted more than five minutes?
2    A.   I don't think any one topic was
3  constant.
4    Q.   What variety of topics were
5  discussed?
6    A.   I can't even really tell you
7  that.
8    Q.   Was there any particular reason
9  that your calls with Ms. Johnson were
10  typically longer when they were made after
11  midnight?
12   A.   Yeah, yeah.
13   Q.   And what was that?
14   A.   How could I say this?  Because
15  she had somewhat of -- I wouldn't say
16  hysterical, but she can be an emotional
17  person.
18   Q.   What was she emotional about
19  during your phone conversations that took
20  place after midnight?
21   A.   I can't -- I can't really say
22  specifically.
23   Q.   Well, what was she emotional

45 (Pages 174 to 177)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 178 | Page 180 |
|---|---|
| 1  about during your conversations in general? | 1  probably till like 8:00 o'clock or so. I |
| 2     A.  Various experiences. | 2  wasn't getting ready to do that. |
| 3     Q.  Tell me what those various | 3     Q.  So, you told Ms. Johnson you |
| 4  experiences were. | 4  were not going to -- |
| 5     A.  Just the relationship between | 5     A.  Right. So, she hung up the |
| 6  her and her family. That's all. | 6  phone and called me back. |
| 7     Q.  What did she say specifically? | 7     Q.  Did you call Ms. Johnson back on |
| 8     A.  I can't really say specifically. | 8  that day? |
| 9     Q.  Okay. Well, tell me | 9     A.  On the 31st? |
| 10  specifically some things that you said to Ms. | 10     Q.  Yeah. |
| 11  Johnson. | 11     A.  To my knowledge. Why is the -- |
| 12     A.  That she'll be okay. That's | 12  why is it that this phone log stops? |
| 13  something I know I said specifically. | 13     Q.  You need to turn to the front. |
| 14     Q.  And you said that you spoke with | 14  It's out of order. The pages that relate to |
| 15  Ms. Johnson on the 31st, correct? | 15  the 31st actually begin on Page 25 of the |
| 16     A.  To my knowledge, yes. | 16  exhibit. |
| 17     Q.  To your knowledge? | 17     A.  Okay. |
| 18     A.  Uh-huh (affirmative). | 18     Q.  Having had a chance to review |
| 19     Q.  What did you speak with Ms. | 19  the phone records, do you still contend that |
| 20  Johnson about on the 31st? | 20  you did not call Ms. Johnson on the 31st? |
| 21     A.  Initially? | 21     A.  That was calling her back and |
| 22     Q.  Yeah. | 22  forth between the two of us. |
| 23     A.  She wanted me to come and meet | 23     Q.  And the two of you spoke on a |

| Page 179 | Page 181 |
|---|---|
| 1  her. | 1  number of occasions on that day. What else |
| 2     Q.  Meet her where? | 2  did you -- |
| 3     A.  We didn't even get that far. | 3     A.  That evening, yeah. I told you |
| 4     Q.  Why didn't you get that far? | 4  pretty much the nature of that. |
| 5     A.  Because it was something that I | 5     Q.  And that was the gist of the |
| 6  wasn't about to do. I was in a very bad mood | 6  conversations -- |
| 7  that day. I had a long day. My grandmother | 7     A.  Pretty much, yeah. |
| 8  had been taken to the hospital. It wasn't a | 8     Q.  -- all of them? |
| 9  good day. | 9     A.  Except the last time. |
| 10     Q.  Did you share with Ms. Johnson | 10     Q.  Tell me about the last time you |
| 11  that your grandmother -- | 11  talked that evening. |
| 12     A.  Yes, I did. | 12     A.  Well, she said that she had a |
| 13     Q.  What did you tell Ms. Johnson | 13  discrepancy at home. She had to leave. In |
| 14  about your grandmother on that day? | 14  the process, though, she had to leave home |
| 15     A.  That they had -- she had to be | 15  without a sweater or jacket or anything and |
| 16  rushed to the hospital. | 16  nor did she have on any socks. |
| 17     Q.  And -- | 17     She said that the argument and |
| 18     A.  And that I wasn't -- you know, | 18  everything with her parents was pretty |
| 19  she said something about some medical | 19  heated. She's tried to get in contact with |
| 20  situation that they had had. And I said, | 20  her sister. She wasn't able to. And she |
| 21  well, you know, I'm having a similar day. I | 21  asked me would I give one to her. |
| 22  had a bad day myself. It was raining. The | 22     Q.  Would you give what to her? |
| 23  weather was bad. I was not -- I had worked | 23     A.  A sweater or something, you |

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 182 | Page 184 |
|---|---|
| 1 know, because she was probably going to have | 1 home sometime around 7:30? |
| 2 to -- and have some socks because she was | 2    A.    More or less.  Maybe more. |
| 3 probably going to have to wait in her car. | 3    Q.    Right. |
| 4    Q.    Where was Ms. Jalonda Johnson | 4    A.    Probably about -- I would say -- |
| 5 when she called you? | 5 I would say about 15 or 20 minutes. |
| 6    A.    As far as I know, she was | 6    Q.    When you told Ms. Johnson she |
| 7 leaving home. | 7 could come to your house and get a sweater |
| 8    Q.    What time was that? | 8 and some socks -- |
| 9    A.    I'm really not sure of the exact | 9    A.    Which I gave her. |
| 10 time, but it was sometime probably around | 10    Q.    Okay.  When you told her she |
| 11 6:00 or so maybe, probably sometime around | 11 could come and get the sweater and socks, you |
| 12 there. | 12 were not fulfilling any responsibilities for |
| 13    Q.    And what was your response to | 13 Alabama State University at that time, were |
| 14 Ms. Johnson? | 14 you? |
| 15    A.    When she asked for my help? | 15    A.    No, no. |
| 16    Q.    Right. | 16    Q.    You told Ms. Johnson that you |
| 17    A.    I told her that was no problem. | 17 would help her out because she was a cordial |
| 18    Q.    You told her no problem? | 18 acquaintance of yours, correct? |
| 19    A.    I told her -- yeah, I would give | 19    A.    Yeah.  I had no reason to deal |
| 20 it to her. | 20 with it otherwise.  You could call me, and I |
| 21    Q.    And is that the point where she | 21 probably would have. |
| 22 was going to come over to your house? | 22    Q.    Okay. |
| 23    A.    Yeah. | 23    A.    Well, maybe not now, but |

| Page 183 | Page 185 |
|---|---|
| 1    Q.    What time did she arrive at your | 1 probably then. |
| 2 house? | 2    Q.    That was purely a personal |
| 3    A.    I'm not sure exactly what time | 3 decision that you made? |
| 4 she arrived, but I know the last time that | 4    A.    I would probably leave it at the |
| 5 she called before arriving was 7:14 p.m. | 5 -- yeah, yeah. |
| 6    Q.    And what number did she call you | 6    Q.    Okay.  I didn't hear what you |
| 7 at at 7:14 p.m.? | 7 said. |
| 8    A.    She called my personal cell | 8    A.    I said I would probably leave it |
| 9 phone. | 9 in a bag on my front porch or something. |
| 10    Q.    What number did she call you | 10    Q.    Okay. |
| 11 from? | 11    A.    And that's just the nature -- |
| 12    A.    From her cell phone. | 12 that's how I am as a person. |
| 13    Q.    She called you from her cell | 13    Q.    After Ms. Johnson arrived at the |
| 14 phone? | 14 house to get the sweater and the socks, when |
| 15    A.    Uh-huh (affirmative). | 15 she arrived, did you invite her inside? |
| 16    Q.    And your cell phone number is | 16    A.    Uh-huh (affirmative). |
| 17 386-546-0160, correct? | 17    Q.    Is that a yes? |
| 18    A.    That's correct. | 18    A.    Yes. |
| 19    Q.    And did she arrive shortly after | 19    Q.    After she entered your house, |
| 20 that phone call? | 20 did you lock the door behind her when she |
| 21    A.    I'm sure within about fifteen | 21 came in? |
| 22 minutes, ten or fifteen minutes. | 22    A.    No. |
| 23    Q.    So, she may have arrived at your | 23    Q.    Would you describe for me the |

47 (Pages 182 to 185)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 186

1    lock on your doors at that time at the Hull
2    Street address.
3        A.    There is a knob.  The actual
4    lock on the door itself, there is no lock,
5    and there is two -- a gate which you would
6    have to turn -- it's a key, a dead bolt kind
7    of a lock.  You can't lock it from the inside
8    without a key.
9        Q.    So, it's of the type that I
10   describe as a double dead bolt lock?
11       A.    I guess.  I guess.  And there
12   was no reason to lock it.
13       Q.    Did you normally keep the key to
14   that lock in the lock while you were inside
15   the house?
16       A.    No.  Because you could reach
17   your hand right through.  Anybody could if --
18   so, that's something you never do.  Either I
19   locked it or I didn't.
20       Q.    Was it your habit to lock that
21   door when you were inside the home?
22       A.    If I was inside for the rest of
23   the evening, yes.

Page 187

1        Q.    And you would do that regardless
2    of whether you were going to turn in for the
3    night, you would still lock the door?
4        A.    Yeah.  If I'm -- yeah, just for
5    security reasons.  You know, that's -- but if
6    I'm right there and, I mean, I'm coming in
7    and out, I didn't lock it.
8        Q.    Tell me what you say happened at
9    your house the evening Jalonda visited on
10   January 31st.
11       A.    She came.  I gave her those, you
12   know, articles.  Right in my front area is --
13   I have -- it's like a gym.  I would say she
14   was there maybe five or ten minutes tops.
15   She got the articles, and she left.
16       Q.    So, it is your contention that
17   Ms. Johnson entered the house?
18       A.    Uh-huh (affirmative).
19       Q.    You handed her a sweater and
20   some socks?
21       A.    That's correct.
22       Q.    Ms. Johnson accepted the sweater
23   and socks?

Page 188

1        A.    Correct.
2        Q.    And left immediately thereafter?
3        A.    She put the -- she put the socks
4    on, and she put the sweater on.  A few -- you
5    know, she was emotional, you know.  And she
6    was crying, you know.  I told her, you know,
7    calm down, everything was going to be all
8    right.  I hugged her.
9              And that was pretty much it.
10   And sent her on the way.
11       Q.    At any point during Ms.
12   Johnson's visit, did she sit on your bed?
13       A.    She may have sat on my bed when
14   I initially went and got the sweater and the
15   socks.
16       Q.    Describe the sweater that you
17   gave to Ms. Johnson for me.
18       A.    It was like an argyle sweater
19   that buttoned down.
20       Q.    Did Ms. Johnson take that
21   sweater with her when she left?
22       A.    Yeah.  And white socks.
23       Q.    Has Ms. Johnson returned the

Page 189

1    sweater?
2        A.    Nor the socks.
3        Q.    Okay.
4        A.    I wouldn't even take them back
5    if she did.
6        Q.    Have you seen the sweater or
7    socks since Ms. Johnson took them?
8        A.    Yeah.
9        Q.    Where were they?
10       A.    In her mother's office.  She
11   asked me did I want them back.  I told her
12   they can have them.
13       Q.    When was that conversation with
14   her mother?
15       A.    It was the last day of the work
16   year when we usually have -- it was like a --
17   you know, a little cookout and things like
18   that for all the employees.  It was on that
19   day.
20       Q.    Okay.  What date is that
21   usually?
22       A.    It was December.  I can tell you
23   that.

48 (Pages 186 to 189)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 190

1    Q.   That was in December?
2    A.   Yeah.
3    Q.   December of what year?
4    A.   2005.
5    Q.   And this was in the physical
6  plant building?
7    A.   That's correct.
8    Q.   Why were you in the physical
9  plant building?
10   A.   As I said, that was the last
11 day, and that was a period when they had the
12 cookout for staff and things like that.
13   Q.   And you came back for that?
14   A.   Yeah.
15   Q.   Why did you come back for the
16 staff cookout or December 5th, 2005?
17   A.   Because I did it as -- just as a
18 courtesy to craft supervisors and the
19 assistant director who asked me, if I would,
20 just to at least give kind of like a farewell
21 to the employees and say something.
22        You know, because that was
23 really probably the first time that they

Page 191

1  would have encountered me since that
2  situation. So, I did it.
3    Q.   At any point during that night,
4  was Jalonda actually in your bed under the
5  covers?
6    A.   No.
7    Q.   At any point during the night,
8  did Jalonda tell you that your bed was
9  particularly comfortable?
10   A.   Oh, let me change that. Let me
11 -- let me change that. As a matter of fact,
12 that's really the reason I rushed her out of
13 my house.
14        She was on my bed. She wrapped
15 up under my covers, which I thought was
16 particularly kind of -- she got real cozy
17 considering that she had never been to my
18 house, you know. And she said that it was
19 because she was cold and everything.
20        But after I gave her the sweater
21 and all of that, then -- you know, she put on
22 the socks. She put on the sweater. And she
23 left shortly after.

Page 192

1        But, yeah, she did. As a matter
2  of fact, that's one of the things that kind
3  of alarmed me.
4    Q.   How long had she been in the
5  house when she wrapped up in the covers on
6  your bed?
7    A.   Long enough for me to let her in
8  and go to get the sweater and the pair of
9  socks because that was in another room.
10   Q.   So, it's your testimony that
11 Jalonda entered the house?
12   A.   Uh-huh (affirmative).
13   Q.   Came in and got on your bed?
14   A.   Yeah.
15   Q.   And got under the covers?
16   A.   Yeah.
17   Q.   Almost immediately upon entering
18 the house?
19   A.   Yeah.
20   Q.   Okay. And you said you went to
21 another room. What room did you go to?
22   A.   The room where I had the sweater
23 hanging and the socks in the drawer.

Page 193

1    Q.   And that was in a separate room
2  in the apartment?
3    A.   Yes.
4    Q.   In what room was the bed?
5    A.   Right when you come in the door.
6    Q.   And you stated that at some
7  point during the night you hugged Ms.
8  Johnson. Was that before or after she was on
9  the bed?
10   A.   That was right before because
11 she was hysterical. She was crying, you
12 know. Just her reasoning. I told her it
13 will be okay. And I gave her the sweater. I
14 gave her the socks. I told her she should
15 talk to her sister. And that was it.
16   Q.   At any point during the night,
17 were both you and Ms. Johnson on the bed at
18 the same time?
19   A.   No.
20   Q.   At any point during the night,
21 did you have any physical contact with Ms.
22 Johnson other than the hug you've already
23 told me about?

49 (Pages 190 to 193)

FREEDOM COURT REPORTING

Page 194

1    A.    No, no. I mean, I hugged her
2 and everything. And that -- I mean, that was
3 pretty much it.
4    Q.    At any point during the night,
5 did you kiss Ms. Johnson?
6    A.    That was the whole sequence. I
7 mean, I hugged her and told her it was going
8 to be okay, you know. And I kissed her on
9 the forehead.
10   Q.    You kissed her on the forehead?
11   A.    Yeah.
12   Q.    At the time that you hugged her?
13   A.    Yeah.
14   Q.    And following that, she sat on
15 the bed while you went to get the sweater and
16 the socks, correct?
17   A.    Yeah.
18   Q.    Okay.
19   A.    Yes.
20   Q.    Is that the only time that you
21 kissed her?
22   A.    Yeah.
23   Q.    And that's the only place you

Page 195

1 kissed her?
2    A.    Yes.
3    Q.    At any point during the night
4 did you touch Ms. Johnson on her breasts?
5    A.    No.
6    Q.    You never kissed Ms. Johnson on
7 her breasts?
8    A.    Never.
9    Q.    At any point during the night,
10 did you touch Ms. Johnson's vagina?
11   A.    Never.
12   Q.    At any point during the night,
13 did Ms. Johnson touch your penis?
14   A.    Never.
15   Q.    At any point during the night,
16 did you remove any of Ms. Johnson's clothes?
17   A.    No.
18   Q.    Did she remove any of her
19 clothes?
20   A.    No.
21   Q.    At any point that night, did you
22 remove any of your clothes?
23   A.    No.

Page 196

1    Q.    Did she remove any of your
2 clothes?
3    A.    No.
4    Q.    Do you remember what Ms. Johnson
5 was wearing when she arrived at your house
6 that night?
7    A.    Not really.
8    Q.    Do you remember what you were
9 wearing that night?
10   A.    I'm sure I probably was wearing
11 some slacks and a shirt or something like
12 that. I'm sure it was slacks. I don't know
13 which ones. I can't tell you.
14   Q.    And just for clarification, you
15 say that you're sure it must be slacks and a
16 shirt because that's your usual habit?
17   A.    Because I don't even have a pair
18 of jeans.
19   Q.    When did Ms. Johnson decide to
20 leave your home that evening?
21   A.    Shortly -- it was shortly after,
22 you know, she put on the sweater and the
23 socks. Like I said, when I came back in from

Page 197

1 getting those garments, those articles, I
2 kind of got alarmed a little bit because she
3 was under my cover. And I thought that was
4 kind of cozy. But it was shortly after that.
5    Q.    When you gave Ms. Johnson the
6 socks -- you said you gave her a pair of
7 white socks, correct?
8    A.    Uh-huh (affirmative).
9    Q.    Did you also have on a pair of
10 socks?
11   A.    I'm sure I -- I'm sure I did.
12   Q.    After you gave Ms. Johnson the
13 socks, did you invite her to slide across the
14 floor with you?
15   A.    Do I look like a person that
16 would slide across the floor?
17   Q.    I'm asking you if that's what
18 you did.
19   A.    No.
20   Q.    Did Ms. Johnson slide across the
21 floor after you gave her the socks?
22   A.    She probably slid from the --
23 from that little small area towards the door.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 198

1  She probably did that.
2      Q.   And you didn't participate in
3  that with her?
4      A.   No.
5      Q.   After Ms. Johnson slid across
6  the floor, did she return to the bed?
7      A.   No.
8      Q.   What led up to the decision for
9  Ms. Johnson to leave your home that evening?
10     A.   Me.
11     Q.   You invited Ms. Johnson to
12 leave?
13     A.   Yeah.
14     Q.   What did you say?
15     A.   I mean, I -- first of all, I was
16 not in the best of mood. Okay. And, you
17 know, I had other things that I needed to
18 attend to.
19     Q.   So, what did you say to Ms.
20 Johnson?
21     A.   That she needs to go and talk to
22 her sister.
23     Q.   And when you said that, did you

Page 199

1  -- how did you get her out of the house, is
2  what I'm trying to get to?
3      A.   I mean, there was no -- there's
4  no major distance between where my bed area
5  is and the front door.
6      Q.   Okay.
7      A.   So, that immediate area right
8  there, it wasn't very difficult at all.
9      Q.   So, did you say to her, for
10 example, you need to leave or --
11     A.   No. I said, you know,
12 everything's going to be okay as I was
13 heading towards the door, opened the door.
14 Okay. It's going to be all right.
15         Just -- you need to talk to your
16 sister, and I hope everything's okay, you
17 know, blah, blah, blah. And that was it.
18         MR. MADISON: Do you mind if we
19 take another short break?
20         MS. MEADOWS: No. I was just
21 about to say I'm going to have to take one.
22         (Whereupon, the taking of the
23 deposition was recessed from approximately

Page 200

1  3:49 p.m. to approximately 4:00 p.m., after
2  which the following proceedings were had and
3  done:)
4      Q.   Is there anything else you feel
5  like you need to tell me about the incident
6  that took place on January 31st, 2005?
7      A.   I mean, not particularly. I'm
8  sure you pretty much have all of the details
9  available to you, you know. I mean, some
10 areas I remember, you know, vividly. Some
11 areas, you know, you kind of have to jog my
12 memory.
13         However, it was a very
14 unpleasant experience, you know. I don't
15 know if you have a copy of her letter that
16 she wrote to the University, but I'm sure
17 you'll find that there are vast
18 contradictions.
19         And the bottom line is it just
20 never happened.
21     Q.   Okay. Here is where I am,
22 Mr. Diop. And I don't know what your
23 attorney has explained to you, but what I'm

Page 201

1  trying to get to here is not what Jalonda
2  says happened. I've already talked to her.
3  I know what she says happened.
4          What I am most interested in is
5  what you say happened. I want to know what
6  the facts are from your perspective. What is
7  your side of the story?
8          So, what you need to tell me --
9      A.   Pretty much my side of the story
10 is this. You know, they came to me in a very
11 different posture, okay, with some ulterior
12 motives. All right. I never would have
13 imagined that their intentions were as such.
14 Okay.
15         However, this whole thing was
16 orchestrated towards an outcome that puts us
17 here currently. I never would have imagined
18 it. I never caused any harm to her, nor have
19 I had any kind of intentions of doing so.
20     Q.   Now, I just need some
21 clarification. When you say they had
22 ulterior motives --
23     A.   Because, I mean, her -- her

51 (Pages 198 to 201)

17249641-2df0-4c36-b999-32292148c606

## FREEDOM COURT REPORTING

Page 202

1  parents, you know, were also involved in
2  this. I mean, this wasn't a single effort.
3      Q.    So, when you say "they," in this
4  context you mean Jalonda, her mother, Linda,
5  and her father --
6      A.    Eddie
7      Q.    -- Eddie?
8      A.    Yeah.
9      Q.    And what do you believe their
10 ulterior motives to be?
11     A.    Money.
12     Q.    Okay. Money --
13     A.    I think their intention was to
14 end up with Alabama State paying them money.
15 And the reason I say this is because this is
16 something that they've done before. This is
17 not just something they did with me. This is
18 something that they did when she was in high
19 school. This is something that they did with
20 her sister.
21     Q.    Okay.
22     A.    Okay. So, this -- so, they were
23 very sophisticated and knowledgeable of what

Page 203

1  they were doing.
2      Q.    Are you saying she made -- she
3  and/or her sister made substantially the same
4  allegations before?
5      A.    Oh, yeah.
6      Q.    Taking them separately so that
7  your attorney doesn't yell and scream at me,
8  who did Jalonda previously accuse of sexual
9  harassment?
10     A.    In high school.
11     Q.    Okay. Who --
12     A.    At Jefferson Davis High School.
13     Q.    Who did she accuse of sexual
14 harassment?
15     A.    One of -- one of her teachers or
16 coaches.
17     Q.    Do you know approximately what
18 year this was?
19     A.    2000, I think.
20     Q.    And it's in 2000 that the
21 accusation was made?
22     A.    Yeah. Around 2000, maybe 2002.
23 Between 2000 and 2002.

Page 204

1      Q.    And she accused a male faculty
2  member --
3      A.    Correct.
4      Q.    -- at Jeff Davis?
5      A.    Yes.
6      Q.    Were criminal charges brought
7  against this individual?
8      A.    To my knowledge, yes.
9      Q.    Do you know the outcome of that
10 criminal matter?
11     A.    I know that there was some kind
12 of a settlement.
13     Q.    I'm not talking about a civil
14 action.
15     A.    I don't -- no, no. Well, that
16 was definitely a result. Now, as far as, you
17 know, all of the ramifications that he had to
18 encounter, I'm -- I think that they were
19 pretty severe, but I cannot tell you
20 specifically.
21     Q.    Was this teacher terminated from
22 his employment?
23     A.    Yes.

Page 205

1      Q.    And that would have been
2  sometime between the year of 2000 and 2002?
3      A.    That's correct.
4      Q.    And the reason for his
5  termination was?
6      A.    Was this -- that incident that
7  related to Jalonda.
8      Q.    And you have no idea what the
9  faculty member's name was?
10     A.    It might have been -- the last
11 name might have been Holly or Hollis.
12     Q.    How did you come to discover
13 this information?
14     A.    Because lo and to my behold, a
15 lot of information Alabama State was already
16 aware of. They have a whole book on Mrs.
17 Johnson.
18     Q.    There is a book on --
19     A.    Yeah.
20     Q.    -- Jalonda Johnson?
21     A.    No. Linda Johnson.
22     Q.    On Linda Johnson?
23     A.    And during this time she

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 206

1  evidently took off work and there was -- they
2  supposedly went through some emotional and
3  psychological distress as a result of this
4  incident.
5      Q.    And Linda Johnson's records
6  contain the information about this
7  allegation?
8      A.    Yes.
9      Q.    And you reviewed this book of
10  information on Linda Johnson?
11     A.    Yes.
12     Q.    How did you come to get that
13  information?
14     A.    Well, because it's something
15  that was kept in the vice president's office.
16     Q.    Which vice president?
17     A.    Leon Frazier.
18     Q.    And Dr. Frazier shared this
19  information with you?
20     A.    Uh-huh (affirmative).
21         MR. MADISON:  Is that a yes?
22         THE WITNESS:  Yes.
23         In addition to the fact that the

Page 207

1  sister supposedly made the same allegation
2  with her supervisor at -- I think Family
3  Dollar and accused him as being the father of
4  a child.  Well, they had blood tests and
5  everything where it ended up proving that he
6  was not.
7         Now, they're saying that this --
8  it's somebody that she went to prom with.
9  You know, so...
10     Q.    (By Ms. Meadows)  What is Ms.
11  Johnson's sister's name, do you know?
12     A.    You mean --
13     Q.    I mean Jalonda's --
14     A.    -- Jalonda's sister?
15     Q.    Right.
16     A.    I don't know her real name, but
17  I know they call her Londy.
18     Q.    Okay.  I thought they called
19  Jalonda Londy.
20     A.    Maybe they do.  Maybe they do.
21  Nee Nee.  That was her nickname.  Yeah.
22  You're right, though.  Yeah.
23     Q.    To your knowledge, did the

Page 208

1  Johnsons file any charges against the manager
2  at Family Dollar?
3      A.    I'm not sure.  I know that there
4  was -- I know that these same kind of actions
5  were initiated in that situation as well.  I
6  don't know, you know, how far they went.  I
7  hope they didn't ruin that man's life the way
8  they did me.  I hope and pray.
9      Q.    Do you know when they made the
10  allegations against the manager at Family
11  Dollar?
12     A.    I know the -- I know the DNA
13  test -- within the last year and a half or
14  two that's -- the results of that have come
15  out.
16     Q.    Sometime between 2006 and 2007?
17     A.    Between maybe 2005 and 2006.
18     Q.    How did you become aware of
19  their accusations against the manager at
20  Family Dollar?
21     A.    Well that's what I'm saying.
22  You know, there is a whole file.  I mean,
23  Mrs. Johnson has accused people at the

Page 209

1  University of assaulting her.  Even Stratford
2  Moore, she had charges against him for a kind
3  of brutality situation that happened at
4  Alabama State.  All of this stuff.  And I
5  wish they would have gave me a copy of it.  I
6  wanted it so bad.
7      Q.    And the information concerning
8  the sister is also in Mrs. Johnson's file --
9      A.    Yeah.
10     Q.    -- that you saw in Dr. Frazier's
11  office?
12     A.    They -- yeah.  In this -- no.
13  It's a notebook really.
14     Q.    This file, was it regularly kept
15  in Dr. Frazier's office, or did he have it
16  brought to --
17     A.    No.  I think -- I think he might
18  have had it brought.  I mean, I -- it may be
19  in part of her human resources file.  I'm not
20  really sure where it was kept.
21     Q.    Do you remember if the notebook
22  had like a cover page that said where it
23  originated?

53  (Pages 206 to 209)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 210

1    A.    I don't know.  No.  I mean, I
2  really can't tell you where it originated,
3  but I promise you it exists.
4    Q.    And I'm not disputing you at
5  this point.  I'm simply trying to figure out
6  where --
7    A.    Where it is.
8    Q.    -- it might be.
9    A.    We might not never find that
10  notebook.  I'll tell you that right now.
11    Q.    Okay.  But you've seen it?
12    A.    Yeah.
13    Q.    And you say that Dr. Frazier has
14  seen it?
15    A.    Just like I -- just like I saw
16  letters that were written supposedly from her
17  son saying that I assaulted him and that he
18  was a sister where he -- where they got the
19  gender and everything mixed up.  I'm telling
20  you.
21       Now, ask me if I was able to get
22  a copy of that.  No.
23    Q.    Where was this letter sent?

Page 211

1    A.    I anonymously got a copy of her
2  accusation saying that I raped her.
3    Q.    Okay.  I'm trying to --
4    A.    That wasn't -- none of this was
5  really made readily available even though it
6  exists.  The only reason you have it is
7  because I had got a copy.
8    Q.    What I'm trying to get to is the
9  letter about you assaulting her brother.  Who
10  was that sent to?
11    A.    Human resources.
12    Q.    That was sent to human
13  resources?
14    A.    Yeah.
15    Q.    Do you know when that was sent?
16    A.    I know around May.
17       MR. MADISON:  Of what year?
18       THE WITNESS:  2005.  I'm pretty
19  sure.
20    Q.    (By Ms. Meadows) So, in --
21    A.    I'm almost sure.  As a matter of
22  fact, it was probably the first week of May
23  2005.  And the only reason that nothing

Page 212

1  became of it, because they had the gender and
2  everything messed up.  That's why it didn't
3  go any further.  Otherwise, he would have
4  probably...
5    Q.    And this was sent to human
6  resources prior to your termination in May of
7  2005?
8    A.    That's correct.
9    Q.    You saw a copy of this letter?
10    A.    Yeah.
11    Q.    Where did you see a copy of the
12  letter?
13    A.    In Dr. Frazier's office.
14    Q.    Okay.
15    A.    This -- that letter initiated
16  action going to the President for me to be at
17  least put on administrative leave.
18    Q.    In May of 2005?
19    A.    Yeah.  And they said that they
20  came to my office to use a fax machine.
21  Well, they had just bought a fax machine
22  three days -- three or so days before that
23  that was brand new.  No reason in the world.

Page 213

1    Q.    At your office where?
2    A.    At the physical plant.
3    Q.    In May 2005 at your office.
4  Tell me what the letter said.
5    A.    It was saying that they were
6  using -- they came to my office to use my fax
7  machine because theirs was not working.
8  Okay.  As a matter of fact -- maybe it was
9  April of --
10       But, anyway, it was around that
11  time because I know that that was what
12  initiated my administrative leave.  So,
13  within a week of me being placed on
14  administrative leave that was when that
15  letter was done.
16       They said that they came to my
17  office, him and his mother, to use the fax
18  machine, that I bowed up at him.  As a matter
19  of fact, better than yet I wrote a police
20  report because on that same day.  That was
21  another reason nothing could be done.  I gave
22  you a copy of that police report, too, that I
23  initiated.

54  (Pages 210 to 213)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 214

1    Q.    You initiated?
2    A.    Yeah.  Because what they did --
3  it was really the other way around.  He stood
4  in my doorway, you know.  And I asked him,
5  you know, if he could move so I can go in my
6  office.  He said this ain't my office, he
7  wasn't doing nothing.  He balled up his fist
8  and everything and was in the process of
9  launching at me.
10        I went around through the
11  secretary's entrance into my office and
12  closed the door.  I called the University
13  police.
14    Q.    And the officer came and took a
15  police report from you?
16    A.    Yes.
17    Q.    What is the brother's name?
18    A.    Cornelius or something like
19  that.
20    Q.    Approximately how old --
21    A.    Or Julius.  He's older than me.
22    Q.    He's older than you?
23    A.    Yeah.  Maybe around the same age

Page 215

1  or whatever.
2    Q.    So, somewhere in the
3  neighborhood of 40 to 45 years old?
4    A.    Yeah, I would say.
5    Q.    Okay.  When did you first become
6  aware that Ms. Johnson had contacted the
7  police and accused you of raping her?
8    A.    The next -- well, I got a call
9  from -- I got a call from them that same
10  night.
11    Q.    They called you that night?
12    A.    Yes, they did, at 8:26 p.m. on
13  my personal phone and they asked me if I had
14  raped they daughter.
15        And I told her, I said, well,
16  Mrs. Johnson, I have no idea what you're
17  talking about about.  If you can talk to your
18  daughter.  I understand y'all had some
19  problems that night, but surely there's got
20  to be a mistake.
21        But then when I went to work the
22  next day, the detective called me on the job.
23  She told me -- she told me I needed to come

Page 216

1  down.  And I said, surely, you-all don't
2  initiate any charges because somebody makes a
3  -- you know, false allegations like that, to
4  which she said this is a serious charge, you
5  know.
6        I contacted the chief of police
7  at the University.  Okay.  And Dr. Frazier.
8    Q.    You contacted the chief of
9  police and Dr. Frazier?
10    A.    Yeah.  And I told them what
11  happened.  They advised me to -- when I do
12  that, that I needed to go with an attorney.
13    Q.    They advised you that when you
14  go to the police department, you needed to go
15  with an attorney?
16    A.    Uh-huh (affirmative).
17    Q.    Okay.  Let's back up to the
18  phone call from Mr. and Mrs. Johnson.  What
19  time was that call?
20    A.    At eight twenty -- 8:28 p.m.
21    Q.    What phone number were they
22  calling you from?
23    A.    334-613-1957.  That was their

Page 217

1  home phone.
2    Q.    And for the record, you're
3  referring to your personal cellular phone --
4    A.    Yeah.
5    Q.    -- records, correct?
6    A.    Yes.
7    Q.    I am going to -- since we're
8  going to refer to those, I'm going to go
9  ahead and introduce those on the record, and
10  we'll mark those Exhibit 8.
11    A.    All right.
12    Q.    And we'll copy those before you
13  leave.
14        Okay.  So, you became aware that
15  Ms. Johnson was accusing you of rape when her
16  parents called you to ask you if, in fact,
17  you had raped her, correct?
18    A.    They asked me if I raped they
19  daughter.  I mean, and it -- it really took
20  me for a loop.
21    Q.    And prior to the call from her
22  parents, you were completely unaware that she
23  was accusing you of rape?

55 (Pages 214 to 217)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 218

1    A.    Yeah. I mean, I couldn't -- I
2  couldn't -- I mean, how you go from me giving
3  her a sweater and some socks and everything
4  to rape. That just...
5    Q.    Were you ever arrested on those
6  charges?
7    A.    Yeah.
8    Q.    When were you arrested?
9    A.    A year and a half later.
10   Q.    Can you give me a date of your
11  arrest?
12   A.    Maybe sometime in August of
13  2007, 2006. I know it was at least a year
14  and a half later. And then the judge threw
15  the thing out. Thank God.
16   Q.    Okay. I want to get to that.
17   A.    But the detective investigated
18  the case. I submitted to the DNA. I did my
19  very best to cooperate in every way.
20  Montgomery police never arrested me on those
21  charges.
22   Q.    The Montgomery police never
23  arrested you?

Page 219

1    A.    On those charges, no.
2    Q.    Who arrested you?
3    A.    I was actually on my way, as a
4  matter of fact, getting ready to come to
5  Montgomery, and I was stopped for speeding.
6    Q.    Uh-huh (affirmative).
7    A.    Birmingham police. They said I
8  had a warrant because of a Grand Jury
9  indictment.
10         So, they held me. I had to wait
11  until Montgomery came and picked me up. I
12  couldn't make no phone calls, none of that.
13  Couldn't eat. None of that. Until I got
14  back here to Montgomery.
15         I had no idea. As a matter of
16  fact, one of the first calls I made was to
17  the detective at Montgomery police that
18  investigated the case because I had been in
19  communications with her the entire time. She
20  was even surprised.
21   Q.    The Birmingham Police Department
22  informed you that the Grand Jury had issued
23  an indictment against you?

Page 220

1    A.    Correct.
2    Q.    And that they -- they told you
3  that there was a warrant for your arrest
4  because of that indictment, correct?
5    A.    That's correct.
6    Q.    And you subsequently appeared
7  before a judge on those charges?
8    A.    Yeah, yeah, yeah.
9    Q.    Do you remember when that was?
10   A.    It was in February when the
11  final disposition was made, February of 2007.
12   Q.    And is February 2007 the first
13  time you appeared before a judge?
14   A.    That was the first time. I
15  think -- the only court appearance I had
16  prior to that was to determine whether or not
17  I was going to hire an attorney or have a
18  court-appointed attorney. Other than that, I
19  hadn't been before the judge.
20   Q.    So, other than your initial
21  appearance --
22   A.    Right.
23   Q.    -- you went to court once?

Page 221

1    A.    As a matter of fact, I think
2  that was case management or something like
3  that.
4         MR. MADISON: Answer to her.
5    Q.    (By Ms. Meadows) He can't
6  answer the question for you.
7    A.    Oh, okay. Say that again.
8    Q.    So, other than your initial
9  appearance where you took care of issues like
10  whether you were going to retain your own
11  counsel or have someone appointed and some
12  other preliminary --
13   A.    Right.
14   Q.    -- administrative type matters
15  --
16   A.    That was the only time prior to
17  the February date I had even been in court.
18   Q.    Do you remember who your judge
19  was in February?
20   A.    Judge Hardwick.
21   Q.    Judge Hardwick?
22   A.    Uh-huh (affirmative).
23   Q.    And that was not a trial, was

56 (Pages 218 to 221)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 222

1  it?
2      A.    No.
3      Q.    That was a pretrial motion --
4      A.    Correct.
5      Q.    -- hearing?
6            And it was dismissed at that
7  time by Judge Hardwick?
8      A.    Yeah.  And that was -- continue.
9      Q.    Oh, I thought you were getting
10 ready to say something else.
11     A.    No.
12           (Whereupon, said document was
13           marked for identification as
14           Exhibit No. 9 to the deposition
15           of Anwar K. Diop.)
16     Q.    I'm going to show you Exhibit 9.
17 Do you recall receiving a copy of this
18 letter?
19     A.    Yes.
20     Q.    And is this a letter giving you
21 notice that Ms. Johnson filed a charge of
22 sexual harassment against you at Alabama
23 State?

Page 223

1      A.    Yes.
2      Q.    And this letter advises that a
3  committee is going to conduct an
4  investigation into her allegations, correct?
5      A.    Uh-huh (affirmative).
6            MR. MADISON:  Was that a yes?
7  Was that yes?
8            THE WITNESS:  Yes.
9            (Whereupon, said document was
10           marked for identification as
11           Exhibit No. 10 to the deposition
12           of Anwar K. Diop.)
13     Q.    (By Ms. Meadows)  Okay.  I want
14 you to take a look at Exhibit 10.  This
15 letter is also dated February 11, 2005,
16 correct?
17     A.    Yes, it is.
18     Q.    And does this letter request to
19 set up a meeting with you to discuss the
20 complaint filed by Ms. Johnson?
21     A.    Yes.
22     Q.    Do you recall attending that
23 meeting?

Page 224

1      A.    Yes.
2      Q.    And do you recall that during
3  that meeting Mr. Wesley was present?
4      A.    Mr. Wesley, yes.
5      Q.    And was Ms. Rudolph present?
6      A.    Yes.
7      Q.    And Ms. Brown?
8      A.    I don't really -- I can't really
9  -- I don't really recall Ms. Brown, but I do
10 remember Ms. Rudolph being present.
11     Q.    And you were also present?
12     A.    Yes.
13           (Whereupon, said document was
14           marked for identification as
15           Exhibit No. 11 to the deposition
16           of Anwar K. Diop.)
17     Q.    Okay.  I'm going to show you
18 Exhibit No. 11.  Although you don't recall
19 Ms. Brown being present, do you have any
20 reason to believe that Ms. Brown was not
21 present?
22     A.    I would have -- I would have --
23 I don't know.  I just cannot picture her

Page 225

1  being there.  I mean, I could be wrong.  I
2  just don't picture her being there, and I'm
3  -- I don't know.  I just -- I just don't
4  remember Ms. Brown being there.
5      Q.    Are you certain that Ms. Brown
6  was not there?
7      A.    No, I'm not.
8      Q.    So, if --
9      A.    I'm not.  I mean -- well, I
10 mean, I'm not -- if it says she was there,
11 she was there.
12     Q.    Okay.  Because that's what I'm
13 getting to.  If the notes taken at that
14 meeting reflect that Ms. Brown was present,
15 do you have any reason to believe that those
16 notes are inaccurate?
17     A.    No.  I just -- no, no, no.  I
18 just don't -- I just don't picture Ms. Brown
19 being there.  I can almost see myself sitting
20 at that table, and I really don't picture --
21 I don't remember Ms. Brown being there.
22           But I don't dispute it.  If the
23 notes say she was there, she was there.

57 (Pages 222 to 225)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 226

1    Q.    And like you said, you did
2  attend this meeting on the 11th?
3    A.    I did.
4    Q.    At about 4:00 o'clock that
5  afternoon?
6    A.    I did.
7    Q.    And during that meeting, you
8  discussed with Mr. Wesley, the Alabama State
9  University investigation process, correct?
10    A.    Which I was totally misinformed.
11    Q.    Tell me what you were told about
12  the investigation process in that meeting.
13    A.    That it was a committee that
14  would be established to investigate her
15  accusations, that this process was taken
16  seriously and that false accusations would
17  not be condoned, that it was not an
18  adversarial process, no attorneys would be
19  allowed, that it was a fact-finding
20  proceeding.
21    Q.    And which of those statements
22  were inaccurate?
23    A.    That it was a nonadversarial

Page 227

1  process, that it -- I was led to believe that
2  it had no real significant legal impact as
3  far as my employment is concerned.
4    Q.    Who told you that it would not
5  have any impact on your employment?
6    A.    Mr. Wesley. Otherwise, I would
7  have came with an attorney.
8    Q.    Mr. Wesley told you that the --
9    A.    He told me that this was purely
10  a fact-finding procedure, that it was
11  nonadversarial and it was an effort to either
12  validate or disvalidate the accusation made
13  by the student.
14    Q.    You stated --
15    A.    And that was just not correct.
16    Q.    You stated that if you had
17  known, you would have had your attorney
18  present?
19    A.    Absolutely.
20    Q.    Okay. So --
21    A.    Considering the repercussions.
22    Q.    Were you told then that you
23  could have an attorney?

Page 228

1    A.    I was told that I could not.
2    Q.    Were you --
3    A.    And it specifically -- it even
4  states that in the handbook.
5    Q.    Were you -- following that
6  meeting, did you review the handbook to
7  determine what the -- did you review the
8  handbook? Did you review the sexual
9  harassment policy?
10    A.    Yeah. Yes.
11    Q.    And after you reviewed the
12  policy, you believed that the EEO
13  investigation would not have any impact on
14  your employment status?
15    A.    Well, first I all, I knew the
16  EEOC committee would not come with the fact
17  finding to validate her accusation because I
18  knew it was utterly false.
19    Okay. Secondly, I thought that
20  the process would be fair and impartial and
21  that we would be similarly situated. And I
22  also felt that the University would
23  diligently pursue a false accusation as they

Page 229

1  did the initial accusation itself.
2    Q.    Okay.
3    A.    Which they did not?
4    Q.    So, your belief that the results
5  of the investigation would have no bearing on
6  your job was based upon your belief in the
7  falsity of the accusations?
8    A.    As well as the information that
9  I received from Mr. Wesley and the
10  information that I received from Dr. Frazier.
11    Q.    And you stated that after you
12  talked with them, you reviewed the policy?
13    A.    I reviewed -- I reviewed the
14  policy. And it said that false -- I mean,
15  accusations or if it was valid, that it would
16  be dealt with.
17    However, even when you deal with
18  the disciplinary actions that would result,
19  it's far short of what was done with me.
20    Q.    Okay. Is it your contention --
21    A.    And the committee came out and
22  said that they found no documentary evidence
23  to support her claim.

58 (Pages 226 to 229)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 230

1    Q.    Okay.
2    A.    Not some, a little.  They said
3  they found no evidence to support Ms.
4  Johnson's claim.
5    Q.    Okay.  What I'm directing your
6  attention to now is solely the policy.
7    A.    Okay.
8    Q.    We're not at the state of what
9  facts were found or not found.
10   A.    Okay.
11   Q.    I am asking you, based on the
12 policy, is it your contention that Alabama
13 State University cannot terminate an employee
14 for sexual harassment?
15       MR. MADISON:  Object to the
16 form.
17       THE WITNESS:  If I'm not
18 mistaken, for sexual harassment if there is
19 an offense, there are disciplinary actions.
20 I don't think it says terminable.
21   Q.    (By Ms. Meadows)  Are you saying
22 that you cannot be terminated for sexual
23 harassment?

Page 231

1    A.    There is guidelines for
2  disciplinary actions, and termination is not
3  one of those.
4    Q.    And you're saying that
5  termination is not a disciplinary action for
6  sexual harassment under the policy?
7    A.    Not --
8        MR. MADISON:  Object to the
9  form.  Go ahead.
10       THE WITNESS:  Not -- according
11 to what I read, no.
12   Q.    (By Ms. Meadows)  Okay.  I want
13 you to pick up Exhibit 5.
14   A.    And I hope -- is this the whole
15 book, too, by the way?
16   Q.    No, that's not the whole book.
17   A.    Now, what page am I --
18   Q.    Sixty-two.
19   A.    Well, we need to whole book in
20 here, don't we?
21       Okay.  What do you want me to
22 read?
23   Q.    I want you to read Section 6.5.

Page 232

1    A.    Okay.
2    Q.    And just read that first
3  paragraph.
4    A.    Hold up.  Hold on.
5        And will not hesitate to impose
6  the maximum sanction where warranted.
7  Deliberate false accusation of sexual
8  harassment will not be condoned and may
9  result in disciplinary action being taken
10 against anyone who knowingly makes a false
11 report.
12   Q.    Now --
13   A.    Now, that's 6.5.
14   Q.    -- based upon what you just
15 read, can an employee be dismissed for sexual
16 harassment under this policy?
17   A.    It says that it will not
18 hesitate sanction of dismissal where
19 warranted, meaning there are --
20   Q.    Okay.
21   A.    There is a subjective area
22 there.
23   Q.    And I want you to -- exactly.  I

Page 233

1  want you to answer my question.
2    A.    Okay.  Yeah.
3    Q.    Can an employee --
4    A.    Yes, yes, yes.
5    Q.    -- be terminated --
6    A.    Yes.
7    Q.    -- for sexual harassment?
8    A.    Yes.
9    Q.    So, when you read this, it did
10 not provide you with notice that if the
11 committee believed Ms. Johnson, you could be
12 in jeopardy of losing your job?
13       MR. MADISON:  Object to the
14 form.
15       THE WITNESS:  If the committee
16 believed her?
17   Q.    (By Ms. Meadows)  Right.
18   A.    I guess, yes.  But I guess I
19 specifically focused on the following
20 sentence.
21   Q.    And I understand that you
22 focused on --
23   A.    I really did.

59 (Pages 230 to 233)

FREEDOM COURT REPORTING

Page 234

1    Q.    -- your belief that she was
2  making a false accusation, but --
3    A.    But I knew she was lying.
4    Q.    -- that's not what I'm asking
5  you here.
6         MR. MADISON: Let her finish.
7    Q.    (By Ms. Meadows) What I am
8  asking you here is when you received this
9  notice, you were told this was serious?
10   A.    I was told that this initial
11 proceeding was fact-finding and that it was
12 intended to validate or disvalidate her
13 claim.
14   Q.    Okay.
15   A.    Now, my understanding was that
16 should her accusation had been correct, there
17 would have been some other proceeding that
18 would have followed. That just was my false
19 understanding.
20   Q.    That was your understanding?
21   A.    Right. And I was wrong.
22   Q.    And I want you to turn back to
23 Exhibit No. 9, which is your notice of

Page 235

1  allegations.
2    A.    Exhibit 9?
3    Q.    Exhibit 9.
4    A.    Which one is that?
5    Q.    It is the letter dated February
6  11th that is a couple of paragraphs long that
7  let's you know that an allegation of
8  harassment has been filed against you.
9    A.    Right. Yeah.
10   Q.    That second paragraph of Exhibit
11 9 states a committee will be formed to
12 conduct the investigation in accordance with
13 current policy. The committee will contact
14 you shortly. Every effort will be made to
15 conduct the investigation, compile the
16 findings and make recommendations to the
17 President as expeditiously as possible.
18   A.    Okay.
19   Q.    Now, based upon this --
20   A.    And that's -- that what I
21 thought. He said that it would be a
22 proceeding to determine facts or substantiate
23 them or not and then inform the President as

Page 236

1  to what their conclusions were.
2    Q.    Right.
3    A.    And that -- and that -- and I
4  had no problems with that.
5    Q.    And you didn't understand that
6  the recommendations that the committee would
7  make to the President would impact
8  potentially your future employment with the
9  University?
10   A.    No, I didn't. I just didn't.
11   Q.    Okay. This letter --
12   A.    I mean, maybe it was stupid on
13 my part because I really shouldn't have went
14 in there without an attorney in the first
15 place.
16   Q.    This letter also directs you to
17 Paragraph 6.5 of the handbook, correct?
18   A.    Uh-huh (affirmative).
19   Q.    Which we reviewed. But I want
20 you to turn over to Page 64, which is the
21 continuation of Section 6.5.3, investigating
22 reported incidents of sexual harassment.
23   A.    Okay.

Page 237

1    Q.    Read to yourself that paragraph.
2  It's at the top of the page.
3    A.    Now, technically -- well, okay.
4    Q.    Okay. Now, this paragraph
5  clearly speaks about the committee making
6  recommendations to the President, correct?
7    A.    And their policies by which you
8  can disagree.
9    Q.    We're going to get to that. And
10 it says here the President can approve or
11 disapprove the committee's decision --
12 recommendation, correct?
13   A.    Recommendation.
14   Q.    And it clearly talks about a
15 sanction being imposed by the President,
16 correct? Was that a yes?
17   A.    Yeah.
18   Q.    And a sanction -- a sanction in
19 my mind involves potential negative
20 consequences. Would you agree with that?
21   A.    Right.
22   Q.    And in an employee handbook the
23 word sanction to me would mean the potential

60  (Pages 234 to 237)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 238

1  for an adverse employment action. Do you --
2       A.  Possibly.
3       Q.  Do you agree that that's
4  possible?
5       A.  Yes.
6       Q.  And it says that if you are an
7  employee of the proper classification, you
8  may appeal, correct?
9       A.  Correct.
10      Q.  But if you are an employee of a
11 classification that does not have the right
12 to an appeal, you won't be able to appeal,
13 correct?
14      MR. MADISON:  Object to the
15 form.
16      Q.  (By Ms. Meadows)  Am I correct?
17      A.  That's correct.
18      Q.  All right.  So, if you're an
19 employee who is not otherwise entitled to an
20 appeal, you don't get an appeal, correct?
21      A.  Correct.
22      Q.  So, we had gotten through
23 February 11th where you received notice of

Page 239

1  the appeal.
2       (Whereupon, said document was
3       marked for identification as
4       Exhibit No. 12 to the deposition
5       of Anwar K. Diop.)
6       Q.  Do you recall getting Exhibit
7  12, which is a notice of suspension with pay?
8       A.  Yeah.
9       Q.  And you received this on or
10 about February the 25th?
11      A.  Yes.
12      Q.  Is that a yes?
13      A.  Yes.  As a matter of fact,
14 that's probably -- the week about that letter
15 would have been around the same -- would have
16 been around that same time frame.
17      Q.  That's what I want to know.
18      A.  Yeah.
19      Q.  So, around -- sometime in
20 February --
21      A.  Yeah.
22      Q.  -- is when the brother made the
23 accusation?

Page 240

1       A.  Yes.  It would have been in that
2  same -- within the same week or so.
3       Q.  And he made the accusation that
4  you had assaulted him?
5       A.  Uh-huh (affirmative).
6       Q.  Is that a yes?
7       A.  Yes, ma'am.
8       Q.  And during that same time
9  sometime in mid to late February, you also
10 made a police report with University police
11 about this same incident?
12      A.  Yes.
13      Q.  Do you know who signed the
14 letter accusing you of assaulting the
15 brother?
16      A.  Well, I mean, it was alleged to
17 be a letter that he wrote.
18      Q.  Okay.
19      A.  But the reason that it was
20 disvalidated is because he got his own gender
21 incorrect.
22      Q.  What exactly did the letter say
23 as far as you recall?

Page 241

1       A.  It says I'm the sister of
2  Jalonda Johnson.  And then he went on to
3  describe the incident in my office.  And had
4  there not been that one error.
5       Q.  Now, even though this letter --
6  this notice that is Exhibit 12 states that
7  you are suspended pending the conclusion of
8  the investigation, you actually returned to
9  work prior to the investigation being
10 concluded, correct?
11      A.  Correct.  A week or two,
12 something like that.  But I was put -- given
13 some other duties as well.
14      Q.  When you returned to work, would
15 you say that it was somewhere around March
16 the 18th?
17      A.  Quite possible.  It was two
18 months or so -- two months before.
19      (Whereupon, said document was
20      marked for identification as
21      Exhibit No. 13 to the deposition
22      of Anwar K. Diop.)
23      Q.  Okay.  And when you returned to

61 (Pages 238 to 241)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 242

1   work, according to Exhibit 13, which is a
2   notice of temporary reassignment, you were
3   relocated to the Southern Normal campus in
4   Brewton, correct?
5       A.   Uh-huh (affirmative).
6       Q.   And did you continue to work at
7   Brewton until the conclusion of the
8   investigation?
9       A.   Yeah.
10      Q.   Okay. So --
11      A.   Really, it was probably a month
12  later.
13      Q.   Brewton was what? I'm sorry.
14      A.   I probably even -- probably even
15  -- weeks -- I worked weeks after the
16  investigation was concluded.
17      Q.   So, you worked at Brewton from
18  sometime around March the 18th up until --
19      A.   Until May, yeah.
20      Q.   Okay. Up until your
21  termination, correct?
22      A.   (Whereupon, the witness
23  indicated an affirmative response by nodding

Page 243

1   his head up and down.)
2       Q.   Is that a yes?
3       A.   Yes, ma'am.
4       Q.   And did you not return to your
5   duties on the Alabama State University campus
6   following your reassignment to the Brewton
7   campus?
8       A.   No, no. I mean, I used my
9   office from time to time.
10      Q.   When would you go to your
11  office?
12      A.   Whenever I had to deal with
13  reports and things like that on the main
14  campus.
15      Q.   Did you go to your office during
16  the regular workday?
17      A.   Yeah.
18      Q.   Did you see Mrs. Linda Johnson
19  while you were there?
20      A.   I don't recall. Maybe once or
21  twice. I know maybe once I did.
22      Q.   Did you have any interaction
23  with her when you saw her?

Page 244

1       A.   I asked her why. I asked her
2   why they would lie like that.
3       Q.   And what was her response?
4       A.   She said she believed her
5   daughter.
6       Q.   Did she say anything else?
7       A.   I don't recall. You know, she
8   wanted me to talk to her.
9       Q.   And did you talk to her?
10      A.   I mean, it was really hard to
11  talk to her, you know. I couldn't -- what
12  was I going to say to her?
13      Q.   Okay.
14      A.   You know, I told her, you know,
15  that I couldn't understand how they could do
16  that, you know. I've never treated any of
17  them, you know, in any kind of negative way.
18  And I just -- I just couldn't understand it.
19  I mean, I just -- that hurt me. I couldn't
20  understand it.
21      Q.   Okay.
22      A.   I still can't understand it.
23      Q.   How would you describe your

Page 245

1   relationship with Linda Johnson prior to
2   January 31st, 2005?
3       A.   I mean, I thought she was nice.
4   I know she came -- I know now that she came
5   and she misrepresented a lot of things to me,
6   and I think that she intentionally tried to
7   get close to me.
8       Q.   What specific things did she
9   misrepresent to you?
10      A.   Well, she informed me that she
11  was the assistant to the previous director.
12  That was not true.
13      She knew that I got a great deal
14  of hostility, I was getting no real support
15  and assistance with that job, and she came to
16  me as a person that would -- could help and
17  would be willing to help me in any way that
18  she can, way that she could.
19      And she -- and it just -- it
20  just wasn't true.
21      Q.   Okay.
22      A.   And that's one of the reasons
23  why my posture with her was -- was cordial,

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 246 |
| --- |

1  you know. I really thought she was nice. I
2  mean, I thought her efforts were genuine, but
3  it wasn't.
4      Q.    Did she misrepresent anything
5  else to you?
6      A.    I mean, I can't think of
7  anything, you know. But there were a few
8  things that just turned out to be not true.
9  I can't specifically...
10     Q.    You can't recall right now
11  specifically?
12     A.    Right.
13     Q.    Were those things related to the
14  job?
15     A.    Yeah. She even ordered some
16  supplies and said that I told her she could
17  order them one time. That's one of the
18  things that kind of alarmed me a little bit.
19          Just in hindsight looking back,
20  it was several things that I should have seen
21  coming.
22     Q.    The committee contacted you
23  prior to scheduling the hearing, correct?

| Page 247 |
| --- |

1      A.    Yeah. Ms. Brown contacted me.
2      Q.    And you were given advance
3  notice of the date of the hearing?
4      A.    About a week maybe.
5      Q.    And you were, of course, advised
6  that you had the right to be present during
7  the hearing, correct?
8      A.    Well, I thought it was a
9  hearing, but it wasn't really a hearing.
10     Q.    Right. It's more of an informal
11  investigation, correct?
12     A.    Right, which is what -- which,
13  you know, is why I guess I kind of didn't see
14  it as being -- I don't know. I just didn't
15  -- my understanding and the way I should have
16  regarded that whole proceeding should have
17  been totally different than what it was.
18          Because I never even got an
19  opportunity to, first of all, see the
20  accusation that she made even though I
21  requested it two or three times. I never got
22  an opportunity to question her.
23          Okay. I never even got an

| Page 248 |
| --- |

1  opportunity to be privy to any of the
2  questions and answers that were given by
3  anyone other than myself.
4      Q.    Okay.
5      A.    And I just -- that just seemed
6  like a very one-sided proceeding. Nor was I
7  allowed to have -- I wasn't even allowed to
8  call any witnesses.
9      Q.    You were not allowed to call
10  witnesses?
11     A.    No.
12     Q.    Who told you that you were not
13  allowed to call witnesses?
14     A.    I made the request with Mr.
15  Wesley.
16     Q.    You made a request for
17  witnesses?
18     A.    Yeah. And I even provided
19  names.
20     Q.    Did you give him a written
21  request for witnesses?
22     A.    Yes.
23     Q.    Who did you request to be your

| Page 249 |
| --- |

1  witnesses?
2      A.    One, I wanted Mrs. Johnson's
3  boss. I wanted the three people who were
4  present in my office that witnessed Jalonda
5  but into my office during a meeting. I
6  wanted the assistant to me during that time
7  who could attest to some of her sporadic
8  behavior.
9          I wanted the -- Mr. Nichols, who
10  was the night supervisor who was there
11  present when she was in a parking lot sitting
12  in her car at night, you know, when we were
13  meeting and just sitting there in the dark.
14  It was those individuals specifically.
15     Q.    Okay. And --
16     A.    And my neighbor who lived in the
17  same complex who came up with her the evening
18  that she came to my house and who was out
19  there when she left.
20     Q.    And what is the name of that
21  neighbor?
22     A.    Chad is his first name. I don't
23  remember his last name. But it's on record

63 (Pages 246 to 249)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 250

1  because I know -- if I'm not mistaken, I'm
2  pretty sure the detectives talked to him.
3       Q.   You're pretty sure what?
4       A.   That the detectives talked to
5  him.
6       Q.   I'm asking for --
7       A.   But these were people that I
8  requested to come before the committee.
9       Q.   Right. And you submitted a
10  written request to Mr. Wesley?
11       A.   Yes.
12       Q.   Requesting these witnesses and
13  identifying them by name?
14       A.   Yes.
15       Q.   Do you have a copy of that
16  request you submitted to Mr. Wesley?
17       A.   I'll have to find it.
18       Q.   I'd like a copy of it --
19       A.   But it should be in my personnel
20  file. But I will do -- I will diligently
21  pursue that letter.
22            MR. MADISON: And then we'd like
23  to see a copy of the file that all of these

Page 251

1  things that Mrs. Johnson supposedly had in
2  her file. You know, I think we made a
3  request for production on anything relative
4  to that.
5            THE WITNESS: I did, and I never
6  --
7            MR. MADISON: But, anyway --
8            THE WITNESS: I never received
9  it.
10            MR. MADISON: -- we'll address
11  that later.
12            THE WITNESS: But I'll try to
13  find -- I should be able to come up with
14  something.
15       Q.   (By Ms. Meadows) I'd like a
16  copy of the letter you actually submitted to
17  Dr. Wesley.
18       A.   Okay. Well, his -- he's not a
19  doctor.
20       Q.   I mean, Mr. Wesley. You're
21  correct.
22            How did Mr. Wesley inform -- did
23  Mr. Wesley inform you that you would not be

Page 252

1  allowed to call witnesses?
2       A.   No. They just did not act on
3  it, period. It was my understanding from Ms.
4  Brown that a few -- a subsequent date would
5  be established for that. By the time I knew
6  it, the committee had made their -- had made
7  their conclusions. They did not react on it
8  at all.
9       Q.   So, it's your contention that
10  just no date was ever scheduled for your
11  witnesses?
12       A.   That's correct.
13       Q.   Did you --
14       A.   Nor was I given the opportunity
15  to question my accuser.
16       Q.   Okay.
17       A.   Which the handbook specifically
18  states that I should be given that
19  opportunity. It also states that I should be
20  given a copy of the accusation that was made.
21            It was never given to me. As a
22  matter of fact -- as a matter of fact -- and
23  I know -- I will find this information. When

Page 253

1  I made those requests and I personally took
2  it to Mr. Wesley, I stamped it with their
3  stamp and I wrote on there that he refused to
4  give me this information. I have that.
5            Now, it's going to take me about
6  a day or so to get it, but I have that.
7       Q.   Okay.
8       A.   But it was an outright refusal
9  to give me my due process. As a matter of
10  fact, he was even angry. And I have that.
11  And I even time stamped it with human
12  resources time stamp.
13       Q.   Okay.
14       A.   They was requested.
15       Q.   And you were not present during
16  Jalonda's testimony?
17       A.   No, ma'am.
18       Q.   And you were not present during
19  Mrs. Linda Johnson's testimony?
20       A.   No, ma'am.
21       Q.   And you were not present during
22  Eddie Johnson's testimony?
23       A.   No.

64 (Pages 250 to 253)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 254

1    Q.    Did you present testimony at the
2  hearing?
3    A.    I answered questions.
4    Q.    The committee directed specific
5  questions to you, which you answered?
6    A.    Yes.
7    Q.    Did you submit any documents or
8  anything in your defense at that hearing?
9    A.    Oh, one other person I wanted to
10 have up before the committee was the
11 detective from Montgomery police.
12   Q.    Okay.
13   A.    Any documents that I submitted?
14   Q.    Yes.
15   A.    My phone records. I also asked
16 them to -- she made an accusation -- she made
17 -- she stated that she had the physical and
18 everything at Baptist Hospital. I requested
19 that that be investigated and proved that --
20 nothing became of that as well. I did
21 provide my phone records.
22   Q.    Was there anything else you
23 attempted to present to the committee?

Page 255

1    A.    I don't recall.
2       MR. MADISON: It doesn't sound
3  like it would have mattered too much.
4       THE WITNESS: No.
5       MS. MEADOWS: I'm going to
6  object to you testifying on the record.
7       MR. MADISON: I wasn't
8  testifying. I was making a statement.
9       MS. MEADOWS: And I'm going to
10 object to you making comments, derogatory
11 comments. That's inappropriate, and you know
12 it.
13      MR. MADISON: Well, no, I think
14 it's pretty accurate.
15      MS. MEADOWS: It is
16 inappropriate and conclusory, and you know
17 it.
18      MR. MADISON: I think that it's
19 obvious --
20      MS. MEADOWS: And it is
21 inappropriate in his deposition, and it's
22 going to --
23      MR. MADISON: -- that he wasn't

Page 256

1  provided much due process based upon his
2  testimony.
3       MS. MEADOWS: I don't know that
4  anything is obvious unless you assume he's
5  telling the truth, and I don't have to make
6  that assumption.
7    Q.    Was Jalonda present during your
8  testimony?
9    A.    No.
10   Q.    Did Jalonda ask you any
11 questions?
12   A.    No.
13   Q.    Did any representative for
14 Jalonda ask you any questions?
15   A.    The whole committee was her
16 representative.
17   Q.    Okay. And you say that based
18 upon?
19   A.    The nature of the questions and
20 how they were structured. And the
21 cooperation that I got from those individuals
22 on the committee.
23   Q.    What cooperation did you get

Page 257

1  from individuals on the committee?
2    A.    I didn't.
3    Q.    What did you ask the members of
4  the committee to do?
5    A.    First of all, to have an open
6  mind, to diligently -- you know, to pursue
7  the accusations that were made by Ms.
8  Johnson. I asked them to make this as fair
9  and impartial process as possible, none of
10 which was done. And I say that based upon
11 their conclusion.
12   Q.    And your conclusion about what
13 the committee did or did not do is based
14 solely on the conclusion that they reached,
15 correct?
16   A.    Yes, ma'am.
17      MR. MADISON: Object to the
18 form.
19      THE WITNESS: It's based upon
20 the treatment that I received. It's based
21 upon the cooperation or lack of that I
22 received throughout the process, in addition
23 to the recommendation as opposed to the

65 (Pages 254 to 257)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 258

1  finding of fact.
2        They made a recommendation
3  without finding any basis upon which to base
4  their recommendation. It was just
5  inconsistent.
6        Q.    (By Ms. Meadows) What treatment
7  did you receive from the committee?
8        A.    Very adversarial, very cold.
9  And it was clear that they were reaching for
10 a specific outcome.
11       Q.    I want you to give me a specific
12 example of something they did that mistreated
13 you.
14       MR. MADISON: Other than what
15 he's already testified to?
16       MS. MEADOWS: He hasn't
17 testified to anything specific. I want a
18 specific concrete example of mistreatment.
19       THE WITNESS: Making the
20 determination that there was no evidence to
21 support Ms. Johnson's claim but recommending
22 that I be terminated.
23       Q.    (By Ms. Meadows) Okay. Tell me

Page 259

1  something they did that mistreated you prior
2  to issuing their decision.
3        A.    Ignoring my requests for
4  witnesses and even the opportunity to
5  question my accuser.
6        Q.    You requested --
7        A.    Additionally, providing me
8  copies of the accusations that were made. I
9  made the statement that it's very hard to
10 defend myself against accusations and I don't
11 even know what they are. Basically, all that
12 said is she made an accusation of sexual
13 harassment/rape. That didn't tell me
14 anything.
15       Q.    Okay.
16       A.    Never was I provided it.
17       Q.    Did you at any point become
18 aware of the substance of Ms. Johnson's
19 allegations against you?
20       A.    Long after all of this -- the
21 proceedings and everything was over.
22       Q.    So, it was not until after --
23       A.    Way after.

Page 260

1        Q.    -- the recommendation?
2        A.    Yes. Way after.
3        Q.    And to your knowledge, the
4  committee issued its findings and decision on
5  April the 19th, 2005, correct?
6        A.    As far as I know.
7        Q.    You have no reason to disagree
8  that that's true?
9        A.    No.
10       Q.    And to the best of your
11 knowledge, these recommendations were --
12 their findings and recommendations were
13 conveyed to President Lee, correct?
14       A.    To the best of -- to my
15 knowledge, yes. But from what I -- I mean,
16 they may have in part.
17       Q.    I'm sorry. They may have been
18 in part what?
19       A.    As far as I know, they were, but
20 I do have reason to believe that they
21 weren't.
22       Q.    You have reason to believe that
23 Dr. Lee --

Page 261

1        A.    That they were not.
2        Q.    -- did not receive --
3        A.    That he did not receive the full
4  committee's report.
5        Q.    And you base that upon?
6        A.    The fact that the Board of
7  Trustees had no knowledge.
8        Q.    And how do you know the Board of
9  Trustees had no knowledge of it?
10       A.    Because I specifically asked.
11       Q.    Who did you specifically ask?
12       A.    Judge Wiggins, Catherine Wright.
13 What's the other man's name? It slips me the
14 other's name. But I personally talked with
15 them, and it was their understanding that I
16 had been indicted and charged with the
17 offense and that the committee had all kind
18 of evidence to support -- you know.
19       Q.    And on what date did the Board
20 members convey this information to you?
21       A.    After they refused -- after I
22 wasn't given an opportunity to appeal.
23       Q.    And when was that?

66 (Pages 258 to 261)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 262

1    A.    Probably a few months -- a few
2   months later.  Maybe around July or August,
3   something like that.
4    Q.    And they told you that President
5   Lee had not received a copy of the
6   committee's recommendation?
7    A.    It was determined that a lot of
8   information was censored.  Now, as to how
9   much, I can't really say.
10   Q.    What I'm asking you is did --
11   A.    No --
12   Q.    -- either or those three --
13   A.    -- they did not say that.  They
14  did not say that.
15   Q.    Okay.  Let me clarify my
16  question.
17   A.    I said I had reason to believe
18  that he may not have.
19   Q.    Let me clarify my question for
20  the record, please.
21         Did either of those three
22  trustees that you talked with tell you that
23  President Lee did not receive the committee's

Page 263

1   recommendation?
2    A.    No.
3    Q.    Did they tell you that they did
4   not see the committee's recommendation?
5    A.    They weren't privy to that
6   information.
7    Q.    They weren't privy to what?
8    A.    All they know is that I was
9   terminated, but it's my understanding that
10  the details of that were not --
11   Q.    That they did not see the
12  details --
13   A.    Correct.
14   Q.    -- of the recommendation?
15   A.    Correct.
16   Q.    And as we discussed based on the
17  policy, President Lee could either approve or
18  disapprove the committee's recommendation,
19  correct?
20   A.    That's correct.
21   Q.    So, as far as you know, is
22  President Lee obligated to accept the
23  committee's recommendation?

Page 264

1    A.    No.
2    Q.    President Lee approved your
3   termination on May 5th, 2005, correct?
4    A.    Correct.
5         MR. MADISON:  Can we take
6   another break?
7         MS. MEADOWS:  I really would
8   like to get through this little section if I
9   could.
10        THE WITNESS:  Are we done after
11  that?
12        MR. MADISON:  Well, I really
13  would like to go to the restroom, too.
14        MS. MEADOWS:  Can I -- well, let
15  me introduce this document --
16        MR. MADISON:  All right.  Go
17  ahead.
18        MS. MEADOWS:  -- and then we
19  will be done with this little section, and we
20  can take a break.  This will be Exhibit 14.
21        (Whereupon, said document was
22        marked for identification as
23        Exhibit No. 14 to the deposition

Page 265

1         of Anwar K. Diop.)
2    Q.    Is this the notice of
3   termination that you received?
4    A.    Yeah.
5    Q.    Okay.
6    A.    But you know this is a
7   contradiction from the handbook, too.  My
8   letter shouldn't come from human resources.
9   It's supposed to --
10   Q.    But this is the letter that you
11  received, correct?
12   A.    Yeah.
13   Q.    When did you receive this
14  letter?
15   A.    I picked it up from Dr. Frazier
16  that Monday, if the 6th is on a Monday.
17   Q.    Okay.  The 6th was on a Friday,
18  but if I tell you that --
19   A.    I picked it up Monday.
20   Q.    That Monday was May 9th.
21   A.    That's when I picked it up.
22   Q.    And this notice informed you
23  that you were being terminated as a result of

67 (Pages 262 to 265)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 266

1  the investigation of the allegations made by
2  Jalonda Johnson, correct?
3      A.    That's correct.
4      Q.    And based upon this notice, is
5  it your understanding that you were being
6  terminated for disciplinary reasons?
7      A.    I was being terminated for
8  sexual harassment/rape, which is what it says
9  in this letter.
10     Q.    And is it your understanding
11 that that was a disciplinary action?
12     A.    It was -- that's what it says.
13     Q.    Right. I'm just asking you.
14 You were --
15     A.    And it says that I was
16 terminated for a charge that the committee
17 itself specifically stated that they found no
18 evidence to support.
19     Q.    Based upon this, it says that
20 you are being terminated for sexual
21 harassment and rape, correct?
22     A.    Correct.
23     Q.    Which is a disciplinary reason

Page 267

1  for your termination, correct?
2      A.    Yeah. They're saying the
3  committee's findings and recommendations
4  regarding sexual harassment and rape.
5      Q.    Right.
6      A.    And that the President has
7  approved termination of my contract as a
8  result of that.
9      Q.    And it states that the effective
10 date of your termination is what?
11     A.    July --
12     Q.    It is May 6th, 2005, correct?
13     A.    Right, right. Correct.
14     Q.    And it states that you will be
15 paid through June 6th, 2005, correct?
16     A.    Correct.
17     Q.    Giving you four weeks advance
18 pay --
19     A.    Right.
20     Q.    -- correct?
21     A.    More or less.
22     Q.    More or less four weeks of pay?
23     A.    It's some -- it's some kind of

Page 268

1  reason that that was done. I forgot what it
2  was.
3      Q.    Right. That's because your
4  termination was made effective immediately,
5  correct?
6      A.    Correct.
7      Q.    And you were not given --
8      A.    Instead of giving the notice,
9  right.
10     Q.    Right.
11     A.    There you go. That's what it
12 was.
13     Q.    You were not given advance
14 notice of termination?
15     A.    So, that -- that made up for the
16 advance notice, the fact that they kept me on
17 the payroll 30 more days.
18         MS. MEADOWS: Okay. We will
19 take a break.
20         (Whereupon, the taking of the
21 deposition was recessed from approximately
22 5:14 p.m. to approximately 5:25 p.m., after
23 which the following proceedings were had and

Page 269

1  done:)
2          (Whereupon, said document was
3          marked for identification as
4          Exhibit No. 8 to the deposition
5          of Anwar K. Diop.)
6      Q.    Now, Mr. Diop, at one point
7  during this you were represented by Mr.
8  Julian McPhillips, correct?
9      A.    Uh-huh (affirmative).
10     Q.    Is that a yes?
11     A.    Yes.
12     Q.    And Mr. McPhillips is an
13 attorney here in Montgomery, correct?
14     A.    Yes.
15     Q.    And Mr. McPhillips submitted on
16 your behalf an appeal dated May 13th, 2005?
17     A.    Yes.
18     Q.    Is that correct?
19     A.    Uh-huh (affirmative). Yes.
20         MS. MEADOWS: Okay. I'm going
21 to mark that notice of appeal as Exhibit 15.
22         (Whereupon, said document was
23         marked for identification as

68 (Pages 266 to 269)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 270

1     Exhibit No. 15 to the deposition
2     of Anwar K. Diop.)
3     Q.    Does this look like the request
4  that you submitted for consideration to the
5  Board of Trustees?
6     A.    Yes.
7         Yeah.  That brings another
8  issue.  She wasn't even a student.
9         MS. MEADOWS:  I'm going to
10  submit to you what I'm going to have marked
11  as Exhibit 16.
12         (Whereupon, said document was
13         marked for identification as
14         Exhibit No. 16 to the deposition
15         of Anwar K. Diop.)
16     Q.    Does Exhibit 16 appear to you to
17  be a letter dated June 22nd, 2005, from
18  Attorney Fred D. Gray to Mr. McPhillips?
19     A.    Uh-huh (affirmative).
20     Q.    Is that a yes?
21     A.    Yes.
22     Q.    And is this letter regarding
23  your appeal to the Board of Trustees?

Page 271

1     A.    Yes.
2     Q.    And according to this letter,
3  does it say that your appeal was submitted to
4  the Board of Trustees at the June 16th
5  meeting?
6     A.    Yeah.
7     Q.    Does it also say that after due
8  consideration of the appeal, the Board
9  sustained the action of the President?
10     A.    Yeah.
11     Q.    So, that means that your
12  termination was upheld, correct?
13     A.    Yes.
14     Q.    And your appeal was denied?
15     A.    Yes.
16     Q.    And to your knowledge -- well,
17  did Mr. McPhillips convey the contents of
18  that letter to you?
19     A.    Yeah.
20     Q.    And he acknowledged that he
21  received that letter shortly after it's
22  dated?
23     A.    Yes.

Page 272

1     Q.    Do you remember when Mr.
2  McPhillips told you that your appeal had been
3  denied?
4     A.    I don't remember the exact day,
5  no.
6     Q.    Do you have any reason to
7  dispute that he told you it was denied
8  sometime in June of 2005?
9     A.    No.
10         (Whereupon, said document was
11         marked for identification as
12         Exhibit No. 17 to the deposition
13         of Anwar K. Diop.)
14     Q.    Okay.  I'm going to show you
15  Exhibit 17.  Have you seen this document
16  before?
17     A.    Okay.
18     Q.    Have you seen the document
19  before?
20     A.    Yes, I think I have.
21     Q.    Okay.  Does this letter appear
22  to be a request for reconsideration by the
23  Board?

Page 273

1     A.    Yeah.
2     Q.    To whom is this letter
3  addressed?
4     A.    Fred Gray.
5     Q.    Go back to our handbook excerpts
6  at Exhibit 5.
7     A.    Okay.  What page is that?
8     Q.    It would be 59.  Here.  You can
9  --
10     A.    I've got it.  Fifty-nine.
11     Q.    Okay.  It is Section 6.3.2,
12  Appeals to the Board of Trustees.
13     A.    Uh-huh (affirmative).
14     Q.    I'm going to let you look at my
15  copy, and I want you to look at the
16  highlighted portion.
17     A.    Okay.
18     Q.    Under this provision the
19  employee is required to notify the President
20  of the University that he wishes to appeal to
21  the Board of Trustees, correct?
22     A.    Which I did personally.
23     Q.    Okay.  We're going to get to

69 (Pages 270 to 273)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 274

1  that. But according to this --
2      A.   Uh-huh (affirmative).
3      Q.   -- is that the requirement?
4      A.   Yes, because the President is
5  the secretary of the Board.
6      Q.   Okay. And the notice has to be
7  directed to the President, correct?
8      A.   Uh-huh (affirmative). So,
9  you're saying that's why it wasn't given
10  consideration?
11     Q.   The notice has to be addressed
12  to the President, correct?
13     A.   Yes.
14     Q.   To whom --
15     A.   Fred Gray.
16     Q.   -- is the August 25th letter
17  addressed?
18     A.   Fred Gray.
19     Q.   And to your knowledge, on August
20  25th, 2005, who was the President of Alabama
21  State University?
22     A.   Joe Lee.
23     Q.   Section 6.3.2 also requires that

Page 275

1  the notice of appeal has to be filed within
2  20 days of the adverse action, correct?
3      A.   And he would forward it to the
4  Board, yes.
5      Q.   And there's a 20-day time period
6  on that?
7      A.   Yes, yes.
8      Q.   You stated earlier that your
9  appeal was -- you received notice that your
10  appeal was denied in June --
11     A.   Yes. Now, can I --
12     Q.   -- of 2005?
13     A.   Can I make a statement as well?
14     Q.   Okay.
15     A.   The committee -- it's 20 days
16  after the termination, not the findings from
17  the committee.
18     Q.   Right.
19     A.   Okay.
20     Q.   I agree with that.
21     A.   All right.
22     Q.   And you received your original
23  notice of termination on May 9th, 2005,

Page 276

1  correct?
2      A.   Uh-huh (affirmative).
3      Q.   And you filed a notice of appeal
4  on May 13th, 2005, correct? That was --
5      A.   The initial appeal.
6      Q.   -- Exhibit 15.
7      A.   Okay.
8      Q.   You received notice that your
9  appeal had been denied on June 23rd, 2005?
10     A.   Okay.
11     Q.   Correct?
12     A.   Did the Board actually meet on
13  June 16th? Yeah. Are you sure?
14     Q.   Did you receive notice that your
15  appeal had been denied on June 23rd?
16     A.   I guess. I guess. If not,
17  shortly after.
18     Q.   June 23rd or some date close --
19     A.   Right.
20     Q.   -- to that?
21     A.   Yes.
22     Q.   Would you agree that there are
23  more than 20 days between June 26th and

Page 277

1  August 25th?
2      A.   Now, this is saying the initial
3  appeal within 20 days.
4      Q.   Okay.
5      A.   It doesn't speak to
6  reconsideration.
7      Q.   Okay. Is there a provision --
8      A.   Now, the reconsideration is what
9  was done on the 25th.
10     Q.   Turn to the provision on appeal
11  to the Board.
12     A.   That was on 25? Page 25, was
13  it?
14         MR. MADISON: Here you go.
15         THE WITNESS: Okay.
16     Q.   (By Ms. Meadows) Is there a
17  provision for reconsideration by the Board?
18     A.   I don't see that it's mentioned
19  here.
20     Q.   So, there is no provision for
21  reconsideration by the Board?
22     A.   This is a provision.
23     Q.   Where is that provision?

70 (Pages 274 to 277)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 278

1    A.    I don't see that it's in here,
2  but I think I do recall seeing it. It was in
3  the handbook somewhere.
4    Q.    Well, we're going to pause and
5  go off the record and get the remainder of
6  the handbook and you can show me that
7  provision.
8    A.    Well, I mean, I would take me
9  some time to find it. I would have to go all
10 the way through it, you know.
11   Q.    I've got time. I'll make time.
12   A.    Well, can I just defer that
13 issue?
14       MR. MADISON:  Well, let her get
15 the handbook.
16       MS. MEADOWS:  No. That's --
17 that's a question that I want answered today
18 --
19       THE WITNESS:  Okay.
20       MS. MEADOWS:  -- during this
21 deposition.
22       THE WITNESS:  All right.
23       MS. MEADOWS:  We're going off

Page 279

1  the record for a moment, Belinda.
2       (Whereupon, the taking of the
3  deposition was recessed from approximately
4  5:36 p.m. to approximately 5:39 p.m., after
5  which the following proceedings were had and
6  done:)
7       THE WITNESS:  Okay. What is
8  your question? What's the question?
9    Q.    (By Ms. Meadows) You were going
10 to point me to the provision about
11 reconsideration by the Board of Trustees.
12   A.    I don't see it. But it doesn't
13 say that it's not allowed either.
14   Q.    But there is nothing in there
15 that speaks --
16   A.    And if it was no basis for it,
17 why did they he acknowledge that -- why would
18 it even be given consideration of a response?
19   Q.    Again, I'm asking you the
20 questions today, Mr. Diop.
21   A.    Oh, okay. You're right.
22   Q.    And my question to you is what
23 provision of the handbook --

Page 280

1    A.    I don't specifically see it.
2    Q.    -- allows you a reconsideration?
3    A.    I don't see that there. It just
4  seems like it would be a good idea.
5    Q.    On September the 8th, 2005, Mr.
6  McPhillips sends again a request for
7  reconsideration by the Board of Trustees, and
8  on this attempt he addresses it to President
9  Lee, correct?
10   A.    Right.
11       MS. MEADOWS:  Okay. I want to
12 mark this as Exhibit 18.
13       (Whereupon, said document was
14       marked for identification as
15       Exhibit No. 18 to the deposition
16       of Anwar K. Diop.)
17   Q.    And this is your request to be
18 reheard by the Board of Trustees, correct?
19   A.    Yes.
20       (Whereupon, said document was
21       marked for identification as
22       Exhibit No. 19 to the deposition
23       of Anwar K. Diop.)

Page 281

1    Q.    And I'm now going to show you
2  Exhibit 19. This is a request for
3  reconsideration that you submitted, correct?
4    A.    Yeah, it's one of them.
5    Q.    And you submitted --
6    A.    I submitted about three or four.
7    Q.    And you submitted this request
8  to --
9    A.    Dr. Lee.
10   Q.    -- President Lee?
11   A.    Uh-huh (affirmative).
12   Q.    Is that a yes?
13   A.    Yes.
14   Q.    At some point did you receive
15 correspondence or -- hold on. Let me strike
16 that.
17       At some point did you receive
18 notification that the Board had listened to
19 your request for reconsideration and
20 considered it during executive session?
21   A.    No.
22   Q.    You did not receive --
23   A.    No.

71 (Pages 278 to 281)

FREEDOM COURT REPORTING

Page 282

1    Q.    -- notification that the Board
2  decided not to reverse its June 2005
3  decision?
4    A.    That they decided to reverse it?
5    Q.    That they decided not to reverse
6  the June 2005 decision?
7    A.    That they were upholding the
8  President's termination, is that what you're
9  asking?
10       Now, there is a letter saying
11  that they -- you know --
12    Q.    No.
13    A.    -- that they just did not agree
14  to answer the appeal. The appeal was denied.
15       MS. MEADOWS: Let's mark this as
16  Exhibit 20.
17       (Whereupon, said document was
18       marked for identification as
19       Exhibit No. 20 to the deposition
20       of Anwar K. Diop.)
21    Q.    Read the second paragraph of --
22  well, first of all, let's identify Exhibit
23  20.

Page 283

1       Exhibit 20 is a letter dated
2  September 30th, 2005, from Julian McPhillips
3  written to Fred Gray; is that correct?
4    A.    Uh-huh (affirmative).
5    Q.    Is that a yes?
6    A.    Yes.
7    Q.    Okay. Please, read paragraph
8  two into the record.
9    A.    As you are aware, the request
10  for reconsideration did not go to the Board
11  of Trustees, which went in the Executive
12  Session, and the Board, as a body acting on
13  your recommendation (from what I've heard),
14  decided not to change its original ruling.
15       It said it did not go to the
16  Board.
17    Q.    Where do you see the word "not"
18  in that sentence?
19    A.    Oh, it said did go. The request
20  for reconsideration did go to the Board of
21  Trustees, which went in the Executive
22  Session, and the Board, as a body acting on
23  your recommendation --

Page 284

1       Well, that right there is -- is
2  not true. That can't be true because all of
3  the Board members are not on the executive
4  committee. So, how would they be privy as a
5  Board as a whole?
6    Q.    Okay. Again, is that what this
7  letter says?
8    A.    It says it went into executive
9  session.
10    Q.    Okay.
11    A.    Okay. Executive session is not
12  a session held -- convened by the full Board.
13    Q.    That is your understanding of
14  what an executive session is?
15    A.    I mean, that's been my -- that's
16  been my understanding when attending the
17  Board meeting --
18    Q.    Okay.
19    A.    -- that when they go into
20  executive session that is for the executive
21  committee. And it's behind closed doors.
22    Q.    So, based upon that statement
23  that they went into executive session, that's

Page 285

1  what leads you to believe that the Board --
2    A.    That it was not a full Board.
3    Q.    -- did not consider your
4  reconsideration?
5    A.    Not a full board. Maybe some
6  board members.
7    Q.    But that is your only basis for
8  saying that, is that you feel that the entire
9  Board did not convene to hear your
10  reconsideration?
11    A.    And when I've attended the Board
12  meeting and it says -- and they announce that
13  the Board is going into executive session,
14  then certain members convene to a private
15  area and it is closed.
16       Now, I mean, I could have
17  misinterpreted it, but that's been my --
18    Q.    That's been your understanding?
19    A.    Right.
20    Q.    And that understanding is what
21  you base your contention that the Board did
22  not reconsider your appeal on?
23    A.    No. My understanding is from my

72 (Pages 282 to 285)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 286

1  conversation with certain Board members that
2  they were not privy to the information that I
3  provided, which would have been the basis for
4  reconsideration.
5         If they weren't privy to that,
6  then what would they be considering?
7      Q.   Okay. Which Board members told
8  you they were not privy to your information?
9      A.   Catherine Wright specifically,
10 who was assistant chair.
11        Do you have a list of the Board
12 members? If you can give me that, I can tell
13 you specifically.
14     Q.   Somewhere -- well, you know
15 what, the Board has changed since then. So,
16 no, I'm not sure that I do.
17     A.   It wouldn't be --
18        MR. MADISON: Just off your
19 recollection, what do you recall?
20        THE WITNESS: The names?
21        MR. MADISON: Right.
22        THE WITNESS: I know Catherine
23 Wright. I know Wiggins. I know -- but it's

Page 287

1  one other Board member that I specifically
2  talked to.
3      Q.   (By Ms. Meadows) Did you have
4  any conversations with Joe Reed?
5      A.   Joe Lee, no. But I made an
6  attempt to. He never talked to me. I even
7  went to his house.
8      Q.   Did you have any conversations
9  with Chairman Elton Dean regarding this?
10     A.   I wrote him a letter.
11     Q.   No. I mean -- I'm talking about
12 Board members who told you that --
13     A.   I made an attempt to, but he was
14 actually -- actually, he was new to the Board
15 at that time as well. I'm talking about
16 people who were very familiar who had been
17 through this process from the beginning.
18     Q.   Okay. Listen -- my question --
19     A.   No.
20     Q.   Let me finish the question. My
21 question --
22     A.   Those are the only three people,
23 and the one name I cannot recall.

Page 288

1      Q.   And both Ms. Wright and Judge
2  Wiggins and one other Board member, whom you
3  cannot name, told you that they were not
4  present and did not receive -- well, back up,
5  that they did not receive information --
6      A.   They were not privy --
7      Q.   -- about your appeal?
8      A.   -- to all of the information
9  regarding my appeal.
10     Q.   What information --
11     A.   That's what was stated.
12     Q.   -- were they not privy to?
13     A.   Well, just the nature of the
14 whole proceeding itself and the -- you know,
15 what actions had been taken against me up to
16 that time.
17     Q.   Did they say that they did not
18 receive copies of your requests?
19     A.   I can't remember the specific
20 word -- you know, the specific statement as
21 regarding that one fact, but it was implied.
22     Q.   Which facts were they not privy
23 to?

Page 289

1      A.   That they did not receive my
2  information.
3      Q.   What information did they not
4  receive?
5      A.   My letter specifically stating
6  the reasons for my appeal.
7      Q.   Those three trustees told you
8  that they did not receive copies your letter
9  requesting appeal?
10     A.   They did not receive -- the only
11 letter that they actually received was the
12 letter that I mailed to them directly.
13     Q.   Okay. And what letter was that
14 that you mailed to them directly?
15     A.   From one of these appeals.
16     Q.   Would that be the September 18th
17 letter?
18     A.   I'm not sure. It may be.
19     Q.   Okay. And did they receive --
20     A.   Or a subsequent letter. But I
21 know the only letter that they actually
22 received was a letter that I mailed to them
23 directly because the previous attempts they

73 (Pages 286 to 289)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 290

1  had not received at all.
2      Q.   And all three of them told you
3  that?
4      A.   Yeah.
5      Q.   And that one you only requested
6  -- that was your final attempt to request a
7  reconsideration, correct?
8      A.   As far as I know. I've done it
9  three or four times.
10     Q.   Do you have --
11     A.   At least to get that derogatory
12 information out of my file and for the record
13 to reflect that the accusation by Ms. Johnson
14 was false.
15     Q.   Do you --
16     A.   Now, I do have copies I'm sure.
17     Q.   That's my next question. You do
18 have copies of those requests?
19     A.   Yes.
20     Q.   On May 5th, 2005, you prepared a
21 document seeking a check request to initiate
22 payment to a local contractor in the Brewton
23 area, correct?

Page 291

1      A.   I'm not sure. I probably -- I
2  mean, I did a lot of stuff like that.
3      Q.   Do you recall processing a
4  request for payment for $28,050?
5      A.   Probably.
6      Q.   Okay. Do you recall indicating
7  that the contractor was being paid for work
8  on the dining hall in the boys dormitory at
9  the Southern Normal campus?
10     A.   The dining hall was probably one
11 aspect of their scope.
12     Q.   And the boys dormitory?
13     A.   The boys. The girls dormitory,
14 too.
15     Q.   Yes.
16     A.   Probably.
17     Q.   Do you remember which contractor
18 you would have done that for?
19     A.   There were several.
20     Q.   There were several different
21 ones?
22     A.   Yes.
23     Q.   Do you remember the identity of

Page 292

1  the contractor who was to do the excavation
2  work and install the handicap rails?
3      A.   No. And I'm not sure that that
4  was even a part of that pay request. As a
5  matter of fact, I'm almost sure it wasn't.
6      Q.   Did you have any invoices for
7  the contractor to substantiate the request
8  for $28,050?
9      A.   Absolutely. That's what the
10 basis of the documentation to support that
11 request was provided.
12     Q.   Where would that documentation
13 have been maintained?
14     A.   Probably in the comptroller's
15 office, fiscal affairs. And, actually, now
16 in the auditor general's office because I've
17 actually been called to the auditor general's
18 office about several things like that
19 specifically.
20     Q.   Okay. You have stated to other
21 sources that on May 11, 2005, you accompanied
22 the contractor in question to the bank to
23 cash that check. Do you recall making that

Page 293

1  statement to anyone?
2      A.   One of the contractors.
3          MR. MADISON: Object to the
4  form.
5      Q.   (By Ms. Meadows) Which
6  contractor was that?
7      A.   Maintenance Alternative, I
8  think. And one of the reasons was because we
9  had to wire some money to Brewton.
10     Q.   When did you wire the money to
11 Brewton?
12     A.   I don't know, but --
13         MR. MADISON: Object to the
14 form. I don't think he would have wired the
15 money. Alabama State would have wired the
16 money.
17         THE WITNESS: There is a -- the
18 auditor has a copy of the wire.
19     Q.   (By Ms. Meadows) Okay. And
20 this was on May 11, 2005, that the check was
21 cashed, correct?
22     A.   Something like that.
23     Q.   And you previously stated that

74 (Pages 290 to 293)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 294 | Page 296 |
|---|---|
| 1 you gave the contractor who accompanied you | 1 for which he was terminated. |
| 2 to the bank $12,000 of the money from the | 2   Q.   (By Ms. Meadows) Mr. Diop, are |
| 3 check, correct? | 3 you going to accept your attorney's advice |
| 4   A.   I don't know all of the | 4 and not answer questions regarding this |
| 5 disbursements, but there is documentation for | 5 transaction? |
| 6 it. | 6   A.   Absolutely. |
| 7   Q.   Is there documentation for what | 7   Q.   Okay. Can you identify for me |
| 8 you did with the remaining $16,050? | 8 Paul Gray? |
| 9   A.   It's documentation for every | 9   A.   Paul Gray. |
| 10 penny. | 10   MR. MADISON: If that has |
| 11   Q.   Where would this documentation | 11 anything to do with these invoices, then I'm |
| 12 be located? | 12 going to instruct you not to answer any |
| 13   A.   It should be attached to the | 13 further questions along those lines. |
| 14 check request. | 14   MS. MEADOWS: John, I actually, |
| 15   Q.   And if there is no documentation | 15 unlike some people, do adhere to an |
| 16 attached to the check request, is there a | 16 attorney's decision not to question on that |
| 17 reason -- | 17 line, and I have moved on. |
| 18   A.   Well, the auditors -- | 18   MR. MADISON: Okay. |
| 19   MR. MADISON: I'm going to | 19   MS. MEADOWS: I have a totally |
| 20 object to the form. | 20 unrelated reason for asking him who Paul Gray |
| 21   Number one, I'm going to | 21 is. |
| 22 instruct you not to answer any further | 22   Q.   Have you ever heard of Paul |
| 23 questions if there is an implication of some | 23 Gray? |

| Page 295 | Page 297 |
|---|---|
| 1 wrongdoing because we don't have any | 1   A.   Not to my knowledge. |
| 2 documentation that you're referring to to | 2   Q.   To your knowledge, is there any |
| 3 provide him to review to answer your | 3 reason he would be associated with the same |
| 4 questions. | 4 Social Security number as yourself? |
| 5   And, secondly, if there is an | 5   A.   No. |
| 6 investigation occurring right now which may | 6   Q.   You said that you attempted to |
| 7 involve allegations of wrongdoing by Mr. | 7 contact Trustee Joe Reed regarding this |
| 8 Diop, then I'm going to instruct him not to | 8 matter? |
| 9 answer any further questions regarding that | 9   A.   I never -- I never stated that. |
| 10 issue. | 10 I never stated that I tried to contact Joe |
| 11   MS. MEADOWS: Okay. Are you | 11 Reed. |
| 12 instructing him unconditionally or | 12   Q.   I thought you told me earlier -- |
| 13 conditionally? | 13   A.   Joe Lee. |
| 14   MR. MADISON: I'm instructing | 14   MR. MADISON: Joe Lee. |
| 15 him unconditionally. | 15   Q.   (By Ms. Meadows) Oh, President |
| 16   MS. MEADOWS: Okay. I just | 16 Lee? |
| 17 needed to clarify that. | 17   A.   Yes. |
| 18   Q.   Mr. Diop, are you going to take | 18   Q.   Okay. My question to you |
| 19 your -- | 19 earlier was did you attempt to contact |
| 20   MR. MADISON: And, furthermore, | 20 Trustee Joe Reed regarding your appeal |
| 21 I'll state that it's not relevant to these | 21 situation. |
| 22 proceedings because it had no basis or | 22   A.   Oh. I may have -- I might have |
| 23 relevance to the charges assessed against him | 23 sent him a letter. I may have sent him the |

75 (Pages 294 to 297)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 298

1  same letter that I sent to all of the other
2  Board members.
3      Q.    And other than attempting to
4  contact him like you did the other Board
5  members, you didn't have any contact with Joe
6  Reed?
7      A.    Not regarding this.
8      Q.    Do you have any personal
9  relationship with Joe Reed?
10     A.    No.
11     Q.    And you're not related to him in
12 any way?
13     A.    No.
14          MS. MEADOWS: Okay. I think I'm
15 done with my examination.
16 EXAMINATION BY MR. MADISON:
17     Q.    First of all, the handbook,
18 employee handbook, sets out provisions at
19 Pages 55, 56, 57 through 59 involving the
20 process that Alabama State University is
21 supposed to follow when the contract of an
22 employee is being cancelled for cause; isn't
23 that correct?

Page 299

1      A.    Yes.
2      Q.    Can you look at those provisions
3  -- well, let me just go ahead and --
4          First of all, there never has
5  been a hearing conducted on your termination
6  for cause, has there?
7      A.    No.
8      Q.    Have you ever been allowed to --
9  or has Alabama State ever provided you a
10 hearing where you could call witnesses to
11 examine and cross-examine those witnesses on
12 your behalf regarding your termination?
13     A.    No.
14     Q.    As a matter of fact, I believe
15 you testified earlier that you requested that
16 witnesses be allowed to be called and that
17 was refused?
18     A.    Yeah.
19     Q.    Now, that was not a hearing
20 officer that you appeared before. It was an
21 EEOC committee; isn't that correct?
22     A.    Yes.
23     Q.    What does the handbook state is

Page 300

1  the proper procedure for initiation of a
2  complaint against an employee for
3  termination? How it is to be handled?
4      A.    Well, that a hearing officer
5  would be selected, and it would be done by
6  selection from alphabetical name and that the
7  list would be compiled by the President.
8      Q.    And, furthermore, it says that
9  the person should be familiar with due
10 process procedures; isn't that correct?
11     A.    Yes.
12          MS. MEADOWS: Object to the
13 form.
14     Q.    (By Mr. Madison) I mean, is
15 that what it states?
16     A.    The handbook does state that
17 they should be --
18     Q.    And in paragraph eight it states
19 the following procedures that are supposed to
20 be followed for a hearing for termination for
21 cause, does it not?
22     A.    Yes.
23     Q.    And outline each one of those

Page 301

1  provision that you're supposed to be entitled
2  to there to protect your due process rights.
3      A.    The hearing officer may hold a
4  prehearing conference with parties and their
5  representatives to simplify the issues,
6  determine the facts, provide for exchange of
7  witness lists and documentary and/or other
8  evidence and achieve such other appropriate
9  prehearing objectives.
10     Q.    Were you provided any
11 opportunity to exchange witness lists?
12     A.    No.
13     Q.    And were you provided any
14 opportunity for appropriate prehearing
15 objectives or to determine or achieve those
16 as will make the hearing fair, effective and
17 expeditious?
18          MS. MEADOWS: Object to the
19 form.
20          THE WITNESS: No.
21     Q.    (By Mr. Madison) Now, what does
22 paragraph two state what the procedures that
23 Alabama State University is supposed to

76 (Pages 298 to 301)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 302

1  follow in conjunction with a termination
2  hearing?
3      A.    That a notice --
4          MS. MEADOWS: Object to the
5  form.
6      Q.    (By Mr. Madison) Go ahead.
7      A.    A notice of hearing setting
8  forth the time, place of hearing, setting
9  forth specific charges against the employee
10 and incorporating the written statement of
11 reasons required under Section C above shall
12 be served on the employee at least seven days
13 prior to the hearing.
14     Q.    Okay. And let me stop you right
15 there. Did you ever receive a copy of the
16 written compliant filed by the employee in
17 order for you to defend the charges asserted
18 against you?
19     A.    No.
20         MS. MEADOWS: Object to the
21 form.
22     Q.    (By Mr. Madison) Go ahead.
23     A.    No.

Page 303

1      Q.    And let me point you to
2  Paragraph 4 on Page 57. What does that
3  provision state that you're entitled to as
4  part of any hearing?
5      A.    Throughout the hearing,
6  including any prehearing conferences, the
7  employee has the option of being represented
8  by any individual or counsel.
9          In addition, at the request of
10 the employee, a representative of any
11 employee organization or association shall be
12 permitted to attend all proceedings.
13     Q.    Were you provided the
14 opportunity to have counsel present before
15 the EEOC committee?
16     A.    No. I was told that an attorney
17 would not be allowed.
18     Q.    Were you provided any other
19 hearing in conjunction with your termination
20 where you were allowed an attorney to be
21 present to aid you in the examination or
22 cross-examination of witnesses?
23     A.    No.

Page 304

1      Q.    Let me -- Paragraph 6 deals with
2  what?
3      A.    The employee shall be afforded
4  an opportunity to obtain necessary witnesses
5  and documentary or other evidence. The
6  University shall cooperate with the hearing
7  officer and the employee in securing
8  witnesses and making available documentary or
9  other evidence.
10     Q.    And I understand your earlier
11 testimony was that you did, in fact, provide
12 a list of witnesses that you requested be
13 presented to that EEOC committee on your
14 behalf; is that correct?
15     A.    Yes.
16     Q.    And how many of those witnesses
17 did the EEOC committee permit to testify
18 before them?
19     A.    None.
20         MS. MEADOWS: Objection to form
21 and foundation.
22     Q.    (By Mr. Madison) Go ahead.
23     A.    None.

Page 305

1      Q.    Were you instructed by the EEOC
2  committee that they would not allow you to
3  have or present any witnesses on your behalf?
4          MS. MEADOWS: Object to the
5  form.
6          THE WITNESS: They never gave me
7  an opportunity. I provided the list. And
8  shortly thereafter, the whole proceeding had
9  been concluded and the committee had made a
10 finding.
11     Q.    (By Mr. Madison) What does
12 Paragraph 7 state as to what your rights are
13 concerning witnesses at any hearing for your
14 termination?
15     A.    The employee and the University
16 shall have the right to confront and
17 cross-examine witnesses.
18         When the witnesses cannot or
19 will not appear but the hearing officer
20 determines that the interest of justice
21 requires admission of their statement, the
22 hearing officer shall identify the witnesses,
23 disclose their statements and, if possible,

77 (Pages 302 to 305)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 306

1  provide for interrogatories.
2      Q.    Were you provided the right to
3  confront and cross-examine witnesses?
4      A.    No.
5      Q.    Did ASU provide you or the EEOC
6  committee provide you the opportunity to
7  examine or cross-examine the person making
8  allegations against you?
9      A.    No.
10     Q.    Are you aware as to whether any
11  record of the -- or transcript of the
12  hearings or the EEOC committee's interviews
13  of the two -- two of you, I guess, were
14  provided to the Board of Trustees?
15         MS. MEADOWS:  Object to the
16  form.
17         THE WITNESS:  No.
18     Q.    (By Mr. Madison)  Now, earlier
19  you were asked the question about a certain
20  letter, and you stated that the person
21  sending you the letter or the notice of the
22  hearing was not the person that the handbook
23  stated was supposed to provide you the notice

Page 307

1  with respect to the action taken against you;
2  is that correct?
3      A.    That's correct.
4         MS. MEADOWS:  Object to the
5  form.
6      Q.    (By Mr. Madison)  Who does the
7  handbook state or what was the procedure to
8  be followed in handling the notice of your
9  termination?
10     A.    That it should come from --
11        MS. MEADOWS:  Object to the
12  form.
13        THE WITNESS:  -- the President
14  and that any initiation of termination should
15  be done by my immediate supervisor and
16  concurred by all department heads, up to the
17  vice president, which my immediate supervisor
18  would have been the vice president.
19     Q.    (By Mr. Madison)  Okay.  And did
20  you receive your notice from your vice
21  president?
22     A.    No.
23     Q.    So, that would not have been in

Page 308

1  compliance with their own policies and
2  procedures?
3         MS. MEADOWS:  Object to the form
4  --
5         THE WITNESS:  That's correct.
6         MS. MEADOWS:  -- and foundation.
7      Q.    (By Mr. Madison)  Have you been
8  provided anything -- or were you provided at
9  the hearing or at the EEOC committee meeting
10  any evidence that Ms. Jalonda Johnson was a
11  student at the time that the allegations were
12  asserted against you?
13        MS. MEADOWS:  Object to the
14  form.
15        THE WITNESS:  There is a letter
16  specifically stating that she had withdrawn
17  from school prior to filing the accusation.
18     Q.    (By Mr. Madison)  But were you
19  aware as to whether or not she was enrolled
20  as a student at the time?
21     A.    I was not aware of whether she
22  was a student at all.  That had not been
23  conveyed to me.

Page 309

1      Q.    From the standpoint that you
2  were questioned regarding the procedures for
3  appeals, I -- and my recollection may not be
4  correct.
5         But earlier in the day I thought
6  your were questioned as to whether or not you
7  had no right to appeal; is that correct?
8         MS. MEADOWS:  Object to the
9  form.
10     Q.    (By Mr. Madison)  Do you recall
11  that?
12     A.    Ask that again.
13     Q.    Were you questioned earlier in
14  the day as to whether you even had a right to
15  appeal?
16        MS. MEADOWS:  Object to the
17  form.
18        THE WITNESS:  Yes, I was
19  questioned as to whether I had a right.
20     Q.    (By Mr. Madison)  Okay.
21     A.    Because it didn't -- I didn't
22  seem to be given that opportunity.
23     Q.    Now, the three or four persons

78 (Pages 306 to 309)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 310

1  you identified earlier today in your
2  testimony as having had their legal bills
3  paid, according to your understanding of
4  Alabama State University in their defense,
5  were those employees the same status as you?
6      MS. MEADOWS: Object to the
7  form.
8      Q.   (By Mr. Madison) To your
9  knowledge?
10     A.   Yes. You mean -- if you're
11 meaning were they executive level?
12     Q.   Right.
13     A.   Yes.
14     Q.   So, those persons would have
15 been the same classification under the
16 handbook as you would have been classified
17 as?
18     MS. MEADOWS: Object to the
19 form.
20     THE WITNESS: Yes, yes.
21     Q.   (By Mr. Madison) Now, would the
22 only -- and when I asked that question, I was
23 referring to the excerpt of the employee

Page 311

1  handbook at Page 23, which I believe you were
2  questioned about as an executive status
3  employee; is that correct?
4      MS. MEADOWS: Object to the
5  form.
6      THE WITNESS: Correct.
7      Q.   (By Mr. Madison) The permanent
8  employees, would those have pretty much
9  the tenured professors?
10     MS. MEADOWS: Object to the
11 form.
12     Q.   (By Mr. Madison) To your
13 knowledge?
14     A.   Yes.
15     Q.   The first sentence of the
16 executive status employee definition states
17 what?
18     A.   An employee who fills a
19 permanent senior-level staff position.
20     Q.   Now, did the EEOC committee
21 advise you at any time, any of the members of
22 that committee, that rape charges had been
23 asserted against you and that you had the

Page 312

1  right not to make any statements without the
2  presence of counsel?
3      MS. MEADOWS: Object to the
4  form.
5      THE WITNESS: No, never.
6      Q.   (By Mr. Madison) Was any -- I
7  think I've already asked you this, but how
8  many people -- I haven't asked you this.
9      How many people were on that
10 EEOC committee to your recollection?
11     A.   Three.
12     Q.   And were those the three persons
13 identified earlier as being on that sign-in
14 sheet?
15     A.   No.
16     Q.   All right. Who were the three
17 persons who were sitting on the committee
18 that you recall?
19     A.   Weaver was one last name. You
20 don't have the committee report by chance, do
21 you? I know Weaver was one name.
22     MR. MADISON: Let me see the
23 exhibits. Was that marked as an exhibit?

Page 313

1      MS. MEADOWS: No.
2      MR. MADISON: Okay. I thought
3  it was.
4      THE WITNESS: Wilson, Weaver and
5  Simmons. Wilson, Weaver and Simmons.
6      Another thing that handbook
7  says, that these names should be among the
8  faculty that's employed by the University,
9  and one of them is an adjunct who was the --
10 who was -- was not a full faculty member of
11 the University.
12     The other was a student who
13 wasn't currently enrolled, and the man was a
14 staff member.
15     Q.   (By Mr. Madison) And finding
16 one of the EEOC committee was what?
17     A.   The EEOC committee cannot
18 conclusively say that Ms. Johnson -- that Mr.
19 Diop raped Ms. Johnson. There was no
20 documentary evidence given to substantiate
21 this claim.
22     Q.   What does Paragraph 4 allude to?
23     A.   The EEOC committee -- the EEOC

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 314

1  concludes that Mrs. Johnson was not fired
2  because of sexual harassment, but an improper
3  requisition for the transfer of funds.  She
4  was allowed to work without a contract.
5      Q.   When you were questioned by the
6  EEOC committee, how did that work?
7          MS. MEADOWS:  Object to the
8  form.
9          THE WITNESS:  I was called into
10  a room, they were already assembled and they
11  asked me some questions.
12     Q.   (By Mr. Madison)  Who else was
13  present besides the three members of that
14  committee?
15     A.   No one.
16     Q.   Were you placed under oath?
17     A.   No.
18     Q.   Was a transcript made that you
19  were aware of?
20     A.   Well, there was a recording of
21  the proceeding I do know.
22     Q.   Did you state on the record with
23  any of those three individuals that you had

Page 315

1  requested that you be allowed to --
2      A.   Yes.
3      Q.   -- to submit witnesses?
4      A.   Yes.
5      Q.   On your behalf?
6      A.   Yes, yes.
7      Q.   That would appear in the
8  recordings then --
9      A.   Yes.
10     Q.   -- if they have those?
11         MS. MEADOWS:  You have those.
12         MR. MADISON:  What?
13         MS. MEADOWS:  You have those.
14         MR. MADISON:  I've got those?
15         MS. MEADOWS:  Yes.
16         MR. MADISON:  I don't think so.
17     Q.   While you were employed as the
18  plant manager, did you ever have an
19  opportunity to file or submit with anybody
20  any concerns of any alleged wrongdoing by
21  employees of the physical plant?
22         MS. MEADOWS:  Object to the
23  form.

Page 316

1          THE WITNESS:  Yes.
2      Q.   (By Mr. Madison)  And what was
3  it that you reported?
4      A.   I filed a police report against
5  Cornelius Johnson.
6      Q.   And what was that for?
7      A.   For assault.
8      Q.   Was there any other occasion
9  that you filed any complaints regarding any
10  misuse of ASU property while you were there?
11     A.   Yes.
12     Q.   Did you request an investigation
13  be performed?
14     A.   Yes.
15     Q.   And what was it that you
16  requested be investigated?
17     A.   The handling of material.  It
18  was like Freon and other materials related to
19  electrical and plumbing.
20     Q.   And what was it that you
21  conveyed to your superiors that you were
22  concerned about?
23     A.   That there was no accountability

Page 317

1  of where certain materials went, that there
2  seemed to be several of the craft supervisors
3  that had private businesses, and it appeared
4  that they were using materials purchased by
5  the University for their private enterprises.
6      Q.   And you reported that to your
7  superiors?
8      A.   Yes.
9      Q.   Do you know if any investigation
10  was made of that?
11     A.   No.
12     Q.   Were there any particular
13  individuals that you reported?
14     A.   Plumbing, electrical supervisor.
15     Q.   Do you recall any specific
16  persons?
17     A.   I know Lasley was one, his last
18  name; Mr. Bibbs, I think his name; Mr.
19  Garnell was another one; McDuffy.
20     Q.   On Defendant's Exhibit 2 -- I'm
21  sorry.  Defendant's Exhibit 4.  Was there a
22  stated term for your employment?
23     A.   Yes.

80  (Pages 314 to 317)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

**Page 318**

1    Q.    And what was the stated term or
2   period of time that you were to be employed
3   under that contract?
4    A.    From November through September.
5    Q.    November what?
6    A.    The 1st through September 30th.
7    Q.    And was that a full year?
8    A.    Yes.
9    Q.    Actually, it would have been
10  October.
11   A.    It would have been less.  Well,
12  it's a little bit less than a year.  Well,
13  November 1st.  Yeah, it's a little bit less
14  than a year.
15   Q.    And what was the amount of your
16  salary?
17   A.    $64,413.
18   Q.    What was represented to you when
19  you took your job as to the nature of the
20  position that you were taking as far as the
21  time that you be would be employed?
22       MS. MEADOWS:  Object to the
23  form.

**Page 319**

1       THE WITNESS:  That I was
2   director of physical plant, that the
3   contract, which was an annual contract and
4   renewed 30 days before termination, renewed
5   or either terminated.
6       MR. MADISON:  If can have just a
7   minute.  I don't think -- I want to take just
8   a minute just to --
9       MS. MEADOWS:  I'm glad you're
10  going to take a minute because I need to be
11  excused.
12       (Whereupon, the taking of the
13  deposition was recessed from approximately
14  6:27 p.m. to approximately 6:31 p.m., after
15  which the following proceedings were had and
16  done:)
17       MR. MADISON:  I think that's it
18  for me.
19  FURTHER EXAMINATION BY MS. MEADOWS:
20   Q.    What was the date that you
21  testified before the EEOC committee?
22   A.    February 11th or something.
23   Q.    No.  That was when you got the

**Page 320**

1   notice.  I'm talking about when you actually
2   met with the three committee members and they
3   questioned you.
4    A.    Oh, okay.  March 10th maybe.
5    Q.    Okay.  On March 10th, were you
6   aware that Ms. Johnson had filed criminal
7   charges against you?
8    A.    Yes.  I was aware of that in
9   February.
10   Q.    You testified earlier that you
11  conveyed concerns regarding the handling of
12  certain materials, correct?
13   A.    Yeah.
14   Q.    Okay.  How did you convey your
15  concerns?
16   A.    By me writing to my vice
17  president just to -- and this was an effort
18  to discontinue open purchase orders, which
19  was the initial basis for those kind of
20  conclusions.
21       Because there were open purchase
22  orders maybe in excess of $50,000-$60,000,
23  but our work order procedures and process

**Page 321**

1   didn't really tie a piece of material or part
2   to a specific job or task.
3       And after going and receiving
4   invoices for large amounts of things, I just
5   became suspicious.
6    Q.    And you conveyed your concern in
7   writing?
8    A.    Yes.
9    Q.    And in your writing you
10  requested that --
11   A.    That, first of all, open
12  purchase orders be discontinued and that we
13  be required to go through the purchase order
14  process.
15   Q.    And who did you say you
16  submitted that to by name?
17   A.    Leon Frazier.
18   Q.    In your correspondence to Mr.
19  Frazier, you actually wrote the names of Mr.
20  Lasley, Mr. Bibbs, Mr. Garnell and Mr.
21  McDuffy; is that correct?
22   A.    Mr. McDuffy?  Ms. McDuffy.
23   Q.    Ms. McDuffy.  I'm sorry.

81 (Pages 318 to 321)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 322

1    A.    I actually referred to their
2   crafts and not their specific names.
3    Q.    So, you did not name the
4   specific individual.  You named the craft
5   that --
6    A.    In conversation I'm sure I did.
7    Q.    Okay.  I'm --
8    A.    Because I found that most of
9   them had private businesses.
10   Q.    And this was --
11   A.    In the same area that they were
12  supervising, you know, with the University.
13  So, yeah, in that respect I did.
14   Q.    And this was in an oral
15  conversation with Dr. Frazier?
16   A.    Yes.
17   Q.    Do you recall when that
18  conversation took place?
19   A.    Not specifically.  As a matter
20  of fact, I never thought I'd even have to
21  bring that one up.
22   Q.    Did you file a police report
23  over the missing materials?

Page 323

1    A.    No.
2    Q.    Did you ever ascertain that
3   materials were missing?
4    A.    Yes and no.
5    Q.    Explain.
6    A.    Well, one, it was very difficult
7   because of procedures, the current policies
8   in place.  And I just mentioned that it was
9   very difficult because there was no tie to a
10  specific task or project with the piece of
11  material.
12        In addition to that, there was
13  no centralized inventory or control.  So, it
14  was very easy to flouge numbers.
15        The only way that I became
16  suspicious is because I received invoices for
17  large amounts of things.  However, when I go
18  to identify these items on the shelf, they
19  were not there.
20   Q.    I'm going to direct you back to
21  Page 55 of the handbook.  Mr. Madison had you
22  read Section 6.3, some provisions from that.
23   A.    Uh-huh (affirmative).

Page 324

1    Q.    I want you to read for me the
2   first sentence of that.
3    A.    Section 6.3?
4    Q.    Yes.
5    A.    Cancellation of contract is the
6   term used to define those administrative
7   actions of the University that result in a
8   permanent employee suffering a loss of
9   employment or compensation or a temporary
10  employee suffering a loss of employment or
11  compensation prior to the expiration of a
12  temporary appointment.
13   Q.    And were you a permanent
14  employee or an executive employee?
15   A.    I was an executive employee.
16   Q.    Okay.
17   A.    But executive employee is
18  defined as a person that -- let me find that
19  as a matter of fact.  It's the same as a
20  permanent employee.
21   Q.    So, the handbook creates two
22  separate statuses for no reason?
23   A.    It's just redundancy.  And

Page 325

1   that's -- that occurs a lot in this book.
2    Q.    Okay.
3    A.    As a matter of fact, which is
4   why this is being discontinued.  Did you know
5   that?
6    Q.    Okay.  That's your testimony.
7        MR. MADISON:  Ms. Meadows may be
8   doing it.
9        THE WITNESS:  No, it is.  It's
10  true.  And this was done -- did you know it
11  was several years since this was written and
12  it hadn't even been updated or amended or
13  anything?
14        MS. MEADOWS:  I have nothing
15  further.
16        THE WITNESS:  Thank you.
17        MR. MADISON:  Concluded.
18        FURTHER DEPONENT SAITH NOT
19
20
21
22
23

82 (Pages 322 to 325)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 326

```
1        C E R T I F I C A T E
2    STATE OF ALABAMA
3    JEFFERSON COUNTY
4        I hereby certify that the above
5    and foregoing deposition was taken down by me
6    in stenotype, and the questions and answers
7    thereto were reduced to typewriting under my
8    supervision, and that the foregoing
9    represents a true and correct transcript of
10   the deposition given by said witness upon
11   said hearing.
12       I further certify that I am
13   neither of counsel nor kin to the parties to
14   the action, nor am I in any way interested in
15   the result of said cause.
16       Given under my hand and seal this
17   the 19th day of May, 2008.
18
19       _____
         Belinda S. Brewster, RPR
20       Alabama License #335
21
22
     My Commission Expires:
23   September 1, 2009
```

83  (Page 326)

17249641-2df0-4c36-b999-32292148c606



71/0001

# ALABAMA STATE UNIVERSITY
## MONTGOMERY, ALABAMA 36101-0301
### NOTICE OF EMPLOYMENT

**TITLE: Mr     NAME: Anwar K. Diop     SSAN:**
**TITLE/RANK:** Director of Physical Plant
**UNIT ASSIGNED:** Physical Plant
**REPORTING DEPARTMENT:** Administrative Services



### REPORTING PERIOD
**FROM:** 1 November 2004          **TO:** 30 September 2005
**GRADE:** SM I     **STEP:** 5          **PAY STATUS:** Exempt
**REPLACEMENT FOR:** Lytle Allen     **NEW POSITION:**
**STATUS:** Executive

### PERIOD OF PROBATION
**FROM:**                    **TO:**
### SALARY
**YEARLY:** $64,413.00 **PRORATED:** $59,045.25   **MONTHLY:** $5,367.75   **HOURLY:** $
**ACCOUNT #1:** 2-17100-1210   **OBJ/EEO CODE 1:** 010/01   **COST:**
**ACCOUNT #2:**     **OBJ/EEO CODE 2:**   **COST:**
**ACCOUNT #3:**     **OBJ/EEO CODE 3:**   **COST:**
**ACCOUNT #4:**     **OBJ/EEO CODE 4:**   **COST:**
**FUNDING UNIT:** Physical Plant Admin

### !!!!NOTICE!!!!
**Your employment with Alabama State University is subject to the polices and regulations of the University and its Board of Trustees, available funds, and the following terms and conditions.**

**SPECIAL CONDITIONS:** Persons holding staff positions classified at salary grade XVIII or higher, are prohibited from teaching for supplemental pay.

1. _____ 10/11/04       2. _____ 10/12/04
   PERSONNEL          DATE            AREA VICE PRESIDENT     DATE

3. _____ 10/13/04       4. _____ 10/13/04
   FISCAL AFFAIRS     DATE            PRESIDENT          DATE

Budget Office _____  Grants _____
Title III Only _____

5. _____ 10/18/04
   EMPLOYEE SIGNATURE     DATE

Exhibit

2

An Equal Opportunity Employer



NON ACADEMIC STAFF HANDBOOK

NON ACADEMIC STAFF HANDBOOK

Exhibit

3

# SECTION 1.0
## CLASSIFICATION OF POSITIONS AND EMPLOYEE SERVICE STATUS

### 1.1 CLASSIFICATION OF POSITIONS

Every position at the University is designated according to five different forms of employment classification which in turn determine how various personnel policies are applied to that position as well as how employee benefits are administered to persons holding that position. Thus, every employee should be clear regarding the various kinds of classification that apply to the position that he or she holds.

One means by which positions are classified is according to six broad job categories that are reported by the University to the Equal Employment Opportunity Commission (EEOC). The classification of employment under this method is as follows:

Executive, Administrative and Managerial:  All positions requiring major responsibility for the management or general business operation of the University or of a department or subdivision thereof.

Positions in this category include president, vice president, assistant vice president, dean, assistant dean, academic department chairperson, controller and those positions that carry the title of director and which supervise the following units:  Communications and Public Affairs, Intercollegiate Athletics, Institute for Social Research and Governmental Services, Small Business Development and Urban Economic Research Centers, Teacher Education Center, Office of Professional Laboratory Experiences, College of Education Certification Office, Office of Off-Campus Sites, Academic Advisement Center, Library and Learning Resources, Instructional Resource Center, Enrollment Management, Records and Registration, Counseling and Student Development, Career Planning and Placement, Health Services, Student Activities, University Police and Security, University Center, Student Housing Services, Residential Life, Student Financial Aid, Purchasing, Auxiliary Enterprises, Personnel Services and Human Relations, Computing and Information Services, Development and Title III Programs, Alumni Relations and Development Services, and Physical Plant.

Professional Non-Faculty:  All positions that do not carry faculty rank and require at least a bachelor's degree or require specialized professional training that is comparable to a bachelor's degree or require a combination of training and experience of such kind as to be comparable to a bachelor's degree.

Positions include accountants, employment manager, systems analysts and athletic coaches.

Clerical and Secretarial: All positions that relate to clerical or secretarial activities involving internal and external communications, recording and retrieving of data or information, and other paperwork required in an office.

Positions include secretaries, clerk-typists, accounting clerks, office machine operators, statistical clerks, payroll clerks, sales clerks, and library clerks.

Technical and Paraprofessional: All positions requiring specialized knowledge or skills that require experience or academic work such as is offered in two-year technical institutions, junior colleges or equivalent on-the-job training.

This category includes computer operators, computer programmers, mathematical aides, licensed practical nurses, photographers, radio operators, laboratory assistants and laboratory technicians.

Skilled Crafts: All positions that typically require special manual skills acquired through on-the-job training or through apprenticeship or other formal training programs.

This category includes mechanics, repairers, electricians, stationary engineers, skilled machinists, carpenters, plumbers, painters and typesetters.

Service and Maintenance: All positions requiring limited degrees of previously acquired skills, the performance of which results in or contributes to the comfort, convenience and hygiene of personnel and the student body or which contributes to the maintenance of University buildings, facilities or grounds.

This category includes vehicle drivers, general laborers, custodians, groundskeepers and security personnel.

A second means by which positions are classified is according to whether they are permanent or temporary. The classification of positions under this method is as follows:

Permanent Position: A position that is in the current budget of the University and for which current University plans or programs include no definite date for discontinuance of the position.

Temporary Position: A position that is in the current budget of the University and for which current University plans or programs include a definite date for discontinuance of the position. Every position established as part of a joint project between the University and an outside agency shall be designated as a temporary position without regard to the source of funding for the position.

A third means by which positions are classified is according to the number of months within the fiscal year that the position functions. The classification of positions under this method is as follows:

Twelve-Month Position: A position that functions during each of the 12 months of the fiscal year with the employee who fills such a position normally eligible to accrue annual leave during that period.

Nine-Month Position: A position that functions only during the nine months of the regular fall and spring semesters with the faculty employees who fill such positions normally not eligible to accrue annual leave during that period. The most numerous nine-month positions are those that include teaching faculty and residence hall supervisors.

A fourth means by which positions are classified is according to the number of hours within a work week they are scheduled to operate. The classification of positions under this method is as follows:

Full-time Position: A position that requires the employee filling it to render 30 hours or more of service per week on a regular schedule.

Part-time Position: A position that requires the employee filling it to render less than 30 hours of service per week on a regular schedule. Such employees are not eligible to achieve permanent status or University benefits.

Substitute Position: A position that does not require the employee filling it to render a fixed number of hours of service per week or to follow a regular work schedule. Persons filling such positions are on a standby or "on-call" basis and are most commonly employed as staff members in the student residence halls and the radio station. Such employees are not eligible to achieve permanent employee status and are not eligible to receive any University benefits.

A fifth means by which positions are classified is according to whether they are exempt or nonexempt from the minimum wage and overtime compensation provisions of the U. S. Fair Labor Standards Act. The classification of positions under this method is as follows:

Exempt Position: A position that meets all of the tests of the Fair Labor Standards Act relating to job responsibilities, supervision, authority and salary that are necessary for classification under the law as administrative, executive or professional.

Nonexempt Position: A position that does not meet all of the tests defined above for classification under the law as administrative, executive or professional.

22

## 1.2 EMPLOYEE SERVICE STATUS

Every employee is classified according to four of the five different categories of positions previously described. In addition, each employee is further categorized according to the employee's service status as follows:

Temporary Employee: An employee who fills a temporary position or who fills a permanent position on an acting basis for a limited term until either a permanent employee returns to the position from a leave of absence or until a search is completed for a new probationary employee.

Probationary Employee: A full-time employee who is appointed to the University to fill a permanent position or who is promoted from within the University to fill a permanent position and who has not completed the required term of continuous and satisfactory service in the position that is necessary to advance beyond probationary status. Persons newly appointed as executive status employees (see below) do not serve a probationary period.

Permanent Employee: A full-time employee who has completed the required term of continuous and satisfactory probationary service in a permanent position and who has been designated as a permanent employee. A permanent employee may take a leave of absence from a permanent position to fill a temporary position at the University without losing his or her permanent employee status at the University or his or her right to return to the permanent position when the term of the temporary position has ended. Persons appointed to positions as executive status employees (see below) serve at the pleasure of the President or Board of Trustees and are not eligible to achieve permanent employee status. An employee on permanent status may be re-assigned to another job without losing permanent status of employment at the University. Persons appointed to laboratory staff positions must meet additional requirements prescribed elsewhere in this Handbook before being eligible to achieve permanent employee status.

Executive Status Employee: An employee who fills a permanent senior-level staff position that does not carry with it the authority to convey permanent employee status. These include all positions of Vice President, Assistant Vice President, Dean, Director of Library and Learning Resources, Controller, Director of Computing and Information Services, Director of Physical Plant, Director of Communications and Public Affairs and Director of Intercollegiate Athletics.

Suspension without pay is one of several forms of Cancellation of Contract for Cause that follow very specific administrative procedures and that are dealt with in more detail later in this section of the Handbook. Employees subject to such suspensions should refer to those later pages for more specific information relating to their rights under a pending suspension action. A permanent employee may appeal the action of being placed on 10 day suspension by resorting to the University's grievance procedure explained elsewhere in this Handbook.

6.1.4 SUSPENSION WITH PAY. An employee who appears to have engaged in major misconduct for which termination of employment would normally follow may be placed on suspension with pay pending a further inquiry into the matter. Only the President has the authority to suspend an employee with pay, and when such suspensions are initiated, they must be in writing with a copy given to the employee. An employee who has been suspended with pay is not permitted to report for work until instructed to do so in writing.

Within 10 working days of the suspension, the President must notify the employee in writing regarding the results of the inquiry. If the inquiry has shown that the original charges were not valid, the employee will be reinstated to active service. If the inquiry has shown that the original charges against the employee were valid, the employee will be notified that his or her employment has been terminated effective the date of notification.

## 6.2 TERMINATION FOR DISCIPLINARY REASONS

Termination of an employee for disciplinary reasons will occur as a result of one of the following three patterns:

1) The employee has engaged in major misconduct involving, but not limited to, those forms of misconduct which are listed in this section of the Handbook and which call for termination either for the initial offense or for successive offenses.

2) The employee has failed to meet satisfactorily the terms of a disciplinary probation.

3) The employee has within a 12 month period either received three reprimands or been twice placed on disciplinary probation.

A recommendation to terminate an employee for disciplinary reasons shall be initiated by the immediate supervisor and concurred with by all successive supervisors up to and including the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics,

before being sent to the President. Only the President has authority to actually terminate the employee, and such notice must be in writing with a copy of the notice provided to the employee. A termination of employment for disciplinary reasons may take effect upon the date of notification when in the judgment of the President the seriousness of the offense is such that keeping the employee on the job would be detrimental to the University or to the employee. On the other hand, if the President does not believe that immediate termination is necessary to protect the interests of the University or the employee, then the President will give an advance notice of termination rather than an immediate notice of termination. When an advance notice of termination is given, all persons holding staff positions in the categories of service and maintenance, skilled crafts, clerical and secretarial and technical and paraprofessional shall receive a two-week advance notice of termination. And all persons holding staff positions in the categories of executive, administrative and managerial and professional nonfaculty shall receive a four-week advance notice of termination. Compensation for the two-week or four-week period will be deemed as advance notice.

Permanent employees who are terminated for disciplinary reasons may appeal their termination in accordance with the University's grievance procedure. If an employee resigns after being informed that he or she will be terminated for disciplinary reasons, it will still be recorded in the employee's personnel record as a termination for disciplinary reasons. If an employee elects to resign prior to being informed that he or she will be terminated for disciplinary reasons, his/her personnel record will reflect that he/she resigned employment.

## 6.3 CANCELLATION OF CONTRACT

Cancellation of contract is the term used to define those administrative actions of the University that result in a permanent employee suffering a loss of employment or compensation or a temporary employee suffering a loss of employment or compensation, prior to the expiration of a temporary appointment. Cancellation of contract may be effected by the University only for adequate cause or for medical disability, and it may take one of the following forms: involuntary termination, suspension without pay, demotion or involuntary transfer.

6.3.1 CANCELLATION OF CONTRACT FOR CAUSE. The divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics is responsible for initiating all actions involving a cancellation of contract of nonacademic staff employees. The following criteria and procedures shall be followed for such actions based upon adequate cause:

A) Adequate cause for contract cancellation shall be related directly and substantially to the fitness of the employee to perform the duties and responsibili-

IOH 0480

FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JALONDA JOHNSON,           )

      Plaintiff,          )

vs.                        )    CASE NUMBER:

ALABAMA STATE UNIVERSITY ) 02:07-CV-101

and ANWAR DIOP,            )

      Defendants.         )


DEPOSITION OF JALONDA JOHNSON

     In accordance with Rule 5(d) of

The Alabama Rules of Civil Procedure, as

Amended, effective May 15, 1988, I, Cindy

Weldon, am hereby delivering to LaTasha A.

Meadows, the original transcript of the oral

testimony taken on the 12th day of February,

2008, along with exhibits.

     Please be advised that this is the

same and not retained by the Court Reporter,

nor filed with the Court.

Exhibit

4

FREEDOM COURT REPORTING

| Page 2 | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | |
| 5 | JALONDA JOHNSON, ) |
| 6 | Plaintiff, ) |
| 7 | vs. ) CASE NUMBER: |
| 8 | ) 02:07-CV-101 |
| 9 | ALABAMA STATE UNIVERSITY ) |
| 10 | and ANWAR DIOP, ) |
| 11 | Defendants. ) |
| 12 | |
| 13 | STIPULATION |
| 14 | IT IS STIPULATED AND AGREED, by |
| 15 | and between the parties through their |
| 16 | respective counsel, that the deposition of |
| 17 | JALONDA JOHNSON, may be taken before Cindy |
| 18 | Weldon, Certified Shorthand Reporter, |
| 19 | Commissioner and Notary Public, at the |
| 20 | offices of Thomas, Means, Gillis, 3121 Zelda |
| 21 | Court, Montgomery, Alabama, on February the |
| 22 | 12th, 2008 at 9:30 a.m. |
| 23 | IT IS FURTHER STIPULATED AND |

| Page 3 | |
|---|---|
| 1 | AGREED that the signature to and the reading |
| 2 | of the deposition by the witness is waived, |
| 3 | the deposition to have the same force and |
| 4 | effect as if full compliance had been had |
| 5 | with all laws and rules of Court relating to |
| 6 | the taking of depositions. |
| 7 | IT IS FURTHER STIPULATED AND |
| 8 | AGREED that it shall not be necessary for |
| 9 | any objections to be made by counsel to any |
| 10 | questions, except as to form or leading |
| 11 | questions, and that counsel for the parties |
| 12 | may make objections and assign grounds at |
| 13 | the time of trial, or at the time said |
| 14 | deposition is offered in evidence, or prior |
| 15 | thereto. |
| 16 | IT IS FURTHER STIPULATED AND |
| 17 | AGREED that notice of filing of the |
| 18 | deposition by the Commissioner is waived. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| Page 4 | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | FOR THE PLAINTIFF: |
| 4 | MR. ALLEN D. ARNOLD |
| 5 | 2018 MORRIS AVENUE |
| 6 | BIRMINGHAM, ALABAMA 35203 |
| 7 | |
| 8 | FOR THE DEFENDANT: |
| 9 | MS. LATASHA A. MEADOWS |
| 10 | MS. RAMADANAH SALAAM-JONES |
| 11 | 3121 ZELDA COURT |
| 12 | MONTGOMERY, ALABAMA 36103 |
| 13 | |
| 14 | MR. DONALD G. MADISON |
| 15 | 418 SCOTT STREET |
| 16 | MONTGOMERY, ALABAMA 36104 |
| 17 | |
| 18 | ALSO PRESENT: |
| 19 | MS. LINDA JOHNSON |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| Page 5 | | |
|---|---|---|
| 1 | INDEX | |
| 2 | EXAMINATION BY: | PAGE |
| 3 | MS. MEADOWS | 6, 278, 282, 287 |
| 4 | MR. MADISON | 230, 280, 283 |
| 5 | MR. ARNOLD | 280 |
| 6 | | |
| 7 | EXHIBITS | |
| 8 | | PAGE |
| 9 | DEFENDANT'S EXHIBIT NO. 1 | 35 |
| 10 | DEFENDANT'S EXHIBIT NO. 2 | 35 |
| 11 | DEFENDANT'S EXHIBIT NO. 3 | 46 |
| 12 | DEFENDANT'S EXHIBIT NO. 4 | 59 |
| 13 | DEFENDANT'S EXHIBIT NO. 5 | 75 |
| 14 | DEFENDANT'S EXHIBIT NO. 6 | 77 |
| 15 | DEFENDANT'S EXHIBIT NO. 7 | 100 |
| 16 | DEFENDANT'S EXHIBIT NO. 8 | 102 |
| 17 | DEFENDANT'S EXHIBIT NO. 9 | 106 |
| 18 | DEFENDANT'S EXHIBIT NO. 10 | 111 |
| 19 | DEFENDANT'S EXHIBIT NO. 11 | 176 |
| 20 | DEFENDANT'S EXHIBIT NO. 12 | 212 |
| 21 | DEFENDANT'S EXHIBIT NO. 13 | 287 |
| 22 | DEFENDANT'S DIOP EXHIBIT NO. 2 | 255 |
| 23 | PLAINTIFF'S EXHIBIT NO. 1 | 280 |

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 6

1      JALONDA JOHNSON,
2  after first being duly sworn, testified
3          as follows:
4  EXAMINATION BY MS. MEADOWS:
5      THE COURT REPORTER:  Usual
6  stipulations?
7      MR. MADISON:  Yes.
8      MR. ARNOLD:  Yes.
9      MS. MEADOWS:  Yes, please.
10     MR. ARNOLD:  Before we begin, Mr.
11 Madison and I are going to put some things
12 on the record before the examination
13 starts.  As counsel for Mr. Diop and for Ms.
14 Johnson, we've come to I guess an agreement
15 where we will dismiss our specific claims of
16 the assault and battery, invasion of privacy
17 against Mr. Diop and Mr. Madison is
18 dismissing --
19     MR. MADISON:  Are those the only
20 claims?
21     MR. ARNOLD:  I believe you've got
22 --
23     MR. MADISON:  No.  I'm talking

Page 7

1  about all y'all's claims.
2      MR. ARNOLD:  I think those are the
3  only two we've got against --
4      MR. MADISON:  Anyway, it's
5  supposed to be a dismissal, all claims each
6  has against the other with prejudice.  So
7  any claims that Mr. Diop may have against
8  Ms. Johnson and any claims that Ms. Johnson
9  may have against Mr. Diop are being
10 dismissed with prejudice.
11     MR. ARNOLD:  And that is agreed
12 with.
13     MS. MEADOWS:  If it's all claims,
14 I think we can agree.
15     MR. ARNOLD:  All right.  Just to
16 make sure.  I'm very thorough.
17     MR. MADISON:  That's any and all
18 claims that -- not only those brought, but
19 those that could have been brought or may
20 have been brought or contemplated by the
21 parties in this action.
22     And each party is to bear their
23 own respective cost with respect to those

Page 8

1  claims as well.
2      MR. ARNOLD:  Thank you.  All
3  right.  I think we're done with that.
4      MR. MADISON:  I say cost.  But
5  attorneys fees and cost.
6      MR. ARNOLD:  Okay.
7      MR. MADISON:  Each party to bear
8  their own.
9      MS. MEADOWS:  Are you two
10 satisfied?
11     MR. MADISON:  I believe that's it.
12     MR. ARNOLD:  I think we're
13 satisfied.  And we'll get a formal
14 settlement agreement beforehand.
15     MR. MADISON:  Sure.
16     MS. MEADOWS:  Okay.
17     Q.  Good morning, Ms. Johnson.
18     A.  Good morning.
19     Q.  My name is LaTasha Meadows.  And
20 this is my co-counsel Ramadanah
21 Salaam-Jones.  And we represent Alabama
22 State University in this matter.  Well, you
23 know Don Madison who is representing Anwar

Page 9

1  Diop.  And you all have just dismissed your
2  claim.
3      We're just here today to take your
4  deposition.  You understand that we're here
5  to depose you because you have filed a
6  lawsuit against Alabama State University?
7      A.  Yes.
8      Q.  Have you ever given a deposition
9  before?
10     A.  No.
11     Q.  Well, it's very important that you
12 speak loudly and clearly enough for everyone
13 in the room to hear what it is you have to
14 say.  And I will try to remember to speak up
15 as well.
16     If at any time you don't
17 understand my question, let me know and I
18 will try to rephrase the question so you can
19 understand it or I'll repeat the question.
20 Otherwise, I'll assume that you understand
21 what I'm asking you.  Is that okay?
22     A.  Yes.
23     Q.  Are you on any medication today

3  (Pages 6 to 9)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

<table>
<tr><td colspan="2">Page 10</td></tr>
<tr><td>1</td><td>that will keep you from being able to</td></tr>
<tr><td>2</td><td>understand and answer my questions</td></tr>
<tr><td>3</td><td>accurately?</td></tr>
<tr><td>4</td><td>A. No.</td></tr>
<tr><td>5</td><td>Q. Are you under the influence of any</td></tr>
<tr><td>6</td><td>illegal drugs or alcohol that would impair</td></tr>
<tr><td>7</td><td>your ability to understand and answer my</td></tr>
<tr><td>8</td><td>questions today?</td></tr>
<tr><td>9</td><td>A. No.</td></tr>
<tr><td>10</td><td>Q. Very good. Please state your full</td></tr>
<tr><td>11</td><td>name.</td></tr>
<tr><td>12</td><td>A. Jalonda Richay Johnson.</td></tr>
<tr><td>13</td><td>Q. Would you spell your middle name</td></tr>
<tr><td>14</td><td>for the record, please?</td></tr>
<tr><td>15</td><td>A. R-I-C-H-A-Y.</td></tr>
<tr><td>16</td><td>Q. Okay. Do you have a nickname or</td></tr>
<tr><td>17</td><td>other name that you are known by?</td></tr>
<tr><td>18</td><td>A. Londie, L-O-N-D-I-E.</td></tr>
<tr><td>19</td><td>Q. Have you ever officially used the</td></tr>
<tr><td>20</td><td>name Londie?</td></tr>
<tr><td>21</td><td>A. No.</td></tr>
<tr><td>22</td><td>Q. That's something your family and</td></tr>
<tr><td>23</td><td>friends call you?</td></tr>
</table>

Page 11

1    A. Yes.
2    Q. Have you ever been known by any
3    other name?
4    A. No.
5    Q. How old are you, Ms. Johnson?
6    A. I'm twenty-two.
7    Q. What is your date of birth?
8    A. August 29th, 1985.
9    Q. What is your social security
10   number?
11   A. 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.
12   Q. Okay. What is the address of your
13   present residence?
14   A. 1190 Gibson Hills Drive. Do you
15   need me to spell it?
16   Q. I think I've got it. Thank you.
17   How long have you lived at that address?
18   A. Twenty-two years.
19   Q. So you've always lived there? Is
20   that your parents' address?
21   A. Yes.
22   Q. And that's where you lived in
23   January of 2005 as well?

Page 12

1    A. Yes.
2    Q. Okay. What is your home telephone
3    number?
4    A. 334-613-1957.
5    Q. Was that your home telephone
6    number on January 31st of '05?
7    A. Yes.
8    Q. What is your cell phone number?
9    A. 334-303-4757.
10   Q. Was that your cell phone number in
11   January of 2005?
12   A. I think it wasn't, no.
13   Q. Do you remember what that number
14   was?
15   A. I can't remember. I know it was a
16   303. I've forgot the last four.
17   Q. Are you presently married, Ms.
18   Johnson?
19   A. No.
20   Q. Have you ever been married?
21   A. No.
22   Q. Do you have any children?
23   A. No.

Page 13

1    Q. Do you have relatives who live in
2    Montgomery, Alabama?
3    A. I do.
4    Q. Who are they?
5    A. My brother Cornelius Wright and my
6    grandmother and -- Dorothy Wright.
7    Q. Okay.
8    A. And I have some aunts.
9    Q. Do you know who they are?
10   A. Yes. Gwendolyn Wright is my
11   aunt. She's the closest to me.
12   Q. I'm just trying to find out
13   everybody you're related to in Montgomery.
14   A. Well, let's see. I've forgot
15   their names. But my cousins from Auntie
16   Gwen are Gabriel, Tony and Chris.
17   Q. Okay.
18   A. It's a small family.
19   Q. Can't think of anybody else?
20   A. Not close. Huh-uh.
21   Q. Well, if you think of who your
22   other aunts are or cousins, let me know,
23   okay?

4 (Pages 10 to 13)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 14

1    A. Okay.
2    Q. Have you ever been arrested?
3    A. No.
4    Q. Never been charged or convicted of
5    a felony or misdemeanor?
6    A. No.
7    Q. Where did you attend high school?
8    A. Jefferson Davis.
9    Q. When did you graduate from Jeff
10   Davis?
11   A. '04. May 19th, '04.
12   Q. Is this the only high school you
13   attended?
14   A. Yes.
15   Q. So what was your freshman year?
16   Do you remember what year that was that you
17   started at Jeff Davis?
18   A. Okay. Yes. Tenth grade.
19       MR. MADISON: The ninth is
20   freshman year.
21       MS. MEADOWS: Well, I'm not from
22   here. Okay. That's why it's important to
23   ask.

Page 15

1    Q. Go ahead.
2    A. Tenth grade.
3    Q. No. I was asking what calendar
4    year. I'm sorry.
5    A. Oh. Let's see. I graduated the
6    twelfth. It was '04. So the eleventh grade
7    would be '03. And '02 would be tenth grade.
8    Q. Okay. While you were at Jeff
9    Davis, were you ever disciplined for any
10   reason?
11   A. No.
12   Q. Tell me about any honors or awards
13   you received.
14   A. Just at Jefferson Davis or --
15   Q. Well, let's start with Jeff
16   Davis.
17   A. Okay. I had -- I maintained over
18   a three point five GPA. So I was in their
19   honor program. And I got an award for the
20   math society and I was in the student
21   counsel.
22   I won the privilege to work in
23   like the library and to work in the office

Page 16

1    as a student aid. And then I was on --
2    Well, we call it HUB. It's where you get to
3    work on the year book.
4        So I got a chance to get on that
5    staff. And I was in the Robotics team. We
6    won a brass medal for that.
7        Q. Anything else? Did you
8    participate in any other extracurricular
9    activities while you were at Jeff Davis?
10   A. Oh, yes. We had Tri High Y. It's
11   like Christian youth government.
12   Q. Okay.
13   A. Key Club. That's about it.
14   Q. Did you participate in any other
15   -- you know, sports or cheerleading or
16   band? None of that?
17   A. No.
18   Q. Is Alabama State the only college
19   you've ever attended?
20   A. No. Right now I go to AUM.
21   Q. When did you start at AUM?
22   A. I started -- It was in '06.
23   Q. You started in '06. Do you

Page 17

1    remember what semester or quarter -- Is AUM
2    on quarters?
3    A. We're on semesters.
4    Q. On semesters now. Okay. When did
5    you start?
6    A. I don't know the exact date.
7    Q. Not just --
8    A. One semester.
9    Q. Okay. What is your major at AUM?
10   A. Social work.
11   Q. Have you been continuously
12   enrolled from 2006 whenever you started
13   until the present time?
14   A. Yes.
15   Q. What is your overall GPA?
16   A. Right now, it's three point three.
17   Q. Do you participate in any other
18   extracurricular activities at AUM?
19   A. No.
20   Q. Are you involved in any community
21   service projects through AUM?
22   A. No.
23   Q. Have you ever been disciplined at

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1    AUM?
2        A.  No.
3        Q.  Have you received any honors or
4    awards?
5        A.  No.
6        Q.  Now, earlier you mentioned you
7    received some other honors or awards other
8    than at Jeff Davis.  Were those prior to
9    high school or would they have been since
10   high school?
11       A.  It was when I was at ASU.
12       Q.  Now, I want you to tell me about
13   your time at ASU.  When did you start at
14   ASU?
15       A.  I was -- Since I graduated.  I
16   enrolled that following semester.
17       Q.  So in the fall of 2004 sounds
18   about right to you?
19       A.  Yes.
20       Q.  And when did you leave ASU?
21       A.  I left a week after the incident.
22       Q.  So sometime in the spring of 2005?
23       A.  Well, a week after the incident.

Page 19

1        Q.  I'm just trying to approximate a
2    time.
3        MR. ARNOLD:  Do you mean the
4    spring semester?
5        Q.  Okay.  That would be the spring of
6    2005 that I'm talking about.  So sometime in
7    February perhaps of 2005?  Would that be
8    accurate?
9        A.  Yes.
10       Q.  What was your overall grade point
11   average when you left?
12       A.  Three point six.
13       Q.  Do you remember how many hours you
14   had already taken?
15       A.  No.
16       Q.  Okay.  Did you participate in any
17   extracurricular activities at ASU?
18       A.  I was beginning to.  You guys had
19   a Kiwanis Club.
20       Q.  Okay.  Were you --
21       A.  I was beginning to start that.
22   But didn't.
23       Q.  Did you complete a membership

Page 20

1    application for the Kiwanis Club?
2        A.  No.
3        Q.  Not yet?  Okay.  Any other
4    activities?
5        A.  Not that I can remember.  That's
6    what I remember the most.
7        Q.  Between February of 2005 and 2006
8    when you enrolled at AUM, did you enroll in
9    any other junior college, community college?
10       A.  No.
11       Q.  Did you work during that time?
12       A.  I did.
13       Q.  Where did you work?
14       A.  Let's see.  I was at Barnes and
15   Nobles, Sears, Best Buy, and
16   Books-A-Million.
17       Q.  Give me the dates that you were
18   employed at Barnes and Nobles.
19       A.  I don't know the specific dates,
20   but I do know the month.
21       Q.  That will work.
22       A.  Okay.  It was in December of '06
23   until July of '07.

Page 21

1        Q.  Okay.  And which Barnes and Nobles
2    were you working at?
3        A.  The one on the Eastern Boulevard.
4        MR. ARNOLD:  What was that?
5        THE WITNESS:  The one on the
6    Eastern Boulevard.
7        Q.  And what was your position?
8        A.  I was a barista.
9        Q.  So you worked in the coffee shop?
10       A.  Uh-huh.
11       Q.  About how many hours per week were
12   you working at Barnes and Nobles?
13       A.  About thirty.
14       Q.  What was your wage?  How much were
15   you being paid per hour?
16       A.  It was about six seventy-five.
17       Q.  Six seventy-five an hour?
18       A.  Uh-huh.
19       Q.  Did you receive any benefits or
20   anything like that while you were there?
21       A.  Not really.  I was part-time.
22       Q.  Right.  Okay.  So you weren't
23   eligible for any of the insurance or

6 (Pages 18 to 21)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 22

1    anything like that; right?
2        A.   No.
3        Q.   Okay.  Who was your immediate
4    supervisor?
5        A.   Cory.  She just went by her first
6    name.
7        Q.   So you don't know Cory's last
8    name?
9        A.   No.
10       Q.   As far as you know, is Cory still
11   at Barnes and Nobles?
12       A.   She is.
13       Q.   What was her official title or
14   position?
15       A.   She was manager of the cafe.
16       Q.   What were your duties and
17   responsibilities as a barista?
18       A.   I cleaned the cafe.  I made
19   expresso based drinks and cappicinos and
20   just assisted with customer -- like just
21   customer service.  Just make sure everybody
22   was okay.
23       Q.   Okay.

Page 23

1        A.   And I worked the register.
2        Q.   Did you manage anybody, other
3    employees while you were there?
4        A.   No.
5        Q.   No supervisory responsibilities?
6        A.   No.
7        Q.   And you said you also worked at
8    Sears?
9        A.   Uh-huh.
10       Q.   What were the dates of your
11   employment with Sears?
12       A.   Again, it's just a month.
13       Q.   Yes.  The months are fine.
14       A.   Okay.  It was 08 until December of
15   '07.  08, 07 to December '07.
16       Q.   Okay.  What was your position or
17   title at Sears?
18       A.   I was -- let's see.  We didn't
19   really have a title.  But I worked in the
20   vacuum cleaning and mattress department.
21       Q.   So would you say you were a sales
22   associate?
23       A.   Yes.

Page 24

1        Q.   And you sold vacuum cleaners and
2    household goods basically?
3        A.   Yes.
4        Q.   How many hours per week did you
5    work while you were at Sears?
6        A.   I worked about twenty.
7        Q.   How much were you paid at Sears?
8        A.   It was commission.
9        Q.   It was commission only?
10       A.   Uh-huh.
11       Q.   How much was the commission?
12       A.   It varied.
13       Q.   What was the percentage supposed
14   to be first?
15       A.   It varied on all products.  I
16   remember that vacuum cleaners were one
17   percent and then mattresses were like five
18   percent to seven.
19       Q.   Okay.  And about how much did you
20   bring home while you were working at Sears
21   in an average week?
22       A.   Let's see.  About two hundred two
23   weeks.  We got paid biweekly.

Page 25

1        Q.   Biweekly pay.  Okay.  And you
2    brought home approximately two hundred
3    dollars a pay period?
4        A.   Uh-huh.
5        Q.   Was it ever more than that?
6        A.   No.  It was just about two
7    hundred.  That's it.
8        Q.   Almost every time, it was about
9    two hundred dollars?
10       A.   Uh-huh.
11       Q.   Who was your supervisor while you
12   were at Sears?
13       A.   Mr. Makeithen.
14       Q.   Do you know how to spell that
15   name?
16       A.   M-A-K-E-I-T-H-E-N.
17       Q.   Now, which Sears location were you
18   at?
19       A.   The one at Eastdale Mall.
20       Q.   And as far as you know, is Mr.
21   Makeithen still there?
22       A.   He is.
23       Q.   Do you know what his title was?

7  (Pages 22 to 25)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 26

1    A.  He was assistant manager.
2    Q.  He was the assistant manager for
3    the entire store over there?
4    A.  Yes.
5    Q.  Did you ever report to anybody
6    else?
7    A.  He had a manager.  Mr. -- He
8    rarely came in.  But we had to do
9    inspections and stuff.  He would come and
10   look at our department.  I've forgot his
11   name.
12   Q.  Okay.  But he was not somebody
13   that you regularly interacted with?
14   A.  Oh, no.
15   Q.  And he didn't give you
16   instructions on a daily basis?
17   A.  No.
18   Q.  What were your basic duties and
19   responsibilities?
20   A.  Assist the customers, clean the
21   department and make sure I sell.  And I
22   worked the register.
23   Q.  Did you supervise any of the other

Page 27

1    employees while you were there?
2    A.  No.
3    Q.  You also said you worked at Best
4    Buy; right?
5    A.  Uh-huh.
6    Q.  Give me the date range that you
7    worked at Best Buy.
8    A.  Best Buy was -- let's see.  I
9    think it was the year '05 to like 08.  I
10   want to say 08.  08-05 to December.
11   Q.  So from like August of '05 to
12   December of '05?
13   A.  Uh-huh.
14       MR. ARNOLD:  Try to say yes or no
15   for the court reporter.
16   A.  Oh, I'm sorry.  Yes.
17   Q.  And I will try to do the same
18   thing.  What was your position at Best Buy?
19   A.  I worked in the media department.
20       MR. MADISON:  I'm sorry, what was
21   that?
22       THE WITNESS:  I worked in the
23   media department.

Page 28

1        MR. MADISON:  Media.
2        THE WITNESS:  Media.
3    A.  And music.
4    Q.  About how many hours per week did
5    you work at Best Buy?
6    A.  About thirty.
7    Q.  How much were you paid at Best
8    Buy?
9    A.  It was about six fifteen.
10   Q.  Six fifteen an hour?
11   A.  Uh-huh.  Yes.
12   Q.  Who was your supervisor at Best
13   Buy?
14   A.  I can't remember her name.  I
15   can't remember her name.
16   Q.  Do you remember her title?
17   A.  Oh, Walter.  Yes, it was Walter.
18   I can't remember his last name.
19   Q.  Okay.  What was Walter's title?
20   A.  He was head of the media
21   department.
22   Q.  Now, which Best Buy location were
23   you at?

Page 29

1    A.  It was on the Eastern Boulevard.
2    Q.  What were your specific duties and
3    responsibilities?
4    A.  I had to straighten up the CD's,
5    DVD's and I stocked the CD's and DVD's
6    before the store opens and assist customers,
7    help customers and I worked the register.
8    Q.  Okay.  Did you have to supervise
9    any other employees?
10   A.  No.
11   Q.  Let me just go back while I'm
12   thinking about it.  What was your reason for
13   leaving Barnes and Nobles in July of 2007?
14   A.  I just wanted to try a new job.
15   Q.  And why did you decide to leave
16   the Sears location?
17   A.  I really wanted to try a new job.
18   Commission wasn't paying enough.
19   Q.  Okay.  And why did you leave Best
20   Buy?
21   A.  I wanted to try a new job.
22   Q.  You said you also worked at
23   Books-A-Million for a while?

8  (Pages 26 to 29)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 30

1    A.  Uh-huh.
2    Q.  When did you work at
3  Books-A-Million?
4    A.  I worked at Books-A-Million -- it
5  was about March.  I think March of '05 to
6  about August of '05.
7    Q.  Which Books-A-Million were you
8  working at?
9    A.  It was on the Eastern Boulevard.
10    Q.  What was your title at
11  Books-A-Million?
12    A.  I worked customer service and
13  helped people look up their books and I
14  worked the registers and I stocked the
15  books.  And that's it.
16    Q.  So you didn't really have an
17  official title, those are just things you
18  did?
19    A.  Uh-huh.
20    Q.  Is that a yes?
21    A.  Yes.
22    Q.  How many hours per week did you
23  work at Books-A-Million?

Page 31

1    A.  About twenty.
2    Q.  And how much did you make per
3  hour?
4    A.  It was about five fifteen or five
5  twenty-five.
6    Q.  Who was your supervisor at
7  Books-A-Million?
8    A.  Chris.
9    Q.  Do you know Chris' last name?
10    A.  He just went by his first.
11    Q.  And that's a male Chris?
12    A.  Oh, yes.
13    Q.  I have to ask because some of
14  these names you can't really tell just by
15  what their name is.  What was Chris' title?
16    A.  He was manager.
17    Q.  He was the store manager?
18    A.  Yes.
19    Q.  Why did you decide to leave
20  Books-A-Million?
21    A.  Just focus on my school, my
22  schooling.
23    Q.  Where were you in school at that

Page 32

1  time?
2    A.  Well, I was trying to go to AUM.
3    Q.  So you had already decided that
4  you wanted to go to AUM in August of 2005?
5    A.  Yes.  Pretty much.
6    Q.  Okay.  Had you completed the
7  application process?
8    A.  Not then.
9    Q.  When did you complete that
10  process?
11    A.  I can't remember the specific
12  date.  But it's when I started.  Like I
13  started in '06.  I can't remember the
14  specific day.
15    Q.  Okay.  I just want to clarify the
16  time line.  After you left Books-A-Million
17  to focus on school, that's -- after that,
18  you worked at Best Buy, after you did not
19  complete the application process for AUM;
20  right?
21    A.  Uh-huh.
22    Q.  Now, at some point you worked at
23  Walgreen's; right?  Do you remember when

Page 33

1  that was?
2    A.  Walgreen's.  That was in '04.  It
3  was I think August, around August '04.
4    Q.  Do you remember when you left?
5    A.  It was when I -- Well, I left when
6  I got hired at ASU.
7    Q.  So until January of '05?
8    A.  Yes.  Yes.
9    Q.  What was your position at
10  Walgreen's?
11    A.  I worked the registers, stocked.
12  I worked in the beauty consultant area and I
13  worked customer service.
14    Q.  How many hours per week were you
15  working at Walgreen's?
16    A.  I can't remember.  I was
17  part-time.  So I can't remember.  I don't
18  know.  Maybe it was thirty, you know, thirty
19  hours part-time.  I don't know.
20    Q.  Do you remember what your rate of
21  pay was?
22    A.  I can't remember.
23    Q.  Was it more or less than six

9  (Pages 30 to 33)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 34

1  dollars an hour?
2      A.  Honestly, I don't know.
3      Q.  Do you remember who your
4  supervisor was?
5      A.  I don't know.
6      Q.  Any other duties there that you
7  haven't told me about?
8      A.  No.  That's it.
9      Q.  And you say you left that job to
10 take the job in data entry at inventory
11 control?
12     A.  Yes.
13     Q.  You filed a charge of
14 discrimination against Alabama State
15 University with the EEOC; correct?
16     A.  Yes.
17     Q.  Do you remember doing that?
18     A.  Yes.
19         MR. MADISON:  Can we take a quick
20 break?
21         MS. MEADOWS:  Certainly.
22         (Whereupon, a short recess was
23 taken.)

Page 35

1      Q.  Ms. Johnson, when we left off, we
2  were talking about your charge with the
3  EEOC; correct?
4      A.  Yes.  I guess.
5      Q.  I'm going to show you what's going
6  to be Defendant's 1, which is the Alabama
7  State University's Exhibit 1 to your
8  deposition.
9          (Whereupon, Defendant's Exhibit
10 No. 1 was marked for identification and
11 attached to the original transcript.)
12     Q.  Does that look like the charge
13 that you filed, looking at page two of that
14 exhibit?
15     A.  Yes, ma'am.
16     Q.  Okay.  Show you Exhibit No. 2,
17 which is an amended charge of
18 discrimination.  Do you recall filing an
19 amended charge in this case?
20         (Whereupon, Defendant's Exhibit
21 No. 2 was marked for identification and
22 attached to the original transcript.)
23     A.  I don't remember.  I mean, what

Page 36

1  does amend mean?
2      Q.  It means you changed it or you
3  added some more information to it.
4      A.  I don't remember.
5      Q.  You don't remember submitting that
6  information?
7      A.  No, ma'am.
8      Q.  Does that look like something you
9  would have submitted?
10     A.  I just don't remember the paper.
11     Q.  Ms. Johnson, I want to direct your
12 attention to the first page of Exhibit No.
13 2.  At the bottom left of the page, does
14 that appear to be your signature?
15     A.  It is.
16     Q.  On the bottom right of the page
17 where it says signature Jalonda Johnson,
18 does that appear to be your signature as
19 well?
20     A.  Uh-huh.
21     Q.  Do you have any reason to dispute
22 that that's your signature?
23     A.  No.  It's my signature.

Page 37

1      Q.  So you agree that you signed what
2  says is an amended charge of discrimination?
3      A.  Yes.  This is my first time seeing
4  this, though.
5      Q.  Ms. Johnson, are you saying that
6  this paper was not filled out when you
7  signed it?
8      A.  Yes, I signed it.  Uh-huh.
9          MR. ARNOLD:  Wait, wait.  Did you
10 understand the question, dear?
11     A.  Redo the question.
12     Q.  Ms. Johnson, what I'm trying to
13 get to is, when you signed this paper that
14 you say you've never seen before, did you
15 sign a blank page?
16     A.  Oh, no, I didn't.  I didn't sign a
17 blank page.
18     Q.  So this page was filled out when
19 you signed it?
20     A.  Uh-huh.  Yes.  I'm sorry.
21     Q.  Do you have any idea who prepared
22 this page, Ms. Johnson?
23     A.  I don't.

10  (Pages 34 to 37)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 38

1    Q.  Do you have any idea who asked you
2  to sign this page?
3    A.  I can't remember.
4    Q.  Were you represented by an
5  attorney at this point?  When you filed your
6  EEOC charge, did you have an attorney?
7    A.  When I filed the charge for EEOC,
8  I didn't at that time.
9    Q.  Okay.  If you didn't fill out this
10  page, Ms. Johnson, what I'm trying to get to
11  is, how did you know to sign it and send it
12  to the EEOC?
13    MR. ARNOLD:  Stop.  We need to
14  clarify which one.  She asked about the --
15  You asked about the charge of
16  discrimination.  You're referring to the
17  amended charge of discrimination.
18    MS. MEADOWS:  I'm now asking her
19  about the amended charge of discrimination.
20    A.  Okay.
21    Q.  We're talking about Exhibit 2.
22    A.  Okay.
23    Q.  Did you have a lawyer when you did

Page 39

1  Exhibit No. 2, the amended charge of
2  discrimination which you signed August 9th
3  of 2005?
4    A.  You've been my only lawyer.  I
5  don't know if I had a lawyer or not.
6    Q.  Look over the remainder, the next
7  two pages of the exhibit which says it sets
8  forth the particulars of your amended EEOC
9  charge.  Is that your statement, Ms.
10  Johnson?
11    A.  Uh-huh.
12    Q.  Is that a yes?
13    A.  Yes.
14    Q.  Do you recall submitting that
15  statement to the U.S. Equal Employment
16  Opportunity Commission, the EEOC?
17    A.  Okay.  So this is the -- Is this
18  the hearing at Alabama State?
19    Q.  No.  I'm talking about to the
20  United States EEOC.
21    A.  Yes, I did write them.
22    Q.  Okay.  Did you send this to them?
23    A.  Yes.

Page 40

1    Q.  You sent these three pages?
2    A.  Uh-huh.
3    Q.  Is that a yes?
4    A.  Yes.
5    Q.  Okay.  So do you acknowledge that
6  this is your amended charge of
7  discrimination?
8    A.  Yes.
9    Q.  In your charge of discrimination,
10  in your amended charge of discrimination,
11  did you set forth all the reasons that you
12  feel you were subjected to sexual harassment
13  and retaliation by Alabama State University?
14    MR. ARNOLD:  Object to the form.
15    Q.  You can still answer.
16    A.  Uh-huh.
17    Q.  Is that a yes?
18    A.  Repeat that.  That threw me off.
19  Repeat the question.
20    Q.  Sure.  In your charge of
21  discrimination and your amended charge of
22  discrimination, did you tell the EEOC all
23  the reasons you feel you were subjected to

Page 41

1  sexual harassment and retaliation by Alabama
2  State University?
3    A.  I did.
4    MR. ARNOLD:  Objection.
5    Q.  There are no reasons why you feel
6  you were sexually harassed other than what
7  are stated in these two documents as Exhibit
8  1 and Exhibit 2?
9    A.  Yes.  I complained that I was
10  raped and they fired me.
11    Q.  Those were your only complaints?
12    A.  Yes.  I was raped, I told them and
13  they fired me.
14    Q.  I'm just trying to make sure that
15  what's in your charge, that you're not
16  saying anything different today.  You're not
17  saying anything different, are you?
18    A.  No.  I was raped and they fired me
19  when I told them.
20    Q.  Okay.  Have you ever filed another
21  charge of discrimination with the EEOC other
22  than those against Alabama State University?
23    A.  No.

11  (Pages 38 to 41)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 42

1    Q.  Have you ever been involved in a
2  lawsuit other than this one?
3    A.  No.
4    Q.  Have you ever been involved in
5  filing a sexual harassment complaint other
6  than the one against -- the one here today?
7    A.  Yes.
8    Q.  When was that?
9    A.  That was when I was working at
10  Best Buy.
11    Q.  Do you know an approximate date
12  that you filed that complaint?
13    A.  I don't.
14    Q.  Was that a complaint internal to
15  the store or an EEOC complaint?
16    A.  It was just in the store.
17    Q.  Who was that complaint against?
18    A.  I can't remember the guy's name.
19    Q.  Who did you complain to?
20    A.  It was -- Well, my manager Walter
21  in the media department of Best Buy.
22    Q.  Okay.  What was your reason for
23  filing the complaint?

Page 43

1    A.  I was bent over putting up gaming
2  controllers and this guy walked right up
3  behind me -- I guess he was playing or
4  something -- and he grabbed me and like
5  pulled me against him.
6        And he had like, you know, like an
7  erection.  And when he picked me up, it was
8  like a bear hug.  And I don't know if he
9  played like that.
10        It just caught me off guard.  It
11  was just really awful.  He invaded my space
12  and it just -- and I let the store know.
13    Q.  And you let the store know about
14  it?
15    A.  Walter, yes.
16    Q.  Okay.  What did you do when he
17  walked up behind you and grabbed you like
18  that?
19    A.  Total shock.  And I told him, I
20  said don't touch me.  Do not touch me like
21  that.  And he had this big smile like he was
22  playing.  And I wanted to report it because
23  that was like -- that was unnecessary

Page 44

1  invasion.
2    Q.  Okay.  So you reported it to
3  Walter?
4    A.  Uh-huh.
5    Q.  What happened after you reported
6  it to Walter?
7    A.  Well, I believe Walter followed
8  protocol.  Like he went to his manager or
9  whoever he was supposed to go to.
10    Q.  Okay.  And what happened after
11  that?
12    A.  After that, the guy just never
13  bothered me again.  Everything was just
14  smooth.  I believe they disciplined him.  I
15  don't know how.
16    Q.  Did you participate in any
17  investigation of the complaint?
18    A.  It wasn't an investigation.
19    Q.  There was no investigation?
20    A.  Huh-uh.
21    Q.  Okay.  And after that was
22  resolved, after they disciplined him or
23  whatever, did you file -- you did not file a

Page 45

1  charge with the EEOC?
2    A.  No.
3    Q.  You considered the disciplinary
4  action to be sufficient?  Is that a yes?
5    A.  Yes.
6    Q.  When did you begin to seek
7  employment at Alabama State University?
8    A.  It was in January.  Yes, January
9  25th.
10    Q.  No.  When did you start looking
11  for the job?  When did you start asking for
12  a job at Alabama State?
13    A.  Oh, okay.  It was in January I was
14  looking for a job.
15    Q.  Okay.  You got an approximate time
16  frame?
17    A.  It had to be two weeks before I
18  left Walgreen's because I always give a two
19  week notice.
20    Q.  At the time you were seeking
21  employment at Alabama State University, you
22  were aware that Alabama State University had
23  a Department of Personnel and Human

12  (Pages 42 to 45)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 46

1    Relations; correct?
2        A.   Yes, sir.
3        Q.   Were you also aware that in order
4    to get a job on campus, you were required to
5    complete an application for employment
6    through personnel and human relations?
7        A.   Yes.
8        Q.   Were you aware that no contract
9    for employment would be approved until after
10   you completed your application with
11   personnel and human relations?
12       A.   Yes.
13       Q.   I'm going to show you Exhibit No.
14   3.
15           (Whereupon, Defendant's Exhibit
16   No. 3 was marked for identification and
17   attached to the original transcript.)
18       Q.   Is this the application for
19   employment that you completed in order to be
20   hired at Alabama State University?
21       A.   It is.
22       Q.   Is this the first application you
23   completed at Alabama State University?

Page 47

1        A.   Yes. This is the application.
2        Q.   Okay. And now I'm asking you --
3    making sure this is the first one you
4    completed. Correct?
5        A.   Oh. No.
6        Q.   You filled out another application
7    like this?
8        A.   I used to work in the writing lab.
9        Q.   Okay. When was that?
10       A.   That was freshman. Freshman, like
11   right as soon as I started there.
12       Q.   So --
13       A.   Freshman year.
14       Q.   -- August of '04?
15       A.   Yes. It was during fall.
16       Q.   It was during the fall semester of
17   2004?
18       A.   Uh-huh.
19       Q.   And you completed an application
20   like this?
21       A.   Uh-huh.
22       Q.   When did you complete that
23   application?

Page 48

1        A.   I don't know the exact date.
2        Q.   But this is your first application
3    for the data entry clerk position?
4        A.   Uh-huh.
5        Q.   Is that a yes?
6        A.   Yes.
7        Q.   I just don't want to get into an
8    argument later with Allen about whether when
9    you said uh-huh you meant yes or you meant
10   no. It's hard to read later on sometimes.
11   Okay?
12       A.   Okay.
13           MR. ARNOLD: I just want you to be
14   clear so Judge Fuller doesn't yell at us
15   later because he'll be equally hard on us.
16       Q.   Right. And when you submitted
17   this application, you submitted this so that
18   you could be employed as a data entry clerk
19   in the inventory control department;
20   correct?
21       A.   Yes.
22       Q.   And inventory control is located
23   in the same building as the physical plant?

Page 49

1        A.   Yes.
2        Q.   You completed this application on
3    February 2nd, 2005; right?
4        A.   It was before -- it was before
5    then.
6        Q.   Okay. I want you to look at page
7    JOH 0009.
8        A.   Uh-huh.
9        Q.   Did you complete this page at the
10   same time that you completed the rest of the
11   application?
12       A.   Yes.
13       Q.   Okay. What is the date on that
14   page?
15       A.   February 2nd, 2005.
16       Q.   Okay. Did you write that date on
17   this page?
18       A.   Looks like my handwriting.
19       Q.   Okay. So you completed this
20   application on February 2nd, 2005; correct?
21       A.   No. I believe it was before then.
22       Q.   Okay. Can you explain to me why
23   you dated the application for February 2nd,

13  (Pages 46 to 49)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 50

1  2005 if you completed it earlier?
2      A.  Honestly, I do not know why that
3  -- I don't know why it's dated like that.
4      Q.  What date did you complete the
5  application?
6      A.  I don't know the exact date.  But
7  you have to -- like you have to fill out an
8  an application before you even start
9  working.  And I started working on the 25th.
10     Q.  I understand that, Ms. Johnson.
11  But I'm looking at an application that's
12  dated February 2nd, 2005.  I don't have --
13  You just told me that there is no other
14  application; correct?
15     A.  Yes, ma'am.
16     Q.  And you dated this application;
17  correct?
18     A.  Yes, ma'am.
19     Q.  And you dated this application
20  February 2nd, 2005; correct?
21     A.  Yes, ma'am.
22     Q.  Which is more than a week after
23  you contend that you were employed at

Page 51

1  Alabama State University; right?
2      A.  Yes, ma'am.
3      Q.  So what I'm trying to get to is,
4  if you didn't put the right date on this
5  application, I need an explanation and I
6  need to know what date the application was
7  completed on.
8          MR. ARNOLD:  Object to form.
9      Q.  Do you have any evidence to
10  support that this application was completed
11  on any other date other than February 2nd,
12  2005?
13     A.  Any evidence?
14     Q.  Do you have anything to show me
15  that there is another date?
16     A.  I don't have anything to show
17  you.  I mean, you can check with my lawyer.
18  But I just don't have anything to show you.
19     Q.  Do you have -- Do you have
20  anything to support your contention that you
21  dated this application for more than a week
22  after the date you contend you completed an
23  application?

Page 52

1      A.  I mean, I don't know.  Like I
2  said, I don't know.  I honestly don't know
3  why it's dated on the 2nd.
4      Q.  I mean, you understand, Ms.
5  Johnson, that you dated it for an entirely
6  different month; right?
7          MR. ARNOLD:  Object to form.
8      Q.  You can still answer.
9      A.  And I'm trying to tell you I just
10  -- I don't know why and I don't have any
11  proof of anything.  I don't have anything to
12  give you.  You'll just have to talk to my
13  lawyer about that.
14     Q.  Well, Ms. Johnson, unfortunately,
15  I have to talk to you about it because you
16  completed the application, not your lawyer.
17  So I need your explanation for why your
18  application is dated February 2nd, 2005.
19     A.  I don't know.
20     Q.  Do you have any witness that will
21  support your contention that you did not
22  complete this application on February 2nd,
23  2005?

Page 53

1      A.  No.  I mean -- no.
2      Q.  And this is the first application
3  and only application you submitted for this
4  position; correct?
5      A.  Yes.
6      Q.  Did you go to the human resources
7  office to fill out this application?
8      A.  Yes.
9      Q.  While you were there, did you ask
10  if there were any other positions available
11  that you could apply for?
12     A.  Yes, I did.  I asked them.
13     Q.  Who did you ask?
14     A.  It was -- I don't know.  I can't
15  remember his name.
16     Q.  Can you describe him to me?
17     A.  He's light skinned.  That's all I
18  know.
19     Q.  Is he short, tall, skinny, fat?
20     A.  I do not remember.
21     Q.  Do you know what his job title
22  was?
23     A.  I don't.

14  (Pages 50 to 53)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 54

1   Q. What did he tell you when you
2 asked if there were other positions you
3 could apply for?
4   A. Like he just told me to fill out
5 an application, put my application on file.
6 And then I remember -- I remember that there
7 was a position open in the physical plant
8 where my mom worked in that vicinity. So I
9 chose data entry.
10   Q. Okay. What other positions did he
11 tell you were open?
12   A. Well, I remember that. And it was
13 open, you know.
14   Q. This is the one you decided to
15 apply for?
16   A. Yes.
17   Q. Ms. Johnson, you never -- your
18 charge says that you had worked a study
19 job. But you never applied for Federal work
20 study, did you?
21   A. What do you mean?
22   Q. You never applied to the Federal
23 work study program, did you?

Page 55

1   A. My application?
2   Q. Right. Did you apply for the
3 Federal work study program?
4   A. Yes. I had an application. I
5 gave them an application.
6   Q. I'm not talking about this
7 application. I'm talking about did you
8 apply for Federal work study?
9   A. Yes. I worked there.
10   Q. Let me clarify for you, Ms.
11 Johnson. Work study is a federally funded
12 program that's administered through
13 financial aid. Do you still contend that
14 you applied for work study?
15   A. Yes.
16   MR. ARNOLD: She's asking you --
17   A. What are you asking?
18   Q. I'm asking if you applied for the
19 program known as the Federal work study
20 program?
21   MR. ARNOLD: Do you understand the
22 question?
23   THE WITNESS: I don't honestly.

Page 56

1   Q. Okay. A work study program job is
2 different from a part-time position at the
3 University. They are not the same thing.
4 Work study is a Federally funded program.
5   In order to apply for work study,
6 there's a process that you must go through
7 each year. And it is governed by a specific
8 handbook and specific Federal guidelines. I
9 am asking if you participated in that
10 program?
11   MR. ARNOLD: To be perfectly
12 frank, what is the relevance of whether it's
13 a Federal work study program or a part-time
14 job?
15   MS. MEADOWS: I'm just getting to
16 her allegation that she applied for work
17 study and that she had a work study job
18 because they are two different programs and
19 two different application processes.
20   MR. ARNOLD: Okay. I guess what
21 I'm trying to understand is regardless of
22 whether it's a Federal work study or a
23 part-time job, it's still an

Page 57

1 employee/employer relationship whether she's
2 a student or not.
3   I'm guess you're looking -- I'm
4 trying to understand the relevance of
5 whether or not it's form over substance
6 here.
7   MS. MEADOWS: I think it is
8 substantive. And at this point, you know,
9 I'm going to ask her that. Now, you can
10 instruct her not to answer if that's what
11 you choose to do.
12   But I'm providing her with all the
13 relevant material and information and I'm
14 attempting to explain to her what work study
15 is because I think it's kind of clear she
16 has no clue.
17   So she could not have applied for
18 work study if she doesn't even know what it
19 is.
20   MR. ARNOLD: I guess what I'm
21 trying to understand is how it goes to one
22 of the relevant elements of the claims or to
23 any of the defendant's affirmative

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 58

1  defenses. I just don't see the relevance of
2  either one.
3       MS. MEADOWS: I think it does make
4  a difference. So we'll just have to agree
5  to disagree unless you're objecting and
6  telling her not to answer.
7       MR. ARNOLD: I'll just be happy if
8  you can tell me which affirmative defense
9  you're trying to direct this because I have
10 no clue where you're coming from with this.
11 And I'm fine with it if you can demonstrate
12 that.
13      MS. MEADOWS: Well, I think you've
14 already stated that she has claimed that she
15 applied for a Federal work study position
16 and we're trying to get it on the record
17 whether it was or not.
18      MR. ARNOLD: Does it say Federal
19 work study in her charge?
20      MS. SALAAM-JONES: There is no
21 work study other than Federal work study.
22 So either she did work study or she didn't.
23      MR. MADISON: Why don't you ask

Page 59

1  her if she knows the difference.
2       MS. MEADOWS: And that's what I'm
3  getting to. And it also makes a difference
4  in when she submitted her application.
5       Q. Did you complete a application for
6  student aid?
7       A. Student aid?
8       Q. Right.
9       A. So we're not talking about work
10 study?
11      Q. This is work study.
12      MR. ARNOLD: Do you understand
13 what -- the question she just asked?
14      THE WITNESS: I don't.
15      Q. What I'm trying to get to, did you
16 ever go by financial aid and pick up one of
17 these handbooks?
18      A. I don't remember that. I don't
19 remember.
20      Q. Okay. Did you ever go -- and I'm
21 going to go ahead and mark this as 4 since
22 we're going to talk about it.
23      (Whereupon, Defendant's Exhibit

Page 60

1  No. 4 was marked for identification and
2  attached to the original transcript.)
3       Q. Did you ever go to financial aid
4  and ask them for help in getting a job?
5       MR. ARNOLD: Why don't you ask her
6  if she's actually seen the document before.
7       MS. MEADOWS: I did. I just asked
8  her if she had gone to financial aid and
9  picked one up and she said she doesn't
10 recall.
11      A. Yes, I don't recall.
12      Q. Did you ever go to financial aid
13 and ask them for assistance with getting a
14 job?
15      A. I did.
16      Q. You went to the financial aid
17 office?
18      A. Uh-huh.
19      Q. What did they tell you?
20      A. I filled out an application. I
21 filled it out for data entry.
22      Q. Okay. That was at personnel;
23 right? You filled this out at personnel;

Page 61

1  correct?
2       MR. ARNOLD: Just for the record,
3  she's referring to Defendant's Exhibit 3.
4       A. Yes, I filled this out. Uh-huh.
5       Q. And you filled out Exhibit 3 at
6  the personnel office?
7       A. Yes.
8       Q. Okay. What did you get from
9  financial aid?
10      A. I can't remember.
11      Q. Do you remember who you talked to
12 in the financial aid office?
13      A. I don't.
14      Q. Do you remember what you were told
15 at financial aid?
16      A. I don't.
17      Q. Do you recall that financial aid
18 directed you to personnel?
19      A. I don't know.
20      Q. You don't recall? Okay.
21      MR. ARNOLD: Let's take a break
22 real quick if you don't mind.
23      MS. MEADOWS: Sure.

16  (Pages 58 to 61)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 62

1      (Whereupon, a short recess was
2  taken.)
3      Q.  Financial aid did not assign you
4  to work in inventory control, did they?
5      A.  All I know is that I filled out an
6  application and Mr. Moore told me I was
7  hired and I worked.  And I think I was
8  getting confused with the Federal work study
9  because they called us work study students.
10     Q.  Okay.  What I'm trying to get to
11  is, when you went to the financial aid
12  office, did someone in financial aid send
13  you to see Mr. Moore?
14     A.  I don't know.
15     Q.  You don't know?  Okay.  But you
16  don't have any reason to believe someone in
17  financial aid sent you to Mr. Moore?
18     A.  I don't know.  I mean, I don't
19  know.
20     Q.  Who told you to go and see Mr.
21  Moore?
22     A.  Mr. Moore told me that I had a
23  job.  I had a job.

Page 63

1      Q.  Okay.
2      A.  And I started working.  I mean, I
3  started working for him.
4      Q.  Okay.  Prior to completing your
5  application which is Exhibit 3, you had not
6  applied for a position through human
7  resources other than the writing lab
8  position; correct?
9      A.  You're asking if I just worked at
10  the writing lab?
11     MR. ARNOLD:  Do you understand the
12  question?
13     THE WITNESS:  Huh-uh.
14     Q.  Okay.  You completed the
15  application to work in the writing lab at
16  human resources; correct?
17     A.  Yes.
18     Q.  And that was at human resources in
19  personnel; right?
20     A.  I can't remember.  I can't
21  remember that, but I do know that I worked
22  at the writing lab.  I filled out an
23  application.

Page 64

1      Q.  Do you remember what building you
2  went to when you filled out that
3  application?
4      A.  I don't.
5      Q.  But you remember filling out that
6  application?
7      A.  Yes.
8      Q.  Correct?
9      A.  I filled out an application.
10     Q.  And then you filled out this
11  application; correct?
12     A.  Uh-huh.  I filled out this
13  application.
14     Q.  Are those the only two
15  applications you filled out?
16     A.  That's it.
17     Q.  Okay.  So now I want to talk only
18  about the inventory control.
19     A.  Okay.
20     Q.  So my questions now don't apply to
21  the writing lab because I think maybe that's
22  what's confusing you, okay?
23     A.  Okay.

Page 65

1      Q.  You understand?  Okay.  So prior
2  to completing this application, you had not
3  applied for any other position through human
4  resources to work in inventory control?
5      A.  This is my first application to
6  work in inventory control.
7      Q.  Now, at some point, you talked to
8  Stratford Moore about getting a job in
9  inventory control; correct?
10     A.  Yes, I did.
11     Q.  Do you remember when you talked to
12  Mr. Moore?
13     A.  I don't remember.
14     Q.  But Mr. Moore told you that he
15  would hire you?
16     A.  Yes, he did.
17     Q.  Okay.  Did he also tell you that
18  he would have to have funds transferred into
19  his account because he didn't have any money
20  in his budget?
21     A.  No.
22     Q.  You never had a discussion with
23  Mr. Moore about the transfer of funds?

17  (Pages 62 to 65)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 66

1    A.   No.
2    Q.   But you know that even after
3  talking with Mr. Moore, that you were going
4  to have to have your contract approved by
5  the University; correct?
6    A.   I don't know what happened after
7  him. But I knew that he told me that I had
8  the job.
9    Q.   Okay.
10   A.   And then I started working for
11  him.
12   Q.   Okay. You knew you would have to
13  complete an employment application before a
14  contract could be approved; correct?
15   A.   I knew I had to fill out this
16  application.
17   Q.   Right. And you knew that you were
18  going to have to complete your tax forms,
19  your W-4 forms and your W-A forms before
20  your employment would be considered
21  official; correct?
22   A.   I knew that he told me to fill out
23  the application and I started working.

Page 67

1    Q.   Mr. Moore told you to fill out the
2  application?
3    A.   He told -- He told me that I had
4  the job.
5    Q.   Okay. And then he told you to
6  fill out the application?
7    A.   I filled the application out.
8  Like I said before, I filled the application
9  out. And then when I did that, he just told
10  me I could start working. I started working
11  for him.
12   Q.   So he didn't tell you that until
13  after you filled out the application?
14   A.   Told me what?
15   Q.   That you could start working?
16   A.   Yes. I put my application in and
17  I started working. He told me that I had
18  the job.
19   Q.   He told you, you had the job?
20   A.   Yes.
21   Q.   And then you put in the
22  application. I'm just trying to figure out,
23  did you start -- because your application is

Page 68

1  dated the February the 2nd; right?
2    A.   I see that. Uh-huh.
3    Q.   And not just your application.
4  Let's turn to JOH 010 which is a part of
5  Exhibit 3. Does that look like the W-4
6  certificate you filled out?
7    A.   Uh-huh.
8    Q.   Is that a yes?
9    A.   Yes. Yes.
10   Q.   And you filled that out in
11  connection with this application; correct?
12   A.   Yes. It's part of the
13  application.
14   Q.   It's part of the application?
15   A.   Uh-huh.
16   Q.   Okay. I want you to look at --
17  don't turn from there. I want you to look
18  at that date on there. What date did you
19  put on that application on your W-4 form?
20   A.   It's 02-02-05.
21   Q.   Okay. And is that your signature?
22   A.   It is.
23   Q.   And did you date this?

Page 69

1    A.   I did.
2    Q.   And I want you to turn over to the
3  next page. This is your Alabama withholding
4  certificate, your A-4; is that correct?
5    A.   Uh-huh.
6    Q.   Is that a yes?
7    A.   Yes.
8    Q.   Did you sign this form?
9    A.   I did.
10   Q.   And did you date this form?
11   A.   I did.
12   Q.   And what date did you put on this
13  form?
14   A.   02-02-05.
15   Q.   Okay. So you have consistently in
16  your application said that you were
17  submitting an application dated February
18  2nd, 2005; correct?
19   A.   Yes. It's dated --
20   Q.   It's dated --
21   A.   It's dated 02-02-05.
22   Q.   Okay. And that's the only date
23  anywhere on this application, is February

18  (Pages 66 to 69)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

| Page 70 | Page 72 |
|---|---|
| 1  the 2nd, 2005; correct? | 1    A.  No. |
| 2      A.  Yes. | 2    Q.  Okay.  When you started working, |
| 3      Q.  Do you have any reason why you | 3  you were aware that you had not reported to |
| 4  would have completed an application in | 4  personnel to complete your application; |
| 5  January of 2005 and then dated it February | 5  correct? |
| 6  2nd, 2005? | 6    A.  No.  I was hired.  This is my |
| 7      A.  Honestly, I don't know. | 7  application.  They told me I was hired and I |
| 8      Q.  So you don't have any reason why | 8  worked.  And that's it.  I worked. |
| 9  you would have done that? | 9    Q.  Okay.  You said you started |
| 10     A.  No.  I don't know why it's dated | 10  working on January the 24th or 25th; |
| 11  that. | 11  correct? |
| 12     Q.  Is there any reason you would have | 12    A.  Yes.  25th. |
| 13  dated your application for a date other than | 13    Q.  The 25th? |
| 14  the date you filled it out? | 14    A.  Uh-huh. |
| 15         MR. ARNOLD:  Asked and answered. | 15    Q.  Okay.  But you reported to |
| 16  Go ahead and answer it. | 16  personnel to complete your application on |
| 17     A.  I mean, the only reason I can | 17  February the 2nd after you started working? |
| 18  think is I was instructed to do so. | 18    A.  No.  I don't know why it's dated |
| 19     Q.  And who instructed you to do that? | 19  like that.  But no.  I filled -- I remember |
| 20     A.  I was hired by Mr. Moore.  I | 20  I filled out my application first and I got |
| 21  started working for him.  That's all I know. | 21  the job and I started working. |
| 22     Q.  So are you saying Mr. Moore told | 22    Q.  What date did you fill out this |
| 23  you to date your application for February | 23  application? |

| Page 71 | Page 73 |
|---|---|
| 1  the 2nd? | 1    A.  It says 02-02-05. |
| 2      A.  I don't know. | 2    Q.  Okay.  Right, it does.  So prior |
| 3      Q.  What I'm asking you is, I want the | 3  to February the 2nd, 2005, you had not |
| 4  name of the person who instructed you to | 4  fulfilled all the requirements to be |
| 5  date your application for February 2nd, | 5  employed at Alabama State University? |
| 6  2005. | 6    A.  That's not true.  I did. |
| 7      A.  I don't know. | 7    Q.  You completed an application? |
| 8         MR. ARNOLD:  That's misstating her | 8    A.  Yes. |
| 9  testimony. | 9    Q.  And you signed your W-4 and your |
| 10        MS. MEADOWS:  She said that's the | 10  A-4? |
| 11  only reason she would have dated it for a | 11    A.  Yes, I did. |
| 12  date other than February the 2nd, 2005. | 12    Q.  And you signed it before February |
| 13        MR. ARNOLD:  She gave you a | 13  2nd, 2005? |
| 14  speculative answer, though. | 14    A.  I did. |
| 15     Q.  Are you saying that someone | 15    Q.  And do you have any witness to |
| 16  instructed you to date it? | 16  your signing this on a date other than |
| 17     A.  No. | 17  February 2nd, 2005? |
| 18     Q.  You're not saying that? | 18        MR. ARNOLD:  Asked and answered. |
| 19     A.  No. | 19  You established the point. |
| 20     Q.  Okay.  When you started working in | 20        MS. MEADOWS:  But if Ms. Johnson |
| 21  inventory control, were you aware that your | 21  is going to continue to insist that her |
| 22  application had not -- that your contract | 22  application was submitted on a date other |
| 23  had not been approved? | 23  than February 2nd, 2005, I'm afraid that -- |

19  (Pages 70 to 73)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 74

1    MR. ARNOLD: She's consistently
2  submitted I don't know.
3    Q.  But prior to February the 2nd,
4  2005, Alabama State University has no reason
5  to believe that you fulfilled the
6  requirements to be employed there, do they?
7    A.  I worked there.
8    MR. ARNOLD: Object to form. She
9  can't possibly answer to what Alabama State
10  thinks.
11    Q.  You worked there prior to
12  submitting your application; correct?
13    A.  I put in application and I worked
14  there.
15    Q.  Okay. You started working. Never
16  mind. You're right. As a student of
17  Alabama State University, did you receive a
18  copy of the Pilot, the student handbook?
19    A.  I really don't remember.
20    Q.  You don't remember whether you
21  received a Pilot?
22    A.  No, I don't remember.
23    Q.  Prior to your freshman year, did

Page 75

1  you attend freshman orientation?
2    A.  No.
3    Q.  You didn't attend orientation?
4    A.  No.
5    Q.  Do you recall seeing a booklet
6  that looks something like this, keeping in
7  mind this is not the best copy? But did you
8  see something that looked like that?
9    A.  I don't remember. I don't
10  remember.
11    Q.  Okay. Or did you receive one that
12  looked more like that?
13    A.  I don't remember.
14    Q.  Okay. Go ahead and mark this as
15  5.
16    (Whereupon, Defendant's Exhibit
17  No. 5 was marked for identification and
18  attached to the original transcript.)
19    Q.  Okay. Well, Ms. Johnson, this is
20  one of the policies contained in the Pilot.
21  Have you ever heard that the Pilot is the
22  student handbook at Alabama State
23  University?

Page 76

1    A.  I don't remember.
2    Q.  Okay. I'm going to direct you to
3  the cover of that book. What does it say
4  the Pilot is?
5    A.  It reads that it's the student
6  handbook of Alabama State University.
7    Q.  Okay.
8    MR. MADISON: Did you mark that as
9  Exhibit 5?
10    MS. MEADOWS: Yes, I did.
11    Q.  I want you to turn to the second
12  page of that exhibit. What you're holding
13  is an excerpt from the Pilot detailing the
14  University's policy on sexual harassment.
15  Do you see that?
16    A.  I do see this.
17    Q.  Okay. Take a few minutes to
18  familiarize yourself with it.
19    A.  Okay.
20    Q.  Ms. Johnson, this policy details
21  what constitutes sexual harassment and how
22  to report it; correct?
23    A.  It does.

Page 77

1    Q.  And the policy requires students
2  to report any allegations of harassment to
3  the vice-president of student affairs or the
4  campus police; correct?
5    A.  Yes.
6    Q.  The policy also states that a
7  formal investigation of the matter will
8  begin when the student files a written
9  complaint; correct?
10    A.  Yes.
11    (Whereupon, Defendant's Exhibit
12  No. 6 was marked for identification and
13  attached to the original transcript.)
14    Q.  Ms. Johnson, I want to direct your
15  attention to this excerpt from the
16  University's non-academic staff handbook.
17  Have you had an opportunity to review this
18  before?
19    A.  Yes, I have.
20    Q.  Okay. I want you to turn to the
21  third page of this exhibit. This policy
22  also details things that the University
23  considers to be sexual harassment; correct?

20  (Pages 74 to 77)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 78

1    A. Yes.
2    Q. And it also provides for reporting
3  incidents of sexual harassment; correct?
4    A. Yes.
5    Q. And under this policy, you're
6  supposed to report harassment to the
7  director of personnel services and human
8  relations; correct?
9    A. Yes.
10    Q. And this policy also says that a
11  report can be in oral or written form;
12  correct?
13    A. Yes.
14    Q. But it also says that a formal
15  investigation cannot begin until the
16  complaint is submitted in written form
17  signed by the complainant; correct?
18    A. Yes, it does say that.
19    Q. So is it your understanding, based
20  upon the two policies that we've just
21  reviewed, that only a written report of
22  sexual harassment is considered an official
23  report?

Page 79

1    A. You said only a written?
2    Q. That only a -- let me back up.
3  Only a written report will be considered an
4  official report that will start an
5  investigation?
6    A. Official report may be in oral or
7  written form.
8    MR. ARNOLD: Are you asking her if
9  that's what it says?
10    MS. MEADOWS: I'm asking her if
11  she understands.
12    Q. I will rephrase the question. Do
13  you understand that no sexual harassment
14  complaint will be officially investigated
15  until a written report is filed?
16    A. Yes.
17    Q. In this lawsuit, you contend that
18  ASU retaliated against you for filing sexual
19  harassment charges against Anwar Diop; is
20  that correct?
21    A. Yes.
22    Q. Is there any other reason you
23  believe you were allegedly retaliated

Page 80

1  against?
2    A. No. I told them I was raped and
3  they fired me.
4    Q. Okay. So that's the only reason
5  you contend you were retaliated against?
6    A. Yes. I told them I was raped and
7  they fired me.
8    Q. Okay. Following the alleged rape
9  by Mr. Diop on January 31st, you telephoned
10  your friend C'aira Robins in Michigan to
11  tell her what happened; right?
12    A. I did.
13    Q. Okay. When you called Ms. Robins,
14  you were seeking her advice as a friend;
15  right?
16    A. I called her out of panic.
17    Q. Right. Because she was your
18  friend; correct?
19    A. Yes, she's my friend.
20    Q. Right. And you wanted to talk to
21  a friend at that time; right?
22    A. I was ashamed to tell my parents.
23    Q. Okay. So you needed a friend to

Page 81

1  talk to?
2    A. I called her because -- I didn't
3  want to talk to her. I wanted to tell her
4  what happened to me.
5    Q. Okay.
6    A. Yes.
7    Q. Okay. And I guess we're getting
8  into semantics. This isn't a trick
9  question. I'm just saying you called Ms.
10  Robins because she was a friend?
11    A. Yes.
12    Q. And you felt like you could tell
13  her what had happened?
14    A. Yes.
15    Q. Okay. Ms. Robins is not employed
16  with Alabama State University, is she?
17    A. She's not.
18    Q. Okay. And you didn't believe when
19  you were talking to Ms. Robins that you were
20  making an official report of sexual
21  harassment to Alabama State University, did
22  you?
23    A. No.

21  (Pages 78 to 81)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 82

1    Q.  In fact, the last thing on your
2   mind was making a sexual harassment
3   complaint; correct?
4    A.  The last thing?
5    Q.  Yes.  That's the last thing you
6   were thinking about?
7       MR. ARNOLD:  Object to form.
8    Q.  When you called Ms. Robins, were
9   you thinking about filing a sexual
10  harassment complaint against Alabama State
11  University?
12   A.  Was I thinking about filing a
13  complaint?
14   Q.  Yes.
15   A.  I went to the hospital.  Yes.
16   Q.  But you weren't thinking about
17  calling Alabama State University?
18   A.  No.  I was raped.
19   Q.  Right.
20   A.  I had to go to the hospital.
21   Q.  And I understand from your
22  statement that Ms. Robins advised you to go
23  to the hospital?

Page 83

1    A.  Uh-huh.
2    Q.  And you took her advice and went
3   to Baptist Hospital; correct?
4    A.  I did.
5    Q.  And you informed the hospital
6   staff that you had been raped; correct?
7    A.  I did.
8    Q.  And at that time, you were seeking
9   medical treatment?
10   A.  Yes.  They were doing a rape kit.
11   Q.  Right.  You were seeking medical
12  treatment and some potential assistance with
13  your rape case; correct?
14   A.  Yes.
15   Q.  Okay.  But you are aware that the
16  staff members at Baptist Hospital were not
17  Alabama State University employees; right?
18   A.  Yes, I'm aware of that.
19   Q.  Okay.  And you didn't believe that
20  you were making an official report of sexual
21  harassment to Alabama State University when
22  you were talking to Baptist Hospital, did
23  you?

Page 84

1    A.  Are you asking me if I made an
2   attempt to complain to Alabama State?
3    Q.  I'm asking you when you were
4   talking to Baptist Hospital, did you
5   consider yourself to be complaining to
6   Alabama State University at that time?
7    A.  Look, at that time, I wasn't even
8   thinking about all that.
9    Q.  Okay.  Thank you.
10   A.  I mean, I was raped.
11   Q.  Right.  And you weren't even
12  thinking about Alabama State University at
13  that time?
14      MR. ARNOLD:  Object to form.
15   Q.  You can answer the question.
16      MR. ARNOLD:  You can answer.
17   A.  Okay.
18      MR. ARNOLD:  Actually you already
19  have.
20   A.  Sorry.  Reask the question.
21   Q.  You weren't thinking about making
22  a complaint to Alabama State University when
23  you were at Baptist Hospital?

Page 85

1    A.  No.
2    Q.  Okay.
3       MR. ARNOLD:  Asked and answered.
4   I'm just trying to figure --
5       MS. MEADOWS:  Well, you made your
6   objection after that and I think that threw
7   her off.  She was unsure what she was going
8   to say.
9       MR. ARNOLD:  I'm trying to figure
10  out are you contending she should have gone
11  to Alabama State before she went to a
12  hospital?
13      MS. MEADOWS:  No, I'm not.  I
14  don't contend that at all.
15   Q.  While you were at the hospital,
16  the Montgomery Police Department was
17  contacted; correct?
18   A.  Yes.
19   Q.  Okay.  And the police officers
20  came to Baptist Hospital to speak with you;
21  right?
22   A.  They did.
23   Q.  Okay.  And you were speaking with

22  (Pages 82 to 85)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 86

1  the officers from the Montgomery Police
2  Department and they took a statement from
3  you at that time; correct?
4      A.  They did.
5      Q.  And you knew then that you were
6  speaking to the Montgomery Police Department
7  and not Alabama State University campus
8  police department; right?
9      A.  This happened on the same night.
10  All this that you're talking about happened
11  on the same night.
12      Q.  Right.
13      A.  Yes.  I spoke with the police
14  department.
15      Q.  Okay.  The Montgomery Police
16  Department?
17      A.  Yes.
18      Q.  Correct?  You did not speak with
19  the Alabama State police department, did
20  you?
21      A.  No.
22      Q.  When you were talking with the
23  officers, it was your intention to discuss

Page 87

1  possible criminal charges during that time;
2  right?
3      A.  They wanted to know what
4  happened.  I told them what happened.  And
5  that's all that we discussed.
6      Q.  Okay.  And while you were talking
7  to the officers, you considered yourself to
8  be reporting a crime; correct?
9      A.  Yes.  I was reporting my rape.
10      Q.  Right.  You were reporting that
11  you were raped?
12      A.  Yes.
13      Q.  So you reported a crime; correct?
14      A.  Yes.
15      Q.  Okay.  But you had no reason to
16  believe when you were speaking with the
17  Montgomery Police Department that you were
18  making a sexual harassment complaint to
19  Alabama State University, did you?
20      A.  No.
21      Q.  Okay.  And at that time -- Well,
22  the police officers then took you to the
23  Star Rape Crisis Center; correct?

Page 88

1      A.  Yes.
2      Q.  And you were examined by the nurse
3  on duty at Star; correct?
4      A.  Yes.
5      Q.  Did you tell the nurse what
6  happened to you?
7      A.  I did.
8      Q.  And you knew that the nurse was
9  not an employee of Alabama State University;
10  correct?
11      A.  No.  She worked at Star.
12      Q.  Okay.  And at that time, you knew
13  that the nurse was doing what they call a
14  rape test kit to collect evidence for your
15  criminal case; correct?
16      A.  Yes.
17      Q.  And you understood at that time
18  that you were talking to the nurse, talking
19  to the police and collecting evidence to
20  assist you with a potential criminal
21  prosecution; correct?
22      A.  Yes.
23      Q.  You didn't believe you were making

Page 89

1  an official report of sexual harassment to
2  Alabama State University at that time?
3      A.  No.  Not that night.
4      Q.  Not that night.  Okay.  You were
5  still focused on having Mr. Diop arrested
6  and sent to jail for raping you; correct?
7      A.  I was still focused on what
8  happened to me.
9      Q.  Right.
10      A.  That's all you focus on.  You just
11  focus on the incident, what happened.
12      Q.  Okay.  And you weren't trying to
13  make a sexual harassment complaint at that
14  time?
15      A.  He raped me.
16      Q.  Okay.  So you went to the
17  hospital; right?
18      A.  Yes.
19      Q.  You called the police; correct?
20      A.  Yes.
21      Q.  The police took you to Star?
22      A.  Yes.
23      Q.  Which is a rape crisis center;

23  (Pages 86 to 89)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 90

1  correct?
2      A.  Yes.
3      Q.  Okay.  But nobody there was from
4  Alabama State University?
5      A.  No.
6      Q.  Nobody you talked to that night
7  was from Alabama State University?
8      A.  No.
9      Q.  And you were not making a report
10 to Alabama State University any time on that
11 night?
12     A.  I made a police report.
13     Q.  And that was all; right?
14     A.  Yes.
15     Q.  Okay.  On February 1st, 2005, you
16 didn't contact Mr. Wesley, the director of
17 personnel in human resources, and file a
18 sexual harassment complaint, did you?
19     A.  My mom did that for me.
20     Q.  I'm asking what you did.  Did you
21 contact Mr. Wesley on February the 1st,
22 2005?
23     A.  I couldn't.  I was crying.  I was

Page 91

1  just going through all the drama with that.
2  I could not.  I didn't even leave the
3  house.  My mom handled all that for me.  She
4  made a complaint for me.
5      Q.  And she made that complaint on
6  what day?
7      A.  The day after.
8      Q.  Did she talk with Mr. Wesley?
9      A.  She followed protocol.  I don't
10 know their names or whatever.  But she
11 followed protocol.
12     Q.  And right now I'm speaking what
13 you did.  We'll get to what your mom did in
14 a minute.  But I want to talk about what you
15 did, okay?
16     A.  Okay.
17     Q.  On February 1st, 2005, you didn't
18 contact Alabama State University's
19 vice-president for student affairs to file a
20 sexual harassment complaint, did you?
21     A.  We let Alabama State know what
22 happened.
23     Q.  Okay.  The question is, on

Page 92

1  February 1st, 2005, did you contact the
2  vice-president for student affairs and file
3  a sexual harassment complaint?
4      MR. ARNOLD:  Could you say that
5  person's name for clarification.
6      MS. MEADOWS:  I believe it was Ms.
7  Williams at that time.  Charles Smith.
8      A.  I can't remember the days.  But I
9  promise we made a complaint to Alabama
10 State.
11     Q.  Okay.  I'm trying to establish
12 when you made your complaint to Alabama
13 State.  So on February 1st, 2005, did you
14 contact the vice-president for student
15 affairs Charles Smith and file a sexual
16 harassment complaint?
17     A.  Honestly, I can't remember.
18     Q.  Did you contact the campus police
19 on February 1st, 2005 and file a sexual
20 harassment complaint?
21     A.  Like I said before, I was at home
22 just -- I was -- Look.  I was raped.  I was
23 at home crying, just going through the whole

Page 93

1  process.  My mom handled that.
2      Q.  So you were at home on February
3  the 1st, 2005?
4      A.  You said February -- Yes, February
5  1st.
6      Q.  February 1st, 2005, you were at
7  home?
8      A.  The day after, I was at home.  I
9  did not leave home.
10     Q.  You didn't go to campus at all on
11 February the 1st, 2005?
12     A.  No.
13     Q.  So you didn't contact anyone at
14 Alabama State University on February the
15 1st, 2005?
16     A.  I know my mom, she -- I'm trying
17 to tell you that she did that for me.
18     Q.  I'm asking you, Ms. Johnson, what
19 you did.
20     A.  And I'm telling you I was at home
21 crying, just going through all that.  My mom
22 contacted -- went through protocol.  She did
23 everything for me.  So we -- Alabama State

24  (Pages 90 to 93)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 94

1   didn't know what happened.
2      Q.  What I'm trying to get to right
3   now, Ms. Johnson, is the steps that you
4   took.  I need to know what you did.  I
5   promise you I will get to what your mother
6   did.  But right now, I need to know what you
7   did.  And if you didn't, you just say no.
8      I understand that you have a
9   reason why you did not.  And it's fine for
10  you to give me your reason.  But I still
11  need you to answer the question whether you
12  did this or not.
13     So on February 1st, 2005, did you
14  file a sexual harassment complaint with
15  anyone at Alabama State University?
16     MR. ARNOLD:  Can I help qualify?
17  Did you personally is what she's asking.
18  She understands you testified that your mom
19  contacted.  Do you understand that she's
20  asking you did you personally make a phone
21  call or contact anybody?
22     THE WITNESS:  No.
23     A.  No.  I was at home.  No, I didn't.

Page 95

1      Q.  Okay.  On February 2nd, 2005, did
2   you contact Mr. Wesley and file a sexual
3   harassment complaint?
4      A.  That day, that's when they told me
5   I didn't have a job.  Mr. Moore fired me
6   that day.
7      Q.  Okay.  Did you contact Mr. Wesley
8   and file a sexual harassment complaint on
9   that day?
10     A.  My mom did.  But I didn't.
11     Q.  Okay.  On February the 2nd, did
12  you contact Mr. Smith and file the sexual
13  harassment complaint?
14     A.  I didn't.  But my mom did.
15     Q.  Okay.  On February the 2nd, did
16  you contact the campus police and file a
17  sexual harassment complaint?
18     A.  No, I didn't.
19     Q.  On February the 2nd, did you file
20  a sexual harassment complaint with anyone at
21  Alabama State University?
22     A.  I didn't.  But my mom did.
23     Q.  Okay.  Are you certain your mother

Page 96

1   contacted someone at Alabama State
2   University on February the 2nd?
3      A.  I know she contacted Alabama
4   State.
5      Q.  I'm asking do you know that it was
6   on February the 2nd?
7      A.  I don't know if it was the 2nd.
8   But I know that right after -- she contacted
9   Alabama State right after I was raped.
10     Q.  Okay.  Was it the 1st or the 2nd?
11     A.  She contacted them on the 1st.
12  She let them know.
13     Q.  Did you tell your mother to
14  contact Alabama State University?
15     A.  I mean, she knew I couldn't.  I
16  couldn't.
17     Q.  Okay.  But I'm asking you.  What
18  I'm asking you is, did you instruct your
19  mother to contact Alabama State University?
20     A.  We were instructed that we needed
21  to let them know.
22     Q.  Who -- I'm sorry.  Go ahead.
23     A.  The police officers.

Page 97

1      Q.  The Montgomery police officers
2   told you to contact Alabama State
3   University?
4      A.  Yes.  We needed to let them know.
5      Q.  Which officer told you that?
6      A.  I don't remember.
7      Q.  Was it a male or a female?
8      A.  I don't remember.
9      Q.  Was it on the same night as the
10  incident or was it in a subsequent
11  conversation?
12     A.  I think it was the same night.
13     Q.  Okay.  What did they tell you to
14  tell Alabama State?
15     A.  I don't know.
16     Q.  They just told you to call Alabama
17  State?
18     A.  I don't know what they said.  I
19  can't remember.
20     Q.  Did you talk to them?
21     A.  I know I gave my report.
22     Q.  Did you have the conversation with
23  them that involved them giving instructions

25  (Pages 94 to 97)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 98

1  to call Alabama State University?
2     A.  My mom spoke with them.
3     Q.  Did you participate in the
4  conversation where the police instructed you
5  to call Alabama State University?
6     A.  My mom spoke with them.  I was
7  just -- I was raped.  I mean, I didn't -- I
8  didn't talk or do anything.  My mom spoke
9  with them.
10    Q.  Were you present during this
11 conversation?
12    A.  I don't remember.
13    Q.  If you don't remember the
14 conversation, how do you know the police
15 instructed your mom to call Alabama State
16 University?
17    A.  Because she -- they told her the
18 next step.  We need to let Alabama State
19 know.
20    Q.  Okay.  So what I'm trying to
21 figure out is what they told your mom and
22 when they told her.
23    A.  I don't know what they told her.

Page 99

1     Q.  Because you weren't a party to the
2  conversation.  Okay.  So again, did you tell
3  your mother to contact Alabama State
4  University?
5     A.  No.
6     Q.  Okay.  On February 2nd, 2005, did
7  you still want to work in the physical plant
8  building?
9     A.  I did.  I had a job there.
10    Q.  Okay.  So even though Diop still
11 worked in that building, you wanted to
12 return to work there on February the 2nd,
13 2005?
14    A.  I did.  I went to work.
15    Q.  You actually went to the building
16 on February the 2nd, 2005; correct?
17    A.  Yes.  I went to work.
18    Q.  Okay.  When you were completing
19 your application for the data entry
20 position, did you inform the personnel
21 office that you wanted to file a sexual
22 harassment complaint against the physical
23 plant director?

Page 100

1     A.  When I was completing my form?
2     Q.  Right.
3     A.  For what?
4     Q.  For application, Exhibit 3.
5     A.  That I wanted to what?
6     Q.  File a sexual harassment
7  complaint.
8     A.  No.  I filled that out before,
9  before I even started working.  Before they
10 told me I had the job.
11    Q.  Okay.  On February the 2nd or 3rd,
12 Mr. Moore told you that he had not been
13 granted approval for you to work for
14 inventory control; correct?
15    A.  Yes.  He told me that on the 2nd.
16    Q.  And the reason I'm asking, are you
17 certain it was the 2nd when you were told
18 that?
19    A.  He fired me on the 2nd.
20    Q.  Okay.
21       MS. MEADOWS:  Mark this as 7 for
22 me, please.
23       (Whereupon, Defendant's Exhibit

Page 101

1  No. 7 was marked for identification and
2  attached to the original transcript.)
3     Q.  Do you recognize this as the
4  statement you submitted to Mr. Wesley on
5  February 16th, 2005?
6     A.  Yes.
7     Q.  And this statement details that
8  incident?
9     A.  Yes.
10    Q.  The reason I've asked you whether
11 it was the 2nd or the 3rd, Ms. Johnson, is
12 because if you will turn to the third page
13 of this document, at the bottom of the page,
14 you state that -- what date do you state
15 that you were told you would not be able to
16 continue to work for Mr. Moore?
17    A.  It says the 3rd.
18    Q.  Okay.  I also want to show you No.
19 8.
20       (Whereupon, Defendant's Exhibit
21 No. 8 was marked for identification and
22 attached to the original transcript.)
23    Q.  Have you seen the letter that's

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 102

1  Exhibit 8 before, Ms. Johnson?
2      A.  No, I haven't.
3      Q.  Okay.  Does this document appear
4  to be signed by either your mother or your
5  father?
6      A.  Yes.
7      Q.  Is this one of those notices that
8  you say that your mother provided to the
9  University about what happened to you?
10     A.  Mind if I look at it?
11     Q.  No, not at all.
12     A.  Uh-huh.
13     Q.  Okay.  What date does your mother
14  say that you were moved off of your job?
15  And she calls it a work study job.  But what
16  date does she say you were moved off of that
17  job?
18     A.  February 3rd.
19     Q.  Okay.  So that's why I say either
20  on February the 2nd or February the 3rd,
21  because there are some statements -- the
22  earlier statements say that you were moved
23  off your job on February the 3rd and then

Page 103

1  there are later statements which state
2  February 2nd, okay.
3          Prior to the letter in Exhibit 8,
4  do you know what your mother had
5  communicated to Alabama State University
6  about what happened to you?
7      A.  You're saying this letter?
8      Q.  Yes.  Prior to that letter of
9  February 3rd?
10     A.  I don't know what she -- no, I
11  don't know.
12     Q.  You don't know what she told them?
13     A.  Huh-uh.
14     Q.  Is that a no?
15     A.  No.
16     Q.  To your knowledge, did your mother
17  tell Alabama State University that you were
18  pursuing criminal charges against Anwar
19  Diop?
20     A.  Yes.  She -- yes.
21     Q.  Okay.  To your knowledge, prior to
22  February the 3rd, 2005, did your mother
23  submit a request to Alabama State University

Page 104

1  to investigate Anwar Diop for sexual
2  harassment?
3      A.  I don't know what she submitted.
4      Q.  Prior to February the 3rd, 2005,
5  did you submit a request to Alabama State
6  University to institute a sexual harassment
7  investigation against Anwar Diop?
8      A.  Prior meaning after?
9      Q.  Prior meaning before.
10     A.  Before?
11     Q.  Yes.
12     A.  Before February 3rd?
13     Q.  Before February 3rd, 2005, did you
14  request Alabama State University to conduct
15  a sexual harassment investigation into Anwar
16  Diop's activities?
17     A.  No, I didn't.
18     Q.  Prior to February 3rd, 2005, were
19  you asking Alabama State University to do
20  anything regarding Anwar Diop and the rape?
21     A.  No.  But my mom did.
22     Q.  What did your mom ask Alabama
23  State University to do prior to February

Page 105

1  3rd?
2      A.  I don't know exactly what she
3  said.
4      Q.  Okay.  Your mother -- This letter
5  of February the 3rd that your mother
6  submitted that's marked as Exhibit 8, that
7  was submitted after you had already been
8  notified that your contract would not be
9  approved; correct?
10     A.  Yes.  I remember it was on the 2nd
11  and he fired me.
12     Q.  So you're saying you were fired on
13  the 2nd; correct?
14     A.  Yes.
15     Q.  Okay.  And your mother submitted
16  this letter after you were fired; correct?
17     A.  Yes.
18     Q.  And in this letter, your mother
19  cites to the sexual harassment policy;
20  correct?  Is that true?
21     A.  Yes.  Non-academic handbook.  Yes,
22  it appears to.
23     Q.  Okay.  And this is a written

27 (Pages 102 to 105)

FREEDOM COURT REPORTING

Page 106

1  report of sexual harassment; correct?
2      A.  It's a written report.
3      Q.  Yes.
4      A.  Yes.  It's telling them what
5  happened to me.
6      Q.  She's writing a complaint in
7  writing about what happened; correct?
8      A.  Yes.
9      Q.  And based upon the policy we
10  reviewed earlier, do you believe your mother
11  is asking for a sexual harassment
12  investigation?
13      A.  Yes.  I was raped and she's
14  telling them that I was raped.  And this
15  letter is so that something can be done
16  about it.
17      Q.  And to your knowledge, did your
18  parents receive a letter in response to
19  their correspondence on February the 3rd?
20      A.  I don't know.
21      Q.  Let me show you Defendant's
22  Exhibit 9.
23      (Whereupon, Defendant's Exhibit

Page 107

1  No. 9 was marked for identification and
2  attached to the original transcript.)
3      Q.  Did your mother share that letter
4  with you?
5      A.  No.  I don't remember this letter.
6      Q.  Okay.  Take a few minutes and look
7  at it.
8      A.  Okay.
9      Q.  Okay.  Prior to Dr. Frazier
10  sending this letter on February the 7th,
11  2005, had you had any conversations with him
12  regarding your charges against Mr. Diop?
13      A.  And prior is before; right?
14      Q.  Yes.  Prior is before February
15  7th.  I mean conversations that you had, not
16  your mother.
17      A.  No, I didn't speak with him.
18      Q.  Okay.  Did your mother give you
19  any advice after she received this
20  correspondence?
21      A.  Advice like what?
22      Q.  Did she give you any instructions
23  on what you needed to do to pursue your

Page 108

1  sexual harassment charge?
2      A.  My mother told me that I needed to
3  type up what happened to me.
4      Q.  Okay.  And is it your
5  understanding that she did that because she
6  was instructed to do so by Dr. Frazier?
7      A.  I believe that they were following
8  protocol.
9      Q.  Right.  Based upon this letter,
10  Dr. Frazier is advising your mother to
11  follow protocol; correct?
12      A.  Hold on.  Okay.  Yes.
13      Q.  Okay.  Does Dr. Frazier appear to
14  be advising your mother that you as the
15  victim would have to be the one to file the
16  formal complaint in this case?
17      A.  Yes.  He said that a proper report
18  needs to be written by me.
19      Q.  Right.  And he said that because
20  you were nineteen years old at the time of
21  the incident; correct?
22      A.  Yes.
23      Q.  Does Dr. Frazier also appear to

Page 109

1  reference a prior conversation with your
2  mother?  That means a conversation before
3  her letter of February the 3rd.
4      A.  It does mention that.
5      Q.  Right.  In an earlier
6  conversation?
7      A.  It says letter.
8      Q.  Right.  But it talks about a
9  verbal report; right?  Is that correct?
10      A.  It says Ms. Johnson had verbally
11  reported to me that you and your daughter
12  had agreed among yourselves to use the legal
13  system external to the campus and to keep
14  the matter totally out of the University
15  system.
16      Now that you have formally
17  introduced the matter into the University, I
18  urge you to follow appropriate procedures so
19  that a full and proper investigation can be
20  made of the alleged crime and/or offense and
21  appropriate action may be taken.
22      Q.  So based upon Dr. Frazier's
23  writing in his letter, he seems to have been

28 (Pages 106 to 109)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 110

1  under the impression that your intention
2  before February 3rd was to pursue criminal
3  actions against Mr. Diop; correct?
4       MR. ARNOLD: Would you just ask
5  that question again.
6       Q. Before February 3rd, it appears
7  from this letter that Dr. Frazier believed
8  that it was your intention to pursue
9  criminal action against Mr. Diop?
10      A. Yes, that's what he says.
11      Q. Okay. And he was also under the
12  impression that you were not pursuing this
13  matter through the University system?
14      MR. ARNOLD: Object to form. Are
15  you asking her if that's what the letter
16  says or are you asking her or --
17      MS. MEADOWS: I'm asking her --
18      MR. ARNOLD: -- if she is agreeing
19  with what the letter says?
20      MS. MEADOWS: I'm asking her if
21  that's what the letter conveys to her.
22      Q. Is it your understanding based on
23  this letter that Dr. Frazier understood that

Page 111

1  you were not pursuing a complaint within the
2  University system?
3       A. This is what he says.
4       Q. Right. And that's what he says;
5  correct?
6       A. Uh-huh. That's what he says.
7       Q. Okay. And based upon this letter,
8  he says that you are now, based on the
9  correspondence from your mother, indicating
10  that you're willing now to pursue a sexual
11  harassment claim through the University?
12      A. You're saying that since we
13  introduced the matter to the University and
14  then he's telling -- He's saying that I urge
15  you to follow appropriate procedures so that
16  a full and proper investigation can be made
17  of the alleged crime.
18      Q. Okay. And taking Dr. Frazier's
19  advice, you filed a complaint; correct?
20      A. I did.
21      Q. Okay. I'm going to mark this as
22  10, Defendant's Exhibit No. 10.
23      (Whereupon, Defendant's Exhibit

Page 112

1  No. 10 was marked for identification and
2  attached to the original transcript.)
3       Q. Is this a copy of the complaint
4  that you sent to Olan Wesley, the director
5  of personnel?
6       A. Yes.
7       Q. Okay. This is the first time that
8  you personally filed a sexual harassment
9  charge with Alabama State University;
10  correct?
11      A. Yes.
12      Q. Did you sign and date this letter
13  yourself?
14      A. I did.
15      Q. And the letter is dated February
16  10th; correct?
17      A. Yes.
18      Q. Any reason to believe that this is
19  not the correct date on this letter?
20      A. No. I don't know.
21      Q. You dated it; correct?
22      A. Uh-huh. This letter.
23      Q. Is that a -- So yes, you dated it?

Page 113

1       A. I wrote the letter.
2       Q. And you dated the letter; correct?
3       A. Yes.
4       Q. And you don't dispute that you
5  dated this letter for February the 10th?
6       A. Yes, I dated it.
7       Q. Okay. So you first -- This is the
8  first -- This letter was written after you
9  were notified that you would not have your
10  job in inventory control; correct?
11      A. It was.
12      Q. So the first time that you
13  submitted a complaint to Alabama State
14  University alleging sexual harassment
15  committed by Anwar Diop was after you had
16  been notified that you would not have your
17  job in inventory control?
18      A. No. My mom submitted the first
19  complaint for me.
20      Q. Okay. The first time that you
21  personally filed a complaint of sexual
22  harassment with Alabama State University was
23  after you were notified that you would no

29 (Pages 110 to 113)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 114

1   longer have the position in inventory
2   control; correct?
3      A.  Yes.  Uh-huh.
4      Q.  Okay.  And even the February 3rd
5   letter that your mother wrote to Mr. Wesley,
6   to Dr. Frazier was written after you had
7   been notified that you wouldn't be given the
8   data entry clerk position; correct?
9      A.  Okay.  But keep in mind that we
10  verbally told them.  My mom let them know as
11  soon as I was raped the next day.
12     Q.  Now, I want to talk about the
13  letter.  The letter that your mother wrote
14  to Dr. Frazier was written after you had
15  been notified that you would not be given
16  the data entry clerk position; correct?
17     A.  I had the position.  I worked
18  there.
19     Q.  After you allege you were fired,
20  you were told you could not work there;
21  correct?
22     MR. ARNOLD:  Do you understand the
23  question?

Page 115

1      THE WITNESS:  I don't.
2      Q.  Did your mother write that letter
3   on February the 3rd before or after you
4   found out that you would not have the job at
5   inventory control?
6      A.  She did write it on the 3rd.
7      Q.  Did she write it before or after
8   you knew that you were not going to be
9   allowed to work at inventory control?
10     A.  He told me I didn't have a job on
11  the 2nd.
12     Q.  So that letter is -- You agree
13  that that letter is after?
14     A.  Uh-huh.
15     Q.  Yes?
16     A.  Yes.
17     Q.  Okay.  Were you present when your
18  mother spoke with the other officials at
19  Alabama State University before she
20  submitted the February 3rd letter?
21     A.  No.
22     Q.  Did you hear any of those
23  conversations?

Page 116

1      A.  No.
2      Q.  Do you know what she told them?
3      A.  No, I don't.
4      Q.  Do you know who she talked to?
5      A.  It says she talked to Dr. Frazier.
6      Q.  Do you know if she talked to
7   anybody else?
8      A.  I don't know.
9      Q.  Did you tell her to talk to anyone
10  else?
11     A.  No.
12     Q.  Did you tell her to talk to Dr.
13  Frazier?
14     A.  No, I didn't.
15     MR. MADISON:  I'm sure we're going
16  to go on a pretty good while.  It's
17  lunchtime if anybody cares to have lunch.
18     MS. MEADOWS:  We'll take a brief
19  minute while I find out about the air.
20     (Whereupon, a short recess was
21  taken.)
22     Q.  Before Mr. Moore told you that you
23  could not work at inventory control, the

Page 117

1   only report that you officially made about
2   the rape was to the Montgomery Police
3   Department and medical care personnel;
4   correct?
5      A.  That's correct.  My mom did it for
6   me.
7      Q.  My question is, what did you
8   personally do?  And you personally reported
9   to the Montgomery Police Department and the
10  medical care personnel; correct?
11     MR. ARNOLD:  Asked and answered.
12     A.  Yes.
13     Q.  When did you first meet Mr. Diop?
14     A.  I can't remember the exact day.
15     Q.  Give me an approximate time
16  frame.
17     A.  Sometime before Christmas.
18     Q.  Okay.  How often did you see him
19  between the time you met him and -- you say
20  before Christmas.  Was that sometime in
21  December?
22     A.  Sometime before Christmas.  I said
23  I don't know.

30  (Pages 114 to 117)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 118

1    Q.  Okay.  So between the time you met
2  him and January 31st, how often had you seen
3  him?
4    A.  Well, I worked in the same
5  building as he.  So I don't know.  I don't
6  know like how many.
7    Q.  How frequently?  Was it everyday,
8  several times a day or several times a
9  week?  How often?
10    A.  Like I really can't say because I
11  knew -- we worked in the same building.
12    Q.  Okay.  But you worked in the same
13  building you say starting on January 24th or
14  25th; right?
15    A.  Uh-huh.
16    Q.  By my count, that's about eight
17  days from February -- January 25th to
18  January 31st.  That was about eight days.
19  And some of those days were weekends;
20  correct?
21    A.  I never seen him on weekends.
22    Q.  Okay.  So what I am getting at is,
23  you only worked with him for five days;

Page 119

1  correct?
2    A.  Uh-huh.
3    Q.  So how often from the time you met
4  him -- which would have included time before
5  you started working there; right?  Right?
6    A.  Wait.  Ask the question again.
7    Q.  Okay.  You met Mr. Diop before you
8  started working for Mr. Moore; right?
9    A.  Uh-huh.
10    Q.  Is that a yes?
11    A.  Yes.
12    Q.  Okay.  How often did you see him
13  before you started working at Alabama State?
14      MR. ARNOLD: Object to form.
15    Q.  And by him I mean Mr. Diop.  How
16  often between the time you met him sometime
17  before Christmas until the day you started
18  working at Alabama State did you see Mr.
19  Diop?
20    A.  I didn't see him.  My mom worked
21  in the same building as the building that
22  he's over.  And I am in my mom's office
23  frequently because I go to school there.  So

Page 120

1  I don't know how many times.
2    Q.  So did you see him prior to your
3  starting to work in that building?
4      MR. ARNOLD: Object to form.
5    Q.  You can answer the question.
6      MR. ARNOLD: We need to have a
7  definition of seeing him.  There's
8  vernacular and then there's visual sight.
9    Q.  I mean visual see him walking by.
10    A.  Oh, okay.
11    Q.  By see, I really mean see him with
12  your eyes.
13    A.  Oh, okay.  Well, again, that's
14  hard to say.  I went to school Monday
15  through Friday.  My mom works there.  In her
16  office.  I don't know how many times he
17  comes to the building.  I don't know.
18    Q.  How often did you speak to him
19  between the time you met him and January the
20  31st, 2005?
21    A.  It was about -- I want to say
22  about three, four times.
23    Q.  Okay.  What was the nature of your

Page 121

1  conversations on those three or four times?
2    A.  Hello.
3    Q.  So by speak, you just mean you
4  said hello to him as he passed by?
5    A.  Well, he would speak and just say
6  hello.
7    Q.  Okay.  Did you have any
8  conversations with him that were beyond just
9  saying hello and good-bye between the time
10  you met him and January 31st, 2005?
11    A.  He -- Yes, I did.
12    Q.  How often?
13    A.  He offered to take my family out
14  to eat.
15    Q.  Okay.
16    A.  And the only -- Of course, we
17  spoke while we were eating dinner.  And --
18  let's see.  And then on the day of the rape,
19  he called my cell phone twice.
20    Q.  Had you had any conversations with
21  him other than him taking you out to dinner
22  and him calling you twice on the day of the
23  rape, with Mr. Diop, other than saying hello

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 122

1   and good-bye?
2       A.  That's really all I recall right
3   now.
4       Q.  And you never had any
5   conversations with Mr. Diop over the
6   telephone other than him calling your cell
7   phone twice the day of the rape?
8       A.  Let's see.  He did call me.
9       Q.  He called you?  When did he call
10  you?
11      A.  When we were out to dinner, he got
12  lost and he kept calling -- well, it's
13  really my mom's cell phone, but I have it.
14  He kept calling the number because he got
15  lost.
16      Q.  What day was that, that he took
17  you out to dinner?
18      A.  I don't remember the exact day.
19      Q.  Give me an approximate date.
20      A.  I don't remember.
21      Q.  Where did you go?
22      A.  It was Outback Steak House.
23      Q.  Was this before you started

Page 123

1   working for Mr. Moore or after?
2       A.  I really can't remember.
3       Q.  So other than calling your cell
4   phone twice the day of the rape and calling
5   your cell phone when he was lost trying to
6   get to Outback, did Mr. Diop call your cell
7   phone on any other occasions?
8       A.  After I was raped, he left me two
9   sexual messages on my phone.
10      Q.  When was that?
11      A.  It was on that same night.
12      Q.  So on January 31st?
13      A.  Uh-huh.
14      Q.  And he left two messages?  Did you
15  save those messages, Ms. Johnson?
16      A.  I have a new phone.  I didn't save
17  it.
18      Q.  Prior to getting the new phone,
19  did you record those messages onto any other
20  medium?
21      A.  We let -- It was -- I forgot her
22  name.  She's a deputy at the Montgomery
23  Police Department.  She heard it.  I don't

Page 124

1   know her name, though.
2       Q.  Was a transcript made of those
3   messages?
4       A.  I don't know.  I just know that
5   she heard it.
6       Q.  Okay.  What did the messages say?
7       A.  One of them, he was just moaning,
8   like moaning.
9       Q.  Okay.
10      A.  And I forgot what the other one
11  said.
12      Q.  Okay.  When did you listen to the
13  messages?
14      A.  It was that same night.  I saw
15  that I had a missed -- you know, two missed
16  messages.  So I listened and I let my mom
17  hear it.  And she contacted the police
18  department.
19      Q.  Okay.  When you looked on your
20  cell phone and saw that you had missed
21  calls, did you look to see who had called
22  you first?
23      A.  No.  I went straight to my voice

Page 125

1   mail.
2       Q.  You went straight to voice mail
3   without checking to see who the calls were
4   from?
5       A.  Uh-huh.
6       Q.  Did he call you on any other
7   occasions?
8       A.  No.  That's all I recall right
9   now.
10      Q.  Okay.  How did Mr. Diop get your
11  cell phone number?
12      A.  That night when we were going --
13  when he said that he wanted to take my
14  family out to Outback Steak House.  I don't
15  really have a cell phone.  It's really my
16  mom's.
17          And so she just -- because he said
18  that he don't know his way around.  And she
19  gave out the number to him because he said
20  he's lost, he's going to get lost.  And
21  that's how.
22      Q.  What time of day was it when you
23  went to Outback, your family and Mr. Diop?

32  (Pages 122 to 125)

FREEDOM COURT REPORTING

Page 126

1    A.  It was evening.
2    Q.  Was it on a weekday or a weekend?
3    A.  I don't remember.
4    Q.  Had you been to work on the day
5  you went to Outback with Mr. Diop and your
6  family?
7    A.  I don't remember.
8    Q.  In one of your previous statements
9  you stated that one afternoon at 4:30 while
10  you were visiting your mother at work, Mr.
11  Diop invited you to see his home; is that
12  correct?
13    A.  Uh-huh.
14    Q.  Is that a yes?
15    A.  Oh, yes.
16    Q.  Okay.  You remember making that
17  statement?
18    A.  Yes.
19    Q.  And you remember going to Mr.
20  Diop's home one afternoon?
21    A.  Not going to.  We just drove by.
22    Q.  Okay.  You went to his house?
23    A.  Drove by.

Page 127

1    Q.  Okay.  Did your mother know you
2  were going by his house?
3    A.  It was -- yes.  It was right
4  around the corner.
5    Q.  Okay.  Describe his house for me.
6    A.  I don't know how it looked.
7    Q.  You don't remember how the house
8  looked?
9    A.  No, I don't.  I know what the
10  inside looks like.  That's it.
11    Q.  How did you get to Mr. Diop's
12  house that day?
13    A.  Which day?
14    Q.  The day you went by at 4:30.
15    A.  Just trailed -- drove behind him
16  to see the house and that was it.
17    Q.  You drove your own car?
18    A.  Uh-huh.
19    Q.  Did you stop the car when you got
20  to the house?
21    A.  Just to look at -- like just
22  rolled down the window and looked and that's
23  it.

Page 128

1    Q.  Okay.  I'm asking did you stop the
2  -- You didn't get out of the car?
3    A.  No, I didn't get out.
4    Q.  Did he get out of his car?
5    A.  I can't -- I can't remember if he
6  did.
7    Q.  Is his house close to any other
8  houses?
9    A.  I think they are all lined up
10  together.
11    Q.  About how close would you say the
12  other houses are?
13    A.  I don't know.
14    Q.  Do they look kind of close
15  together or do they look really far apart?
16    A.  I really don't remember.
17    Q.  How did you know when you had
18  arrived at the house that that was Mr.
19  Diop's house?
20    A.  What day?
21    Q.  The day you went there at 4:30.
22    A.  Because I trailed him there and he
23  pointed.

Page 129

1    Q.  So he pointed out the window to
2  which house was his?
3    A.  Yes, he pointed.  Like he let me
4  know that that's his house.
5    Q.  Okay.  And you said you never got
6  out of your car on that day.  So you did not
7  go in the house; correct?
8    A.  No, I didn't.
9    Q.  Okay.  Was your trip to view the
10  house before or after the dinner that Mr.
11  Diop took you and your parents to?
12    A.  I don't remember that time.  I
13  don't remember.
14    Q.  You don't remember when you went?
15  Do you have an approximate date when you
16  went to his house?  And I'm speaking of the
17  afternoon when you went at 4:30.
18    A.  I don't remember the day.
19    Q.  But during this dinner in
20  January of 2005, Mr. Diop asked your parents
21  for permission to date you; correct?
22    A.  He did.
23    Q.  Okay.  And your parents told him

33  (Pages 126 to 129)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 130

1   he was too old; correct?
2       A.  Uh-huh.
3       Q.  Is that a yes?
4       A.  Yes.
5       Q.  Okay.  And they refused to give
6   him permission to date you; correct?
7       A.  Yes.
8       Q.  Okay.  Before this dinner, had Mr.
9   Diop expressed any romantic interest in you?
10      A.  Not really.  No.
11      Q.  When you say not really, what did
12  he do to indicate that he had a romantic
13  interest in you before he took you and your
14  parents to dinner?
15      A.  He didn't.  It was just hi or hi
16  and bye.  It was nothing.
17      Q.  So before he took your parents to
18  dinner, he didn't make any comments to you
19  or anything that let you know he was
20  interested in you?
21      A.  Huh-uh.
22      Q.  Is that a no?
23      A.  No.

Page 131

1       Q.  Was the dinner invitation before
2   or after January 25th?
3       A.  I don't remember.
4       Q.  Okay.  Was the invitation to view
5   his house that afternoon at 4:30 before or
6   after January 25th?
7       A.  I don't remember.
8       Q.  But you do remember January 31st,
9   2005; right?
10      A.  Yes.
11      Q.  Where were you when Diop first
12  called you on your cell phone that
13  afternoon?
14      A.  I was at home.
15      Q.  So you had already arrived home?
16      A.  Uh-huh.
17      MR. MADISON:  January the 31st?
18      MS. MEADOWS:  Yes, January the
19  31st.
20      Q.  What did Mr. Diop say when he
21  called you?
22      A.  Do you mind if I take a second?
23  Okay.  On that day, it was -- let's see.  He

Page 132

1   was telling me about some repairing or
2   something that needed to be done on some
3   building, telling me how his day went or
4   something.
5       Q.  Did he ask you how your day went?
6       A.  I don't know.  But I do remember
7   him telling me how his day went.
8       Q.  Did you tell him how your day
9   went?
10      A.  No.  Because as soon as -- like as
11  soon as he called, my mom, she came and told
12  me about I needed to go take my cousin home
13  and go to Walgreen's to pick up medicine for
14  my nephew.
15      Q.  So you don't -- So you don't
16  recall telling him about some award you had
17  received or something you had done that day,
18  your presentation or something of that
19  nature?
20      A.  Presentation?
21      Q.  Yes.  Do you recall telling him
22  about some presentation you had made that
23  day?

Page 133

1       A.  No.
2       Q.  What did you talk about with Mr.
3   Diop that day, the first time he called?
4       A.  Nothing really.  I mean, he just
5   told me how his day went.  I don't remember
6   talking about a presentation.
7       Q.  You talked to him more than once
8   that day; correct?
9       A.  I did.
10      Q.  How many times -- You said you
11  talked to him twice that day?
12      A.  It was two or three, yes.
13      Q.  Do you recall that you called him
14  as well on that day?
15      A.  No.
16      Q.  You didn't call him?
17      MR. ARNOLD:  Object to form.
18      Q.  Are you now saying that you did
19  not call him at all on that day for any
20  reason?
21      A.  No, I didn't.
22      Q.  During one of your later
23  conversations with Diop, either the second

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

| Page 134 | Page 136 |
|---|---|
| 1 or third time he called you, tell me what | 1    A. I went over there because he said |
| 2 those conversations were about, what both of | 2 that he hasn't been down here long. The |
| 3 those later conversations were about. | 3 only people -- he knows me and my mom were |
| 4    A. One of them was in the car with my | 4 Christians. He knows my mom is a |
| 5 cousin. Again, he was telling me about like | 5 missionary. |
| 6 working on the buildings and stuff like | 6        He said that he was just really |
| 7 that, how hard his day was. | 7 sad and he just needed somebody to talk to. |
| 8        And then I told him, well, I've | 8 And I was just going to pray for him, you |
| 9 got to go. I'm about to drop my cousin | 9 know. |
| 10 off. And then I just got off the phone. | 10    Q. Okay. Did you have to ask him for |
| 11 And then the other time when I was in | 11 directions to his house? |
| 12 Walgreen's, that's the time when he called | 12    A. I did. I didn't know how to get |
| 13 and sounded really sad. | 13 there. |
| 14        And that's the one where he told | 14    Q. Okay. What time did you arrive at |
| 15 me that his grandmother was about to die. | 15 the house? |
| 16    Q. Okay. Let's talk about your -- | 16    A. It was about seven o'clock, 7:15. |
| 17 Who was your cousin that was in the car with | 17        MR. MADISON: I'm sorry. What |
| 18 you? What's your cousin's name? | 18 time did you say? |
| 19    A. Jabrell. But I dropped her off. | 19        THE WITNESS: Seven o'clock, 7:15. |
| 20    Q. Okay. Did you make any | 20    Q. How long did you plan on staying |
| 21 explanation to Jabrell about who was on the | 21 at the house? |
| 22 phone with you? | 22    A. Not long. I was just going to |
| 23    A. No. | 23 pray for him. Let him know everything was |

| Page 135 | Page 137 |
|---|---|
| 1    Q. Okay. And you said that while you | 1 okay. Not long. |
| 2 were at Walgreen's you received a call from | 2    Q. Did you have an approximate time |
| 3 Mr. Diop and he was sad; correct? | 3 in your mind about how long you thought it |
| 4    A. Uh-huh. Yes. | 4 would take? |
| 5    Q. Okay. And he told you he was sad | 5    A. Just a couple of minutes. |
| 6 because his grandmother was in the hospital; | 6    Q. Okay. In your prior statements, |
| 7 is that correct? | 7 you said that your mother sent you to |
| 8    A. He said his grandmother was dying. | 8 Walgreen's to fill the baby's prescription; |
| 9    Q. Was dying? | 9 right? |
| 10    A. Uh-huh. | 10    A. Uh-huh. |
| 11    Q. During this conversation, did he | 11    Q. Is that a yes? |
| 12 ask you to come to his house? | 12    A. Yes. |
| 13    A. He did. He said that he just | 13    Q. Whose baby is it? |
| 14 really needed somebody to talk to, his | 14    A. My sister. |
| 15 grandmother was about to die. And the only | 15    Q. Okay. How old is the baby? |
| 16 people he knows is me and my mom. | 16    A. He was about seven months at the |
| 17    Q. Okay. So you went to his house to | 17 time, six, seven months. |
| 18 consult him because he was losing his | 18    Q. You also indicated that the baby |
| 19 grandmother? | 19 had just been released from the hospital; is |
| 20    A. Yes. I was going to pray for him. | 20 that correct? |
| 21    Q. Okay. And you went over there | 21    A. He did. |
| 22 because you considered him a friend or at | 22    Q. Do you remember why he was in the |
| 23 least -- | 23 hospital? |

35 (Pages 134 to 137)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

<table>
<tr><td>

Page 138

1   A.  He had breathing problems.
2   Q.  Do you remember what prescription
3  you were getting filled?
4   A.  I don't.
5   Q.  Do you know what it was for?
6   A.  I just assumed it was for his
7  breathing problems.
8   Q.  Okay.  Did you drop off the
9  medication at home before you went to Mr.
10  Diop's house?
11   A.  No.  I still had it with me.
12   Q.  Okay.  Did you call your mother
13  and tell her that you were going to go by
14  Diop's house before you brought the medicine
15  home?
16   A.  I didn't.
17   Q.  Did you call your mother and tell
18  her that you were going to Diop's house at
19  all?
20   A.  I didn't.
21   Q.  Okay.  Did you take your cell
22  phone with you when you went to Diop's
23  house?

</td><td>

Page 140

1  knock on the door?
2   A.  I did.
3   Q.  Did Mr. Diop open the door for
4  you?
5   A.  He did.
6   Q.  So he didn't just tell you to come
7  in, he did get up and open the door;
8  correct?
9   A.  Yes.
10   Q.  Okay.  Was he fully dressed when
11  you arrived?
12   A.  Yes.
13   Q.  What was he wearing?
14   A.  I can't remember what he was
15  wearing.  Shirts and pants.
16   Q.  You also stated that you entered
17  Mr. Diop's home and sat down.  Where did you
18  sit?
19   A.  He only had -- Between the den,
20  living room, he only had a bed, a really big
21  bed.  And he said that it was just because
22  he had just moved in.  So on the edge of the
23  bed.

</td></tr>
<tr><td>

Page 139

1   A.  I did.
2   Q.  Did you take it with you into the
3  house?
4   A.  I did.
5   Q.  Was the phone turned on when you
6  went into the house?
7   A.  It was.
8   Q.  Okay.  Was it capable of ringing
9  when you took it into the house?
10   A.  Uh-huh.  Yes.
11   Q.  So you would have heard it ring?
12   A.  Yes.
13   Q.  Okay.  Exhibit No. 7 is a
14  statement you sent to Mr. Wesley outlining
15  what happened to you; is that correct?
16   A.  Yes.
17   Q.  Okay.  And do you contend that
18  this is a truthful and accurate account of
19  the events of that evening?
20     MR. ARNOLD:  Object to form.
21   A.  Yes.
22   Q.  Okay.  When you arrived at Mr.
23  Diop's house on January the 31st, did you

</td><td>

Page 141

1   Q.  You sat on the edge of the bed?
2   A.  Uh-huh.
3   Q.  Okay.  At what point did Mr. Diop
4  go into the kitchen?
5   A.  I don't remember.
6   Q.  Do you remember why he went into
7  the kitchen after you arrived?
8   A.  Huh-uh.  I don't remember.  I
9  don't remember him going into the kitchen.
10   Q.  In your statement you said that
11  Mr. Diop was walking from his kitchen toward
12  you.  Where is the kitchen in relation to
13  the bed that you were sitting on?
14   A.  It's in the den.
15   Q.  The kitchen is in the den?
16   A.  It's part of the den.  Yes.  It's
17  like everything is open.
18   Q.  It's a one room arrangement?
19   A.  Yes.  It's like everything is
20  open, out in the open.  And it's a bed.
21  It's a bed, a big bed.
22   Q.  Okay.  Describe the furnishings in
23  the kitchen for me.

</td></tr>
</table>

36 (Pages 138 to 141)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 142

1    A.  I don't remember how it was.  I
2  don't remember.
3    Q.  Do you remember what was in there?
4    A.  Huh-uh.
5    Q.  Okay.  What size bed did Mr. Diop
6  have?
7    A.  I don't know the size bed.  But it
8  was a big bed.
9    Q.  What size bed do you have at home?
10   A.  I have a full.
11   Q.  Okay.  What size bed do your
12  parents have?
13   A.  They have a king.
14   Q.  Okay.  Is Mr. Diop's bed bigger
15  than your bed?
16   A.  Bigger than my bed?
17   Q.  Yes.
18   A.  Yes.  Yes, it was.
19   Q.  Is it the same size as your
20  parents' bed?
21   A.  I don't know.
22   Q.  Is it smaller than your parents'
23  bed?

Page 143

1    A.  I don't know.
2    Q.  Okay.  Describe the bed for me.
3    A.  I really can't.  All I know is
4  that it was a big bed and it's in the den.
5  That's all I remember.  It's a big bed and
6  it's in the den.
7    Q.  When you arrived at the house, was
8  Mr. Diop's bed made?
9    A.  I think it was.  I don't remember.
10   Q.  Did he have a comforter?
11   A.  I don't remember that.
12   Q.  Did he have any other furniture
13  besides the bed?
14   A.  Huh-uh.  That bed is all I
15  remember.
16   Q.  Did he have anything else in the
17  house except for the bed?
18   A.  Are you asking me if he had like
19  sofas and stuff?
20   Q.  I'm asking any furniture he had.
21  I want you to tell me everything that you
22  saw in the house on January the 31st.
23   A.  Oh, okay.  Let's see.  When you

Page 144

1  walked through the door, in this area over
2  here, I remember there was like a weight
3  lifting machine.  And then right across from
4  the bed, there was a TV.
5       And then like right there was a
6  tall dresser.  And then the bed.  That's all
7  I remember.
8    Q.  Tell you what.  I'm kind of
9  visual.  Do me a favor.  I'm not asking you
10  to draw me something to scale.  But can you
11  kind of sketch out for me what it looked
12  like on the inside of the house?
13       Just draw me from the
14  entranceway.  And you can put a little mark
15  and tell me this is the weight machine, this
16  is the bed, this is the TV, this is the
17  kitchen.  Okay?
18       MR. ARNOLD:  While she does that,
19  can we step outside for a minute?
20       MS. MEADOWS:  Sure.  We'll go off
21  the record while she writes her diagram.
22       (Whereupon, a short recess was
23  taken.)

Page 145

1       (Whereupon, a lunch recess was
2  taken.)
3    Q.  Ms. Johnson, when we left off, you
4  were going to draw me a diagram so that I
5  could kind of see what you were talking
6  about when you were describing Mr. Diop's
7  house for me.  Okay.  Now, which way is the
8  door?
9    A.  When you walk in, you see weights
10  over here.
11   Q.  Are the weights to your left or to
12  your right?
13   A.  They are on my left.
14   Q.  Okay.
15   A.  This is the door, I mean, like
16  when you walk in here.
17   Q.  Okay.
18   A.  And then that's the weights there.
19   Q.  Okay.
20   A.  And then the bed is there.
21   Q.  Okay.
22   A.  And this is a long hallway.
23   Q.  Okay.

37  (Pages 142 to 145)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 146

1    A.  And that's the TV and that's the
2  hall like to the -- well, it just leads --
3  all that leads into the kitchen, like all of
4  this.
5    Q.  So there's just an area over here
6  that leads into the kitchen?
7    A.  Uh-huh.  This whole area.  And
8  this is his bed which is this whole area.
9    Q.  Okay.  And what's this right here?
10    A.  That's the TV.
11    Q.  So the TV is across from the bed
12  and next to the kitchen?
13    A.  Yes.  And then that's the dresser.
14    Q.  Okay.  That's the only furniture
15  you remember anywhere inside the house?
16    A.  Uh-huh.
17    Q.  Where is the bathroom?
18    A.  I don't know.
19    Q.  Okay.  When you first came into
20  the house, had you and Mr. Diop started
21  talking at that point?
22    A.  Just when me entering?
23    Q.  Yes.  When you walked in, did you

Page 147

1  all start talking?
2    A.  He had opened the door and then he
3  just told me to have a seat.  And he went
4  back somewhere.  But it's like he came out
5  from the kitchen.
6    Q.  So he went back which way, to the
7  left or to the right?
8    A.  He kept straight here and somehow
9  he came out from the kitchen.
10    Q.  So he went straight down this long
11  -- what you have described as a long
12  hallway through the middle of the house;
13  right?
14    A.  Uh-huh.
15    Q.  And he ended up over behind the
16  television?
17    A.  In the kitchen.  Like he was
18  coming out.  I don't know if there's a place
19  where you can go like that, but he was
20  coming out of the kitchen.
21    Q.  And did you talk about anything
22  during that time?
23    A.  Not at that time.

Page 148

1    Q.  So when he came back from the
2  kitchen, did you all start talking then?
3    A.  He had two pair of socks in his
4  hand.  And he put on his socks and he
5  started sliding across the floor.  And then
6  he asked me if I wanted to join him sliding
7  across the floor.
8    Q.  So when he came out of the
9  kitchen, he had two pairs of socks with him?
10    A.  Uh-huh.
11    Q.  And he walked toward you with the
12  two socks?
13    A.  Uh-huh.
14    Q.  And gave you the socks?
15    A.  He gave -- yes.  He put his pair
16  on and then he had gave me a pair.  He asked
17  if I wanted to join him sliding across the
18  floor.
19    Q.  Where did he get the socks from?
20    A.  I don't know.
21    Q.  Did you see him?
22    A.  Huh-uh.  I didn't see where he got
23  the socks from.

Page 149

1    Q.  You didn't watch him retrieve the
2  socks or anything?
3    A.  No.
4    Q.  And he started sliding across the
5  floor?
6    A.  Uh-huh.  Yes.
7    Q.  And you decided -- You joined him
8  sliding across the floor?
9    A.  Yes.
10    Q.  What kind of shoes were you
11  wearing?  What were you wearing when you
12  arrived at his house?
13    A.  I had on blue -- my blue pants.  I
14  had on a shirt.  I had on another shirt tied
15  across me and some tennis shoes.
16    Q.  So you had on tennis shoes?
17    A.  Uh-huh.
18    Q.  And the blue pants, what kind of
19  material are they made out of?
20    A.  Like cotton.
21    Q.  And you had one shirt on?
22    A.  Uh-huh.
23    Q.  What kind of shirt was that?

38 (Pages 146 to 149)

FREEDOM COURT REPORTING

Page 150

1    A.  It was a tee shirt.
2    Q.  And you had another shirt tied
3  around you.  Where was it tied?
4    A.  Around my waist.
5    Q.  Around your waist.  And did the
6  tail of that shirt hang down over your hips?
7    A.  Yes.
8    Q.  And when he gave you the socks to
9  put on, did you put on the socks he gave
10  you?
11    A.  Uh-huh.
12    Q.  Were you already wearing socks
13  with your tennis shoes?
14    A.  No.  I don't wear socks.
15    Q.  You don't wear socks?  Okay.  So
16  you put on the pair of socks he gave you?
17    A.  Yes.
18    Q.  And you began sliding across the
19  floor?
20    A.  Uh-huh.
21    Q.  Did you take off the shirt you had
22  tied around your waist to slide across the
23  floor?

Page 151

1    A.  No.
2    Q.  So you kept on everything you had
3  on except you took your shoes off; right?
4    A.  Uh-huh.
5    Q.  Was Mr. Diop still fully clothed
6  at that time?
7    A.  Yes.
8    Q.  He had on his pants and a shirt?
9    A.  Uh-huh.  Yes.
10    Q.  And he had on a pair of socks?
11    A.  Yes.
12    Q.  Okay.  How long did you slide
13  across the floor?
14    A.  It wasn't long.  It was about five
15  minutes.  It wasn't long at all.
16    Q.  Okay.  When you were sliding
17  across the floor, were you talking?
18    A.  Actually, I was just laughing,
19  like just sliding across the floor.
20    Q.  So the two of you were laughing?
21    A.  Yes.  We were sliding across the
22  floor.
23    Q.  And when you finished sliding --

Page 152

1  Who finished sliding across the floor first?
2    A.  He did.  He had sat on the edge of
3  the bed and he got serious.
4    Q.  Okay.  Which side of the bed --
5  Where on the bed did he sit?
6    A.  On the edge like -- on the edge.
7  He was on this side closer to the dresser.
8    Q.  Was that the head of the bed or
9  the foot of the bed?
10    A.  This should have been a
11  rectangle.  His bed was like that
12  (indicating).  Like it looked like this.
13  This is the side.  I should have drawed this
14  like a rectangle.  And then he was sitting
15  here (indicating), and I was sitting right
16  about there.  There was a considerable
17  amount of space between us.
18    Q.  Was that at the head of the bed or
19  at the foot of the bed?
20    A.  On the sides.
21    Q.  It was on the sides?
22    A.  Uh-huh.
23    Q.  Where does the head of the bed

Page 153

1  face?
2    A.  It was here.
3    Q.  The head of the bed faces towards
4  the weights?
5    A.  Uh-huh.
6    Q.  And the foot faces towards this
7  dresser?
8    A.  Yes.
9    Q.  Okay.  And so the side of the bed
10  faces the TV?
11    A.  Uh-huh.
12    Q.  Okay.  So you all were sitting
13  with a little -- with some space inbetween
14  y'all on the side of the bed?
15    A.  Yes.  It was a considerably long
16  space.
17    Q.  How much space would you say was
18  between the two of you?
19    A.  Like just a considerable amount.
20  Like very respectful.
21    Q.  Were you sitting as close as you
22  and Mr. Arnold are sitting?
23    A.  Yes.  It was just normal.

39 (Pages 150 to 153)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 154

1       MR. ARNOLD:  Possibly three feet.
2  Can we agree on that?
3       A.  This is the amount of space.  I
4  mean, it was really respectfully normal.
5       Q.  So as Mr. Arnold -- If I say about
6  three feet, you're going to accept that as
7  being the approximate amount of space?
8       A.  Yes.
9       Q.  And understand, I'm not going to
10  get out a ruler and measure.
11       A.  Yes.
12       Q.  You might be as bad about guessing
13  distance as I am.  But this is --
14       A.  Uh-huh.
15       Q.  The distance of your two chairs
16  apart?
17       A.  Yes.
18       Q.  Okay.  And this is when you first
19  came and sat down on the bed to talk to him?
20       A.  Uh-huh.
21       Q.  Okay.  And you said he had started
22  to get serious.  How did you know he was
23  getting serious when he went and sat down?

Page 155

1       A.  Well, his tone changed.  He got
2  really sad, like -- he was like my
3  grandmother -- he just started talking about
4  his grandmother.
5       Q.  Was he crying at this point?
6       A.  No.
7       Q.  Okay.  But he -- Did he seem upset
8  to you at this point?
9       A.  Uh-huh.  Like sad.
10       Q.  Is that a yes?
11       A.  Yes.
12       Q.  Did he discuss his grandmother's
13  illness?
14       A.  He just told me that she's about
15  to die and that's it.
16       Q.  Can you give me any more specifics
17  of the conversation that you had about his
18  grandmother?
19       A.  He told me that he's really close
20  to her, that that's his only grandmother.
21  That's all I know.  And that she's about to
22  die.
23       Q.  How long would you say you talked

Page 156

1  about his grandmother?
2       A.  From since we like sat down on the
3  bed.
4       Q.  Were you talking about her before
5  you sat down on the bed?
6       A.  Just that one phone call that I
7  told you about.
8       Q.  Oh, okay.  Now I want to know
9  about the conversation after you got to the
10  house.  I'm sorry.
11       A.  Okay.
12       Q.  So I want to know how long you
13  talked about his grandmother while you were
14  at the house.
15       A.  Okay.  That lasted about three to
16  five minutes.
17       Q.  Three to five minutes?
18       A.  Uh-huh.
19       Q.  Okay.  And did his mood remain sad
20  while he was talking to you about his
21  grandmother?
22       A.  No.  Then about three to five
23  minutes when -- that's -- he reached over

Page 157

1  and pushed me back.  You know, all of a
2  sudden, he just started playing again.
3       He pushed me back and I sat up.  I
4  was like, no, seriously, you know.  I just
5  thought to move back to serious again.
6       Q.  Okay.  So he went from sad to
7  playing with you?
8       A.  To a playful mood.
9       Q.  So he went from a sad mood to a
10  playful mood?
11       A.  Uh-huh.
12       Q.  Had he finished talking about his
13  grandmother when he got in this playful
14  mood?
15       A.  Huh-uh.
16       Q.  No?
17       A.  No.
18       Q.  You were still talking about his
19  grandmother?
20       A.  Yeah.  I was thinking we were
21  still talking about his grandmother.
22       Q.  Was he still talking about his
23  grandmother?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 158

1    A.  Not at that point when he pushed
2  me back.  And then I tried to bring it back
3  to his grandmother.
4    Q.  Did he say anything to you prior
5  to pushing you back other than about his
6  grandmother?
7    A.  Before; right?
8    Q.  Yes.
9    A.  Did he say anything to me other --
10  Say that again.
11    Q.  Did he say anything else to you
12  before he started getting playful and
13  pushing you back?
14    A.  He was still talking about his
15  grandmother.  Like in the middle of him
16  talking about his grandmother, he just out
17  of nowhere, just did that (indicating).
18    Q.  Okay.  How long -- At this point,
19  how long have you been at the house before
20  he pushes you back?
21    A.  I don't really know how long, like
22  exactly how long.
23    Q.  Right.  I know you weren't maybe

Page 159

1  looking at your watch.  I just want an
2  approximation of how much time you had
3  already spent at the house.
4    A.  Let's see.  About ten minutes.
5    Q.  Okay.  So you had been in the
6  house for approximately ten minutes --
7    A.  Uh-huh.
8    Q.  -- before he started to push you?
9    A.  Yes.  About ten minutes.
10    Q.  Okay.
11    A.  Again, that's an estimate.  I
12  really don't remember.
13    Q.  And again, I understand that
14  you're just giving me -- Right now what I
15  need you to give me is your best
16  recollection or guess of how much time is
17  past, okay?
18    A.  Okay.
19    Q.  Now, when he's sitting on the bed,
20  he still has on his shirt; right?
21    A.  Uh-huh.
22    Q.  Is that a yes?
23    A.  Yes.

Page 160

1    Q.  He still has on his pants?
2    A.  Yes.
3    Q.  He still has on the socks?
4    A.  Yes.
5    Q.  So he's still fully clothed?
6    A.  Yes.
7    Q.  Do you still have on all of your
8  clothes?
9    A.  Yes.
10    Q.  You still have your shirt tied
11  around your waist?
12    A.  Yes.
13    Q.  And you still have on your tee
14  shirt?
15    A.  Yes.
16    Q.  And you still have on your pants?
17    A.  Yes.
18    Q.  And now you have on the socks?
19    A.  Yes.
20    Q.  You don't have your shoes on now,
21  do you?
22    A.  No.
23    Q.  Okay.  Prior to him pushing you

Page 161

1  down, did he touch you in any other way?
2    A.  No.
3    Q.  Okay.  When he moved closer to you
4  -- Well, prior to pushing you down, did he
5  move closer to you?
6    A.  No.  Like he reached over and just
7  like really fast just (indicating).
8    Q.  Okay.  Did he attempt to kiss you
9  at that time?
10    A.  No.
11    Q.  Okay.  Where did he touch you when
12  he pushed you down?
13    A.  Like here (indicating).
14    Q.  And when you say here, can you say
15  verbally what you mean?
16    A.  Like my chest.
17    Q.  Like the middle of your chest
18  right above your breast is where you have
19  your hand at?
20    A.  Yes.
21    Q.  And that's where you approximate
22  that he touched you when he pushed you down?
23    A.  Yes.

41 (Pages 158 to 161)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 162

1    Q.  Okay.  How was he pushing you --
2  Describe for me how he was pushing on you.
3  You say he reached across and --
4    A.  Yes.  It was like with his right
5  hand, just really quick.  Just -- I don't
6  know how.  It was just like really fast
7  like.  And then I came up, you know.
8    Q.  So you sat back up after he pushed
9  you down that first time?
10   A.  That first time.
11   Q.  The first time?
12   A.  Uh-huh.
13   Q.  Okay.  Was he touching you in any
14 way other way while he was pushing you to
15 the bed?
16   A.  You talking about after that?
17   Q.  I'm talking about the first time.
18 When he pushed you back, was he touching you
19 in any other way other than with his hand in
20 the middle of your chest?
21   A.  Huh-uh.
22   Q.  No?  Is that a no?
23   A.  No.

Page 163

1    Q.  Okay.  At this time, is he still
2  fully clothed?
3    A.  Yes.
4    Q.  And you're still fully clothed?
5    A.  Yes.
6    Q.  You said you came back up?
7    A.  Uh-huh.
8    Q.  How did you come back up?
9    A.  Like I got straight back up.
10   Q.  You sat up?
11   A.  Uh-huh.
12   Q.  Yes?
13   A.  Yes.
14   Q.  So he pushed you down, but he
15 wasn't holding you down at this point?
16   A.  Not at that time.
17   Q.  After you sat back up, did he push
18 you down again?
19   A.  He immediately pushed me back
20 down.  And that's when he held me down.
21   Q.  Okay.  When he pushed you down the
22 second time, was he touching you any other
23 way than in the middle of your chest?

Page 164

1    A.  Yes.  At that time, he -- that's
2  when he held me down and he got on top of
3  me.
4    Q.  Okay.  So first he pushed you back
5  on the bed?
6    A.  No.  That was the first time,
7  uh-huh.
8    Q.  Okay.  The second -- okay.  I
9  meant the second time when he pushes you
10 back on the bed.  But there's several things
11 that happen at that time; correct?
12   A.  Uh-huh.
13   Q.  I'm trying to figure out each
14 thing that's happening at this time.
15   A.  Oh, okay.  Well, he pushed me back
16 with, you know, his right hand on my chest.
17 He pushed me back again.
18   Q.  Okay.
19   A.  And then he immediately got on top
20 of me.  And it's like he switched -- he
21 switches hands.  Like his left hand was
22 holding down my hand and his right hand --
23 he tore my pants.  And that's when he -- so

Page 165

1  he did touch me.  That's when he stuck his
2  fingers in my vagina.
3    Q.  So his left hand is holding down
4  your right hand?
5    A.  Uh-huh.
6    Q.  And with his right hand, he's
7  tearing your pants off?
8    A.  Yes.
9    Q.  Okay.  You still have on
10 everything else except for your pants?
11   A.  I still have them on.  They were
12 -- He tore it and like he pulled it towards
13 my ankle.  And he had his face like on the
14 pants with my legs in the air.  So my pants
15 were still on me.  They were just down in my
16 ankle.
17     It was like his -- his head was
18 like -- where his chin was, he was holding
19 my legs in the air with my pants.  So they
20 were still on me.
21   Q.  Okay.  And they were at your
22 ankles at this point?
23   A.  Uh-huh.

42  (Pages 162 to 165)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 166

1    Q.  Where is the shirt that was tied
2  around your waist?
3    A.  It was still on me.
4    Q.  It was still on you?
5    A.  Yes.
6    Q.  Still around your waist?
7    A.  I assume it was down at my ankle
8  with my pants.
9    Q.  So he pulled your shirt and your
10  pants down?
11    A.  Yes.  Everything.
12    Q.  Okay.
13    A.  At my ankle.
14    Q.  How was the shirt tied around you?
15    A.  A knot.
16    Q.  And he held your legs open by
17  putting his chin on top of your pants?
18    A.  Yes.  It's like my legs -- like my
19  pants are right here (indicating) and his
20  chin was resting on my pants.  And my legs
21  were just -- they were just there like bent
22  up over me.
23    Q.  So your legs were all the way at

Page 167

1  your face?  How far up would you say your
2  legs were in the air?
3    A.  I'll say they were about right
4  here above me (indicating).
5    Q.  So when he was -- When he had his
6  chin holding your legs up, where was his
7  face on -- where in relation to your body
8  was his face?
9    A.  His face was right here
10  (indicating).  Like when you're laying down,
11  my legs were bent.  You know how like pants
12  are at your ankles and -- his head was
13  holding the pants down by my ankle.  They
14  are right here up under his chin.  And so
15  everything is exposed down there.
16    Q.  And his face was almost even with
17  your face?
18    A.  Yes.  I'm looking at him.
19    Q.  Okay.  At that time, you're still
20  wearing the tee shirt that you had on?
21    A.  Yes, sir.
22    Q.  And you're still wearing your bra?
23    A.  Yes.

Page 168

1    Q.  Was he still dressed at this
2  point?
3    A.  I saw his shirt.  That's all I
4  remember.
5    Q.  Did you at any point see him --
6  Did his pants have a zipper on them?
7    A.  I don't remember that.  I don't
8  know.  I don't remember that.
9    Q.  Do you remember him opening his
10  clothes?
11    A.  It all happened so fast.  Huh-uh.
12  I don't remember that.
13    Q.  Did you ever see that he -- Was
14  there any point where you noticed he didn't
15  have his pants on?
16    A.  I didn't see it.
17    Q.  At any point did you see his pants
18  open exposing himself?
19    A.  I don't remember that.  I didn't
20  -- I didn't notice that.
21    Q.  At any point did you see his
22  penis?
23    A.  No.

Page 169

1    Q.  At any point during this incident
2  did he kiss you on your breast?
3    A.  He did.
4    Q.  Okay.  When was that?
5    A.  This is -- That's when he -- it
6  was at the point where he tried to switch
7  positions.
8    Q.  Okay.  This is the same incident
9  on the bed, though; right?
10    A.  Uh-huh.
11    Q.  Okay.
12    A.  And it's right after -- It's right
13  after -- I remember that.  It's right after
14  when he was like this is your fault for
15  making me angry.  And he was whispering all
16  that stuff in my ear.
17    Q.  Okay.  And you said he was trying
18  to switch positions?
19    A.  Uh-huh.
20    Q.  Now, what was he trying to do?
21    A.  I don't know.  Like I don't know.
22  All I know is that he pushed my legs over.
23    Q.  He pushed them over which way?

43  (Pages 166 to 169)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 170

1   A.  Yes.  He pushed them over to the
2   left.  Like I was dangling -- I was dangling
3   like on the side of the bed there.  And at
4   that point, he was like -- I remember he was
5   whispering in my ear that this is your fault
6   for making me angry.
7       And it's like he just kissed me
8   right there (indicating).  Like my shirt --
9   I had a little low cut shirt.  Like right
10  there, just a normal tee shirt.  And I
11  remember he kissed me here (indicating).
12  Q.  Okay.  Describe this tee shirt for
13  me.  Is this a V neck tee shirt?
14  A.  Uh-huh.
15  Q.  And it had sleeves to it?
16  A.  Uh-huh.
17  Q.  Is it a baby doll tee shirt?
18  A.  No.  It was just a tee shirt and
19  sleeves.
20      MR. ARNOLD:  What's a baby doll
21  tee shirt?
22      MS. MEADOWS:  We'll explain it to
23  you later.  It's a girl thing.

Page 171

1       MR. ARNOLD:  Got you.
2   Q.  But it's just a regular tee shirt?
3   A.  Yes.
4   Q.  With a V neck?
5   A.  Yes.
6   Q.  How far down did the V go?
7   A.  Just about where your's is at.
8   Well, mine usually stops just here
9   (indicating).
10  Q.  Where it stops now?
11  A.  Yes.
12  Q.  Where your shirt is now?  Where
13  you have it buttoned?
14  A.  Yes.  And he kissed me here
15  (indicating).
16  Q.  So for the record -- because it's
17  going to be hard for us later on to tell
18  where you said it was.  So it was closed up
19  actually above your cleavage?  You didn't
20  have cleavage exposed; right?
21  A.  Well, it's probably like right
22  there.  I mean, it's just like a normal tee
23  shirt.

Page 172

1   Q.  Okay.  But it was not -- What I'm
2   getting at is, you didn't have your breasts
3   exposed?
4   A.  Oh, no.  Not like that.
5   Q.  Okay.  So when he kissed you on
6   your breast, did he pull your tee shirt
7   down?
8   A.  Yes.  He -- It's like he just
9   kissed me here (indicating).
10  Q.  And by here, you're indicating the
11  top of your left breast?
12  A.  Uh-huh.
13  Q.  Okay.
14      MR. ARNOLD:  Say yes or no.
15  A.  Yes.
16  Q.  Thank you.
17  A.  Yes.
18  Q.  And at some point while he was
19  doing this change of position, he moved your
20  legs you said to the left; correct?
21  A.  Yes.
22  Q.  Did your legs go towards the bed
23  or towards the floor?

Page 173

1   A.  It went towards the floor.
2   Q.  And at that point, were you able
3   to push him off?
4   A.  Yes.  At that point, I pulled up
5   my pants, was going towards the door.  His
6   door was locked.
7   Q.  Okay.  What was Mr. Diop doing
8   while you were pulling your pants up?
9   A.  I don't know.  All I know is that
10  when I made it to the door, he pulled me
11  back to the bed.
12  Q.  Okay.  He had not -- Was he still
13  on the bed when you were pulling your pants
14  up?
15  A.  I really didn't focus on that.  I
16  was just pulling my pants up running towards
17  the door.
18  Q.  And I understand you were trying
19  to get away from him?
20  A.  Uh-huh.
21  Q.  How close behind you was he when
22  you got to the door?
23  A.  When I got to the door, he

44  (Pages 170 to 173)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 174

1   immediately pulled me back to the bed.
2       Q.  So would you say he got to the
3   door at almost the same time you did?
4       A.  Yes.  I guess you could say that.
5       Q.  Did you have time -- You had time
6   to try to open the door before he got there?
7       A.  Yes.  I noticed that it was
8   locked.
9       Q.  Okay.  Describe that lock for me.
10  How was it locked?  How did it lock?
11      A.  I couldn't open it.
12      Q.  Yes.  I guess that was a poor
13  question.  What I'm trying to get is,
14  describe to me what type of lock it was.
15      A.  I don't remember what type of lock
16  it was.  I don't remember what type of lock
17  it was.
18      Q.  Was it a dead bolt lock?
19      A.  I don't remember.
20      Q.  Okay.  Ms. Johnson, I want you to
21  take a real deep breath.  I know this is
22  difficult.  Just take a deep breath for me.
23  Okay.  I want you to concentrate.

Page 175

1       When you got to the door and you
2   reached out to turn the handle and found
3   that it was locked -- right --
4       A.  Yes.
5       Q.  -- did you notice what kind of --
6   What did the knob look like?
7       A.  The knob was -- it was like a
8   golden brass.  It was like a round knob.
9       Q.  Okay.  It was a regular round
10  knob?
11      A.  Uh-huh.
12      Q.  Is that the part that was locked?
13      A.  No.  It didn't have one of those
14  things on it.  It was just a knob.
15      Q.  It didn't have a locking mechanism
16  on that knob?
17      A.  Huh-uh.
18      Q.  Was there a lock above that?
19      A.  It was two doors.  I don't know.
20  It was like a metal door and then a regular
21  door.
22      Q.  Okay.  Where is the metal door?
23      A.  That's the one with the gold knob

Page 176

1   on it.
2       Q.  Where is the regular door?
3       A.  It's on the outside.
4       Q.  Okay.  I'm going back to your
5   diagram.  And actually I'm going to go ahead
6   and mark this diagram as 11 because we may
7   need to refer back to it.
8           (Whereupon, Defendant's Exhibit
9   No. 11 was marked for identification and
10  attached to the original transcript.)
11      Q.  Okay.  At the bottom of this page,
12  you indicated that this is the entrance.
13  How much -- Describe this metal door to me.
14  Where is the metal door?
15      A.  It's with the door.
16      Q.  Okay.  And when you come in, you
17  come in through both doors, like the one
18  immediately right after the other?
19      A.  Uh-huh.
20      Q.  Is that a yes?
21      A.  Yes.
22      Q.  It's not like there's -- the
23  regular door on the outside and then an

Page 177

1   entranceway and then there's a metal door;
2   correct?
3       A.  Yes, correct.  They are together.
4       Q.  Okay.  What you're calling the
5   regular door, is that like a screen door?
6       A.  No.  The regular door looks like a
7   door, like just a door.
8       Q.  And the metal door, what does that
9   look like?
10      A.  It was -- See, you had a brass
11  knob and it was like a black bar, just
12  straight back bar.
13      Q.  Was the metal bar burglar bars?
14      A.  If it's just straight bars, like
15  straight bars with a doorknob.
16          MR. MADISON:  Spaces between them.
17      Q.  Were there spaces between the
18  bars?
19      A.  Uh-huh.
20      Q.  Is that a yes?
21      A.  Yes.
22      Q.  So did it look like what people
23  call burglar bars?

45 (Pages 174 to 177)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 178

1    A.  Yes.  It has a knob like -- It
2  just has a knob and then it has the --
3    Q.  Okay.  Was there a lock above the
4  knob?
5    A.  Honestly, I cannot remember.
6    Q.  Okay.
7    A.  I do remember that knob, though,
8  because it wouldn't open.  I remember
9  twisting it and it wouldn't open.
10    Q.  So you twisted the knob and it
11  wouldn't turn?
12    A.  No.
13    Q.  So you considered it locked at
14  whatever that knob was?
15    A.  Yes.  It would not open.
16    Q.  Okay.  Now, let me to after he
17  catches up with you at the door.  Well,
18  first, how far from the bed to the door was
19  it do you think?
20    A.  How far was it?
21    Q.  Yes.
22    A.  I don't know.  It wasn't far.  I
23  don't know.

Page 179

1    Q.  Did it seem like a short distance
2  to you or a long distance?
3    A.  Yes.  It felt like a short.
4    Q.  Okay.  Now, go to what happened
5  after he caught you at the door.
6    A.  He pulled me back to the bed.
7    Q.  Okay.
8    A.  And this time, his hand was around
9  my neck.  And I tried to -- Like when I
10  tried to get back up, he tightened his hand
11  around it.  So I didn't --
12    Q.  No.  I'm just trying to understand
13  what you're saying.  Did he drag you back to
14  the bed by your neck?
15    A.  No.  Like he pulled me.  He pulled
16  me back to the bed, threw me back on the bed
17  and he held his hand around my neck.
18    Q.  Okay.  So did he pull -- What part
19  of your body was he touching when he pulled
20  you back across the room?
21    A.  My arms.
22    Q.  Both your arms?
23    A.  Uh-huh.

Page 180

1    Q.  Did he pick you up off the floor?
2    A.  No.
3    Q.  Okay.  And he pushed you back on
4  the bed?
5    A.  Uh-huh.  Yes.
6    Q.  Okay.  And this time when he holds
7  you down, he's now holding you down by your
8  neck?
9    A.  By my neck.
10    Q.  Now I think I understand where you
11  are.  Go ahead.
12    A.  And with the other hand -- the
13  other hand, he pulled my pants back down.
14  And then this time he forced -- he forced --
15  he forced his penis inside.  And then at
16  that time, I was screaming stop because it
17  hurted.
18      And I had screamed stop because it
19  hurt.  And he didn't listen.  And I just --
20  I started crying.  And after a while, it got
21  -- I guess it got moist down there.  And so
22  he whispered in my ear, yes, now you're
23  getting wet.

Page 181

1      And then he kept -- he kept just
2  having -- you know, just having sex.  He
3  just kept going.  And then I was telling him
4  -- and I was telling -- hold on.
5    Q.  Okay.
6    A.  And then he kept going.  Hold on.
7  I don't talk about it.
8      MS. MEADOWS:  We're going to take
9  a three minute break.
10      (Whereupon, a short recess was
11  taken.)
12    Q.  We were talking about this is
13  after you've escaped and gone to the door
14  and he's brought you back on the bed;
15  right?  And you were telling me that this
16  time he penetrated you with his penis;
17  correct?
18    A.  The first time he did as well.
19    Q.  Oh, okay.  You said this time he
20  -- okay.  So you can go ahead and finish
21  where you left off, if you remember.
22    A.  Okay.  And what I meant is that
23  this time he just -- he used so much force.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 182

1  And I told him, I said stop because this
2  hurt, this hurt. I was saying stop the
3  whole time, I mean, ever since the
4  beginning, just -- this just really hurted.
5      And I remember him saying -- he
6  was like this is your fault for making me
7  angry and just a whole bunch of stuff. And
8  it kept going for -- it seems like forever.
9      But he just -- he just raped me.
10  And I remember one time I tried to -- Like
11  when I tried to get up, his hand -- like
12  he'd squeeze my neck tighter. So I just had
13  to lay there and just --
14      Q.  Okay. This second time --
15      A.  Go ahead.
16      Q.  This second time, did he take your
17  pants all the way off or are they still down
18  at your ankles?
19      A.  He took them off.
20      Q.  He took them off that time?
21  Okay. Where are your legs this second time?
22      A.  My legs?
23      Q.  Yes.

Page 183

1      A.  They are just laying there.
2      Q.  Okay. Are your legs flat on the
3  bed this time?
4      A.  Yes. And then he had to -- like
5  he had took his -- he took his hands and
6  pushed -- it's like first he started with
7  the first leg and then he held them -- like
8  he held it like up. And then he got the
9  other one.
10      And then it was like almost just
11  on his shoulder. And I remember that they
12  -- it went further -- it seems like they
13  went further behind my head. And at that
14  point, I just started crying really bad
15  because it really hurt.
16      Q.  Okay. Did Mr. Diop kiss you
17  anywhere during this particular incident?
18  And by this particular incident, I mean the
19  second time after you had tried to get to
20  the door.
21      A.  When it was -- When it was over, I
22  had pulled up my pants and put -- I had put
23  on my shoes and was trying to go. And he

Page 184

1  jumped up and grabbed me, gave me a very
2  tight hug and he kissed me on my forehead.
3  And he had whispered -- he had told me to
4  keep him in my prayers. I'm sorry.
5      Q.  No, no, no.
6      A.  He had kissed me. And he told me
7  to keep it in my prayers.
8      Q.  Where did he kiss you?
9      A.  On my forehead here (indicating).
10      Q.  Okay. So during this incident, he
11  kissed you on your forehead; correct?
12      A.  Yes.
13      Q.  And he kissed you on your breast?
14      A.  Yes.
15      Q.  Okay. When he kissed you on your
16  breast, did he attempt to pull your shirt
17  down farther and kiss you on your nipple?
18      A.  No.
19      Q.  Did he attempt to kiss you
20  anywhere else?
21      A.  On my forehead.
22      Q.  Okay. Did he touch your vagina in
23  any way other than with his finger and with

Page 185

1  his penis?
2      A.  No.
3      Q.  And you said that he kissed you on
4  your forehead and hugged you after it was
5  over. To your knowledge, did Mr. Diop
6  ejaculate during this encounter?
7      A.  I thought he did because he rolled
8  over and sighed. I don't know.
9      Q.  Is that the only thing that made
10  you think that he ejaculated?
11      A.  Yes.
12      Q.  Okay. To your knowledge, did he
13  use a condom during this encounter?
14      A.  I don't know.
15      Q.  Did you see a condom?
16      A.  No.
17      Q.  Do you know at what point -- Did
18  you ever see a point where Mr. Diop appeared
19  to be unfastening his pants?
20      A.  No.
21      Q.  You say when it was over, you
22  rolled over and you put your pants back on?
23      A.  Yes. Very fast. I just jumped up

47 (Pages 182 to 185)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 186

1   and put on my pants and --
2       Q.   Where was -- I'm sorry.  I didn't
3   mean to interrupt you.
4       A.   I just put on my pants.
5       Q.   Where was the shirt that you had
6   tied around your waist at this point?
7       A.   I don't know.  I thought it was
8   around my waist.
9       Q.   Okay.  But you don't recall having
10  to pick that up?
11      A.   No.
12      Q.   Okay.  Ms. Johnson, let's take a
13  few minutes at this point.
14           (Whereupon, a short recess was
15  taken.)
16      Q.   Ms. Johnson, after you got your
17  clothes back on, Mr. Diop got up to let you
18  out of the door?
19      A.   Yes.
20      Q.   Okay.  How did he unlock the door?
21      A.   I don't know.  I didn't even pay
22  attention.
23      Q.   Did you see him get a key?

Page 187

1       A.   No.
2       Q.   Did you see him use a key to
3   unlock the door?
4       A.   I don't know.
5       Q.   Were you at the door with him when
6   he was opening the door?
7       A.   Yes.
8       Q.   While you were in the house, did
9   your cell phone ring?
10      A.   No.
11      Q.   Did you take it with you when you
12  left?
13      A.   When I left his house?
14      Q.   Yes.
15      A.   Yes.
16      Q.   Okay.  Where was it while you were
17  in the house?
18      A.   It was in my pocket or clamped on.
19      Q.   It was clamped on your pants?
20      A.   Yes.  I had a phone clip.
21      Q.   And it stayed on your phone -- the
22  clip stayed on your pants the whole time
23  this was going on?

Page 188

1       A.   Yes.
2       Q.   Was it on ring or vibrate?
3       A.   I don't know.  I didn't hear any
4   rings.
5       Q.   Okay.  Ms. Johnson, I'm going to
6   take you back to the contract you tried to
7   get with Alabama State if that's okay with
8   you.
9       A.   Okay.
10      Q.   Okay.  You were aware that the
11  contract that you attempted to have approved
12  was only going to last until September 30th,
13  2005; right?
14      A.   The contract?
15      Q.   You realize that you were --
16      A.   Sorry.  Say it again.
17      Q.   Okay.  Did you -- You did realize
18  that you were only going to be employed up
19  until September 30th, 2005; right?
20      A.   Working as the data entry?
21      Q.   Right.  And that that would only
22  last until September 30th, 2005?
23      A.   I don't know when it was going to

Page 189

1   last.
2       Q.   Did you have anything to indicate
3   it would have been beyond September 30th,
4   2005?
5       A.   No.  Just my contract.
6       Q.   Right.  And I'm trying to
7   establish the end date of that contract.
8       A.   I don't know the end date.
9       Q.   Okay.  You did know that you were
10  only going to be allowed to work twenty
11  hours per week; right?
12      A.   Yes.
13      Q.   That was the maximum number of
14  hours you could be paid for; correct?
15      A.   Yes.
16      Q.   Okay.  You were aware that you
17  were not entitled to any benefits; correct?
18      A.   What do you mean like benefits?
19  Like what?
20      Q.   Did you think you were going to
21  get insurance through Alabama State?
22      A.   Okay.  Yes, I was aware I wasn't.
23      Q.   You were aware that you were not;

48  (Pages 186 to 189)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 190

1   correct?
2      A.  Yes.
3      Q.  And you didn't expect to get any
4   type of 401-K participation?
5      A.  No.
6      Q.  Okay.  And you knew that you
7   couldn't receive any overtime pay; correct?
8      A.  I didn't know that.
9      Q.  You didn't realize that as a
10  twenty hour employee you would not receive
11  overtime?
12     A.  No.
13     Q.  Okay.  What terms did you believe
14  that you would receive overtime?
15     A.  I mean, I don't know.
16     Q.  Are you aware of any overtime
17  policy at the University that would have
18  allowed you to earn overtime as a twenty
19  hour per week employee?
20     A.  I don't know.  I haven't seen a
21  document.
22     Q.  You haven't seen any policy that
23  says that?

Page 191

1      A.  I don't know.
2      Q.  Okay.  Would you agree that if
3   there is no policy that allows twenty hour
4   per week employees to receive overtime, then
5   you would have been ineligible for overtime?
6      A.  If there wasn't?
7      Q.  If Alabama State University's
8   policy is that it does not pay overtime for
9   twenty hour per week employees, do you agree
10  that you would not have received overtime?
11     A.  Yes.
12     Q.  Okay.  And do you agree that even
13  if your contract had been approved, your
14  last day of employment would have been
15  whatever the contract end date was?
16     A.  No.
17     Q.  No, you believe you could have
18  continued to work after your contract
19  expired?
20     A.  I would have got it renewed.
21     Q.  And on what basis would you have
22  gotten that contract renewed?
23     A.  You're asking me why would -- What

Page 192

1   are you asking me?
2      Q.  I'm asking you what obligated
3   Alabama State University to extend you a
4   renewed contract of employment?
5      A.  Because I was a hard worker and I
6   had a very high GPA and I was never late
7   coming in to work and I was a good student.
8      Q.  But is there some reason that
9   Alabama State University would have been
10  required to give you another contract?
11     A.  I don't know about them.
12     Q.  Okay.  And I understand that you
13  may have asked for your contract to be
14  renewed.  That's what you're telling me;
15  right?
16     A.  Yes.
17     Q.  Right.  But are you saying now
18  that Alabama State University would have had
19  to continue to employ you after your
20  contract was over?
21     A.  I'm saying they had no reason to
22  not.
23     Q.  Okay.  Despite whether they had a

Page 193

1   reason not to renew the contract, is there
2   some reason why they would not have been
3   free to decide not to renew the contract?
4      A.  Look.  They fired me when I
5   reported the rape.  That's the only
6   reason why I was terminated, is because I
7   reported the rape.
8      Q.  Okay.  What I'm asking you now is,
9   if you had not been fired, okay, if you had
10  not been fired in February and you worked
11  all the way to September the 30th of 2005,
12  which is the end date of the contract that
13  you contend that you were extended, what
14  obligated Alabama State University to allow
15  you to come back to work for them on October
16  the 1st?
17     A.  I can't say.  I mean, that's up to
18  them.  I can't say.
19     Q.  Right.  You agree that that's
20  Alabama State University's decision?
21     A.  Uh-huh.
22     Q.  Is that a yes?
23     A.  Yes.

49  (Pages 190 to 193)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 194

1    Q.   And you agree that they don't have
2  to decide in your favor on October the 1st;
3  correct?
4    A.   I agree they didn't have any
5  reason not to.
6    Q.   But do you agree that they would
7  have been required to do it or are you
8  saying they would not have been required to
9  do it?
10   A.   I don't know.  That's up to
11 Alabama State.
12   Q.   Right.  So you agree it's their
13 decision to make?
14   A.   Yes.
15   Q.   Okay.  Do you contend that you
16 have lost any wages other than the five
17 thousand eight hundred and eighty-nine
18 dollars and sixty cents maximum you would
19 have earned if your contract had been
20 approved for January 24th, 2005 through
21 September 30th, 2005?
22   A.   I don't know about the amount.
23   Q.   Do you contend you lost any wages

Page 195

1  other than the job you would have gotten as
2  a data entry clerk in inventory control?
3    A.   Yes.  I lost wages.  I mean, they
4  fired me.
5    Q.   Okay.  What other wages did you
6  lose?
7    A.   I would have still been working
8  there.
9    Q.   Okay.  Do you have any reason to
10 believe that the amount you would have
11 earned is more than the five thousand eight
12 hundred and eighty-nine dollars and sixty
13 cents that I just quoted to you?
14   A.   Yes.  Because I still -- I would
15 have been working there.
16   Q.   You would have been working there
17 from what date?
18   A.   I would have renewed my contract.
19 They fired me.
20   Q.   Okay.  But you agree that at the
21 end of your contract, you could have been
22 fired anyway; correct?
23   A.   No.  I was a good student and a

Page 196

1  good employee.
2    Q.   But you had a contract that had a
3  definite end date; correct?
4    A.   I don't recall the end date.  But
5  --
6    Q.   But you knew it had a date that it
7  was going to end?
8    A.   Yes.  And I had to renew it.
9    Q.   And we just discussed that Alabama
10 State didn't have to agree to renew it;
11 right?  So I'm asking you to tell me what
12 amount of money you would have lost or what
13 amount of money you think you lost because
14 you were fired?
15   A.   And at this time, I do not know
16 that amount.  I don't know the exact amount.
17   Q.   Okay.  What would I have to base
18 those calculations on?
19   A.   I would have been able to continue
20 to renew my contracts.  And like I said, I
21 was a good employee, a hard worker, good
22 student.  And they fired me because I
23 reported that I was raped.

Page 197

1         MR. MADISON:  I think it's fair to
2  say that her testimony basically is that she
3  assumes she would have continued working
4  there and would have been employed and that
5  you assume that she wasn't automatically
6  continued in her contract.
7         MS. MEADOWS:  Well, Don, when I
8  get ready for you to testify, I'll notice
9  your deposition.
10        MR. MADISON:  Well, I'm tired of
11 hearing you ask the same questions over and
12 over.
13        MS. MEADOWS:  Like I said, when I
14 get ready for you to testify, I'll ask you.
15        MR. MADISON:  I'm not testifying.
16 I'm speaking to the fact that you're being
17 repetitive in your questioning.  And you're
18 asking questions which all involve
19 speculative answers.
20   Q.   Do you contend that you have
21 sustained any physical injuries that Alabama
22 State University is responsible for?
23   A.   Yes.  I was raped.  I was raped by

50 (Pages 194 to 197)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 198

1    an employee of them.
2       Q.   And you contend that Alabama State
3    -- How did Alabama State University cause
4    your physical injuries?
5       A.   He was an employee of Alabama
6    State and so was I.  And I was physically
7    harmed -- I'm covered under the harassment
8    clause.  He raped me and I reported it and
9    they fired me.
10      Q.   Okay.  Have you received treatment
11   for your -- What injury did you receive?
12   And when I say injury now, I mean a physical
13   condition that you're still being treated
14   for.
15      A.   That I'm still being treated for?
16      Q.   Yes.  Have you received any
17   treatment for any injury since January the
18   31st?
19      A.   In regards to the rape?
20      Q.   Yes.
21      A.   And you said just physical damage.
22      Q.   Right now we're talking about
23   physical injuries.

Page 199

1       A.   Okay.  There was trauma to my
2    vagina.
3       Q.   What doctor did you see for that?
4       A.   The hospital.  And I went to my
5    doctor.
6       Q.   Who is your doctor?
7       A.   Dr. Tutt.
8       Q.   What's Dr. Tutt's first name?
9       A.   Felicia.
10      Q.   Where is her office located?
11      A.   She's in Baptist East.
12      Q.   What type of physician is Dr.
13   Tutt?
14      A.   She's my physician.
15      Q.   I mean, does she have a specialty
16   or is she just a general practitioner?
17      A.   She's a general practitioner.
18      Q.   Okay.  How often have you seen her
19   since January 31st of 2005?
20      A.   Routine checkups.
21      Q.   About how often is that?
22      A.   About twice a year.
23      Q.   What injuries resulting from the

Page 200

1    rape did Dr. Tutt treat you for?
2       A.   Just physical injuries?
3       Q.   Right.
4       A.   Well, I had some trauma to my
5    vagina.  So she gave me -- she gave me -- I
6    think it was a prescription for -- it was
7    like a yeast infection medicine.
8       Q.   You had a yeast infection?
9       A.   It was like because of the
10   bleeding that happened down there, it was
11   like it was torn.  And so it just -- it
12   caused an infection, a minor yeast
13   infection.
14      Q.   When were you diagnosed with the
15   infection?
16      A.   I don't remember the specific
17   date.
18      Q.   Can you tell me what month it was?
19      A.   Uh-huh.  It was in -- it was --
20   Let's see.  I went to her -- it was in
21   February.
22      Q.   What type of treatment did she
23   give you for the infection?

Page 201

1       A.   She wrote me a prescription for --
2    I forgot what it's called, but it's medicine
3    for that.
4       Q.   Did you take that medication she
5    prescribed?
6       A.   I did.
7       Q.   Did it clear up the infection?
8       A.   It did.
9       Q.   Okay.  Anything else that she
10   treated you for following the rape?
11      A.   Yes.  Because I couldn't sleep and
12   because I was depressed, she had prescribed
13   an antidepressant and a sleeping pill.
14      Q.   What antidepressant did she
15   prescribe?
16      A.   It was Lexipro.
17      Q.   What sleeping pill?
18      A.   It was Ambian.
19      Q.   Okay.  When did she prescribe the
20   Lexipro?
21      A.   I don't remember the specific day.
22      Q.   Get me as close as you can.
23      A.   It was in February.

51 (Pages 198 to 201)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 202

1    Q.  Okay.  Are you still taking the
2  Lexipro?
3    A.  No.
4    Q.  How long did you take it?
5    A.  Let me see.  It was about a month.
6    Q.  When did she prescribe the Ambian?
7    A.  The same time she did the
8  Lexipro.  In February.
9    Q.  How long did you take the Ambian?
10   A.  The same amount of time as the
11  Lexipro.  Just about a month.
12   Q.  Did Dr. Tutt prescribe you any
13  other medications for treatment of anything
14  you associate with the rape?
15   A.  No.  That's it.
16   Q.  Okay.  And you're not still on any
17  medication that you were on as a result of
18  the rape?
19   A.  No.
20   Q.  Did you see any physician other
21  than Dr. Tutt for treatment of any injuries
22  related to the rape?
23   A.  No.  Just her.

Page 203

1    Q.  Did you receive treatment at any
2  hospital other than Baptist Hospital for
3  these injuries?
4    A.  No.
5    Q.  And you said Baptist.  I'm not
6  sure I clarified.  Which Baptist did you go
7  to that night?
8    A.  It was South.
9    Q.  Okay.  Did you return to Baptist
10  South after that evening?
11   A.  No.
12   Q.  Is that the only occasion you had
13  to be treated at Baptist South?
14   A.  The only occasion?
15   Q.  Is that the only time you've been
16  treated for anything at Baptist South?
17   A.  Related to this case?
18   Q.  First related to this case.  Yes,
19  related to the case.
20   A.  Just related to the case?
21   Q.  Yes.
22   A.  Yes, that was it.
23   Q.  Okay.  Have you been treated at

Page 204

1  Baptist South for any other reason?
2    A.  Related to the case?
3    Q.  No.  Any other reason at all?
4    A.  Just outside reasons?
5    Q.  Yes.
6    A.  Yes.
7    Q.  When was that?
8    A.  I don't remember.
9    Q.  Was it before this incident or
10  after?
11   A.  Are you asking for before and
12  after?
13   Q.  I'm asking you was the treatment
14  you received at Baptist South before this
15  incident or after?
16   A.  I mean, I don't know.
17   Q.  Okay.  Have you been treated at
18  any other hospitals for any reason?
19   A.  I think it was Baptist East.
20   Q.  Okay.  Do you remember when that
21  was?
22   A.  No, I don't remember when.
23   Q.  Do you remember what it was for?

Page 205

1    A.  Like when I get colds and stuff.
2    Q.  Other than Dr. Tutt, have you been
3  treated by any other physician other than
4  associated with the rape within let's say
5  the last five years?
6    A.  You said associated with the
7  rape?
8    Q.  For anything.  Even if it's not
9  associated with the rape, have you been
10  treated by another physician in the last
11  five years?
12   A.  I think she's just it.  That's my
13  doctor.
14   Q.  About how long have you been going
15  to Dr. Tutt?
16   A.  Since I think high school.
17   Q.  Do you have a gynecologist that
18  you regularly see?
19   A.  She does my -- Dr. Tutt.
20   Q.  Okay.  Dr. Tutt does your
21  gynecological examinations as well?
22   A.  Yes.
23   Q.  So you haven't seen any other

52  (Pages 202 to 205)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 206

1    gynecologist?
2        A.  I used to go to one.
3        Q.  Who did you used to go to?
4        A.  I can't remember the name.  It was
5    a while back.
6        Q.  Was it while you were in high
7    school?
8        A.  I don't remember when.  I don't
9    remember when.
10       Q.  What did you see him for?
11       A.  Just pap smears, just regular pap
12   smears.
13       Q.  This is just for a routine annual
14   examination?
15       A.  Uh-huh.
16       Q.  Is that a yes?
17       A.  Yes.
18       Q.  Was this before or after you
19   started seeing Dr. Tutt?
20       A.  I think this was -- I was still
21   seeing Dr. Tutt.  I just wanted to try
22   somebody new.
23       Q.  Okay.  Do you remember where his

Page 207

1    office was located maybe?
2        A.  He's in Baptist South.
3        Q.  Okay.  Have you been treated by
4    any physician for any emotional distress
5    related to this rape?
6        A.  Just Dr. Tutt.
7        Q.  Okay.  Did Dr. Tutt ever provide
8    you with a specific diagnosis?
9        A.  What do you mean?
10       Q.  Concerning your emotional
11   distress?
12       A.  Just told me I was depressed.
13       Q.  So she diagnosed you with
14   depression?
15       A.  She told me I did have
16   depression.  She prescribed Lexipro.
17       Q.  Okay.  And did you consult with
18   Dr. Tutt before you stopped taking the
19   Lexipro?
20       A.  I did always consult with her.
21       Q.  Okay.  And she advised you that it
22   was okay for you to stop taking that
23   medication?

Page 208

1        A.  Uh-huh.
2        Q.  Is that a yes?
3        A.  Yes.
4        Q.  Okay.  And she advised you that it
5    was okay for you to stop taking the Ambian?
6        A.  She did.
7        Q.  Since you stopped take the Ambian,
8    have you been able to sleep?
9        A.  I have.  Every now and then I'll
10   have nightmares.  But I have.
11       Q.  But overall, you have not had any
12   lack of sleep problems that have led you to
13   go back to Dr. Tutt for Ambian?
14       A.  No.
15       Q.  And you have not been prescribed
16   any other sleep medication?
17       A.  No.
18       Q.  Did Dr. Tutt advise to you take
19   any over-the-counter medication?
20       A.  No.
21       Q.  Nothing for sleep?
22       A.  No.
23       Q.  And nothing for depression?

Page 209

1        A.  No.
2        Q.  Okay.  And you've never been
3    treated for any mental disorder?
4        A.  No.
5        Q.  Never been told that you have any
6    mental disorder?
7        A.  No.
8        Q.  Have you ever been -- You've never
9    been treated for any emotional disorder?
10       A.  No.
11       Q.  You have never been told that you
12   have an emotional disorder?
13       A.  What is emotional?
14       Q.  It's another mental health
15   diagnosis.
16       A.  Is it depression?
17           MR. ARNOLD:  Could you define the
18   difference for me.
19       Q.  Yes, it can be.
20       A.  Oh, okay.
21       Q.  It can be -- what do they call it
22   -- disassociative mood disorder.  It can be
23   any paranoid schizophrenia.  It can be any

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 210

1  number of psychosis.
2      MR. ARNOLD: I thought they were
3  all the same.
4      A.  So you said depression?
5      Q.  Right.
6      A.  Well, just earlier when she
7  prescribed Lexipro.
8      Q.  Okay.  So for that time period
9  immediately following the January --
10  immediately -- January 31st, sometime in
11  February is when you saw Dr. Tutt; correct?
12      A.  Yes.
13      Q.  That's when she told you that you
14  were exhibiting signs of depression?
15      A.  Yes.
16      Q.  Okay.  Other than that treatment
17  by Dr. Tutt for -- I think you said you took
18  medication for approximately a month;
19  correct?
20      A.  Yes.
21      Q.  Other than that treatment, has any
22  other physician or has Dr. Tutt told you
23  that you are now suffering from continued

Page 211

1  depression?
2      A.  No.
3      Q.  Have you sought treatment for
4  depression since that time?
5      A.  No.
6      Q.  Okay.  I just have one or two
7  things I want to clarify with you and we'll
8  be about done.
9      A.  Okay.
10      Q.  You are now attending AUM you told
11  me earlier?
12      A.  Yes.
13      Q.  What is your classification at
14  AUM?
15      A.  I'm a junior.
16      Q.  Are you working at AUM?
17      A.  No.
18      Q.  And you testified earlier that you
19  did not remember calling Mr. Diop; is that
20  correct?
21      A.  I'm sorry.  As the interview went
22  on, I'm just starting to remembering stuff.
23  Sorry.  We did like on that day because I

Page 212

1  remember when I was driving on that day
2  because the phone -- we stay in the country
3  and the phones kept getting disconnected or
4  cutting off.
5      I think about maybe four times
6  that happened.  So I had to call him back,
7  it cut off.  He had to call me back, it cut
8  off.  It kept hanging up.
9      Q.  Okay.  I'm going to briefly show
10  you this.  Those are what your counsel has
11  produced to me as the records from your cell
12  phone.  Does that call dropping and you
13  calling him back, does that account for the
14  phone calls that you appear to have made to
15  Mr. Diop?
16      A.  Okay.  Yes.
17      Q.  Okay.  And I do want to mark this
18  one as 12.
19      (Whereupon, Defendant's Exhibit
20  No. 12 was marked for identification and
21  attached to the original transcript.)
22      MR. MADISON: Did you mark that
23  last one as an exhibit?

Page 213

1      MS. MEADOWS: Oh, you know what.
2  I think they are all part of the same
3  thing.  So just mark the whole thing as 12.
4  So yes.
5      MR. ARNOLD: I thought we had
6  something before.
7      Q.  I want you to turn to the page
8  that's numbered thirty-three.
9      A.  Okay.
10      Q.  There's a block of calls that's
11  circled from about 7:18 p.m. to 7:50 p.m. on
12  January the 5th.  You see that?
13      A.  Uh-huh.
14      Q.  And there's a handwritten note on
15  the side that says mama called, dinner.  Do
16  you know what that refers to?
17      A.  Yes.  Dinner.  That's when we went
18  out to dinner.
19      Q.  So the dinner was on January the
20  5th?
21      A.  Wait.  Are you talking about this
22  block of calls here?  Is it the 11th?
23      Q.  I see January the 5th.

54  (Pages 210 to 213)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 214

1       MR. ARNOLD: That's the call
2   number on the log. That's the date, the
3   time, that's the city, that's the number.
4       THE WITNESS: Okay.
5       MR. ARNOLD: You see the 01-05?
6       THE WITNESS: Uh-huh. Okay.
7   Q.   So the dinner was on January the
8   5th?
9   A.   Yes.
10  Q.   Okay. So it's fair to say that
11  the dinner was prior to you starting to work
12  for Mr. Moore; correct?
13  A.   It was. I'm sorry about that.
14  Q.   No problem. Did you have any
15  conversations with Mr. Diop after the
16  dinner?
17  A.   Let's see. I remember -- I think
18  I did.
19  Q.   Do you remember what you talked
20  about?
21  A.   I told him thank you for the
22  dinner. And that was it.
23  Q.   Okay. How many times after the

Page 215

1   dinner did you talk to him?
2   A.   Including the day of the rape or
3   --
4   Q.   Exclude the day of the rape.
5   A.   Oh, okay. I think maybe three
6   times.
7   Q.   You only talked with him three
8   times?
9   A.   Three, four times. Three or
10  four. I don't remember how many times. But
11  three, four.
12  Q.   What did you talk about during
13  those times when you spoke with him?
14  A.   Nothing really. I mean, short
15  phone calls. Usually he would call to tell
16  me about his day and I'd get off the phone.
17  They would be really short. Like a minute.
18  Q.   Okay. So when he called you on
19  the day of the rape and talked to you about
20  his day, it wasn't really a call out of the
21  blue?
22  A.   What do you mean for that day?
23  Q.   I mean, it was not completely

Page 216

1   abnormal for him to call you to talk to you
2   about his day?
3   A.   Yes, you could say it wasn't
4   abnormal. But, I mean, it was unexpected
5   because I don't --
6   Q.   Okay. Let's look below the block
7   of calls that's circled on page
8   thirty-three. Do you see call number two
9   thirty-seven.
10  A.   Yes.
11  Q.   And that's a call on January the
12  6th?
13  A.   Uh-huh.
14  Q.   Okay. And that call -- that means
15  it's the day after the dinner; correct?
16  A.   Yes.
17  Q.   Okay. And there's a call from Mr.
18  Diop that lasts approximately thirteen
19  minutes on your bill; correct?
20  A.   Uh-huh.
21  Q.   What did you talk about during
22  that conversation?
23  A.   Well, basically he was telling me

Page 217

1   how -- like what -- he respect what my dad
2   said about, you know, not dating. And I
3   told him my dad is right, he's too old for
4   me.
5       And he apologized or something for
6   just saying that out of the blue. And
7   that's really all I recall. It was like he
8   was apologizing for saying that.
9   Q.   Okay.
10  A.   He just respected what my dad
11  said.
12  Q.   Okay. Then it appears that you
13  called him back sometime after that;
14  correct? I'm just looking at the next
15  call.
16  A.   The check?
17  Q.   Yes.
18  A.   Which one?
19  Q.   The one right after the thirteen
20  minute call on number two thirty-eight.
21  It's to the same number. But that one is
22  one that you made.
23  A.   Uh-huh.

55  (Pages 214 to 217)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 218

1  Q.  Correct?
2  A.  Yes.
3  Q.  Okay.  Because it doesn't say it's
4  an incoming call; right?
5  A.  Uh-huh.
6  Q.  It says Montgomery Alabama to that
7  cell phone -- that telephone number?
8  A.  Okay.
9  Q.  And you called Mr. Diop.  Why did
10  you call Mr. Diop?
11  A.  Well, it was just two minutes
12  long.  So I don't know.  I don't know if
13  it's maybe the phone cut off or -- I don't
14  know.
15  Q.  And then he called you back?
16  A.  Yes.  That could be -- I don't
17  know.  Because usually when you leave a
18  voice mail, those minutes count.
19  Q.  Okay.
20  A.  I don't know.
21  Q.  It's possible because -- okay.
22  The first call that we just talked about,
23  that was at 1:42 a.m.; correct?

Page 219

1  A.  Okay.  Uh-huh.
2  Q.  Is that what -- You said you
3  remember it being almost two o'clock in the
4  morning?
5  A.  Uh-huh.
6  Q.  Okay.  And then at 2:11 a.m., you
7  called him back?
8  A.  Okay.
9  Q.  And then at 2:45, he called you
10  back?
11  A.  Okay.
12  Q.  Or at least tried to; right?
13  A.  Okay.
14  Q.  Okay.  So you remember talking to
15  Mr. Diop in the early morning hours of
16  January 6th?
17  A.  Yes.  I remember him calling me
18  and apologizing.
19  Q.  Okay.  Do you remember talking to
20  Mr. Diop later that evening?
21  A.  You want the check?  Which one?
22  Q.  On page thirty-four, call number
23  two fifty-nine came in at 7:10 p.m. on

Page 220

1  January the 6th.  And it's a four minute
2  phone call.  Do you recall talking to him
3  that evening?
4  A.  Yes, I could have.  But I don't
5  remember what it was about, though.
6  Q.  Okay.
7  A.  It was four minutes.
8  Q.  Right.  And do you remember him
9  calling you back at 9:38 that evening?
10  A.  I don't remember that.  But, you
11  know, it's here.
12  Q.  Yes.  Well, do you remember
13  calling him at 11:56 p.m. that evening?  Do
14  you recall calling him then?
15  A.  I don't recall what it was about.
16  It was three minutes.
17  Q.  It was three minutes.  And I want
18  you to look at call number -- Did we talk
19  about two seventy-five at 12:37 a.m. on
20  January 7?  He called you and you talked for
21  thirteen minutes.  Do you remember what you
22  talked about in that conversation?
23  A.  Huh-uh.

Page 221

1  Q.  Is that a no?
2  A.  Oh, no.  Sorry.  No.
3  Q.  Okay.  But that is a call coming
4  to you from him; correct?
5  A.  Uh-huh.
6  Q.  Is that a yes?
7  A.  Yes.
8  Q.  Okay.  I want you to look now at
9  call number three thirty-eight on January
10  the 8th.
11  A.  Okay.
12  Q.  At 6:39 p.m., there's a call that
13  you made to Mr. Diop's number.
14  A.  The one for four minutes?
15  Q.  For four minutes.  Do you know
16  what you called him about?
17  A.  No, I don't.
18  Q.  Okay.  But you did have a
19  conversation with him on that day; correct?
20  A.  I called him.
21  Q.  Okay.
22  A.  I don't know what it was about,
23  though.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 222

1    Q.  Okay.  But you talked to him?  You
2  did talk to Mr. Diop?  Is that a yes?
3    A.  I mean -- But, you know -- yes, I
4  guess so.  Yes, four minutes.
5    Q.  Okay.  Flip over to page
6  thirty-five for me.  At call number four
7  eighteen on January the 11th at 3:58 p.m.,
8  you placed another call to Mr. Diop's
9  number; correct?
10    A.  Where?
11    Q.  Call number four eighteen.
12    A.  Two minutes?
13    Q.  Yes.
14    A.  Okay.
15    Q.  And then right after that, Mr.
16  Diop calls you and you talk for three
17  minutes; correct?
18    A.  Yes.
19    Q.  And then on the 11th, call number
20  four twenty-two at 7:28 p.m., Mr. Diop calls
21  you again?
22    A.  Uh-huh.
23    Q.  Correct?

Page 223

1    A.  For two minutes.
2    Q.  And you talk for two minutes;
3  right?
4    A.  Okay.  Yes.
5    Q.  Okay.  And call number four
6  twenty-eight on the 11th at 8:18 p.m., you
7  call Mr. Diop; correct?
8    A.  Yes.
9    Q.  And you talk to him for about five
10  minutes?
11    A.  Uh-huh.
12    Q.  What were you talking with Mr.
13  Diop about on January the 11th?
14    A.  I don't know.
15    Q.  But you were conversing back and
16  forth with him; correct?
17    A.  Yes.
18    Q.  On January the 14th, call number
19  four eighty-one, at 12:05 a.m., you placed a
20  call to Mr. Diop; correct?
21    A.  Uh-huh.
22    Q.  How long did you talk that time,
23  Ms. Johnson?

Page 224

1    A.  That one, forty-two minutes.
2    Q.  What were you talking about for
3  forty-two minutes?
4    A.  I'm trying to think is that the
5  one where I was actually trying to tell him
6  that he should stop calling me and blah,
7  blah, blah.  I can't remember which calls
8  are which.
9      But I do remember that I was
10  trying to tell him that he needed to stop
11  calling me.  He was just talking about a
12  whole bunch of stuff.  I just told him that
13  he just needed to stop.
14    Q.  What was he talking about?
15    A.  I can't really remember.  How he
16  just wanted to -- I don't know.  Just wanted
17  to be my friend and blah, blah, blah and
18  that.  Excuse me.  Sorry for saying blah,
19  blah, blah.
20    Q.  I'm trying to find out what the
21  blah, blah, blah is.
22    A.  Yes.  That just means that I don't
23  know what he was saying.  I don't know

Page 225

1  everything that he was saying.
2    Q.  Okay.
3    A.  Sorry about that.
4    Q.  Okay.  I want you to skip down to
5  call number four eighty-three.  Okay.  This
6  time it's 12:56 a.m. and Mr. Diop calls you;
7  correct?
8    A.  Uh-huh.
9    Q.  And this time how long do you talk
10  to him?
11    A.  Thirty-six minutes.
12    Q.  Thirty-six minutes?
13    A.  Uh-huh.
14    Q.  Okay.  What did you talk about for
15  thirty-six minutes?
16    A.  I do not know.  I do not remember.
17    Q.  And now these are conversations
18  all after your father has told him that he
19  doesn't want Mr. Diop dating you; correct?
20    A.  Yes.
21    Q.  Okay.  Did you take any of these
22  conversations that the two of you had back
23  and forth for being romantically inclined

57 (Pages 222 to 225)

FREEDOM COURT REPORTING

Page 226

1  behavior?
2      A.  No.  Not really.
3      Q.  No?  You did not think that he was
4  expressing an interest in you by calling
5  you?
6      A.  I mean, what I'm saying is, I
7  didn't have interest in him and I -- you
8  know, I didn't think he had a romantic
9  interest in me.
10     Q.  Okay.  And you didn't take this
11 calling back and forth to be in defiance of
12 your father's directions on January the 5th?
13         MR. ARNOLD:  Object to form.
14     A.  I don't know what my dad would
15 think.
16     Q.  Did you ask your dad?
17     A.  My dad voiced his opinion at the
18 restaurant.
19     Q.  Right.  Did you ask him -- Did you
20 tell your dad about these conversations you
21 were having with Diop after the restaurant?
22     A.  No.
23     Q.  Okay.  But suffice it to say, Ms.

Page 227

1  Johnson, you continued to have a number of
2  conversations with Mr. Diop in between
3  January the 6th, which is the day after your
4  dad told him he couldn't date you, all the
5  way up to January the 31st; correct?
6      A.  Yes.
7      Q.  Okay.  And would you agree that
8  these are your phone records from your cell
9  phone bill?
10     A.  Yes.
11     Q.  Okay.  So if these records show
12 that you talked to Diop in addition to the
13 days we already talked about, you also
14 talked to him on January 22nd?
15         You would say that you did talk to
16 him that day; correct?  And actually I'm
17 looking at January 21st, call number six
18 eighty-seven and six eighty-eight.
19     A.  Yes.  He called.
20     Q.  Okay.  And January 22nd, call
21 number six ninety-six?
22     A.  Okay.  Six ninety-six?
23     Q.  Yes.

Page 228

1      A.  One for two minutes?  Uh-huh.
2      Q.  Okay.  And January 23rd, calls
3  number seven oh seven, seven oh eight, seven
4  twelve, seven fourteen, seven fifteen?
5      A.  Okay.
6      Q.  And you agree that you all are
7  having these discussions back and forth;
8  correct?
9          MR. ARNOLD:  Object to form.
10     A.  I see he's calling -- we're
11 calling.
12     Q.  Are you saying you're not talking
13 to him when he calls?
14     A.  I mean, I don't know what the
15 discussions are about.  Some of them are
16 just one minute long.
17     Q.  Okay.  And some of them are
18 considerably longer than one minute; right?
19         MR. ARNOLD:  Object to form.
20     A.  The majority of them are one and
21 two minutes.  But the other three that you
22 pointed out, they were considerably longer.
23     Q.  Well, let's look at call number

Page 229

1  seven fourteen on January the 24th at 12:58
2  a.m.  Mr. Diop calls you; correct?
3      A.  Yes.
4      Q.  And that call lasts eleven
5  minutes; correct?
6      A.  I see that.
7      Q.  Do you see it now?
8      A.  I see.
9      Q.  Okay.  And right up under that
10 column number seven fifteen, also on January
11 24th, at 1:05 a.m., Mr. Diop calls you
12 again.  And that call lasts fifteen minutes;
13 correct?
14     A.  Uh-huh.
15     Q.  Is that a yes?
16     A.  Oh, yes.
17     Q.  So again, Ms. Johnson, on some
18 occasions when you talked to Mr. Diop, there
19 are times when you do have conversations
20 that last more than one or two minutes?
21         MR. ARNOLD:  Asked and answered.
22         MS. MEADOWS:  She said she didn't
23 know before.

58 (Pages 226 to 229)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 230

1    Q.  Sometimes you talked to him for
2  longer periods of time?
3    A.  Yes.
4    Q.  Okay.
5    MS. MEADOWS:  I believe that's it,
6  Ms. Johnson.
7  EXAMINATION BY MR. MADISON:
8    Q.  That same exhibit, those phone
9  calls continued on through the end of that
10  billing period?
11    MR. ARNOLD:  Are you addressing
12  with us or with her?
13    A.  What?
14    MR. MADISON:  I didn't hear your
15  last question.
16    Q.  Did she ask you about the call on
17  January the 25th?
18    A.  Did she?
19    Q.  Did LaTasha, Ms. Meadows ask you
20  about the phone calls made to Mr. Diop on
21  January the 25th and the 26th?
22    THE WITNESS:  Did you?
23    MS. MEADOWS:  I believe we stopped

Page 231

1  going through them at the 24th of January.
2    Q.  That's what I thought.  But you
3  continued exchanging phone calls with Mr.
4  Diop on through the end of that billing
5  period on this statement, did you not?
6    A.  Oh, you didn't check it?  So I
7  don't look at the checks?
8    MS. MEADOWS:  I didn't check any
9  of these.  They were checked when I got
10  them.
11    Q.  If you will, look at call number
12  seven fifty-seven on January the 25th.
13    MR. ARNOLD:  Are we going to go
14  through each and every call?
15    MR. MADISON:  No.  I'm just trying
16  to get a general answer that the calls
17  continued through the end of the billing
18  statement.  If she'll take a second and look
19  at them.  I'm just now beginning my
20  questioning.
21    A.  January is not on here.  Wait.
22  And you want me to tell you the last day?
23    Q.  If you will.  Well, just tell me

Page 232

1  if you didn't continue making phone -- or
2  exchanging calls with Mr. Diop on -- I think
3  there are only two or three days for the
4  remainder of that bill, the 25th, 26th and
5  possibly the 27th.
6    A.  I see.
7    Q.  They should be check marked.  It
8  should help you.
9    A.  I see.  Here's the 25th.  Yes.  On
10  the 26th.  The 26th.
11    Q.  Okay.  Did Mr. Diop have a
12  different phone number which you called that
13  you can recall offhand?
14    A.  No.  I don't recall.
15    Q.  Okay.  Were you -- Do you
16  recognize a 549 phone number?  I'm sorry.
17  548-0160?
18    A.  No.
19    Q.  You don't know if Mr. Diop had a
20  another phone number which was utilized in
21  phone conversations between you and he?
22    A.  No.  I do not know.
23    Q.  I thought that --

Page 233

1    MR. ARNOLD:  Could you repeat that
2  number for me.
3    MR. MADISON:  548-0160.  And it's
4  a 388 or 386.
5    MS. MEADOWS:  It's a 386 on mine.
6  Do you need a better copy?
7    MR. MADISON:  No.  I just think my
8  eyes are just going.
9    Q.  I think these were produced to us
10  by your attorney or either given to us in
11  discovery.  But let me show Defendant's 1
12  for Diop.
13    MR. ARNOLD:  It's the same as
14  Exhibit 12, Bates labeled P 24 through P
15  30.
16    MR. MADISON:  That's what I
17  thought.  But I think it's a different
18  billing period.
19    MS. MEADOWS:  Mine covers all of
20  them.  I just didn't go over all of them.
21    MR. MADISON:  But, in fact, we've
22  got some numbers that are duplicating
23  themselves for different time periods.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 234

1  February is in the other one?
2      MS. MEADOWS: February is at the
3  beginning. It's the first few pages. I
4  went right to the back. P 25 I believe is
5  where you are.
6      MR. MADISON: Right.
7  Q. If you will -- I apologize.
8      MS. MEADOWS: Do you want to mark
9  that still?
10     MR. MADISON: No, I don't want to
11  mark that one.
12  Q. Page twenty-five of Exhibit 12,
13  Defendant's Exhibit 12, the 386-546-0160
14  numbers, are you aware that those are Mr.
15  Diop's phone numbers?
16  A. No, I didn't know.
17  Q. Okay. Those numbers are checked
18  on your exhibit as well, are they not?
19  A. Yes.
20  Q. And does it reflect both incoming
21  and out going calls from the phone of Linda
22  Johnson on January the 31st?
23  A. Yes. Incoming, uh-huh.

Page 235

1  Q. And the first call I believe is at
2  5:19, an incoming call from that number;
3  correct? And that's number eight-six, the
4  first check mark at the top on the
5  right-hand side.
6  A. Okay. The four minute?
7  Q. Right.
8  A. Okay.
9  Q. And then there's another incoming
10  call below that, number eighty-seven?
11  A. Okay.
12  Q. And then there are several calls
13  from you or from this phone to that same
14  number; isn't that correct?
15  A. The three minute? Uh-huh.
16  Q. As a matter of fact, there are
17  approximately ten calls I believe?
18  A. Oh, that's -- well --
19  Q. Ten calls on January the 31st
20  either to or from?
21  A. The one minutes are -- I think
22  those are the ones where we kept getting
23  disconnected.

Page 236

1  Q. And there's a seven minute?
2  A. Okay.
3  Q. But you also called that number;
4  correct?
5  A. Which -- oh, which one?
6  Q. The 546-0160 number?
7  A. Okay. Uh-huh.
8  Q. The last time shown on there is
9  number ninety-nine. It shows a 7:13 p.m.;
10  is that correct?
11  A. Yes.
12  Q. Where were you when you made that
13  phone call or received that phone call from
14  Mr. Diop?
15  A. Let's see. I think that's when he
16  was giving me directions. I didn't know how
17  to get there.
18  Q. I believe that the reason you had
19  gone out that evening was because you were
20  picking up some medicine for your nephew; is
21  that correct?
22  A. Yes.
23  Q. What Walgreen's did you go to to

Page 237

1  pick up the medicine?
2  A. The one on the Eastern Boulevard.
3  Q. And you say the one on the Eastern
4  Boulevard. What location? There may be
5  more than one Walgreen's on the Eastern
6  Boulevard.
7  A. It's the one right there on the
8  Woodley Road.
9  Q. Woodley Road?
10  A. Uh-huh. Woodley Road.
11  Q. Southern Boulevard; is that right?
12  A. Oh, I'm sorry. Southern
13  Boulevard.
14      MS. MEADOWS: Don, when you get to
15  a good point, I need to take a break.
16      MR. MADISON: Sure. Let's go
17  ahead and take a break.
18      (Whereupon, a short recess was
19  taken.)
20  Q. Did you make the phone call from
21  the Walgreen's parking lot when you called
22  Mr. Diop to obtain those directions?
23  A. I think I was still in line at

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 238

1   Walgreen's about to get the medicine and
2   leave.
3       Q.   So it would have taken you then
4   some time to leave or pay -- for a check out
5   and pay for the medicine, then depart and
6   travel to Mr. Diop's residence; is that
7   correct?
8       A.   Yes.   I was picking up -- picked
9   up the medicine.   And then like maybe a
10  minute to call and got the medicine and was
11  walking towards my car.
12      Q.   How long did it take you to travel
13  from Walgreen's to Mr. Diop's apartment that
14  evening?
15      A.   I'll say about ten minutes.   Not
16  long.
17      Q.   After you left Mr. Diop's
18  apartment, did you go home and return home
19  with the medicine that you had purchased at
20  Walgreen's?
21      A.   No.   I went to the hospital.
22      Q.   Did you call your mother from the
23  telephone that you had with you?

Page 239

1       A.   I think I called her when I got to
2   the hospital.   I think I used my cell phone
3   or the hospital number.   Let's see.   Yes.   I
4   called her with my cell phone.
5       Q.   What time did you call from your
6   cell phone?
7       A.   It says 8:13.
8       Q.   And are you positive you were
9   already at the hospital by that time?
10      A.   I don't know when I got there.
11  But when I had -- When I called her, I think
12  I had hung up and then I had called -- I was
13  debating whether to tell them.   So I had
14  called CC.   And she's the one who had told
15  me to go to the hospital.
16      Q.   So which of the calls appearing --
17  or were the calls made from the telephone
18  numbers shown on Defendant's Exhibit 12 for
19  the 31st, January 31st?
20      A.   Was made on my phone, my cell
21  phone?
22      Q.   On this phone, yes.   Is that your
23  phone?

Page 240

1       A.   It's really my mom's.   But yes,
2   this is the cell phone that I had.
3       Q.   Which number is the one that
4   you're identifying where you called your
5   mother?
6       A.   Let's see.   Right here.   At 8:13,
7   right here.   The one that says a minute.
8   That's where I had hung up.   I was going to
9   tell them, but I didn't.   And so where you
10  see the two minute.
11      Q.   Right.
12      A.   This is my friend CC.   She's the
13  one who told me to go to the hospital.
14      Q.   So you first called home and then
15  you called your friend CC; is that correct?
16      A.   Uh-huh.
17      Q.   And then you called home again as
18  well several times.   Were you unable to get
19  someone?
20      A.   I didn't want to tell them.
21      Q.   Okay.   So at what point that
22  evening did you tell them that you were
23  going to the hospital?

Page 241

1       A.   When I got at the hospital, I told
2   them what happened.   And I think I called
3   from the hospital phone.   I think I called
4   from the hospital phone and I told them that
5   I was raped.
6       Q.   Okay.   Can you tell me on -- Was
7   it from this phone that that call was made
8   or the hospital phone?
9       A.   I believe it was from the hospital
10  phone.
11      Q.   Did anyone with your family
12  contact Mr. Diop that evening that you're
13  aware of?
14      A.   Honestly, I don't know.
15      Q.   If his telephone bill shows that
16  someone contacted him on January the 31st at
17  8:28, then it's your testimony that that
18  wasn't you calling his house from your
19  phone?
20      A.   No.
21      Q.   If you told Mr. Diop to quit
22  calling you as early as the middle part of
23  January, why did y'all continue to have

61  (Pages 238 to 241)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 242

1  conversations together on through the end of
2  the month?
3      A.  I do not know.
4      Q.  Did you report to Mr. Diop's
5  supervisor or to anyone at Alabama State
6  University that you were concerned about Mr.
7  Diop continuing to call you?
8      A.  Continuing to call me?
9      Q.  Right.
10     A.  After -- I mean, like --
11     Q.  Before the incident.
12     A.  No.
13     Q.  You didn't have a problem with him
14  continuing to call you then, did you?
15         MR. ARNOLD:  Object to the form.
16  You can answer.
17         THE WITNESS:  You said I can
18  answer?
19         MR. ARNOLD:  If you understood the
20  question.
21     A.  I didn't have a problem like --
22  Say it again.  I'm sorry.
23     Q.  Let me rephrase it.  There

Page 243

1  appeared to be a mutual thing that y'all
2  were contacting each other, not just him
3  calling you; is that correct?
4      A.  We were calling.
5      Q.  I may have missed this earlier, so
6  I apologize.  I'm going to have to ask you
7  some personal questions and I apologize for
8  that as well.  But I'm just doing my job.
9         The clothes that you were wearing
10  on the night of the incident, you described
11  yourself wearing pants, I believe.
12         What sort of pants were you
13  wearing?  I think you said blue earlier.
14  But what type?
15     A.  They were cotton, blue cotton.
16     Q.  Like sweat pants or --
17     A.  Huh-uh.
18     Q.  Belt loops, belt?
19     A.  Yes, they had belt loops.
20     Q.  Were you wearing a belt that
21  evening?
22     A.  I used -- I just used my shirt.  I
23  tied my shirt around me.

Page 244

1      Q.  Okay.  I believe you testified
2  earlier you were wearing a tee shirt and you
3  said -- Did you have a shirt that you were
4  wearing over the top of the tee shirt or did
5  you take that shirt off and wrap it around
6  your waist?
7      A.  No.  I had a tee shirt, like, you
8  know, with sleeves like this.  Just a tee
9  shirt.  And I wear shirts around me when I
10  wear pants.  I just tie shirts around me.
11     Q.  This was in January during the
12  winter.  Do you recall what the weather was
13  like that evening?
14     A.  I don't remember.
15     Q.  Do you remember whether it was
16  raining or dry or --
17     A.  No, it wasn't raining.
18     Q.  Okay.
19         MR. ARNOLD:  Let him finish his
20  questions.
21     Q.  I believe you had given a
22  statement previously.  It may have been the
23  one given to Alabama State.  If I can find

Page 245

1  it.  Exhibit 7.  I believe you stated that
2  the reason you were calling him on the 31st
3  was because his grandmother was ill or
4  dying; is that correct?
5      A.  Yes.
6      Q.  Do you know for a fact that his
7  grandmother wasn't hospitalized on that
8  occasion?
9      A.  She wasn't?
10     Q.  No.  I'm asking you do you know
11  whether she was or wasn't?
12     A.  No.
13     Q.  Okay.  I'm going to show you on
14  page two of Exhibit 7 the highlighted
15  portion of the statement that you gave.
16         And I believe you stated therein
17  that he did, in fact, ejaculate in you
18  during the time that you alleged that y'all
19  were having intercourse.
20     A.  Okay.
21     Q.  Is that correct?
22     A.  Yes.
23     Q.  Now, at the time that you had the

62  (Pages 242 to 245)

FREEDOM COURT REPORTING

Page 246

1  rape examination performed, were you
2  provided the results of any DNA tests which
3  were performed in conjunction with the rape
4  exam?
5      A.  What?
6      Q.  Did you ever receive any of the
7  analysis of the DNA done with the rape exam?
8      A.  Talking about the end product?
9      Q.  Right.
10     A.  It said it was inconclusive.
11     Q.  Were you aware that no semen was
12  able to have been retrieved from the areas
13  which were examined during the rape kit
14  being performed from the vaginal areas?
15     A.  No, I didn't know.
16     Q.  And I believe you also stated in
17  Exhibit 7 that you did not believe that Mr.
18  Diop was wearing a condom as well; isn't
19  that correct?
20     A.  The highlighted portion?
21     Q.  No.  I'm sorry.  Not the
22  highlighted portion.
23         MR. ARNOLD:  I think she already

Page 247

1  testified to that.
2      Q.  Can you explain I guess -- Well,
3  let me back up.  Did you take any showers or
4  wash off before the rape examination was
5  performed?
6      A.  No.
7      Q.  You went directly to the hospital
8  from Mr. Diop's apartment?
9      A.  Yes.
10     Q.  On the next page you stated that
11  you felt stupid for falling for the lie
12  about his grandmother; isn't that correct?
13     A.  Yes.
14     Q.  And you don't know to this day
15  whether or not his grandmother was actually
16  hospitalized on that occasion?
17     A.  I figured it was a lie because he
18  raped me.  I figured the whole thing was a
19  lie.
20     Q.  Well, if you're saying it was a
21  lie and it's not, then you're the person
22  lying; isn't that correct?
23         MR. ARNOLD:  That's unnecessary.

Page 248

1      A.  He raped me.
2      Q.  I'm asking you, if you made the
3  statement that it was a lie and that his
4  grandmother was not ill and she was ill,
5  then that's not true, is it?
6      A.  What?
7         MS. MEADOWS:  Object to the form.
8         MR. ARNOLD:  Object to the form
9  and also to the point --
10     Q.  You accused Mr. Diop of lying
11  about his grandmother's illness when you
12  didn't know whether or not if, in fact, she
13  was ill or not.
14         MR. ARNOLD:  Is that a question?
15     Q.  Isn't that correct?
16     A.  You're asking -- wait.  You're
17  asking me?
18     Q.  Yes, I am.
19     A.  What?  Say it again.
20     Q.  Okay.  If his grandmother was
21  actually ill, then your statement was not
22  true, that his grandmother was not ill;
23  isn't that right?

Page 249

1      A.  No.  I'm not lying.  He lied to
2  me.  I went over there and he raped me.
3      Q.  You're the one that went to his
4  apartment; correct?
5      A.  Yes.
6      Q.  And you went there and you say
7  that he lied to you about his grandmother
8  being ill as the premise for your going to
9  his apartment is what I understand your
10  testimony is.
11     A.  What do you mean premise?
12     Q.  The reason why you said you went
13  to the apartment was because you said that
14  he lied to you about his grandmother.
15     A.  The reason I went to his apartment
16  is because he told me that his grandmother
17  was dying.
18     Q.  If she was very ill, then that
19  would have been a true statement, would it
20  not?
21     A.  If she what?  Say it again.
22     Q.  I don't know how many different
23  ways I can say it.

63 (Pages 246 to 249)

FREEDOM COURT REPORTING

Page 250

1      MR. ARNOLD: I don't really get
2  what you're trying to accomplish regardless
3  of the answer I think you're looking for.
4      MR. MADISON: She alleged as a
5  pretense for her going to the apartment that
6  Mr. Diop lied to her.
7      Q.  Correct?
8      A.  No. See, Mr. Diop, he told me
9  that his grandmother was dying.
10     Q.  Well, was there anything false
11  about that to your knowledge?
12     A.  When he raped me, I assumed that
13  that was a lie to get me over there and rape
14  me.
15     Q.  But if his grandmother was, in
16  fact, ill, then he wasn't lying to you about
17  his grandmother's health?
18     MR. ARNOLD: Would that excuse the
19  rape? I guess --
20     MR. MADISON: Well, we're not
21  agreeing that there was a rape. That's a
22  disputed fact in this case. Your client has
23  alleged there was a rape and my client

Page 251

1  denies that there was a rape.
2      So we're trying to get at who's
3  telling the truth in this whole thing. Now,
4  I'm not sure that everybody accepts it. We
5  don't accept the fact that your client is
6  telling the truth. Okay.
7      MS. MEADOWS: Okay. Now, I'm
8  confused.
9      MR. ARNOLD: Because we've
10  dismissed both of our claims of prejudice, I
11  don't understand the relevance of it even at
12  this point.
13     MR. MADISON: Well, we still have
14  claims outstanding against Alabama State for
15  wrongful termination, breach of contract.
16     MS. MEADOWS: And what I'm
17  confused about here, Don, is, are you trying
18  to say that she knew when she went to his
19  apartment that his grandmother was, in fact,
20  not sick?
21     MR. MADISON: Right.
22     MS. MEADOWS: You're saying she
23  knew his grandmother was not sick before she

Page 252

1  left to go to the apartment.
2      MR. MADISON: No. She said that
3  he lied about his grandmother being sick.
4  And all I'm saying is does she know for a
5  fact whether or not the grandmother was
6  sick.
7      MS. MEADOWS: Okay. But what I'm
8  trying to find out is, are you saying that
9  she lied about what her reason was for going
10  to the apartment?
11     MR. MADISON: No. She said he
12  lied about her reason for going to the
13  apartment. In other words, she was trying
14  to claim in my reading of her statement that
15  he induced her to come to the apartment by
16  using a lie.
17     MS. MEADOWS: Okay. But I guess
18  what I don't see is how even if, in fact,
19  it's true that his grandmother was sick, I
20  don't see how that changes anything or how
21  that's relevant to anything.
22     MR. MADISON: Well, it was a
23  correct pretense under which she went to the

Page 253

1  apartment in the first place and not a false
2  -- not a falsehood as she said in her
3  statement.
4      MS. MEADOWS: Okay. But I don't
5  see how that makes anything that she says
6  happened after that any more likely or any
7  less likely.
8      MR. MADISON: Well, I think if she
9  gave a statement -- I don't know why we're
10  arguing this on the record. You could have
11  made an objection and she could have
12  answered the question. We could have
13  continued.
14     All I've done is sit here and
15  listened for six hours about her talking
16  about my client raping her. And now I'm
17  asking her questions which I have a right to
18  ask to try to support my client's position.
19     So if she says something that's
20  inaccurate or incorrect, then it would be
21  testimony that we could utilize against
22  her. But I'm not going to argue the merits
23  of why I'm asking questions.

64  (Pages 250 to 253)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 254

1    I'm just going to ask the
2 questions, she can give the answers and
3 y'all can object to the form. So I have a
4 right to ask whatever I want to ask. And I
5 wasn't able to start until about twenty or
6 thirty minutes ago.
7    Q.  Did you ever answer the question
8 about whether you knew his grandmother was
9 sick?
10    A.  Whether I knew or not that his
11 grandmother was sick?
12    Q.  Right.
13       MS. MEADOWS: I object to the form
14 and object to foundation.
15    Q.  You can answer.
16    A.  I don't know.
17    Q.  I believe you testified that
18 during the time that you're stating that Mr.
19 Diop raped you, that he held you down with
20 one hand and pulled your pants down with the
21 other; is that correct?
22    A.  Yes.
23    Q.  And as I'm facing you, would he

Page 255

1 have been holding his right hand on your
2 left hand and pulling your pants with his
3 left hand or how did that occur?
4    A.  He had his left hand on my right
5 hand when I was laying down. And he used --
6 He used his right hand to pull my pants
7 down.
8    Q.  Okay. Was he pulling from the
9 front or from the rear?
10    A.  I don't remember. It could have
11 been the front. My zipper was broken. It
12 could have been the front.
13    Q.  How did the pants attach, by
14 buckle or by button or how?
15    A.  I had a button and zipper.
16    Q.  Was the button broken?
17    A.  The zipper was broken. That's
18 what I do remember. The zipper was broken.
19    Q.  But the button was not broken?
20    A.  I don't remember about the
21 button. But I know my zipper was broken.
22    Q.  I'm going to show you Defendant's
23 Exhibit 2.

Page 256

1       (Whereupon, Defendant's Exhibit
2 Diop No. 2 was marked for identification and
3 attached to the original transcript.)
4    Q.  I highlighted the first paragraph
5 I want to ask you about there. It stated
6 that Mr. Diop harassed you continuously; is
7 that correct, in your EEOC complaint?
8    A.  Yes. This is true.
9    Q.  Okay. Other than the incident on
10 the 31st, what other harassment are you
11 alleging that Mr. Diop engaged in?
12    A.  I said that he harassed me by
13 asking me to date him even though I told him
14 I was not interested.
15    Q.  But you omitted from that
16 statement that y'all just sort of continued
17 to call each other back and forth, didn't
18 you?
19    A.  Yes.
20    Q.  What is the second highlighted
21 portion there?
22    A.  This sentence?
23    Q.  Right.

Page 257

1    A.  I was assigned to the supervision
2 of Stratford Moore supervisor.
3    Q.  Now, did Mr. Diop to your
4 knowledge have anything to do with your
5 hiring at Alabama State?
6    A.  I don't know.
7    Q.  Did he tell you that he was going
8 to get you a job in return for any favors or
9 anything?
10    A.  No.
11    Q.  Okay. Did he indicate in any way
12 that he had the authority to be able to help
13 you obtain a job with Alabama State?
14    A.  No.
15    Q.  How long had your mother worked at
16 Alabama State University?
17    A.  About eleven years.
18    Q.  So if anyone had any contacts at
19 Alabama State University, it probably would
20 have been someone there for a period of time
21 as opposed to Mr. Diop, would it not?
22    A.  I don't know.
23    Q.  Can I have that back, please. Mr.

65 (Pages 254 to 257)

FREEDOM COURT REPORTING

Page 258

1  Diop did not have the right to supervise nor
2  control you in any manner as an employee of
3  his, did he?
4      A.  Say that again.
5      Q.  Mr. Diop did not have the right to
6  supervise or instruct you on how you
7  performed your job at Alabama State
8  University?
9      A.  I don't know.
10     Q.  Well, I mean, you didn't report to
11 Mr. Diop, did you, after you say you started
12 to work there?
13     A.  Stratford Moore, that was my boss.
14     Q.  But not Mr. Diop?
15     A.  Stratford Moore was my immediate
16 boss.
17     Q.  Do you recall receiving any work
18 assignments from Mr. Diop while you were
19 employed before your termination there?
20     A.  You asked me if I worked?
21     Q.  Did you receive any work
22 assignments from Mr. Diop while you worked
23 there up to the point in time of your

Page 259

1  termination?
2      A.  I received work assignments from
3  my boss, Stratford Moore.
4      Q.  So that would be no, you received
5  no assignments, work from Mr.
6  Diop?
7      A.  I received work assignments from
8  Stratford Moore.
9      Q.  Which department was Mr. Stratford
10 Moore working with?
11     A.  We were in the physical plant.
12     Q.  Do you know which aspect of the
13 physical plant or which department within
14 the physical plant Mr. Moore was working?
15     A.  Transportation.
16     Q.  Mr. Diop was not an employee in
17 the Transportation Department, was he?
18     A.  I don't know.
19     Q.  Did you ever go to the physical
20 plant and have any conversations with Mr.
21 Diop before the date of the incident?
22     A.  Say it again.
23     Q.  Shortly before the date of the

Page 260

1  incident, say within five days, did you ever
2  have an occasion to go to the physical plant
3  and meet with Mr. Diop?
4      A.  Oh, no.
5      Q.  Okay.  And it's your testimony
6  that you didn't go into his office or talk
7  to him in an upset manner?
8      A.  No.
9      Q.  You were asked earlier regarding
10 other incidences of sexual harassment.  I
11 believe you named an individual at Best Buy
12 that you said had done something in the
13 nature of a sexual harassment act against
14 you?
15     A.  I didn't name him.  I don't know
16 his name.
17     Q.  Did you quit after that?
18     A.  I resigned.
19     Q.  Was it as a result of that
20 incident?
21     A.  No.
22     Q.  How much longer did you continue
23 to work after that incident there?

Page 261

1      A.  It was about two weeks.
2      Q.  Were there ever any other
3  occasions other than that incident where you
4  led any form of a sexual harassment or any
5  other type of charge against a person other
6  than Mr. Diop?
7      A.  No.
8      Q.  Has any other member of your
9  family ever leveled a sexual harassment
10 charge against any individual?
11         MR. ARNOLD:  Relevance.
12         MR. MADISON:  Is that an objection
13 to form?
14         MR. ARNOLD:  There's nothing
15 relevant to the form of the question.
16         MR. MADISON:  I believe the
17 general objection is supposed to be object
18 to form.
19         MS. MEADOWS:  Well, I object to
20 the foundation.
21         MR. ARNOLD:  No other member of
22 the family is a part of this case.
23         MR. MADISON:  Are you instructing

66 (Pages 258 to 261)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 262

1   her not to answer?
2        MR. ARNOLD: No, I'm not
3   instructing her not to answer.
4        Q.  Go ahead and answer, please.
5        A.  My sister.
6        Q.  Against whom did she file a
7   harassment claim?
8        A.  I don't know.  She's older than
9   me.  I don't know.
10       Q.  Are you aware as to whether she
11  filed a civil suit against the individual?
12       A.  I don't know.
13       Q.  Have you ever had any discussions
14  with your mother about filing civil suits
15  against anyone with respect to sexual
16  harassment claims?
17       A.  What do you mean with anyone?
18       Q.  Against Mr. Diop.
19       A.  That's what I'm doing now.  He
20  raped me.
21       Q.  Did you discuss that with your
22  mother or your sister?
23       MR. ARNOLD: Object to the form.

Page 263

1   Go ahead and answer.
2        A.  Like what we're doing now?
3        Q.  Right.
4        A.  I talked with my mom.
5        Q.  Okay.  Did you speak with your
6   sister regarding her sexual harassment
7   claim?
8        A.  No.
9        Q.  So she never discussed that with
10  you?
11       A.  No.
12       Q.  How were you aware that she had
13  filed one then?
14       A.  She lives in the same house with
15  me.  It's when we were in school.
16       Q.  Did she tell you or did your
17  mother tell you or did you just overhear
18  them talking about it?
19       A.  I can't remember.
20       Q.  When you filled out an application
21  for employment, did I understand during that
22  questioning that you had previously worked
23  for Alabama State?

Page 264

1        A.  Yes.
2        Q.  And that was approximately a year
3   earlier?
4        A.  No.  That was -- let's see.  Yes.
5   That was when I was in the -- like in the
6   fall like when I just graduated from high
7   school.
8        Q.  Would you say that was
9   approximately around the time you were a
10  freshman; is that correct?
11       A.  Uh-huh.
12       Q.  And did you fill out an
13  application for employment with Alabama
14  State University for that job?
15       A.  I did.
16       Q.  Did you receive any additional
17  approvements from Alabama State regarding
18  that position as opposed to the second
19  position that you applied for?
20       MS. MEADOWS: Object to the form.
21       A.  What does that mean?
22       Q.  I think what I understood earlier
23  today was a lot of time was spent on the

Page 265

1   approval of your application.  Did you have
2   to receive any such approval the first time
3   you were employed with Alabama State?
4        MR. ARNOLD: The majority of that
5   questioning I believe her answer was I don't
6   know.
7        MR. MADISON: I'm asking about the
8   first time, if she recalled what happened on
9   that occasion.
10       A.  With the writing lab?
11       Q.  Right.
12       A.  Put in an application.
13       Q.  And then you began work and you
14  were paid; is that correct?
15       A.  Yes.  I worked and -- yes.
16       Q.  Okay.  You reported to work on
17  February the 2nd, 2005.  Did you report to
18  anyone about the incident when you reported
19  on the 31st?
20       A.  You said did I report to somebody
21  on the 31st?
22       Q.  I believe your testimony earlier
23  was that you reported to work on the

67 (Pages 262 to 265)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 266

1  February the 2nd; is that correct?
2  A.  Yes, I did go.
3  Q.  Did you report to anyone on that
4  date about the incident which occurred with
5  Mr. Diop on the 31st?
6  A.  My mom did.
7  Q.  I'm asking you when you went to
8  work that day, did you report to anyone?
9  A.  That's the day he fired me.
10  Q.  Well, when you went to work and
11  you walked in, did you tell anybody that Mr.
12  Diop had raped you on the 31st?
13  A.  No, I didn't.
14  Q.  I believe it was your testimony,
15  too, that at the time that you followed Mr.
16  Diop by his house where he could show you
17  where he lived was a point in time -- or in
18  the month of January which was subsequent or
19  after the time that you told Mr. Diop to
20  quit calling you according to your
21  testimony; is that right?
22        MR. ARNOLD:  Object to the form.
23  A.  Say it again.

Page 267

1  Q.  If I understood your testimony
2  earlier, you testified that it was around
3  mid month when you told Mr. Diop to quit
4  calling you, mid-January of '05; is that
5  correct?
6  A.  I don't remember the specific day.
7  Q.  You don't recall the point in time
8  you testified to earlier that you stated
9  that you followed Mr. Diop by his home?
10  A.  Yes.
11  Q.  What approximate date was that?
12  A.  I don't know the date.
13  Q.  Okay.  Did you say it was toward
14  the end of the month or was it after you
15  started your employment with Alabama State
16  or before that time?
17  A.  I think it was after.
18  Q.  Okay.  You testified earlier about
19  two messages which were left on your phone.
20  Are you aware whether the police department
21  transcribed those messages?
22  A.  No, I don't know.
23  Q.  And I believe, unless I

Page 268

1  misunderstood you, that you testified that
2  you let your mother hear the messages and
3  then she called the police department; is
4  that right?
5  A.  No.  I said that we let the deputy
6  lady hear it.  I don't know her name,
7  though.  She heard it.
8  Q.  So you didn't let your mother hear
9  the messages that evening?
10  A.  She heard it.
11  Q.  Did your mother hear the messages
12  at the hospital?
13  A.  It was that same -- it was that
14  same night.  I don't know where.  But it was
15  on that same night.
16  Q.  I'm trying to get in my mind
17  what your testimony is.  Did you let the
18  police officer hear the messages first or
19  did you let your mother hear the messages
20  first?
21  A.  My mom did hear the message and
22  the police officer heard it.
23  Q.  In what order?

Page 269

1  A.  Excuse me?
2  Q.  In what order?
3  A.  I don't know what order.  But they
4  did hear it.
5  Q.  You don't remember whom you played
6  the message for first, your mother or the
7  police officer?
8  A.  I don't remember what order.
9  Q.  The evening that y'all went out to
10  eat the dinner, did you ride in the vehicle
11  with Mr. Diop that evening?
12  A.  No.  We left --
13  Q.  In different vehicles?
14  A.  My family left.  We all left.
15  Q.  I thought you testified that you
16  were riding with your cousin; is that
17  correct, or is that a different --
18  A.  No.  Not my cousin.  That's from
19  the 31st.  What are you talking about?
20  Q.  That was my bad.  I thought that I
21  understood you to say that you had ridden
22  with your cousin.  Apparently that was a
23  different meeting.  That was the evening of

68  (Pages 266 to 269)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 270

1 the 31st when you went to Walgreen's; is
2 that correct?
3     A.  What are we talking about now?
4     Q.  Didn't you testify that you were
5 in a vehicle with your cousin and dropped
6 the cousin off at some point in time?
7     A.  We're on the 31st again?
8     Q.  Yes.  If that's the date.  I'm
9 asking you is that the date that --
10     A.  The date of what?
11     Q.  When you were with your cousin and
12 you dropped them off.
13     MR. ARNOLD:  If you understand the
14 question --
15     THE WITNESS:  I don't.
16     Q.  You testified earlier that you
17 were with your cousin on a particular
18 occasion and you dropped the cousin off;
19 correct?
20     A.  Okay.  Yes.
21     Q.  What date was that?
22     A.  That was on the 31st.
23     Q.  Okay.  Did you drop your cousin

Page 271

1 off before you went to Walgreen's or
2 afterwards?
3     A.  Before.
4     Q.  What is your cousin's name?
5     A.  Jabrell.
6     Q.  Last name?
7     A.  Wright.
8     Q.  When you went out to eat with Mr.
9 Diop that evening, were you aware that he
10 was going to ask you or ask your parents if
11 he could ask you out on a date?
12     A.  I wasn't.
13     Q.  Do you recall any statements that
14 you gave that you stated that you began
15 watching a movie at Mr. Diop's?
16     A.  No.
17     Q.  Do you recall watching a movie --
18     A.  No.
19     Q.  -- at Mr. Diop's?  Were you aware
20 that Mr. Diop cooperated with the police
21 department in providing the DNA evidence?
22     MR. ARNOLD:  Object to the form.
23 She can't agree or disagree with that.  She

Page 272

1 wasn't there.
2     MR. MADISON:  I'm just asking her
3 if she was aware.
4     MR. ARNOLD:  You asked her if she
5 thought he was cooperative.
6     MR. MADISON:  I asked her if she
7 was aware that he cooperated in providing
8 the DNA evidence.
9     MS. MEADOWS:  I'm sorry.
10 Cooperating or corroborating?
11     MR. MADISON:  That he cooperated
12 in providing them the DNA evidence.
13     MS. MEADOWS:  Okay.
14     A.  I don't know.
15     Q.  Exhibit 1, and ask to see if you
16 have seen a copy of that statement before?
17     A.  I have.
18     Q.  What does that statement purport
19 to be?
20     A.  This is the Montgomery Police
21 Department.
22     Q.  It's a statement you gave to the
23 police department during the investigation;

Page 273

1 isn't that correct?
2     A.  Yes.
3     Q.  May I see that back again,
4 please.  I have highlighted one of your
5 answers there in that statement.  What does
6 it say that you did when you went over to
7 Mr. Diop's apartment or began doing?
8     A.  You want me to read it?
9     Q.  If you don't mind.
10     A.  You to come over and maybe we can
11 just talk about that.  And, you know -- and
12 we ended up watching a movie.  I forgot what
13 kind of movie.  And, you know, he was -- he
14 was very nice because, you know, he was
15 laughing and then --
16     Q.  But you told the police officer in
17 giving that statement that y'all watched a
18 movie, did you not?
19     A.  I think this was taken out of
20 content.  But okay.
21     Q.  And isn't that what that says, you
22 watched a movie?  You were watching a movie?
23     A.  No.  No, he has a TV.  I think the

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 274

1  TV was on, but we were not watching a movie.
2      Q.  Let me see that back again,
3  please.  I don't know how that statement was
4  taken out of context because it states he
5  said you could come over to talk about that,
6  and, you know -- It says we ended up
7  watching a movie.
8          How is your statement that we
9  ended up watching a movie taking something
10  out of context?
11      A.  I don't know.  All I know is that
12  we did not watch a movie.  I mean, the TV
13  was on.  I think she must have wrote it down
14  wrong or whoever typed it.
15      Q.  Then it goes on to say, though,
16  that you forgot what kind of movie.  So were
17  you --
18      A.  I wasn't paying attention to the
19  TV.
20      Q.  But you don't deny that you told
21  the police department that you were watching
22  a movie, the investigator?
23      A.  I think that was taken out of

Page 275

1  context.
2      Q.  When you say it was taken out of
3  context, what are you saying?
4      A.  I'm saying that I went over there
5  because he told me his grandmother was dying
6  and that was it.  I was there to just -- I
7  was just going to pray for him and just let
8  him know it was going to be okay.  People
9  die.
10      Q.  During your examination, were they
11  allowed to make an intrusion into your
12  vagina to try to obtain semen samples or to
13  see if any semen samples were within you?
14      A.  Yes.  They did a rape kit.
15      Q.  And were they able to obtain any
16  semen samples that you were aware of?
17      A.  I don't know.
18      Q.  But they did make the attempt that
19  you recall to obtain any samples to try to
20  collect DNA from your vaginal area?
21      A.  Yes.  They did a rape kit.
22      Q.  Did you cooperate fully with that?
23      A.  Yes.

Page 276

1      Q.  Okay.  And were they able to make
2  an intrusion within your vagina to collect
3  semen samples?
4      A.  She did a rape kit.
5      Q.  Is that yes?
6      A.  Yes.  She did a rape kit.
7      Q.  And again, I may have asked you
8  this earlier.  Somebody else may have.  To
9  your knowledge, were any semen samples or
10  DNA of Mr. Diop collected anywhere from your
11  vaginal area?
12          MS. MEADOWS:  Object to the form.
13          MR. ARNOLD:  Asked and answered.
14      Q.  Well, go ahead.
15      A.  I don't know.
16      Q.  Have you not discussed the DNA
17  test results with anyone with the District
18  Attorney's Office?
19      A.  I'm sorry.  Repeat that.
20      Q.  Did you have any discussions with
21  anyone with the District Attorney's Office
22  concerning the DNA results?
23      A.  No, I didn't.

Page 277

1      Q.  Have you ever seen --
2          MR. MADISON:  Mark this as
3  Defendant Diop 2.
4      Q.  You asked me have I seen it?
5      Q.  Right.
6      A.  No.
7      Q.  You were aware that a rape kit had
8  been performed; correct?
9      A.  Yes.
10      Q.  And you testified to that
11  already.  You were not curious as to what
12  that examination revealed?
13          MR. ARNOLD:  Object to the form.
14      Q.  Go ahead.
15      A.  You're asking me was I curious?
16      Q.  Right.
17      A.  Wanted to know what happened?
18      Q.  Yes.  If they found any evidence
19  of the rape outside of what you said
20  happened?
21      A.  Yes, I wanted to know what
22  happened.
23      Q.  Did you ever ask anyone for a copy

70  (Pages 274 to 277)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 278

1  of the forensics analysis of the rape kit?
2      A.  My mom asked her.  She handled
3  that.
4      Q.  What did she tell you?
5      A.  She told me it was inconclusive.
6      MR. MADISON:  I don't think I have
7  any further questions.
8  EXAMINATION BY MS. MEADOWS:
9      Q.  I just have two very quick
10  questions.  Can you spell your cousin
11  Jabrell's name for us, please?
12     A.  J-A-B-R-E-L-L, Wright.
13     Q.  And that's just W-R-I-G-H-T?
14     A.  Oh, yes.
15     Q.  Okay.  And I just wanted to make
16  really sure.  You visited Diop's house only
17  on two occasions; correct?
18     A.  Yes.
19     Q.  And the first time was when you
20  drove by it?
21     A.  Yes.
22     Q.  And the second time was on January
23  31st?

Page 279

1      A.  Yes.
2      Q.  There were no other occasions when
3  you went to his house for any reason?
4      A.  No.
5      Q.  Okay.  And during this entire time
6  period where you were -- since you have
7  known Diop from before Christmas when you
8  told me you met him earlier up until January
9  31st, did you have a boyfriend?
10     A.  He wasn't really a boyfriend.  We
11  knew each other for just five months.  And
12  he took me out the first time within a
13  month.  That was it.
14     Q.  Within a month of --
15     A.  Like out of the five months, we
16  just went out one time.
17     Q.  Okay.  Was it towards the --
18     A.  He was just a friend.
19     Q.  What was his name?
20     A.  His name was Steven Clemmings.
21     Q.  Were you still talking to him on
22  the phone during this time?
23     A.  After or before?

Page 280

1      Q.  Before the sexual assault, were
2  you talking to him?
3      A.  Uh-huh.
4      Q.  Is that a yes?
5      A.  Yes.
6      Q.  Okay.
7  EXAMINATION BY MR. MADISON:
8      Q.  What was his phone number?
9      A.  I can't remember.
10     Q.  Would it be reflected on your cell
11  phone bill?
12     A.  It will be.  Here we go.  It's
13  right here.  One oh one, 618-315-2236.
14     Q.  One oh one?
15     MS. MEADOWS:  The call number.
16     MR. ARNOLD:  Call number.  Give me
17  just a second.
18     (Whereupon, Plaintiff's Exhibit
19  No. 1 was marked for identification and
20  attached to the original transcript.)
21  EXAMINATION BY MR. ARNOLD:
22     Q.  Jalonda, I'm showing you
23  Plaintiff's Exhibit 1.  Have you seen this

Page 281

1  document before?
2      A.  Yes.
3      Q.  What is this document?
4      A.  It's my time sheet.
5      Q.  What are the dates that you signed
6  this top sheet?
7      A.  02-02.
8      Q.  Okay.  And who else has signed
9  this time sheet?
10     A.  Mr. Moore.
11     Q.  What's the date of his signature?
12     A.  02-24.
13     Q.  This total which is on the far
14  right column, what are the -- what do these
15  numbers reflect?
16     A.  How many hours I've worked.
17     Q.  And where were you working when
18  you worked these hours?
19     A.  I was working as a data entry
20  clerk in transportation up under Mr. Moore.
21     Q.  And that was at Alabama State
22  University?
23     A.  Yes.

71 (Pages 278 to 281)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

Page 282

1    Q. Okay. So you were acting as an
2  employee with Alabama State when you
3  performed this labor?
4    A. Yes.
5    Q. Okay. Were you paid for this
6  labor?
7    A. No.
8    Q. Okay.
9       MR. ARNOLD: That's all the
10  questions I have.
11       MR. MADISON: Let me ask you a
12  question about that exhibit. LaTasha, do
13  you want to go first?
14       MS. MEADOWS: I do actually have a
15  question about that. Do you need to ask me
16  a question first, though?
17       MR. MADISON: Well, I was. But he
18  finished up. If you want to go ahead and
19  ask her about that exhibit, go ahead.
20  EXAMINATION BY MS. MEADOWS:
21    Q. Ms. Johnson, are you now
22  testifying that you never received payment
23  for those twenty-five hours?

Page 283

1    A. I didn't.
2    Q. Okay. Then I'm going to need to
3  take a break.
4       MR. MADISON: Let me go ahead and
5  ask my question then.
6       MS. MEADOWS: Okay.
7  EXAMINATION BY MR. MADISON:
8    Q. On that sheet it shows that the
9  work week started on January the 31st, 2005,
10  which was a Sunday; is that correct?
11       MR. ARNOLD: That's -- I want to
12  correct you before you make an inaccurate
13  question. It starts on the 23rd at the
14  top.
15       MR. MADISON: I'm talking about
16  the second week.
17       MR. ARNOLD: Okay. It just wasn't
18  clear.
19    Q. The second week.
20    A. Yes.
21    Q. And it shows you working on Monday
22  which would have been the 1st; isn't that
23  correct?

Page 284

1    A. Actually, the 30th is Sunday and
2  the 31st is Monday.
3       MR. MADISON: This sheet is just
4  incorrect then. It says Sunday the 31st.
5  And that's not correct.
6       MR. ARNOLD: I'll point out, if
7  you look at the top, it also says the 29th
8  for the day. So I think it's been
9  mislabeled by somebody. Who, I don't know.
10    Q. Well, I took this as two weeks.
11  The first one is the week beginning Sunday
12  the 23rd and running through the 29th. And
13  the second week is the 31st running through
14  the 6th. That's a two week period, is it
15  not?
16       MR. ARNOLD: Do you understand the
17  question?
18       THE WITNESS: No.
19    Q. Well, up on top, you've got one
20  full week; correct?
21    A. Yes.
22    Q. And it says the first work week
23  begins, and it says Sunday 01 to 23 slash oh

Page 285

1  oh five; isn't that right?
2    A. Yes.
3    Q. And it ends on Saturday 01-29, oh
4  oh five?
5    A. Yes.
6    Q. And then it says below that,
7  Sunday through Saturday, does it not?
8    A. Yes.
9    Q. So that would have been one week's
10  work. Then immediately below that it says
11  the second work week begins January the
12  31st, 2005 which was a Sunday; right?
13    A. We're still here; right?
14    Q. Right.
15    A. Okay.
16    Q. And then it goes through Saturday,
17  which is February the 6th, 2005; correct?
18    A. That's a five.
19    Q. Five. But it's -- that's February
20  the 6th, isn't it, or is that a --
21    A. It's five.
22    Q. Well, regardless, it ended on a
23  Saturday. And then below that, it starts

FREEDOM COURT REPORTING

Page 286

1  out Sunday, Monday, Tuesday, Wednesday
2  through Saturday again, does it not?
3      A.  Yes.
4      Q.  And it shows that you worked on
5  that Sunday; correct?
6      A.  Yes.
7      Q.  When you made the statement
8  earlier, were you saying it was incorrect
9  that Sunday was the 31st or were you -- or
10 is your time sheet showing that you worked
11 on the 1st and not the 2nd?  If Sunday was
12 the 31st, then Monday ought to be February
13 the 1st.
14     A.  No, no, no.  Monday is the 31st.
15     Q.  Okay.  I don't have a calendar.
16 I'm just saying that's what you're saying,
17 is Monday is the 31st and not Sunday as it
18 states; right?
19     A.  Yes.
20         MR. MADISON:  No other questions.
21         MS. MEADOWS:  Okay.  I'm going to
22 have to take a recess and I'll be right
23 back.

Page 287

1          (Whereupon, a short recess was
2  taken.)
3  EXAMINATION BY MS. MEADOWS:
4      Q.  Now, Ms. Johnson, I want to be
5  absolutely clear.  You contend that Alabama
6  State University has never paid you for
7  these twenty-five hours?
8      A.  No.
9      Q.  So as of today's date, you have
10 never been paid for the twenty-five hours
11 that you worked January 23rd until February
12 5th pay period?
13     A.  No, I haven't.
14         (Whereupon, Defendant's Exhibit
15 No. 13 was marked for identification and
16 attached to the original transcript.)
17     Q.  Do you recall receiving a check
18 sometime in July from Alabama State
19 University?
20     A.  I didn't get a check.
21     Q.  You never received one hundred and
22 eighty-five dollars from Alabama State
23 University?

Page 288

1      A.  No.
2      Q.  So this check list history -- You
3  are Jalonda R. Johnson; correct?
4      A.  That's my name, uh-huh.
5      Q.  And so you contend that you were
6  never issued Alabama State University check
7  number 0336111?
8      A.  I did not get a check.
9      Q.  Which means you never cashed that
10 check?
11     A.  I never --
12         MR. ARNOLD:  Object to the form.
13     Q.  Did you return a check to Alabama
14 State University?
15     A.  No.  I never got one.
16     Q.  Did you refuse to accept a check
17 from Alabama State University?
18     A.  No.  I never was offered a check.
19     Q.  Okay.
20         MS. MEADOWS:  No further
21 questions.
22         MR. MADISON:  I don't have any
23 further questions.

Page 289

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6          I hereby certify that the above
7  and foregoing deposition was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means of
10 computer-aided transcription, and that the
11 foregoing represents a true and correct
12 transcript of the testimony given by said
13 witness upon said hearing.
14         I further certify that I am
15 neither of counsel, nor of kin to the
16 parties to the action, nor am I in any wise
17 interested in the result of said cause.
18
19
20         ------------------
21         CINDY WELDON
22         ACCR #: 433
23

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FEB 1'05  1:21:19

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| | ☐ INCIDENT ☒ OFFENSE | 2 CASE # | | 3 SFX |
|---|---|---|---|---|
| | ☐ SUPPLEMENT | 002319 | | |

| 4 ORI # | 5 DATE AND TIME OF THIS REPORT | 6 AGENCY NAME | 7 IF SUPPLEMENT ORIGINAL OFFENSE DATE |
|---|---|---|---|
| 0 0 3 0 1 0 0 | 0 2 0 1 0 5  01:00 ☐AM ☐PM ☒MIL. | Montgomery Police Department | |

| 8 REPORTED BY | ☐ VICTIM OR | | 10 PHONE ( ) |
|---|---|---|---|

**VICTIM / REPORTING PARTY**

| 12 VICTIM (LAST, FIRST, MIDDLE NAME)  1P 2R 3S | 13 ADDRESS (STREET, CITY, STATE, ZIP) | 14 PHONE |
|---|---|---|
| Johnson, Jalonda | 1190 Gibson Hills Dr. Montgomery Al 36116 | (334) 613-1957 |
| 15 EMPLOYER/SCHOOL | 16 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) | 18 PHONE |
| ASU | Secretary | 1301 W Fifth St. Montgomery Al 36111 | (334) 229-4413 |

| 19 ☒ RESIDENT ☐ NON-RESIDENT | 20 INJURY ☐Y ☒N | 21 RACE ☒W ☐A ☐B ☐O | 22 SEX ☐MALE ☒FEMALE | 23 HGT 5'06" | 24 WGT 135 | 25 DOB 0 8 2 9 8 5 | 26 AGE 19 | 27 WAS OFFENDER KNOWN TO VICTIM? ☒Y ☐N | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) Acquaintance |
|---|---|---|---|---|---|---|---|---|---|

**EVENT**

| 30 TYPE INCIDENT OR OFFENSE  ☒ FEL. ☐ MISD. | 31 DEGREE (CIRCLE) ① 2 3 | 33 STATE CODE/LOCAL ORDINANCE 08A (03) |
|---|---|---|
| Rape | | |
| 34 TYPE INCIDENT OR OFFENSE  ☐ FEL. ☐ MISD. | 35 DEGREE (CIRCLE) 1 2 3 | 37 STATE CODE/LOCAL ORDINANCE |

| 38 PLACE OF OCCURRENCE | 39 SECTOR |
|---|---|
| Unk Block Burton Ave Montgomery Al 36104 | 1 1 1 |

| 40 POINT OF ENTRY ☐DOOR ☐WINDOW ☐ROOF ☐Other | 41 METHOD OF ENTRY ☐ FORCIBLE ☐ NO FORCE ☐ ATT. FORCIBLE | 42 ASSAULT ☐ SIMPLE ☐ AGGR. | 43 TREATMENT FOR ASSAULT INJURY ☐ Y ☐ N |
|---|---|---|---|

| OCCURRED ON OR BETWEEN | 45 TIME 19:30 ☐AM ☒PM ☐MIL. | 49 TIME ☒☒☒☒ | 47 LIGHTING ☐ NATURAL ☒ ART. EXT. ☒ ART. INT. ☐ UNK. | 48 WEATHER ☐ CLEAR ☐ CLOUDY ☒ RAIN ☐ FOG ☐ SNOW ☐ HAIL ☐ UNK. | 49 PREMISE ☐ HWY.-ST.-ALLEY ☐ RAILROAD ☒ RESIDENCE ☐ CHURCH ☐ SCHOOL ☐ CONVENIENCE ☐ INDUSTRIAL ☐ SERVICE STA. | ☐ BANK ☐ DRUG STORE ☐ APT./TWN. HSE. ☐ SHOPPING CENTER ☐ PARKING LOT ☐ OTHER COMMER. ☐ OTHER |
|---|---|---|---|---|---|---|
| 0 1 3 1 0 5 | 52 TIME ☐AM ☐PM ☐MIL. | 53 ☐☐☐☐ | 46 LIGHTING | | ☐ MOON | |

| 54 VERIFY FOR ☐ Y | 55 TREAT FOR ☐ Y | 56 CIRCUMSTANCES HOMICIDE/ASSAULT | 57 CODE |
|---|---|---|---|
| RAPE EXAM ☐ R | RAPE INJURY ☐ H | LOCATION: RAPE | |

| 58 WEAPON USED ☐ FIREARM ☐ KNIFE ☐ HANDS, FISTS VOICE ETC. ☐ OTHER DANGEROUS | 59 DESCRIPTION OF WEAPON/FIREARM/TOOLS USED IN OFFENSE ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN   DESCRIBE: |
|---|---|

**PROPERTY DESCRIPTION**

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | 63 RECOVERED |
|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| | Initial Unit 426/Coughlin | | | | |

☐ CONTINUED IN NARRATIVE

**DOLLAR VALUE**

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| | | | | | |

| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS |
|---|---|---|---|---|
| | | | | |

**VEHICLES**

| 75 CHECK CATEGORIES ☐ STOLEN ☐ RECOVERED ☐ SUSPECTS VEH. ☐ VICTIMS VEH. ☐ UNAUTH. USE ☐ ABANDONED |
|---|

| 76 STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|

| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |
|---|---|---|---|---|---|

| STOLEN MTR. VEH. ONLY | 88 AREA STOLEN ☐ BUS. ☐ RES. ☐ RUR. | 89 OWNERSHIP VERIFIED BY: ☐ TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ Other | 90 WARRANT SIGNED ☐ Yes ☐ No |
|---|---|---|---|

| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | 92 PHONE ( ) |
|---|---|

| MOTOR VEH. RECOVERY ONLY REQUIRED FOR 24hr UCR CODE | 93 STOLEN IN YOUR JURISDICTION? ☐ Yes   No WHERE? | 94 RECOVERED IN YOUR JURISDICTION? ☐ Yes   No WHERE? |
|---|---|---|

**TYPE OR PRINT IN BLACK INK**

717

ACJIC-32 REV. 6-94

Exhibit

FEB 1 '05 1:21:24

002319

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 0 2 0 1 0 5 | 01:00 | ☐ AM ☐ PM ☐ MIL. | 95 CASE # | | | ST SFX | 98 ☒ OFFENDER ☐ CHECK IF MULTIPLE SUSPECT ☐ MISSING PERSON |

| 99 NAME (LAST, FIRST, MIDDLE) | 100 NICKNAME/ALIAS | | 101 RACE ☐ W ☐ A ☒ B ☐ I ☐ O | 102 SEX ☒ M ☐ F | 103 DOB M  P  Y | 104 AGE 37 |
|---|---|---|---|---|---|---|
| Diopp, Anwar | | | | | | |

| 105 ADDRESS (STREET, CITY, STATE, ZIP) | | 106 HGT 507 | 107 WGT 150 | 108 EYE Bro | 109 HAIR Blk | 110 COMPLEXION Drk |
|---|---|---|---|---|---|---|
| Burton Ave Montgomery Al 36104 | | | | | | |

| 111 PROBABLE DESTINATION | 112 ARMED? ☐ Y ☒ N ☐ UNK | 113 WEAPON |
|---|---|---|
| Director of Physical Plant for ASU | | |

| 114 CLOTHING | ☐ SCARS ☐ MARKS ☐ TATTOOS | 115 ☐ ARRESTED ☐ WANTED |
|---|---|---|
| Red Shirt/Brown Kaki Pants | | |

| 116 NAME (LAST, FIRST, MIDDLE) | 117 NICKNAME/ALIAS | 118 RACE ☐ W ☐ A ☐ B ☐ I ☐ O | 119 SEX ☐ M ☐ F | 120 DOB M  P  Y | 121 AGE |
|---|---|---|---|---|---|
| N/A | | | | | |

| 122 ADDRESS (STREET, CITY, STATE, ZIP) | 123 HGT | 124 WGT | 125 EYE | 126 HAIR | 127 COMPLEXION |
|---|---|---|---|---|---|

| 125 PROBABLE DESTINATION | 128 ARMED? ☐ Y ☐ N ☐ UNK | 129 WEAPON |
|---|---|---|

| 131 CLOTHING | ☐ SCARS ☐ MARKS ☐ TATTOOS | 132 ☐ ARRESTED ☐ WANTED |
|---|---|---|

WITNESSES

| | 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE ( ) | 136 BUS. PHONE ( ) |
|---|---|---|---|---|---|
| #1 | N/A | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I | | ( ) | ( ) |
| #2 | | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I | | ( ) | ( ) |
| #3 | | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I | | ( ) | ( ) |
| #4 | | SEX ☐M ☐F  RACE ☐W ☐A ☐B ☐I | | ( ) | ( ) |

| WITNESS #1 SSN | WITNESS #2 SSN | WITNESS #3 SSN | WITNESS #4 SSN |
|---|---|---|---|

NARRATIVE

The victim stated that she was forcibly raped by the listed offender

| | ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | SFX |
|---|---|---|---|

CONTINUED ON SUPPLEMENT ☐Y ☒N

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person is/are reported or recovered.

SIGNATURE _____



| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | | 143 SFX | 144 CASE # | | 145 SFX | 146 ADDITIONAL CASES CLOSED NARRATIVE ☐Y ☐R |
|---|---|---|---|---|---|---|---|---|---|

ADMINISTRATION

| 147 CASE STATUS ☐ PENDING ☐ INACTIVE ☐ CLOSED  ENTERED ☐Y ACIC/NCIC ☐N  DATE | 148 CASE DISPOSITION: ☐ CLEARED BY ARREST (JUV.) ☐ CLEARED BY ARREST (ADULT) ☐ UNFOUNDED ☐ ADM. CLEARED | ☐ EXCEPTIONAL CLEARANCE: ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL ☐ DEATH OF VICTIM | 149 REPORTING OFFICER Det C.J. Coughlin | ID# 1008 |
| | | | 150 ASSISTING OFFICER | ID# |
| | | | 151 SUPERVISOR APPROVAL | ID# | 152 WATCH CMDR. | ID# |

## ALABAMA UNIFORM INCIDENT / OFFENSE REPORT SUPPLEMENT

*OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION*

**EVENT**

| 1 ORI# | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 0 0 3 0 1 0 0 | Montgomery Police Department | 0 8 3 0 0 5  14:55  □AM □PM ☒MIL | 0 5 - 0 0 2 3 1 9 | |

| 6 VICTIMS NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Johnson, Jalonda | 0 1 3 1 0 5 | □CONTINUATION ☒FOLLOW-UP |

| 9 ORIGINAL INCIDENT / OFFENSE | 10 UCR CODE | 11 STATE CODE / LOCAL ORDINANCE |
|---|---|---|
| Rape 1st Degree | | |

| 12 NEW INCIDENT / OFFENSE | 13 UCR CODE | 14 STATE CODE / LOCAL ORDINANCE |
|---|---|---|
| | | |

| 15 HAS AN ARREST BEEN HAVE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR PREMISE |
|---|---|---|---|---|
| □YES ☒NO | M  D  Y | □YES □NO  WARRANT # | M  D  Y | YEAR WEAPON ___ |

| 20 □DEFENDANT ☒SUSPECT | | | 21 □DEFENDANT □SUSPECT | |
|---|---|---|---|---|
| NAME: | Anwar Diopp | | NAME: | |

| RACE ☒W □A ☒B □I | SEX ☒M □F | DOB 0 7 1 4 6 7 | AGE 37 | RACE □W □A □B □I | SEX □M □F | DOB M  D  Y | AGE |

**NARRATIVE**

Show this case Exceptionally Cleared. This case will be presented to the Montgomery County Grand Jury.

| 22 LOCAL USE |
|---|
| U |   | U K |
| 23 STATE USE |

**DOLLAR VALUE  S.C R.D U E**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING / FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24cir UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? □Yes □No  WHERE? | 36 RECOVERED IN YOUR JURISDICTION? □Yes □No  WHERE? |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE □Y □N |
|---|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS | 45 CASE DISPOSITION: | EXCEPTIONAL CLEARANCE. | 46 REPORTING OFFICER | ID # |
|---|---|---|---|---|
| □PENDING □INACTIVE □CLOSED | □CLEARED BY ARREST (JUV) □CLEARED BY ARREST (ADULT) □UNFOUNDED □ADM. CLEARED | □SUSPECT / OFFENDER DEAD □OTHER PROSECUTION □EXTRADITION DENIED □LACK OF PROSECUTION □JUVENILE, NO REFERRAL □DEATH OF VICTIM | Cpl M.D. Hall | 413 |
| ENTERED ACIC / NCIC □Yes □No  DATE | | | 47 ASSISTING OFFICER | ID # |
| | | | 48 SUPERVISOR APPROVAL  ID # | 49 WATCH CMDR.  ID # |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC-33 REV. 11-94

RECEIVED

PERSONNEL AND HUMAN
RELATIONS

February 10, 2005

Mr. Olan Wesley
Director of Personnel &
Human Resource
Alabama State University
915 South Jackson Street
Montgomery, AL 36104

Dear Sir:

My name is Jalonda Johnson and I am a student at Alabama State University. Mr. Anwar Diopp, Director of Physical Plant, has physically violated me by way of **rape**, which is in violation to The Sexual Harassment Law. I may be reached at 334 613-1957.

Sincerely,

Jalonda Johnson
Student



Exhibit

# ASU

OFFICE OF PERSONNEL
AND HUMAN RELATIONS

**PERSONAL AND CONFIDENTIAL**
**CALL FOR PICK UP**

February 11, 2005

Mr. Anwar Diop, Director
Physical Plant
**CAMPUS MAIL**          **(CALL FOR PICK UP)**

Dear Mr. Diop:

A student at Alabama State University has filed an Equal Opportunity compliant against you for sexual harassment.  This letter serves as notification of charges and the impending investigation.

I have scheduled an appointment for you on **Friday, February 11, 2005 at 4:00 p.m.** in the office of Personnel and Human Relations, Room 1, Councill Hall, to discuss this matter. If you have any questions, please contact me at 334-229-4667/4206.

Sincerely,

Olan L. Wesley
Equal Opportunity Officer

OLW/mb

ALABAMA
STATE
UNIVERSITY
P.O. BOX 271
MONTGOMERY,
ALABAMA
36101-0271
334.229.4667
34.265.0697 FAX
www.alasu.edu

Exhibit

7



February 11, 2005

OFFICE OF PERSONNEL
AND HUMAN RELATIONS

Ms. Jalonda Johnson
1190 Gibson Hills Drive
Montgomery, Alabama 36116

**PERSONAL AND CONFIDENTIAL**
*Certified Mail:  #7001 2510 0005 4707 7040*

**RE:    Letter dated 2/10/2005 (Sexual Harassment Incident)**

Dear Ms. Johnson:

As the University's Equal Opportunity Officer, it is my desire to assure you that efforts are currently underway to investigate the allegations identified in your February 10, 2005 compliant.  Alabama State University is firmly committed to providing a workplace and an academic environment that is free of all forms of discrimination for all individuals.

During the investigative process for sexual harassment, we have notified the accused person of the sexual harassment charge and the impending investigation. The investigation will be non-adversarial; meaning attorneys for either side will not be permitted.   You will be contacted by a committee and a time will be scheduled for an interview.  At this time, you may be requested to identify any witnesses to the alleged incident.  Please insure that you have complete names, addresses and telephone numbers of all witnesses.  Since details tend to dissipate with time, you may want to write down any relevant information.   Upon completion of the investigation, recommendations will be made to the President regarding the findings.  The President of the University will review the findings and consider the recommendations and render a final decision.  Additional rights include the right to appeal and the right to submit a grievance in accordance with the **Non-Academic Staff Handbook** and **The Pilot (Student Handbook).**

I must ask that all information regarding the stated allegation remain confidential. Again, this office will work expeditiously to conduct and conclude the investigation and make appropriate recommendation to the President.

Thank you for bringing this issue to our attention.  Ms. Johnson, we have tried to reach you by phone, would you please call me or Ms. Brown in this office at (334) 229-4667/4206 and set up a time that we can meet with you.  Please let us know if we can provide further assistance.

**ALABAMA
STATE
UNIVERSITY**
P.O. BOX 271

MONTGOMERY,

ALABAMA

36101-0271

'34.229.4667

34.265.0697 FAX

www.alasu.edu

Sincerely,

Olan L. Wesley,
Equal Opportunity Officer

OLW/mb

Exhibit

o

**NOTIFICATION LETTER**
**(HAND DELIVERED)**

**PERSONAL AND CONFIDENTIAL**

RECEIVED BY: _____     DATE: 02-11-05
Student's Name (Please Print)

_____     DATE: 02-11-05
Student's Name (Signature Please)

WITNESS: _____     DATE: 2/11/05
                                                      2/11/05

OLW/mb

Alabama State University and Human Relations
915 South Jackson Street
Montgomery, AL 36104

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered.

Is your RETURN ADDRESS completed on the reverse side?

3. Article Addressed to:

Ms. Jalonda Johnson
1190 Gibson Hills Drive
Montgomery, Alabama 36116

4a. Article Number

7001 2510 0005

4b. Service Type
- ☐ Registered
- ☐ Express Mail
- ☑ Return Receipt for Merchandise
- ☐ Certified
- ☐ Insured
- ☐ COD

5. Received By: (Print Name)

6. Signature: (Addressee or Agent)
X

7. Date of Delivery

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1994          Domestic Return Receipt

Thank you for using R

---

7001 2510 0005

Ms. Jalonda Johnson
1190 Gibson Hills Drive
Montgomery, Alabama 36116

Total Postage & Fees $

Return Receipt Fee
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)

PS Form 3800, January 2001       See Reverse for Instructions

---

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☑ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.

3. Article Addressed to:

DELIVERED
MAY 10 2005
PERSONNEL & HUMAN RELATIONS

Ms. Jalonda Johnson
1190 Gibson Hills Drive
Montgomery, Alabama 36116

4a. Article Number

7001 2510 0005 4707 7088

4b. Service Type
- ☐ Registered
- ☐ Express Mail
- ☑ Return Receipt for Merchandise
- ☑ Certified
- ☐ Insured
- ☐ COD

7. Date of Delivery

3-7-05

5. Received By: (Print Name)

Jalonda Johnson

6. Signature: (Addressee or Agent)
X

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1994          Domestic Return Receipt

116





Equal Employment Opportunity Committee
Dr. Carolyn D. Simmons, Chair
Miss Brenna Weaver
Mr. Clarence Wilson
April 19, 2005

Mr. Olan Wesley, Director
Office of Personnel and Human Relations
Alabama State University
P. O. Box 271
Montgomery, Alabama  36101

Dear Mr. Wesley:

Upon your request the EEOC (formed March 1, 2005) met to investigate the charges of Sexual Harassment and Rape referred by Miss Jalonda Johnson, a former student of Alabama State University, against Mr. Anwar Diop, Director of the Physical Plant. Miss Johnson was a student of the University at the time of the incident. She believes that she was fired from her job as data entry clerk in the Department of Inventory Control because she reported the sexual assault.

The EEOC met to hear testimonies and to consider evidence presented by both parties. The testimonis of the witnesses were taped for future reference. The dates and times of these meetings are given below:

> March 8, March 10, and March 17; 3:00pm, Benson Lounge, MH 108
> April 7, April 12, and April 14; 3:00pm, 2nd floor conference room, Buskey Building

From these fair and impartial sessions, the EEOC was able to ascertain the information presented below:

1) Miss Jalonda Johnson met Mr. Anwar Diop through her mother Mrs. Linda Johnson. Mrs. Johnson works in Inventory Control. Mr. Diop and Mrs. Johnson were acquaintances.

2) Mr. Diop pursued a relationship with Miss Johnson. The cellular phone records of both parties indicated that they talked on a regular basis. On January 1 or January 5 Mr. Diop asked Miss Johnson's father for permission to date her. The father, Mr. Eddie Johnson, said no and strongly objected to Mr. Diop and Miss Johnson having an intimate relationship. Mr. Diop and Miss Johnson talked on the phone after Mr. Johnson gave his disapproval of a relationship.

Exhibit

3) Miss Johnson begin to work in Inventory Control as a 20-hour data entry clerk on January 25. Her hourly wage was set at $8.18 per hour. Miss Johnson worked without a contract. The funds to pay her were to be transferred from Mr. Diop's account to the Inventory Control account. Dr. Frazier did not approve the request for the transfer of funds. Mr. Stratford Moore told Miss Johnson, during the first week of February, that the funds were not approved and that she could no longer work. Miss Johnson has not been paid for the time she worked in Inventory Control.

4) Miss Johnson said that on January 31 Mr. Diop ask her to come to his apartment because he needed to talk to her. He was sad because his grandmother was seriously ill and might die. Miss Johnson stated that, after some amount of time with Mr. Diop in the apartment, Mr. Diop raped her.

5) Mr. Diop stated that he did not rape Miss Johnson, and that he and Miss Johnson have never had sexual intercourse; however, he admitted to kissing and fondling her on some other occasion, but nothing of that nature happened on January 31. Mr. Diop stated that Miss Johnson phoned him on the night in question and asked if she could come to visit him. According to Mr. Diop, Miss Johnson was at his apartment for about twenty minutes.

After carefully considering all the testimonies and evidence presented, the EEOC submit the following conclusions and recommendations:

1) The EEOC cannot conclusively say that Mr. Anwar Diop raped Miss Jalonda Johnson. There was no documented evidence given by either party to substantiate this claim by Miss Johnson.

2) The EEOC concludes that Mr. Diop pursued and carried on an inappropriate relationship with a student of the University. He allowed Miss Johnson to visit his apartment on two occasions.

3) The EEOC recommends that Mr. Diop be reassigned to another position offsite or terminated. To avoid a potentially hostile or volatile work environment, Mr. Diop should not be allowed to return to the physical plant area.

4) The EEOC concludes that Miss Johnson was not fired because of sexual harassment but an improper requisition for the transfer of funds. Since she was allowed to work without a contract, the EEOC recommends that Miss Johnson be paid for the days she worked.



RECEIVED
APR 2 1 2005
PERSONNEL & HUMAN RELATIONS

Sincerely
Submitted by the EEOC

Dr. Carolyn D. Simmons, Chair

Miss Brenna Weaver

Mr. Clarence Wilson



Must be given to Chair of Committee

# WITNESS LIST

### Student:

Yes <u>X</u> (indicate names below)
No _____

<u>Mrs. Linda Johnson</u>

<u>Mr. Eddie Johnson</u>

_____

_____

_____

### Employee:

Yes _____ (indicate names below)
No <u>X</u>

# EVIDENTIARY DOCUMENTS/OBJECTS

Please list all documents and other materials submitted in support of student of charges made against the employee.

<u>A Brief View of Cellphone</u> Records

<u>A copy of a letter written</u>
    to Mr. David McAdory
    <u>from Mr. Stratford Moore</u>

<u>Budget Adjustment Request</u> Form

_____

**Please submit this sheet as an attachment to your Report of Findings and Recommendations.**



OFFICE OF PERSONNEL
AND HUMAN RELATIONS



**MEMORANDUM**

RECEIVED
APR 22 2005
Alabama State University
Office of the President

TO:        Dr. Joe A. Lee
           President

FROM:      Olan L. Wesley, Director
           Personnel and Human Relations

DATE:      April 21, 2005

RE:        **Ms. Jalonda Johnson vs Mr. Anwar Diop**

The Equal Opportunity Committee has completed its review of findings and recommendations regarding Sexual Harassment and Rape charges filed by Ms. Jalonda Johnson against Mr. Anwar Diop.  The proceedings were audio taped and are available upon request.

The committee reviewed the findings from the investigation and presented the attached report on their conclusions and recommendations.

The Equal Opportunity Committee's report is submitted for your review and consideration in accordance with the **Faculty Handbook, Section 3.27** and **The Pilot, the official Student Handbook of Alabama State University, pages 38-39.**  Audio-taped information is available for review upon request.

I concur with the EEOC's decisions and recommendations, however, I also recommend that Mr. Anwar Diop be terminated and that he be paid for 1 month in lieu of notification.  Please be advised that in accordance with the current policy, a final decision must be rendered.

OLW/mb

Enclosures

Termination Approved _____ Date _5/5/05_

Reassignment Off Campus _____ Date _____

Disapproved _____ Date _____

**ALABAMA
STATE
UNIVERSITY**
P.O. BOX 271
MONTGOMERY,
ALABAMA
36101-0271
334.229.4667
334.265.0697 FAX
www.alasu.edu



OFFICE OF PERSONNEL
AND HUMAN RELATIONS    May 6, 2005

CONFIDENTIAL

C/O Dr. Leon Frazier, Vice President
Administrative Services/ASU
112 Councill Hall
Mr. Anwar Diop
3112 Wenonah Drive
Birmingham, AL 35211

CONFIDENTIAL
"CALL FOR PICK UP"
(Please sign for pick up)

Dear Mr. Diop:

RE: SEXUAL HARASSMENT CHARGES

Dr. Joe Lee, President, has approved termination of your contract as a results of the investigation of findings and recommendations regarding Sexual Harassment and Rape charges filed by Ms. Jalonda Johnson against you. Mr. Diop your contract is terminated on the date of this letter May 6, 2005 and you will be paid up to June 6, 2005. Your will be removed from benefits effective July 1, 2005.

Enclosed is a copy of the committee's report of findings and recommendations for your files.

You would need to contact this office and schedule an exit interview. The purpose of this interview is to insure that all documents regarding campus clearance, pay and benefits have been completed. You will be informed concerning remaining annual, compensatory and sick leave benefits. Mr. Diop, you would need to return your Non Academic Staff Handbook. A Financial and Property Clearance form is enclosed for you to secure signatures form on-campus departments.

Sincere best wishes,

Olan L. Wesley,
Equal Opportunity Officer

LABAMA
TATE
IIVERSITY

BOX 271

TGOMERY,
IMA

0271

).4667

0697 FAX

isu.edu

OLW/mb

Enclosures

cc:    Dr. Joe A. Lee, President
Dr. Leon Frazier, Vice President for Administrative Services
Dr. Carolyn D. Simmons, Chair of EEOC Committee

Exhibit

11