**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORHTERN DIVISION**

| | | |
|---|---|---|
| **JALONDA JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 02:07-cv-101-MEF** |
| | ) | |
| **ALABAMA STATE UNIVERSITY** | ) | |
| **and** | ) | |
| **ANWAR DIOP,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT, ALABAMA STATE UNIVERSITY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON**
**PLAINTIFF'S COMPLAINT**

COMES NOW Alabama State University (hereinafter "Defendant" or "ASU"), one of the Defendants in the above-captioned matter, by and through its undersigned counsel of record and files its Memorandum of Law in Support of its Motion for Summary Judgment against each and every claim asserted in Plaintiff's (hereinafter "Plaintiff" or "Johnson") Complaint.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Jolanda Johnson was a student at ASU at the beginning of the Spring 2005 semester. Ex. 1, Johnson Deposition, pp. 18-19, ll.12-9. She met Anwar Diop, Director of Physical Plant through her mother, Linda Johnson, an ASU employee in the Transportation Department. Ex. 1, Johnson Deposition, p. 117, ll.13-23; Ex. 2, Diop's Deposition , p.117, ll.15-19. Johnson and Diop developed a friendly acquaintance and began to exchange telephone calls in January 2005. Ex. 1, Johnson Deposition, pp. 215-224, ll.12-1; pp. 225- , ll. 4-13; Ex. 2, Diop's Deposition , pp. 119-120, ll.19-2. During

the month of January, Plaintiff was also seeking employment as an ASU student worker. Ex. 1, Johnson Deposition, p. 45, ll.6-14.

ASU policy requires that an applicant for employment complete an application prior to beginning work.  Ex.3, Non-Academic Staff Handbook, Section 2.3 Recruitment, Screening and Appointment.  Further, an individual is not considered employed until after a written contract is signed by the employee and the President and approved by the Board of Trustees.  Id.  Stratford Moore, Interim Director of Inventory Control, apparently allowed Plaintiff to begin working as a data entry clerk in the Inventory Control Department on January 25, 2005 in violation of University Policy.  Ex. 1, Johnson Deposition, p. 62-63, ll.20-3; Ex. 4, Time Sheet.  The following day, he submitted a request to hire Plaintiff as a 20-hour worker, to be paid from funds in a designated account.  Ex. 5, Memo from S. Moore to D. McAdory, dated January 26, 2005.

On January 31, 2005, Diop told Plaintiff during telephone conversations, that his grandmother was seriously ill and/or dying.  Ex. 1, Johnson Deposition, p. 131, ll.11-14, pp. 133-134, ll 22-15; Ex. 2, Diop's Deposition, pp. 178-179, ll.14-16.  At Diop's invitation, Plaintiff went to his home.  Ex. 1, Johnson Deposition, p. 135, ll.11-16. Following the visit, on January 31, 2005 or the early morning hours of February 1, 2005, Plaintiff went to Baptist Medical Center where she reported that she had been raped by Diop.  Ex. 1, Johnson Deposition, p. 80, ll.8-12; pp. 82-83, ll. 21-7.  Plaintiff also spoke with officers of the Montgomery Police Department and alleged that she had been raped by Diop during her visit to his apartment. Ex. 1, Johnson Deposition, pp. 85-86, ll.15-4; Ex. 6, Alabama Uniform Incident/Offense Report.  Plaintiff was taken to the local rape

crisis center where she repeated her allegations against Diop and a forensic rape evaluation was performed.    Ex. 1, Johnson Deposition, pp. 87-88, ll. 21-7, 12-16. Plaintiff and her parents decided to pursue criminal charges against Diop for the alleged rape. Ex. 1, Johnson Deposition, p. 88, ll. 17-22.

Following the alleged rape, on either February 1, 2 or 3, Linda Johnson verbally informed Dr. Frazier that Diop had raped her daughter and that they would be pursing criminal charges against Diop through the legal system. Ex. 1, Johnson Deposition, p. 93, ll.13-17; Ex. 7, letter from Leon Frazier to Eddie & Linda Johnson, dated February 7, 2005.

Plaintiff submitted an application for employment as a Data Entry Clerk in Inventory Control.    Ex. 8, Plaintiff's Employment Application Documents.    This application, the applicant data record, the W-4 form, and the A-4 form are all dated February 2, 2005.  Id.  Plaintiff cannot provide any other date, prior to February 2, 2005, when the documents were completed.  Ex. 1, Johnson Deposition, pp. 67-70, ll. 21-11. Plaintiff cannot provide a reason why she would have dated the documents for a date other than the date on which it was completed.   Ex. 1, Johnson Deposition, p. 70, ll.3-11.

Inventory Control's budget for the 2004-2005 did not provide for the employment of a 20-hour per week employee.  Ex. 9, Affidavit of Willie Thomas.  The Request for Budget Adjustment Form, which would have transferred funds to pay Plaintiff into the Inventory Control Account was never signed and submitted to Inventory Control.  Ex. 9, Affidavit of Willie Thomas.; Ex. 10, Request for Budget Adjustment.  Mr. Thomas did not become aware of the Budget Adjustment Request until after the University began

3

investigating Plaintiff's internal harassment complaint.    Ex. 9, Affidavit of Willie Thomas.

Mr. David McAdory contacted the budget office to determine whether funds were available to pay Plaintiff as requested by Mr. Moore.  Ex. 11, Affidavit of David McAdory.  He discovered that there were insufficient funds in the account to fund payroll for the 20-hour per week position Mr. Moore requested.  Id.  He then informed Mr. Moore that there were no funds available to pay a 20-hour employee in the designated account and that he would have to request a budget adjustment before he could create the position. Ex. 11; Affidavit of David McAdory; Ex. 12, Statement of David McAdory, dated January 17, 2006.  Mr. McAdory also informed Mr. Moore that his request would have to receive prior approval from his supervisor, Mr. Willie Thomas.  Id.

On February 2, 2005, Mr. Moore advised Plaintiff that the transfer of funds to pay for her employment had not been approved and he would not be allowed to hire her as previously anticipated.  Ex. 1, Johnson Deposition, p. 105, ll. 4-14.  After receiving notice that Plaintiff would not be hired, her mother and father filed a written complaint with Dr. Leon Frazier, Vice-President of Administrative Services, alleging violations of the University's anti-harassment policy and requesting an ASU investigation. Ex. 13, letter to Leon Frazier from Eddie & Linda Johnson, dated February 3, 2005; Ex. 1, Johnson Deposition, p. 105, ll. 15-17.  On February 10, 2005, following instructions from Dr. Frazier, Plaintiff filed a sexual harassment complaint pursuant to ASU's policies.  Ex. 1, Johnson Deposition, p. 111, ll.18-20, p. 112, ll. 3-17; Ex. 7, letter from Leon Frazier to Eddie & Linda Johnson, dated February 7, 2005; Ex. 14, Sexual Harassment Complaint, dated February 10, 2005.

## STANDARD OF REVIEW

Summary Judgment is appropriate under Rule 56of the Federal Rules of Civil Procedure if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 US 317, 322 (1986). The moving party may meet its burden by presenting evidence which shows that there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence to support an element of its case on which it bears the ultimate burden of proof. *Id*. at 322-324. In the present case, there is no genuine issue of material fact and Johnson is unable to present evidence to support the material elements necessary to establish and maintain her claim. Therefore, ASU is entitled to judgment in its favor as a matter of law.

## ARGUMENT

Plaintiff has not and cannot produce substantial evidence to support her claims and establish a prima facie case of retaliation against Defendant ASU in this case. Even if the Court concludes that Plaintiff has established a prima facie case, Defendant has presented evidence of a legitimate non-retaliatory reason for its actions. Plaintiff has not produced any evidence to show that Defendant's articulated reasons are merely a pretext as required to defeat summary judgment.

### I.    Plaintiff Cannot Establish a Prima Facie Case of Retaliation

In order to establish a prima facie case of retaliation, Plaintiff must prove (1) that she engaged in a statutorily protected activity under Title VII; (2) that she suffered an adverse employment action; and (3) that there is a causal connection between the protected participation and the adverse action. *Cooper v. Southern Co.*, 390 F.3d 695,

740 (11th Cir. 2004); *Brook v. City of Montgomery*, 916 F.Supp.1193, 1208 (M.D. Ala. 1996). In the instant case, Plaintiff establishes only one of the required elements; that she suffered an adverse employment action. Specifically, it is undisputed that she was not hired as a part-time employee in ASU's Inventory Control Department.

### a. Plaintiff Did Not Personally Participate in Any Protected Activity Under Title VII Until February 10, 2005

Plaintiff does not dispute that she did not notify ASU of her desire to pursue sexual harassment charges arising from her allegations against Defendant Diop until February 10, 2005. Ex. 1, Johnson Deposition, p. 112, ll. 3-17. ASU does not dispute that Plaintiff engaged in protected participation under Title VII when she filed her complaint on that date. However, ASU contends that Plaintiff cannot demonstrate that she engaged in any protected activity prior to the submission of her complaint to ASU. The anti-retaliation clause of Title VII states:

> "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. §2000e-3(a).

Under the plain and ordinary meaning of the words in this section, Plaintiff is required to have engaged in protected activity in order to be afforded the protection of the ant-retaliation clause. In the instant case, Plaintiff bases her retaliation claim solely upon the complaint her mother made to Dr. Frazier; thereby asking this Court to go beyond the plain meaning of the statute and imply a cause of action based on the association between herself and her mother, the party who engaged in the protected activity. Plaintiff's

argument for an extension of the law in this area has previously been rejected by District Courts in the Eleventh Circuit. *See, e.g., Singh v. Green Thumb Landscaping, Inc.*, 390 F. Supp.2d 1129 (M.D. Fla. 2005); *Miller v. Bed, Bath & Beyond, Inc.*, 185 F.Supp.2d 1253, 1273 (N.D. Ala. 2002); *Thomas v. Ford Motor Co.*, 2000 WL 951733 (N.D. Ga. 2000).

Although the Eleventh Circuit has previously held that the plain-meaning rule should not be applied to produce a result that is inconsistent with the policy reasons underlying the statute, such rationale does not apply in the instant case. *Bailey v. USX Corp.*, 850 F.2d 1506 (11th Cir. 1988). The rationale of *Singh* is more analogous to the present case. In that case, the court stated:

> "[w]hile allowing employers to retaliate via friends and family would appear to be in significant tension with the overall purpose of the anti-retaliation provision, which is intended to promote reporting of discrimination claims, prohibiting such claims is not an absurd outcome that contravenes the clearly expressed intent of the legislature."
> *Singh*, 390 F.Supp.2d at 1138.

Indeed, Congress would have had every reason to believe that the individual who actually considered herself a victim of the sexually harassing behavior would have participated in some manner in bringing the charge of discrimination. *See, Id.* Expanding the category of persons protected by the anti-retaliation provision to include individuals who failed to engage in any protected activity, even where participation may have directly benefited them, has the potential to lead to frivolous law suits and unnecessarily hinders employers' right to freely make employment decisions. *Id.*

In the instant case, Plaintiff eventually determined that she should make a sexual harassment complaint about the alleged incidents of January 31, 2005. Ex. 1, Johnson

Deposition, p. 112, ll.3-11;pp. 113-114, ll. 20-3; Ex. 14, Sexual Harassment Complaint, dated February 10, 2005. However, Plaintiff failed to engage in any protected activity until eight days *after* she learned that she would not be hired by Defendant. Ex. 1, Johnson Deposition, p. 105, ll. 15-17, p. 112, ll.3-17; Ex. 12, Statement of David McAdory, dated January 17, 2006. Even if the Court determines that the Plaintiff's mother's complaint was sufficient to constitute action by Plaintiff, she has still failed to present substantial evidence to support her prima facie case.

### b. Plaintiff's Mother's Actions Do Not Constitute Protected Participation

Plaintiff has not and cannot establish that her mother's report to Dr. Leon Frazier, Vice-President for Administrative Services, that her daughter had allegedly been raped by Diop on February 1, 2005 constitutes notice of a claim of sexual harassment to ASU. The University has adopted and promulgated an effective anti-harassment policy which has been widely and consistently disseminated to its employees and students. Ex, 3, Non-Academic Handbook, Section 6.5, Policies Relating to Sexual Harassment; Ex. 15, The Pilot, University Policy on Sexual Harassment, pp. 90-91. These policies clearly and unambiguously set forth the procedures for providing notice to ASU of all sexual harassment complaints and requests for investigation. Id. It was incumbent upon Plaintiff and her mother to follow ASU's established policies to provide ASU notice of Plaintiff's intent to pursue a sexual harassment complaint. *Madray v. Publix Supermarkets, Inc*., 208 F.3d 1290, 1300 (11th Cir. 2000) (*citing Coates v. Sundor Brands*, 164 F.3d 1361, 1364 (11th Cir. 1999)(per curiam).

Pursuant to the University's policies, of which Mrs. Johnson was well aware, employees' sexual harassment complaints must be filed in writing with the Director of

Human Resources in order to initiate an investigation.   Ex. 3, Non-Academic Staff

Handook, Section 6.5.2 Reporting Incidents of Sexual Harassment; *see also* Ex. 13, letter

to Leon Frazier from Eddie & Linda Johnson, dated February 3, 2005. (quoting

extensively from the ASU policy).  Dr. Frazier was the Vice President for Administrative

Services and had no role in ASU's enforcement of its sexual harassment policies.  *See*

Ex. 7, letter to Eddie & Linda Johnson from Leon Frazier, dated February 7, 2005.

Even had Mrs, Johnson intended to initiate an investigation under the policy

relating to students, the complaint should have been made in writing to either the Vice-

President for Student Affairs or the ASU Department of Police and Campus Security.

See, Ex. 15, The Pilot, Reporting Incidents of Sexual Harassment, p. 91.   Neither

Plaintiff, nor Mrs. Johnson attempted to notify either of the designated individuals of

their complaint prior to the February 10, 2005 complaint addressed to Mr. Olan Wesley,

Director of Personnel and Human Resources.  Ex. 14, Sexual Harassment Complaint,

dated February 10, 2005.

The failure to notify the designated individuals of the alleged harassment and the

failure to request a formal investigation is fatal to Plaintiffs' assertion that her mother's

actions are sufficient to constitute protected participation under Title VII because the

complaints to Dr. Frazier are not sufficient to put ASU on notice of an allegation of

sexual harassment.  *Madray,* 208 F.3d at 1300; *See also, Walton v. Johnson & Johnson*

*Services, Inc.*, 203 F.Supp.2d 1312, 1323, n. 15, 1325 (M.D. Fla 2002)(holding that

reporting harassment to another individual who reported to senior managers who were

not designated to receive sexual harassment reports under company policy is not a

protected activity).   Likewise, Plaintiff's reporting a rape to the Montgomery Police

Department, an agency with no responsibility for enforcement under Title VII, does not provide notice to ASU of any sexual harassment claims or involve or relate to any attempt to report a violation of the prohibition against sexual harassment. *See id.* Consequently, Plaintiff has failed to present substantial evidence to establish that she engaged in protected activity prior to the adverse employment action.

### c. Plaintiff Cannot Establish a Causal Connection Between the Adverse Action and the Protected Participation

Plaintiff failed to provide ASU notice of her participation in any protected activity until February 10, 2005 when she writes a complaint to Mr. Olan Wesley, Director of Personnel & Human Resources, an individual designated to receive and investigate such complaints under the policy. Additionally, Plaintiff cannot establish that anyone with authority to approve her application for employment had received her application prior to February 2, 2005, the date on her application. Ex. 8, Plaintiff's Employment Application Documents. Although Plaintiff contends that she filled out the required application prior to beginning work on January 25, 2005, she cannot provide the specific date, cannot provide any reason why she would have dated her application for a date other than the date she completed it, and cannot produce any witnesses to her alleged earlier signing date. Ex. 1, Johnson Deposition, pp. 48-53, ll.2-1. Plaintiff's testimony on this subject fails to provide any specific factual basis to support her claim that she officially applied for the position prior to February 2, 2005. All of Plaintiff's communications regarding her prospective employment prior to February 2 were with Stratford Moore, an individual without authority to bind ASU to any employment contract. Ex. 1, Johnson Deposition, pp. 62-63, ll.20-3; p. 65, ll. 7-16. As soon as Plaintiff's application was submitted, it was promptly determined that the position for which she sought employment was not funded

in the budget and her application was denied.  Ex. 11, Affidavit of David McAdory; Ex. 9, Affidavit of Willie Thomas.

In order to establish a causal connection between the protected participation and the adverse action, Plaintiff "must show that the adverse act followed the protected conduct; this minimum proof stems from the important requirement that "the employer was actually aware of the protected expression at the time it took adverse employment action.""  *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999)(*quoting Goldsmith v. City of Atmore*, 996 F.2d 1163 (11th Cir. 1993)).  As stated above, Plaintiff failed to provide ASU notice of her sexual harassment complaint prior to February 10, 2005, eight days after she officially applied for the position and received notice of the adverse employment action.  Therefore, Plaintiff has failed to establish a causal connection between ASU's refusal to hire her and her sexual harassment complaint.

## II.    Defendant Has a Legitimate Non-Retaliatory Reason for its Actions

Even if the Court determines that Plaintiff has produced sufficient evidence to maintain a prima facie retaliation claim, Defendant has proffered a legitimate non-retaliatory reason for its decision.  Under the widely adopted McDonnell-Douglas burden-shifting analysis, defendant merely has to produce a non-discriminatory motive for its actions.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  ASU has consistently stated that Plaintiff was not hired because there were no funds budgeted to pay a 20-hour employee in the account from which she was supposed to be paid.  Ex. 11, Affidavit of David McAdory; Ex; 9, Affidavit of Willie Thomas.   In fact, the Inventory Control

Department had not been budgeted to employ any part-time employee as of the date Mr. Moore submitted his request to hire Plaintiff. Ex. 9, Affidavit of Willie Thomas.

Defendant's production of a non-retaliatory reason for its decision not to hire Plaintiff meets the very minimal requirement that Defendant merely proffer a reason for its decision. *Burdine*, 450 U.S. at 253. ASU has presented undisputed evidence that Plaintiff requested to be employed in a position that did not exist, that was not funded in ASU's Inventory Control budget, and for which no funds were available to meet payroll. Ex. 11, Affidavit of David McAdory; Ex. 9, Affidavit of Willie Thomas; Ex. 12, Statement of D. McAdory. ASU's proffered reason provides an explanation of its actions that is "legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255. ASU's explanation that there was no money in the budget to pay a 20-hour employee to work in the Inventory Control Department clearly provides sufficient justification for its decision. Therefore, ASU has clearly met its burden and proffered a non-retaliatory reason for its employment decision regarding Plaintiff's application and has successfully rebutted any presumption of retaliation. *Id.*

## III.    Plaintiff Has Failed to Present Any Evidence to Show That Defendant's Proffered Reason is Pre-Textual

Plaintiff has failed to provide any evidence that ASU's stated reason for not hiring her is pre-textual. The burden of proof rests upon the plaintiff to prove that defendant's stated reason is merely a pretext for intentional discrimination. *McDonnell-Douglas*, 411 U.S. at 804-805; *Burdine*, 450 U.S. at 256. The only evidence Plaintiff has provided in support of her claim that she was not hired in retaliation for filing a complaint against Diop is her testimony that she told ASU she was raped and "they fired me." Ex. 1, Johnson Deposition, p. 41, ll. 9-13, 18-19; p. 80, ll. 6-7. Plaintiff's testimony clearly

relates the timing of the adverse action with her complaint of harassment; however, she makes no attempt to provide any evidence to show that the proffered reason is untrue.

In order to defeat Defendant's motion for summary judgment, Plaintiff must present "significantly probative evidence on the issue [of pretext]." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, (11th Cir. 1996)(internal quotations omitted)(internal citations omitted). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where a defendant has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Id. (quoting Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)).Where, as here, plaintiff fails to produce substantial evidence as to any element of a claim upon which it bears the burden of proof summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiff has clearly failed to meet this standard and Defendant is entitled to judgment in its favor as a matter of law.

## CONCLUSION

Plaintiff's sole remaining claim against ASU is retaliation under Title VII. As set forth above, Plaintiff has failed to produce the evidence necessary to create genuine issues of material fact which would merit a trial in this action. Therefore, Defendant ASU respectfully requests that this Court grant its motion and issue summary judgment in its favor.

Respectfully Submitted,

 /s/ LaTasha A. Meadows
**KENNETH L. THOMAS (THO 043)**
**LaTASHA A. MEADOWS (MEA020)**

**OF COUNSEL:**
**THOMAS, MEANS, GILLIS & SEAY**
3121 Zelda Court (36106)
P.O. Box 5058
Montgomery, Alabama 36103-5058
(334) 270-1033 (phone)
(334) 260-9396 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon the following via this Court's electronic filing system this the 30th day of May, 2008.

David Arendall, Esq.
Allen D. Arnold, Esq.
ARENDALL & ASSOCIATES
2018 Morris Avenue, Third Floor
Birmingham, AL 35203

Donald Gordon Madison, Esq.
Law Offices of Donald Gordon Madison
418 Scott Street
Montgomery, AL 36104

_/s/ LaTasha A. Meadows_____
**OF COUNSEL**

## FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JALONDA JOHNSON,          )

      Plaintiff,        )

vs.                      )   CASE NUMBER:

ALABAMA STATE UNIVERSITY )   02:07-CV-101

and ANWAR DIOP,          )

      Defendants.       )

DEPOSITION OF JALONDA JOHNSON

      In accordance with Rule 5(d) of

The Alabama Rules of Civil Procedure, as

Amended, effective May 15, 1988, I, Cindy

Weldon, am hereby delivering to LaTasha A.

Meadows, the original transcript of the oral

testimony taken on the 12th day of February,

2008, along with exhibits.

      Please be advised that this is the

same and not retained by the Court Reporter,

nor filed with the Court.

Exhibit

1

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 2

```
1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    JALONDA JOHNSON,        )
6       Plaintiff,       )
7    vs.              ) CASE NUMBER:
8               ) 02:07-CV-101
9    ALABAMA STATE UNIVERSITY )
10   and ANWAR DIOP,        )
11      Defendants.      )
12
13      STIPULATION
14      IT IS STIPULATED AND AGREED, by
15   and between the parties through their
16   respective counsel, that the deposition of
17   JALONDA JOHNSON, may be taken before Cindy
18   Weldon, Certified Shorthand Reporter,
19   Commissioner and Notary Public, at the
20   offices of Thomas, Means, Gillis, 3121 Zelda
21   Court, Montgomery, Alabama, on February the
22   12th, 2008 at 9:30 a.m.
23      IT IS FURTHER STIPULATED AND
```

Page 3

```
1    AGREED that the signature to and the reading
2    of the deposition by the witness is waived,
3    the deposition to have the same force and
4    effect as if full compliance had been had
5    with all laws and rules of Court relating to
6    the taking of depositions.
7       IT IS FURTHER STIPULATED AND
8    AGREED that it shall not be necessary for
9    any objections to be made by counsel to any
10   questions, except as to form or leading
11   questions, and that counsel for the parties
12   may make objections and assign grounds at
13   the time of trial, or at the time said
14   deposition is offered in evidence, or prior
15   thereto.
16      IT IS FURTHER STIPULATED AND
17   AGREED that notice of filing of the
18   deposition by the Commissioner is waived.
19
20
21
22
23
```

Page 4

```
1         APPEARANCES
2
3    FOR THE PLAINTIFF:
4        MR. ALLEN D. ARNOLD
5        2018 MORRIS AVENUE
6        BIRMINGHAM, ALABAMA 35203
7
8    FOR THE DEFENDANT:
9        MS. LATASHA A. MEADOWS
10       MS. RAMADANAH SALAAM-JONES
11       3121 ZELDA COURT
12       MONTGOMERY, ALABAMA 36103
13
14       MR. DONALD G. MADISON
15       418 SCOTT STREET
16       MONTGOMERY, ALABAMA 36104
17
18   ALSO PRESENT:
19       MS. LINDA JOHNSON
20
21
22
23
```

Page 5

```
1         INDEX
2    EXAMINATION BY:              PAGE
3    MS. MEADOWS       6, 278, 282, 287
4    MR. MADISON       230, 280, 283
5    MR. ARNOLD            280
6
7       EXHIBITS
8               PAGE
9    DEFENDANT'S EXHIBIT NO. 1        35
10   DEFENDANT'S EXHIBIT NO. 2        35
11   DEFENDANT'S EXHIBIT NO. 3        46
12   DEFENDANT'S EXHIBIT NO. 4        59
13   DEFENDANT'S EXHIBIT NO. 5        75
14   DEFENDANT'S EXHIBIT NO. 6        77
15   DEFENDANT'S EXHIBIT NO. 7        100
16   DEFENDANT'S EXHIBIT NO. 8        102
17   DEFENDANT'S EXHIBIT NO. 9        106
18   DEFENDANT'S EXHIBIT NO. 10       111
19   DEFENDANT'S EXHIBIT NO. 11       176
20   DEFENDANT'S EXHIBIT NO. 12       212
21   DEFENDANT'S EXHIBIT NO. 13       287
22   DEFENDANT'S DIOP EXHIBIT NO. 2      255
23   PLAINTIFF'S EXHIBIT NO. 1        280
```

2 (Pages 2 to 5)

FREEDOM COURT REPORTING

Page 6

1          JALONDA JOHNSON,
2     after first being duly sworn, testified
3              as follows:
4     EXAMINATION BY MS. MEADOWS:
5          THE COURT REPORTER:  Usual
6     stipulations?
7          MR. MADISON:  Yes.
8          MR. ARNOLD:  Yes.
9          MS. MEADOWS:  Yes, please.
10         MR. ARNOLD:  Before we begin, Mr.
11    Madison and I are going to put some things
12    on the record before the examination
13    starts.  As counsel for Mr. Diop and for Ms.
14    Johnson, we've come to I guess an agreement
15    where we will dismiss our specific claims of
16    the assault and battery, invasion of privacy
17    against Mr. Diop and Mr. Madison is
18    dismissing --
19         MR. MADISON:  Are those the only
20    claims?
21         MR. ARNOLD:  I believe you've got
22    --
23         MR. MADISON:  No.  I'm talking

Page 7

1     about all y'all's claims.
2          MR. ARNOLD:  I think those are the
3     only two we've got against --
4          MR. MADISON:  Anyway, it's
5     supposed to be a dismissal, all claims each
6     has against the other with prejudice.  So
7     any claims that Mr. Diop may have against
8     Ms. Johnson and any claims that Ms. Johnson
9     may have against Mr. Diop are being
10    dismissed with prejudice.
11         MR. ARNOLD:  And that is agreed
12    with.
13         MS. MEADOWS:  If it's all claims,
14    I think we can agree.
15         MR. ARNOLD:  All right.  Just to
16    make sure.  I'm very thorough.
17         MR. MADISON:  That's any and all
18    claims that -- not only those brought, but
19    those that could have been brought or may
20    have been brought or contemplated by the
21    parties in this action.
22         And each party is to bear their
23    own respective cost with respect to those

Page 8

1     claims as well.
2          MR. ARNOLD:  Thank you.  All
3     right.  I think we're done with that.
4          MR. MADISON:  I say cost.  But
5     attorneys fees and cost.
6          MR. ARNOLD:  Okay.
7          MR. MADISON:  Each party to bear
8     their own.
9          MS. MEADOWS:  Are you two
10    satisfied?
11         MR. MADISON:  I believe that's it.
12         MR. ARNOLD:  I think we're
13    satisfied.  And we'll get a formal
14    settlement agreement beforehand.
15         MR. MADISON:  Sure.
16         MS. MEADOWS:  Okay.
17    Q.   Good morning, Ms. Johnson.
18    A.   Good morning.
19    Q.   My name is LaTasha Meadows.  And
20    this is my co-counsel Ramadanah
21    Salaam-Jones.  And we represent Alabama
22    State University in this matter.  Well, you
23    know Don Madison who is representing Anwar

Page 9

1     Diop.  And you all have just dismissed your
2     claim.
3          We're just here today to take your
4     deposition.  You understand that we're here
5     to depose you because you have filed a
6     lawsuit against Alabama State University?
7     A.   Yes.
8     Q.   Have you ever given a deposition
9     before?
10    A.   No.
11    Q.   Well, it's very important that you
12    speak loudly and clearly enough for everyone
13    in the room to hear what it is you have to
14    say.  And I will try to remember to speak up
15    as well.
16         If at any time you don't
17    understand my question, let me know and I
18    will try to rephrase the question so you can
19    understand it or I'll repeat the question.
20    Otherwise, I'll assume that you understand
21    what I'm asking you.  Is that okay?
22    A.   Yes.
23    Q.   Are you on any medication today

3  (Pages 6 to 9)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 10

1    that will keep you from being able to
2    understand and answer my questions
3    accurately?
4        A.   No.
5        Q.   Are you under the influence of any
6    illegal drugs or alcohol that would impair
7    your ability to understand and answer my
8    questions today?
9        A.   No.
10       Q.   Very good.  Please state your full
11   name.
12       A.   Jalonda Richay Johnson.
13       Q.   Would you spell your middle name
14   for the record, please?
15       A.   R-I-C-H-A-Y.
16       Q.   Okay.  Do you have a nickname or
17   other name that you are known by?
18       A.   Londie, L-O-N-D-I-E.
19       Q.   Have you ever officially used the
20   name Londie?
21       A.   No.
22       Q.   That's something your family and
23   friends call you?

Page 11

1        A.   Yes.
2        Q.   Have you ever been known by any
3    other name?
4        A.   No.
5        Q.   How old are you, Ms. Johnson?
6        A.   I'm twenty-two.
7        Q.   What is your date of birth?
8        A.   August 29th, 1985.
9        Q.   What is your social security
10   number?
11       A.   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.
12       Q.   Okay.  What is the address of your
13   present residence?
14       A.   1190 Gibson Hills Drive.  Do you
15   need me to spell it?
16       Q.   I think I've got it.  Thank you.
17   How long have you lived at that address?
18       A.   Twenty-two years.
19       Q.   So you've always lived there?  Is
20   that your parents' address?
21       A.   Yes.
22       Q.   And that's where you lived in
23   January of 2005 as well?

Page 12

1        A.   Yes.
2        Q.   Okay.  What is your home telephone
3    number?
4        A.   334-613-1957.
5        Q.   Was that your home telephone
6    number on January 31st of '05?
7        A.   Yes.
8        Q.   What is your cell phone number?
9        A.   334-303-4757.
10       Q.   Was that your cell phone number in
11   January of 2005?
12       A.   I think it wasn't, no.
13       Q.   Do you remember what that number
14   was?
15       A.   I can't remember.  I know it was a
16   303.  I've forgot the last four.
17       Q.   Are you presently married, Ms.
18   Johnson?
19       A.   No.
20       Q.   Have you ever been married?
21       A.   No.
22       Q.   Do you have any children?
23       A.   No.

Page 13

1        Q.   Do you have relatives who live in
2    Montgomery, Alabama?
3        A.   I do.
4        Q.   Who are they?
5        A.   My brother Cornelius Wright and my
6    grandmother and -- Dorothy Wright.
7        Q.   Okay.
8        A.   And I have some aunts.
9        Q.   Do you know who they are?
10       A.   Yes.  Gwendolyn Wright is my
11   aunt.  She's the closest to me.
12       Q.   I'm just trying to find out
13   everybody you're related to in Montgomery.
14       A.   Well, let's see.  I've forgot
15   their names.  But my cousins from Auntie
16   Gwen are Gabriel, Tony and Chris.
17       Q.   Okay.
18       A.   It's a small family.
19       Q.   Can't think of anybody else?
20       A.   Not close.  Huh-uh.
21       Q.   Well, if you think of who your
22   other aunts are or cousins, let me know,
23   okay?

4  (Pages 10 to 13)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 14

1    A.  Okay.
2    Q.  Have you ever been arrested?
3    A.  No.
4    Q.  Never been charged or convicted of
5  a felony or misdemeanor?
6    A.  No.
7    Q.  Where did you attend high school?
8    A.  Jefferson Davis.
9    Q.  When did you graduate from Jeff
10  Davis?
11    A.  '04.  May 19th, '04.
12    Q.  Is this the only high school you
13  attended?
14    A.  Yes.
15    Q.  So what was your freshman year?
16  Do you remember what year that was that you
17  started at Jeff Davis?
18    A.  Okay.  Yes.  Tenth grade.
19    MR. MADISON:  The ninth is
20  freshman year.
21    MS. MEADOWS:  Well, I'm not from
22  here.  Okay.  That's why it's important to
23  ask.

Page 15

1    Q.  Go ahead.
2    A.  Tenth grade.
3    Q.  No.  I was asking what calendar
4  year.  I'm sorry.
5    A.  Oh.  Let's see.  I graduated the
6  twelfth.  It was '04.  So the eleventh grade
7  would be '03.  And '02 would be tenth grade.
8    Q.  Okay.  While you were at Jeff
9  Davis, were you ever disciplined for any
10  reason?
11    A.  No.
12    Q.  Tell me about any honors or awards
13  you received.
14    A.  Just at Jefferson Davis or --
15    Q.  Well, let's start with Jeff
16  Davis.
17    A.  Okay.  I had -- I maintained over
18  a three point five GPA.  So I was in the
19  honor program.  And I got an award for the
20  math society and I was in the student
21  counsel.
22    I won the privilege to work in
23  like the library and to work in the office

Page 16

1  as a student aid.  And then I was on --
2  Well, we call it HUB.  It's where you get to
3  work on the year book.
4    So I got a chance to get on that
5  staff.  And I was in the Robotics team.  We
6  won a brass medal for that.
7    Q.  Anything else?  Did you
8  participate in any other extracurricular
9  activities when you were at Jeff Davis?
10    A.  Oh, yes.  We had Tri High Y.  It's
11  like Christian youth government.
12    Q.  Okay.
13    A.  Key Club.  That's about it.
14    Q.  Did you participate in any other
15  -- you know, sports or cheerleading or
16  band?  None of that?
17    A.  No.
18    Q.  Is Alabama State the only college
19  you've ever attended?
20    A.  No.  Right now I go to AUM.
21    Q.  When did you start at AUM?
22    A.  I started -- It was in '06.  You
23    Q.  You started in '06.  Do you

Page 17

1  remember what semester or quarter -- Is AUM
2  on quarters?
3    A.  We're on semesters.
4    Q.  On semesters now.  Okay.  When did
5  you start?
6    A.  I don't know the exact date.
7    Q.  Not just --
8    A.  One semester.
9    Q.  Okay.  What is your major at AUM?
10    A.  Social work.
11    Q.  Have you been continuously
12  enrolled from 2006 whenever you started
13  until the present time?
14    A.  Yes.
15    Q.  What is your overall GPA?
16    A.  Right now, it's three point three.
17    Q.  Do you participate in any other
18  extracurricular activities at AUM?
19    A.  No.
20    Q.  Are you involved in any community
21  service projects through AUM?
22    A.  No.
23    Q.  Have you ever been disciplined at

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1   AUM?
2       A.  No.
3       Q.  Have you received any honors or
4   awards?
5       A.  No.
6       Q.  Now, earlier you mentioned you
7   received some other honors or awards other
8   than at Jeff Davis.  Were those prior to
9   high school or would they have been since
10  high school?
11      A.  It was when I was at ASU.
12      Q.  Now, I want you to tell me about
13  your time at ASU.  When did you start at
14  ASU?
15      A.  I was -- Since I graduated.  I
16  enrolled that following semester.
17      Q.  So in the fall of 2004 sounds
18  about right to you?
19      A.  Yes.
20      Q.  And when did you leave ASU?
21      A.  I left a week after the incident.
22      Q.  So sometime in the spring of 2005?
23      A.  Well, a week after the incident.

Page 19

1       Q.  I'm just trying to approximate a
2   time.
3           MR. ARNOLD:  Do you mean the
4   spring semester?
5       Q.  Okay.  That would be the spring of
6   2005 that I'm talking about.  So sometime in
7   February perhaps of 2005?  Would that be
8   accurate?
9       A.  Yes.
10      Q.  What was your overall grade point
11  average when you left?
12      A.  Three point six.
13      Q.  Do you remember how many hours you
14  had already taken?
15      A.  No.
16      Q.  Okay.  Did you participate in any
17  extracurricular activities at ASU?
18      A.  I was beginning to.  You guys had
19  a Kiwanis Club.
20      Q.  Okay.  Were you --
21      A.  I was beginning to start that.
22  But didn't.
23      Q.  Did you complete a membership

Page 20

1   application for the Kiwanis Club?
2       A.  No.
3       Q.  Not yet?  Okay.  Any other
4   activities?
5       A.  Not that I can remember.  That's
6   what I remember the most.
7       Q.  Between February of 2005 and 2006
8   when you enrolled at AUM, did you enroll in
9   any other junior college, community college?
10      A.  No.
11      Q.  Did you work during that time?
12      A.  I did.
13      Q.  Where did you work?
14      A.  Let's see.  I was at Barnes and
15  Nobles, Sears, Best Buy, and
16  Books-A-Million.
17      Q.  Give me the dates that you were
18  employed at Barnes and Nobles.
19      A.  I don't know the specific dates,
20  but I do know the month.
21      Q.  That will work.
22      A.  Okay.  It was in December of '06
23  until July of '07.

Page 21

1       Q.  Okay.  And which Barnes and Nobles
2   were you working at?
3       A.  The one on the Eastern Boulevard.
4           MR. ARNOLD:  What was that?
5           THE WITNESS:  The one on the
6   Eastern Boulevard.
7       Q.  And what was your position?
8       A.  I was a barista.
9       Q.  So you worked in the coffee shop?
10      A.  Uh-huh.
11      Q.  About how many hours per week were
12  you working at Barnes and Nobles?
13      A.  About thirty.
14      Q.  What was your wage?  How much were
15  you being paid per hour?
16      A.  It was about six seventy-five.
17      Q.  Six seventy-five an hour?
18      A.  Uh-huh.
19      Q.  Did you receive any benefits or
20  anything like that while you were there?
21      A.  Not really.  I was part-time.
22      Q.  Right.  Okay.  So you weren't
23  eligible for any of the insurance or

6  (Pages 18 to 21)

FREEDOM COURT REPORTING

Page 22

1  anything like that; right?
2      A.  No.
3      Q.  Okay.  Who was your immediate
4  supervisor?
5      A.  Cory.  She just went by her first
6  name.
7      Q.  So you don't know Cory's last
8  name?
9      A.  No.
10      Q.  As far as you know, is Cory still
11  at Barnes and Nobles?
12      A.  She is.
13      Q.  What was her official title or
14  position?
15      A.  She was manager of the cafe.
16      Q.  What were your duties and
17  responsibilities as a barista?
18      A.  I cleaned the cafe.  I made
19  expresso based drinks and cappicinos and
20  just assisted with customer -- like just
21  customer service.  Just make sure everybody
22  was okay.
23      Q.  Okay.

Page 23

1      A.  And I worked the register.
2      Q.  Did you manage anybody, other
3  employees while you were there?
4      A.  No.
5      Q.  No supervisory responsibilities?
6      A.  No.
7      Q.  And you said you also worked at
8  Sears?
9      A.  Uh-huh.
10      Q.  What were the dates of your
11  employment with Sears?
12      A.  Again, it's just a month.
13      Q.  Yes.  The months are fine.
14      A.  Okay.  It was 08 until December of
15  '07.  08, 07 to December '07.
16      Q.  Okay.  What was your position or
17  title at Sears?
18      A.  I was -- let's see.  We didn't
19  really have a title.  But I worked in the
20  vacuum cleaning and mattress department.
21      Q.  So would you say you were a sales
22  associate?
23      A.  Yes.

Page 24

1      Q.  And you sold vacuum cleaners and
2  household goods basically?
3      A.  Yes.
4      Q.  How many hours per week did you
5  work while you were at Sears?
6      A.  I worked about twenty.
7      Q.  How much were you paid at Sears?
8      A.  It was commission.
9      Q.  It was commission only?
10      A.  Uh-huh.
11      Q.  How much was the commission?
12      A.  It varied.
13      Q.  What was the percentage supposed
14  to be first?
15      A.  It varied on all products.  I
16  remember that vacuum cleaners were one
17  percent and then mattresses were like five
18  percent to seven.
19      Q.  Okay.  And about how much did you
20  bring home while you were working at Sears
21  in an average week?
22      A.  Let's see.  About two hundred two
23  weeks.  We got paid biweekly.

Page 25

1      Q.  Biweekly pay.  Okay.  And you
2  brought home approximately two hundred
3  dollars a pay period?
4      A.  Uh-huh.
5      Q.  Was it ever more than that?
6      A.  No.  It was just about two
7  hundred.  That's it.
8      Q.  Almost every time, it was about
9  two hundred dollars?
10      A.  Uh-huh.
11      Q.  Who was your supervisor while you
12  were at Sears?
13      A.  Mr. Makeithen.
14      Q.  Do you know how to spell that
15  name?
16      A.  M-A-K-E-I-T-H-E-N.
17      Q.  Now, which Sears location were you
18  at?
19      A.  The one at Eastdale Mall.
20      Q.  And as far as you know, is Mr.
21  Makeithen still there?
22      A.  He is.
23      Q.  Do you know what his title was?

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1    A. He was assistant manager.
2    Q. He was the assistant manager for
3  the entire store over there?
4    A. Yes.
5    Q. Did you ever report to anybody
6  else?
7    A. He had a manager. Mr. -- He
8  rarely came in. But we had to do
9  inspections and stuff. He would come and
10  look at our department. I've forgot his
11  name.
12    Q. Okay. But he was not somebody
13  that you regularly interacted with?
14    A. Oh, no.
15    Q. And he didn't give you
16  instructions on a daily basis?
17    A. No.
18    Q. What were your basic duties and
19  responsibilities?
20    A. Assist the customers, clean the
21  department and make sure I sell. And I
22  worked the register.
23    Q. Did you supervise any of the other

Page 27

1  employees while you were there?
2    A. No.
3    Q. You also said you worked at Best
4  Buy; right?
5    A. Uh-huh.
6    Q. Give me the date range that you
7  worked at Best Buy.
8    A. Best Buy was -- let's see. I
9  think it was the year '05 to like 08. I
10  want to say 08. 08-05 to December.
11    Q. So from like August of '05 to
12  December of '05?
13    A. Uh-huh.
14    MR. ARNOLD: Try to say yes or no
15  for the court reporter.
16    A. Oh, I'm sorry. Yes.
17    Q. And I will try to do the same
18  thing. What was your position at Best Buy?
19    A. I worked in the media department.
20    MR. MADISON: I'm sorry, what was
21  that?
22    THE WITNESS: I worked in the
23  media department.

Page 28

1    MR. MADISON: Media.
2    THE WITNESS: Media.
3    A. And music.
4    Q. About how many hours per week did
5  you work at Best Buy?
6    A. About thirty.
7    Q. How much were you paid at Best
8  Buy?
9    A. It was about six fifteen.
10    Q. Six fifteen an hour?
11    A. Uh-huh. Yes.
12    Q. Who was your supervisor at Best
13  Buy?
14    A. I can't remember her name. I
15  can't remember her name.
16    Q. Do you remember her title?
17    A. Oh, Walter. Yes, it was Walter.
18  I can't remember his last name.
19    Q. Okay. What was Walter's title?
20    A. He was head of the media
21  department.
22    Q. Now, which Best Buy location were
23  you at?

Page 29

1    A. It was on the Eastern Boulevard.
2    Q. What were your specific duties and
3  responsibilities?
4    A. I had to straighten up the CD's,
5  DVD's and I stocked the CD's and DVD's
6  before the store opens and assist customers,
7  help customers and I worked the register.
8    Q. Okay. Did you have to supervise
9  any other employees?
10    A. No.
11    Q. Let me just go back while I'm
12  thinking about it. What was your reason for
13  leaving Barnes and Nobles in July of 2007?
14    A. I just wanted to try a new job.
15    Q. And why did you decide to leave
16  the Sears location?
17    A. I really wanted to try a new job.
18  Commission wasn't paying enough.
19    Q. Okay. And why did you leave Best
20  Buy?
21    A. I wanted to try a new job.
22    Q. You said you also worked at
23  Books-A-Million for a while?

8 (Pages 26 to 29)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 30

1   A. Uh-huh.
2   Q. When did you work at
3  Books-A-Million?
4   A. I worked at Books-A-Million -- it
5  was about March. I think March of '05 to
6  about August of '05.
7   Q. Which Books-A-Million were you
8  working at?
9   A. It was on the Eastern Boulevard.
10   Q. What was your title at
11  Books-A-Million?
12   A. I worked customer service and
13  helped people look up their books and I
14  worked the registers and I stocked the
15  books. And that's it.
16   Q. So you didn't really have an
17  official title, those are just things you
18  did?
19   A. Uh-huh.
20   Q. Is that a yes?
21   A. Yes.
22   Q. How many hours per week did you
23  work at Books-A-Million?

Page 31

1   A. About twenty.
2   Q. And how much did you make per
3  hour?
4   A. It was about five fifteen or five
5  twenty-five.
6   Q. Who was your supervisor at
7  Books-A-Million?
8   A. Chris.
9   Q. Do you know Chris' last name?
10   A. He just went by his first.
11   Q. And that's a male Chris?
12   A. Oh, yes.
13   Q. I have to ask because some of
14  these names you can't really tell just by
15  what their name is. What was Chris' title?
16   A. He was manager.
17   Q. He was the store manager?
18   A. Yes.
19   Q. Why did you decide to leave
20  Books-A-Million?
21   A. Just focus on my school, my
22  schooling.
23   Q. Where were you in school at that

Page 32

1  time?
2   A. Well, I was trying to go to AUM.
3   Q. So you had already decided that
4  you wanted to go to AUM in August of 2005?
5   A. Yes. Pretty much.
6   Q. Okay. Had you completed the
7  application process?
8   A. Not then.
9   Q. When did you complete that
10  process?
11   A. I can't remember the specific
12  date. But it's when I started. Like I
13  started in '06. I can't remember the
14  specific day.
15   Q. Okay. I just want to clarify the
16  time line. After you left Books-A-Million
17  to focus on school, that's -- after that,
18  you worked at Best Buy, after you did not
19  complete the application process for AUM;
20  right?
21   A. Uh-huh.
22   Q. Now, at some point you worked at
23  Walgreen's; right? Do you remember when

Page 33

1  that was?
2   A. Walgreen's. That was in '04. It
3  was I think August, around August '04.
4   Q. Do you remember when you left?
5   A. It was when I -- Well, I left when
6  I got hired at ASU.
7   Q. So until January of '05?
8   A. Yes. Yes.
9   Q. What was your position at
10  Walgreen's?
11   A. I worked the registers, stocked.
12  I worked in the beauty consultant area and I
13  worked customer service.
14   Q. How many hours per week were you
15  working at Walgreen's?
16   A. I can't remember. I was
17  part-time. So I can't remember. I don't
18  know. Maybe it was thirty, you know, thirty
19  hours part-time. I don't know.
20   Q. Do you remember what your rate of
21  pay was?
22   A. I can't remember.
23   Q. Was it more or less than six

9 (Pages 30 to 33)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 34

1  dollars an hour?
2     A.  Honestly, I don't know.
3     Q.  Do you remember who your
4  supervisor was?
5     A.  I don't know.
6     Q.  Any other duties there that you
7  haven't told me about?
8     A.  No.  That's it.
9     Q.  And you say you left that job to
10 take the job in data entry at inventory
11 control?
12    A.  Yes.
13    Q.  You filed a charge of
14 discrimination against Alabama State
15 University with the EEOC; correct?
16    A.  Yes.
17    Q.  Do you remember doing that?
18    A.  Yes.
19    MR. MADISON:  Can we take a quick
20 break?
21    MS. MEADOWS:  Certainly.
22    (Whereupon, a short recess was
23 taken.)

Page 35

1     Q.  Ms. Johnson, when we left off, we
2  were talking about your charge with the
3  EEOC; correct?
4     A.  Yes.  I guess.
5     Q.  I'm going to show you what's going
6  to be Defendant's 1, which is the Alabama
7  State University's Exhibit 1 to your
8  deposition.
9     (Whereupon, Defendant's Exhibit
10 No. 1 was marked for identification and
11 attached to the original transcript.)
12    Q.  Does that look like the charge
13 that you filed, looking at page two of that
14 exhibit?
15    A.  Yes, ma'am.
16    Q.  Okay.  Show you Exhibit No. 2,
17 which is an amended charge of
18 discrimination.  Do you recall filing an
19 amended charge in this case?
20    (Whereupon, Defendant's Exhibit
21 No. 2 was marked for identification and
22 attached to the original transcript.)
23    A.  I don't remember.  I mean, what

Page 36

1  does amend mean?
2     Q.  It means you changed it or you
3  added some more information to it.
4     A.  I don't remember.
5     Q.  You don't remember submitting that
6  information?
7     A.  No, ma'am.
8     Q.  Does that look like something you
9  would have submitted?
10    A.  I just don't remember the paper.
11    Q.  Ms. Johnson, I want to direct your
12 attention to the first page of Exhibit No.
13 2.  At the bottom left of the page, does
14 that appear to be your signature?
15    A.  It is.
16    Q.  On the bottom right of the page
17 where it says signature Jalonda Johnson,
18 does that appear to be your signature as
19 well?
20    A.  Uh-huh.
21    Q.  Do you have any reason to dispute
22 that that's your signature?
23    A.  No.  It's my signature.

Page 37

1     Q.  So you agree that you signed what
2  says is an amended charge of discrimination?
3     A.  Yes.  This is my first time seeing
4  this, though.
5     Q.  Ms. Johnson, are you saying that
6  this paper was not filled out when you
7  signed it?
8     A.  Yes, I signed it.  Uh-huh.
9     MR. ARNOLD:  Wait, wait.  Did you
10 understand the question, dear?
11    A.  Redo the question.
12    Q.  Ms. Johnson, what I'm trying to
13 get to is, when you signed this paper that
14 you say you've never seen before, did you
15 sign a blank page?
16    A.  Oh, no, I didn't.  I didn't sign a
17 blank page.
18    Q.  So this page was filled out when
19 you signed it?
20    A.  Uh-huh.  Yes.  I'm sorry.
21    Q.  Do you have any idea who prepared
22 this page, Ms. Johnson?
23    A.  I don't.

10  (Pages 34 to 37)

FREEDOM COURT REPORTING

Page 38

1    Q.   Do you have any idea who asked you
2  to sign this page?
3    A.   I can't remember.
4    Q.   Were you represented by an
5  attorney at this point? When you filed your
6  EEOC charge, did you have an attorney?
7    A.   When I filed the charge for EEOC,
8  I didn't at that time.
9    Q.   Okay. If you didn't fill out this
10  page, Ms. Johnson, what I'm trying to get to
11  is, how did you know to sign it and send it
12  to the EEOC?
13        MR. ARNOLD: Stop. We need to
14  clarify which one. She asked about the --
15  You asked about the charge of
16  discrimination. You're referring to the
17  amended charge of discrimination.
18        MS. MEADOWS: I'm now asking her
19  about the amended charge of discrimination.
20    A.   Okay.
21    Q.   We're talking about Exhibit 2.
22    A.   Okay.
23    Q.   Did you have a lawyer when you did

Page 39

1  Exhibit No. 2, the amended charge of
2  discrimination which you signed August 9th
3  of 2005?
4    A.   You've been my only lawyer. I
5  don't know if I had a lawyer or not.
6    Q.   Look over the remainder, the next
7  two pages of the exhibit which says it sets
8  forth the particulars of your amended EEOC
9  charge. Is that your statement, Ms.
10  Johnson?
11    A.   Uh-huh.
12    Q.   Is that a yes?
13    A.   Yes.
14    Q.   Do you recall submitting that
15  statement to the U.S. Equal Employment
16  Opportunity Commission, the EEOC?
17    A.   Okay. So this is the -- Is this
18  the hearing at Alabama State?
19    Q.   No. I'm talking about to the
20  United States EEOC.
21    A.   Yes, I did write them.
22    Q.   Okay. Did you send this to them?
23    A.   Yes.

Page 40

1    Q.   You sent these three pages?
2    A.   Uh-huh.
3    Q.   Is that a yes?
4    A.   Yes.
5    Q.   Okay. So do you acknowledge that
6  this is your amended charge of
7  discrimination?
8    A.   Yes.
9    Q.   In your charge of discrimination,
10  in your amended charge of discrimination,
11  did you set forth all the reasons that you
12  feel you were subjected to sexual harassment
13  and retaliation by Alabama State University?
14        MR. ARNOLD: Object to the form.
15    Q.   You can still answer.
16    A.   Uh-huh.
17    Q.   Is that a yes?
18    A.   Repeat that. That threw me off.
19  Repeat the question.
20    Q.   Sure. In your charge of
21  discrimination and your amended charge of
22  discrimination, did you tell the EEOC all
23  the reasons you feel you were subjected to

Page 41

1  sexual harassment and retaliation by Alabama
2  State University?
3    A.   I did.
4        MR. ARNOLD: Objection.
5    Q.   There are no reasons why you feel
6  you were sexually harassed other than what
7  are stated in these two documents as Exhibit
8  1 and Exhibit 2?
9    A.   Yes. I complained that I was
10  raped and they fired me.
11    Q.   Those were your only complaints?
12    A.   Yes. I was raped, I told them and
13  they fired me.
14    Q.   I'm just trying to make sure that
15  what's in your charge, that you're not
16  saying anything different today. You're not
17  saying anything different, are you?
18    A.   No. I was raped and they fired me
19  when I told them.
20    Q.   Okay. Have you ever filed another
21  charge of discrimination with the EEOC other
22  than those against Alabama State University?
23    A.   No.

11 (Pages 38 to 41)

FREEDOM COURT REPORTING

Page 42

1    Q.  Have you ever been involved in a
2  lawsuit other than this one?
3    A.  No.
4    Q.  Have you ever been involved in
5  filing a sexual harassment complaint other
6  than the one against -- the one here today?
7    A.  Yes.
8    Q.  When was that?
9    A.  That was when I was working at
10  Best Buy.
11    Q.  Do you know an approximate date
12  that you filed that complaint?
13    A.  I don't.
14    Q.  Was that a complaint internal to
15  the store or an EEOC complaint?
16    A.  It was just in the store.
17    Q.  Who was that complaint against?
18    A.  I can't remember the guy's name.
19    Q.  Who did you complain to?
20    A.  It was -- Well, my manager Walter
21  in the media department of Best Buy.
22    Q.  Okay.  What was your reason for
23  filing the complaint?

Page 43

1    A.  I was bent over putting up gaming
2  controllers and this guy walked right up
3  behind me -- I guess he was playing or
4  something -- and he grabbed me and like
5  pulled me against him.
6        And he had like, you know, like an
7  erection.  And when he picked me up, it was
8  like a bear hug.  And I don't know if he
9  played like that.
10        It just caught me off guard.  It
11  was just really awful.  He invaded my space
12  and it just -- and I let the store know.
13    Q.  And you let the store know about
14  it?
15    A.  Walter, yes.
16    Q.  Okay.  What did you do when he
17  walked up behind you and grabbed you like
18  that?
19    A.  Total shock.  And I told him, I
20  said don't touch me.  Do not touch me like
21  that.  And he had this big smile like he was
22  playing.  And I wanted to report it because
23  that was like -- that was unnecessary

Page 44

1  invasion.
2    Q.  Okay.  So you reported it to
3  Walter?
4    A.  Uh-huh.
5    Q.  What happened after you reported
6  it to Walter?
7    A.  Well, I believe Walter followed
8  protocol.  Like he went to his manager or
9  whoever he was supposed to go to.
10    Q.  Okay.  And what happened after
11  that?
12    A.  After that, the guy just never
13  bothered me again.  Everything was just
14  smooth.  I believe they disciplined him.  I
15  don't know how.
16    Q.  Did you participate in any
17  investigation of the complaint?
18    A.  It wasn't an investigation.
19    Q.  There was no investigation?
20    A.  Huh-uh.
21    Q.  Okay.  And after that was
22  resolved, after they disciplined him or
23  whatever, did you file -- you did not file a

Page 45

1  charge with the EEOC?
2    A.  No.
3    Q.  You considered the disciplinary
4  action to be sufficient?  Is that a yes?
5    A.  Yes.
6    Q.  When did you begin to seek
7  employment at Alabama State University?
8    A.  It was in January.  Yes, January
9  25th.
10    Q.  No.  When did you start looking
11  for the job?  When did you start asking for
12  a job at Alabama State?
13    A.  Oh, okay.  It was in January I was
14  looking for a job.
15    Q.  Okay.  You got an approximate time
16  frame?
17    A.  It had to be two weeks before I
18  left Walgreen's because I always give a two
19  week notice.
20    Q.  At the time you were seeking
21  employment at Alabama State University, you
22  were aware that Alabama State University had
23  a Department of Personnel and Human

12  (Pages 42 to 45)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 46

1  Relations; correct?
2      A.  Yes, sir.
3      Q.  Were you also aware that in order
4  to get a job on campus, you were required to
5  complete an application for employment
6  through personnel and human relations?
7      A.  Yes.
8      Q.  Were you aware that no contract
9  for employment would be approved until after
10  you completed your application with
11  personnel and human relations?
12      A.  Yes.
13      Q.  I'm going to show you Exhibit No.
14  3.
15          (Whereupon, Defendant's Exhibit
16  No. 3 was marked for identification and
17  attached to the original transcript.)
18      Q.  Is this the application for
19  employment that you completed in order to be
20  hired at Alabama State University?
21      A.  It is.
22      Q.  Is this the first application you
23  completed at Alabama State University?

Page 47

1      A.  Yes.  This is the application.
2      Q.  Okay.  And now I'm asking you --
3  making sure this is the first one you
4  completed.  Correct?
5      A.  Oh.  No.
6      Q.  You filled out another application
7  like this?
8      A.  I used to work in the writing lab.
9      Q.  Okay.  When was that?
10      A.  That was freshman.  Freshman, like
11  right as soon as I started there.
12      Q.  So --
13      A.  Freshman year.
14      Q.  -- August of '04?
15      A.  Yes.  It was during fall.
16      Q.  It was during the fall semester of
17  2004?
18      A.  Uh-huh.
19      Q.  And you completed an application
20  like this?
21      A.  Uh-huh.
22      Q.  When did you complete that
23  application?

Page 48

1      A.  I don't know the exact date.
2      Q.  But this is your first application
3  for the data entry clerk position?
4      A.  Uh-huh.
5      Q.  Is that a yes?
6      A.  Yes.
7      Q.  I just don't want to get into an
8  argument later with Allen about whether when
9  you said uh-huh you meant yes or you meant
10  no. It's hard to read later on sometimes.
11  Okay?
12      A.  Okay.
13          MR. ARNOLD:  I just want you to be
14  clear so Judge Fuller doesn't yell at us
15  later because he'll be equally hard on us.
16      Q.  Right.  And when you submitted
17  this application, you submitted this so that
18  you could be employed as a data entry clerk
19  in the inventory control department;
20  correct?
21      A.  Yes.
22      Q.  And inventory control is located
23  in the same building as the physical plant?

Page 49

1      A.  Yes.
2      Q.  You completed this application on
3  February 2nd, 2005; right?
4      A.  It was before -- it was before
5  then.
6      Q.  Okay.  I want you to look at page
7  JOH 0009.
8      A.  Uh-huh.
9      Q.  Did you complete this page at the
10  same time that you completed the rest of the
11  application?
12      A.  Yes.
13      Q.  Okay.  What is the date on that
14  page?
15      A.  February 2nd, 2005.
16      Q.  Okay.  Did you write that date on
17  this page?
18      A.  Looks like my handwriting.
19      Q.  Okay.  So you completed this
20  application on February 2nd, 2005; correct?
21      A.  No.  I believe it was before then.
22      Q.  Okay.  Can you explain to me why
23  you dated the application for February 2nd,

13  (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1  2005 if you completed it earlier?
2      A.  Honestly, I do not know why that
3  -- I don't know why it's dated like that.
4      Q.  What date did you complete the
5  application?
6      A.  I don't know the exact date.  But
7  you have to -- like you have to fill out an
8  an application before you even start
9  working.  And I started working on the 25th.
10      Q.  I understand that, Ms. Johnson.
11  But I'm looking at an application that's
12  dated February 2nd, 2005.  I don't have --
13  You just told me that there is no other
14  application; correct?
15      A.  Yes, ma'am.
16      Q.  And you dated this application;
17  correct?
18      A.  Yes, ma'am.
19      Q.  And you dated this application
20  February 2nd, 2005; correct?
21      A.  Yes, ma'am.
22      Q.  Which is more than a week after
23  you contend that you were employed at

Page 51

1  Alabama State University; right?
2      A.  Yes, ma'am.
3      Q.  So what I'm trying to get to is,
4  if you didn't put the right date on this
5  application, I need an explanation and I
6  need to know what date the application was
7  completed on.
8      MR. ARNOLD:  Object to form.
9      Q.  Do you have any evidence to
10  support that this application was completed
11  on any other date other than February 2nd,
12  2005?
13      A.  Any evidence?
14      Q.  Do you have anything to show me
15  that there is another date?
16      A.  I don't have anything to show
17  you.  I mean, you can check with my lawyer.
18  But I just don't have anything to show you.
19      Q.  Do you have -- Do you have
20  anything to support your contention that you
21  dated this application for more than a week
22  after the date you contend you completed an
23  application?

Page 52

1      A.  I mean, I don't know.  Like I
2  said, I don't know.  I honestly don't know
3  why it's dated on the 2nd.
4      Q.  I mean, you understand, Ms.
5  Johnson, that you dated it for an entirely
6  different month; right?
7      MR. ARNOLD:  Object to form.
8      Q.  You can still answer.
9      A.  And I'm trying to tell you I just
10  -- I don't know why and I don't have any
11  proof of anything.  I don't have anything to
12  give you.  You'll just have to talk to my
13  lawyer about that.
14      Q.  Well, Ms. Johnson, unfortunately,
15  I have to talk to you about it because you
16  completed the application, not your lawyer.
17  So I need your explanation for why your
18  application is dated February 2nd, 2005.
19      A.  I don't know.
20      Q.  Do you have any witness that will
21  support your contention that you did not
22  complete this application on February 2nd,
23  2005?

Page 53

1      A.  No.  I mean -- no.
2      Q.  And this is the first application
3  and only application you submitted for this
4  position; correct?
5      A.  Yes.
6      Q.  Did you go to the human resources
7  office to fill out this application?
8      A.  Yes.
9      Q.  While you were there, did you ask
10  if there were any other positions available
11  that you could apply for?
12      A.  Yes, I did.  I asked them.
13      Q.  Who did you ask?
14      A.  It was -- I don't know.  I can't
15  remember his name.
16      Q.  Can you describe him to me?
17      A.  He's light skinned.  That's all I
18  know.
19      Q.  Is he short, tall, skinny, fat?
20      A.  I do not remember.
21      Q.  Do you know what his job title
22  was?
23      A.  I don't.

14  (Pages 50 to 53)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 54

1    Q.  What did he tell you when you
2  asked if there were other positions you
3  could apply for?
4    A.  Like he just told me to fill out
5  an application, put my application on file.
6  And then I remember -- I remember that there
7  was a position open in the physical plant
8  where my mom worked in that vicinity.  So I
9  chose data entry.
10    Q.  Okay.  What other positions did he
11  tell you were open?
12    A.  Well, I remember that.  And it was
13  open, you know.
14    Q.  This is the one you decided to
15  apply for?
16    A.  Yes.
17    Q.  Ms. Johnson, you never -- your
18  charge says that you had worked a study
19  job.  But you never applied for Federal work
20  study, did you?
21    A.  What do you mean?
22    Q.  You never applied to the Federal
23  work study program, did you?

Page 55

1    A.  My application?
2    Q.  Right.  Did you apply for the
3  Federal work study program?
4    A.  Yes.  I had an application.  I
5  gave them an application.
6    Q.  I'm not talking about this
7  application.  I'm talking about did you
8  apply for Federal work study?
9    A.  Yes.  I worked there.
10    Q.  Let me clarify for you, Ms.
11  Johnson.  Work study is a federally funded
12  program that's administered through
13  financial aid.  Do you still contend that
14  you applied for work study?
15    A.  Yes.
16    MR. ARNOLD:  She's asking you --
17    A.  What are you asking?
18    Q.  I'm asking if you applied for the
19  program known as the Federal work study
20  program?
21    MR. ARNOLD:  Do you understand the
22  question?
23    THE WITNESS:  I don't honestly.

Page 56

1    Q.  Okay.  A work study program job is
2  different from a part-time position at the
3  University.  They are not the same thing.
4  Work study is a Federally funded program.
5    In order to apply for work study,
6  there's a process that you must go through
7  each year.  And it is governed by a specific
8  handbook and specific Federal guidelines.  I
9  am asking if you participated in that
10  program?
11    MR. ARNOLD:  To be perfectly
12  frank, what is the relevance of whether it's
13  a Federal work study program or a part-time
14  job?
15    MS. MEADOWS:  I'm just getting to
16  her allegation that she applied for work
17  study and that she had a work study job
18  because they are two different programs and
19  two different application processes.
20    MR. ARNOLD:  Okay.  I guess what
21  I'm trying to understand is regardless of
22  whether it's a Federal work study or a
23  part-time job, it's still an

Page 57

1  employee/employer relationship whether she's
2  a student or not.
3    I'm guess you're looking -- I'm
4  trying to understand the relevance of
5  whether or not it's form over substance
6  here.
7    MS. MEADOWS:  I think it is
8  substantive.  And at this point, you know,
9  I'm going to ask her that.  Now, you can
10  instruct her not to answer if that's what
11  you choose to do.
12    But I'm providing her with all the
13  relevant material and information and I'm
14  attempting to explain to her what work study
15  is because I think it's kind of clear she
16  has no clue.
17    So she could not have applied for
18  work study if she doesn't even know what it
19  is.
20    MR. ARNOLD:  I guess what I'm
21  trying to understand is how it goes to one
22  of the relevant elements of the claims or to
23  any of the defendant's affirmative

15  (Pages 54 to 57)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 58

1  defenses. I just don't see the relevance of
2  either one.
3        MS. MEADOWS: I think it does make
4  a difference. So we'll just have to agree
5  to disagree unless you're objecting and
6  telling her not to answer.
7        MR. ARNOLD: I'll just be happy if
8  you can tell me which affirmative defense
9  you're trying to direct this because I have
10 no clue where you're coming from with this.
11 And I'm fine with it if you can demonstrate
12 that.
13        MS. MEADOWS: Well, I think you've
14 already stated that she has claimed that she
15 applied for a Federal work study position
16 and we're trying to get it on the record
17 whether it was or not.
18        MR. ARNOLD: Does it say Federal
19 work study in her charge?
20        MS. SALAAM-JONES: There is no
21 work study other than Federal work study.
22 So either she did work study or she didn't.
23        MR. MADISON: Why don't you ask

Page 59

1  her if she knows the difference.
2        MS. MEADOWS: And that's what I'm
3  getting to. And it also makes a difference
4  in when she submitted her application.
5        Q.  Did you complete a application for
6  student aid?
7        A.  Student aid?
8        Q.  Right.
9        A.  So we're not talking about work
10 study?
11        Q.  This is work study.
12        MR. ARNOLD: Do you understand
13 what -- the question she just asked?
14        THE WITNESS: I don't.
15        Q.  What I'm trying to get to, did you
16 ever go by financial aid and pick up one of
17 these handbooks?
18        A.  I don't remember that. I don't
19 remember.
20        Q.  Okay. Did you ever go -- and I'm
21 going to go ahead and mark this as 4 since
22 we're going to talk about it.
23        (Whereupon, Defendant's Exhibit

Page 60

1  No. 4 was marked for identification and
2  attached to the original transcript.)
3        Q.  Did you ever go to financial aid
4  and ask them for help in getting a job?
5        MR. ARNOLD: Why don't you ask her
6  if she's actually seen the document before.
7        MS. MEADOWS: I did. I just asked
8  her if she had gone to financial aid and
9  picked one up and she said she doesn't
10 recall.
11        A.  Yes, I don't recall.
12        Q.  Did you ever go to financial aid
13 and ask them for assistance with getting a
14 job?
15        A.  I did.
16        Q.  You went to the financial aid
17 office?
18        A.  Uh-huh.
19        Q.  What did they tell you?
20        A.  I filled out an application. I
21 filled it out for data entry.
22        Q.  Okay. That was at personnel;
23 right? You filled this out at personnel;

Page 61

1  correct?
2        MR. ARNOLD: Just for the record,
3  she's referring to Defendant's Exhibit 3.
4        A.  Yes, I filled this out. Uh-huh.
5        Q.  And you filled out Exhibit 3 at
6  the personnel office?
7        A.  Yes.
8        Q.  Okay. What did you get from
9  financial aid?
10        A.  I can't remember.
11        Q.  Do you remember who you talked to
12 in the financial aid office?
13        A.  I don't.
14        Q.  Do you remember what you were told
15 at financial aid?
16        A.  I don't.
17        Q.  Do you recall that financial aid
18 directed you to personnel?
19        A.  I don't know.
20        Q.  You don't recall? Okay.
21        MR. ARNOLD: Let's take a break
22 real quick if you don't mind.
23        MS. MEADOWS: Sure.

16  (Pages 58 to 61)

FREEDOM COURT REPORTING

Page 62

1    (Whereupon, a short recess was
2    taken.)
3    Q.    Financial aid did not assign you
4    to work in inventory control, did they?
5    A.    All I know is that I filled out an
6    application and Mr. Moore told me I was
7    hired and I worked.  And I think I was
8    getting confused with the Federal work study
9    because they called us work study students.
10    Q.    Okay.  What I'm trying to get to
11    is, when you went to the financial aid
12    office, did someone in financial aid send
13    you to see Mr. Moore?
14    A.    I don't know.
15    Q.    You don't know?  Okay.  But you
16    don't have any reason to believe someone in
17    financial aid sent you to Mr. Moore?
18    A.    I don't know.  I mean, I don't
19    know.
20    Q.    Who told you to go and see Mr.
21    Moore?
22    A.    Mr. Moore told me that I had a
23    job.  I had a job.

Page 63

1    Q.    Okay.
2    A.    And I started working.  I mean, I
3    started working for him.
4    Q.    Okay.  Prior to completing your
5    application which is Exhibit 3, you had not
6    applied for a position through human
7    resources other than the writing lab
8    position; correct?
9    A.    You're asking if I just worked at
10    the writing lab?
11    MR. ARNOLD:  Do you understand the
12    question?
13    THE WITNESS:  Huh-uh.
14    Q.    Okay.  You completed the
15    application to work in the writing lab at
16    human resources; correct?
17    A.    Yes.
18    Q.    And that was at human resources in
19    personnel; right?
20    A.    I can't remember.  I can't
21    remember that, but I do know that I worked
22    at the writing lab.  I filled out an
23    application.

Page 64

1    Q.    Do you remember what building you
2    went to when you filled out that
3    application?
4    A.    I don't.
5    Q.    But you remember filling out that
6    application?
7    A.    Yes.
8    Q.    Correct?
9    A.    I filled out an application.
10    Q.    And then you filled out this
11    application; correct?
12    A.    Uh-huh.  I filled out this
13    application.
14    Q.    Are those the only two
15    applications you filled out?
16    A.    That's it.
17    Q.    Okay.  So now I want to talk only
18    about the inventory control.
19    A.    Okay.
20    Q.    So my questions now don't apply to
21    the writing lab because I think maybe that's
22    what's confusing you, okay?
23    A.    Okay.

Page 65

1    Q.    You understand?  Okay.  So prior
2    to completing this application, you had not
3    applied for any other position through human
4    resources to work in inventory control?
5    A.    This is my first application to
6    work in inventory control.
7    Q.    Now, at some point, you talked to
8    Stratford Moore about getting a job in
9    inventory control; correct?
10    A.    Yes, I did.
11    Q.    Do you remember when you talked to
12    Mr. Moore?
13    A.    I don't remember.
14    Q.    But Mr. Moore told you that he
15    would hire you?
16    A.    Yes, he did.
17    Q.    Okay.  Did he also tell you that
18    he would have to have funds transferred into
19    his account because he didn't have any money
20    in his budget?
21    A.    No.
22    Q.    You never had a discussion with
23    Mr. Moore about the transfer of funds?

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1     A.  No.
2     Q.  But you know that even after
3   talking with Mr. Moore, that you were going
4   to have to have your contract approved by
5   the University; correct?
6     A.  I don't know what happened after
7   him.  But I knew that he told me that I had
8   the job.
9     Q.  Okay.
10    A.  And then I started working for
11  him.
12    Q.  Okay.  You knew you would have to
13  complete an employment application before a
14  contract could be approved; correct?
15    A.  I knew I had to fill out this
16  application.
17    Q.  Right.  And you knew that you were
18  going to have to complete your tax forms,
19  your W-4 forms and your W-A forms before
20  your employment would be considered
21  official; correct?
22    A.  I knew that he told me to fill out
23  the application and I started working.

Page 67

1     Q.  Mr. Moore told you to fill out the
2   application?
3     A.  He told -- He told me that I had
4   the job.
5     Q.  Okay.  And then he told you to
6   fill out the application?
7     A.  I filled the application out.
8   Like I said before, I filled the application
9   out.  And then when I did that, he just told
10  me I could start working.  I started working
11  for him.
12    Q.  So he didn't tell you that until
13  after you filled out the application?
14    A.  Told me what?
15    Q.  That you could start working?
16    A.  Yes.  I put my application in and
17  I started working.  He told me that I had
18  the job.
19    Q.  He told you, you had the job?
20    A.  Yes.
21    Q.  And then you put in the
22  application.  I'm just trying to figure out,
23  did you start -- because your application is

Page 68

1   dated the February the 2nd; right?
2     A.  I see that.  Uh-huh.
3     Q.  And not just your application.
4   Let's turn to JOH 010 which is a part of
5   Exhibit 3.  Does that look like the W-4
6   certificate you filled out?
7     A.  Uh-huh.
8     Q.  Is that a yes?
9     A.  Yes.  Yes.
10    Q.  And you filled that out in
11  connection with this application; correct?
12    A.  Yes.  It's part of the
13  application.
14    Q.  It's part of the application?
15    A.  Uh-huh.
16    Q.  Okay.  I want you to look at --
17  don't turn from there.  I want you to look
18  at that date on there.  What date did you
19  put on that application on your W-4 form?
20    A.  It's 02-02-05.
21    Q.  Okay.  And is that your signature?
22    A.  It is.
23    Q.  And did you date this?

Page 69

1     A.  I did.
2     Q.  And I want you to turn over to the
3   next page.  This is your Alabama withholding
4   certificate, your A-4; is that correct?
5     A.  Uh-huh.
6     Q.  Is that a yes?
7     A.  Yes.
8     Q.  Did you sign this form?
9     A.  I did.
10    Q.  And did you date this form?
11    A.  I did.
12    Q.  And what date did you put on this
13  form?
14    A.  02-02-05.
15    Q.  Okay.  So you have consistently in
16  your application said that you were
17  submitting an application dated February
18  2nd, 2005; correct?
19    A.  Yes.  It's dated --
20    Q.  It's dated --
21    A.  It's dated 02-02-05.
22    Q.  Okay.  And that's the only date
23  anywhere on this application, is February

18 (Pages 66 to 69)

FREEDOM COURT REPORTING

Page 70

1  the 2nd, 2005; correct?
2      A.  Yes.
3      Q.  Do you have any reason why you
4  would have completed an application in
5  January of 2005 and then dated it February
6  2nd, 2005?
7      A.  Honestly, I don't know.
8      Q.  So you don't have any reason why
9  you would have done that?
10     A.  No.  I don't know why it's dated
11  that.
12     Q.  Is there any reason you would have
13  dated your application for a date other than
14  the date you filled it out?
15         MR. ARNOLD:  Asked and answered.
16  Go ahead and answer it.
17     A.  I mean, the only reason I can
18  think is I was instructed to do so.
19     Q.  And who instructed you to do that?
20     A.  I was hired by Mr. Moore.  I
21  started working for him.  That's all I know.
22     Q.  So are you saying Mr. Moore told
23  you to date your application for February

Page 71

1  the 2nd?
2      A.  I don't know.
3      Q.  What I'm asking you is, I want the
4  name of the person who instructed you to
5  date your application for February 2nd,
6  2005.
7      A.  I don't know.
8         MR. ARNOLD:  That's misstating her
9  testimony.
10        MS. MEADOWS:  She said that's the
11  only reason she would have dated it for a
12  date other than February the 2nd, 2005.
13        MR. ARNOLD:  She gave you a
14  speculative answer, though.
15     Q.  Are you saying that someone
16  instructed you to date it?
17     A.  No.
18     Q.  You're not saying that?
19     A.  No.
20     Q.  Okay.  When you started working in
21  inventory control, were you aware that your
22  application had not -- that your contract
23  had not been approved?

Page 72

1      A.  No.
2      Q.  Okay.  When you started working,
3  you were aware that you had not reported to
4  personnel to complete your application;
5  correct?
6      A.  No.  I was hired.  This is my
7  application.  They told me I was hired and I
8  worked.  And that's it.  I worked.
9      Q.  Okay.  You said you started
10  working on January the 24th or 25th;
11  correct?
12     A.  Yes.  25th.
13     Q.  The 25th?
14     A.  Uh-huh.
15     Q.  Okay.  But you reported to
16  personnel to complete your application on
17  February the 2nd after you started working?
18     A.  No.  I don't know why it's dated
19  like that.  But no.  I filled -- I remember
20  I filled out my application first and I got
21  the job and I started working.
22     Q.  What date did you fill out this
23  application?

Page 73

1      A.  It says 02-02-05.
2      Q.  Okay.  Right, it does.  So prior
3  to February the 2nd, 2005, you had not
4  fulfilled all the requirements to be
5  employed at Alabama State University?
6      A.  That's not true.  I did.
7      Q.  You completed an application?
8      A.  Yes.
9      Q.  And you signed your W-4 and your
10  A-4?
11     A.  Yes, I did.
12     Q.  And you signed it before February
13  2nd, 2005?
14     A.  I did.
15     Q.  And do you have any witness to
16  your signing this on a date other than
17  February 2nd, 2005?
18        MR. ARNOLD:  Asked and answered.
19  You established the point.
20        MS. MEADOWS:  But if Ms. Johnson
21  is going to continue to insist that her
22  application was submitted on a date other
23  than February 2nd, 2005, I'm afraid that --

19  (Pages 70 to 73)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 74

1      MR. ARNOLD: She's consistently
2  submitted I don't know.
3      Q. But prior to February the 2nd,
4  2005, Alabama State University has no reason
5  to believe that you fulfilled the
6  requirements to be employed there, do they?
7      A. I worked there.
8      MR. ARNOLD: Object to form. She
9  can't possibly answer to what Alabama State
10  thinks.
11     Q. You worked there prior to
12  submitting your application; correct?
13     A. I put in application and I worked
14  there.
15     Q. Okay. You started working. Never
16  mind. You're right. As a student of
17  Alabama State University, did you receive a
18  copy of the Pilot, the student handbook?
19     A. I really don't remember.
20     Q. You don't remember whether you
21  received a Pilot?
22     A. No, I don't remember.
23     Q. Prior to your freshman year, did

Page 75

1  you attend freshman orientation?
2      A. No.
3      Q. You didn't attend orientation?
4      A. No.
5      Q. Do you recall seeing a booklet
6  that looks something like this, keeping in
7  mind this is not the best copy? But did you
8  see something that looked like that?
9      A. I don't remember. I don't
10  remember.
11     Q. Okay. Or did you receive one that
12  looked more like that?
13     A. I don't remember.
14     Q. Okay. Go ahead and mark this as
15  5.
16        (Whereupon, Defendant's Exhibit
17  No. 5 was marked for identification and
18  attached to the original transcript.)
19     Q. Okay. Well, Ms. Johnson, this is
20  one of the policies contained in the Pilot.
21  Have you ever heard that the Pilot is the
22  student handbook at Alabama State
23  University?

Page 76

1      A. I don't remember.
2      Q. Okay. I'm going to direct you to
3  the cover of that book. What does it say
4  the Pilot is?
5      A. It reads that it's the student
6  handbook of Alabama State University.
7      Q. Okay.
8        MR. MADISON: Did you mark that as
9  Exhibit 5?
10       MS. MEADOWS: Yes, I did.
11     Q. I want you to turn to the second
12  page of that exhibit. What you're holding
13  is an excerpt from the Pilot detailing the
14  University's policy on sexual harassment.
15  Do you see that?
16     A. I do see this.
17     Q. Okay. Take a few minutes to
18  familiarize yourself with it.
19     A. Okay.
20     Q. Ms. Johnson, this policy details
21  what constitutes sexual harassment and how
22  to report it; correct?
23     A. It does.

Page 77

1      Q. And the policy requires students
2  to report any allegations of harassment to
3  the vice-president of student affairs or the
4  campus police; correct?
5      A. Yes.
6      Q. The policy also states that a
7  formal investigation of the matter will
8  begin when the student files a written
9  complaint; correct?
10     A. Yes.
11        (Whereupon, Defendant's Exhibit
12  No. 6 was marked for identification and
13  attached to the original transcript.)
14     Q. Ms. Johnson, I want to direct your
15  attention to this excerpt from the
16  University's non-academic staff handbook.
17  Have you had an opportunity to review this
18  before?
19     A. Yes, I have.
20     Q. Okay. I want you to turn to the
21  third page of this exhibit. This policy
22  also details things that the University
23  considers to be sexual harassment; correct?

20  (Pages 74 to 77)

FREEDOM COURT REPORTING

Page 78

1    A.  Yes.
2    Q.  And it also provides for reporting
3  incidents of sexual harassment; correct?
4    A.  Yes.
5    Q.  And under this policy, you're
6  supposed to report harassment to the
7  director of personnel services and human
8  relations; correct?
9    A.  Yes.
10    Q.  And this policy also says that a
11  report can be in oral or written form;
12  correct?
13    A.  Yes.
14    Q.  But it also says that a formal
15  investigation cannot begin until the
16  complaint is submitted in written form
17  signed by the complainant; correct?
18    A.  Yes, it does say that.
19    Q.  So is it your understanding, based
20  upon the two policies that we've just
21  reviewed, that only a written report of
22  sexual harassment is considered an official
23  report?

Page 79

1    A.  You said only a written?
2    Q.  That only a -- let me back up.
3  Only a written report will be considered an
4  official report that will start an
5  investigation?
6    A.  Official report may be in oral or
7  written form.
8    MR. ARNOLD:  Are you asking her if
9  that's what it says?
10    MS. MEADOWS:  I'm asking her if
11  she understands.
12    Q.  I will rephrase the question.  Do
13  you understand that no sexual harassment
14  complaint will be officially investigated
15  until a written report is filed?
16    A.  Yes.
17    Q.  In this lawsuit, you contend that
18  ASU retaliated against you for filing sexual
19  harassment charges against Anwar Diop; is
20  that correct?
21    A.  Yes.
22    Q.  Is there any other reason you
23  believe you were allegedly retaliated

Page 80

1  against?
2    A.  No.  I told them I was raped and
3  they fired me.
4    Q.  Okay.  So that's the only reason
5  you contend you were retaliated against?
6    A.  Yes.  I told them I was raped and
7  they fired me.
8    Q.  Okay.  Following the alleged rape
9  by Mr. Diop on January 31st, you telephoned
10  your friend C'aira Robins in Michigan to
11  tell her what happened; right?
12    A.  I did.
13    Q.  Okay.  When you called Ms. Robins,
14  you were seeking her advice as a friend;
15  right?
16    A.  I called her out of panic.
17    Q.  Right.  Because she was your
18  friend; correct?
19    A.  Yes, she's my friend.
20    Q.  Right.  And you wanted to talk to
21  a friend at that time; right?
22    A.  I was ashamed to tell my parents.
23    Q.  Okay.  So you needed a friend to

Page 81

1  talk to?
2    A.  I called her because -- I didn't
3  want to talk to her.  I wanted to tell her
4  what happened to me.
5    Q.  Okay.
6    A.  Yes.
7    Q.  Okay.  And I guess we're getting
8  into semantics.  This isn't a trick
9  question.  I'm just saying you called Ms.
10  Robins because she was a friend?
11    A.  Yes.
12    Q.  And you felt like you could tell
13  her what had happened?
14    A.  Yes.
15    Q.  Okay.  Ms. Robins is not employed
16  with Alabama State University, is she?
17    A.  She's not.
18    Q.  Okay.  And you didn't believe when
19  you were talking to Ms. Robins that you were
20  making an official report of sexual
21  harassment to Alabama State University, did
22  you?
23    A.  No.

21  (Pages 78 to 81)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 82

1    Q.  In fact, the last thing on your
2    mind was making a sexual harassment
3    complaint; correct?
4    A.  The last thing?
5    Q.  Yes.  That's the last thing you
6    were thinking about?
7        MR. ARNOLD:  Object to form.
8    Q.  When you called Ms. Robins, were
9    you thinking about filing a sexual
10   harassment complaint against Alabama State
11   University?
12   A.  Was I thinking about filing a
13   complaint?
14   Q.  Yes.
15   A.  I went to the hospital.  Yes.
16   Q.  But you weren't thinking about
17   calling Alabama State University?
18   A.  No.  I was raped.
19   Q.  Right.
20   A.  I had to go to the hospital.
21   Q.  And I understand from your
22   statement that Ms. Robins advised you to go
23   to the hospital?

Page 83

1    A.  Uh-huh.
2    Q.  And you took her advice and went
3    to Baptist Hospital; correct?
4    A.  I did.
5    Q.  And you informed the hospital
6    staff that you had been raped; correct?
7    A.  I did.
8    Q.  And at that time, you were seeking
9    medical treatment?
10   A.  Yes.  They were doing a rape kit.
11   Q.  Right.  You were seeking medical
12   treatment and some potential assistance with
13   your rape case; correct?
14   A.  Yes.
15   Q.  Okay.  But you are aware that the
16   staff members at Baptist Hospital were not
17   Alabama State University employees; right?
18   A.  Yes, I'm aware of that.
19   Q.  Okay.  And you didn't believe that
20   you were making an official report of sexual
21   harassment to Alabama State University when
22   you were talking to Baptist Hospital, did
23   you?

Page 84

1    A.  Are you asking me if I made an
2    attempt to complain to Alabama State?
3    Q.  I'm asking you when you were
4    talking to Baptist Hospital, did you
5    consider yourself to be complaining to
6    Alabama State University at that time?
7    A.  Look, at that time, I wasn't even
8    thinking about all that.
9    Q.  Okay.  Thank you.
10   A.  I mean, I was raped.
11   Q.  Right.  And you weren't even
12   thinking about Alabama State University at
13   that time?
14       MR. ARNOLD:  Object to form.
15   Q.  You can answer the question.
16       MR. ARNOLD:  You can answer.
17   A.  Okay.
18       MR. ARNOLD:  Actually you already
19   have.
20   A.  Sorry.  Reask the question.
21   Q.  You weren't thinking about making
22   a complaint to Alabama State University when
23   you were at Baptist Hospital?

Page 85

1    A.  No.
2    Q.  Okay.
3        MR. ARNOLD:  Asked and answered.
4    I'm just trying to figure --
5        MS. MEADOWS:  Well, you made your
6    objection after that and I think that threw
7    her off.  She was unsure what she was going
8    to say.
9        MR. ARNOLD:  I'm trying to figure
10   out are you contending she should have gone
11   to Alabama State before she went to a
12   hospital?
13       MS. MEADOWS:  No, I'm not.  I
14   don't contend that at all.
15   Q.  While you were at the hospital,
16   the Montgomery Police Department was
17   contacted; correct?
18   A.  Yes.
19   Q.  Okay.  And the police officers
20   came to Baptist Hospital to speak with you;
21   right?
22   A.  They did.
23   Q.  Okay.  And you were speaking with

22 (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1  the officers from the Montgomery Police
2  Department and they took a statement from
3  you at that time; correct?
4     A.  They did.
5     Q.  And you knew then that you were
6  speaking to the Montgomery Police Department
7  and not Alabama State University campus
8  police department; right?
9     A.  This happened on the same night.
10  All this that you're talking about happened
11  on the same night.
12     Q.  Right.
13     A.  Yes.  I spoke with the police
14  department.
15     Q.  Okay.  The Montgomery Police
16  Department?
17     A.  Yes.
18     Q.  Correct?  You did not speak with
19  the Alabama State police department, did
20  you?
21     A.  No.
22     Q.  When you were talking with the
23  officers, it was your intention to discuss

Page 87

1  possible criminal charges during that time;
2  right?
3     A.  They wanted to know what
4  happened.  I told them what happened.  And
5  that's all that we discussed.
6     Q.  Okay.  And while you were talking
7  to the officers, you considered yourself to
8  be reporting a crime; correct?
9     A.  Yes.  I was reporting my rape.
10     Q.  Right.  You were reporting that
11  you were raped?
12     A.  Yes.
13     Q.  So you reported a crime; correct?
14     A.  Yes.
15     Q.  Okay.  But you had no reason to
16  believe when you were speaking with the
17  Montgomery Police Department that you were
18  making a sexual harassment complaint to
19  Alabama State University, did you?
20     A.  No.
21     Q.  Okay.  And at that time -- Well,
22  the police officers then took you to the
23  Star Rape Crisis Center; correct?

Page 88

1     A.  Yes.
2     Q.  And you were examined by the nurse
3  on duty at Star; correct?
4     A.  Yes.
5     Q.  Did you tell the nurse what
6  happened to you?
7     A.  I did.
8     Q.  And you knew that the nurse was
9  not an employee of Alabama State University;
10  correct?
11     A.  No.  She worked at Star.
12     Q.  Okay.  And at that time, you knew
13  that the nurse was doing what they call a
14  rape test kit to collect evidence for your
15  criminal case; correct?
16     A.  Yes.
17     Q.  And you understood at that time
18  that you were talking to the nurse, talking
19  to the police and collecting evidence to
20  assist you with a potential criminal
21  prosecution; correct?
22     A.  Yes.
23     Q.  You didn't believe you were making

Page 89

1  an official report of sexual harassment to
2  Alabama State University at that time?
3     A.  No.  Not that night.
4     Q.  Not that night.  Okay.  You were
5  still focused on having Mr. Diop arrested
6  and sent to jail for raping you; correct?
7     A.  I was still focused on what
8  happened to me.
9     Q.  Right.
10     A.  That's all you focus on.  You just
11  focus on the incident, what happened.
12     Q.  Okay.  And you weren't trying to
13  make a sexual harassment complaint at that
14  time?
15     A.  He raped me.
16     Q.  Okay.  So you went to the
17  hospital; right?
18     A.  Yes.
19     Q.  You called the police; correct?
20     A.  Yes.
21     Q.  The police took you to Star?
22     A.  Yes.
23     Q.  Which is a rape crisis center;

23  (Pages 86 to 89)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 90

1  correct?
2      A.  Yes.
3      Q.  Okay.  But nobody there was from
4  Alabama State University?
5      A.  No.
6      Q.  Nobody you talked to that night
7  was from Alabama State University?
8      A.  No.
9      Q.  And you were not making a report
10  to Alabama State University any time on that
11  night?
12      A.  I made a police report.
13      Q.  And that was all; right?
14      A.  Yes.
15      Q.  Okay.  On February 1st, 2005, you
16  didn't contact Mr. Wesley, the director of
17  personnel in human resources, and file a
18  sexual harassment complaint, did you?
19      A.  My mom did that for me.
20      Q.  I'm asking what you did.  Did you
21  contact Mr. Wesley on February the 1st,
22  2005?
23      A.  I couldn't.  I was crying.  I was

Page 91

1  just going through all the drama with that.
2  I could not.  I didn't even leave the
3  house.  My mom handled all that for me.  She
4  made a complaint for me.
5      Q.  And she made that complaint on
6  what day?
7      A.  The day after.
8      Q.  Did she talk with Mr. Wesley?
9      A.  She followed protocol.  I don't
10  know their names or whatever.  But she
11  followed protocol.
12      Q.  And right now I'm speaking what
13  you did.  We'll get to what your mom did in
14  a minute.  But I want to talk about what you
15  did, okay?
16      A.  Okay.
17      Q.  On February 1st, 2005, you didn't
18  contact Alabama State University's
19  vice-president for student affairs to file a
20  sexual harassment complaint, did you?
21      A.  We let Alabama State know what
22  happened.
23      Q.  Okay.  The question is, on

Page 92

1  February 1st, 2005, did you contact the
2  vice-president for student affairs and file
3  a sexual harassment complaint?
4          MR. ARNOLD:  Could you say that
5  person's name for clarification.
6          MS. MEADOWS:  I believe it was Ms.
7  Williams at that time.  Charles Smith.
8      A.  I can't remember the days.  But I
9  promise we made a complaint to Alabama
10  State.
11      Q.  Okay.  I'm trying to establish
12  when you made your complaint to Alabama
13  State.  So on February 1st, 2005, did you
14  contact the vice-president for student
15  affairs Charles Smith and file a sexual
16  harassment complaint?
17      A.  Honestly, I can't remember.
18      Q.  Did you contact the campus police
19  on February 1st, 2005 and file a sexual
20  harassment complaint?
21      A.  Like I said before, I was at home
22  just -- I was -- Look.  I was raped.  I was
23  at home crying, just going through the whole

Page 93

1  process.  My mom handled that.
2      Q.  So you were at home on February
3  the 1st, 2005?
4      A.  You said February -- Yes, February
5  1st.
6      Q.  February 1st, 2005, you were at
7  home?
8      A.  The day after, I was at home.  I
9  did not leave home.
10      Q.  You didn't go to campus at all on
11  February the 1st, 2005?
12      A.  No.
13      Q.  So you didn't contact anyone at
14  Alabama State University on February the
15  1st, 2005?
16      A.  I know my mom, she -- I'm trying
17  to tell you that she did that for me.
18      Q.  I'm asking you, Ms. Johnson, what
19  you did.
20      A.  And I'm telling you I was at home
21  crying, just going through all that.  My mom
22  contacted -- went through protocol.  She did
23  everything for me.  So we -- Alabama State

24  (Pages 90 to 93)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 94

1 didn't know what happened.
2    Q.  What I'm trying to get to right
3 now, Ms. Johnson, is the steps that you
4 took. I need to know what you did. I
5 promise you I will get to what your mother
6 did. But right now, I need to know what you
7 did. And if you didn't, you just say no.
8    I understand that you have a
9 reason why you did not. And it's fine for
10 you to give me your reason. But I still
11 need you to answer the question whether you
12 did this or not.
13    So on February 1st, 2005, did you
14 file a sexual harassment complaint with
15 anyone at Alabama State University?
16    MR. ARNOLD: Can I help qualify?
17 Did you personally is what she's asking.
18 She understands you testified that your mom
19 contacted. Do you understand that she's
20 asking you did you personally make a phone
21 call or contact anybody?
22    THE WITNESS: No.
23    A.  No. I was at home. No, I didn't.

Page 95

1    Q.  Okay. On February 2nd, 2005, did
2 you contact Mr. Wesley and file a sexual
3 harassment complaint?
4    A.  That day, that's when they told me
5 I didn't have a job. Mr. Moore fired me
6 that day.
7    Q.  Okay. Did you contact Mr. Wesley
8 and file a sexual harassment complaint on
9 that day?
10    A.  My mom did. But I didn't.
11    Q.  Okay. On February the 2nd, did
12 you contact Mr. Smith and file the sexual
13 harassment complaint?
14    A.  I didn't. But my mom did.
15    Q.  Okay. On February the 2nd, did
16 you contact the campus police and file a
17 sexual harassment complaint?
18    A.  No, I didn't.
19    Q.  On February the 2nd, did you file
20 a sexual harassment complaint with anyone at
21 Alabama State University?
22    A.  I didn't. But my mom did.
23    Q.  Okay. Are you certain your mother

Page 96

1 contacted someone at Alabama State
2 University on February the 2nd?
3    A.  I know she contacted Alabama
4 State.
5    Q.  I'm asking do you know that it was
6 on February the 2nd?
7    A.  I don't know if it was the 2nd.
8 But I know that right after -- she contacted
9 Alabama State right after I was raped.
10    Q.  Okay. Was it the 1st or the 2nd?
11    A.  She contacted them on the 1st.
12 She let them know.
13    Q.  Did you tell your mother to
14 contact Alabama State University?
15    A.  I mean, she knew I couldn't. I
16 couldn't.
17    Q.  Okay. But I'm asking you. What
18 I'm asking you is, did you instruct your
19 mother to contact Alabama State University?
20    A.  We were instructed that we needed
21 to let them know.
22    Q.  Who -- I'm sorry. Go ahead.
23    A.  The police officers.

Page 97

1    Q.  The Montgomery police officers
2 told you to contact Alabama State
3 University?
4    A.  Yes. We needed to let them know.
5    Q.  Which officer told you that?
6    A.  I don't remember.
7    Q.  Was it a male or a female?
8    A.  I don't remember.
9    Q.  Was it on the same night as the
10 incident or was it in a subsequent
11 conversation?
12    A.  I think it was the same night.
13    Q.  Okay. What did they tell you to
14 tell Alabama State?
15    A.  I don't know.
16    Q.  They just told you to call Alabama
17 State?
18    A.  I don't know what they said. I
19 can't remember.
20    Q.  Did you talk to them?
21    A.  I know I gave my report.
22    Q.  Did you have the conversation with
23 them that involved them giving instructions

25  (Pages 94 to 97)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 98

1    to call Alabama State University?
2        A.  My mom spoke with them.
3        Q.  Did you participate in the
4    conversation where the police instructed you
5    to call Alabama State University?
6        A.  My mom spoke with them.  I was
7    just -- I was raped.  I mean, I didn't -- I
8    didn't talk or do anything.  My mom spoke
9    with them.
10       Q.  Were you present during this
11   conversation?
12       A.  I don't remember.
13       Q.  If you don't remember the
14   conversation, how do you know the police
15   instructed your mom to call Alabama State
16   University?
17       A.  Because she -- they told her the
18   next step.  We need to let Alabama State
19   know.
20       Q.  Okay.  So what I'm trying to
21   figure out is what they told your mom and
22   when they told her.
23       A.  I don't know what they told her.

Page 99

1        Q.  Because you weren't a party to the
2    conversation.  Okay.  So again, did you tell
3    your mother to contact Alabama State
4    University?
5        A.  No.
6        Q.  Okay.  On February 2nd, 2005, did
7    you still want to work in the physical plant
8    building?
9        A.  I did.  I had a job there.
10       Q.  Okay.  So even though Diop still
11   worked in that building, you wanted to
12   return to work there on February the 2nd,
13   2005?
14       A.  I did.  I went to work.
15       Q.  You actually went to the building
16   on February the 2nd, 2005; correct?
17       A.  Yes.  I went to work.
18       Q.  Okay.  When you were completing
19   your application for the data entry
20   position, did you inform the personnel
21   office that you wanted to file a sexual
22   harassment complaint against the physical
23   plant director?

Page 100

1        A.  When I was completing my form?
2        Q.  Right.
3        A.  For what?
4        Q.  For application, Exhibit 3.
5        A.  That I wanted to what?
6        Q.  File a sexual harassment
7    complaint.
8        A.  No.  I filled that out before,
9    before I even started working.  Before they
10   told me I had the job.
11       Q.  Okay.  On February the 2nd or 3rd,
12   Mr. Moore told you that he had not been
13   granted approval for you to work for
14   inventory control; correct?
15       A.  Yes.  He told me that on the 2nd.
16       Q.  And the reason I'm asking, are you
17   certain it was the 2nd when you were told
18   that?
19       A.  He fired me on the 2nd.
20       Q.  Okay.
21           MS. MEADOWS:  Mark this as 7 for
22   me, please.
23           (Whereupon, Defendant's Exhibit

Page 101

1    No. 7 was marked for identification and
2    attached to the original transcript.)
3        Q.  Do you recognize this as the
4    statement you submitted to Mr. Wesley on
5    February 16th, 2005?
6        A.  Yes.
7        Q.  And this statement details that
8    incident?
9        A.  Yes.
10       Q.  The reason I've asked you whether
11   it was the 2nd or the 3rd, Ms. Johnson, is
12   because if you will turn to the third page
13   of this document, at the bottom of the page,
14   you state that -- what date do you state
15   that you were told you would not be able to
16   continue to work for Mr. Moore?
17       A.  It says the 3rd.
18       Q.  Okay.  I also want to show you No.
19   8.
20           (Whereupon, Defendant's Exhibit
21   No. 8 was marked for identification and
22   attached to the original transcript.)
23       Q.  Have you seen the letter that's

26  (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1  Exhibit 8 before, Ms. Johnson?
2      A.  No, I haven't.
3      Q.  Okay.  Does this document appear
4  to be signed by either your mother or your
5  father?
6      A.  Yes.
7      Q.  Is this one of those notices that
8  you say that your mother provided to the
9  University about what happened to you?
10     A.  Mind if I look at it?
11     Q.  No, not at all.
12     A.  Uh-huh.
13     Q.  Okay.  What date does your mother
14  say that you were moved off of your job?
15  And she calls it a work study job.  But what
16  date does she say you were moved off of that
17  job?
18     A.  February 3rd.
19     Q.  Okay.  So that's why I say either
20  on February the 2nd or February the 3rd,
21  because there are some statements -- the
22  earlier statements say that you were moved
23  off your job on February the 3rd and then

Page 103

1  there are later statements which state
2  February 2nd, okay.
3          Prior to the letter in Exhibit 8,
4  do you know what your mother had
5  communicated to Alabama State University
6  about what happened to you?
7      A.  You're saying this letter?
8      Q.  Yes.  Prior to that letter of
9  February 3rd?
10     A.  I don't know what she -- no, I
11  don't know.
12     Q.  You don't know what she told them?
13     A.  Huh-uh.
14     Q.  Is that a no?
15     A.  No.
16     Q.  To your knowledge, did your mother
17  tell Alabama State University that you were
18  pursuing criminal charges against Anwar
19  Diop?
20     A.  Yes.  She -- yes.
21     Q.  Okay.  To your knowledge, prior to
22  February the 3rd, 2005, did your mother
23  submit a request to Alabama State University

Page 104

1  to investigate Anwar Diop for sexual
2  harassment?
3      A.  I don't know what she submitted.
4      Q.  Prior to February the 3rd, 2005,
5  did you submit a request to Alabama State
6  University to institute a sexual harassment
7  investigation against Anwar Diop?
8      A.  Prior meaning after?
9      Q.  Prior meaning before.
10     A.  Before?
11     Q.  Yes.
12     A.  Before February 3rd?
13     Q.  Before February 3rd, 2005, did you
14  request Alabama State University to conduct
15  a sexual harassment investigation into Anwar
16  Diop's activities?
17     A.  No, I didn't.
18     Q.  Prior to February 3rd, 2005, were
19  you asking Alabama State University to do
20  anything regarding Anwar Diop and the rape?
21     A.  No.  But my mom did.
22     Q.  What did your mom ask Alabama
23  State University to do prior to February

Page 105

1  3rd?
2      A.  I don't know exactly what she
3  said.
4      Q.  Okay.  Your mother -- This letter
5  of February the 3rd that your mother
6  submitted that's marked as Exhibit 8, that
7  was submitted after you had already been
8  notified that your contract would not be
9  approved; correct?
10     A.  Yes.  I remember it was on the 2nd
11  and he fired me.
12     Q.  So you're saying you were fired on
13  the 2nd; correct?
14     A.  Yes.
15     Q.  Okay.  And your mother submitted
16  this letter after you were fired; correct?
17     A.  Yes.
18     Q.  And in this letter, your mother
19  cites to the sexual harassment policy;
20  correct?  Is that true?
21     A.  Yes.  Non-academic handbook.  Yes,
22  it appears to.
23     Q.  Okay.  And this is a written

27 (Pages 102 to 105)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 106

1  report of sexual harassment; correct?
2      A.  It's a written report.
3      Q.  Yes.
4      A.  Yes.  It's telling them what
5  happened to me.
6      Q.  She's writing a complaint in
7  writing about what happened; correct?
8      A.  Yes.
9      Q.  And based upon the policy we
10  reviewed earlier, do you believe your mother
11  is asking for a sexual harassment
12  investigation?
13      A.  Yes.  I was raped and she's
14  telling them that I was raped.  And this
15  letter is so that something can be done
16  about it.
17      Q.  And to your knowledge, did your
18  parents receive a letter in response to
19  their correspondence on February the 3rd?
20      A.  I don't know.
21      Q.  Let me show you Defendant's
22  Exhibit 9.
23          (Whereupon, Defendant's Exhibit

Page 107

1  No. 9 was marked for identification and
2  attached to the original transcript.)
3      Q.  Did your mother share that letter
4  with you?
5      A.  No.  I don't remember this letter.
6      Q.  Okay.  Take a few minutes and look
7  at it.
8      A.  Okay.
9      Q.  Okay.  Prior to Dr. Frazier
10  sending this letter on February the 7th,
11  2005, had you had any conversations with him
12  regarding your charges against Mr. Diop?
13      A.  And prior is before; right?
14      Q.  Yes.  Prior is before February
15  7th.  I mean conversations that you had, not
16  your mother.
17      A.  No, I didn't speak with him.
18      Q.  Okay.  Did your mother give you
19  any advice after she received this
20  correspondence?
21      A.  Advice like what?
22      Q.  Did she give you any instructions
23  on what you needed to do to pursue your

Page 108

1  sexual harassment charge?
2      A.  My mother told me that I needed to
3  type up what happened to me.
4      Q.  Okay.  And is it your
5  understanding that she did that because she
6  was instructed to do so by Dr. Frazier?
7      A.  I believe that they were following
8  protocol.
9      Q.  Right.  Based upon this letter,
10  Dr. Frazier is advising your mother to
11  follow protocol; correct?
12      A.  Hold on.  Okay.  Yes.
13      Q.  Okay.  Does Dr. Frazier appear to
14  be advising your mother that you as the
15  victim would have to be the one to file the
16  formal complaint in this case?
17      A.  Yes.  He said that a proper report
18  needs to be written by me.
19      Q.  Right.  And he said that because
20  you were nineteen years old at the time of
21  the incident; correct?
22      A.  Yes.
23      Q.  Does Dr. Frazier also appear to

Page 109

1  reference a prior conversation with your
2  mother?  That means a conversation before
3  her letter of February the 3rd.
4      A.  It does mention that.
5      Q.  Right.  In an earlier
6  conversation?
7      A.  It says letter.
8      Q.  Right.  But it talks about a
9  verbal report; right?  Is that correct?
10      A.  It says Ms. Johnson had verbally
11  reported to me that you and your daughter
12  had agreed among yourselves to use the legal
13  system external to the campus and to keep
14  the matter totally out of the University
15  system.
16          Now that you have formally
17  introduced the matter into the University, I
18  urge you to follow appropriate procedures so
19  that a full and proper investigation can be
20  made of the alleged crime and/or offense and
21  appropriate action may be taken.
22      Q.  So based upon Dr. Frazier's
23  writing in his letter, he seems to have been

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1  under the impression that your intention
2  before February 3rd was to pursue criminal
3  actions against Mr. Diop; correct?
4      MR. ARNOLD: Would you just ask
5  that question again.
6      Q.  Before February 3rd, it appears
7  from this letter that Dr. Frazier believed
8  that it was your intention to pursue
9  criminal action against Mr. Diop?
10     A.  Yes, that's what he says.
11     Q.  Okay.  And he was also under the
12  impression that you were not pursuing this
13  matter through the University system?
14     MR. ARNOLD: Object to form.  Are
15  you asking her if that's what the letter
16  says or are you asking her or --
17     MS. MEADOWS: I'm asking her --
18     MR. ARNOLD: -- if she is agreeing
19  with what the letter says?
20     MS. MEADOWS: I'm asking her if
21  that's what the letter conveys to her.
22     Q.  Is it your understanding based on
23  this letter that Dr. Frazier understood that

Page 111

1  you were not pursuing a complaint within the
2  University system?
3      A.  This is what he says.
4      Q.  Right.  And that's what he says;
5  correct?
6      A.  Uh-huh.  That's what he says.
7      Q.  Okay.  And based upon this letter,
8  he says that you are now, based on the
9  correspondence from your mother, indicating
10  that you're willing now to pursue a sexual
11  harassment claim through the University?
12     A.  You're saying that since we
13  introduced the matter to the University and
14  then he's telling -- He's saying that I urge
15  you to follow appropriate procedures so that
16  a full and proper investigation can be made
17  of the alleged crime.
18     Q.  Okay.  And taking Dr. Frazier's
19  advice, you filed a complaint; correct?
20     A.  I did.
21     Q.  Okay.  I'm going to mark this as
22  10, Defendant's Exhibit No. 10.
23     (Whereupon, Defendant's Exhibit

Page 112

1  No. 10 was marked for identification and
2  attached to the original transcript.)
3      Q.  Is this a copy of the complaint
4  that you sent to Olan Wesley, the director
5  of personnel?
6      A.  Yes.
7      Q.  Okay.  This is the first time that
8  you personally filed a sexual harassment
9  charge with Alabama State University;
10  correct?
11     A.  Yes.
12     Q.  Did you sign and date this letter
13  yourself?
14     A.  I did.
15     Q.  And the letter is dated February
16  10th; correct?
17     A.  Yes.
18     Q.  Any reason to believe that this is
19  not the correct date on this letter?
20     A.  No.  I don't know.
21     Q.  You dated it; correct?
22     A.  Uh-huh.  This letter.
23     Q.  Is that a -- So yes, you dated it?

Page 113

1      A.  I wrote the letter.
2      Q.  And you dated the letter; correct?
3      A.  Yes.
4      Q.  And you don't dispute that you
5  dated this letter for February the 10th?
6      A.  Yes, I dated it.
7      Q.  Okay.  So you first -- This is the
8  first -- This letter was written after you
9  were notified that you would not have your
10  job in inventory control; correct?
11     A.  It was.
12     Q.  So the first time that you
13  submitted a complaint to Alabama State
14  University alleging sexual harassment
15  committed by Anwar Diop was after you had
16  been notified that you would not have your
17  job in inventory control?
18     A.  No.  My mom submitted the first
19  complaint for me.
20     Q.  Okay.  The first time that you
21  personally filed a complaint of sexual
22  harassment with Alabama State University was
23  after you were notified that you would no

29 (Pages 110 to 113)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 114

1 longer have the position in inventory
2 control; correct?
3    A.   Yes.  Uh-huh.
4    Q.   Okay.  And even the February 3rd
5 letter that your mother wrote to Mr. Wesley,
6 to Dr. Frazier was written after you had
7 been notified that you wouldn't be given the
8 data entry clerk position; correct?
9    A.   Okay.  But keep in mind that we
10 verbally told them.  My mom let them know as
11 soon as I was raped the next day.
12    Q.   Now, I want to talk about the
13 letter.  The letter that your mother wrote
14 to Dr. Frazier was written after you had
15 been notified that you would not be given
16 the data entry clerk position; correct?
17    A.   I had the position.  I worked
18 there.
19    Q.   After you allege you were fired,
20 you were told you could not work there;
21 correct?
22    MR. ARNOLD:  Do you understand the
23 question?

Page 115

1    THE WITNESS:  I don't.
2    Q.   Did your mother write that letter
3 on February the 3rd before or after you
4 found out that you would not have the job at
5 inventory control?
6    A.   She did write it on the 3rd.
7    Q.   Did she write it before or after
8 you knew that you were not going to be
9 allowed to work at inventory control?
10    A.   He told me I didn't have a job on
11 the 2nd.
12    Q.   So that letter is -- You agree
13 that that letter is after?
14    A.   Uh-huh.
15    Q.   Yes?
16    A.   Yes.
17    Q.   Okay.  Were you present when your
18 mother spoke with the other officials at
19 Alabama State University before she
20 submitted the February 3rd letter?
21    A.   No.
22    Q.   Did you hear any of those
23 conversations?

Page 116

1    A.   No.
2    Q.   Do you know what she told them?
3    A.   No, I don't.
4    Q.   Do you know who she talked to?
5    A.   It says she talked to Dr. Frazier.
6    Q.   Do you know if she talked to
7 anybody else?
8    A.   I don't know.
9    Q.   Did you tell her to talk to anyone
10 else?
11    A.   No.
12    Q.   Did you tell her to talk to Dr.
13 Frazier?
14    A.   No, I didn't.
15    MR. MADISON:  I'm sure we're going
16 to go on a pretty good while.  It's
17 lunchtime if anybody cares to have lunch.
18    MS. MEADOWS:  We'll take a brief
19 minute while I find out about the air.
20    (Whereupon, a short recess was
21 taken.)
22    Q.   Before Mr. Moore told you that you
23 could not work at inventory control, the

Page 117

1 only report that you officially made about
2 the rape was to the Montgomery Police
3 Department and medical care personnel;
4 correct?
5    A.   That's correct.  My mom did it for
6 me.
7    Q.   My question is, what did you
8 personally do?  And you personally reported
9 to the Montgomery Police Department and the
10 medical care personnel; correct?
11    MR. ARNOLD:  Asked and answered.
12    A.   Yes.
13    Q.   When did you first meet Mr. Diop?
14    A.   I can't remember the exact day.
15    Q.   Give me an approximate time
16 frame.
17    A.   Sometime before Christmas.
18    Q.   Okay.  How often did you see him
19 between the time you met him and -- you say
20 before Christmas.  Was that sometime in
21 December?
22    A.   Sometime before Christmas.  I said
23 I don't know.

30 (Pages 114 to 117)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 118

1    Q.  Okay.  So between the time you met
2  him and January 31st, how often had you seen
3  him?
4    A.  Well, I worked in the same
5  building as he.  So I don't know.  I don't
6  know like how many.
7    Q.  How frequently?  Was it everyday,
8  several times a day or several times a
9  week?  How often?
10   A.  Like I really can't say because I
11 knew -- we worked in the same building.
12   Q.  Okay.  But you worked in the same
13 building you say starting on January 24th or
14 25th; right?
15   A.  Uh-huh.
16   Q.  By my count, that's about eight
17 days from February -- January 25th to
18 January 31st.  That was about eight days.
19 And some of those days were weekends;
20 correct?
21   A.  I never seen him on weekends.
22   Q.  Okay.  So what I am getting at is,
23 you only worked with him for five days;

Page 119

1  correct?
2    A.  Uh-huh.
3    Q.  So how often from the time you met
4  him -- which would have included time before
5  you started working there; right?  Right?
6    A.  Wait.  Ask the question again.
7    Q.  Okay.  You met Mr. Diop before you
8  started working for Mr. Moore; right?
9    A.  Uh-huh.
10   Q.  Is that a yes?
11   A.  Yes.
12   Q.  Okay.  How often did you see him
13 before you started working at Alabama State?
14     MR. ARNOLD:  Object to form.
15   Q.  And by him I mean Mr. Diop.  How
16 often between the time you met him sometime
17 before Christmas until the day you started
18 working at Alabama State did you see Mr.
19 Diop?
20   A.  I didn't see him.  My mom worked
21 in the same building as the building that
22 he's over.  And I am in my mom's office
23 frequently because I go to school there.  So

Page 120

1  I don't know how many times.
2    Q.  So did you see him prior to your
3  starting to work in that building?
4      MR. ARNOLD:  Object to form.
5    Q.  You can answer the question.
6      MR. ARNOLD:  We need to have a
7  definition of seeing him.  There's
8  vernacular and then there's visual sight.
9    Q.  I mean visual see him walking by.
10   A.  Oh, okay.
11   Q.  By see, I really mean see him with
12 your eyes.
13   A.  Oh, okay.  Well, again, that's
14 hard to say.  I went to school Monday
15 through Friday.  My mom works there.  In her
16 office.  I don't know how many times he
17 comes to the building.  I don't know.
18   Q.  How often did you speak to him
19 between the time you met him and January the
20 31st, 2005?
21   A.  It was about -- I want to say
22 about three, four times.
23   Q.  Okay.  What was the nature of your

Page 121

1  conversations on those three or four times?
2    A.  Hello.
3    Q.  So by speak, you just mean you
4  said hello to him as he passed by?
5    A.  Well, he would speak and just say
6  hello.
7    Q.  Okay.  Did you have any
8  conversations with him that were beyond just
9  saying hello and good-bye between the time
10 you met him and January 31st, 2005?
11   A.  He -- Yes, I did.
12   Q.  How often?
13   A.  He offered to take my family out
14 to eat.
15   Q.  Okay.
16   A.  And the only -- Of course, we
17 spoke while we were eating dinner.  And --
18 let's see.  And then on the day of the rape,
19 he called my cell phone twice.
20   Q.  Had you had any conversations with
21 him other than him taking you out to dinner
22 and him calling you twice on the day of the
23 rape, with Mr. Diop, other than saying hello

31  (Pages 118 to 121)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 122

1  and good-bye?
2      A.  That's really all I recall right
3  now.
4      Q.  And you never had any
5  conversations with Mr. Diop over the
6  telephone other than him calling your cell
7  phone twice the day of the rape?
8      A.  Let's see.  He did call me.
9      Q.  He called you?  When did he call
10  you?
11      A.  When we were out to dinner, he got
12  lost and he kept calling -- well, it's
13  really my mom's cell phone, but I have it.
14  He kept calling the number because he got
15  lost.
16      Q.  What day was that, that he took
17  you out to dinner?
18      A.  I don't remember the exact day.
19      Q.  Give me an approximate date.
20      A.  I don't remember.
21      Q.  Where did you go?
22      A.  It was Outback Steak House.
23      Q.  Was this before you started

Page 123

1  working for Mr. Moore or after?
2      A.  I really can't remember.
3      Q.  So other than calling your cell
4  phone twice the day of the rape and calling
5  your cell phone when he was lost trying to
6  get to Outback, did Mr. Diop call your cell
7  phone on any other occasions?
8      A.  After I was raped, he left me two
9  sexual messages on my phone.
10      Q.  When was that?
11      A.  It was on that same night.
12      Q.  So on January 31st?
13      A.  Uh-huh.
14      Q.  And he left two messages?  Did you
15  save those messages, Ms. Johnson?
16      A.  I have a new phone.  I didn't save
17  it.
18      Q.  Prior to getting the new phone,
19  did you record those messages onto any other
20  medium?
21      A.  We let -- It was -- I forgot her
22  name.  She's a deputy at the Montgomery
23  Police Department.  She heard it.  I don't

Page 124

1  know her name, though.
2      Q.  Was a transcript made of those
3  messages?
4      A.  I don't know.  I just know that
5  she heard it.
6      Q.  Okay.  What did the messages say?
7      A.  One of them, he was just moaning,
8  like moaning.
9      Q.  Okay.
10      A.  And I forgot what the other one
11  said.
12      Q.  Okay.  When did you listen to the
13  messages?
14      A.  It was that same night.  I saw
15  that I had a missed -- you know, two missed
16  messages.  So I listened and I let my mom
17  hear it.  And she contacted the police
18  department.
19      Q.  Okay.  When you looked on your
20  cell phone and saw that you had missed
21  calls, did you look to see who had called
22  you first?
23      A.  No.  I went straight to my voice

Page 125

1  mail.
2      Q.  You went straight to voice mail
3  without checking to see who the calls were
4  from?
5      A.  Uh-huh.
6      Q.  Did he call you on any other
7  occasions?
8      A.  No.  That's all I recall right
9  now.
10      Q.  Okay.  How did Mr. Diop get your
11  cell phone number?
12      A.  That night when we were going --
13  when he said that he wanted to take my
14  family out to Outback Steak House.  I don't
15  really have a cell phone.  It's really my
16  mom's.
17          And so she just -- because he said
18  that he don't know his way around.  And she
19  gave out the number to him because he said
20  he's lost, he's going to get lost.  And
21  that's how.
22      Q.  What time of day was it when you
23  went to Outback, your family and Mr. Diop?

32 (Pages 122 to 125)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 126

1    A.  It was evening.
2    Q.  Was it on a weekday or a weekend?
3    A.  I don't remember.
4    Q.  Had you been to work on the day
5  you went to Outback with Mr. Diop and your
6  family?
7    A.  I don't remember.
8    Q.  In one of your previous statements
9  you stated that one afternoon at 4:30 while
10  you were visiting your mother at work, Mr.
11  Diop invited you to see his home; is that
12  correct?
13    A.  Uh-huh.
14    Q.  Is that a yes?
15    A.  Oh, yes.
16    Q.  Okay.  You remember making that
17  statement?
18    A.  Yes.
19    Q.  And you remember going to Mr.
20  Diop's home one afternoon?
21    A.  Not going to.  We just drove by.
22    Q.  Okay.  You went to his house?
23    A.  Drove by.

Page 127

1    Q.  Okay.  Did your mother know you
2  were going by his house?
3    A.  It was -- yes.  It was right
4  around the corner.
5    Q.  Okay.  Describe his house for me.
6    A.  I don't know how it looked.
7    Q.  You don't remember how the house
8  looked?
9    A.  No, I don't.  I know what the
10  inside looks like.  That's it.
11    Q.  How did you get to Mr. Diop's
12  house that day?
13    A.  Which day?
14    Q.  The day you went by at 4:30.
15    A.  Just trailed -- drove behind him
16  to see the house and that was it.
17    Q.  You drove your own car?
18    A.  Uh-huh.
19    Q.  Did you stop the car when you got
20  to the house?
21    A.  Just to look at -- like just
22  rolled down the window and looked and that's
23  it.

Page 128

1    Q.  Okay.  I'm asking did you stop the
2  -- You didn't get out of the car?
3    A.  No, I didn't get out.
4    Q.  Did he get out of his car?
5    A.  I can't -- I can't remember if he
6  did.
7    Q.  Is his house close to any other
8  houses?
9    A.  I think they are all lined up
10  together.
11    Q.  About how close would you say the
12  other houses are?
13    A.  I don't know.
14    Q.  Do they look kind of close
15  together or do they look really far apart?
16    A.  I really don't remember.
17    Q.  How did you know when you had
18  arrived at the house that that was Mr.
19  Diop's house?
20    A.  What day?
21    Q.  The day you went there at 4:30.
22    A.  Because I trailed him there and he
23  pointed.

Page 129

1    Q.  So he pointed out the window to
2  which house was his?
3    A.  Yes, he pointed.  Like he let me
4  know that that's his house.
5    Q.  Okay.  And you said you never got
6  out of your car on that day.  So you did not
7  go in the house; correct?
8    A.  No, I didn't.
9    Q.  Okay.  Was your trip to view the
10  house before or after the dinner that Mr.
11  Diop took you and your parents to?
12    A.  I don't remember that time.  I
13  don't remember.
14    Q.  You don't remember when you went?
15  Do you have an approximate date when you
16  went to his house?  And I'm speaking of the
17  afternoon when you went at 4:30.
18    A.  I don't remember the day.
19    Q.  Okay.  But during this dinner in
20  January of 2005, Mr. Diop asked your parents
21  for permission to date you; correct?
22    A.  He did.
23    Q.  Okay.  And your parents told him

33  (Pages 126 to 129)

FREEDOM COURT REPORTING

Page 130

1  he was too old; correct?
2      A.  Uh-huh.
3      Q.  Is that a yes?
4      A.  Yes.
5      Q.  Okay.  And they refused to give
6  him permission to date you; correct?
7      A.  Yes.
8      Q.  Okay.  Before this dinner, had Mr.
9  Diop expressed any romantic interest in you?
10     A.  Not really.  No.
11     Q.  When you say not really, what did
12  he do to indicate that he had a romantic
13  interest in you before he took you and your
14  parents to dinner?
15     A.  He didn't.  It was just hi or hi
16  and bye.  It was nothing.
17     Q.  So before he took your parents to
18  dinner, he didn't make any comments to you
19  or anything that let you know he was
20  interested in you?
21     A.  Huh-uh.
22     Q.  Is that a no?
23     A.  No.

Page 131

1      Q.  Was the dinner invitation before
2  or after January 25th?
3      A.  I don't remember.
4      Q.  Okay.  Was the invitation to view
5  his house that afternoon at 4:30 before or
6  after January 25th?
7      A.  I don't remember.
8      Q.  But you do remember January 31st,
9  2005; right?
10     A.  Yes.
11     Q.  Where were you when Diop first
12  called you on your cell phone that
13  afternoon?
14     A.  I was at home.
15     Q.  So you had already arrived home?
16     A.  Uh-huh.
17         MR. MADISON:  January the 31st?
18         MS. MEADOWS:  Yes, January the
19  31st.
20     Q.  What did Mr. Diop say when he
21  called you?
22     A.  Do you mind if I take a second?
23  Okay.  On that day, it was -- let's see.  He

Page 132

1  was telling me about some repairing or
2  something that needed to be done on some
3  building, telling me how his day went or
4  something.
5      Q.  Did he ask you how your day went?
6      A.  I don't know.  But I do remember
7  him telling me how his day went.
8      Q.  Did you tell him how your day
9  went?
10     A.  No.  Because as soon as -- like as
11  soon as he called, my mom, she came and told
12  me about I needed to go take my cousin home
13  and go to Walgreen's to pick up medicine for
14  my nephew.
15     Q.  So you don't -- So you don't
16  recall telling him about some award you had
17  received or something you had done that day,
18  your presentation or something of that
19  nature?
20     A.  Presentation?
21     Q.  Yes.  Do you recall telling him
22  about some presentation you had made that
23  day?

Page 133

1      A.  No.
2      Q.  What did you talk about with Mr.
3  Diop that day, the first time he called?
4      A.  Nothing really.  I mean, he just
5  told me how his day went.  I don't remember
6  talking about a presentation.
7      Q.  You talked to him more than once
8  that day; correct?
9      A.  I did.
10     Q.  How many times -- You said you
11  talked to him twice that day?
12     A.  It was two or three, yes.
13     Q.  Do you recall that you called him
14  as well on that day?
15     A.  No.
16     Q.  You didn't call him?
17         MR. ARNOLD:  Object to form.
18     Q.  Are you now saying that you did
19  not call him at all on that day for any
20  reason?
21     A.  No, I didn't.
22     Q.  During one of your later
23  conversations with Diop, either the second

34  (Pages 130 to 133)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 134

1  or third time he called you, tell me what
2  those conversations were about, what both of
3  those later conversations were about.
4      A.  One of them was in the car with my
5  cousin.  Again, he was telling me about like
6  working on the buildings and stuff like
7  that, how hard his day was.
8          And then I told him, well, I've
9  got to go.  I'm about to drop my cousin
10 off.  And then I just got off the phone.
11 And then the other time when I was in
12 Walgreen's, that's the time when he called
13 and sounded really sad.
14         And that's the one where he told
15 me that his grandmother was about to die.
16     Q.  Okay.  Let's talk about your --
17 Who was your cousin that was in the car with
18 you?  What's your cousin's name?
19     A.  Jabrell.  But I dropped her off.
20     Q.  Okay.  Did you make any
21 explanation to Jabrell about who was on the
22 phone with you?
23     A.  No.

Page 135

1      Q.  Okay.  And you said that while you
2  were at Walgreen's you received a call from
3  Mr. Diop and he was sad; correct?
4      A.  Uh-huh.  Yes.
5      Q.  Okay.  And he told you he was sad
6  because his grandmother was in the hospital;
7  is that correct?
8      A.  He said his grandmother was dying.
9      Q.  Was dying?
10     A.  Uh-huh.
11     Q.  During this conversation, did he
12 ask you to come to his house?
13     A.  He did.  He said that he just
14 really needed somebody to talk to, his
15 grandmother was about to die.  And the only
16 people he knows is me and my mom.
17     Q.  Okay.  So you went to his house to
18 consult him because he was losing his
19 grandmother?
20     A.  Yes.  I was going to pray for him.
21     Q.  Okay.  And you went over there
22 because you considered him a friend or at
23 least --

Page 136

1      A.  I went over there because he said
2  that he hasn't been down here long.  The
3  only people -- he knows me and my mom were
4  Christians.  He knows my mom is a
5  missionary.
6          He said that he was just really
7  sad and he just needed somebody to talk to.
8  And I was just going to pray for him, you
9  know.
10     Q.  Okay.  Did you have to ask him for
11 directions to his house?
12     A.  I did.  I didn't know how to get
13 there.
14     Q.  Okay.  What time did you arrive at
15 the house?
16     A.  It was about seven o'clock, 7:15.
17     MR. MADISON:  I'm sorry.  What
18 time did you say?
19     THE WITNESS:  Seven o'clock, 7:15.
20     Q.  How long did you plan on staying
21 at the house?
22     A.  Not long.  I was just going to
23 pray for him.  Let him know everything was

Page 137

1  okay.  Not long.
2      Q.  Did you have an approximate time
3  in your mind about how long you thought it
4  would take?
5      A.  Just a couple of minutes.
6      Q.  Okay.  In your prior statements,
7  you said that your mother sent you to
8  Walgreen's to fill the baby's prescription;
9  right?
10     A.  Uh-huh.
11     Q.  Is that a yes?
12     A.  Yes.
13     Q.  Whose baby is it?
14     A.  My sister.
15     Q.  Okay.  How old is the baby?
16     A.  He was about seven months at the
17 time, six, seven months.
18     Q.  You also indicated that the baby
19 had just been released from the hospital; is
20 that correct?
21     A.  He did.
22     Q.  Do you remember why he was in the
23 hospital?

35 (Pages 134 to 137)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 138

1    A.  He had breathing problems.
2    Q.  Do you remember what prescription
3  you were getting filled?
4    A.  I don't.
5    Q.  Do you know what it was for?
6    A.  I just assumed it was for his
7  breathing problems.
8    Q.  Okay.  Did you drop off the
9  medication at home before you went to Mr.
10  Diop's house?
11    A.  No.  I still had it with me.
12    Q.  Okay.  Did you call your mother
13  and tell her that you were going to go by
14  Diop's house before you brought the medicine
15  home?
16    A.  I didn't.
17    Q.  Did you call your mother and tell
18  her that you were going to Diop's house at
19  all?
20    A.  I didn't.
21    Q.  Okay.  Did you take your cell
22  phone with you when you went to Diop's
23  house?

Page 139

1    A.  I did.
2    Q.  Did you take it with you into the
3  house?
4    A.  I did.
5    Q.  Was the phone turned on when you
6  went into the house?
7    A.  It was.
8    Q.  Okay.  Was it capable of ringing
9  when you took it into the house?
10    A.  Uh-huh.  Yes.
11    Q.  So you would have heard it ring?
12    A.  Yes.
13    Q.  Okay.  Exhibit No. 7 is a
14  statement you sent to Mr. Wesley outlining
15  what happened to you; is that correct?
16    A.  Yes.
17    Q.  Okay.  And do you contend that
18  this is a truthful and accurate account of
19  the events of that evening?
20      MR. ARNOLD:  Object to form.
21    A.  Yes.
22    Q.  Okay.  When you arrived at Mr.
23  Diop's house on January the 31st, did you

Page 140

1  knock on the door?
2    A.  I did.
3    Q.  Did Mr. Diop open the door for
4  you?
5    A.  He did.
6    Q.  So he didn't just tell you to come
7  in, he did get up and open the door;
8  correct?
9    A.  Yes.
10    Q.  Okay.  Was he fully dressed when
11  you arrived?
12    A.  Yes.
13    Q.  What was he wearing?
14    A.  I can't remember what he was
15  wearing.  Shirts and pants.
16    Q.  You also stated that you entered
17  Mr. Diop's home and sat down.  Where did you
18  sit?
19    A.  He only had -- Between the den,
20  living room, he only had a bed, a really big
21  bed.  And he said that it was just because
22  he had just moved in.  So on the edge of the
23  bed.

Page 141

1    Q.  You sat on the edge of the bed?
2    A.  Uh-huh.
3    Q.  Okay.  At what point did Mr. Diop
4  go into the kitchen?
5    A.  I don't remember.
6    Q.  Do you remember why he went into
7  the kitchen after you arrived?
8    A.  Huh-uh.  I don't remember.  I
9  don't remember him going into the kitchen.
10    Q.  In your statement you said that
11  Mr. Diop was walking from his kitchen toward
12  you.  Where is the kitchen in relation to
13  the bed that you were sitting on?
14    A.  It's in the den.
15    Q.  The kitchen is in the den?
16    A.  It's part of the den.  Yes.  It's
17  like everything is open.
18    Q.  It's a one room arrangement?
19    A.  Yes.  It's like everything is
20  open, out in the open.  And it's a bed.
21  It's a bed, a big bed.
22    Q.  Okay.  Describe the furnishings in
23  the kitchen for me.

36 (Pages 138 to 141)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 142

1    A.  I don't remember how it was.  I
2  don't remember.
3    Q.  Do you remember what was in there?
4    A.  Huh-uh.
5    Q.  Okay.  What size bed did Mr. Diop
6  have?
7    A.  I don't know the size bed.  But it
8  was a big bed.
9    Q.  What size bed do you have at home?
10    A.  I have a full.
11    Q.  Okay.  What size bed do your
12  parents have?
13    A.  They have a king.
14    Q.  Okay.  Is Mr. Diop's bed bigger
15  than your bed?
16    A.  Bigger than my bed?
17    Q.  Yes.
18    A.  Yes.  Yes, it was.
19    Q.  Is it the same size as your
20  parents' bed?
21    A.  I don't know.
22    Q.  Is it smaller than your parents'
23  bed?

Page 143

1    A.  I don't know.
2    Q.  Okay.  Describe the bed for me.
3    A.  I really can't.  All I know is
4  that it was a big bed and it's in the den.
5  That's all I remember.  It's a big bed and
6  it's in the den.
7    Q.  When you arrived at the house, was
8  Mr. Diop's bed made?
9    A.  I think it was.  I don't remember.
10    Q.  Did he have a comforter?
11    A.  I don't remember that.
12    Q.  Did he have any other furniture
13  besides the bed?
14    A.  Huh-uh.  That bed is all I
15  remember.
16    Q.  Did he have anything else in the
17  house except for the bed?
18    A.  Are you asking me if he had like
19  sofas and stuff?
20    Q.  I'm asking any furniture he had.
21  I want you to tell me everything that you
22  saw in the house on January the 31st.
23    A.  Oh, okay.  Let's see.  When you

Page 144

1  walked through the door, in this area over
2  here, I remember there was like a weight
3  lifting machine.  And then right across from
4  the bed, there was a TV.
5    And then like right there was a
6  tall dresser.  And then the bed.  That's all
7  I remember.
8    Q.  Tell you what.  I'm kind of
9  visual.  Do me a favor.  I'm not asking you
10  to draw me something to scale.  But can you
11  kind of sketch out for me what it looked
12  like on the inside of the house?
13    Just draw me from the
14  entranceway.  And you can put a little mark
15  and tell me this is the weight machine, this
16  is the bed, this is the TV, this is the
17  kitchen.  Okay?
18    MR. ARNOLD:  While she does that,
19  can we step outside for a minute?
20    MS. MEADOWS:  Sure.  We'll go off
21  the record while she writes her diagram.
22    (Whereupon, a short recess was
23  taken.)

Page 145

1    (Whereupon, a lunch recess was
2  taken.)
3    Q.  Ms. Johnson, when we left off, you
4  were going to draw me a diagram so that I
5  could kind of see what you were talking
6  about when you were describing Mr. Diop's
7  house for me.  Okay.  Now, which way is the
8  door?
9    A.  When you walk in, you see weights
10  over here.
11    Q.  Are the weights to your left or to
12  your right?
13    A.  They are on my left.
14    Q.  Okay.
15    A.  This is the door, I mean, like
16  when you walk in here.
17    Q.  Okay.
18    A.  And then that's the weights there.
19    Q.  Okay.
20    A.  And then the bed is there.
21    Q.  Okay.
22    A.  And this is a long hallway.
23    Q.  Okay.

37 (Pages 142 to 145)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 146

1    A.  And that's the TV and that's the
2  hall like to the -- well, it just leads --
3  all that leads into the kitchen, like all of
4  this.
5    Q.  So there's just an area over here
6  that leads into the kitchen?
7    A.  Uh-huh.  This whole area.  And
8  this is his bed which is this whole area.
9    Q.  Okay.  And what's this right here?
10   A.  That's the TV.
11   Q.  So the TV is across from the bed
12 and next to the kitchen?
13   A.  Yes.  And then that's the dresser.
14   Q.  Okay.  That's the only furniture
15 you remember anywhere inside the house?
16   A.  Uh-huh.
17   Q.  Where is the bathroom?
18   A.  I don't know.
19   Q.  Okay.  When you first came into
20 the house, had you and Mr. Diop started
21 talking at that point?
22   A.  Just when me entering?
23   Q.  Yes.  When you walked in, did you

Page 147

1  all start talking?
2    A.  He had opened the door and then he
3  just told me to have a seat.  And he went
4  back somewhere.  But it's like he came out
5  from the kitchen.
6    Q.  So he went back which way, to the
7  left or to the right?
8    A.  He kept straight here and somehow
9  he came out from the kitchen.
10   Q.  So he went straight down this long
11 -- what you have described as a long
12 hallway through the middle of the house;
13 right?
14   A.  Uh-huh.
15   Q.  And he ended up over behind the
16 television?
17   A.  In the kitchen.  Like he was
18 coming out.  I don't know if there's a place
19 where you can go like that, but he was
20 coming out of the kitchen.
21   Q.  And did you talk about anything
22 during that time?
23   A.  Not at that time.

Page 148

1    Q.  So when he came back from the
2  kitchen, did you all start talking then?
3    A.  He had two pair of socks in his
4  hand.  And he put on his socks and he
5  started sliding across the floor.  And then
6  he asked me if I wanted to join him sliding
7  across the floor.
8    Q.  So when he came out of the
9  kitchen, he had two pairs of socks with him?
10   A.  Uh-huh.
11   Q.  And he walked toward you with the
12 two socks?
13   A.  Uh-huh.
14   Q.  And gave you the socks?
15   A.  He gave -- yes.  He put his pair
16 on and then he had gave me a pair.  He asked
17 if I wanted to join him sliding across the
18 floor.
19   Q.  Where did he get the socks from?
20   A.  I don't know.
21   Q.  Did you see him?
22   A.  Huh-uh.  I didn't see where he got
23 the socks from.

Page 149

1    Q.  You didn't watch him retrieve the
2  socks or anything?
3    A.  No.
4    Q.  And he started sliding across the
5  floor?
6    A.  Uh-huh.  Yes.
7    Q.  And you decided -- You joined him
8  sliding across the floor?
9    A.  Yes.
10   Q.  What kind of shoes were you
11 wearing?  What were you wearing when you
12 arrived at his house?
13   A.  I had on blue -- my blue pants.  I
14 had on a shirt.  I had on another shirt tied
15 across me and some tennis shoes.
16   Q.  So you had on tennis shoes?
17   A.  Uh-huh.
18   Q.  And the blue pants, what kind of
19 material are they made out of?
20   A.  Like cotton.
21   Q.  And you had one shirt on?
22   A.  Uh-huh.
23   Q.  What kind of shirt was that?

38 (Pages 146 to 149)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 150

1    A.  It was a tee shirt.
2    Q.  And you had another shirt tied
3  around you.  Where was it tied?
4    A.  Around my waist.
5    Q.  Around your waist.  And did the
6  tail of that shirt hang down over your hips?
7    A.  Yes.
8    Q.  And when he gave you the socks to
9  put on, did you put on the socks he gave
10 you?
11   A.  Uh-huh.
12   Q.  Were you already wearing socks
13 with your tennis shoes?
14   A.  No.  I don't wear socks.
15   Q.  You don't wear socks?  Okay.  So
16 you put on the pair of socks he gave you?
17   A.  Yes.
18   Q.  And you began sliding across the
19 floor?
20   A.  Uh-huh.
21   Q.  Did you take off the shirt you had
22 tied around your waist to slide across the
23 floor?

Page 151

1    A.  No.
2    Q.  So you kept on everything you had
3  on except you took your shoes off; right?
4    A.  Uh-huh.
5    Q.  Was Mr. Diop still fully clothed
6  at that time?
7    A.  Yes.
8    Q.  He had on his pants and a shirt?
9    A.  Uh-huh.  Yes.
10   Q.  And he had on a pair of socks?
11   A.  Yes.
12   Q.  Okay.  How long did you slide
13 across the floor?
14   A.  It wasn't long.  It was about five
15 minutes.  It wasn't long at all.
16   Q.  Okay.  When you were sliding
17 across the floor, were you talking?
18   A.  Actually, I was just laughing,
19 like just sliding across the floor.
20   Q.  So the two of you were laughing?
21   A.  Yes.  We were sliding across the
22 floor.
23   Q.  And when you finished sliding --

Page 152

1  Who finished sliding across the floor first?
2    A.  He did.  He had sat on the edge of
3  the bed and he got serious.
4    Q.  Okay.  Which side of the bed --
5  Where on the bed did he sit?
6    A.  On the edge like -- on the edge.
7  He was on this side closer to the dresser.
8    Q.  Was that the head of the bed or
9  the foot of the bed?
10   A.  This should have been a
11 rectangle.  His bed was like that
12 (indicating).  Like it looked like this.
13 This is the side.  I should have drawed this
14 like a rectangle.  And then he was sitting
15 here (indicating), and I was sitting right
16 about there.  There was a considerable
17 amount of space between us.
18   Q.  Was that at the head of the bed or
19 at the foot of the bed?
20   A.  On the sides.
21   Q.  It was on the sides?
22   A.  Uh-huh.
23   Q.  Where does the head of the bed

Page 153

1  face?
2    A.  It was here.
3    Q.  The head of the bed faces towards
4  the weights?
5    A.  Uh-huh.
6    Q.  And the foot faces towards this
7  dresser?
8    A.  Yes.
9    Q.  Okay.  And so the side of the bed
10 faces the TV?
11   A.  Uh-huh.
12   Q.  Okay.  So you all were sitting
13 with a little -- with some space inbetween
14 y'all on the side of the bed?
15   A.  Yes.  It was a considerably long
16 space.
17   Q.  How much space would you say was
18 between the two of you?
19   A.  Like just a considerable amount.
20 Like very respectful.
21   Q.  Were you sitting as close as you
22 and Mr. Arnold are sitting?
23   A.  Yes.  It was just normal.

39 (Pages 150 to 153)

FREEDOM COURT REPORTING

Page 154

1      MR. ARNOLD: Possibly three feet.
2  Can we agree on that?
3      A.  This is the amount of space.  I
4  mean, it was really respectfully normal.
5      Q.  So as Mr. Arnold say about
6  three feet, you're going to accept that as
7  being the approximate amount of space?
8      A.  Yes.
9      Q.  And understand, I'm not going to
10  get out a ruler and measure.
11      A.  Yes.
12      Q.  You might be as bad about guessing
13  distance as I am.  But this is --
14      A.  Uh-huh.
15      Q.  The distance of your two chairs
16  apart?
17      A.  Yes.
18      Q.  Okay.  And this is when you first
19  came and sat down on the bed to talk to him?
20      A.  Uh-huh.
21      Q.  Okay.  And you said he had started
22  to get serious.  How did you know he was
23  getting serious when he went and sat down?

Page 155

1      A.  Well, his tone changed.  He got
2  really sad, like -- he was like my
3  grandmother -- he just started talking about
4  his grandmother.
5      Q.  Was he crying at this point?
6      A.  No.
7      Q.  Okay.  But he -- Did he seem upset
8  to you at this point?
9      A.  Uh-huh.  Like sad.
10      Q.  Is that a yes?
11      A.  Yes.
12      Q.  Did he discuss his grandmother's
13  illness?
14      A.  He just told me that she's about
15  to die and that's it.
16      Q.  Can you give me any more specifics
17  of the conversation that you had about his
18  grandmother?
19      A.  He told me that he's really close
20  to her, that that's his only grandmother.
21  That's all I know.  And that she's about to
22  die.
23      Q.  How long would you say you talked

Page 156

1  about his grandmother?
2      A.  From since we like sat down on the
3  bed.
4      Q.  Were you talking about her before
5  you sat down on the bed?
6      A.  Just that one phone call that I
7  told you about.
8      Q.  Oh, okay.  Now I want to know
9  about the conversation after you got to the
10  house.  I'm sorry.
11      A.  Okay.
12      Q.  So I want to know how long you
13  talked about his grandmother while you were
14  at the house.
15      A.  Okay.  That lasted about three to
16  five minutes.
17      Q.  Three to five minutes?
18      A.  Uh-huh.
19      Q.  And did his mood remain sad
20  while he was talking to you about his
21  grandmother?
22      A.  No.  Then about three to five
23  minutes when -- that's -- he reached over

Page 157

1  and pushed me back.  You know, all of a
2  sudden, he just started playing again.
3      He pushed me back and I sat up.  I
4  was like, no, seriously, you know.  I just
5  thought to move back to serious again.
6      Q.  Okay.  So he went from sad to
7  playing with you?
8      A.  To a playful mood.
9      Q.  So he went from a sad mood to a
10  playful mood?
11      A.  Uh-huh.
12      Q.  Had he finished talking about his
13  grandmother when he got in this playful
14  mood?
15      A.  Huh-uh.
16      Q.  No?
17      A.  No.
18      Q.  You were still talking about his
19  grandmother?
20      A.  Yeah.  I was thinking we were
21  still talking about his grandmother.
22      Q.  Was he still talking about his
23  grandmother?

40  (Pages 154 to 157)

FREEDOM COURT REPORTING

Page 158

1    A.  Not at that point when he pushed
2  me back.  And then I tried to bring it back
3  to his grandmother.
4    Q.  Did he say anything to you prior
5  to pushing you back other than about his
6  grandmother?
7    A.  Before; right?
8    Q.  Yes.
9    A.  Did he say anything to me other --
10  Say that again.
11    Q.  Did he say anything else to you
12  before he started getting playful and
13  pushing you back?
14    A.  He was still talking about his
15  grandmother.  Like in the middle of him
16  talking about his grandmother, he just out
17  of nowhere, just did that (indicating).
18    Q.  Okay.  How long -- At this point,
19  how long have you been at the house before
20  he pushes you back?
21    A.  I don't really know how long, like
22  exactly how long.
23    Q.  Right.  I know you weren't maybe

Page 159

1  looking at your watch.  I just want an
2  approximation of how much time you had
3  already spent at the house.
4    A.  Let's see.  About ten minutes.
5    Q.  Okay.  So you had been in the
6  house for approximately ten minutes --
7    A.  Uh-huh.
8    Q.  -- before he started to push you?
9    A.  Yes.  About ten minutes.
10    Q.  Okay.
11    A.  Again, that's an estimate.  I
12  really don't remember.
13    Q.  And again, I understand that
14  you're just giving me -- Right now what I
15  need you to give me is your best
16  recollection or guess of how much time is
17  past, okay?
18    A.  Okay.
19    Q.  Now, when he's sitting on the bed,
20  he still has on his shirt; right?
21    A.  Uh-huh.
22    Q.  Is that a yes?
23    A.  Yes.

Page 160

1    Q.  He still has on his pants?
2    A.  Yes.
3    Q.  He still has on the socks?
4    A.  Yes.
5    Q.  So he's still fully clothed?
6    A.  Yes.
7    Q.  Do you still have on all of your
8  clothes?
9    A.  Yes.
10    Q.  You still have your shirt tied
11  around your waist?
12    A.  Yes.
13    Q.  And you still have on your tee
14  shirt?
15    A.  Yes.
16    Q.  And you still have on your pants?
17    A.  Yes.
18    Q.  And now you have on the socks?
19    A.  Yes.
20    Q.  You don't have your shoes on now,
21  do you?
22    A.  No.
23    Q.  Okay.  Prior to him pushing you

Page 161

1  down, did he touch you in any other way?
2    A.  No.
3    Q.  Okay.  When he moved closer to you
4  -- Well, prior to pushing you down, did he
5  move closer to you?
6    A.  No.  Like he reached over and just
7  like really fast just (indicating).
8    Q.  Okay.  Did he attempt to kiss you
9  at that time?
10    A.  No.
11    Q.  Okay.  Where did he touch you when
12  he pushed you down?
13    A.  Like here (indicating).
14    Q.  And when you say here, can you say
15  verbally what you mean?
16    A.  Like my chest.
17    Q.  Like the middle of your chest
18  right above your breast is where you have
19  your hand at?
20    A.  Yes.
21    Q.  And that's where you approximate
22  that he touched you when he pushed you down?
23    A.  Yes.

41 (Pages 158 to 161)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 162

1    Q.  Okay.  How was he pushing you --
2  Describe for me how he was pushing on you.
3  You say he reached across and --
4    A.  Yes.  It was like with his right
5  hand, just really quick.  Just -- I don't
6  know how.  It was just like really fast
7  like.  And then I came up, you know.
8    Q.  So you sat back up after he pushed
9  you down that time?
10   A.  That first time.
11   Q.  The first time?
12   A.  Uh-huh.
13   Q.  Okay.  Was he touching you in any
14  way other way while he was pushing you to
15  the bed?
16   A.  You talking about after that?
17   Q.  I'm talking about the first time.
18  When he pushed you back, was he touching you
19  in any other way other than with his hand in
20  the middle of your chest?
21   A.  Huh-uh.
22   Q.  No?  Is that a no?
23   A.  No.

Page 163

1    Q.  Okay.  At this time, is he still
2  fully clothed?
3    A.  Yes.
4    Q.  And you're still fully clothed?
5    A.  Yes.
6    Q.  You said you came back up?
7    A.  Uh-huh.
8    Q.  How did you come back up?
9    A.  Like I got straight back up.
10   Q.  You sat up?
11   A.  Uh-huh.
12   Q.  Yes?
13   A.  Yes.
14   Q.  So he pushed you down, but he
15  wasn't holding you down at this point?
16   A.  Not at that time.
17   Q.  After you sat back up, did he push
18  you down again?
19   A.  He immediately pushed me back
20  down.  And that's when he held me down.
21   Q.  Okay.  When he pushed you down the
22  second time, was he touching you any other
23  way than in the middle of your chest?

Page 164

1    A.  Yes.  At that time, he -- that's
2  when he held me down and he got on top of
3  me.
4    Q.  Okay.  So first he pushed you back
5  on the bed?
6    A.  No.  That was the first time,
7  uh-huh.
8    Q.  Okay.  The second -- okay.  I
9  meant the second time when he pushes you
10  back on the bed.  But there's several things
11  that happen at that time; correct?
12   A.  Uh-huh.
13   Q.  I'm trying to figure out each
14  thing that's happening at this time.
15   A.  Oh, okay.  Well, he pushed me back
16  with, you know, his right hand on my chest.
17  He pushed me back again.
18   Q.  Okay.
19   A.  And then he immediately got on top
20  of me.  And it's like he switched -- he
21  switches hands.  Like his left hand was
22  holding down my hand and his right hand --
23  he tore my pants.  And that's when he -- so

Page 165

1  he did touch me.  That's when he stuck his
2  fingers in my vagina.
3    Q.  So his left hand is holding down
4  your right hand?
5    A.  Uh-huh.
6    Q.  And with his right hand, he's
7  tearing your pants off?
8    A.  Yes.
9    Q.  Okay.  You still have on
10  everything else except for your pants?
11   A.  I still have them on.  They were
12  -- He tore it and like he pulled it towards
13  my ankle.  And he had his face like on the
14  pants with my legs in the air.  So my pants
15  were still on me.  They were just down in my
16  ankle.
17      It was like his -- his head was
18  like -- where his chin was, he was holding
19  my legs in the air with my pants.  So they
20  were still on me.
21   Q.  Okay.  And they were at your
22  ankles at this point?
23   A.  Uh-huh.

42 (Pages 162 to 165)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 166

1    Q.  Where is the shirt that was tied
2  around your waist?
3    A.  It was still on me.
4    Q.  It was still on you?
5    A.  Yes.
6    Q.  Still around your waist?
7    A.  I assume it was down at my ankle
8  with my pants.
9    Q.  So he pulled your shirt and your
10  pants down?
11    A.  Yes.  Everything.
12    Q.  Okay.
13    A.  At my ankle.
14    Q.  How was the shirt tied around you?
15    A.  A knot.
16    Q.  And he held your legs open by
17  putting his chin on top of your pants?
18    A.  Yes.  It's like my legs -- like my
19  pants are right here (indicating) and his
20  chin was resting on my pants.  And my legs
21  were just -- they were just there like bent
22  up over me.
23    Q.  So your legs were all the way at

Page 167

1  your face?  How far up would you say your
2  legs were in the air?
3    A.  I'll say they were about right
4  here above me (indicating).
5    Q.  So when he was -- When he had his
6  chin holding your legs up, where was his
7  face on -- where in relation to your body
8  was his face?
9    A.  His face was right here
10  (indicating).  Like when you're laying down,
11  my legs were bent.  You know how like pants
12  are at your ankles and -- his head was
13  holding the pants down by my ankle.  They
14  are right here up under his chin.  And so
15  everything is exposed down there.
16    Q.  And his face was almost even with
17  your face?
18    A.  Yes.  I'm looking at him.
19    Q.  Okay.  At that time, you're still
20  wearing the tee shirt that you had on?
21    A.  Yes, sir.
22    Q.  And you're still wearing your bra?
23    A.  Yes.

Page 168

1    Q.  Was he still dressed at this
2  point?
3    A.  I saw his shirt.  That's all I
4  remember.
5    Q.  Did you at any point see him --
6  Did his pants have a zipper on them?
7    A.  I don't remember that.  I don't
8  know.  I don't remember that.
9    Q.  Do you remember him opening his
10  clothes?
11    A.  It all happened so fast.  Huh-uh.
12  I don't remember that.
13    Q.  Did you ever see that he -- Was
14  there any point where you noticed he didn't
15  have his pants on?
16    A.  I didn't see it.
17    Q.  At any point did you see his pants
18  open exposing himself?
19    A.  I don't remember that.  I didn't
20  -- I didn't notice that.
21    Q.  At any point did you see his
22  penis?
23    A.  No.

Page 169

1    Q.  At any point during this incident
2  did he kiss you on your breast?
3    A.  He did.
4    Q.  Okay.  When was that?
5    A.  This is -- That's when he -- it
6  was at the point where he tried to switch
7  positions.
8    Q.  Okay.  This is the same incident
9  on the bed, though; right?
10    A.  Uh-huh.
11    Q.  Okay.
12    A.  And it's right after -- It's right
13  after -- I remember that.  It's right after
14  when he was like this is your fault for
15  making me angry.  And he was whispering all
16  that stuff in my ear.
17    Q.  Okay.  And you said he was trying
18  to switch positions?
19    A.  Uh-huh.
20    Q.  Now, what was he trying to do?
21    A.  I don't know.  Like I don't know.
22  All I know is that he pushed my legs over.
23    Q.  He pushed them over which way?

43 (Pages 166 to 169)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 170

1   A.  Yes.  He pushed them over to the
2  left.  Like I was dangling -- I was dangling
3  like on the side of the bed there.  And at
4  that point, he was like -- I remember he was
5  whispering in my ear that this is your fault
6  for making me angry.
7      And it's like he just kissed me
8  right there (indicating).  Like my shirt --
9  I had a little low cut shirt.  Like right
10 there, just a normal tee shirt.  And I
11 remember he kissed me here (indicating).
12   Q.  Okay.  Describe this tee shirt for
13 me.  Is this a V neck tee shirt?
14   A.  Uh-huh.
15   Q.  And it had sleeves to it?
16   A.  Uh-huh.
17   Q.  Is it a baby doll tee shirt?
18   A.  No.  It was just a tee shirt and
19 sleeves.
20      MR. ARNOLD:  What's a baby doll
21 tee shirt?
22      MS. MEADOWS:  We'll explain it to
23 you later.  It's a girl thing.

Page 171

1      MR. ARNOLD:  Got you.
2   Q.  But it's just a regular tee shirt?
3   A.  Yes.
4   Q.  With a V neck?
5   A.  Yes.
6   Q.  How far down did the V go?
7   A.  Just about where your's is at.
8  Well, mine usually stops just here
9  (indicating).
10   Q.  Where it stops now?
11   A.  Yes.
12   Q.  Where your shirt is now?  Where
13 you have it buttoned?
14   A.  Yes.  And he kissed me here
15 (indicating).
16   Q.  So for the record -- because it's
17 going to be hard for us later on to tell
18 where you said it was.  So it was closed up
19 actually above your cleavage?  You didn't
20 have cleavage exposed; right?
21   A.  Well, it's probably like right
22 there.  I mean, it's just like a normal tee
23 shirt.

Page 172

1   Q.  Okay.  But it was not -- What I'm
2  getting at is, you didn't have your breasts
3  exposed?
4   A.  Oh, no.  Not like that.
5   Q.  Okay.  So when he kissed you on
6  your breast, did he pull your tee shirt
7  down?
8   A.  Yes.  He -- It's like he just
9  kissed me here (indicating).
10   Q.  And by here, you're indicating the
11 top of your left breast?
12   A.  Uh-huh.
13   Q.  Okay.
14      MR. ARNOLD:  Say yes or no.
15   A.  Yes.
16   Q.  Thank you.
17   A.  Yes.
18   Q.  And at some point while he was
19 doing this change of position, he moved your
20 legs you said to the left; correct?
21   A.  Yes.
22   Q.  Did your legs go towards the bed
23 or towards the floor?

Page 173

1   A.  It went towards the floor.
2   Q.  And at that point, were you able
3  to push him off?
4   A.  Yes.  At that point, I pulled up
5  my pants, was going towards the door.  His
6  door was locked.
7   Q.  Okay.  What was Mr. Diop doing
8  while you were pulling your pants up?
9   A.  I don't know.  All I know is that
10 when I made it to the door, he pulled me
11 back to the bed.
12   Q.  Okay.  He had not -- Was he still
13 on the bed when you were pulling your pants
14 up?
15   A.  I really didn't focus on that.  I
16 was just pulling my pants up running towards
17 the door.
18   Q.  And I understand you were trying
19 to get away from him?
20   A.  Uh-huh.
21   Q.  How close behind you was he when
22 you got to the door?
23   A.  When I got to the door, he

44 (Pages 170 to 173)

FREEDOM COURT REPORTING

Page 174

1    immediately pulled me back to the bed.
2        Q.  So would you say he got to the
3    door at almost the same time you did?
4        A.  Yes.  I guess you could say that.
5        Q.  Did you have time -- You had time
6    to try to open the door before he got there?
7        A.  Yes.  I noticed that it was
8    locked.
9        Q.  Okay.  Describe that lock for me.
10   How was it locked?  How did it lock?
11       A.  I couldn't open it.
12       Q.  Yes.  I guess that was a poor
13   question.  What I'm trying to get to is,
14   describe to me what type of lock it was.
15       A.  I don't remember what type of lock
16   it was.  I don't remember what type of lock
17   it was.
18       Q.  Was it a dead bolt lock?
19       A.  I don't remember.
20       Q.  Okay.  Ms. Johnson, I want you to
21   take a real deep breath.  I know this is
22   difficult.  Just take a deep breath for me.
23   Okay.  I want you to concentrate.

Page 175

1            When you got to the door and you
2    reached out to turn the handle and found
3    that it was locked -- right --
4        A.  Yes.
5        Q.  -- did you notice what kind of --
6    What did the knob look like?
7        A.  The knob was -- it was like a
8    golden brass.  It was like a round knob.
9        Q.  Okay.  It was a regular round
10   knob?
11       A.  Uh-huh.
12       Q.  Is that the part that was locked?
13       A.  No.  It didn't have one of those
14   things on it.  It was just a knob.
15       Q.  It didn't have a locking mechanism
16   on that knob?
17       A.  Huh-uh.
18       Q.  Was there a lock above that?
19       A.  It was two doors.  I don't know.
20   It was like a metal door and then a regular
21   door.
22       Q.  Okay.  Where is the metal door?
23       A.  That's the one with the gold knob

Page 176

1    on it.
2        Q.  Where is the regular door?
3        A.  It's on the outside.
4        Q.  Okay.  I'm going back to your
5    diagram.  And actually I'm going to go ahead
6    and mark this diagram as 11 because we may
7    need to refer back to it.
8            (Whereupon, Defendant's Exhibit
9    No. 11 was marked for identification and
10   attached to the original transcript.)
11       Q.  Okay.  At the bottom of this page,
12   you indicated that this is the entrance.
13   How much -- Describe this metal door to me.
14   Where is the metal door?
15       A.  It's with the door.
16       Q.  Okay.  And when you come in, you
17   come in through both doors, like the one
18   immediately right after the other?
19       A.  Uh-huh.
20       Q.  Is that a yes?
21       A.  Yes.
22       Q.  It's not like there's -- the
23   regular door on the outside and then an

Page 177

1    entranceway and then there's a metal door;
2    correct?
3        A.  Yes, correct.  They are together.
4        Q.  Okay.  What you're calling the
5    regular door, is that like a screen door?
6        A.  No.  The regular door looks like a
7    door, like just a door.
8        Q.  And the metal door, what does that
9    look like?
10       A.  It was -- See, you had a brass
11   knob and it was like a black bar, just
12   straight back bar.
13       Q.  Was the metal bar burglar bars?
14       A.  If it's just straight bars, like
15   straight bars with a doorknob.
16           MR. MADISON:  Spaces between them.
17       Q.  Were there spaces between the
18   bars?
19       A.  Uh-huh.
20       Q.  Is that a yes?
21       A.  Yes.
22       Q.  So did it look like what people
23   call burglar bars?

45  (Pages 174 to 177)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 178

1    A.   Yes.  It has a knob like -- It
2   just has a knob and then it has the --
3    Q.   Okay.  Was there a lock above the
4   knob?
5    A.   Honestly, I cannot remember.
6    Q.   Okay.
7    A.   I do remember that knob, though,
8   because it wouldn't open.  I remember
9   twisting it and it wouldn't open.
10   Q.   So you twisted the knob and it
11  wouldn't turn?
12   A.   No.
13   Q.   So you considered it locked at
14  whatever that knob was?
15   A.   Yes.  It would not open.
16   Q.   Okay.  Now, take me to after he
17  catches up with you at the door.  Well,
18  first, how far from the bed to the door was
19  it do you think?
20   A.   How far was it?
21   Q.   Yes.
22   A.   I don't know.  It wasn't far.  I
23  don't know.

Page 179

1    Q.   Did it seem like a short distance
2   to you or a long distance?
3    A.   Yes.  It felt like a short.
4    Q.   Okay.  Now, go to what happened
5   after he caught up with you at the door.
6    A.   He pulled me back to the bed.
7    Q.   Okay.
8    A.   And this time, his hand was around
9   my neck.  And I tried to -- Like when I
10  tried to get back up, he tightened his hand
11  around it.  So I didn't --
12   Q.   No.  I'm just trying to understand
13  what you're saying.  Did he drag you back to
14  the bed by your neck?
15   A.   No.  Like he pulled me.  He pulled
16  me back to the bed, threw me back on the bed
17  and he held his hand around my neck.
18   Q.   Okay.  So did he pull -- What part
19  of your body was he touching when he pulled
20  you back across the room?
21   A.   My arms.
22   Q.   Both your arms?
23   A.   Uh-huh.

Page 180

1    Q.   Did he pick you up off the floor?
2    A.   No.
3    Q.   Okay.  And he pushed you back on
4   the bed?
5    A.   Uh-huh.  Yes.
6    Q.   Okay.  And this time when he holds
7   you down, he's now holding you down by your
8   neck?
9    A.   By my neck.
10   Q.   Now I think I understand where you
11  are.  Go ahead.
12   A.   And with the other hand -- the
13  other hand, he pulled my pants back down.
14  And then this time he forced -- he forced --
15  he forced his penis inside.  And then at
16  that time, I was screaming stop because it
17  hurted.
18       And I had screamed stop because it
19  hurt.  And he didn't listen.  And I just --
20  I started crying.  And after a while, it got
21  -- I guess it got moist down there.  And so
22  he whispered in my ear, yes, now you're
23  getting wet.

Page 181

1       And then he kept -- he kept just
2   having -- you know, just having sex.  He
3   just kept going.  And then I was telling him
4   -- and I was telling -- hold on.
5    Q.   Okay.
6    A.   And then he kept going.  Hold on.
7   I don't talk about it.
8       MS. MEADOWS:  We're going to take
9   a three minute break.
10      (Whereupon, a short recess was
11  taken.)
12   Q.   We were talking about this is
13  after you've escaped and gone to the door
14  and he's brought you back on the bed;
15  right?  And you were telling me that this
16  time he penetrated you with his penis;
17  correct?
18   A.   The first time he did as well.
19   Q.   Oh, okay.  You said this time he
20  -- okay.  So you can go ahead and finish
21  where you left off, if you remember.
22   A.   Okay.  And what I meant is that
23  this time he just -- he used so much force.

FREEDOM COURT REPORTING

Page 182

1  And I told him, I said stop because this
2  hurt, this hurt. I was saying stop the
3  whole time, I mean, ever since the
4  beginning, just -- this just really hurted.
5       And I remember him saying -- he
6  was like this is your fault for making me
7  angry and just a whole bunch of stuff. And
8  it kept going for -- it seems like forever.
9       But he just -- he just raped me.
10 And I remember one time I tried to -- Like
11 when I tried to get up, his hand -- like
12 he'd squeeze my neck tighter. So I just had
13 to lay there and just --
14     Q. Okay. This second time --
15     A. Go ahead.
16     Q. This second time, did he take your
17 pants all the way off or are they still down
18 at your ankles?
19     A. He took them off.
20     Q. He took them off that time?
21 Okay. Where are your legs this second time?
22     A. My legs?
23     Q. Yes.

Page 183

1       A. They are just laying there.
2       Q. Okay. Are your legs flat on the
3  bed this time?
4       A. Yes. And then he had to -- like
5  he had took his -- he took his hands and
6  pushed -- it's like first he started with
7  the first leg and then he held them -- like
8  he held it like up. And then he got the
9  other one.
10      And then it was like almost just
11 on his shoulder. And I remember that they
12 -- it went further -- it seems like they
13 went further behind my head. And at that
14 point, I just started crying really bad
15 because it really hurt.
16      Q. Okay. Did Mr. Diop kiss you
17 anywhere during this particular incident?
18 And by this particular incident, I mean the
19 second time after you had tried to get to
20 the door.
21      A. When it was -- When it was over, I
22 had pulled up my pants and put -- I had put
23 on my shoes and was trying to go. And he

Page 184

1  jumped up and grabbed me, gave me a very
2  tight hug and he kissed me on my forehead.
3  And he had whispered -- he had told me to
4  keep him in my prayers. I'm sorry.
5       Q. No, no, no.
6       A. He had kissed me. And he told me
7  to keep it in my prayers.
8       Q. Where did he kiss you?
9       A. On my forehead here (indicating).
10      Q. Okay. So during this incident, he
11 kissed you on your forehead; correct?
12      A. Yes.
13      Q. And he kissed you on your breast?
14      A. Yes.
15      Q. Okay. When he kissed you on your
16 breast, did he attempt to pull your shirt
17 down farther and kiss you on your nipple?
18      A. No.
19      Q. Did he attempt to kiss you
20 anywhere else?
21      A. On my forehead.
22      Q. Okay. Did he touch your vagina in
23 any way other than with his finger and with

Page 185

1  his penis?
2       A. No.
3       Q. And you said that he kissed you on
4  your forehead and hugged you after it was
5  over. To your knowledge, did Mr. Diop
6  ejaculate during this encounter?
7       A. I thought he did because he rolled
8  over and sighed. I don't know.
9       Q. Is that the only thing that made
10 you think that he ejaculated?
11      A. Yes.
12      Q. Okay. To your knowledge, did he
13 use a condom during this encounter?
14      A. I don't know.
15      Q. Did you see a condom?
16      A. No.
17      Q. Do you know at what point -- Did
18 you ever see a point where Mr. Diop appeared
19 to be unfastening his pants?
20      A. No.
21      Q. You say when it was over, you
22 rolled over and you put your pants back on?
23      A. Yes. Very fast. I just jumped up

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 186

1  and put on my pants and --
2  Q.  Where was -- I'm sorry.  I didn't
3  mean to interrupt you.
4  A.  I just put on my pants.
5  Q.  Where was the shirt that you had
6  tied around your waist at this point?
7  A.  I don't know.  I thought it was
8  around my waist.
9  Q.  Okay.  But you don't recall having
10 to pick that up?
11 A.  No.
12 Q.  Okay.  Ms. Johnson, let's take a
13 few minutes at this point.
14     (Whereupon, a short recess was
15 taken.)
16 Q.  Ms. Johnson, after you got your
17 clothes back on, Mr. Diop got up to let you
18 out of the door?
19 A.  Yes.
20 Q.  Okay.  How did he unlock the door?
21 A.  I don't know.  I didn't even pay
22 attention.
23 Q.  Did you see him get a key?

Page 187

1  A.  No.
2  Q.  Did you see him use a key to
3  unlock the door?
4  A.  I don't know.
5  Q.  Were you at the door with him when
6  he was opening the door?
7  A.  Yes.
8  Q.  While you were in the house, did
9  your cell phone ring?
10 A.  No.
11 Q.  Did you take it with you when you
12 left?
13 A.  When I left his house?
14 Q.  Yes.
15 A.  Yes.
16 Q.  Okay.  Where was it while you were
17 in the house?
18 A.  It was in my pocket or clamped on.
19 Q.  It was clamped on your pants?
20 A.  Yes.  I had a phone clip.
21 Q.  And it stayed on your phone -- the
22 clip stayed on your pants the whole time
23 this was going on?

Page 188

1  A.  Yes.
2  Q.  Was it on ring or vibrate?
3  A.  I don't know.  I didn't hear any
4  rings.
5  Q.  Okay.  Ms. Johnson, I'm going to
6  take you back to the contract you tried to
7  get with Alabama State if that's okay with
8  you.
9  A.  Okay.
10 Q.  Okay.  You were aware that the
11 contract that you attempted to have approved
12 was only going to last until September 30th,
13 2005; right?
14 A.  The contract?
15 Q.  You realize that you were --
16 A.  Sorry.  Say it again.
17 Q.  Okay.  Did you -- You did realize
18 that you were only going to be employed up
19 until September 30th, 2005; right?
20 A.  Working as the data entry?
21 Q.  Right.  And that that would only
22 last until September 30th, 2005?
23 A.  I don't know when it was going to

Page 189

1  last.
2  Q.  Did you have anything to indicate
3  it would have been beyond September 30th,
4  2005?
5  A.  No.  Just my contract.
6  Q.  Right.  And I'm trying to
7  establish the end date of that contract.
8  A.  I don't know the end date.
9  Q.  Okay.  You did know that you were
10 only going to be allowed to work twenty
11 hours per week; right?
12 A.  Yes.
13 Q.  That was the maximum number of
14 hours you could be paid for; correct?
15 A.  Yes.
16 Q.  Okay.  You were aware that you
17 were not entitled to any benefits; correct?
18 A.  What do you mean like benefits?
19 Like what?
20 Q.  Did you think you were going to
21 get insurance through Alabama State?
22 A.  Okay.  Yes, I was aware I wasn't.
23 Q.  You were aware that you were not;

48 (Pages 186 to 189)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 190

1  correct?
2      A.  Yes.
3      Q.  And you didn't expect to get any
4  type of 401-K participation?
5      A.  No.
6      Q.  Okay.  And you knew that you
7  couldn't receive any overtime pay; correct?
8      A.  I didn't know that.
9      Q.  You didn't realize that as a
10  twenty hour employee you would not receive
11  overtime?
12      A.  No.
13      Q.  Okay.  What terms did you believe
14  that you would receive overtime?
15      A.  I mean, I don't know.
16      Q.  Are you aware of any overtime
17  policy at the University that would have
18  allowed you to earn overtime as a twenty
19  hour per week employee?
20      A.  I don't know.  I haven't seen a
21  document.
22      Q.  You haven't seen any policy that
23  says that?

Page 191

1      A.  I don't know.
2      Q.  Okay.  Would you agree that if
3  there is no policy that allows twenty hour
4  per week employees to receive overtime, then
5  you would have been ineligible for overtime?
6      A.  If there wasn't?
7      Q.  If Alabama State University's
8  policy is that it does not pay overtime for
9  twenty hour per week employees, do you agree
10  that you would not have received overtime?
11      A.  Yes.
12      Q.  Okay.  And do you agree that even
13  if your contract had been approved, your
14  last day of employment would have been
15  whatever the contract end date was?
16      A.  No.
17      Q.  No, you believe you could have
18  continued to work after your contract
19  expired?
20      A.  I would have got it renewed.
21      Q.  And on what basis would you have
22  gotten that contract renewed?
23      A.  You're asking me why would -- What

Page 192

1  are you asking me?
2      Q.  I'm asking you what obligated
3  Alabama State University to extend you a
4  renewed contract of employment?
5      A.  Because I was a hard worker and I
6  had a very high GPA and I was never late
7  coming in to work and I was a good student.
8      Q.  But is there some reason that
9  Alabama State University would have been
10  required to give you another contract?
11      A.  I don't know about them.
12      Q.  Okay.  And I understand that you
13  may have asked for your contract to be
14  renewed.  That's what you're telling me;
15  right?
16      A.  Yes.
17      Q.  Right.  But are you saying now
18  that Alabama State University would have had
19  to continue to employ you after your
20  contract was over?
21      A.  I'm saying they had no reason to
22  not.
23      Q.  Okay.  Despite whether they had a

Page 193

1  reason not to renew the contract, is there
2  some reason why they would not have been
3  free to decide not to renew the contract?
4      A.  Look.  They fired me when I
5  reported the rape to them.  That's the only
6  reason why I was terminated, is because I
7  reported the rape.
8      Q.  Okay.  What I'm asking you now is,
9  if you had not been fired, okay, if you had
10  not been fired in February and you worked
11  all the way to September the 30th of 2005,
12  which is the end date of the contract that
13  you contend that you were extended, what
14  obligated Alabama State University to allow
15  you to come back to work for them on October
16  the 1st?
17      A.  I can't say.  I mean, that's up to
18  them.  I can't say.
19      Q.  Right.  You agree that that's
20  Alabama State University's decision?
21      A.  Uh-huh.
22      Q.  Is that a yes?
23      A.  Yes.

49 (Pages 190 to 193)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 194

1    Q.  And you agree that they don't have
2  to decide in your favor on October the 1st;
3  correct?
4    A.  I agree they didn't have any
5  reason not to.
6    Q.  But do you agree that they would
7  have been required to do it or are you
8  saying they would not have been required to
9  do it?
10    A.  I don't know.  That's up to
11  Alabama State.
12    Q.  Right.  So you agree it's their
13  decision to make?
14    A.  Yes.
15    Q.  Okay.  Do you contend that you
16  have lost any wages other than the five
17  thousand eight hundred and eighty-nine
18  dollars and sixty cents maximum you would
19  have earned if your contract had been
20  approved for January 24th, 2005 through
21  September 30th, 2005?
22    A.  I don't know about the amount.
23    Q.  Do you contend you lost any wages

Page 195

1  other than the job you would have gotten as
2  a data entry clerk in inventory control?
3    A.  Yes.  I lost wages.  I mean, they
4  fired me.
5    Q.  Okay.  What other wages did you
6  lose?
7    A.  I would have still been working
8  there.
9    Q.  Okay.  Do you have any reason to
10  believe that the amount you would have
11  earned is more than the five thousand eight
12  hundred and eighty-nine dollars and sixty
13  cents that I just quoted to you?
14    A.  Yes.  Because I still -- I would
15  have been working there.
16    Q.  You would have been working there
17  from what date?
18    A.  I would have renewed my contract.
19  They fired me.
20    Q.  Okay.  But you agree that at the
21  end of your contract, you could have been
22  fired anyway; correct?
23    A.  No.  I was a good student and a

Page 196

1  good employee.
2    Q.  But you had a contract that had a
3  definite end date; correct?
4    A.  I don't recall the end date.  But
5  --
6    Q.  But you knew it had a date that it
7  was going to end?
8    A.  Yes.  And I had to renew it.
9    Q.  And we just discussed that Alabama
10  State didn't have to agree to renew it;
11  right?  So I'm asking you to tell me what
12  amount of money you would have lost or what
13  amount of money you think you lost because
14  you were fired?
15    A.  And at this time, I do not know
16  that amount.  I don't know the exact amount.
17    Q.  Okay.  What would I have to base
18  those calculations on?
19    A.  I would have been able to continue
20  to renew my contracts.  And like I said, I
21  was a good employee, a hard worker, good
22  student.  And they fired me because I
23  reported that I was raped.

Page 197

1    MR. MADISON:  I think it's fair to
2  say that her testimony basically is that she
3  assumes she would have continued working
4  there and would have been employed and that
5  you assume that she wasn't automatically
6  continued in her contract.
7    MS. MEADOWS:  Well, Don, when I
8  get ready for you to testify, I'll notice
9  your deposition.
10    MR. MADISON:  Well, I'm tired of
11  hearing you ask the same questions over and
12  over.
13    MS. MEADOWS:  Like I said, when I
14  get ready for you to testify, I'll ask you.
15    MR. MADISON:  I'm not testifying.
16  I'm speaking to the fact that you're being
17  repetitive in your questioning.  And you're
18  asking questions which all involve
19  speculative answers.
20    Q.  Do you contend that you have
21  sustained any physical injuries that Alabama
22  State University is responsible for?
23    A.  Yes.  I was raped.  I was raped by

50 (Pages 194 to 197)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 198

1  an employee of them.
2      Q.  And you contend that Alabama State
3  -- How did Alabama State University cause
4  your physical injuries?
5      A.  He was an employee of Alabama
6  State and so was I.  And I was physically
7  harmed -- I'm covered under the harassment
8  clause.  He raped me and I reported it and
9  they fired me.
10     Q.  Okay.  Have you received treatment
11 for your -- What injury did you receive?
12 And when I say injury now, I mean a physical
13 condition that you're still being treated
14 for.
15     A.  That I'm still being treated for?
16     Q.  Yes.  Have you received any
17 treatment for any injury since January
18 31st?
19     A.  In regards to the rape?
20     Q.  Yes.
21     A.  And you said just physical damage.
22     Q.  Right now we're talking about
23 physical injuries.

Page 199

1      A.  Okay.  There was trauma to my
2  vagina.
3      Q.  What doctor did you see for that?
4      A.  The hospital.  And I went to my
5  doctor.
6      Q.  Who is your doctor?
7      A.  Dr. Tutt.
8      Q.  What's Dr. Tutt's first name?
9      A.  Felicia.
10     Q.  Where is her office located?
11     A.  She's in Baptist East.
12     Q.  What type of physician is Dr.
13 Tutt?
14     A.  She's my physician.
15     Q.  I mean, does she have a specialty
16 or is she just a general practitioner?
17     A.  She's a general practitioner.
18     Q.  Okay.  How often have you seen her
19 since January 31st of 2005?
20     A.  Routine checkups.
21     Q.  About how often is that?
22     A.  About twice a year.
23     Q.  What injuries resulting from the

Page 200

1  rape did Dr. Tutt treat you for?
2      A.  Just physical injuries?
3      Q.  Right.
4      A.  Well, I had some trauma to my
5  vagina.  So she gave me -- she gave me -- I
6  think it was a prescription for -- it was
7  like a yeast infection medicine.
8      Q.  You had a yeast infection?
9      A.  It was like because of the
10 bleeding that happened down there, it was
11 like it was torn.  And so it just -- it
12 caused an infection, a minor yeast
13 infection.
14     Q.  When were you diagnosed with the
15 infection?
16     A.  I don't remember the specific
17 date.
18     Q.  Can you tell me what month it was?
19     A.  Uh-huh.  It was in -- it was --
20 Let's see.  I went to her -- it was in
21 February.
22     Q.  What type of treatment did she
23 give you for the infection?

Page 201

1      A.  She wrote me a prescription for --
2  I forgot what it's called, but it's medicine
3  for that.
4      Q.  Did you take that medication she
5  prescribed?
6      A.  I did.
7      Q.  Did it clear up the infection?
8      A.  It did.
9      Q.  Okay.  Anything else that she
10 treated you for following the rape?
11     A.  Yes.  Because I couldn't sleep and
12 because I was depressed, she had prescribed
13 an antidepressant and a sleeping pill.
14     Q.  What antidepressant did she
15 prescribe?
16     A.  It was Lexipro.
17     Q.  What sleeping pill?
18     A.  It was Ambian.
19     Q.  Okay.  When did she prescribe the
20 Lexipro?
21     A.  I don't remember the specific day.
22     Q.  Get me as close as you can.
23     A.  It was in February.

51 (Pages 198 to 201)

FREEDOM COURT REPORTING

Page 202

1    Q.   Okay.  Are you still taking the
2  Lexipro?
3    A.   No.
4    Q.   How long did you take it?
5    A.   Let me see.  It was about a month.
6    Q.   When did she prescribe the Ambian?
7    A.   The same time she did the
8  Lexipro.  In February.
9    Q.   How long did you take the Ambian?
10   A.   The same amount of time as the
11 Lexipro.  Just about a month.
12   Q.   Did Dr. Tutt prescribe you any
13 other medications for treatment of anything
14 you associate with the rape?
15   A.   No.  That's it.
16   Q.   Okay.  And you're not still on any
17 medication that you were on as a result of
18 the rape?
19   A.   No.
20   Q.   Did you see any physician other
21 than Dr. Tutt for treatment of any injuries
22 related to the rape?
23   A.   No.  Just her.

Page 203

1    Q.   Did you receive treatment at any
2  hospital other than Baptist Hospital for
3  these injuries?
4    A.   No.
5    Q.   And you said Baptist.  I'm not
6  sure I clarified.  Which Baptist did you go
7  to that night?
8    A.   It was South.
9    Q.   Okay.  Did you return to Baptist
10 South after that evening?
11   A.   No.
12   Q.   Is that the only occasion you had
13 to be treated at Baptist South?
14   A.   The only occasion?
15   Q.   Is that the only time you've been
16 treated for anything at Baptist South?
17   A.   Related to this case?
18   Q.   First related to this case.  Yes,
19 related to the case.
20   A.   Just related to the case?
21   Q.   Yes.
22   A.   Yes, that was it.
23   Q.   Okay.  Have you been treated at

Page 204

1  Baptist South for any other reason?
2    A.   Related to the case?
3    Q.   No.  Any other reason at all?
4    A.   Just outside reasons?
5    Q.   Yes.
6    A.   Yes.
7    Q.   When was that?
8    A.   I don't remember.
9    Q.   Was it before this incident or
10 after?
11   A.   Are you asking for before and
12 after?
13   Q.   I'm asking you was the treatment
14 you received at Baptist South before this
15 incident or after?
16   A.   I mean, I don't know.
17   Q.   Okay.  Have you been treated at
18 any other hospitals for any reason?
19   A.   I think it was Baptist East.
20   Q.   Okay.  Do you remember when that
21 was?
22   A.   No, I don't remember when.
23   Q.   Do you remember what it was for?

Page 205

1    A.   Like when I get colds and stuff.
2    Q.   Other than Dr. Tutt, have you been
3  treated by any other physician other than
4  associated with the rape within let's say
5  the last five years?
6    A.   You said associated with the
7  rape?
8    Q.   For anything.  Even if it's not
9  associated with the rape, have you been
10 treated by another physician in the last
11 five years?
12   A.   I think she's just it.  That's my
13 doctor.
14   Q.   About how long have you been going
15 to Dr. Tutt?
16   A.   Since I think high school.
17   Q.   Do you have a gynecologist that
18 you regularly see?
19   A.   She does my -- Dr. Tutt.
20   Q.   Okay.  Dr. Tutt does your
21 gynecological examinations as well?
22   A.   Yes.
23   Q.   So you haven't seen any other

52 (Pages 202 to 205)

FREEDOM COURT REPORTING

Page 206

1 gynecologist?
2    A. I used to go to one.
3    Q. Who did you used to go to?
4    A. I can't remember the name. It was
5 a while back.
6    Q. Was it while you were in high
7 school?
8    A. I don't remember when. I don't
9 remember when.
10    Q. What did you see him for?
11    A. Just pap smears, just regular pap
12 smears.
13    Q. This is just for a routine annual
14 examination?
15    A. Uh-huh.
16    Q. Is that a yes?
17    A. Yes.
18    Q. Was this before or after you
19 started seeing Dr. Tutt?
20    A. I think this was -- I was still
21 seeing Dr. Tutt. I just wanted to try
22 somebody new.
23    Q. Okay. Do you remember where his

Page 207

1 office was located maybe?
2    A. He's in Baptist South.
3    Q. Okay. Have you been treated by
4 any physician for any emotional distress
5 related to this rape?
6    A. Just Dr. Tutt.
7    Q. Okay. Did Dr. Tutt ever provide
8 you with a specific diagnosis?
9    A. What do you mean?
10    Q. Concerning your emotional
11 distress?
12    A. Just told me I was depressed.
13    Q. So she diagnosed you with
14 depression?
15    A. She told me I did have
16 depression. She prescribed Lexipro.
17    Q. Okay. And did you consult with
18 Dr. Tutt before you stopped taking the
19 Lexipro?
20    A. I did always consult with her.
21    Q. Okay. And she advised you that it
22 was okay for you to stop taking that
23 medication?

Page 208

1    A. Uh-huh.
2    Q. Is that a yes?
3    A. Yes.
4    Q. Okay. And she advised you that it
5 was okay for you to stop taking the Ambian?
6    A. She did.
7    Q. Since you stopped take the Ambian,
8 have you been able to sleep?
9    A. I have. Every now and then I'll
10 have nightmares. But I have.
11    Q. But overall, you have not had any
12 lack of sleep problems that have led you to
13 go back to Dr. Tutt for Ambian?
14    A. No.
15    Q. And you have not been prescribed
16 any other sleep medication?
17    A. No.
18    Q. Did Dr. Tutt advise to you take
19 any over-the-counter medication?
20    A. No.
21    Q. Nothing for sleep?
22    A. No.
23    Q. And nothing for depression?

Page 209

1    A. No.
2    Q. Okay. And you've never been
3 treated for any mental disorder?
4    A. No.
5    Q. Never been told that you have any
6 mental disorder?
7    A. No.
8    Q. Have you ever been -- You've never
9 been treated for any emotional disorder?
10    A. No.
11    Q. You have never been told that you
12 have an emotional disorder?
13    A. What is emotional?
14    Q. It's another mental health
15 diagnosis.
16    A. Is it depression?
17    MR. ARNOLD: Could you define the
18 difference for me.
19    Q. Yes, it can be.
20    A. Oh, okay.
21    Q. It can be -- what do they call it
22 -- disassociative mood disorder. It can be
23 any paranoid schizophrenia. It can be any

53 (Pages 206 to 209)

FREEDOM COURT REPORTING

Page 210

1   number of psychosis.
2       MR. ARNOLD: I thought they were
3   all the same.
4       A.  So you said depression?
5       Q.  Right.
6       A.  Well, just earlier when she
7   prescribed Lexipro.
8       Q.  Okay.  So for that time period
9   immediately following the January --
10  immediately -- January 31st, sometime in
11  February is when you saw Dr. Tutt; correct?
12      A.  Yes.
13      Q.  That's when she told you that you
14  were exhibiting signs of depression?
15      A.  Yes.
16      Q.  Okay.  Other than that treatment
17  by Dr. Tutt for -- I think you said you took
18  medication for approximately a month;
19  correct?
20      A.  Yes.
21      Q.  Other than that treatment, has any
22  other physician or has Dr. Tutt told you
23  that you are now suffering from continued

Page 211

1   depression?
2       A.  No.
3       Q.  Have you sought treatment for
4   depression since that time?
5       A.  No.
6       Q.  Okay.  I just have one or two
7   things I want to clarify with you and we'll
8   be about done.
9       A.  Okay.
10      Q.  You are now attending AUM you told
11  me earlier?
12      A.  Yes.
13      Q.  What is your classification at
14  AUM?
15      A.  I'm a junior.
16      Q.  Are you working at AUM?
17      A.  No.
18      Q.  And you testified earlier that you
19  did not remember calling Mr. Diop; is that
20  correct?
21      A.  I'm sorry.  As the interview went
22  on, I'm just starting to remembering stuff.
23  Sorry.  We did like on that day because I

Page 212

1   remember when I was driving on that day
2   because the phone -- we stay in the country
3   and the phones kept getting disconnected or
4   cutting off.
5       I think about maybe four times
6   that happened.  So I had to call him back,
7   it cut off.  He had to call me back, it cut
8   off.  It kept hanging up.
9       Q.  Okay.  I'm going to briefly show
10  you this.  Those are what your counsel has
11  produced to me as the records from your cell
12  phone.  Does that call dropping and you
13  calling him back, does that account for the
14  phone calls that you appear to have made to
15  Mr. Diop?
16      A.  Okay.  Yes.
17      Q.  Okay.  And I do want to mark this
18  one as 12.
19          (Whereupon, Defendant's Exhibit
20  No. 12 was marked for identification and
21  attached to the original transcript.)
22      MR. MADISON: Did you mark that
23  last one as an exhibit?

Page 213

1       MS. MEADOWS: Oh, you know what.
2   I think they are all part of the same
3   thing.  So just mark the whole thing as 12.
4   So yes.
5       MR. ARNOLD: I thought we had
6   something before.
7       Q.  I want you to turn to the page
8   that's numbered thirty-three.
9       A.  Okay.
10      Q.  There's a block of calls that's
11  circled from about 7:18 p.m. to 7:50 p.m. on
12  January the 5th.  You see that?
13      A.  Uh-huh.
14      Q.  And there's a handwritten note on
15  the side that says mama called, dinner.  Do
16  you know what that refers to?
17      A.  Yes.  Dinner.  That's when we went
18  out to dinner.
19      Q.  So the dinner was on January the
20  5th?
21      A.  Wait.  Are you talking about this
22  block of calls here?  Is it the 11th?
23      Q.  I see January the 5th.

54  (Pages 210 to 213)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 214

1    MR. ARNOLD: That's the call
2  number on the log. That's the date, the
3  time, that's the city, that's the number.
4    THE WITNESS: Okay.
5    MR. ARNOLD: You see the 01-05?
6    THE WITNESS: Uh-huh. Okay.
7    Q. So the dinner was on January the
8  5th?
9    A. Yes.
10    Q. Okay. So it's fair to say that
11  the dinner was prior to you starting to work
12  for Mr. Moore; correct?
13    A. It was. I'm sorry about that.
14    Q. No problem. Did you have any
15  conversations with Mr. Diop after the
16  dinner?
17    A. Let's see. I remember -- I think
18  I did.
19    Q. Do you remember what you talked
20  about?
21    A. I told him thank you for the
22  dinner. And that was it.
23    Q. Okay. How many times after the

Page 215

1  dinner did you talk to him?
2    A. Including the day of the rape or
3    --
4    Q. Exclude the day of the rape.
5    A. Oh, okay. I think maybe three
6  times.
7    Q. You only talked with him three
8  times?
9    A. Three, four times. Three or
10  four. I don't remember how many times. But
11  three, four.
12    Q. What did you talk about during
13  those times when you spoke with him?
14    A. Nothing really. I mean, short
15  phone calls. Usually he would call to tell
16  me about his day and I'd get off the phone.
17  They would be really short. Like a minute.
18    Q. Okay. So when he called you on
19  the day of the rape and talked to you about
20  his day, it wasn't really a call out of the
21  blue?
22    A. What do you mean for that day?
23    Q. I mean, it was not completely

Page 216

1  abnormal for him to call you to talk to you
2  about his day?
3    A. Yes, you could say it wasn't
4  abnormal. But, I mean, it was unexpected
5  because I don't --
6    Q. Okay. Let's look below the block
7  of calls that's circled on page
8  thirty-three. Do you see call number two
9  thirty-seven.
10    A. Yes.
11    Q. And that's a call on January the
12  6th?
13    A. Uh-huh.
14    Q. Okay. And that call -- that means
15  it's the day after the dinner; correct?
16    A. Yes.
17    Q. Okay. And there's a call from Mr.
18  Diop that lasts approximately thirteen
19  minutes on your bill; correct?
20    A. Uh-huh.
21    Q. What did you talk about during
22  that conversation?
23    A. Well, basically he was telling me

Page 217

1  how -- like what -- he respect what my dad
2  said about, you know, not dating. And I
3  told him my dad is right, he's too old for
4  me.
5    And he apologized or something for
6  just saying that out of the blue. And
7  that's really all I recall. It was like he
8  was apologizing for saying that.
9    Q. Okay.
10    A. He just respected what my dad
11  said.
12    Q. Okay. Then it appears that you
13  called him back sometime after that;
14  correct? I'm just looking at the next
15  call.
16    A. The check?
17    Q. Yes.
18    A. Which one?
19    Q. The one right after the thirteen
20  minute call on number two thirty-eight.
21  It's to the same number. But that one is
22  one that you made.
23    A. Uh-huh.

55 (Pages 214 to 217)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 218

1    Q.  Correct?
2    A.  Yes.
3    Q.  Okay.  Because it doesn't say it's
4  an incoming call; right?
5    A.  Uh-huh.
6    Q.  It says Montgomery Alabama to that
7  cell phone -- that telephone number?
8    A.  Okay.
9    Q.  And you called Mr. Diop.  Why did
10  you call Mr. Diop?
11    A.  Well, it was just two minutes
12  long.  So I don't know.  I don't know if
13  it's maybe the phone cut off or -- I don't
14  know.
15    Q.  And then he called you back?
16    A.  Yes.  That could be -- I don't
17  know.  Because usually when you leave a
18  voice mail, those minutes count.
19    Q.  Okay.
20    A.  I don't know.
21    Q.  It's possible because -- okay.
22  The first call that we just talked about,
23  that was at 1:42 a.m.; correct?

Page 219

1    A.  Okay.  Uh-huh.
2    Q.  Is that what -- You said you
3  remember it being almost two o'clock in the
4  morning?
5    A.  Uh-huh.
6    Q.  Okay.  And then at 2:11 a.m., you
7  called him back?
8    A.  Okay.
9    Q.  And then at 2:45, he called you
10  back?
11    A.  Okay.
12    Q.  Or at least tried to; right?
13    A.  Okay.
14    Q.  Okay.  So you remember talking to
15  Mr. Diop in the early morning hours of
16  January 6th?
17    A.  Yes.  I remember him calling me
18  and apologizing.
19    Q.  Okay.  Do you remember talking to
20  Mr. Diop later that evening?
21    A.  You want the check?  Which one?
22    Q.  On page thirty-four, call number
23  two fifty-nine came in at 7:10 p.m. on

Page 220

1  January the 6th.  And it's a four minute
2  phone call.  Do you recall talking to him
3  that evening?
4    A.  Yes, I could have.  But I don't
5  remember what it was about, though.
6    Q.  Okay.
7    A.  It was four minutes.
8    Q.  Right.  And do you remember him
9  calling you back at 9:38 that evening?
10    A.  I don't remember that.  But, you
11  know, it's here.
12    Q.  Yes.  Well, do you remember
13  calling him at 11:56 p.m. that evening?  Do
14  you recall calling him then?
15    A.  I don't recall what it was about.
16  It was three minutes.
17    Q.  It was three minutes.  And I want
18  you to look at call number -- Did we talk
19  about two seventy-five at 12:37 a.m. on
20  January 7?  He called you and you talked for
21  thirteen minutes.  Do you remember what you
22  talked about in that conversation?
23    A.  Huh-uh.

Page 221

1    Q.  Is that a no?
2    A.  Oh, no.  Sorry.  No.
3    Q.  Okay.  But that is a call coming
4  to you from him; correct?
5    A.  Uh-huh.
6    Q.  Is that a yes?
7    A.  Yes.
8    Q.  Okay.  I want you to look now at
9  call number three thirty-eight on January
10  the 8th.
11    A.  Okay.
12    Q.  At 6:39 p.m., there's a call that
13  you made to Mr. Diop's number.
14    A.  The one for four minutes?
15    Q.  For four minutes.  Do you know
16  what you called him about?
17    A.  No, I don't.
18    Q.  Okay.  But you did have a
19  conversation with him on that day; correct?
20    A.  I called him.
21    Q.  Okay.
22    A.  I don't know what it was about,
23  though.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 222

1    Q.   Okay.  But you talked to him?  You
2  did talk to Mr. Diop?  Is that a yes?
3    A.   I mean -- But, you know -- yes, I
4  guess so.  Yes, four minutes.
5    Q.   Okay.  Flip over to page
6  thirty-five for me.  At call number four
7  eighteen on January the 11th at 3:58 p.m.,
8  you placed another call to Mr. Diop's
9  number; correct?
10   A.   Where?
11   Q.   Call number four eighteen.
12   A.   Two minutes?
13   Q.   Yes.
14   A.   Okay.
15   Q.   And then right after that, Mr.
16  Diop calls you and you talk for three
17  minutes; correct?
18   A.   Yes.
19   Q.   And then on the 11th, call number
20  four twenty-two at 7:28 p.m., Mr. Diop calls
21  you again?
22   A.   Uh-huh.
23   Q.   Correct?

Page 223

1    A.   For two minutes.
2    Q.   And you talk for two minutes;
3  right?
4    A.   Okay.  Yes.
5    Q.   Okay.  And call number four
6  twenty-eight on the 11th at 8:18 p.m., you
7  call Mr. Diop; correct?
8    A.   Yes.
9    Q.   And you talk to him for about five
10  minutes?
11   A.   Uh-huh.
12   Q.   What were you talking with Mr.
13  Diop about on January the 11th?
14   A.   I don't know.
15   Q.   But you were conversing back and
16  forth with him; correct?
17   A.   Yes.
18   Q.   On January the 14th, call number
19  four eighty-one, at 12:05 a.m., you placed a
20  call to Mr. Diop; correct?
21   A.   Uh-huh.
22   Q.   How long did you talk that time,
23  Ms. Johnson?

Page 224

1    A.   That one, forty-two minutes.
2    Q.   What were you talking about for
3  forty-two minutes?
4    A.   I'm trying to think is that the
5  one where I was actually trying to tell him
6  that he should stop calling me and blah,
7  blah, blah.  I can't remember which calls
8  are which.
9         But I do remember that I was
10  trying to tell him that he needed to stop
11  calling me.  He was just talking about a
12  whole bunch of stuff.  I just told him that
13  he just needed to stop.
14   Q.   What was he talking about?
15   A.   I can't really remember.  How he
16  just wanted to -- I don't know.  Just wanted
17  to be my friend and blah, blah, blah and
18  that.  Excuse me.  Sorry for saying blah,
19  blah, blah.
20   Q.   I'm trying to find out what the
21  blah, blah, blah is.
22   A.   Yes.  That just means that I don't
23  know what he was saying.  I don't know

Page 225

1  everything that he was saying.
2    Q.   Okay.
3    A.   Sorry about that.
4    Q.   Okay.  I want you to skip down to
5  call number four eighty-three.  Okay.  This
6  time it's 12:56 a.m. and Mr. Diop calls you;
7  correct?
8    A.   Uh-huh.
9    Q.   And this time how long do you talk
10  to him?
11   A.   Thirty-six minutes.
12   Q.   Thirty-six minutes?
13   A.   Uh-huh.
14   Q.   Okay.  What did you talk about for
15  thirty-six minutes?
16   A.   I do not know.  I do not remember.
17   Q.   And now these are conversations
18  all after your father has told him that he
19  doesn't want Mr. Diop dating you; correct?
20   A.   Yes.
21   Q.   Okay.  Did you take any of these
22  conversations that the two of you had back
23  and forth for being romantically inclined

57 (Pages 222 to 225)

FREEDOM COURT REPORTING

Page 226

1  behavior?
2      A.  No.  Not really.
3      Q.  No?  You did not think that he was
4  expressing an interest in you by calling
5  you?
6      A.  I mean, what I'm saying is, I
7  didn't have interest in him and I -- you
8  know, I didn't think he had a romantic
9  interest in me.
10      Q.  Okay.  And you didn't take this
11  calling back and forth to be in defiance of
12  your father's directions on January the 5th?
13          MR. ARNOLD:  Object to form.
14      A.  I don't know what my dad would
15  think.
16      Q.  Did you ask your dad?
17      A.  My dad voiced his opinion at the
18  restaurant.
19      Q.  Right.  Did you ask him -- Did you
20  tell your dad about these conversations you
21  were having with Diop after the restaurant?
22      A.  No.
23      Q.  Okay.  But suffice it to say, Ms.

Page 227

1  Johnson, you continued to have a number of
2  conversations with Mr. Diop in between
3  January the 6th, which is the day after your
4  dad told him he couldn't date you, all the
5  way up to January the 31st; correct?
6      A.  Yes.
7      Q.  Okay.  And would you agree that
8  these are your phone records from your cell
9  phone bill?
10      A.  Yes.
11      Q.  Okay.  So if these records show
12  that you talked to Diop in addition to the
13  days we already talked about, you also
14  talked to him on January 22nd?
15          You would say that you did talk to
16  him that day; correct?  And actually I'm
17  looking at January 21st, call number six
18  eighty-seven and six eighty-eight.
19      A.  Yes.  He called.
20      Q.  Okay.  And January 22nd, call
21  number six ninety-six?
22      A.  Okay.  Six ninety-six?
23      Q.  Yes.

Page 228

1      A.  One for two minutes?  Uh-huh.
2      Q.  Okay.  And January 23rd, calls
3  number seven oh seven, seven oh eight, seven
4  twelve, seven fourteen, seven fifteen?
5      A.  Okay.
6      Q.  And you agree that you all are
7  having these discussions back and forth;
8  correct?
9          MR. ARNOLD:  Object to form.
10      A.  I see he's calling -- we're
11  calling.
12      Q.  Are you saying you're not talking
13  to him when he calls?
14      A.  I mean, I don't know what the
15  discussions are about.  Some of them are
16  just one minute long.
17      Q.  Okay.  And some of them are
18  considerably longer than one minute; right?
19          MR. ARNOLD:  Object to form.
20      A.  The majority of them are one and
21  two minutes.  But the other three that you
22  pointed out, they were considerably longer.
23      Q.  Well, let's look at call number

Page 229

1  seven fourteen on January the 24th at 12:58
2  a.m.  Mr. Diop calls you; correct?
3      A.  Yes.
4      Q.  And that call lasts eleven
5  minutes; correct?
6      A.  I see that.
7      Q.  Do you see it now?
8      A.  I see.
9      Q.  Okay.  And right up under that
10  column number seven fifteen, also on January
11  24th, at 1:05 a.m., Mr. Diop calls you
12  again.  And that call lasts fifteen minutes;
13  correct?
14      A.  Uh-huh.
15      Q.  Is that a yes?
16      A.  Oh, yes.
17      Q.  So again, Ms. Johnson, on some
18  occasions when you talked to Mr. Diop, there
19  are times when you do have conversations
20  that last more than one or two minutes?
21          MR. ARNOLD:  Asked and answered.
22          MS. MEADOWS:  She said she didn't
23  know before.

58 (Pages 226 to 229)

FREEDOM COURT REPORTING

Page 230

1    Q.  Sometimes you talked to him for
2  longer periods of time?
3    A.  Yes.
4    Q.  Okay.
5    MS. MEADOWS: I believe that's it,
6  Ms. Johnson.
7  EXAMINATION BY MR. MADISON:
8    Q.  That same exhibit, those phone
9  calls continued on through the end of that
10  billing period?
11    MR. ARNOLD: Are you addressing
12  with us or with her?
13    A.  What?
14    MR. MADISON: I didn't hear your
15  last question.
16    Q.  Did she ask you about the call on
17  January the 25th?
18    A.  Did she?
19    Q.  Did LaTasha, Ms. Meadows ask you
20  about the phone calls made to Mr. Diop on
21  January the 25th and the 26th?
22    THE WITNESS: Did you?
23    MS. MEADOWS: I believe we stopped

Page 231

1  going through them at the 24th of January.
2    Q.  That's what I thought. But you
3  continued exchanging phone calls with Mr.
4  Diop on through the end of that billing
5  period on this statement, did you not?
6    A.  Oh, you didn't check it? So I
7  don't look at the checks?
8    MS. MEADOWS: I didn't check any
9  of these. They were checked when I got
10  them.
11    Q.  If you will, look at call number
12  seven fifty-seven on January the 25th.
13    MR. ARNOLD: Are we going to go
14  through each and every call?
15    MR. MADISON: No. I'm just trying
16  to get a general answer that the calls
17  continued through the end of the billing
18  statement. If she'll take a second and look
19  at them. I'm just now beginning my
20  questioning.
21    A.  January is not on here. Wait.
22  And you want me to tell you the last day?
23    Q.  If you will. Well, just tell me

Page 232

1  if you didn't continue making phone -- or
2  exchanging calls with Mr. Diop on -- I think
3  there are only two or three days for the
4  remainder of that bill, the 25th, 26th and
5  possibly the 27th.
6    A.  I see.
7    Q.  They should be check marked. It
8  should help you.
9    A.  I see. Here's the 25th. Yes. On
10  the 26th. The 26th.
11    Q.  Okay. Did Mr. Diop have a
12  different phone number which you called that
13  you can recall offhand?
14    A.  No. I don't recall.
15    Q.  Okay. Were you -- Do you
16  recognize a 549 phone number? I'm sorry.
17  548-0160?
18    A.  No.
19    Q.  You don't know if Mr. Diop had a
20  another phone number which was utilized in
21  phone conversations between you and he?
22    A.  No. I do not know.
23    Q.  I thought that --

Page 233

1    MR. ARNOLD: Could you repeat that
2  number for me.
3    MR. MADISON: 548-0160. And it's
4  a 388 or 386.
5    MS. MEADOWS: It's a 386 on mine.
6  Do you need a better copy?
7    MR. MADISON: No. I just think my
8  eyes are just going.
9    Q.  I think these were produced to us
10  by your attorney or either given to us in
11  discovery. But let me show Defendant's 1
12  for Diop.
13    MR. ARNOLD: It's the same as
14  Exhibit 12, Bates labeled P 24 through P
15  30.
16    MR. MADISON: That's what I
17  thought. But I think it's a different
18  billing period.
19    MS. MEADOWS: Mine covers all of
20  them. I just didn't go over all of them.
21    MR. MADISON: But, in fact, we've
22  got some numbers that are duplicating
23  themselves for different time periods.

59 (Pages 230 to 233)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 234

1 February is in the other one?
2          MS. MEADOWS: February is at the
3 beginning. It's the first few pages. I
4 went right to the back. P 25 I believe is
5 where you are.
6          MR. MADISON: Right.
7     Q. If you will -- I apologize.
8          MS. MEADOWS: Do you want to mark
9 that still?
10         MR. MADISON: No, I don't want to
11 mark that one.
12    Q. Page twenty-five of Exhibit 12,
13 Defendant's Exhibit 12, the 386-546-0160
14 numbers, are you aware that those are Mr.
15 Diop's phone numbers?
16    A. No, I didn't know.
17    Q. Okay. Those numbers are checked
18 on your exhibit as well, are they not?
19    A. Yes.
20    Q. And does it reflect both incoming
21 and out going calls from the phone of Linda
22 Johnson on January the 31st?
23    A. Yes. Incoming, uh-huh.

Page 235

1     Q. And the first call I believe is at
2 5:19, an incoming call from that number;
3 correct? And that's number eight-six, the
4 first check mark at the top on the
5 right-hand side.
6     A. Okay. The four minute?
7     Q. Right.
8     A. Okay.
9     Q. And then there's another incoming
10 call below that, number eighty-seven?
11    A. Okay.
12    Q. And then there are several calls
13 from you or from this phone to that same
14 number; isn't that correct?
15    A. The three minute? Uh-huh.
16    Q. As a matter of fact, there are
17 approximately ten calls I believe?
18    A. Oh, that's -- well --
19    Q. Ten calls on January the 31st
20 either to or from?
21    A. The one minutes are -- I think
22 those are the ones where we kept getting
23 disconnected.

Page 236

1     Q. And there's a seven minute?
2     A. Okay.
3     Q. But you also called that number;
4 correct?
5     A. Which -- oh, which one?
6     Q. The 546-0160 number?
7     A. Okay. Uh-huh.
8     Q. The last time shown on there is
9 number ninety-nine. It shows a 7:13 p.m.;
10 is that correct?
11    A. Yes.
12    Q. Where were you when you made that
13 phone call or received that phone call from
14 Mr. Diop?
15    A. Let's see. I think that's when he
16 was giving me directions. I didn't know how
17 to get there.
18    Q. I believe that the reason you had
19 gone out that evening was because you were
20 picking up some medicine for your nephew; is
21 that correct?
22    A. Yes.
23    Q. What Walgreen's did you go to to

Page 237

1 pick up the medicine?
2     A. The one on the Eastern Boulevard.
3     Q. And you say the one on the Eastern
4 Boulevard. What location? There may be
5 more than one Walgreen's on the Eastern
6 Boulevard.
7     A. It's the one right there on the
8 Woodley Road.
9     Q. Woodley Road?
10    A. Uh-huh. Woodley Road.
11    Q. Southern Boulevard; is that right?
12    A. Oh, I'm sorry. Southern
13 Boulevard.
14         MS. MEADOWS: Don, when you get to
15 a good point, I need to take a break.
16         MR. MADISON: Sure. Let's go
17 ahead and take a break.
18         (Whereupon, a short recess was
19 taken.)
20    Q. Did you make the phone call from
21 the Walgreen's parking lot when you called
22 Mr. Diop to obtain those directions?
23    A. I think I was still in line at

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 238

1  Walgreen's about to get the medicine and
2  leave.
3      Q.  So it would have taken you then
4  some time to leave or pay -- for a check out
5  and pay for the medicine, then depart and
6  travel to Mr. Diop's residence; is that
7  correct?
8      A.  Yes.  I was picking up -- picked
9  up the medicine.  And then like maybe a
10  minute to call and got the medicine and was
11  walking towards my car.
12     Q.  How long did it take you to travel
13  from Walgreen's to Mr. Diop's apartment that
14  evening?
15     A.  I'll say about ten minutes.  Not
16  long.
17     Q.  After you left Mr. Diop's
18  apartment, did you go home and return home
19  with the medicine that you had purchased at
20  Walgreen's?
21     A.  No.  I went to the hospital.
22     Q.  Did you call your mother from the
23  telephone that you had with you?

Page 239

1      A.  I think I called her when I got to
2  the hospital.  I think I used my cell phone
3  or the hospital number.  Let's see.  Yes.  I
4  called her with my cell phone.
5      Q.  What time did you call from your
6  cell phone?
7      A.  It says 8:13.
8      Q.  And are you positive you were
9  already at the hospital by that time?
10     A.  I don't know when I got there.
11  But when I had -- When I called her, I think
12  I had hung up and then I had called -- I was
13  debating whether to tell them.  So I had
14  called CC.  And she's the one who had told
15  me to go to the hospital.
16     Q.  So which of the calls appearing --
17  or were the calls made from the telephone
18  numbers shown on Defendant's Exhibit 12 for
19  the 31st, January 31st?
20     A.  Was made on my phone, my cell
21  phone?
22     Q.  On this phone, yes.  Is that your
23  phone?

Page 240

1      A.  It's really my mom's.  But yes,
2  this is the cell phone that I had.
3      Q.  Which number is the one that
4  you're identifying where you called your
5  mother?
6      A.  Let's see.  Right here.  At 8:13,
7  right here.  The one that says a minute.
8  That's where I had hung up.  I was going to
9  tell them, but I didn't.  And so where you
10  see the two minute.
11     Q.  Right.
12     A.  This is my friend CC.  She's the
13  one who told me to go to the hospital.
14     Q.  So you first called home and then
15  you called your friend CC; is that correct?
16     A.  Uh-huh.
17     Q.  And then you called home again as
18  well several times.  Were you unable to get
19  someone?
20     A.  I didn't want to tell them.
21     Q.  Okay.  So at what point that
22  evening did you tell them that you were
23  going to the hospital?

Page 241

1      A.  When I got at the hospital, I told
2  them what happened.  And I think I called
3  from the hospital phone.  I think I called
4  from the hospital phone and I told them that
5  I was raped.
6      Q.  Okay.  Can you tell me on -- Was
7  it from this phone that that call was made
8  or the hospital phone?
9      A.  I believe it was from the hospital
10  phone.
11     Q.  Did anyone with your family
12  contact Mr. Diop that evening that you're
13  aware of?
14     A.  Honestly, I don't know.
15     Q.  If his telephone bill shows that
16  someone contacted him on January the 31st at
17  8:28, then it's your testimony that that
18  wasn't you calling his house from your
19  phone?
20     A.  No.
21     Q.  If you told Mr. Diop to quit
22  calling you as early as the middle part of
23  January, why did y'all continue to have

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 242

1  conversations together on through the end of
2  the month?
3      A.  I do not know.
4      Q.  Did you report to Mr. Diop's
5  supervisor or to anyone at Alabama State
6  University that you were concerned about Mr.
7  Diop continuing to call you?
8      A.  Continuing to call me?
9      Q.  Right.
10     A.  After -- I mean, like --
11     Q.  Before the incident.
12     A.  No.
13     Q.  You didn't have a problem with him
14 continuing to call you then, did you?
15         MR. ARNOLD:  Object to the form.
16 You can answer.
17         THE WITNESS:  You said I can
18 answer?
19         MR. ARNOLD:  If you understood the
20 question.
21     A.  I didn't have a problem like --
22 Say it again.  I'm sorry.
23     Q.  Let me rephrase it.  There

Page 243

1  appeared to be a mutual thing that y'all
2  were contacting each other, not just him
3  calling you; is that correct?
4      A.  We were calling.
5      Q.  I may have missed this earlier, so
6  I apologize.  I'm going to have to ask you
7  some personal questions and I apologize for
8  that as well.  But I'm just doing my job.
9          The clothes that you were wearing
10 on the night of the incident, you described
11 yourself wearing pants, I believe.
12         What sort of pants were you
13 wearing?  I think you said blue earlier.
14 But what type?
15     A.  They were cotton, blue cotton.
16     Q.  Like sweat pants or --
17     A.  Huh-uh.
18     Q.  Belt loops, belt?
19     A.  Yes, they had belt loops.
20     Q.  Were you wearing a belt that
21 evening?
22     A.  I used -- I just used my shirt.  I
23 tied my shirt around me.

Page 244

1      Q.  Okay.  I believe you testified
2  earlier you were wearing a tee shirt and you
3  said -- Did you have a shirt that you were
4  wearing over the top of the tee shirt or did
5  you take that shirt off and wrap it around
6  your waist?
7      A.  No.  I had a tee shirt, like, you
8  know, with sleeves like this.  Just a tee
9  shirt.  And I wear shirts around me when I
10 wear pants.  I just tie shirts around me.
11     Q.  This was in January during the
12 winter.  Do you recall what the weather was
13 like that evening?
14     A.  I don't remember.
15     Q.  Do you remember whether it was
16 raining or dry or --
17     A.  No, it wasn't raining.
18     Q.  Okay.
19         MR. ARNOLD:  Let him finish his
20 questions.
21     Q.  I believe you had given a
22 statement previously.  It may have been the
23 one given to Alabama State.  If I can find

Page 245

1  it.  Exhibit 7.  I believe you stated that
2  the reason you were calling him on the 31st
3  was because his grandmother was ill or
4  dying; is that correct?
5      A.  Yes.
6      Q.  Do you know for a fact that his
7  grandmother wasn't hospitalized on that
8  occasion?
9      A.  She wasn't?
10     Q.  No.  I'm asking you do you know
11 whether she was or wasn't?
12     A.  No.
13     Q.  Okay.  I'm going to show you on
14 page two of Exhibit 7 the highlighted
15 portion of the statement that you gave.
16         And I believe you stated therein
17 that he did, in fact, ejaculate in you
18 during the time that you alleged that y'all
19 were having intercourse.
20     A.  Okay.
21     Q.  Is that correct?
22     A.  Yes.
23     Q.  Now, at the time that you had the

62 (Pages 242 to 245)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 246

1  rape examination performed, were you
2  provided the results of any DNA tests which
3  were performed in conjunction with the rape
4  exam?
5      A.  What?
6      Q.  Did you ever receive any of the
7  analysis of the DNA done with the rape exam?
8      A.  Talking about the end product?
9      Q.  Right.
10     A.  It said it was inconclusive.
11     Q.  Were you aware that no semen was
12 able to have been retrieved from the areas
13 which were examined during the rape kit
14 being performed from the vaginal areas?
15     A.  No, I didn't know.
16     Q.  And I believe you also stated in
17 Exhibit 7 that you did not believe that Mr.
18 Diop was wearing a condom as well; isn't
19 that correct?
20     A.  The highlighted portion?
21     Q.  No.  I'm sorry.  Not the
22 highlighted portion.
23     MR. ARNOLD:  I think she already

Page 247

1  testified to that.
2      Q.  Can you explain I guess -- Well,
3  let me back up.  Did you take any showers or
4  wash off before the rape examination was
5  performed?
6      A.  No.
7      Q.  You went directly to the hospital
8  from Mr. Diop's apartment?
9      A.  Yes.
10     Q.  On the next page you stated that
11 you felt stupid for falling for the lie
12 about his grandmother; isn't that correct?
13     A.  Yes.
14     Q.  And you don't know to this day
15 whether or not his grandmother was actually
16 hospitalized on that occasion?
17     A.  I figured it was a lie because he
18 raped me.  I figured the whole thing was a
19 lie.
20     Q.  Well, if you're saying it was a
21 lie and it's not, then you're the person
22 lying; isn't that correct?
23     MR. ARNOLD:  That's unnecessary.

Page 248

1      A.  He raped me.
2      Q.  I'm asking you, if you made the
3  statement that it was a lie and that his
4  grandmother was not ill and she was ill,
5  then that's not true, is it?
6      A.  What?
7      MS. MEADOWS:  Object to the form.
8      MR. ARNOLD:  Object to the form
9  and also to the point --
10     Q.  You accused Mr. Diop of lying
11 about his grandmother's illness when you
12 didn't know whether or not if, in fact, she
13 was ill or not.
14     MR. ARNOLD:  Is that a question?
15     Q.  Isn't that correct?
16     A.  You're asking -- wait.  You're
17 asking me?
18     Q.  Yes, I am.
19     A.  What?  Say it again.
20     Q.  Okay.  If his grandmother was
21 actually ill, then your statement was not
22 true, that his grandmother was not ill;
23 isn't that right?

Page 249

1      A.  No.  I'm not lying.  He lied to
2  me.  I went over there and he raped me.
3      Q.  You're the one that went to his
4  apartment; correct?
5      A.  Yes.
6      Q.  And you went there and you say
7  that he lied to you about his grandmother
8  being ill as the premise for your going to
9  his apartment is what I understand your
10 testimony is.
11     A.  What do you mean premise?
12     Q.  The reason why you said you went
13 to the apartment was because you said that
14 he lied to you about his grandmother.
15     A.  The reason I went to his apartment
16 is because he told me that his grandmother
17 was dying.
18     Q.  If she was very ill, then that
19 would have been a true statement, would it
20 not?
21     A.  If she what?  Say it again.
22     Q.  I don't know how many different
23 ways I can say it.

63  (Pages 246 to 249)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 250

1    MR. ARNOLD: I don't really get
2  what you're trying to accomplish regardless
3  of the answer I think you're looking for.
4    MR. MADISON: She alleged as a
5  pretense for her going to the apartment that
6  Mr. Diop lied to her.
7    Q. Correct?
8    A. No. See, Mr. Diop, he told me
9  that his grandmother was dying.
10    Q. Well, was there anything false
11  about that to your knowledge?
12    A. When he raped me, I assumed that
13  that was a lie to get me over there and rape
14  me.
15    Q. But if his grandmother was, in
16  fact, ill, then he wasn't lying to you about
17  his grandmother's health?
18    MR. ARNOLD: Would that excuse the
19  rape? I guess --
20    MR. MADISON: Well, we're not
21  agreeing that there was a rape. That's a
22  disputed fact in this case. Your client has
23  alleged there was a rape and my client

Page 251

1  denies that there was a rape.
2    So we're trying to get at who's
3  telling the truth in this whole thing. Now,
4  I'm not sure that everybody accepts it. We
5  don't accept the fact that your client is
6  telling the truth. Okay.
7    MS. MEADOWS: Okay. Now, I'm
8  confused.
9    MR. ARNOLD: Because we've
10  dismissed both of our claims of prejudice, I
11  don't understand the relevance of it even at
12  this point.
13    MR. MADISON: Well, we still have
14  claims outstanding against Alabama State for
15  wrongful termination, breach of contract.
16    MS. MEADOWS: And what I'm
17  confused about here, Don, is, are you trying
18  to say that she knew when she went to his
19  apartment that his grandmother was, in fact,
20  not sick?
21    MR. MADISON: Right.
22    MS. MEADOWS: You're saying she
23  knew his grandmother was not sick before she

Page 252

1  left to go to the apartment.
2    MR. MADISON: No. She said that
3  he lied about his grandmother being sick.
4  And all I'm saying is does she know for a
5  fact whether or not the grandmother was
6  sick.
7    MS. MEADOWS: Okay. But what I'm
8  trying to find out is, are you saying that
9  she lied about what her reason was for going
10  to the apartment?
11    MR. MADISON: No. She said he
12  lied about her reason for going to the
13  apartment. In other words, she was trying
14  to claim in my reading of her statement that
15  he induced her to come to the apartment by
16  using a lie.
17    MS. MEADOWS: Okay. But I guess
18  what I don't see is how even if, in fact,
19  it's true that his grandmother was sick, I
20  don't see how that changes anything or how
21  that's relevant to anything.
22    MR. MADISON: Well, it was a
23  correct pretense under which she went to the

Page 253

1  apartment in the first place and not a false
2  -- not a falsehood as she said in her
3  statement.
4    MS. MEADOWS: Okay. But I don't
5  see how that makes anything that she says
6  happened after that any more likely or any
7  less likely.
8    MR. MADISON: Well, I think if she
9  gave a statement -- I don't know why we're
10  arguing this on the record. You could have
11  made an objection and she could have
12  answered the question. We could have
13  continued.
14    All I've done is sit here and
15  listened for six hours about her talking
16  about my client raping her. And now I'm
17  asking her questions which I have a right to
18  ask to try to support my client's position.
19    So if she says something that's
20  inaccurate or incorrect, then it would be
21  testimony that we could utilize against
22  her. But I'm not going to argue the merits
23  of why I'm asking questions.

64 (Pages 250 to 253)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 254

1    I'm just going to ask the
2  questions, she can give the answers and
3  y'all can object to the form. So I have a
4  right to ask whatever I want to ask. And I
5  wasn't able to start until about twenty or
6  thirty minutes ago.
7    Q. Did you ever answer the question
8  about whether you knew his grandmother was
9  sick?
10    A. Whether I knew or not that his
11  grandmother was sick?
12    Q. Right.
13    MS. MEADOWS: I object to the form
14  and object to foundation.
15    Q. You can answer.
16    A. I don't know.
17    Q. I believe you testified that
18  during the time that you're stating that Mr.
19  Diop raped you, that he held you down with
20  one hand and pulled your pants down with the
21  other; is that correct?
22    A. Yes.
23    Q. And as I'm facing you, would he

Page 255

1  have been holding his right hand on your
2  left hand and pulling your pants with his
3  left hand or how did that occur?
4    A. He had his left hand on my right
5  hand when I was laying down. And he used --
6  He used his right hand to pull my pants
7  down.
8    Q. Okay. Was he pulling from the
9  front or from the rear?
10    A. I don't remember. It could have
11  been the front. My zipper was broken. It
12  could have been the front.
13    Q. How did the pants attach, by
14  buckle or by button or how?
15    A. I had a button and zipper.
16    Q. Was the button broken?
17    A. The zipper was broken. That's
18  what I do remember. The zipper was broken.
19    Q. But the button was not broken?
20    A. I don't remember about the
21  button. But I know my zipper was broken.
22    Q. I'm going to show you Defendant's
23  Exhibit 2.

Page 256

1    (Whereupon, Defendant's Exhibit
2  Diop No. 2 was marked for identification and
3  attached to the original transcript.)
4    Q. I highlighted the first paragraph
5  I want to ask you about there. It stated
6  that Mr. Diop harassed you continuously; is
7  that correct, in your EEOC complaint?
8    A. Yes. This is true.
9    Q. Okay. Other than the incident on
10  the 31st, what other harassment are you
11  alleging that Mr. Diop engaged in?
12    A. I said that he harassed me by
13  asking me to date him even though I told him
14  I was not interested.
15    Q. But you omitted from that
16  statement that y'all just sort of continued
17  to call each other back and forth, didn't
18  you?
19    A. Yes.
20    Q. What is the second highlighted
21  portion there?
22    A. This sentence?
23    Q. Right.

Page 257

1    A. I was assigned to the supervision
2  of Stratford Moore supervisor.
3    Q. Now, did Mr. Diop to your
4  knowledge have anything to do with your
5  hiring at Alabama State?
6    A. I don't know.
7    Q. Did he tell you that he was going
8  to get you a job in return for any favors or
9  anything?
10    A. No.
11    Q. Okay. Did he indicate in any way
12  that he had the authority to be able to help
13  you obtain a job with Alabama State?
14    A. No.
15    Q. How long had your mother worked at
16  Alabama State University?
17    A. About eleven years.
18    Q. So if anyone had any contacts at
19  Alabama State University, it probably would
20  have been someone there for a period of time
21  as opposed to Mr. Diop, would it not?
22    A. I don't know.
23    Q. Can I have that back, please. Mr.

65 (Pages 254 to 257)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 258

1   Diop did not have the right to supervise nor
2   control you in any manner as an employee of
3   his, did he?
4       A.  Say that again.
5       Q.  Mr. Diop did not have the right to
6   supervise or instruct you on how you
7   performed your job at Alabama State
8   University?
9       A.  I don't know.
10      Q.  Well, I mean, you didn't report to
11  Mr. Diop, did you, after you say you started
12  to work there?
13      A.  Stratford Moore, that was my boss.
14      Q.  But not Mr. Diop?
15      A.  Stratford Moore was my immediate
16  boss.
17      Q.  Do you recall receiving any work
18  assignments from Mr. Diop while you were
19  employed before your termination there?
20      A.  You asked me if I worked?
21      Q.  Did you receive any work
22  assignments from Mr. Diop while you worked
23  there up to the point in time of your

Page 259

1   termination?
2       A.  I received work assignments from
3   my boss, Stratford Moore.
4       Q.  So that would be no, you received
5   no assignments, work assignments from Mr.
6   Diop?
7       A.  I received work assignments from
8   Stratford Moore.
9       Q.  Which department was Mr. Stratford
10  Moore working with?
11      A.  We were in the physical plant.
12      Q.  Do you know which aspect of the
13  physical plant or which department within
14  the physical plant Mr. Moore was working?
15      A.  Transportation.
16      Q.  Mr. Diop was not an employee in
17  the Transportation Department, was he?
18      A.  I don't know.
19      Q.  Did you ever go to the physical
20  plant and have any conversations with Mr.
21  Diop before the date of the incident?
22      A.  Say it again.
23      Q.  Shortly before the date of the

Page 260

1   incident, say within five days, did you ever
2   have an occasion to go to the physical plant
3   and meet with Mr. Diop?
4       A.  Oh, no.
5       Q.  Okay.  And it's your testimony
6   that you didn't go into his office or talk
7   to him in an upset manner?
8       A.  No.
9       Q.  You were asked earlier regarding
10  other incidences of sexual harassment.  I
11  believe you named an individual at Best Buy
12  that you said had done something in the
13  nature of a sexual harassment act against
14  you?
15      A.  I didn't name him.  I don't know
16  his name.
17      Q.  Did you quit after that?
18      A.  I resigned.
19      Q.  Was it as a result of that
20  incident?
21      A.  No.
22      Q.  How much longer did you continue
23  to work after that incident there?

Page 261

1       A.  It was about two weeks.
2       Q.  Were there ever any other
3   occasions other than that incident where you
4   led any form of a sexual harassment or any
5   other type of charge against a person other
6   than Mr. Diop?
7       A.  No.
8       Q.  Has any other member of your
9   family ever leveled a sexual harassment
10  charge against any individual?
11          MR. ARNOLD:  Relevance.
12          MR. MADISON:  Is that an objection
13  to form?
14          MR. ARNOLD:  There's nothing
15  relevant to the form of the question.
16          MR. MADISON:  I believe the
17  general objection is supposed to be object
18  to form.
19          MS. MEADOWS:  Well, I object to
20  the foundation.
21          MR. ARNOLD:  No other member of
22  the family is a part of this case.
23          MR. MADISON:  Are you instructing

66 (Pages 258 to 261)

FREEDOM COURT REPORTING

Page 262

1　her not to answer?
2　　　MR. ARNOLD: No, I'm not
3　instructing her not to answer.
4　　　Q.　Go ahead and answer, please.
5　　　A.　My sister.
6　　　Q.　Against whom did she file a
7　harassment claim?
8　　　A.　I don't know. She's older than
9　me. I don't know.
10　　　Q.　Are you aware as to whether she
11　filed a civil suit against the individual?
12　　　A.　I don't know.
13　　　Q.　Have you ever had any discussions
14　with your mother about filing civil suits
15　against anyone with respect to sexual
16　harassment claims?
17　　　A.　What do you mean with anyone?
18　　　Q.　Against Mr. Diop.
19　　　A.　That's what I'm doing now. He
20　raped me.
21　　　Q.　Did you discuss that with your
22　mother or your sister?
23　　　　MR. ARNOLD: Object to the form.

Page 263

1　Go ahead and answer.
2　　　A.　Like what we're doing now?
3　　　Q.　Right.
4　　　A.　I talked with my mom.
5　　　Q.　Okay. Did you speak with your
6　sister regarding her sexual harassment
7　claim?
8　　　A.　No.
9　　　Q.　So she never discussed that with
10　you?
11　　　A.　No.
12　　　Q.　How were you aware that she had
13　filed one then?
14　　　A.　She lives in the same house with
15　me. It's when we were in school.
16　　　Q.　Did she tell you or did your
17　mother tell you or did you just overhear
18　them talking about it?
19　　　A.　I can't remember.
20　　　Q.　When you filled out an application
21　for employment, did I understand during that
22　questioning that you had previously worked
23　for Alabama State?

Page 264

1　　　A.　Yes.
2　　　Q.　And that was approximately a year
3　earlier?
4　　　A.　No. That was -- let's see. Yes.
5　That was when I was in the -- like in the
6　fall like when I just graduated from high
7　school.
8　　　Q.　Would you say that was
9　approximately around the time you were a
10　freshman; is that correct?
11　　　A.　Uh-huh.
12　　　Q.　And did you fill out an
13　application for employment with Alabama
14　State University for that job?
15　　　A.　I did.
16　　　Q.　Did you receive any additional
17　approvements from Alabama State regarding
18　that position as opposed to the second
19　position that you applied for?
20　　　　MS. MEADOWS: Object to the form.
21　　　A.　What does that mean?
22　　　Q.　I think what I understood earlier
23　today was a lot of time was spent on the

Page 265

1　approval of your application. Did you have
2　to receive any such approval the first time
3　you were employed with Alabama State?
4　　　　MR. ARNOLD: The majority of that
5　questioning I believe her answer was I don't
6　know.
7　　　　MR. MADISON: I'm asking about the
8　first time, if she recalled what happened on
9　that occasion.
10　　　A.　With the writing lab?
11　　　Q.　Right.
12　　　A.　Put in an application.
13　　　Q.　And then you began work and you
14　were paid; is that correct?
15　　　A.　Yes. I worked and -- yes.
16　　　Q.　Okay. You reported to work on
17　February the 2nd, 2005. Did you report to
18　anyone about the incident when you reported
19　on the 31st?
20　　　A.　You said did I report to somebody
21　on the 31st?
22　　　Q.　I believe your testimony earlier
23　was that you reported to work on the

67 (Pages 262 to 265)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 266

1  February the 2nd; is that correct?
2      A.  Yes, I did go.
3      Q.  Did you report to anyone on that
4  date about the incident which occurred with
5  Mr. Diop on the 31st?
6      A.  My mom did.
7      Q.  I'm asking you when you went to
8  work that day, did you report to anyone?
9      A.  That's the day he fired me.
10     Q.  Well, when you went to work and
11  you walked in, did you tell anybody that Mr.
12  Diop had raped you on the 31st?
13     A.  No, I didn't.
14     Q.  I believe it was your testimony,
15  too, that at the time that you followed Mr.
16  Diop by his house where he could show you
17  where he lived was a point in time -- or in
18  the month of January which was subsequent or
19  after the time that you told Mr. Diop to
20  quit calling you according to your
21  testimony; is that right?
22         MR. ARNOLD:  Object to the form.
23     A.  Say it again.

Page 267

1      Q.  If I understood your testimony
2  earlier, you testified that it was around
3  mid month when you told Mr. Diop to quit
4  calling you, mid-January of '05; is that
5  correct?
6      A.  I don't remember the specific day.
7      Q.  You don't recall the point in time
8  you testified to earlier that you stated
9  that you followed Mr. Diop by his home?
10     A.  Yes.
11     Q.  What approximate date was that?
12     A.  I don't know the date.
13     Q.  Okay.  Did you say it was toward
14  the end of the month or was it after you
15  started your employment with Alabama State
16  or before that time?
17     A.  I think it was after.
18     Q.  Okay.  You testified earlier about
19  two messages which were left on your phone.
20  Are you aware whether the police department
21  transcribed those messages?
22     A.  No, I don't know.
23     Q.  And I believe, unless I

Page 268

1  misunderstood you, that you testified that
2  you let your mother hear the messages and
3  then she called the police department; is
4  that right?
5      A.  No.  I said that we let the deputy
6  lady hear it.  I don't know her name,
7  though.  She heard it.
8      Q.  So you didn't let your mother hear
9  the messages that evening?
10     A.  She heard it.
11     Q.  Did your mother hear the messages
12  at the hospital?
13     A.  It was that same -- it was that
14  same night.  I don't know where.  But it was
15  that same night.
16     Q.  I'm just trying to get in my mind
17  what your testimony is.  Did you let the
18  police officer hear the messages first or
19  did you let your mother hear the messages
20  first?
21     A.  My mom did hear the message and
22  the police officer heard it.
23     Q.  In what order?

Page 269

1      A.  Excuse me?
2      Q.  In what order?
3      A.  I don't know what order.  But they
4  did hear it.
5      Q.  You don't remember whom you played
6  the message for first, your mother or the
7  police officer?
8      A.  I don't remember what order.
9      Q.  The evening that y'all went out to
10  eat the dinner, did you ride in the vehicle
11  with Mr. Diop that evening?
12     A.  No.  We left --
13     Q.  In different vehicles?
14     A.  My family left.  We all left.
15     Q.  I thought you testified that you
16  were riding with your cousin; is that
17  correct, or is that a different --
18     A.  No.  Not my cousin.  That's from
19  the 31st.  What are you talking about?
20     Q.  That was my bad.  I thought that I
21  understood you to say that you had ridden
22  with your cousin.  Apparently that was a
23  different meeting.  That was the evening of

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 270

1 the 31st when you went to Walgreen's; is
2 that correct?
3    A.   What are we talking about now?
4    Q.   Didn't you testify that you were
5 in a vehicle with your cousin and dropped
6 the cousin off at some point in time?
7    A.   We're on the 31st again?
8    Q.   Yes. If that's the date. I'm
9 asking you is that the date that --
10    A.   The date of what?
11    Q.   When you were with your cousin and
12 you dropped them off.
13    MR. ARNOLD: If you understand the
14 question --
15    THE WITNESS: I don't.
16    Q.   You testified earlier that you
17 were with your cousin on a particular
18 occasion and you dropped the cousin off;
19 correct?
20    A.   Okay. Yes.
21    Q.   What date was that?
22    A.   That was on the 31st.
23    Q.   Okay. Did you drop your cousin

Page 271

1 off before you went to Walgreen's or
2 afterwards?
3    A.   Before.
4    Q.   What is your cousin's name?
5    A.   Jabrell.
6    Q.   Last name?
7    A.   Wright.
8    Q.   When you went out to eat with Mr.
9 Diop that evening, were you aware that he
10 was going to ask you or ask your parents if
11 he could ask you out on a date?
12    A.   I wasn't.
13    Q.   Do you recall any statements that
14 you gave that you stated that you began
15 watching a movie at Mr. Diop's?
16    A.   No.
17    Q.   Do you recall watching a movie --
18    A.   No.
19    Q.   -- at Mr. Diop's? Were you aware
20 that Mr. Diop cooperated with the police
21 department in providing the DNA evidence?
22    MR. ARNOLD: Object to the form.
23 She can't agree or disagree with that. She

Page 272

1 wasn't there.
2    MR. MADISON: I'm just asking her
3 if she was aware.
4    MR. ARNOLD: You asked her if she
5 thought he was cooperative.
6    MR. MADISON: I asked her if she
7 was aware that he cooperated in providing
8 the DNA evidence.
9    MS. MEADOWS: I'm sorry.
10 Cooperating or corroborating?
11    MR. MADISON: That he cooperated
12 in providing them the DNA evidence.
13    MS. MEADOWS: Okay.
14    A.   I don't know.
15    Q.   Exhibit 1, and ask to see if you
16 have seen a copy of that statement before?
17    A.   I have.
18    Q.   What does that statement purport
19 to be?
20    A.   This is the Montgomery Police
21 Department.
22    Q.   It's a statement you gave to the
23 police department during the investigation;

Page 273

1 isn't that correct?
2    A.   Yes.
3    Q.   May I see that back again,
4 please. I have highlighted one of your
5 answers there in that statement. What does
6 it say that you did when you went over to
7 Mr. Diop's apartment or began doing?
8    A.   You want me to read it?
9    Q.   If you don't mind.
10    A.   You to come over and maybe we can
11 just talk about that. And, you know -- and
12 we ended up watching a movie. I forgot what
13 kind of movie. And, you know, he was -- he
14 was very nice because, you know, he was
15 laughing and then --
16    Q.   But you told the police officer in
17 giving that statement that y'all watched a
18 movie, did you not?
19    A.   I think this was taken out of
20 content. But okay.
21    Q.   And isn't that what that says, you
22 watched a movie? You were watching a movie?
23    A.   No. No, he has a TV. I think the

69 (Pages 270 to 273)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 274

1  TV was on, but we were not watching a movie.
2      Q.  Let me see that back again,
3  please.  I don't know how that statement was
4  taken out of context because it states he
5  said you could come over to talk about that,
6  and, you know -- It says we ended up
7  watching a movie.
8          How is your statement that we
9  ended up watching a movie taking something
10  out of context?
11     A.  I don't know.  All I know is that
12  we did not watch a movie.  I mean, the TV
13  was on.  I think she must have wrote it down
14  wrong or whoever typed it.
15     Q.  Then it goes on to say, though,
16  that you forgot what kind of movie.  So were
17  you --
18     A.  I wasn't paying attention to the
19  TV.
20     Q.  But you don't deny that you told
21  the police department that you were watching
22  a movie, the investigator?
23     A.  I think that was taken out of

Page 275

1  context.
2      Q.  When you say it was taken out of
3  context, what are you saying?
4      A.  I'm saying that I went over there
5  because he told me his grandmother was dying
6  and that was it.  I was there to just -- I
7  was just going to pray for him and just let
8  him know it was going to be okay.  People
9  die.
10     Q.  During your examination, were they
11  allowed to make an intrusion into your
12  vagina to try to obtain semen samples or to
13  see if any semen samples were within you?
14     A.  Yes.  They did a rape kit.
15     Q.  And were they able to obtain any
16  semen samples that you were aware of?
17     A.  I don't know.
18     Q.  But they did make the attempt that
19  you recall to obtain any samples to try to
20  collect DNA from your vaginal area?
21     A.  Yes.  They did a rape kit.
22     Q.  Did you cooperate fully with that?
23     A.  Yes.

Page 276

1      Q.  Okay.  And were they able to make
2  an intrusion within your vagina to collect
3  semen samples?
4      A.  She did a rape kit.
5      Q.  Is that yes?
6      A.  Yes.  She did a rape kit.
7      Q.  And again, I may have asked you
8  this earlier.  Somebody else may have.  To
9  your knowledge, were any semen samples or
10  DNA of Mr. Diop collected anywhere from your
11  vaginal area?
12          MS. MEADOWS:  Object to the form.
13          MR. ARNOLD:  Asked and answered.
14     Q.  Well, go ahead.
15     A.  I don't know.
16     Q.  Have you not discussed the DNA
17  test results with anyone with the District
18  Attorney's Office?
19     A.  I'm sorry.  Repeat that.
20     Q.  Did you have any discussions with
21  anyone with the District Attorney's Office
22  concerning the DNA results?
23     A.  No, I didn't.

Page 277

1      Q.  Have you ever seen --
2          MR. MADISON:  Mark this as
3  Defendant Diop 2.
4      A.  You asked me have I seen it?
5      Q.  Right.
6      A.  No.
7      Q.  You were aware that a rape kit had
8  been performed; correct?
9      A.  Yes.
10     Q.  And you testified to that
11  already.  You were not curious as to what
12  that examination revealed?
13          MR. ARNOLD:  Object to the form.
14     Q.  Go ahead.
15     A.  You're asking me was I curious?
16     Q.  Right.
17     A.  Wanted to know what happened?
18     Q.  Yes.  If they found any evidence
19  of the rape outside of what you said
20  happened?
21     A.  Yes, I wanted to know what
22  happened.
23     Q.  Did you ever ask anyone for a copy

70 (Pages 274 to 277)

FREEDOM COURT REPORTING

Page 278

1  of the forensics analysis of the rape kit?
2      A.  My mom asked her.  She handled
3  that.
4      Q.  What did she tell you?
5      A.  She told me it was inconclusive.
6          MR. MADISON:  I don't think I have
7  any further questions.
8  EXAMINATION BY MS. MEADOWS:
9      Q.  I just have two very quick
10  questions.  Can you spell your cousin
11  Jabrell's name for us, please?
12      A.  J-A-B-R-E-L-L, Wright.
13      Q.  And that's just W-R-I-G-H-T?
14      A.  Oh, yes.
15      Q.  Okay.  And I just wanted to make
16  really sure.  You visited Diop's house only
17  on two occasions; correct?
18      A.  Yes.
19      Q.  And the first time was when you
20  drove by it?
21      A.  Yes.
22      Q.  And the second time was on January
23  31st?

Page 279

1      A.  Yes.
2      Q.  There were no other occasions when
3  you went to his house for any reason?
4      A.  No.
5      Q.  Okay.  And during this entire time
6  period where you were -- since you have
7  known Diop from before Christmas when you
8  told me you met him earlier up until January
9  31st, did you have a boyfriend?
10      A.  He wasn't really a boyfriend.  We
11  knew each other for just five months.  And
12  he took me out the first time within a
13  month.  That was it.
14      Q.  Within a month of --
15      A.  Like out of the five months, we
16  just went out one time.
17      Q.  Okay.  Was it towards the --
18      A.  He was just a friend.
19      Q.  What was his name?
20      A.  His name was Steven Clemmings.
21      Q.  Were you still talking to him on
22  the phone during this time?
23      A.  After or before?

Page 280

1      Q.  Before the sexual assault, were
2  you talking to him?
3      A.  Uh-huh.
4      Q.  Is that a yes?
5      A.  Yes.
6      Q.  Okay.
7  EXAMINATION BY MR. MADISON:
8      Q.  What was his phone number?
9      A.  I can't remember.
10      Q.  Would it be reflected on your cell
11  phone bill?
12      A.  It will be.  Here we go.  It's
13  right here.  One oh one, 618-315-2236.
14      Q.  One oh one?
15          MS. MEADOWS:  The call number.
16          MR. ARNOLD:  Call number.  Give me
17  just a second.
18          (Whereupon, Plaintiff's Exhibit
19  No. 1 was marked for identification and
20  attached to the original transcript.)
21  EXAMINATION BY MR. ARNOLD:
22      Q.  Jalonda, I'm showing you
23  Plaintiff's Exhibit 1.  Have you seen this

Page 281

1  document before?
2      A.  Yes.
3      Q.  What is this document?
4      A.  It's my time sheet.
5      Q.  What are the dates that you signed
6  this top sheet?
7      A.  02-02.
8      Q.  Okay.  And who else has signed
9  this time sheet?
10      A.  Mr. Moore.
11      Q.  What's the date of his signature?
12      A.  02-24.
13      Q.  This total which is on the far
14  right column, what are the -- what do these
15  numbers reflect?
16      A.  How many hours I've worked.
17      Q.  And where were you working when
18  you worked these hours?
19      A.  I was working as a data entry
20  clerk in transportation up under Mr. Moore.
21      Q.  And that was at Alabama State
22  University?
23      A.  Yes.

71 (Pages 278 to 281)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

Page 282

1    Q.  Okay.  So you were acting as an
2    employee with Alabama State when you
3    performed this labor?
4    A.  Yes.
5    Q.  Okay.  Were you paid for this
6    labor?
7    A.  No.
8    Q.  Okay.
9        MR. ARNOLD:  That's all the
10   questions I have.
11       MR. MADISON:  Let me ask you a
12   question about that exhibit.  LaTasha, do
13   you want to go first?
14       MS. MEADOWS:  I do actually have a
15   question about that.  Do you need to ask me
16   a question first, though?
17       MR. MADISON:  Well, I was.  But he
18   finished up.  If you want to go ahead and
19   ask her about that exhibit, go ahead.
20   EXAMINATION BY MS. MEADOWS:
21       Q.  Ms. Johnson, are you now
22   testifying that you never received payment
23   for those twenty-five hours?

Page 283

1    A.  I didn't.
2    Q.  Okay.  Then I'm going to need to
3    take a break.
4        MR. MADISON:  Let me go ahead and
5    ask my question then.
6        MS. MEADOWS:  Okay.
7    EXAMINATION BY MR. MADISON:
8        Q.  On that sheet it shows that the
9    work week started on January the 31st, 2005,
10   which was a Sunday; is that correct?
11       MR. ARNOLD:  That's -- I want to
12   correct you before you make an inaccurate
13   question.  It starts on the 23rd at the
14   top.
15       MR. MADISON:  I'm talking about
16   the second week.
17       MR. ARNOLD:  Okay.  It just wasn't
18   clear.
19       Q.  The second week.
20       A.  Yes.
21       Q.  And it shows you working on Monday
22   which would have been the 1st; isn't that
23   correct?

Page 284

1    A.  Actually, the 30th is Sunday and
2    the 31st is Monday.
3        MR. MADISON:  This sheet is just
4    incorrect then.  It says Sunday the 31st.
5    And that's not correct.
6        MR. ARNOLD:  I'll point out, if
7    you look at the top, it also says the 29th
8    for the day.  So I think it's been
9    mislabeled by somebody.  Who, I don't know.
10       Q.  Well, I took this as two weeks.
11   The first one is the week beginning Sunday
12   the 23rd and running through the 29th.  And
13   the second week is the 31st running through
14   the 6th.  That's a two week period, is it
15   not?
16       MR. ARNOLD:  Do you understand the
17   question?
18       THE WITNESS:  No.
19       Q.  Well, up on top, you've got one
20   full week; correct?
21       A.  Yes.
22       Q.  And it says the first work week
23   begins, and it says Sunday 01 to 23 slash oh

Page 285

1    oh five; isn't that right?
2        A.  Yes.
3        Q.  And it ends on Saturday 01-29, oh
4    oh five?
5        A.  Yes.
6        Q.  And then it says below that,
7    Sunday through Saturday, does it not?
8        A.  Yes.
9        Q.  So that would have been one week's
10   work.  Then immediately below that it says
11   the second work week begins January the
12   31st, 2005 which was a Sunday; right?
13       A.  We're still here; right?
14       Q.  Right.
15       A.  Okay.
16       Q.  And then it goes through Saturday,
17   which is February the 6th, 2005; correct?
18       A.  That's a five.
19       Q.  Five.  But it's -- that's February
20   the 6th, isn't it, or is that a --
21       A.  It's five.
22       Q.  Well, regardless, it ended on a
23   Saturday.  And then below that, it starts

72 (Pages 282 to 285)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

| Page 286 | Page 288 |
|---|---|
| 1 out Sunday, Monday, Tuesday, Wednesday | 1     A. No. |
| 2 through Saturday again, does it not? | 2     Q. So this check list history -- You |
| 3     A. Yes. | 3 are Jalonda R. Johnson; correct? |
| 4     Q. And it shows that you worked on | 4     A. That's my name, uh-huh. |
| 5 that Monday; correct? | 5     Q. And so you contend that you were |
| 6     A. Yes. | 6 never issued Alabama State University check |
| 7     Q. When you made the statement | 7 number 0336111? |
| 8 earlier, were you saying it was incorrect | 8     A. I did not get a check. |
| 9 that Sunday was the 31st or were you -- or | 9     Q. Which means you never cashed that |
| 10 is your time sheet showing that you worked | 10 check? |
| 11 on the 1st and not the 2nd? If Sunday was | 11     A. I never -- |
| 12 the 31st, then Monday ought to be February | 12     MR. ARNOLD: Object to the form. |
| 13 the 1st. | 13     Q. Did you return a check to Alabama |
| 14     A. No, no, no. Monday is the 31st. | 14 State University? |
| 15     Q. Okay. I don't have a calendar. | 15     A. No. I never got one. |
| 16 I'm just saying that's what you're saying, | 16     Q. Did you refuse to accept a check |
| 17 is Monday is the 31st and not Sunday as it | 17 from Alabama State University? |
| 18 states; right? | 18     A. No. I never was offered a check. |
| 19     A. Yes. | 19     Q. Okay. |
| 20     MR. MADISON: No other questions. | 20     MS. MEADOWS: No further |
| 21     MS. MEADOWS: Okay. I'm going to | 21 questions. |
| 22 have to take a recess and I'll be right | 22     MR. MADISON: I don't have any |
| 23 back. | 23 further questions. |

| Page 287 | Page 289 |
|---|---|
| 1     (Whereupon, a short recess was | 1     C E R T I F I C A T E |
| 2 taken.) | 2 |
| 3 EXAMINATION BY MS. MEADOWS: | 3 STATE OF ALABAMA ) |
| 4     Q. Now, Ms. Johnson, I want to be | 4 MONTGOMERY COUNTY ) |
| 5 absolutely clear. You contend that Alabama | 5 |
| 6 State University has never paid you for | 6     I hereby certify that the above |
| 7 these twenty-five hours? | 7 and foregoing deposition was taken down by |
| 8     A. No. | 8 me in stenotype, and the questions and |
| 9     Q. So as of today's date, you have | 9 answers thereto were transcribed by means of |
| 10 never been paid for the twenty-five hours | 10 computer-aided transcription, and that the |
| 11 that you worked January 23rd until February | 11 foregoing represents a true and correct |
| 12 5th pay period? | 12 transcript of the testimony given by said |
| 13     A. No, I haven't. | 13 witness upon said hearing. |
| 14     (Whereupon, Defendant's Exhibit | 14     I further certify that I am |
| 15 No. 13 was marked for identification and | 15 neither of counsel, nor of kin to the |
| 16 attached to the original transcript.) | 16 parties to the action, nor am I in any wise |
| 17     Q. Do you recall receiving a check | 17 interested in the result of said cause. |
| 18 sometime in July from Alabama State | 18 |
| 19 University? | 19 |
| 20     A. I didn't get a check. | 20     -------------- |
| 21     Q. You never received one hundred and | 21     CINDY WELDON |
| 22 eighty-five dollars from Alabama State | 22     ACCR #: 433 |
| 23 University? | 23 |

73 (Pages 286 to 289)

eb86fb24-19de-459d-901e-cf1e8737c087

FREEDOM COURT REPORTING

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JALONDA JOHNSON,           )
                           )
          Plaintiff,       )
                           )
-vs-                       )      CASE NO.:
                           )
ALABAMA STATE UNIVERSITY ) 02:07-CV-101-MEF
                           )
and ANWAR DIOP,            )
                           )
          Defendants.      )

          S T I P U L A T I O N S

          IT IS STIPULATED AND AGREED, by

and between the parties through their

respective counsel, that the deposition of:

          ANWAR K. DIOP,

may be taken before Belinda S. Brewster,

Commissioner and Notary Public for the State

of Alabama at Large, on the 13th day of May,

2008, commencing at approximately 11:55 a.m.,

at the law offices of Thomas, Means, Gillis &

Seay, P.C., 3121 Zelda Court, Montgomery,

Alabama; said deposition taken pursuant to

the Federal Rules of Civil Procedure.

          IT IS STIPULATED AND AGREED, by

Exhibit

2

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 2

1  and between the parties through their
2  respective counsel, that the reading of and
3  signature to the deposition by the witness is
4  waived, said deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8        IT IS STIPULATED AND AGREED that
9  it shall not be necessary for any objections
10 to be made by counsel to any questions,
11 except as to form or leading questions, and
12 that counsel for the parties may make
13 objections and assign grounds at the time of
14 the trial, or at the time said deposition is
15 offered in evidence, or prior thereto.
16       In accordance with Rule 5(d) of
17 The Alabama Rules of Civil Procedure, as
18 amended, effective May 15, 1988, I, Belinda
19 S. Brewster, am hereby delivering to Kenneth
20 L. Thomas the original transcript of the oral
21 testimony of Anwar K. Diop taken on the 13th
22 day of May, 2008, along with exhibits.
23       Please be advised that this is

Page 4

1        A P P E A R A N C E S
2  DONALD GORDON MADISON, Attorney-at-Law, of
3        the LAW OFFICES OF DONALD GORDON
4        MADISON, 418 Scott Street,
5        Montgomery, Alabama 36104;
6        appearing as counsel for Anwar K.
7        Diop.
8  LaTASHA A. MEADOWS, Attorney-at-Law, of the
9        law firm of THOMAS, MEANS, GILLIS
10       & SEAY, P.C., 3121 Zelda Court,
11       Montgomery, Alabama 36106;
12       appearing as counsel for the
13       Defendant Alabama State
14       University.
15 ALSO PRESENT:
16 TAMARA T. VENICE, PARALEGAL, THOMAS, MEANS,
17       GILLIS & SEAY, P.C.
18
19
20
21
22
23

Page 3

1  the same and not retained by the Court
2  Reporter, nor filed with the Court.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1        I N D E X
2  Witness:                    Page
3  ANWAR K. DIOP
4     Examination by Ms. Meadows        8
5     Examination by Mr. Madison      298
6     Further Examination by Ms. Meadows  319
7  - - - - - - - - - - - - - - - - -
8        E X H I B I T S
9  Exhibit No.  Description        Page
10    1    Notice of Deposition      13
11         Dated 5-6-08 (2 Pages)
12    2    Job Posting, Director of   80
13         Physical Plant
14    3    Application for Employment  82
15         Dated 5-20-04 (4 Pages)
16    4    Notice of Employment Dated  87
17         10-14-04
18    5    Excerpts from Nonacademic  110
19         Staff Handbook (15 Pages)
20    6    Budget Adjustment Request  129
21         Form
22
23

2  (Pages 2 to 5)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 6

```
1              E X H I B I T S (Cont'd.)
2    Exhibit No.   Description          Page
3       7     Alltel Phone Records for   146
4             Linda Johnson, 12-04,
5             1-05 and 2-05 (25 Pages)
6       8     Cingular Phone Records     269
7             for Anwar Diop, 1-3-05
8             through 2-2-05 (4 Pages)
9       9     Letter Dated 2-11-05       222
10            with Attachment (2 Pages)
11      10    Letter Dated 2-11-05       223
12      11    Sign-In for Meeting with   224
13            Employee Dated 2-11-05
14      12    Memorandum Dated 2-25-05   239
15      13    Memorandum Dated 3-18-05   241
16      14    Letter Dated 5-6-05        264
17      15    Letter Dated 5-13-05       269
18            (3 Pages)
19      16    Letter Dated 6-22-05       270
20      17    Letter Dated 8-25-05       272
21      18    Letter Dated 9-8-05        280
22            (3 Pages)
23
```

Page 7

```
1              E X H I B I T S
2    Exhibit No.   Description          Page
3       19    Letter Dated 9-18-06       280
4             (3 Pages)
5       20    Letter Dated 9-30-05       282
6             (2 Pages)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 8

```
1              I, Belinda S. Brewster, as
2    Commissioner and Notary Public for the State
3    of Alabama at Large, certify that pursuant to
4    Rule 30 of the Alabama Rules of Civil
5    Procedure and the foregoing stipulations of
6    counsel, there came before me at the law
7    offices of Thomas, Means, Gillis & Seay,
8    P.C., 3121 Zelda Court, Birmingham, Alabama
9    36106, on the 13th day of May, 2008,
10   commencing at approximately 11:55 a.m., Anwar
11   K. Diop, witness in the above cause, for oral
12   examination and the following proceedings
13   were had:
14               ANWAR K. DIOP,
15   a witness of lawful age, having sworn or
16   affirmed to tell the truth, the whole truth,
17   and nothing but the truth, was examined and
18   testified as follows:
19   EXAMINATION BY MS. MEADOWS:
20       Q.   Good afternoon, Mr. Diop.  How
21   are you?
22       A.   I'm good.  How are you?
23       Q.   I'm doing okay.  My name is
```

Page 9

```
1    LaTasha Meadows. I'm one of the attorneys
2    for Alabama State University. This is Ms.
3    Tamara Venia. She's my paralegal, and she's
4    going to be observing today.
5            And we are here today to take
6    your deposition because you filed a
7    crossclaim lawsuit against my client, Alabama
8    State University.
9            Do you understand that to be
10   correct?
11       A.   Yes.
12            MR. MADISON:  Let me stop you.
13   He said uh-huh (affirmative) while ago.
14   Answer either yes or no.  Sometimes --
15            THE WITNESS:  No. I said yes.
16            MR. MADISON:  Before that,
17   though, you said uh-huh (affirmative)
18   earlier.
19            THE WITNESS:  Oh.
20            MS. MEADOWS:  I'll cover that in
21   my instructions.  We'll get acquainted.
22       Q.   Have you ever given a deposition
23   before, Mr. Diop?
```

3  (Pages 6 to 9)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 10

1    A.    I have.
2    Q.    When was that?
3    A.    I really could not tell you the
4  exact date, but I've given a deposition.
5    Q.    Okay.  Give me an approximate
6  timeline.
7    A.    Ten years ago.
8    Q.    Okay.  What was that matter
9  regarding?
10    A.    An issue related to divorce and
11  settlement.
12    Q.    Well, as we move forward today,
13  it's very important that you speak loudly and
14  clearly enough for everyone to hear what
15  you're saying.
16         I know I have a problem.
17  Sometimes I talk a little soft.  So, we'll
18  both remind each other to speak up.  If you
19  can't hear what I'm saying, just ask me to
20  repeat my question.  It's not a problem.  And
21  if I can't hear you, I'll ask you to repeat
22  yourself.
23    A.    Okay.

Page 11

1    Q.    If at any time you don't
2  understand a question that I've asked you,
3  please, let me know, and I will try to
4  rephrase the question so that you can
5  understand it.
6         Otherwise, I will just assume
7  that you understand what I'm asking you.
8         Is that okay with you?
9    A.    That's okay with me.
10    Q.    That sounds reasonable to you?
11    A.    Reasonable.
12    Q.    Also, it's very important that
13  you give verbal responses to the questions.
14  Although I can see you right now and I can
15  tell that if you say uh-huh (affirmative) and
16  nod your head that you mean yes or if you say
17  huh-uh (negative) and shake your head you
18  mean no.
19         Later on on the record when
20  we're just looking at it on paper, it may not
21  be as clear.  So, try to answer a complete
22  yes or no answer.
23    A.    Okay.

Page 12

1    Q.    And, also, we will try to avoid
2  cutting each other off.  I know it's a habit
3  in normal conversation.  I do it.  Don does
4  it.  I'm sure you probably do it, too.
5         We'll try to avoid talking over
6  each other today so that the record can
7  remain clear.
8         Are you on any medication that
9  would keep you from being able to understand
10  my questions today?
11    A.    No.
12    Q.    And you are not on any
13  medications that would in any way inhibit
14  your ability to answer?
15    A.    No.
16         MS. MEADOWS:  We'll pause for a
17  moment.
18         (Brief recess.)
19    Q.    So, we covered that you're not
20  on any medication?
21    A.    Yes.
22    Q.    Okay.  Are you under the
23  influence of any drugs or alcoholic beverages

Page 13

1  today?
2    A.    No.
3         (Whereupon, said document was
4         marked for identification as
5         Exhibit No. 1 to the deposition
6         of Anwar K. Diop.)
7    Q.    I'm going to show you a copy of
8  a notice of deposition.  That's just a notice
9  requesting your presence here today, correct?
10    A.    That's my understanding.
11    Q.    And that notice is set for
12  today, May 13th, at 10:00 o'clock a.m.,
13  correct?
14    A.    That's correct.
15    Q.    At the address where we're
16  presently located?
17    A.    At the address we're currently
18  located?
19    Q.    Right.
20    A.    Yes.
21    Q.    Thank you.
22    A.    However, for the record, this is
23  the first time I've seen that notice.

4 (Pages 10 to 13)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 14

1    Q.    We're going to cover that.  Is
2  there any particular reason you were unaware
3  that your presence was requested today at
4  10:00 o'clock?
5    A.    Well, I think there was just a
6  misunderstanding as to the date and time.
7    Q.    What date and time were you
8  under the impression --
9    A.    I thought it was for the 14th.
10    Q.    You thought it was for the 14th?
11    A.    Yes.
12    Q.    Okay.  Mr. Diop, would you state
13  your full name and spell it for the record,
14  please.
15    A.    Anwar Diop.  A-N-W-A-R.  The
16  last name is D as in David, I-O-P as in Paul.
17    Q.    Do you have a middle name, Mr.
18  Diop?
19    A.    Kwesi, K-W-E-S-I.
20    Q.    Do you have a nickname or any
21  other name that you are known by?
22    A.    No, I don't.
23    Q.    Have you ever been known by any

Page 15

1  other name other than Anwar Diop?
2    A.    Andrew.
3    Q.    Okay.  When were you known by
4  Andrew?
5    A.    Prior to changing my name.
6    Q.    When was that?
7    A.    '91 roughly.
8    Q.    Did you -- when you were known
9  by Andrew, did you still have the same middle
10  name and last name?
11    A.    No.
12    Q.    Okay.  What --
13    A.    Hold it.  Excuse me.  Did I have
14  the same middle name?
15    Q.    Were you still --
16    A.    Oh, yeah.
17    Q.    Were you Andrew Kwesi Diop?
18    A.    No.
19    Q.    What was your full name?
20    A.    Andrew Gray.
21    Q.    Okay.  And you were known as
22  Andrew Gray from the time of your birth until
23  1991?

Page 16

1    A.    Yes.
2    Q.    Have you been known by any other
3  name other Andrew Gray or Anwar Diop?
4    A.    No.
5    Q.    Have you ever been known by the
6  name Andrew Gene?
7    A.    No.
8    Q.    Or Andrew Sean?
9    A.    No.
10    Q.    Or Andrew Sean Gray?
11    A.    Andrew Sean Gray.  Sean is my
12  middle name.
13    Q.    So, you did have a middle name
14  when you were --
15    A.    Yes.
16    Q.    -- Andrew Gray?
17        And you were known by Andrew
18  Sean Gray?
19    A.    Uh-huh (affirmative).
20    Q.    Have you ever been known by the
21  name John Oren?
22    A.    No.
23    Q.    Have you ever been known by the

Page 17

1  name John Gray?
2    A.    No.
3    Q.    Have you ever been known as
4  Johnny Lee Gray?
5    A.    No.
6    Q.    Or Jonathan Oren Gray?
7    A.    No.
8    Q.    Have you ever been known as Sam
9  Mitchell?
10    A.    No.
11    Q.    Have you ever been known by the
12  name Sean Andrew Watt?
13    A.    No.
14    Q.    Or Sean Mitchell?
15    A.    No.
16    Q.    Have you been known as Sean
17  Gray?
18    A.    Well, if somebody abbreviates
19  the name, but I've never been -- you know.
20    Q.    When you were known as Andrew
21  Sean Gray, would you spell your middle name
22  Sean?
23    A.    S-E-A-N.

5 (Pages 14 to 17)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 18

1    Q.    Have you ever been known by the
2    name Thomas Gray?
3    A.    No.
4    Q.    How old are you, Mr. Diop?
5    A.    Forty.
6    Q.    Forty?
7    A.    (Whereupon, the witness
8    indicated an affirmative response by nodding
9    his head up and down.)
10   Q.    What is your date of birth?
11   A.    July 14th.
12   Q.    What year?
13   A.    '67.
14   Q.    Have you ever used any other
15   date of birth?
16   A.    No.
17   Q.    Is your Social Security number
18   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?
19        MR. MADISON:  Object to form.  I
20   object to placing that on the record.
21        MS. MEADOWS:  Are you
22   instructing him not to answer?
23        MR. MADISON:  No.  I'd prefer to

Page 19

1    give that answer to you under a protective
2    order in that I don't want his Social
3    Security number for privacy reasons published
4    in something that could become a matter of
5    record and available to the public.
6         MS. MEADOWS:  I will agree that
7    -- if he will provide that information to me
8    following this deposition, I will agree that
9    that can be removed from the record.
10        MR. MADISON:  You want to go off
11   the record?  And we'll go ahead and give it
12   to you now.
13        MS. MEADOWS:  That's okay.  I
14   think I'll remember that.
15   Q.    What is the address of your
16   present residence, Mr. Diop?
17   A.    3026 Bryn.
18   Q.    Brent?
19   A.    Bryn, B-R-Y-N, Road.
20   Q.    What city and state is that
21   located in?
22   A.    It's in Montgomery.
23   Q.    Okay.

Page 20

1    A.    36111.
2    Q.    How long have you lived that
3    address?
4    A.    A year July 10th.
5    Q.    So, at least since July 10th,
6    2007?
7    A.    That's correct.
8    Q.    What is your current telephone
9    number?
10   A.    205-616-9018.
11   Q.    What was your address prior to
12   the Bryn Road address?
13   A.    3112 Wenonah, W-E-N-O-N-A-H.
14   And that's Drive.  Birmingham, Alabama 35211.
15   Q.    And when did you move into that
16   residence?
17   A.    I can't tell you the specific
18   date.  It's a family home.  So, it's been
19   since I've been born.
20   Q.    Okay.  How long did you live
21   there?
22   A.    Since 2004.
23   Q.    And you moved out on July 10th,

Page 21

1    2007?
2    A.    Correct.  If you can call it
3    that.
4    Q.    Prior to 2004, where did you
5    reside?
6    A.    Florida.
7    Q.    And what was that address?
8    A.    416 East Magnolia Drive,
9    Tallahassee, Florida, 35211 -- I mean, 32301.
10   Q.    And how long did you live at
11   that address?
12   A.    Probably ten -- ten years or so.
13   Fifteen maybe.  More like 15.
14   Q.    Where was your residence on
15   January 31st, 2005?
16   A.    416 -- hold on.  412 Hull.
17   Q.    And that's Hull Street in
18   Montgomery, Alabama?
19   A.    Correct.
20   Q.    What was your zip code at that
21   time?
22   A.    I think 36104.
23   Q.    When did you move into that

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 22 | Page 24 |
|---|---|
| 1  address? | 1  married? |
| 2      A.    It was actually an apartment | 2      A.    Yes. |
| 3  that I had for the times that I was here in | 3      Q.    What is your spouse's name? |
| 4  Montgomery, but my primary address was 3112. | 4      A.    Cynthia Diop. |
| 5  So, I would spend about three days or so, | 5      Q.    When and where were you married? |
| 6  three or four days, from time to time at that | 6      A.    In Montgomery, Alabama, April |
| 7  address. | 7  13th, 2007. |
| 8      Q.    Okay.  What I'm asking you now | 8      Q.    And your spouse resides with you |
| 9  is what were the dates that you -- when did | 9  at the Bryn Road address? |
| 10  you first acquire a right to reside at 412 | 10      A.    That's correct. |
| 11  Hull Street? | 11      Q.    Is your spouse employed? |
| 12      A.    Probably around December. | 12      A.    Yes. |
| 13      Q.    December of? | 13      Q.    Where is she employed? |
| 14      A.    December 2004. | 14      A.    The State of Alabama. |
| 15      Q.    When did you terminate that | 15      Q.    Which department? |
| 16  leasing arrangement? | 16      A.    Cosmetology. |
| 17      A.    April 2005. | 17      Q.    What's her job title? |
| 18      Q.    Did you have a home telephone | 18      A.    (Inaudible) or inspector. |
| 19  number at that address? | 19      Q.    Something like that? |
| 20      A.    No. | 20      A.    Yeah, something like that. |
| 21      Q.    What was your cellular telephone | 21      Q.    Do you know how long she's |
| 22  on number January 31st, 2005? | 22  worked there? |
| 23      A.    I don't even remember. | 23      A.    About seven years. |

| Page 23 | Page 25 |
|---|---|
| 1      Q.    But it is different from your | 1      Q.    Have you been married |
| 2  present telephone number? | 2  previously? |
| 3      A.    My -- I had a work phone that I | 3      A.    No. |
| 4  used primarily.  I don't remember what that | 4      Q.    Do you have any children, Mr. |
| 5  number was. | 5  Diop? |
| 6      Q.    So, the cell number that you had | 6      A.    Yes. |
| 7  on January 31st, 2005, was an Alabama State | 7      Q.    How many? |
| 8  University telephone? | 8      A.    One. |
| 9      A.    Correct. | 9      Q.    You have a daughter, correct? |
| 10      Q.    And that was issued to you for | 10      A.    Correct. |
| 11  -- because you were director of physical | 11      Q.    What's her name? |
| 12  plant? | 12      A.    Imani Diop. |
| 13      A.    Correct. | 13      Q.    Would you spell her name for the |
| 14      Q.    And you used that as your | 14  record, please. |
| 15  primary telephone? | 15      A.    I-M-A-N-I.  The last name the |
| 16      A.    That was my primary phone. | 16  same as mine. |
| 17      Q.    Okay. | 17      Q.    How old is Imani? |
| 18      A.    And I also maintained a personal | 18      A.    Eighteen. |
| 19  line as well. | 19      Q.    And where does Imani reside? |
| 20      Q.    What was your personal line | 20      A.    Tallahassee, Florida. |
| 21  number on January 31st, 2005? | 21      Q.    Do you have any relatives who |
| 22      A.    386 is the area code, 546-0160. | 22  live in Montgomery, Alabama? |
| 23      Q.    Mr. Diop, are you presently | 23      A.    I do, but I don't know them. |

7 (Pages 22 to 25)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 26

1    Q.    Okay.  Do you know what relation
2  they are to you?
3    A.    They're my grandfather's --
4  they're on my grandfather's side.  I mean,
5  like first cousins, aunt.  We have just never
6  met.
7    Q.    Do you know their names?
8    A.    No.  One's name is Emma.
9    Q.    What is her last name?
10   A.    Robinson is the last name.
11   Q.    And is that the family last
12  name?
13   A.    My grandfather's side.
14   Q.    By that I mean your --
15   A.    Yeah.  On my granddad's side,
16  yes.
17   Q.    On your granddad's side, the
18  family last name is Robinson, correct?
19   A.    Correct.
20   Q.    So, there's a chance you could
21  be related to a number of Robinsons in the
22  area?
23   A.    That's a possibility.  That's a

Page 27

1  strong possibility.
2    Q.    Yeah.  I understand.  I have a
3  big family, too.
4    Where did you attend high
5  school?
6    A.    Chicago Vocational.
7    Q.    And that was in Chicago,
8  Illinois?
9    A.    Correct.
10   Q.    When did you graduate?
11   A.    That's been so long ago.  In
12  '84.
13   Q.    Now, I know you attended Florida
14  A&M University; is that correct?
15   A.    Yeah.
16   Q.    When did you attend Florida A&M?
17   A.    I started in '85.
18   Q.    I'm sorry.  Did you say '85?
19   A.    Yes.
20   Q.    And when did you finish?
21   A.    '91.
22   Q.    And when you finished, you
23  obtained a degree?

Page 28

1    A.    Yes.
2    Q.    What was your degree in?
3    A.    I obtained a degree in
4  accounting and in civil and construction
5  engineering.  A Bachelor of Science in both.
6    Q.    Right.  So, you received a dual
7  degree?
8    A.    Correct.
9    Q.    Other than FAM U., have you
10  attended any other colleges or universities?
11   A.    Yes, I have.
12   Q.    Okay.  One at a time, tell me
13  which university did you attend.
14   A.    I attended Southern University
15  Law School for a year and a half until my
16  daughter.
17   Q.    What year did you enroll in
18  Southern?
19   A.    I really don't remember.  I
20  really don't.  It was -- it had to be
21  sometime around '92, '93, something like
22  that.
23   Q.    And you said you decided to

Page 29

1  leave law school after your daughter was
2  born?
3    A.    Well, I had to come back to
4  Florida.  So, what I did was I transferred to
5  the University of Florida and --
6    Q.    So, the University of Florida
7  Law School?
8    A.    Yes.  And I attempted to
9  continue that course.  However, finances kind
10  of prevented it.
11   Q.    Do you know when you started at
12  the University of Florida?
13   A.    A year and a half after -- after
14  I attended Southern.  So, if it was between
15  -- I would say in '94 sometime, around that
16  year.
17   Q.    But you later withdrew for
18  financial reasons?
19   A.    That's correct.
20   Q.    Other than Florida A&M
21  University, Southern University Law School,
22  and the University of Florida School of Law,
23  did you attend any other college or

8 (Pages 26 to 29)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 30 | Page 32 |
|---|---|
| 1 university? | 1 Q. Yeah. Something you want to |
| 2 A. I did a special engineering | 2 tell me about. |
| 3 program at the University of Alabama. | 3 A. Well, I mean -- I mean, I've |
| 4 Q. When was that? | 4 received different type accolades, but -- you |
| 5 A. Huntsville. That was actually | 5 know. |
| 6 in eighty -- '85 or so. It was a summer. | 6 Q. Okay. |
| 7 Q. And you said that was at the | 7 A. But nothing significant. |
| 8 University of Alabama in Huntsville? | 8 Q. Let's talk about your employment |
| 9 A. Right. | 9 history. |
| 10 Q. Did you receive any type of | 10 A. Okay. |
| 11 degree or certificate? | 11 Q. Tell me about your employment |
| 12 A. Certificate of completion. | 12 prior to coming to work at Alabama State |
| 13 Q. And that was a sort of | 13 University. |
| 14 precollege summer program? | 14 A. Well, I worked in the private |
| 15 A. It was pre-engineering, yeah. | 15 industry for a construction and design firm. |
| 16 Q. And that's offered to students | 16 Q. What construction -- |
| 17 who are planning to major in engineering say | 17 A. BE&K. |
| 18 in the upcoming -- | 18 Q. When did you start working at |
| 19 A. Correct. | 19 BE&K? |
| 20 Q. -- semester and enrolled as a | 20 A. '91 or '92. |
| 21 freshman in another university? | 21 Q. How long did you work there? |
| 22 A. Correct. | 22 A. Until taking the position at |
| 23 Q. Were you ever disciplined or | 23 Alabama State. |

| Page 31 | Page 33 |
|---|---|
| 1 asked to leave any of the universities that | 1 Q. So, until 2004? |
| 2 you attended? | 2 A. Yeah. |
| 3 A. No. | 3 Q. When you went to law school, did |
| 4 Q. Did you receive any honors or | 4 you take a leave of absence from BE&K? |
| 5 awards? | 5 A. No. I actually -- I worked on a |
| 6 A. I mean, I've been on -- you | 6 project in Palatka, Florida. I tried to kind |
| 7 know, grade point average wise, I've been on | 7 of maintain both, which is one of the reasons |
| 8 the honor roll, the Dean's list. | 8 I had problems because I couldn't do it. And |
| 9 Q. Where was that? | 9 it was actually something that I tried to do |
| 10 A. Florida A&M. | 10 in privacy. |
| 11 Q. Do you remember -- | 11 Q. Okay. So, while you were |
| 12 A. Exactly when? Now, that one -- | 12 working for BE&K, when you went to the |
| 13 Q. Well, approximately when. | 13 University of Florida School of Law, you |
| 14 A. -- I can tell you. That was in | 14 worked on a project in Palatka, Florida? |
| 15 '89, yeah. | 15 A. Initially, yeah. |
| 16 Q. And that was an honor issued by | 16 Q. What years were you working on |
| 17 the university? | 17 the project in Palatka, Florida? |
| 18 A. Correct. | 18 A. Hold up. Let me see something. |
| 19 Q. And recognized by the Dean's | 19 What date did I say I started working at |
| 20 office, correct? | 20 BE&K? |
| 21 A. Correct. | 21 Q. You said 1991 or 1992. |
| 22 Q. Any other honors or awards? | 22 A. No. That's incorrect. That's |
| 23 A. In school? | 23 not correct. That's not correct. That's not |

9 (Pages 30 to 33)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 34

1  correct.
2      Q.    Okay.  Well, what is the correct
3  date?
4      A.    It had to be -- it had to be
5  probably around '94, I think, or something
6  like that.
7      Q.    Okay.
8      A.    And I would have to refresh my
9  memory of just the specific dates of things.
10     Q.    So, when were you working on the
11 Palatka project?
12     A.    That was immediately -- I was
13 immediately assigned to the Palatka project
14 when I left Louisiana.  So, that was around
15 -- it was around that time.  It was around --
16 it was around '94, something like that, more
17 or less.
18     Q.    And that would be the Georgia
19 Pacific Cluster Rules Project?
20     A.    Correct.
21     Q.    Where you were the field
22 engineer?
23     A.    Uh-huh (affirmative).

Page 35

1      Q.    Okay.
2            MR. MADISON:  And is that a yes
3  or --
4            THE WITNESS:  Yes.
5            MS. MEADOWS:  Thank you.
6      Q.    Who was your immediate
7  supervisor?
8      A.    My immediate supervisor would
9  have been the project superintendent, but my
10 -- but I reported to the construction
11 manager, which was Kenny Smith.
12     Q.    And as the engineer, were you
13 responsible for overseeing any employees?
14     A.    Yes.
15     Q.    How many employees did you
16 supervise?
17     A.    Direct supervision?
18     Q.    Yes.
19     A.    Probably around 15 or 20.
20 Indirect, probably about 200.
21     Q.    What were your duties and
22 responsibilities in that position?
23     A.    Project oversight, field issues,

Page 36

1  scheduling, budgetary, interfacing between
2  client and contractor, value engineering,
3  anything that related to project activities,
4  be it progression and scheduling, quality and
5  performance of work, reviewing of blueprints
6  and designs, any interferences, be it
7  fabrication or delivery or modifications.
8      Q.    And just so that I keep the
9  record clear, this was a project of BE&K that
10 you were working on.  So, BE&K was your
11 employer during this time, correct?
12     A.    That's correct.
13     Q.    Okay.  When did that project
14 terminate?
15     A.    Maybe 14 or 15 months after it
16 started.  I can't tell you an exact date.
17     Q.    So, sometime between --
18     A.    I cannot tell you an exact date.
19     Q.    You said you started working on
20 it in 1994 or thereabouts, correct?
21     A.    Roughly.
22     Q.    Roughly?
23     A.    Yeah.

Page 37

1      Q.    So, roughly the project ended
2  perhaps in 1996?
3      A.    Fourteen or 15 months later,
4  yeah.
5      Q.    Which could have been sometime
6  in 1996?
7      A.    It could have been.  It could
8  have been.
9      Q.    What did you do after that
10 project in 1996?
11     A.    West Virginia and Kentucky power
12 plant projects.  I did two for DINergy, which
13 was -- I was still employed by BE&K.
14 However, I performed the same duties on first
15 the Riverside Project and then the --
16 Foothills was the next.
17     Q.    So, when did you go to the
18 Riverside Project?
19     A.    Right after -- within days after
20 leaving Georgia Pacific.  As a matter of
21 fact, I think I had 72 hours or so.
22     Q.    So, you don't have an
23 approximate date?

10  (Pages 34 to 37)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 38

1    A.    Not really. I mean, I really
2  don't.
3    Q.    Okay.
4    A.    At best I would be guessing.
5    Q.    And you don't remember when you
6  began the DINergy Foothills Project?
7    A.    They were right next door. So,
8  they kind of overlapped as a matter of fact.
9  As a matter of fact, before I closed out the
10 Riverside, the Foothills Project had already
11 began.
12   Q.    I'm just trying to get the dates
13 when you --
14   A.    I understand. And I wish I -- I
15 mean, I just --
16   Q.    I understand. Over time the
17 dates run --
18   A.    Yeah. I mean, they just all run
19 together. Really.
20   Q.    But you were chief field
21 engineer representing BE&K on both projects,
22 correct?
23   A.    Correct.

Page 39

1    Q.    And is it fair for me to say
2  that you did basically the same job duties
3  that you had done at Georgia Pacific?
4    A.    Well, I was field engineer
5  initially at Georgia Pacific. I kind of --
6  actually, my duties increased on those two
7  projects, and there were several reasons for
8  that.
9    Q.    Okay. Would you consider, in
10 essence, that was a promotion then?
11   A.    I wasn't getting promoted money
12 wise. So, no. I don't consider --
13   Q.    Okay. It was an escalation of
14 responsibility?
15   A.    A tremendous escalation of
16 responsibility.
17   Q.    And what did you do after that,
18 after the Foothills Project?
19   A.    Well, I was involved -- it was
20 an accident. The turbine collapsed. So, I
21 was injured, had to go through surgery, had
22 to go through rehabilitation. Then I went to
23 the Birmingham office.

Page 40

1    Q.    What year was that that you were
2  injured?
3    A.    Sometime probably around
4  2001-2002, something like that.
5    Q.    And that was at the Foothills
6  Project?
7    A.    Correct. It was at -- yeah.
8    Q.    And you said following that you
9  moved to --
10   A.    Well, I was -- for a short
11 period of time I was considered on -- what we
12 call on the bench. And that was just a
13 courtesy that they gave me.
14   Q.    Okay.
15   A.    And then I went and moved --
16 they brought me into Birmingham, which is --
17 which is one of the reasons I ended up being
18 there full-time.
19   Q.    So, when did you -- for what
20 period of time were you on the bench as you
21 called it?
22   A.    Probably about -- I think I came
23 into Birmingham maybe sometime around May or

Page 41

1  June or something like that. Yeah. So,
2  maybe five or six months or something like
3  that.
4    Q.    Okay.
5    A.    Jefferson County would be the
6  next project.
7    Q.    Right. That was, again, a BE&K
8  project where you --
9    A.    That's correct.
10   Q.    And this time you were the
11 project engineer?
12   A.    Correct. That was over the
13 storm water and water treatment facilities
14 because Jefferson County was kind of out of
15 compliance.
16   Q.    Okay.
17   A.    And from there to Alabama State.
18   Q.    When were you over their
19 Circleville Ohio Project? When was that?
20   A.    I forgot all about Circleville.
21 That's DuPont. Yeah.
22   Q.    Yes, the DuPont project.
23   A.    I forgot all about that.

11 (Pages 38 to 41)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 42

1    You know what, before going to
2  Jefferson County I went to DuPont. But it
3  was only for -- it was only for a few months.
4  So, that's -- yeah. That was a captime
5  facility. Yeah. I forgot all about that.
6    Q.   Was that before or after you
7  were injured?
8    A.   That was right after. Right
9  after. Yeah. And then I went to Birmingham
10  and then Jefferson County. I totally forgot
11  about Circleville.
12    Q.   Okay. What was your reason for
13  -- well, what was your last day at BE&K?
14    A.   October. As a matter of fact,
15  it was either -- it was either the first of
16  November or the last of October.
17    I know it was within weeks -- a
18  week or so before I reported to Alabama
19  State. And that's 2004. That I know because
20  I was tired. I hadn't had a break.
21    Q.   What was your reason for leaving
22  BE&K?
23    A.   Well, I thought it would be -- I

Page 43

1  thought it to be a good opportunity. And one
2  of -- a major factor, too, I was just ready
3  to get off the road.
4    And, you know, I wanted to
5  transition myself, you know, to the point
6  where I could actually get married, have a
7  family, just be in one place. I was tired of
8  being on the road.
9    And in doing so, you really
10  don't have much control at all as to where
11  you're assigned, nor do you have a lot of
12  time to report to your next destination. So,
13  it was kind of -- it's rough.
14    Q.   Do you have your PE
15  certification?
16    A.   I have been certified as a PE.
17  My certification is not active.
18    Q.   When were you certified?
19    A.   In Florida.
20    Q.   Do you remember when?
21    A.   The same time I was at Georgia
22  Pacific. Now, those specific dates I can get
23  you. I just don't remember the exact date.

Page 44

1    Q.   What is your relation to Turner
2  Construction Company?
3    A.   I worked with Turner prior to
4  graduating.
5    Q.   Was that an intern type
6  position?
7    A.   No. I mean, it wasn't an
8  internship. I did intern with them, which is
9  how I was able to get that position.
10    So, I worked with Turner for a
11  short time and got quite a bit of experience
12  from Turner.
13    Q.   When did you start working at
14  Turner?
15    A.   From the Miami-Dade project.
16  The '90s, sometime around there. As a matter
17  of fact, that was my first big job.
18    Q.   Okay.
19    A.   Yeah.
20    Q.   Who did you report to at Turner?
21    A.   Berry Fitzer, Ken Oaks. But
22  Berry Fitzer was my immediate supervisor.
23    Oh, Thaddeus Horn. I think that

Page 45

1  was -- no, Thaddeus Smith. Smith is the last
2  name. Sorry.
3    Q.   Take your time. You don't have
4  to feel like you have to rush. We'll wait
5  for you to think about it.
6    A.   Well, I appreciate that.
7    Q.   I do realize I'm asking you to
8  go back --
9    A.   Going back almost over my whole
10  life really. Well, a significant part of it.
11    Q.   Right. We're going to cover a
12  significant portion of time.
13    A.   That's not a problem.
14    Q.   So, I do understand that. And
15  at some point you worked for the
16  Tallahassee/Leon County Aquatic Center?
17    A.   No. That was one of my
18  projects.
19    Q.   That was a project. Oh, okay.
20    A.   I worked for Tallahassee
21  Department of Public Works.
22    Q.   Oh, okay. The City of
23  Tallahassee Public Works, is that --

12 (Pages 42 to 45)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 46

1    A.    Yes, yes. And that was my --
2    assistant project manager was that. But,
3    yeah, that was one. That was a good project
4    going on. Yeah.
5        Q.    When did you work there?
6        A.    Oh, man.
7        Q.    You knew I was going to ask.
8        A.    It was sometime '89-'90,
9    something like that. '89-'90.
10       Q.    And were you still in school at
11   this time?
12       A.    Yes.
13       Q.    Briefly, tell me sort of what
14   your duties were for the City of Tallahassee?
15       A.    I was really more a less like
16   assistant to the project managers. I
17   primarily oversaw document control, maybe was
18   a liaison to do a lot of troubleshooting, I
19   would evaluate various milestones in the
20   schedule, I would organize and even direct
21   the owner and contractor meetings.
22            It was -- it was really just a
23   way I got familiar with a lot of practices in

Page 47

1    the industry.
2        Q.    And who was your supervisor?
3        A.    Steve. Steve Schaeffer was his
4    name. I think he's still with the City of
5    Tallahassee, too.
6        Q.    Okay.
7        A.    Steve Schaeffer.
8        Q.    And I didn't ask this. What was
9    your reason for leaving the City of
10   Tallahassee?
11       A.    Just career advancement. Just
12   trying to, you know, gain more experience,
13   better pay, things like that.
14       Q.    And what was your reason for
15   leaving Turner Construction Company?
16       A.    My opportunity with -- with
17   BE&K.
18       Q.    Do you remember when you left
19   your employment with Turner Construction
20   Company?
21       A.    Not really.
22       Q.    Were you employed while you were
23   at law school at Southern University in

Page 48

1    Louisiana?
2        A.    I took a -- I was employed, I
3    think. But I took a leave if I'm not
4    mistaken. If I'm not mistaken, I did.
5        Q.    Where were you working at that
6    time?
7        A.    If I'm not mistaken, I was right
8    between -- that was the City of Tallahassee.
9    If I'm not mistaken, that was the City of
10   Tallahassee.
11       Q.    So, you took a leave from the
12   City of Tallahassee?
13       A.    Yeah, because I didn't formally
14   -- I hadn't formally quit. But for all
15   practical purposes, I was not working.
16            But I didn't know at the time
17   what I was going to do, what I was going to
18   have to do. So, I tried to keep some avenues
19   open.
20       Q.    Is it your understanding that at
21   that time the City of Tallahassee still
22   considered you an employee?
23       A.    I know my position hadn't been

Page 49

1    formally vacated, I don't think. I don't
2    think so. I don't think it had been if my
3    memory serves me correctly.
4        Q.    Were you paid by the City of
5    Tallahassee during this time?
6        A.    No, I wasn't paid, period. I
7    really just tried to keep some things open
8    just to be able to fall back in the event
9    things didn't go how I wanted them to go.
10       Q.    Have you had any other
11   employments that we have not covered?
12       A.    I may have. I just -- I can't
13   really think -- I couldn't tell you right
14   now.
15       Q.    Well, I may get some of the
16   names wrong, but are you familiar with --
17   what is this, The 512 Social Club of America,
18   LLC?
19       A.    512?
20       Q.    I'm not sure. You may call it
21   something else, but it's the Social Club of
22   America LLC, and it had some Roman numerals
23   preceding the name.

13 (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1    A.    I don't know nothing about that.
2    Q.    Okay. So, you were never the
3  manager of that business?
4    A.    Not to my knowledge.
5    Q.    And you would have no reason why
6  someone with your name and Social Security
7  number is listed as their manager?
8    A.    If it is, I sure would love to
9  know about it.
10    Q.    Are you familiar with a business
11  called Well Suited?
12    A.    Yeah.
13    Q.    Were you the owner of that
14  business?
15    A.    Yes.
16    Q.    What type of business was this?
17    A.    It's a business I started while
18  I was in school, and it's a tailoring and
19  design clothing line. Believe it or not, I
20  used to could sew a little bit. So, shirts,
21  things like that. Plus I did cuff links. It
22  was just a little side hustle I had.
23    Q.    Okay. When did you start the

Page 51

1  business?
2    A.    I don't even remember. I don't
3  remember, but it's been years ago.
4    Q.    How long did you operate the
5  business?
6    A.    It was probably -- you know,
7  active operation, probably till sometime
8  around ninety something.
9    Q.    Did you stop operating it before
10  you went to law school?
11    A.    No. I think I had it still
12  then. I had it around then if I'm not
13  mistaken.
14    Q.    And did you start it in
15  Tallahassee?
16    A.    Yeah. It was definitely started
17  in Tallahassee. No question about that.
18    Q.    Do you remember when you ceased
19  to operate the business?
20    A.    No, I don't. It just kind of
21  went defunct.
22    Q.    What was the reason you ceased
23  to operate the business?

Page 52

1    A.    Probably just time and energy.
2  As a matter of fact, I'm sure. Time and
3  energy.
4        And just -- it's the kind of
5  business you kind of have to -- you have to
6  -- it's a lot of foot work and just a matter
7  of keeping in contact with people and maybe
8  going -- you know, it's not something that
9  generated business just on its own. It was
10  something I had to actively pursue.
11    Q.    Well, you let me know when you
12  find one that you don't have to do that to
13  and I'm going to get into it.
14    A.    Well, I'm sure some clients walk
15  in your door, right?
16    Q.    I'm going to tell you, we have
17  to hustle to get clients to walk in the door.
18    A.    Oh, okay.
19        THE WITNESS: I walked in your
20  door, didn't I?
21        MR. MADISON: You did.
22        MS. MEADOWS: Because he did
23  some hustling to get you to come.

Page 53

1    Q.    Did you have any employees other
2  than yourself?
3    A.    No. My grandmother maybe.
4    Q.    Oh, your grandmother was an
5  employee?
6    A.    My grandmother helps me quite a
7  bit. That's my partner and everything.
8    Q.    You actually were able to manage
9  your grandmother as an employee?
10    A.    No. She really managed me.
11    Q.    Okay. I was just wondering
12  because -- is your grandmother the one who
13  taught you to sew?
14    A.    Yeah. As a matter of fact, she
15  did.
16    Q.    I just want to be clear because
17  I think I have that name wrong. You weren't
18  affiliated with any type of social club as a
19  manager?
20    A.    Not to my knowledge that I can
21  remember. I mean, I've done a lot of things.
22  I mean, is it maybe like a student
23  organization or something like that or -- I

14  (Pages 50 to 53)

Page 54

mean, because I did a lot of activities in school, you know. But, I mean, nothing -- not to my knowledge.
Q. Okay. That's just not ringing a bell for you?
A. No.
Q. I can tell you that it's located in Tallahassee, Florida.
A. Huh-uh (negative).
Q. I don't have the address with me now.
A. No. But if it is, I mean --
Is it still active?
Q. It appears to still be active.
A. Because if it is, I sure would love to know.
Q. It does appear to still be active.
A. I sure would love to know.
Q. Okay.
A. Definitely.
Q. Okay.
A. Are they making money? That

Page 55

would be the first thing I want to know.
Q. I did not check that.
A. Now, that would be a good -- I would love to know that, though.
Q. Let's talk about your present employment. You're presently employed at Tuskegee University, correct?
A. Correct.
Q. Which department are you employed with there?
A. Construction and planning.
Q. Construction and planning?
A. Yeah. As a matter of fact, do -- I don't necessarily want my employment, current employment status, being divulged either.
And the reason being, it's just been -- my experience here in Alabama has not been good as far as that's concerned.
Q. Well, I've got to ask you questions about your present employment.
MR. MADISON: She has a right to ask you questions about your employment.

Page 56

THE WITNESS: Well, I understand that, but if it -- if you can -- now, as far as duties and things like that. It's just that -- well, just my locale and things. People can be pretty destructive. This is the only reason I'm saying that.
Q. (By Ms. Meadows) Okay. Well, I'm not going to send them a transcript or anything.
A. Oh, well, that wouldn't matter. They got -- that wouldn't matter.
Q. When did you --
A. I'm not talking about that.
Q. -- first become employed at Tuskegee University?
A. January.
Q. Of this year?
A. Yes.
Q. What is your position or your title?
A. Project manager.
Q. And are you a salaried employee, or are you an hourly employee?

Page 57

A. Salaried.
Q. Okay. About how many hours per week are you required to work in your present job?
A. Technically, 37.5, which has not been the case. Ever, never. Since the day I started, it has not been the case.
Q. Yeah. I'm sort of asking what it actually takes.
A. How many hours I actually put in?
Q. Yeah. How many hours you actually put in.
A. Probably about 60.
Q. Okay.
A. And that's not including what I take home.
Q. Who is your immediate supervisor?
A. Clifford Wesson.
Q. Clifford?
A. Wesson, W-E-S-S-O-N.
Q. And what is Mr. Wesson's

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 58

1  position?
2      A.    Construction manager.
3      Q.    What are your present duties and
4  responsibilities?
5      A.    Oversee capital projects for the
6  university. It's new facilities,
7  renovations, infrastructure.
8      Q.    Do you supervise any employees
9  directly?
10     A.    Fortunately, no.
11     Q.    Okay. Following your
12 termination from Alabama State University and
13 prior to your employment with Tuskegee
14 University in January --
15     A.    Unemployed.
16     Q.    You have not been employed?
17     A.    Unemployed.
18         MS. MEADOWS: Okay. All right.
19 I'm going to take about five minutes, please.
20         (Whereupon, the taking of the
21 deposition was recessed from approximately
22 12:58 a.m. to approximately 1:03 p.m., after
23 which the following proceedings were had and

Page 59

1  done:)
2      Q.    Mr. Diop, how many times have
3  you been arrested?
4         MR. MADISON: Object to the
5  form.
6         THE WITNESS: Three, four,
7  something like that.
8      Q.    (By Ms. Meadows) When was the
9  first time?
10         MR. MADISON: Object to the
11 form. Go ahead.
12         THE WITNESS: What?
13         MR. MADISON: You can answer. I
14 made an objection.
15         THE WITNESS: You mean time
16 wise?
17     Q.    (By Ms. Meadows) Yeah. I mean
18 the very first time. I want to know when it
19 was.
20     A.    I was 15 years old.
21     Q.    Where were you?
22     A.    Chicago.
23         MR. MADISON: Object to the

Page 60

1  form.
2      Q.    (By Ms. Meadows) And why were
3  you arrested at that time?
4         MR. MADISON: Object to the
5  form. Go ahead and answer.
6         THE WITNESS: With the wrong
7  people.
8      Q.    (By Ms. Meadows) Okay. I get
9  that, but what I want to know is why the
10 police arrested you.
11         MR. MADISON: Object to the
12 form. I'm just going to have a continuing
13 objection to your questioning regarding his
14 criminal history.
15         MS. MEADOWS: Okay.
16         THE WITNESS: Do I need to
17 answer?
18         MR. MADISON: Yeah.
19         THE WITNESS: This person I was
20 with took somebody's watch.
21     Q.    (By Ms. Meadows) So, you were
22 arrested for theft?
23     A.    Correct.

Page 61

1      Q.    Did you ever go to court for
2  that?
3      A.    Once.
4      Q.    For that incident when you were
5  15?
6      A.    Correct.
7      Q.    What happened?
8      A.    It was -- it was resolved prior
9  to any kind of trial or anything like that.
10     Q.    Okay. Were the charges
11 dismissed?
12     A.    Not in its entirety.
13     Q.    Okay. Well, tell me what the
14 disposition of it was.
15         MR. MADISON: Object to the
16 form.
17         THE WITNESS: I don't remember.
18     Q.    (By Ms. Meadows) You don't
19 remember how it was resolved?
20     A.    I mean, I don't remember what
21 the final -- what they -- because it was like
22 reduced to something, but I don't remember.
23     Q.    You got some sort of reduced

16 (Pages 58 to 61)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 62

1   charge?
2       A.    Correct.
3       Q.    Did you receive a sentence in
4   connection with the reduced charge?
5       A.    Well, actually, I had to do like
6   probation, and it was thrown out after
7   probation if I did the probation
8   satisfactorily. As a matter of fact, you
9   know what, I was in juvenile so -- yeah.
10      Q.    And you started juvenile
11  probation?
12      A.    Yeah.
13      Q.    And you successfully completed
14  that probation?
15      A.    Yes.
16      Q.    And the charges were dismissed?
17      A.    Correct.
18      Q.    When was the second time that
19  you were arrested?
20          MR. MADISON: Object to the
21  form.
22          THE WITNESS: Maybe about five
23  years later, something like that.

Page 63

1       Q.    (By Ms. Meadows) Do you
2   remember what year that would have been?
3       A.    No.
4       Q.    Well, where were you at that
5   time? And by where --
6       A.    Florida.
7       Q.    Where in Florida?
8       A.    Tallahassee.
9       Q.    Why were you arrested?
10      A.    Dealing with --
11          MR. MADISON: Object to the
12  form.
13          THE WITNESS: Dealing with
14  stolen property.
15      Q.    (By Ms. Meadows) And by dealing
16  with stolen property, explain what you mean
17  by that.
18      A.    Well, I bought a computer that
19  was stolen.
20      Q.    Were you charged with that crime
21  following the arrest?
22      A.    I think initially. And that
23  also was the same. As a matter of fact, I

Page 64

1   was -- initially, I was. And I think they
2   was -- somehow it was reduced some kind of
3   way as well.
4       Q.    Would that have been an incident
5   on or about June 4th of 1996?
6       A.    June 4th, 1996. Yeah. That
7   might have been it, yeah.
8       Q.    You think that might have been?
9       A.    That may have been.
10      Q.    Well, let me ask you this. Did
11  you go to court -- did you have a trial for
12  the receiving stolen property charge?
13          MR. MADISON: Object to the
14  form.
15          THE WITNESS: No, I didn't go to
16  trial on any -- anything.
17      Q.    (By Ms. Meadows) Okay. But all
18  you remember is that you were in Tallahassee,
19  Florida?
20      A.    Correct.
21      Q.    And it was for purchasing a
22  stolen computer?
23      A.    Correct.

Page 65

1           MR. MADISON: Object to the
2   form.
3       Q.    (By Ms. Meadows) Okay. Tell me
4   about the third time.
5           MR. MADISON: Object to the
6   form.
7           THE WITNESS: Like a -- for
8   fraud, bank fraud.
9       Q.    (By Ms. Meadows) When was that?
10      A.    Around the same time.
11      Q.    So, you were approximately 20
12  years of age at that time?
13      A.    No. I might have been about 22,
14  something like that.
15      Q.    Was that also in Tallahassee,
16  Florida?
17      A.    Yeah.
18      Q.    What was the final outcome of
19  that matter?
20          MR. MADISON: Object to the
21  form.
22          THE WITNESS: Dismissed. I
23  don't recall another instance.

17 (Pages 62 to 65)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 66

1    Q.   (By Ms. Meadows) You don't
2  recall what?
3    A.   I don't recall any other
4  instances.
5    Q.   So, just those three times is
6  all you recall?
7    A.   (Whereupon, the witness
8  indicated an affirmative response by nodding
9  her head up and down.)
10    Q.   Okay.  Do you recall an incident
11  on April 24th, 1996, where you were charged
12  with aggravated assault on a law enforcement
13  officer or --
14    A.   The same instance.  That was
15  completely thrown out.
16    Q.   That was which incident?
17    MR. MADISON:  Object to the
18  form.
19    THE WITNESS:  The same instance
20  with the bank.  As a matter of fact, that's
21  how that happened.  I was leaving the bank,
22  and they tried to stop my car.
23    Q.   (By Ms. Meadows) Okay.

Page 67

1    A.   Yeah.  But that was thrown out.
2  I didn't know who they were from Adam.
3    Q.   So, you don't recall entering a
4  plea of nolo contendere?
5    MR. MADISON:  Object to the
6  form.
7    THE WITNESS:  Not on that
8  charge.  Never.
9    Q.   (By Ms. Meadows) And you don't
10  recall being sentenced for one year of
11  probation for that offense?
12    A.   It wasn't for that.  It was for
13  the bank thing.  That's what I'm saying.
14  That charge was completely thrown out.
15    Q.   Were you represented by an
16  attorney regarding that matter?
17    A.   Yeah.
18    Q.   Who was your attorney?
19    A.   Dean LeBoeuf.
20    Q.   Would you happen to know how to
21  spell his last name?
22    A.   L-E-B-O-U-F.
23    Q.   Were you employed at the time of

Page 68

1  this incident?
2    A.   Yeah.
3    Q.   Where were you employed?
4    A.   Mind -- mind -- it was with --
5  I'm trying to think of where I was at that
6  time.  If I'm not mistaken, that was sometime
7  around the time I was doing my Well Suited
8  and City of Tallahassee.
9    Q.   According to the records, the
10  incident was on April 24th, 1996.
11    A.   Okay.
12    Q.   According to your earlier
13  testimony, at that time you were employed by
14  BE&K.  Is that --
15    A.   In '96?
16    Q.   Yes.
17    A.   And that incident occurred in
18  '96?
19    Q.   This incident took place on
20  April 24th, 1996.
21    A.   Are you sure, or is that the
22  disposition?
23    Q.   No.  According to court records,

Page 69

1  the disposition --
2    A.   I don't think that's --
3    Q.   -- was in 2001.
4    A.   The disposition is 2001?
5    Q.   Uh-huh (affirmative).
6    A.   Okay.  That could be it.  But
7  1996 it couldn't have been.  It didn't happen
8  in '96.
9    Q.   What year was it?
10    A.   I know it couldn't have been
11  1996.
12    Q.   Okay.
13    A.   It had to be -- it had to be in
14  '91 or something like that.
15    Q.   So, you believe it was in 1991?
16    A.   Yeah.  Or '92 or something like
17  that.  It was a long time ago.  I can tell
18  you that.  Fifteen years ago.
19    Q.   And you believe that you were
20  employed at that time with the City of
21  Tallahassee?
22    A.   If I'm not mistaken.  As a
23  matter of fact, I had two jobs I think.

18 (Pages 66 to 69)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 70

1    Q.    Okay.
2    A.    I think I was doing my Well
3  Suited and I was at the City of Tallahassee.
4  If I'm not mistaken.
5    Q.    Was Dean LeBoeuf a
6  court-appointed attorney?
7    A.    No.
8    Q.    You paid Dean LeBoeuf?
9    A.    Yeah.
10    Q.    Did your employer pay your
11  attorney's fees?
12        MR. MADISON:  Object to the
13  form.
14        THE WITNESS:  No, no.  My
15  grandmomma probably paid them.
16    Q.    (By Ms. Meadows)  Did you
17  request that your employer pay your
18  attorney's fees.
19    A.    Quite possibly.  I may have.  I
20  mean, I may have requested anybody who would
21  pay them at that time.
22    Q.    No.  I mean --
23    A.    I mean, not to -- I don't

Page 71

1  remember formally.  No, I know I've never
2  made any kind of formal request for that.
3    Q.    Did you expect that they should
4  pay your attorney's fees?
5        MR. MADISON:  Object to the
6  form.
7        THE WITNESS:  I mean, I can't
8  tell you.  I can't speak to my state of mind
9  at that time.  I really can't.  I know it was
10  a frustrating period.  I can tell you that.
11    Q.    (By Ms. Meadows)  Okay.  And you
12  were charged with the grand theft of property
13  during that time?
14        MR. MADISON:  Object to the
15  form.
16        THE WITNESS:  I don't know what
17  the -- what it was reduced to.  I know the
18  charge was bank fraud.  That's what it was.
19    Q.    (By Ms. Meadows)  And it was an
20  attempt at theft of property of $300 -- more
21  than $300 but less than $5,000.  Does that
22  sound right?
23        MR. MADISON:  Object to the

Page 72

1  form.
2        THE WITNESS:  If that's -- if
3  that's the parameters.  Is that the
4  parameters of it?  It had to be then.
5    Q.    (By Ms. Meadows)  Okay.  And you
6  say that this was in 1991 or 1992 perhaps?
7    A.    It wasn't in '96 if I -- you
8  know.
9    Q.    Okay.  That's -- that's why I'm
10  asking you.
11    A.    Yeah.  I'm sure I can find out
12  the exact date.
13    Q.    What were you accused of
14  stealing?
15        MR. MADISON:  Object to the
16  form.
17        THE WITNESS:  It was
18  administrative stuff.  It was dealing with
19  paperwork.  I don't even remember.
20    Q.    (By Ms. Meadows)  When you say
21  dealing with paperwork, what do you mean it
22  was dealing with paperwork?
23    A.    It was dealing with stuff

Page 73

1  related to my company.
2    Q.    To Well Suited?
3    A.    Uh-huh (affirmative).
4    Q.    And you entered a nolo
5  contendere plea to this charge?
6        MR. MADISON:  Object to the
7  form.
8        THE WITNESS:  No.  I entered in
9  a plea to another charge, but it was reduced
10  or something like that because I was the --
11  the company was mine.  I don't even remember
12  all of the parameters of it.
13        But, you know, it was something
14  that could have went either way.  And because
15  I didn't have money, I thought it was
16  probably easier.  I probably took the easier
17  way out.
18    Q.    (By Ms. Meadows)  Did you serve
19  four years of probation for this offense?
20        MR. MADISON:  Object to the
21  form.
22        THE WITNESS:  Not to my
23  knowledge, no.  I've never served four years.

19 (Pages 70 to 73)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 74 |
| --- |

1    Q.    (By Ms. Meadows) Do you recall
2  serving four years of probation for any
3  offense?
4    A.    I never recall serving four
5  years probation, period.
6    Q.    Okay.
7    A.    Now, it could have been that it
8  was four years, but if you serve a certain
9  amount of it, then it would terminate. That
10  could have been.
11    Q.    So, you say that you may have
12  been sentenced to four years of probation?
13    A.    That's possible, yeah.
14        MR. MADISON: Object to the
15  form.
16    Q.    (By Ms. Meadows) And it's your
17  contention that perhaps --
18    A.    But I've never served four years
19  probation. That's my contention.
20    Q.    Okay. So, it is your contention
21  that perhaps you were released from your
22  probation early?
23    A.    I don't recall ever having the

| Page 75 |
| --- |

1  requirement of four years probation.
2    Q.    Okay. Did you have probation --
3    A.    I'm only speculating based upon
4  your question so -- but I -- to my knowledge,
5  no four years of probation.
6    Q.    Did you have a probation
7  officer?
8    A.    Yeah.
9    Q.    What was your probation
10  officer's name?
11    A.    I cannot even tell you. It
12  probably changed every month.
13    Q.    So, you had a variety of
14  probation officers?
15    A.    It probably changed. I know it
16  changed regularly due to admin -- you know.
17    Q.    I understand --
18    A.    They had turnover.
19    Q.    -- they may have had some
20  turnover.
21    A.    No. They had lots of turnover.
22    Q.    Do you recall any of their
23  names?

| Page 76 |
| --- |

1    A.    No. As a matter of fact, I
2  don't think I ever even --
3    Q.    Do you recall meeting --
4    A.    -- attempted. As a matter of
5  fact, I may have only met them one time.
6    Q.    One time each or one time,
7  period?
8    A.    I may have only met a probation
9  officer one time.
10    Q.    Okay. I just want to make sure
11  that I don't misunderstand what it is you're
12  trying to say.
13    A.    That's what I'm saying.
14    Q.    So, I'm going to repeat it for
15  you, and you tell me if I'm understanding you
16  correct.
17    A.    I don't recall seeing the
18  probation officer during the term that I had
19  probation but once.
20    Q.    Okay. Thank you.
21        Have you ever had occasion to
22  reside in Hardee County, Florida?
23    A.    Not to my knowledge.

| Page 77 |
| --- |

1    Q.    Do you recall being arrested for
2  a family offense in Hardee County, Florida?
3    A.    Never.
4    Q.    Okay. Have you ever been --
5    A.    I've never been -- I never
6  recall being arrested for a family offense,
7  period.
8    Q.    I'm just trying to sort out
9  who's you from who's not you.
10    A.    I understand. I understand.
11    Q.    Okay.
12    A.    A good start would be the
13  incidents that I discussed with you. If they
14  don't fit that, then it's probably not me.
15    Q.    And are you stating you only
16  have the one charge of theft of property?
17        I'm not talking about your
18  charge as a juvenile. I'm talking about as
19  an adult.
20        MR. MADISON: Object to the
21  form.
22        THE WITNESS: Yeah, that's what
23  I'm saying.

20  (Pages 74 to 77)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 78

1    Q.    (By Ms. Meadows) Other than the
2    present lawsuit, have you ever been involved
3    in any other lawsuit?
4    A.    I've been in mediation for a
5    proposed lawsuit, yes, with BE&K.
6    Q.    Were you the plaintiff or the
7    defendant?
8    A.    The plaintiff.
9    Q.    When was that?
10   A.    I can't tell you the exact date,
11   but it was some -- as a matter of fact, I
12   remember working on the job at Alabama State
13   while this was -- while we were in discussion
14   with that.
15   Q.    That was in 2004?
16   A.    Correct, sometime around there.
17   Q.    And why were you suing BE&K?
18   A.    Money. Because of incentive
19   bonuses that were a part of a contractual
20   agreement for the two power plant projects
21   that I worked on that I was entitled to.
22   Q.    Were you represented by an
23   attorney at that time?

Page 79

1    A.    Yes.
2    Q.    And who represented you?
3    A.    I cannot remember the firm's
4    name. If you hadn't asked me that question,
5    I could have told you. I think Pantazis and
6    Childs or -- I don't remember the firm's
7    name.
8    Q.    Do you remember the individual
9    lawyer who worked on your case?
10   A.    Yeah, I do. Rod Cook.
11   Q.    Rod Cook?
12   A.    Yes.
13   Q.    And what was the outcome?
14   A.    Privately negotiated.
15   Q.    You were able to negotiate a
16   settlement?
17   A.    Yeah.
18   Q.    How did you learn about the job
19   opening at Alabama State?
20   A.    Probably the same as I learned
21   about the job at Tuskegee. On the Internet.
22   As a matter of fact, the job that I was
23   applying for was not -- was not even -- it

Page 80

1    was just a totally different position.
2    Q.    Well, I'm going to show you the
3    job posting.
4    A.    Okay.
5    Q.    This is not -- this is the
6    posting for director of physical plant.
7    A.    Okay. Which I didn't apply --
8    which was not the initial response that I
9    gave.
10         It's just that when I responded
11   to another position, I guess this immediate
12   position was open. Because I interviewed for
13   two positions.
14   Q.    Do you recall what the other
15   position was?
16   A.    Yes. It was for construction
17   manager.
18         MS. MEADOWS: Okay. I'm going
19   to go ahead mark this as Exhibit 2.
20         (Whereupon, said document was
21         marked for identification as
22         Exhibit No. 2 to the deposition
23         of Anwar K. Diop.)

Page 81

1    Q.    You said you didn't apply for
2    this job posting?
3    A.    I wouldn't have applied to this
4    job posting.
5    Q.    Although, it is for the position
6    of director of physical plant?
7    A.    It may have been for --
8    previously, but this wasn't even posted
9    during the time that I even interviewed for
10   that position. This is from June to July.
11   Q.    Okay. And --
12   A.    I mean, this could have been at
13   some point, but I've never seen that.
14   Q.    Now, it's my understanding that
15   you did apply for a position.
16   A.    Okay.
17   Q.    And you later received a letter,
18   which indicated that the position was being
19   reposted or reopened and asking you if you
20   wish to leave your application on file.
21         Do you recall that?
22   A.    No. I recall -- no. I never
23   recall a letter to that regard.

21 (Pages 78 to 81)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 82

1      (Whereupon, said document was
2      marked for identification as
3      Exhibit No. 3 to the deposition
4      of Anwar K. Diop.)
5      Q.    Okay. Let me show you
6  Defendant's Exhibit 3.
7      A.    That's my application.
8      Q.    You recognize this as the
9  application for employment that you submitted
10 to Alabama State University?
11     A.    Yeah.
12     Q.    And you submitted this on May
13 20th of 2004; is that correct?
14     A.    Yes.
15     Q.    And that was prior to the
16 posting date of June 29th, 2004, correct?
17     A.    Correct.
18     Q.    However, on the front page of
19 the application, what position does it say
20 you are applying for?
21     A.    Director of physical plant.
22     Q.    And is that the same position
23 title of the posting dated June 29th, 2004?

Page 83

1      A.    Yeah. Uh-huh (affirmative).
2      Q.    Is that a yes?
3      A.    Yes, it is.
4      Q.    So, you did apply for the
5  position of director of physical plant,
6  correct?
7      A.    I think I -- I don't remember
8  the full parameters of what -- what -- how it
9  happened, but I did -- I was requested to
10 apply for that position.
11     Q.    Who requested that you apply for
12 this position?
13     A.    I interviewed for another
14 position. The same committee actually dealt
15 with this position.
16          And I guess they saw that
17 someone with my qualifications were similar
18 to what they were seeking, and they asked me
19 about that at that time.
20     Q.    Do you know the name?
21     A.    It was several people.
22     Q.    Do you know the name of any of
23 the individuals on that committee?

Page 84

1      A.    Freddie Gallot; Thaddeus Horn,
2  who was over the committee; Vickie Arrington,
3  who was the police chief; Leon Frazier. I
4  can't remember. It was about three others.
5      Q.    Do you have any reason to
6  disagree that your application was processed
7  at Alabama State University?
8      A.    None at all.
9      Q.    And you will admit that you met
10 with the committee and were interviewed for
11 this position?
12     A.    Yes.
13     Q.    And that you were eventually
14 offered the position?
15     A.    Yes.
16     Q.    Which you accepted, correct?
17     A.    Yes.
18     Q.    And you started working in
19 November of 2004, correct?
20     A.    Yes.
21     Q.    Do you remember the date you
22 started?
23     A.    I don't remember the exact date.

Page 85

1      Q.    Okay.
2      A.    Maybe -- I don't remember the
3  exact date.
4      Q.    What were your job duties at
5  Alabama State?
6      A.    Well, the position was director
7  of physical plant. It was -- oversight
8  duties was housekeeping, operations and
9  maintenance. Those two areas.
10     Q.    Okay. And your work, as you
11 stated, involved general oversight of the
12 campus, the grounds, the buildings, the
13 maintenance, things related to ASU's campus,
14 correct?
15     A.    Yeah.
16     Q.    You were in a supervisory
17 position, correct?
18     A.    Yes.
19     Q.    How many employees did you
20 supervise?
21     A.    A hundred and eight.
22     Q.    Okay. Was one of the employees
23 you supervised Ms. Linda Johnson?

22  (Pages 82 to 85)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 86

1     A.    No.
2     Q.    What department did Ms. Linda
3  Johnson work in?
4     A.    Transportation.
5     Q.    And although transportation is
6  located in the same building as physical --
7  well, let me back up.
8           Is transportation located in the
9  same building as physical plant?
10    A.    Yes.
11    Q.    Okay.  So, although she worked
12  in that building, she was not one of your
13  subordinates, correct?
14    A.    That's correct.
15    Q.    As director of physical plant,
16  did you have the authority to hire
17  individuals to work for you -- or I should
18  say to work for Alabama State University?
19    A.    I had the authority to
20  recommend, but I never used it.
21    Q.    You had the authority to
22  recommend someone to be hired, correct?
23    A.    Yeah.

Page 87

1     Q.    But you did not have the
2  authority to actually hire any individual,
3  did you?
4     A.    I -- to be quite honest, I
5  never, ever had to entertain that issue.
6     Q.    You never attempted to hire
7  anybody, did you?
8     A.    That's correct.
9     Q.    And you never told anybody you
10  had hired them, correct?
11    A.    That's correct.
12           (Whereupon, said document was
13           marked for identification as
14           Exhibit No. 4 to the deposition
15           of Anwar K. Diop.)
16    Q.    I've marked this as Exhibit No.
17  4 to your deposition.  Do you recognize this
18  document?
19    A.    It's the employment contract.
20    Q.    And it says it's a notice of
21  employment there at the top, correct?
22    A.    Correct.
23    Q.    Is this the document that you

Page 88

1  consider to be your employment contract with
2  Alabama State University?
3     A.    Yeah, yeah.
4     Q.    And this --
5     A.    And it -- yes.
6     Q.    And that does contain your
7  signature down there on signature line five?
8     A.    Yes.
9     Q.    Okay.  Are there any other
10  documents that you contend make a contract
11  between yourself and Alabama State
12  University?
13    A.    Besides position, specific
14  salary, tenure, status of employment.
15    Q.    Okay.  I'm asking you anything
16  other than this piece of paper right here.
17  Is there another document?
18    A.    That I would have signed?
19    Q.    That you say constitutes a
20  contract between yourself and Alabama State
21  University, correct.
22    A.    I don't recall.
23    Q.    Does your -- do you need a

Page 89

1  minute?
2     A.    No.
3     Q.    Does your employment contract
4  contain any other terms other than those set
5  forth here?
6     A.    Yeah.
7     Q.    What are the other terms?
8     A.    As it relates to vacation, pay,
9  comp time, the accrual of that.
10    Q.    This document says that you're
11  subject to the policies and regulations of
12  the University?
13    A.    Correct.
14    Q.    Those other things you've named
15  are policies and regulations of the
16  University, correct?
17    A.    I guess they could be considered
18  that.
19    Q.    So, they would be incorporated
20  by reference in this document, correct?
21    A.    Not necessarily.
22    Q.    Okay.  So, we've got -- tell me
23  any other terms then that you feel were

23  (Pages 86 to 89)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 90

1  included in your contract, but that are not
2  reflected here.
3      A.    Other things like the use of
4  University vehicle, reimbursement for any
5  incidentals, as well as any extracurricular
6  activities that pertain to the execution of
7  my duties.
8      Q.    Explain what you mean by
9  extracurricular activities.
10     A.    Well, I was on call 24 hours a
11 day. So, the cell phone would be one of
12 those.
13         In the event that there was an
14 emergency situation that arose that required
15 my presence and I was in Chicago, for
16 example, visiting my family, but it required
17 me to commute back, then the stipulations by
18 which that would be necessary.
19     Q.    And the stipulation was that
20 what would occur on that occasion -- in the
21 event of that?
22     A.    Full reimbursement and then the
23 time frame in which I had to report back.

Page 91

1      Q.    Any other terms or conditions of
2  employment?
3      A.    Not that I could, you know,
4  think of offhand.
5      Q.    Is there a term or condition of
6  your employment in this contract -- well,
7  what documents are those other terms located
8  in?
9      A.    There are other documents that
10 you review and sign during your
11 pre-employment human resources orientation
12 that discloses those particular --
13     Q.    That tell you what those terms
14 and conditions are?
15     A.    Yeah.
16     Q.    So, it's in documentation that
17 you get from human resources?
18     A.    They would come through human
19 resources just like this one.
20     Q.    Okay. And you signed those
21 documents?
22     A.    To my knowledge, yeah.
23     Q.    So, I will find signed documents

Page 92

1  that indicate that --
2      A.    Yeah, I'm sure you will find
3  that.
4      Q.    -- the University is going to do
5  those things that you just named?
6      A.    You should, yes.
7      Q.    Do you have a copy of those
8  documents?
9      A.    I'm sure I had. I don't -- I
10 could probably find them.
11     Q.    You believe you do have them?
12     A.    I know I have other documents.
13     Q.    Okay. If you have other
14 documents, I am going to request that they be
15 provided.
16     A.    Okay. If I can locate them.
17     Q.    Do any of those documents state
18 that Alabama State University will pay your
19 legal fees in the event that you are arrested
20 for a crime or accused of a crime?
21     A.    No.
22         MR. MADISON: Object to the
23 form.

Page 93

1      Q.    (By Ms. Meadows) Is there any
2  term of contract with Alabama State
3  University that provides that they will pay
4  your attorney's fees in the event that you
5  are charged with a crime?
6         MR. MADISON: Object to the
7  form.
8         THE WITNESS: Other than that
9  being the customary practice?
10     Q.    (By Ms. Meadows) Where is that
11 the customary -- what documentation do you
12 have that it's the customary practice for
13 Alabama State University to pay your
14 attorney's fees if you're charged with a
15 crime?
16     A.    Well, I'm stating that based
17 upon my -- my personal knowledge of that
18 being the direct practice.
19         In addition to, if we refer to a
20 recent situation, with a person who was just
21 recently in an incident at Alabama State who
22 were similarly situated. Legal fees were
23 paid.

24  (Pages 90 to 93)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 94

1    Q.    Who is that person?
2    A.    A person that was in the budget
3  office. There's another person who --
4    Q.    I want the name of that person.
5    A.    I can get the name for you, but
6  I can give -- if you want one person -- as a
7  matter of fact, if you have to have a name,
8  then Dr. Bradley, who was director at
9  Southern Normal.
10    Q.    Okay.
11    A.    Okay. Who was charged with
12  inappropriately mishandling University
13  property and initially theft. The University
14  not only paid her legal fees, but they
15  subsidized her husband's as well. And he's
16  not even an employee at the University.
17    Q.    What attorney did Alabama State
18  University hire for Dr. Bradley and her
19  husband?
20    A.    I don't think you guys had come
21  on board as of yet.
22    Q.    I'm asking -- I'm not asking if
23  it was me. I'm asking for the name of the

Page 95

1  attorney, whoever it was.
2    A.    I can't give you the attorney's
3  full name. I can't give you the name of the
4  attorney.
5    Q.    Give me any portion of the name
6  that you have.
7    A.    I don't have the name.
8    Q.    What is the basis for your
9  assertion that Alabama State University paid
10  the attorney's fees?
11    A.    It's printed in a public
12  document.
13    Q.    It's your contention it's a
14  matter of public record that the --
15    A.    Yeah.
16    Q.    -- University paid her
17  attorney's fees?
18    A.    As a matter of fact, it is.
19    Q.    And they paid her attorney's
20  fees in relation to her criminal charges?
21    A.    Yes. And there are others.
22    Q.    Give me the names of those
23  others.

Page 96

1    A.    Leon Frazier, Kenneth Arrington.
2    Q.    Who is Kenneth Arrington?
3    A.    He's a physical plant employee.
4    Q.    And what was Mr. Arrington
5  charged with?
6    A.    Inappropriately dealing with a
7  student some kind -- some kind of way. She
8  was at the physical plant or something, and
9  she charged him with rape, I think,
10  initially.
11    Q.    And it's your contention that
12  ASU paid his attorney's fees?
13    A.    Yes.
14    Q.    Which attorney did Alabama State
15  University --
16    A.    I can't give you --
17    Q.    -- retain for Mr. Arrington?
18    A.    -- an attorney's name.
19    Q.    And what is the basis of your
20  knowledge --
21    A.    And I wouldn't have used Alabama
22  State's attorney. I would have used my own
23  attorney. However, I would require them to

Page 97

1  pay my fee.
2            But the director of the Acadome.
3    Q.    Okay. I'm asking -- my
4  question, I think I asked you a question
5  about Mr. Arrington, which attorney was
6  retained for Mr. Arrington.
7    A.    I'm not sure. I don't know his
8  name.
9    Q.    And I also asked you what is the
10  basis of your knowledge that Alabama State
11  University paid his attorney's fees?
12    A.    Because I was present in the
13  courtroom when it was disclosed.
14    Q.    And it was disclosed -- which
15  courtroom was it disclosed in?
16    A.    Montgomery County.
17    Q.    Who was the judge?
18    A.    I can't tell you the judge's
19  name.
20    Q.    What was the date of this
21  disclosure?
22    A.    Probably two years ago or a year
23  and a half ago.

25 (Pages 94 to 97)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 98

1   Q.   Do you have a --
2   A.   I really don't know.
3   Q.   What type of proceeding was it?
4   A.   I don't know the name.
5   Q.   And who made the disclosure?
6   A.   It was a general statement when
7   it was discussed about counsel --
8   Q.   Who made --
9   A.   -- that he was being provided
10  counsel.
11  Q.   What was the exact --
12  A.   From the University.
13  Q.   Was was the exact statement that
14  was made?
15  A.   I can't tell you the exact
16  statement, but I do recall that.
17  Q.   Was the --
18  A.   That he was being provided
19  counsel by the University.
20  Q.   Was that statement made by his
21  attorney?
22  A.   No.  I think it was made by the
23  state, by the district attorney.

Page 99

1   Q.   That statement was made by the
2   district attorney?
3   A.   Yeah.  The director of the
4   Acadome would be another person.
5   Q.   Give me that name.
6   A.   Can I get back with you with
7   that name?
8   Q.   Well, tell me the date.
9   A.   I think he's -- as a matter of
10  fact, his current -- that's a current legal
11  situation, but it's been going on for about
12  two and a half years now.
13  Q.   What is the situation?
14  A.   Just inappropriate dealings as a
15  director with use of funds and travel with
16  secretary, things like that.
17  Q.   And is that a criminal matter?
18  A.   Yeah.
19  Q.   And he's been charged
20  criminally?
21  A.   Yeah.
22  Q.   Which attorney has Alabama State
23  University hired to represent him?

Page 100

1   A.   I can't tell you the attorney.
2   Q.   What is the basis of your
3   knowledge that Alabama State University has
4   hired -- is paying his legal fees?
5   A.   The basis of meetings that I was
6   in attendance.
7   Q.   And which meetings were these?
8   A.   Well, when we had to deal with
9   who was going to -- when this situation came
10  about, who was actually going to take on some
11  of his duties.
12  Q.   Okay.  And --
13  A.   And a lot of it would have
14  fallen under my tutelage as the physical
15  plant director.
16  Q.   Give me the date of the first
17  meeting where this was discussed.
18  A.   Probably May 5th.
19  Q.   May 5th of what year?
20  A.   2005.
21  Q.   And what was the -- who told you
22  at that meeting that his attorney's fees were
23  being paid for by the University?

Page 101

1   A.   It was discussed as a matter of
2   protocol or -- well, just in random
3   discussion because the VP of fiscal affairs
4   and everybody was there and just how we were
5   juggling.
6   Q.   Okay.  Give me the names of the
7   individuals who were present at the meeting.
8   A.   Leon Frazier; Freddie Gallot;
9   Mr. Arrington, who is over budget; Angela
10  Dickson, who was the comptroller; Mr. Horn,
11  who was the assistant VP of administration.
12  That's all I can recall.
13  Q.   And what specifically was said
14  concerning the representation of the director
15  of the Acadome?
16  A.   Well, what -- how it was
17  specifically brought up was that a
18  determination would have to be made on -- you
19  know, how far they would pursue it without
20  trying to resolve it due to insurance
21  purposes.
22       It was a matter of the insurance
23  being paid or insurance payments being

26 (Pages 98 to 101)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 102

1  appropriated to cover these legal fees. I
2  can't tell you exactly how it was stated, but
3  it was in relation to that.
4      Q.   Was the discussion in relation
5  to civil charges being brought against the
6  University or the criminal charges against --
7      A.   There were no civil charges
8  being brought against the University in his
9  situation.
10     Q.   To your knowledge, the
11 conversation was regarding insurance being
12 available to cover his criminal charges?
13     A.   No. It was -- the statement --
14     Q.   His criminal --
15         MR. MADISON: Object to the
16 form. Go ahead.
17         THE WITNESS: It was in relation
18 to how much we're paying as a result of these
19 legal matters being, you know, thrown on the
20 University and insurance premiums going up.
21     Q.   (By Ms. Meadows) How much money
22 was paid --
23     A.   I can't tell you all that.

Page 103

1      Q.   -- as his legal fees?
2          What was said at the meeting
3  regarding how much money was being paid?
4      A.   A lot of money.
5      Q.   How much is a lot of money?
6      A.   I can't --
7      Q.   Who was the money being paid to?
8      A.   I can't tell you that either. I
9  didn't cut checks.
10     Q.   And can you --
11     A.   And I -- like I'm saying, I was
12 present at the meeting. So, I mean as far as
13 some of the specifics are concerned, I can't
14 really tell you that because, I mean, I don't
15 want to get it incorrect.
16     Q.   And you can't tell me the name
17 of the person for whom this large sum of
18 money was being paid?
19     A.   Coach Parker.
20     Q.   And I think we got jumbled up.
21 Let me take you back to Leon Frazier. You
22 stated that the University has paid his legal
23 fees?

Page 104

1      A.   Is paying.
2      Q.   Is currently paying his legal
3  fees?
4      A.   Yeah.
5      Q.   And this is in connection with a
6  criminal matter?
7      A.   This is in connection with
8  legal, yeah, dealings.
9      Q.   No, no, no. Is this in
10 connection with a criminal matter?
11     A.   Yeah. As a matter of fact, it
12 is.
13     Q.   Dr. Frazier is facing criminal
14 charges, and the University is paying his
15 legal fees?
16     A.   To my knowledge, yes.
17     Q.   To your knowledge. Which
18 attorney have they retained for Dr. Frazier?
19     A.   I can't tell you that.
20     Q.   When did they retain counsel for
21 Dr. Frazier?
22     A.   I can't tell you that.
23     Q.   When did the criminal charges

Page 105

1  against Dr. Frazier arise?
2      A.   I can't tell you that.
3      Q.   Who is the alleged victim in the
4  crime that Dr. Frazier is alleged to have
5  committed?
6      A.   I can't tell you that.
7      Q.   What crime is Dr. Frazier
8  charged with?
9      A.   I can't tell you that. How do I
10 know?
11     Q.   What is the basis of your
12 knowledge that the University is paying his
13 criminal legal fees?
14     A.   He told me.
15     Q.   Dr. Frazier told you that?
16     A.   Yes, ma'am.
17     Q.   How much has the University paid
18 in --
19     A.   I can't tell you that.
20     Q.   -- legal fees for Dr. Frazier?
21     A.   I can't tell you that.
22     Q.   Who at the University is paying
23 Dr. Frazier?

27 (Pages 102 to 105)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 106

1    A.    Who at the University is paying
2  Dr. Frazier?
3    Q.    Yeah.
4    A.    I don't know that anybody's
5  paying Dr. Frazier.
6    Q.    Who's paying his legal fees?
7    A.    Well, I think if it's a
8  University payment, it would come through the
9  University's comptroller's office.
10   Q.    When did Dr. Frazier tell you
11 this?
12   A.    I can't think of the specific
13 date. But I can attest to you that it was a
14 conversation that was held between he and I,
15 and it did happen.
16   Q.    Give me -- where were you when
17 this conversation took place?
18   A.    Probably at the auditor
19 general's office when I was being questioned.
20   Q.    So, that was sometime in --
21   A.    Not too long ago.
22   Q.    Can you give me a year when this
23 conversation took --

Page 107

1    A.    2007.
2    Q.    Can you give me the approximate
3  month when this took place?
4    A.    October or November.
5    Q.    What else did you discuss in
6  this conversation with Dr. Frazier?
7    A.    Nothing.
8    Q.    The only thing you discussed in
9  that conversation was that Dr. Frazier told
10 you that the University was paying his legal
11 fees based upon his criminal charges?
12   A.    That was pretty much the extent
13 of it.
14   Q.    How did Dr. Frazier come to
15 share that information with you?
16   A.    I asked him.
17   Q.    What did you ask him
18 specifically?
19   A.    I asked him why wasn't the
20 University covering my legal fees for the
21 situation that happened with me and they
22 seemed to be covering everybody else's.
23   Q.    And what was his response?

Page 108

1    A.    That y'all obviously made --
2  they obviously made the judgment call or
3  mistake. And, basically, because I was not
4  considered to be, you know, amongst their
5  peers or a counterpart, so to speak.
6        And a lot of people thought I
7  was guilty of that crime. So, they were
8  going to try and make it easy for me.
9    Q.    So, it's your contention that
10 Alabama State University pays the legal fees
11 for employees that they think are not guilty
12 of the crimes with which they are charged?
13   A.    I think that some of those --
14       MR. MADISON: Object to the
15 form. Go ahead.
16       THE WITNESS: I think that some
17 of those decisions are biased.
18   Q.    (By Ms. Meadows) And who is
19 making those decisions?
20   A.    I can't say that. I just know
21 that that's my feeling.
22   Q.    What is the process for
23 requesting that the University pay your legal

Page 109

1  fees?
2    A.    What is the process?
3    Q.    Yes.
4    A.    I can't tell you the full
5  process.
6    Q.    How did these other people apply
7  to have their legal fees paid?
8        MR. MADISON: Object to the
9  form.
10       THE WITNESS: I can't tell you
11 that. But I think -- I mean, they may have
12 made a request.
13   Q.    (By Ms. Meadows) Are there any
14 other people other than Dr. Bradley and her
15 husband, Dr. Leon Frazier, Mr. Kenneth
16 Arrington and Coach Parker whose criminal
17 legal fees are being paid by the University?
18   A.    I'm sure there were many others.
19 I just can't tell you who they are. But I'm
20 sure there are many others.
21   Q.    Those are the ones that you are
22 aware of?
23   A.    That I'm personally

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1  knowledgeable of.
2      Q.    And, again, these are criminal
3  charges?
4      A.    Yeah.
5      Q.    That the University is paying
6  their legal fees for?
7      A.    Yes.
8      Q.    Okay. Let's look back at
9  Exhibit 4. I want you to look down at where
10 it says employment status -- it says status.
11 According to the notice of employment, what
12 was your employment status?
13     A.    Where -- I mean, what are you
14 referring to?
15     Q.    I'm on Exhibit 4, which is your
16 notice of employment.
17     A.    Okay.
18     Q.    The line where it says status.
19     A.    Okay. Executive.
20          (Whereupon, said document was
21          marked for identification as
22          Exhibit No. 5 to the deposition
23          of Anwar K. Diop.)

Page 111

1      Q.    This has been marked as Exhibit
2  No. 5. These are various excerpts from the
3  Alabama State University Nonacademic Staff
4  Handbook.
5      A.    Uh-huh (affirmative).
6      Q.    You received a copy of this
7  handbook when you were first employed at
8  Alabama State?
9      A.    Yes.
10     Q.    And you recall receiving that?
11     A.    Yeah.
12     Q.    And signing saying that you had
13 received a copy of it, correct?
14     A.    Uh-huh (affirmative).
15     Q.    And that was your handbook to
16 read at your leisure, correct?
17     A.    Correct.
18     Q.    Okay. If you would turn to
19 Section 1.2, Employee Service Status.
20     A.    What page is that?
21     Q.    That's Page 23.
22     A.    Okay.
23     Q.    At the bottom of the page. If

Page 112

1  you would review -- and you can read it to
2  yourself -- what an executive status employee
3  is.
4      A.    Okay. You want me to read it?
5  Is that what you said?
6      Q.    I want you to have an
7  understanding of it because we're going to
8  talk about it.
9      A.    Okay.
10     Q.    Now, according to your contract,
11 you are an executive status employee,
12 correct?
13     A.    Correct.
14     Q.    Which means that, according to
15 the handbook, you were not entitled to
16 permanent employee status, correct?
17     A.    Correct.
18     Q.    And do you agree that under the
19 terms of Section 1.2, Employee Service
20 Status, permanent employees and executive
21 status employees are treated as two different
22 employee classifications?
23     A.    Yeah, I'm familiar with that.

Page 113

1      Q.    And do you agree that because
2  you were not a permanent employee, you were
3  not entitled to the benefits reserved only
4  for permanent employees?
5          MR. MADISON: Object to the
6  form.
7          THE WITNESS: No, I don't. No,
8  I don't.
9      Q.    (By Ms. Meadows) Is it your --
10     A.    Because you -- I mean, based
11 upon that statement, you would insinuate that
12 that's a lesser degree of privileges. And
13 it's not.
14     Q.    I'm not saying it's a lesser
15 degree of privileges. What I am saying is
16 that --
17     A.    They're different?
18     Q.    -- that there is a difference --
19     A.    Yeah, there is a difference.
20     Q.    -- in permanent employee status
21 and executive status employee, correct?
22     A.    There is a difference.
23     Q.    Okay. And permanent --

29 (Pages 110 to 113)

FREEDOM COURT REPORTING

Page 114

1    A.    The real difference on it is in
2  terminology.
3    Q.    Permanent employees don't have
4  all of the rights and privileges of executive
5  status employees, correct?
6    A.    Correct.
7    Q.    And executive status employees
8  may not necessarily have all of the benefits
9  and privileges of permanent status employees,
10  correct?
11    A.    Only one.
12    Q.    What's that one?
13    A.    The designation of permanent.
14    Q.    Okay.  And --
15    A.    And permanent means whether
16  you're on the job or not.
17    Q.    Permanent means what?
18    A.    Whether you're on the job or
19  not.
20    Q.    Okay.  I want you to read
21  Section 1.2, Employee Service Status, and
22  familiarize yourself with what permanent
23  status employee means.

Page 115

1    A.    Okay.  It's just the designation
2  of permanent, other than at the discretion of
3  the President or the Board.
4    Q.    Executive status employees are
5  what at the discretion of the President or
6  the Board?
7    A.    Their employment tenure.
8    Q.    Is at the direction of the
9  President or the Board, correct?
10    A.    At the pleasure.  Not
11  discretionary.  At the pleasure of the Board.
12  And is not eligible for permanent status.
13    Q.    So, just to be clear, it states
14  persons appointed to positions as executive
15  status employees -- and it says see below --
16  serve at the pleasure of the President or
17  Board of Trustees and are not eligible to
18  achieve permanent employee status, correct?
19        MR. MADISON:  Object to the
20  form.  Go ahead.
21    Q.    (By Ms. Meadows)  Correct?
22    A.    That's what it says, yeah.
23    Q.    And what does it mean to serve

Page 116

1  at the pleasure of the President or the
2  Board?
3        MR. MADISON:  Object to the
4  form.
5        THE WITNESS:  Well, it means
6  that you don't have the flexibility to move
7  between various positions or vacancies that
8  are open at the University.
9        Like I said, the legal or the
10  terminology as it pertains to permanent is
11  not afforded a person of executive status.
12  It's not -- the same flexibility does not
13  exists.
14    Q.    (By Ms. Meadows)  Okay.
15  Permanent employees are eligible to obtain a
16  form of tenure.  Is that your understanding
17  of it?
18    A.    To a certain degree.
19    Q.    Permanent employees have the
20  right to continuing employment?
21    A.    Correct.
22    Q.    Executive status employees have
23  the right to employment, subject to the

Page 117

1  pleasure of the Board of Trustees or the
2  President?
3    A.    Correct.
4    Q.    Okay.
5    A.    Barring the confines of their
6  agreement.
7    Q.    What's the confines of the
8  agreement?
9    A.    That your employment -- your
10  employment status is renewable on an annual
11  basis.
12    Q.    At the discretion of the
13  President and the Board of Trustees, correct?
14    A.    That's correct.
15    Q.    How did you meet Ms. Johnson,
16  Jalonda Johnson, Mr. Diop?
17    A.    Through her mother.
18    Q.    And her mother is Linda Johnson?
19    A.    Correct.
20    Q.    How did her mother introduce --
21  come to introduce her daughter, Jalonda, to
22  you?
23    A.    Well, they invited me to their

30  (Pages 114 to 117)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 118

1    house for dinner during Christmas. However,
2    I was visiting with my family in Chicago.
3        I thought Ms. Johnson to be a
4    nice lady. She had helped me and was less
5    resistant than most of the other employees
6    that I had encountered since being there, and
7    I thought it to be a very nice gesture.
8        However, since I was not able to
9    accept their invitation, I did accept their
10   invitation for dinner around the 5th of
11   January when I returned.
12   Q.    You accepted an invitation from
13   them for dinner?
14   A.    That's correct.
15   Q.    Around the 5th of January. And
16   is that where you met Jalonda?
17   A.    Yes. And I also met her father
18   and her sister and her nephew.
19   Q.    So, prior to January 5th, 2005,
20   you had never met Jalonda Johnson?
21   A.    Never.
22   Q.    And you had never talked to
23   Jalonda Johnson on the phone prior to --

Page 119

1    A.    Never.
2    Q.    -- January 5th, 2005?
3    A.    Never.
4    Q.    How did you come to get
5    Jalonda's cell phone number?
6    A.    Actually, she -- because she
7    called me.
8    Q.    Jalonda called you?
9    A.    Correct.
10   Q.    How would you describe your
11   relationship with Jalonda?
12   A.    Acquaintance.
13   Q.    As acquaintances?
14   A.    That's correct.
15   Q.    When did you become -- you
16   became acquainted January 5th of 2005?
17   A.    That was our initial
18   acquaintance, yeah.
19   Q.    And did you continue to be
20   acquainted with Ms. Johnson following January
21   5th, 2005?
22   A.    We had communications.
23   Q.    What type of communications did

Page 120

1    you have?
2    A.    Phone conversations.
3    Q.    Okay. How often did you talk on
4    the phone?
5    A.    Very infrequent.
6    Q.    Define very infrequently for me.
7    A.    I would say between January 5th
8    and January 25th we might have talked 25
9    times at most.
10   Q.    Between January 5th and January
11   25th?
12   A.    Right.
13   Q.    Which is approximately 20 days?
14   A.    Uh-huh (affirmative).
15   Q.    You may have talked 25 times?
16   A.    Yes.
17   Q.    Okay. Was that a conversation
18   per day or multiple conversations on some
19   days?
20   A.    It could have been one or two on
21   the same day. As a matter of fact, more than
22   likely, it didn't take place over the 20-day
23   period. It might have been one or two in the

Page 121

1    course of a day maybe.
2    Q.    So, for approximately 20 days
3    you may have talked once or twice a day?
4    A.    May have talked once.
5    Q.    You may have talked to her once
6    a day for 20 days?
7    A.    Possibly.
8    Q.    What did you talk about?
9    A.    Hello and goodbye.
10   Q.    How long did your conversations
11   generally last?
12   A.    Maybe less than a minute.
13   Q.    Did you have any conversations
14   with Ms. Johnson that lasted longer than
15   that?
16   A.    Maybe five.
17   Q.    Did you have any conversations
18   with Ms. Johnson that lasted longer than five
19   minutes?
20   A.    If so, I don't recall them.
21   Q.    You don't recall any
22   conversations you had with Ms. Johnson
23   between --

31 (Pages 118 to 121)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 122

1    A.    That lasted longer than five
2    minutes? No.
3    Q.    And that's any time between
4    January 5th --
5    A.    And the 25th.
6    Q.    -- and January 25th?
7    A.    That's correct.
8    Q.    After January 25th, did you have
9    conversations --
10    A.    There was no communication,
11    period.
12    Q.    You never talked to Ms. Johnson
13    after January 25th, 2005?
14    A.    Maybe one other day.
15    Q.    And what day was that?
16    A.    I think that may have been --
17    THE WITNESS: What day did that
18    incident happen?
19    MR. MADISON: I can't answer
20    your question for you.
21    THE WITNESS: Huh?
22    That would be the only day.
23    MR. MADISON: I said I can't

Page 123

1    answer your question for you.
2    THE WITNESS: Oh, okay.
3    No, I'm asking you a question.
4    MR. MADISON: I'm not taking the
5    deposition. You've got to provide the
6    answers.
7    THE WITNESS: One other day, the
8    31st.
9    Q.    (By Ms. Meadows) And that was
10    the 31st?
11    A.    Uh-huh (affirmative).
12    Q.    So, from January 26th, 2005, up
13    until let's say --
14    A.    No other conversations.
15    Q.    -- through January 30th, there
16    were no other conversations?
17    A.    No.
18    Q.    And you next talked with Jalonda
19    Johnson on January 31st, 2005?
20    A.    Uh-huh (affirmative).
21    Q.    Is that a yes?
22    A.    Yes.
23    Q.    How long did you talk to Ms.

Page 124

1    Johnson on the 31st?
2    A.    It wasn't serious. Probably 60
3    seconds or less.
4    Q.    You talked to Ms. Johnson for
5    one minute or less on January 31st?
6    A.    Correct.
7    Q.    Did you have any -- did you have
8    more than one conversation with Ms. Johnson
9    on the 31st?
10    A.    Yeah. She called me several
11    times.
12    Q.    And how long did you talk on the
13    other occasions when she called you?
14    A.    I mean, I said -- like I said,
15    less than five minutes. I mean, you know, we
16    -- we never had any kind of long, drawn out
17    conversations.
18    Q.    And you never had a conversation
19    that lasted more than five minutes?
20    A.    To my knowledge.
21    Q.    And it's your contention that
22    Ms. Johnson called you on each of those
23    occasions on which you spoke?

Page 125

1    A.    It's a fact that Ms. Johnson
2    called me.
3    Q.    And you never called Ms.
4    Johnson?
5    A.    I returned her calls, yeah.
6    Q.    Okay. You --
7    A.    Now, whether we connected during
8    those times is a different story.
9    Q.    You never initiated any
10    telephone calls to Ms. Johnson?
11    A.    No.
12    Q.    And you never talked to her for
13    longer than five minutes?
14    A.    No.
15    Q.    Generally, what time of day did
16    you talk to Ms. Johnson?
17    A.    Early in the day.
18    Q.    Early in the day?
19    A.    Yeah.
20    Q.    And by early in the day, what
21    time frame do you mean?
22    A.    2:00, 3:00 maybe or maybe 6:00.
23    Q.    2:00 to 3:00 in the morning?

32 (Pages 122 to 125)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 126

1    A.    No, in the afternoon.
2    Q.    2:00 to 3:00 in the afternoon or
3    perhaps 6:00 in the afternoon?
4    A.    Yeah.
5    Q.    Did you have any conversations
6    with Ms. Johnson that took place after 10:00
7    p.m.?
8    A.    Not to my knowledge.
9    Q.    To your knowledge, you never had
10   a conversation with Ms. Jalonda Johnson that
11   took place after 10:00 p.m. --
12   A.    No.
13   Q.    -- and prior to 6:00 a.m.?
14   A.    Not to my knowledge, no.
15   Q.    And to your knowledge, you never
16   would have had a conversation with Ms.
17   Johnson that took place after 10:00 p.m. up
18   until prior to 6:00 a.m. that lasted for more
19   than five minutes?
20   A.    Not to my knowledge, no.
21   Q.    When you and Ms. Johnson would
22   talk at 2:00 or 3:00 in the afternoon and
23   have your conversations, what did you talk

Page 127

1    about during that time?
2    A.    She might call and say hello and
3    ask how my day was going, something like
4    that.
5    Q.    Did you ever inquire into Ms.
6    Johnson's day?
7    A.    I might say, yeah, my day has
8    been fine or, you know, I've had a terrible
9    day. How is yours?
10   Q.    Okay.
11   A.    We've -- it's always been
12   cordial.
13   Q.    Would you -- you said you were
14   friendly acquaintances --
15   A.    Yeah.
16   Q.    -- or cordial acquaintances?
17   A.    We had no reason to be otherwise
18   initially.
19   Q.    And the general subject of your
20   conversation was just making conversation,
21   being friendly?
22   A.    Basically.
23   Q.    In January of 2005, did you make

Page 128

1    any effort to assist Ms. Johnson in finding
2    employment at Alabama State University?
3    A.    No.
4    Q.    In January of 2005, did you ask
5    Stratford Moore if he wanted to hire Ms.
6    Johnson to work for him --
7    A.    No.
8    Q.    -- as a 20-hour student?
9    A.    No.
10   Q.    Did you suggest to Mr. Moore an
11   hourly rate that he should pay Ms. Johnson to
12   work for him?
13   A.    No. I mean, Stratford is over
14   his own department. He makes that
15   determination.
16   Q.    In January of 2005, did you
17   offer to transfer funds from your account to
18   Mr. Moore's account to allow him to pay Ms.
19   Johnson to work for him?
20   A.    Never.
21   Q.    In January of 2005, did you ever
22   complete paperwork to request a budget
23   adjustment for funds to be transferred?

Page 129

1    A.    Never.
2         MS. MEADOWS: Okay. This is
3    going to be Defendant's Exhibit 6.
4         (Whereupon, said document was
5         marked for identification as
6         Exhibit No. 6 to the deposition
7         of Anwar K. Diop.)
8    Q.    Mr. Diop, did anyone present
9    this form to you and request your signature
10   on it?
11   A.    I've seen it.
12   Q.    Okay.
13   A.    Yes.
14   Q.    You have seen it?
15   A.    Yes.
16   Q.    Did anyone present this to you
17   and request that you sign this form?
18   A.    I don't remember exactly who,
19   but it -- it originated somewhere around --
20   it originated between Mrs. Johnson and maybe
21   my office manager or something like that,
22   which is one of the reasons I had a major
23   issue with this form.

33 (Pages 126 to 129)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 130

1    Q.    Who was your officer manager at
2    that time?
3    A.    Geraldine.  I know her first
4    name is Geraldine.  Lampkin.
5    Q.    Okay.
6    A.    Lampkin.
7    Q.    I couldn't think of it either.
8    A.    But, yeah.  I had a major -- a
9    major problem with this.
10   Q.    This was presented to you, but
11   you did not sign this?
12   A.    Absolutely not.
13   Q.    So, there will not be a signed
14   version of this form --
15   A.    Absolutely not.
16   Q.    -- anywhere that I search, will
17   there?
18   A.    If it is, it's forged.
19   Q.    Okay.
20   A.    To my knowledge, I don't think
21   they went that far.
22   Q.    And you never submitted this to
23   any vice president?

Page 131

1    A.    Never.
2    Q.    You never submitted it to Mr.
3    Willie Thomas?
4    A.    Never.
5    Q.    You never made any attempt --
6    A.    Never.
7    Q.    -- to make this happen?
8            MR. MADISON:  Let her finish her
9    question.
10           THE WITNESS:  This form was
11   never submitted by me to any higher or
12   appropriate authority for processing or
13   consideration.
14   Q.    (By Ms. Meadows)  And because
15   you never requested the funds, to your
16   knowledge, no funds were ever transferred
17   from your account?
18   A.    To my knowledge, no.
19   Q.    You never received a notice from
20   internal audit verifying that funds had been
21   transferred?
22   A.    Absolutely not.
23   Q.    You never received any

Page 132

1    indication that this budget transfer had been
2    approved, did you?
3    A.    Absolutely not.
4    Q.    And you would have had no reason
5    to expect to receive notification since you
6    did --
7    A.    That's correct.
8    Q.    -- not submit this?
9    A.    That's correct.
10           MR. MADISON:  Let her finish her
11   question.
12           THE WITNESS:  Okay.  I'm sorry.
13           MR. MADISON:  You're answering
14   before she's finished, and it makes it
15   difficult for the court reporter to take down
16   both.
17           THE WITNESS:  I understand.
18   Q.    (By Ms. Meadows)  And I know
19   that -- you probably talk like I do.  I tend
20   to do that, too.
21           It just makes it really hard
22   later on to piece together what you said in
23   response to my question because what's going

Page 133

1    to happen is there's going to be part of an
2    answer and part of the question, the rest of
3    the answer.
4    A.    I understand.
5    Q.    Okay.  At any point during your
6    acquaintance, your brief acquaintance with
7    Jalonda Johnson, did you express to her any
8    romantic interest?
9    A.    Never.
10   Q.    Did you at any point express to
11   her parents that you had a romantic interest
12   in Ms. Jalonda Johnson?
13   A.    No, but it did come up.
14   Q.    How did the subject come up?
15   A.    Because this was something that
16   Mrs. Johnson sort of orchestrated, and I
17   think that was her initial intention.  And I
18   made it very clear during our dinner that --
19           First of all, I had never spoken
20   or met her before that day.  I wouldn't even
21   -- I couldn't be infatuated and like anyone I
22   don't even know.  Okay.
23           And I made it very clear to her

34  (Pages 130 to 133)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 134

1  father that that was the case and that he
2  didn't have to worry about anything like
3  that. I mean, I told him I had a daughter of
4  my own and I understood.
5      Q.   Just to be clear, what you
6  expressed to her -- when did you express this
7  to her parents?
8      A.   When her father asked me.
9      Q.   And when did he ask you?
10     A.   During dinner.
11     Q.   During that dinner on January
12  5th?
13     A.   Correct.
14     Q.   And what was her father's
15  response when you assured him that he had
16  nothing to be concerned about?
17     A.   I mean, he seemed to be, you
18  know, okay with that.
19     Q.   And what --
20     A.   He seemed to be okay with that.
21  And then the baby started having some medical
22  -- well, I think the baby had just gotten out
23  of the hospital.

Page 135

1          So, he asked me if it was okay,
2  you know, if they just ordered their food and
3  leave. I told him I didn't have no problem
4  with that at all.
5      Q.   Okay. So, you --
6      A.   And that's exactly what they
7  did.
8      Q.   So, you-all did not finish
9  eating together on that evening?
10     A.   Not between the mother, the
11  father and the two -- Jalonda and her sister
12  stayed. I waited for my food because I took
13  my food to go as well.
14          Okay. They asked me if I would
15  drop them at their car, which I did, which
16  was probably about three or four blocks away.
17     Q.   And just for clarification, when
18  you say "they," who did you drop at the car?
19     A.   Jalonda and her sister.
20     Q.   And when did you drop them at
21  the car?
22     A.   After my food arrived, they --
23  and they ordered dessert, we immediately

Page 136

1  left. But their parents had already gone.
2      Q.   Was that before or after the
3  dessert arrived?
4      A.   I mean, we couldn't leave until
5  after they got dessert.
6      Q.   So, you didn't -- you waited
7  while they finished eating dessert?
8      A.   They ate their dessert there. I
9  took my food to go.
10     Q.   And you arrived late to this --
11  did you arrive late to this dinner?
12     A.   Yes.
13     Q.   So, that's why your timing on
14  eating was off because --
15     A.   Right. They had already ordered
16  and everything.
17     Q.   So, when you arrived, had her
18  parents and Jalonda and -- you said her
19  sister?
20     A.   Yes.
21     Q.   Had they all already ordered
22  their food when you got there?
23     A.   Yes.

Page 137

1      Q.   What restaurant was this at?
2      A.   Outback.
3      Q.   Who paid for the dinner that
4  evening?
5      A.   I paid for my portion of the
6  dinner, and I paid for -- I paid for the
7  desserts I know. And that was it.
8      Q.   Who paid for the other meals?
9      A.   I think Mr. Johnson paid for
10  Mrs. Johnson.
11     Q.   Who paid for Jalonda and her
12  sister?
13     A.   Well, they -- the only bill that
14  I paid for was for my meal and the desserts.
15     Q.   You don't have any idea who paid
16  for Jalonda and --
17     A.   I don't know which one of them
18  paid.
19     Q.   Do you know if Mr. Johnson paid
20  with cash or with a credit card?
21     A.   I have no idea.
22     Q.   Do you see Mr. Johnson pay?
23     A.   No, I did not.

35 (Pages 134 to 137)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 138

1    Q.    Did you pay with cash or with
2  credit card?
3    A.    I probably paid with cash.
4    Q.    And just to be clear, Mr. Diop,
5  at no point -- well, let me back up.  That
6  wasn't coming out right.
7        You did not ask Jalonda's
8  parents for permission to date her?
9    A.    Never.
10    Q.    And you never indicated to her
11  parents that you were romantically interested
12  in her?
13    A.    Never.
14    Q.    And you never told them that you
15  wanted to pursue a relationship with her?
16    A.    As a matter of fact because her
17  father -- I really thought we kind of made --
18  I thought the communication went well.  I
19  mean, that was my thoughts.
20        But, no, there was no suggestion
21  or even offer on my part for that.
22    Q.    And you testified earlier that
23  you thought that Mrs. Johnson, meaning Linda,

Page 139

1  may have had intentions of --
2    A.    I know she did.
3    Q.    What I'm trying to get to, can
4  you share with me the things that made you
5  believe she was trying to set you up with
6  Jalonda?
7    A.    Because her father asked me at
8  dinner.  I mean, that's really what struck
9  the whole conversation, you know, because
10  evidently it was something that they had
11  already discussed between them.
12        And, you know, he asked me if I
13  had any, you know, interest in his daughter,
14  you know.  And I told him then that I had
15  never -- had not met her, nor communicated
16  with her at any point before that very
17  instance.  And those were my exact words.
18    Q.    Prior to January 31st, 2005, had
19  you invited Ms. Jalonda Johnson to your
20  house?
21    A.    No.
22    Q.    To your knowledge, before
23  January 31st, 2005, did Ms. Jalonda Johnson

Page 140

1  know where you lived?
2    A.    I believe she did, yeah.
3    Q.    How do you believe she acquired
4  that knowledge?
5    A.    I don't know.  She could have
6  followed me or she could have asked --
7  everybody knew really where I lived because I
8  lived a couple of blocks from the University.
9    Q.    Okay.
10    A.    I mean, it just seemed to be
11  something that interest her.
12    Q.    Do you recall an afternoon where
13  -- well, let me back up.
14        Do you recall seeing Ms. Jalonda
15  Johnson in the physical plant building
16  visiting with her mother on any occasions
17  prior to the January 5th meeting with her?
18    A.    No, not prior to that.  After
19  that.  I mean, I wouldn't have really paid
20  attention, but only after I -- you know,
21  became acquainted would I have -- did I even
22  notice.  She may have.
23    Q.    After --

Page 141

1    A.    But I was -- well, go ahead.
2    Q.    If you're not finished, go
3  ahead.
4    A.    No.  Go ahead.
5    Q.    After January 5th when you knew
6  who she was at least -- and she had started
7  calling you, correct?
8    A.    Probably about three or four
9  days later, yes.
10    Q.    Okay.
11    A.    At least three or four days
12  later.
13    Q.    Did you begin to notice seeing
14  her visiting her mother at the physical plant
15  building after your meeting?
16    A.    Yeah.
17    Q.    Did you speak to her on these
18  occasions?
19    A.    If our paths crossed.
20    Q.    And what would you say on those
21  occasions?
22    A.    Hello.
23    Q.    Do you recall an occasion where

36 (Pages 138 to 141)

FREEDOM COURT REPORTING

| Page 142 |
| --- |

1  Ms. Jalonda Johnson may have been visiting
2  with her mother, Linda, and you invited
3  Jalonda to follow you to see your house on
4  Hull Street?
5      A.   Never.
6      Q.   Do you recall when you got the
7  property on Hull Street?
8      A.   Sometime around December. I've
9  got to take this call.
10          MS. MEADOWS: We'll take a
11  break.
12          (Whereupon, the taking of the
13  deposition was recessed from approximately
14  2:31 p.m. to approximately 2:48 p.m., after
15  which the following proceedings were had and
16  done:)
17          MS. MEADOWS: Belinda, where was
18  I when we left?
19          (Whereupon, the requested portion
20  was read back.)
21      Q.   After you got that property, did
22  you invite Jalonda back to see where you were
23  staying?

| Page 143 |
| --- |

1      A.   No.
2      Q.   Did you ever tell Jalonda you
3  wanted to take her to see your apartment?
4      A.   No.
5      Q.   Prior to January 31st, 2005, you
6  had never invited Ms. Johnson to your
7  apartment?
8      A.   No.
9      Q.   On January 5th, the evening of
10  the dinner, do you remember about what time
11  that dinner was scheduled?
12      A.   About 6:00 or 7:00 o'clock.
13      Q.   And you said you were running
14  late?
15      A.   Significantly late.
16      Q.   Do you recall making telephone
17  conversations -- telephone calls to Ms.
18  Johnson and her family on that evening?
19      A.   I recall them making at least 12
20  to me.
21      Q.   Okay. They called you
22  repeatedly?
23      A.   Yes.

| Page 144 |
| --- |

1      Q.   Okay.
2      A.   Asking me if I was going to
3  come, you know.
4      Q.   And they called you on the cell
5  phone that you had for Alabama State
6  University, correct?
7      A.   That's correct.
8      Q.   Do you have any reason to
9  dispute that that number was 334-202-3473?
10     A.   No. 3473?
11     Q.   Yes.
12     A.   I really don't remember. I
13  thought it was like 0203 or something like
14  that. That could be the number. I'm not
15  sure.
16     Q.   But that could be the number?
17     A.   I still have it in my Blackberry
18  phone as a matter of fact.
19     Q.   Do you have that with you?
20     A.   No, but I could get it.
21     Q.   Okay.
22     A.   I don't live that far.
23     Q.   Well, let's not do that. How

| Page 145 |
| --- |

1  about we do this. For purposes of your
2  deposition -- and we will use it going
3  forward -- we will say that that number was
4  334-202-3473.
5          I will submit a discovery
6  request to your attorney requesting that he
7  verify the phone number. And unless he gives
8  me a different number, we will presume that
9  334-202-3473 was your Alabama State
10  University issued cell phone number.
11          THE WITNESS: Is that all right
12  with you?
13          MR. MADISON: Yeah. And Alabama
14  State ought to have those records.
15          THE WITNESS: I don't mind.
16     Q.   (By Ms. Meadows) You also
17  stated that Jalonda began calling you after
18  the dinner on January the 5th, correct?
19     A.   Three to four days after, yes.
20          MR. MADISON: Speak a little bit
21  louder so the court reporter can hear you.
22          THE WITNESS: Three to four days
23  after.

37 (Pages 142 to 145)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 146

1    Q.    (By Ms. Meadows) Do you recall
2    making a phone call to Jalonda the following
3    evening?
4        A.    I recall her calling me the
5    following evening. Yeah, that's right.
6            MS. MEADOWS: Okay. I'm going
7    to mark this as the next exhibit.
8            (Whereupon, said document was
9            marked for identification as
10           Exhibit No. 7 to the deposition
11           of Anwar K. Diop.)
12   Q.    Mr. Diop, these are -- this next
13   set of documents have been marked as Exhibit
14   7 to your deposition. I want you to turn to
15   the page --
16       A.    Is this supposed to be my phone?
17       Q.    This is not your phone records.
18   These --
19       A.    Oh, okay.
20       Q.    -- have been submitted as the
21   phone records of Linda Johnson.
22       A.    Oh, okay. Yeah. Because I was
23   going to say this is definitely not my phone

Page 147

1    record.
2        Q.    Okay. And these are telephone
3    calls -- a record of calls to and from the
4    cell phone used by Jalonda Johnson.
5        A.    Okay. And what number is her
6    cell phone number supposed to be?
7        Q.    That phone number is, according
8    to Page 23 -- well, it says Page 3, but --
9        A.    1819?
10       Q.    It is 334-303-1819. Okay.
11       A.    Okay.
12       Q.    I'm going to direct your --
13   well, Mr. Diop, what documents are you
14   reviewing?
15       A.    I'm reviewing my phone.
16       Q.    Those are your telephone
17   records?
18       A.    This is my personal phone.
19       Q.    I'm going to direct you to Page
20   33.
21       A.    Excuse me?
22       Q.    It's at Page 33. I want you to
23   look at the second column.

Page 148

1        A.    Okay.
2        Q.    And I want you to look at what
3    is call number 229 at 9:40 p.m.
4            Do you see that?
5        A.    Uh-huh (affirmative).
6        Q.    On January the 5th?
7        A.    On January the 5th at 9:40 p.m.?
8        Q.    Yes. Did you call Ms. Johnson
9    that evening?
10       A.    I guess I did.
11       Q.    Do you remember why you called
12   Ms. Johnson that evening?
13       A.    No, I don't.
14       Q.    I want you to look down at call
15   number --
16       A.    Unless I was returning her call.
17       Q.    Okay.
18       A.    Oh, hold up. Yes, I do. I
19   think I do. Yeah.
20       Q.    Why did you call Ms. Johnson
21   that evening?
22       A.    Because she called me and asked
23   me if I would -- you know, she said, well,

Page 149

1    you know, I know the discussion between you
2    and my dad, you know. But, you know, we
3    could still -- we could at least be friends.
4            And, you know, I -- I told her
5    that I didn't have a problem with that.
6        Q.    She called you on January 5th?
7        A.    Yeah. That was the initial
8    call, yeah.
9        Q.    And said that. What time did
10   she place that call to you?
11       A.    I'm really not sure. It was
12   late -- it was -- it was in the afternoon or
13   early evening, something like that. I don't
14   really recall.
15       Q.    Look at the list of calls prior
16   to that one because you say that this call at
17   9:40 is where you called her.
18       A.    Uh-huh (affirmative).
19       Q.    Were you calling her back?
20       A.    Probably.
21       Q.    And that's when she said -- is
22   that when you had the conversation when you
23   called her back?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 150

1    A.    Well, I think the initial
2    conversation I probably didn't -- I probably
3    didn't give her a call. And I returned her
4    call. That's how it was usually. That's how
5    it usually happened.
6        Q.    So, it's your contention that
7    Ms. Johnson called you sometime prior to the
8    9:40?
9        A.    Yeah. I'm sure.
10       Q.    And you didn't answer?
11       A.    That might have been a second
12   call. I really don't know, but I think she
13   called me at least -- probably around 6:00 or
14   7:00, something like that.
15       Q.    The dinner you said was
16   scheduled to be 6:00 or 7:00 o'clock,
17   correct?
18       A.    That was on the 5th. This is --
19       Q.    That call is on the 5th.
20       A.    -- the 6th.
21       Q.    Call number 229 is on the 5th.
22       A.    Oh, okay. Okay. Well, then,
23   this has to be either after that or right

Page 151

1    when I -- either shortly after I dropped them
2    at their car or something like that.
3        I may have -- I don't know. I
4    might have called to see if they made it or
5    something because I dropped them in a parking
6    lot, which I kind of thought was unusual that
7    -- you know, why they would be parked there
8    in the first place. But that's where I
9    dropped them for their car. So, that -- that
10   probably was what it was.
11       Q.    What parking -- where was this
12   parking lot that they were parked in?
13       A.    Winn-Dixie. It was a Winn-Dixie
14   parking lot further down the Boulevard.
15       Q.    You-all went to the Outback
16   restaurant --
17       A.    Yeah.
18       Q.    -- on the Boulevard, correct?
19       A.    Correct. But then her parents,
20   they asked me to drop them off at their car,
21   which parked down there. That's --
22       Q.    At the --
23       A.    Yeah. And that -- you know, and

Page 152

1    now it kind of -- now, I could -- I kind of
2    could construe a lot in that, but -- you
3    know, and they -- I thought about that that
4    night and I -- it just didn't make sense.
5    But I did drop them off down there.
6        Q.    Okay. And call number 237 --
7        A.    And then I immediately rushed
8    back to the restaurant.
9        Q.    After --
10       A.    Yeah. When I dropped them at
11   their car because I left my -- I got my food
12   to go, but I left it.
13       Q.    Okay. What time was it when you
14   returned to the restaurant?
15       A.    I went -- I dropped them at
16   their car and came -- and went right -- and
17   came right back. And I think that's probably
18   one of the reasons that I called, just to
19   make sure that they was able to get off.
20       Q.    Okay.
21       A.    But I -- I dropped them and I
22   left right back. And then there was a major
23   discrepancy at the restaurant because they

Page 153

1    threw away my food. But I had never eaten
2    and everything. And so -- but they had to
3    give me new food, but they didn't do it till
4    the next day.
5        Q.    So, you arrived back at the
6    restaurant sometime after 9:30?
7        A.    I mean -- yeah.
8        Q.    I'm just trying to figure out
9    what time it was when all this was taking
10   place.
11       A.    I guess it was around that,
12   something like that.
13       Q.    Do you know what time it was
14   when you dropped Jalonda and her sister off
15   at the Winn-Dixie parking lot?
16       A.    Not really, no.
17       Q.    Approximately how long did it
18   take you to drive from the Outback to the
19   Winn-Dixie?
20       A.    Five -- ten minutes. Five
21   minutes. You know, that's not -- I mean,
22   it's -- it's not that far. It's past
23   Wal-Mart, I think.

39 (Pages 150 to 153)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 154

1    Q.    How long did you-all stay at the
2  restaurant after the girls' parents had left?
3    A.    Just enough time for them to eat
4  their dessert.
5    Q.    Approximately how long was that?
6    A.    Ten minutes.  See, I didn't get
7  there until like 8:00 maybe, 8:30, or
8  something like that.
9    Q.    You got there at 8:00 or 8:30?
10    A.    Yeah.  It was after 8:00.  I
11  know that.
12    Q.    How long did her parents stay
13  after you arrived?
14    A.    Thirty minutes maybe.
15    Q.    So, her parents left at about
16  8:30.  Okay.  What time did you return home
17  that evening?
18    A.    I don't remember.
19    Q.    Was it before 10:00 o'clock?
20    A.    I don't remember because I had
21  to stay in the restaurant for a long time.
22  And as a matter of fact, I stayed there and I
23  ended up waiting for the manager to come back

Page 155

1  dealing with that whole instance, the
2  situation with my food.
3    Q.    Now, let's take a look at call
4  number 237.  That call was on January the
5  6th.
6    A.    Okay.
7    Q.    According to the phone record,
8  what time was that call?
9    A.    1:42 a.m., I guess.
10    Q.    Well, it says 1:42, and it has
11  an A by it, correct?
12    A.    Correct.
13    Q.    And there are other calls that
14  have Ps by them, correct?
15    A.    Correct.
16    Q.    So, that would be 1:42 in the
17  morning?
18    A.    Uh-huh (affirmative).  I would
19  assume.
20    Q.    And you called Ms. Johnson at
21  1:42 in the morning, correct?
22    A.    I don't recall calling her at
23  1:42.

Page 156

1    Q.    Did someone else have access to
2  your phone at 1:42 in the morning?
3    A.    No.
4    Q.    Okay.  So, according to the
5  record --
6    A.    This was on the 6th.  That's
7  possible.
8    Q.    And you-all talked for how long
9  at that time?
10    A.    Thirteen minutes.
11    Q.    Thirteen minutes?
12    A.    Uh-huh (affirmative).
13    Q.    That's longer than the five
14  minute maximum you gave me earlier, isn't it?
15    A.    Yeah.
16    Q.    What did you talk about for 13
17  minutes with Ms. Johnson at 1:42 in the
18  morning?
19    A.    The fact that I had already
20  discussed with her father -- I mean, she --
21  she really wanted to, you know, continue to
22  pursue some kind of a romantic type of
23  relationship, you know.  And, I mean, I'm a

Page 157

1  grown man.  I'm not fixing to go behind
2  nobody's back and do anything that I could
3  do.  You understand what I'm saying?
4         So, that's -- I mean, I wasn't
5  going for that.
6    Q.    When did you have a conversation
7  with Ms. Johnson where she indicated that she
8  wanted to continue to pursue a relationship?
9         Was that in-person conversation
10  or over the telephone conversation?
11    A.    Over the telephone if I'm not
12  mistaken.
13    Q.    When did that conversation --
14    A.    I told her, you know, I didn't
15  mind being her friend, you know.
16    Q.    Was that a call that Ms. Johnson
17  made to you?
18    A.    I think initially, yeah.
19    Q.    When did Ms. Johnson call you?
20    A.    I don't remember -- it may have
21  been the same day.  It might have been the
22  same day.
23    Q.    Okay.  I want you to look

40  (Pages 154 to 157)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 158

1  between the calls that are recorded between
2  call numbers 229, which we previously
3  reviewed, which start January the 5th at 9:40
4  p.m. --
5      A.   Okay.
6      Q.   -- all the way up through call
7  number 237, which is the call we're
8  discussing now, which was made on January 6th
9  at 1:42 a.m. where you called Ms. Johnson.
10      Do you see any calls from Ms.
11  Johnson to you reflected there?
12      A.   Yeah.
13      Q.   Which call?
14      A.   Call number 238.
15      Q.   No, no, no.  Okay.  Call number
16  238 was made on the 6th.  What time was that
17  call made?
18      A.   2:11.
19      Q.   2:11 a.m., correct?
20      A.   Uh-huh (affirmative).
21      Q.   So, that call was made after the
22  call at 1:42 a.m., correct?
23      A.   Correct.

Page 159

1      Q.   So, the call at 1:42 a.m. could
2  not have been a return call from the call
3  made at 2:11 a.m., could it?
4      A.   Yeah, it could have.
5      Q.   You could have called Ms.
6  Johnson back before she called you?
7      A.   Yes.  As a matter of fact, yeah.
8  Because there is such a thing as voice mail.
9      Q.   She could have called you at
10  2:11 a.m.?
11      A.   Uh-huh (affirmative).
12      Q.   And in response to her 2:11 a.m.
13  call where you talked for two minutes, you
14  called her at 1:42 a.m.?
15      A.   I mean, I don't remember the
16  sequence and exactly how it went.  But I know
17  that generally our phone calls were initiated
18  by Ms. Johnson.  As a matter of courtesy and
19  no reason to be in a defensive posture we had
20  cordial conversations.
21      Q.   And I understand that.  What I'm
22  getting to is you told me that this call at
23  1:42 a.m. was a return call.

Page 160

1      A.   I said it could have been.
2      Q.   Okay.
3      A.   And if I didn't make that very
4  clear initially, that's what I'm saying.
5      Q.   And you also gave me specific
6  information regarding what Ms. Johnson said
7  to you in the call that you were responding
8  to?
9      A.   Oh, yeah.
10      Q.   So, what I'm trying to figure
11  out --
12      A.   Certain things I have to keep --
13  well, I've had to keep her, you know, pretty
14  much implanted in my mind.
15      Q.   And what I want you to take from
16  your mind and implant on the record is when
17  Ms. Johnson made that call to you and when
18  you had that conversation.
19      A.   Well, I would have to get some
20  other records, I think.  But if you would
21  notice, there was a dillydally in how they --
22  how the sequence of these calls came about.
23      We only communicated on one

Page 161

1  particular phone that they -- that I
2  communicated with her, but they called three
3  different phones of mine and they did that
4  strategically.
5      Q.   Okay.  So, we --
6      A.   Now, if -- and if you would
7  notice -- I don't know if you have copies of
8  my personal phone records as well, but a lot
9  of her -- and I -- and one of the reasons, I
10  think, is because they knew that my office
11  phone did not keep track of -- it was either
12  the incoming or outgoing calls.  So, on
13  certain instances they'll call me on my
14  personal phone.
15      Q.   Okay.
16      A.   And on other instances it will
17  be on my business phone.
18      Q.   Okay.
19      A.   And then on other instances it
20  may be on my office phone.  That's just what
21  was done.
22      Q.   Call number 238, it looks like
23  at 2:11 a.m., correct?

41 (Pages 158 to 161)

FREEDOM COURT REPORTING

Page 162

1    A.    That's what it looks like.
2    Q.    And it looks like Ms. Johnson
3  called you?
4    A.    (Whereupon, the witness
5  indicated an affirmative response by nodding
6  his head up and down.)
7        MR. MADISON:  Verbalize your
8  response.
9        THE WITNESS:  Yes.
10    Q.    (By Ms. Meadows)  And this
11  appears to be shortly after your call?
12    A.    Yes.
13    Q.    Do you recall what you-all
14  talked about at 2:11?
15    A.    No, I don't.
16    Q.    Okay.
17    A.    But it was short in duration.
18    Q.    Yes, it was very short in
19  duration.
20    A.    Which is the case in most of our
21  calls.
22    Q.    And then you called her back at
23  2:45 a.m.?

Page 163

1    A.    Yeah.  I probably couldn't talk
2  or something like that.  I don't -- I don't
3  really specifically remember, but there was a
4  reason for it I'm sure.
5    Q.    And you talked for about a
6  minute then?
7    A.    Right.  Like I said, most of our
8  calls were less than five minutes.
9    Q.    Is there a reason that these
10  calls took place between 1:00 and 3:00 a.m.?
11    A.    Like I say, that was the
12  instance I recall when there was an interest
13  in her of having a romantic relationship.
14    Q.    There was?
15    A.    Yeah, there was.
16    Q.    Interest on whose part?
17    A.    On her part, and she pursued
18  that.
19    Q.    And is that what she was
20  pursuing in these phone conversations between
21  1:00 a.m. and 3:00 a.m.?
22    A.    It may have came up, but then
23  there was the nature of another -- it may

Page 164

1  have came up.
2    Q.    And I asked you earlier, but
3  you-all -- you said that you do not normally
4  talk -- you did not normally talk to her --
5    A.    That's correct.  I --
6    Q.    -- after 10:00 p.m.?
7    A.    This, I'm sure, is a very
8  unusual circumstance.  I'm sure.  And without
9  even looking at the rest of this bill I can
10  say emphatically that that was not the normal
11  nature of our conversations -- or time of our
12  conversations rather.
13    Q.    And you would emphatically deny
14  that you would have had an extended
15  conversation with her that took place after
16  10:00 p.m.?
17    A.    When?
18    Q.    On a date after January --
19    A.    I said I would emphatically deny
20  that that's something that happened.  If it
21  -- if it happened more than once, I would be
22  very surprised.
23    Q.    If what happened?  If you talked

Page 165

1  to her after 10:00 p.m. more --
2    A.    That's correct.
3    Q.    -- than once, you would be
4  surprised?
5    A.    That's correct.
6    Q.    Okay.
7    A.    And if we had conversations
8  longer than five minutes, I would be
9  surprised.
10    Q.    If a conversation was longer
11  than five minutes --
12    A.    Maybe -- I mean, it could be one
13  more, you know.
14    Q.    -- it would surprise you?
15    A.    But that was not the general
16  nature.
17    Q.    Well, turn the page, Mr. Diop,
18  and --
19    A.    Okay.
20    Q.    -- let's prepare to be
21  surprised.
22    A.    Thirteen minutes, this other
23  conversation?

42 (Pages 162 to 165)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 166

1    Q.    You talked to her -- call number
2  275 on the 7th, what time was that call made?
3    A.    12:30.
4    Q.    12:37 what?
5    A.    12:37 a.m.
6    Q.    Okay. That's after 10:00 p.m.,
7  isn't it?
8    A.    Uh-huh (affirmative).
9    Q.    And you called her?
10   A.    Yeah, but it was only after she
11 called me at 11:56 p.m.
12   Q.    And you talked to her at 11:56
13 p.m. for three minutes, correct?
14   A.    That's what it appears to be,
15 yeah.
16   Q.    It appears that you had a
17 conversation at 11:56 --
18   A.    How much of a conversation, I
19 can't say.
20   Q.    Well, what did she say at 11:56
21 that made you need to return the call at
22 12:37?
23   A.    I have no idea. I could have

Page 167

1  made another call or had to make another
2  call. My daughter could have called me. I
3  don't know.
4    Q.    Okay. And --
5    A.    But in any event, the
6  conversation was ended and...
7    Q.    And you called her back and
8  talked for 13 minutes. What was your
9  conversation about when you talked for 13
10 minutes?
11   A.    I don't know. I don't know.
12   Q.    Okay.
13   A.    And this day was on the 6th and
14 the 7th. I know during those -- during that
15 time frame I probably just had to establish
16 some parameters.
17   Q.    And what parameters were you
18 establishing during that time frame?
19   A.    The nature of specific interest.
20   Q.    And explain that to me. I want
21 you to explain it to me just like you
22 explained it to Jalonda.
23   A.    There is no interest.

Page 168

1    Q.    And tell me exactly what you
2  told Ms. Johnson.
3    A.    There is no interest. I don't
4  even know her.
5    Q.    And that took you 13 minutes to
6  explain to her?
7    A.    Obviously, we were on the phone
8  to that -- you know.
9    Q.    And it took you 13 minutes and
10 several different conversations over several
11 days to say that there is no interest?
12   A.    It appears that that was the
13 case, yeah.
14   Q.    Turn the page, Mr. Diop. Let's
15 look at call number 481 on January the 14th.
16 What time was that call made?
17   A.    12:05 a.m.
18   Q.    And here it appears that Ms.
19 Johnson called you, correct?
20   A.    Uh-huh (affirmative).
21   Q.    How long did you talk to Ms.
22 Johnson?
23   A.    Forty-two minutes.

Page 169

1    Q.    For 42 minutes Ms. Johnson talks
2  to you. What did you talk about for 42
3  minutes?
4    A.    I don't know. And I'm not sure
5  that that was all conversation.
6    Q.    You're not sure that it was
7  what?
8    A.    All conversation.
9    Q.    What would it have been?
10   A.    Well, there were several
11 instances -- and that even is the case now --
12 where I would have to put you on hold for
13 extended periods of time.
14   Q.    So, it's --
15   A.    Or answer another phone. I
16 can't really say specifically, but it would
17 not be uncommon.
18   Q.    So, how long -- when you say
19 extended periods of time on hold --
20   A.    It could be ten minutes, it
21 could be fifteen.
22   Q.    Well, what did you talk about
23 the other 25 to 30 minutes of the

43 (Pages 166 to 169)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 170

1  conversation?
2      A.    I don't know.
3      Q.    And do you have any specific
4  recollection of putting Ms. Johnson on hold
5  --
6      A.    I mean --
7      Q.    -- for ten or fifteen minutes?
8      A.    -- I'm sure anybody who talks to
9  me, I would put them on hold. She would not
10  be an exception.
11      Q.    I'm talking about this
12  conversation on the 14th.
13      A.    I can't even speak to the
14  conversation itself. And the only reason I
15  remember or could say that I had a
16  conversation with her is because of the phone
17  log.
18      Q.    Is there any --
19      A.    But it's not as a result of my
20  memory.
21      Q.    Call number 483 also on the
22  14th. What time was that call made?
23      A.    12:56.

Page 171

1      Q.    And you called Ms. Johnson?
2      A.    Uh-huh (affirmative).
3  Thirty-six minutes.
4      Q.    Is that a yes?
5      A.    Yes.
6      Q.    And you talked for 36 minutes
7  that time?
8      A.    Uh-huh (affirmative).
9      Q.    Is that a yes?
10      A.    Yes.
11      Q.    What was that conversation
12  about?
13      A.    I have no idea. And what day
14  was that?
15      Q.    That was January the 14th.
16      A.    Okay.
17      Q.    On the 14th between -- starting
18  at 12:05, you and Ms. Johnson -- we're on
19  Page 35, the second column.
20          MR. MADISON: Page 35, right?
21          MS. MEADOWS: Yes.
22          MR. MADISON: Yeah. Something
23  doesn't make sense.

Page 172

1          THE WITNESS: You're absolutely
2  right. You're absolutely right.
3      Q.    (By Ms. Meadows) You and Ms.
4  Johnson were on the phone for a total of 78
5  minutes.
6      A.    Seventy-eight minutes?
7      Q.    Yeah.
8      A.    And when was this?
9      Q.    That's call numbers 481 and 483
10  combined.
11          MR. MADISON: Object to form.
12      Q.    (By Ms. Meadows) That actually
13  --
14      A.    I don't know how it would have
15  been -- I don't...
16      Q.    Do you know what you and Ms.
17  Johnson talked to for an hour and 18 minutes
18  -- what you talked about?
19      A.    Not specifically, no.
20      Q.    Do you recall having any
21  conversations with Ms. Johnson that lasted an
22  hour?
23      A.    From the record, I stated that I

Page 173

1  don't recall talking to her more than five
2  minutes. And this was the typical case
3  during most of our conversations. And that's
4  just the truth.
5      Q.    And these calls were between
6  1:00 and -- I'm sorry -- between 12:05 a.m.
7  and let's say 1:30 a.m., correct?
8      A.    Yes, it appears.
9      Q.    So, clearly this is an exception
10  to your no calls between 10:00 p.m. and 6:00
11  a.m., correct?
12      A.    Yeah, that's an exception. But
13  there -- but there really is something
14  evidently wrong with this log.
15      Q.    Are you saying that the phone
16  company log is inaccurate?
17      A.    That's what I'm saying. It's
18  something wrong with it.
19      Q.    And what do you base that on?
20      A.    Well, it says that I spoke from
21  12:05 to -- at 12:05 a call was initiated for
22  42 minutes.
23      Q.    Uh-huh (affirmative).

44  (Pages 170 to 173)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 174

1     A.    Okay.  How could another call
2  come in on the same line on the same day that
3  was at 12:49 for 44 minutes and then a call
4  at 12:56 for 36 minutes?
5     Q.    I actually believe I know the
6  answer to that, but you're not asking me.
7     A.    I'm just -- you know, I'm
8  wondering how it's possible.
9     Q.    Would you turn to the next page.
10    A.    (Complies).
11    Q.    It may actually be two pages
12 over.  I'm actually on Page 37.
13    A.    All right.
14    Q.    Look at call number 714.
15    A.    Okay.
16    Q.    That's on January 24th.
17    A.    Okay.
18    Q.    What time was that call?
19    A.    It was at 12:54.
20    Q.    Okay.
21    A.    And that was a return call as
22 well.
23    Q.    And you were returning her call?

Page 175

1     A.    Correct.  After she had called
2  me on the same day maybe one, two, three,
3  four different times.
4     Q.    So, you were returning her
5  telephone call?
6     A.    Yeah.
7     Q.    What did you speak about for 11
8  minutes?
9     A.    I'm not sure.
10    Q.    And you returned her telephone
11 call at 12:54 a.m., correct?
12    A.    I return calls when I get the
13 opportunity.  I mean, I -- I work 24 hours a
14 day.
15    Q.    Okay.
16    A.    So, it was customary.
17    Q.    Okay.
18    A.    But my --
19    Q.    So, are you now saying it was
20 customary for you to call Ms. Johnson after
21 10:00 p.m.?
22         MR. MADISON:  Object to the
23 form.

Page 176

1          THE WITNESS:  It's customary for
2  me to return calls at late -- late hours.
3  However, I just did not recall it being a
4  customary practice.
5     Q.    (By Ms. Meadows)  Okay.  And
6  call number 715 on January 24 at 1:05 a.m.
7     A.    Okay.
8     Q.    You called her again?
9     A.    Right.  I probably had to call
10 back from our previous -- from the previous
11 phone call.
12    Q.    And this time you talked for 15
13 minutes, correct?
14    A.    Uh-huh (affirmative).
15    Q.    What did you and Ms. Johnson
16 talk about for a total of 26 minutes?
17    A.    I really don't -- I can't
18 recall.
19    Q.    No idea what the two of you were
20 talking about?
21    A.    I mean, I can't really --
22    Q.    What did you usually talk about
23 in your conversations with Ms. Johnson that

Page 177

1  lasted more than five minutes?
2     A.    I don't think any one topic was
3  constant.
4     Q.    What variety of topics were
5  discussed?
6     A.    I can't even really tell you
7  that.
8     Q.    Was there any particular reason
9  that your calls with Ms. Johnson were
10 typically longer when they were made after
11 midnight?
12    A.    Yeah, yeah.
13    Q.    And what was that?
14    A.    How could I say this?  Because
15 she had somewhat of -- I wouldn't say
16 hysterical, but she can be an emotional
17 person.
18    Q.    What was she emotional about
19 during your phone conversations that took
20 place after midnight?
21    A.    I can't -- I can't really say
22 specifically.
23    Q.    Well, what was she emotional

45  (Pages 174 to 177)

FREEDOM COURT REPORTING

Page 178

1   about during your conversations in general?
2       A.   Various experiences.
3       Q.   Tell me what those various
4   experiences were.
5       A.   Just the relationship between
6   her and her family.  That's all.
7       Q.   What did she say specifically?
8       A.   I can't really say specifically.
9       Q.   Okay.  Well, tell me
10  specifically some things that you said to Ms.
11  Johnson.
12      A.   That she'll be okay.  That's
13  something I know I said specifically.
14      Q.   And you said that you spoke with
15  Ms. Johnson on the 31st, correct?
16      A.   To my knowledge, yes.
17      Q.   To your knowledge?
18      A.   Uh-huh (affirmative).
19      Q.   What did you speak with Ms.
20  Johnson about on the 31st?
21      A.   Initially?
22      Q.   Yeah.
23      A.   She wanted me to come and meet

Page 179

1   her.
2       Q.   Meet her where?
3       A.   We didn't even get that far.
4       Q.   Why didn't you get that far?
5       A.   Because it was something that I
6   wasn't about to do.  I was in a very bad mood
7   that day.  I had a long day.  My grandmother
8   had been taken to the hospital.  It wasn't a
9   good day.
10      Q.   Did you share with Ms. Johnson
11  that your grandmother --
12      A.   Yes, I did.
13      Q.   What did you tell Ms. Johnson
14  about your grandmother on that day?
15      A.   That they had -- she had to be
16  rushed to the hospital.
17      Q.   And --
18      A.   And that I wasn't -- you know,
19  she said something about some medical
20  situation that they had had.  And I said,
21  well, you know, I'm having a similar day.  I
22  had a bad day myself.  It was raining.  The
23  weather was bad.  I was not -- I had worked

Page 180

1   probably till like 8:00 o'clock or so.  I
2   wasn't getting ready to do that.
3       Q.   So, you told Ms. Johnson you
4   were not going to --
5       A.   Right.  So, she hung up the
6   phone and called me back.
7       Q.   Did you call Ms. Johnson back on
8   that day?
9       A.   On the 31st?
10      Q.   Yeah.
11      A.   To my knowledge.  Why is the --
12  why is it that this phone log stops?
13      Q.   You need to turn to the front.
14  It's out of order.  The pages that relate to
15  the 31st actually begin on Page 25 of the
16  exhibit.
17      A.   Okay.
18      Q.   Having had a chance to review
19  the phone records, do you still contend that
20  you did not call Ms. Johnson on the 31st?
21      A.   That was calling her back and
22  forth between the two of us.
23      Q.   And the two of you spoke on a

Page 181

1   number of occasions on that day.  What else
2   did you --
3       A.   That evening, yeah.  I told you
4   pretty much the nature of that.
5       Q.   And that was the gist of the
6   conversations --
7       A.   Pretty much, yeah.
8       Q.   -- all of them?
9       A.   Except the last time.
10      Q.   Tell me about the last time you
11  talked that evening.
12      A.   Well, she said that she had a
13  discrepancy at home.  She had to leave.  In
14  the process, though, she had to leave home
15  without a sweater or jacket or anything and
16  nor did she have on any socks.
17           She said that the argument and
18  everything with her parents was pretty
19  heated.  She's tried to get in contact with
20  her sister.  She wasn't able to.  And she
21  asked me would I give one to her.
22      Q.   Would you give what to her?
23      A.   A sweater or something, you

46 (Pages 178 to 181)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

| Page 182 | Page 184 |
|---|---|
| 1  know, because she was probably going to have | 1  home sometime around 7:30? |
| 2  to -- and have some socks because she was | 2      A.    More or less.  Maybe more. |
| 3  probably going to have to wait in her car. | 3      Q.    Right. |
| 4      Q.    Where was Ms. Jalonda Johnson | 4      A.    Probably about -- I would say -- |
| 5  when she called you? | 5  I would say about 15 or 20 minutes. |
| 6      A.    As far as I know, she was | 6      Q.    When you told Ms. Johnson she |
| 7  leaving home. | 7  could come to your house and get a sweater |
| 8      Q.    What time was that? | 8  and some socks -- |
| 9      A.    I'm really not sure of the exact | 9      A.    Which I gave her. |
| 10  time, but it was sometime probably around | 10      Q.    Okay.  When you told her she |
| 11  6:00 or so maybe, probably sometime around | 11  could come and get the sweater and socks, you |
| 12  there. | 12  were not fulfilling any responsibilities for |
| 13      Q.    And what was your response to | 13  Alabama State University at that time, were |
| 14  Ms. Johnson? | 14  you? |
| 15      A.    When she asked for my help? | 15      A.    No, no. |
| 16      Q.    Right. | 16      Q.    You told Ms. Johnson that you |
| 17      A.    I told her that was no problem. | 17  would help her out because she was a cordial |
| 18      Q.    You told her no problem? | 18  acquaintance of yours, correct? |
| 19      A.    I told her -- yeah, I would give | 19      A.    Yeah.  I had no reason to deal |
| 20  it to her. | 20  with it otherwise.  You could call me, and I |
| 21      Q.    And is that the point where she | 21  probably would have. |
| 22  was going to come over to your house? | 22      Q.    Okay. |
| 23      A.    Yeah. | 23      A.    Well, maybe not now, but |

| Page 183 | Page 185 |
|---|---|
| 1      Q.    What time did she arrive at your | 1  probably then. |
| 2  house? | 2      Q.    That was purely a personal |
| 3      A.    I'm not sure exactly what time | 3  decision that you made? |
| 4  she arrived, but I know the last time that | 4      A.    I would probably leave it at the |
| 5  she called before arriving was 7:14 p.m. | 5  -- yeah, yeah. |
| 6      Q.    And what number did she call you | 6      Q.    Okay.  I didn't hear what you |
| 7  at at 7:14 p.m.? | 7  said. |
| 8      A.    She called my personal cell | 8      A.    I said I would probably leave it |
| 9  phone. | 9  in a bag on my front porch or something. |
| 10      Q.    What number did she call you | 10      Q.    Okay. |
| 11  from? | 11      A.    And that's just the nature -- |
| 12      A.    From her cell phone. | 12  that's how I am as a person. |
| 13      Q.    She called you from her cell | 13      Q.    After Ms. Johnson arrived at the |
| 14  phone? | 14  house to get the sweater and the socks, when |
| 15      A.    Uh-huh (affirmative). | 15  she arrived, did you invite her inside? |
| 16      Q.    And your cell phone number is | 16      A.    Uh-huh (affirmative). |
| 17  386-546-0160, correct? | 17      Q.    Is that a yes? |
| 18      A.    That's correct. | 18      A.    Yes. |
| 19      Q.    And did she arrive shortly after | 19      Q.    After she entered your house, |
| 20  that phone call? | 20  did you lock the door behind her when she |
| 21      A.    I'm sure within about fifteen | 21  came in? |
| 22  minutes, ten or fifteen minutes. | 22      A.    No. |
| 23      Q.    So, she may have arrived at your | 23      Q.    Would you describe for me the |

47 (Pages 182 to 185)

FREEDOM COURT REPORTING

Page 186

1　lock on your doors at that time at the Hull
2　Street address.
3　　　A.　There is a knob. The actual
4　lock on the door itself, there is no lock,
5　and there is two -- a gate which you would
6　have to turn -- it's a key, a dead bolt kind
7　of a lock. You can't lock it from the inside
8　without a key.
9　　　Q.　So, it's of the type that I
10　describe as a double dead bolt lock?
11　　　A.　I guess. I guess. And there
12　was no reason to lock it.
13　　　Q.　Did you normally keep the key to
14　that lock in the lock while you were inside
15　the house?
16　　　A.　No. Because you could reach
17　your hand right through. Anybody could if --
18　so, that's something you never do. Either I
19　locked it or I didn't.
20　　　Q.　Was it your habit to lock that
21　door when you were inside the home?
22　　　A.　If I was inside for the rest of
23　the evening, yes.

Page 187

1　　　Q.　And you would do that regardless
2　of whether you were going to turn in for the
3　night, you would still lock the door?
4　　　A.　Yeah. If I'm -- yeah, just for
5　security reasons. You know, that's -- but if
6　I'm right there and, I mean, I'm coming in
7　and out, I didn't lock it.
8　　　Q.　Tell me what you say happened at
9　your house the evening Jalonda visited on
10　January 31st.
11　　　A.　She came. I gave her those, you
12　know, articles. Right in my front area is --
13　I have -- it's like a gym. I would say she
14　was there maybe five or ten minutes tops.
15　She got the articles, and she left.
16　　　Q.　So, it is your contention that
17　Ms. Johnson entered the house?
18　　　A.　Uh-huh (affirmative).
19　　　Q.　You handed her a sweater and
20　some socks?
21　　　A.　That's correct.
22　　　Q.　Ms. Johnson accepted the sweater
23　and socks?

Page 188

1　　　A.　Correct.
2　　　Q.　And left immediately thereafter?
3　　　A.　She put the -- she put the socks
4　on, and she put the sweater on. A few -- you
5　know, she was emotional, you know. And she
6　was crying, you know. I told her, you know,
7　calm down, everything was going to be all
8　right. I hugged her.
9　　　　And that was pretty much it.
10　And sent her on the way.
11　　　Q.　At any point during Ms.
12　Johnson's visit, did she sit on your bed?
13　　　A.　She may have sat on my bed when
14　I initially went and got the sweater and the
15　socks.
16　　　Q.　Describe the sweater that you
17　gave to Ms. Johnson for me.
18　　　A.　It was like an argyle sweater
19　that buttoned down.
20　　　Q.　Did Ms. Johnson take that
21　sweater with her when she left?
22　　　A.　Yeah. And white socks.
23　　　Q.　Has Ms. Johnson returned the

Page 189

1　sweater?
2　　　A.　Nor the socks.
3　　　Q.　Okay.
4　　　A.　I wouldn't even take them back
5　if she did.
6　　　Q.　Have you seen the sweater or
7　socks since Ms. Johnson took them?
8　　　A.　Yeah.
9　　　Q.　Where were they?
10　　　A.　In her mother's office. She
11　asked me did I want them back. I told her
12　they can have them.
13　　　Q.　When was that conversation with
14　her mother?
15　　　A.　It was the last day of the work
16　year when we usually have -- it was like a --
17　you know, a little cookout and things like
18　that for all the employees. It was on that
19　day.
20　　　Q.　Okay. What date is that
21　usually?
22　　　A.　It was December. I can tell you
23　that.

48 (Pages 186 to 189)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 190

1    Q.    That was in December?
2    A.    Yeah.
3    Q.    December of what year?
4    A.    2005.
5    Q.    And this was in the physical
6  plant building?
7    A.    That's correct.
8    Q.    Why were you in the physical
9  plant building?
10   A.    As I said, that was the last
11 day, and that was a period when they had the
12 cookout for staff and things like that.
13   Q.    And you came back for that?
14   A.    Yeah.
15   Q.    Why did you come back for the
16 staff cookout or December 5th, 2005?
17   A.    Because I did it as -- just as a
18 courtesy to craft supervisors and the
19 assistant director who asked me, if I would,
20 just to at least give kind of like a farewell
21 to the employees and say something.
22         You know, because that was
23 really probably the first time that they

Page 191

1  would have encountered me since that
2  situation. So, I did it.
3    Q.    At any point during that night,
4  was Jalonda actually in your bed under the
5  covers?
6    A.    No.
7    Q.    At any point during the night,
8  did Jalonda tell you that your bed was
9  particularly comfortable?
10   A.    Oh, let me change that. Let me
11 -- let me change that. As a matter of fact,
12 that's really the reason I rushed her out of
13 my house.
14         She was on my bed. She wrapped
15 up under my covers, which I thought was
16 particularly kind of -- she got real cozy
17 considering that she had never been to my
18 house, you know. And she said that it was
19 because she was cold and everything.
20         But after I gave her the sweater
21 and all of that, then -- you know, she put on
22 the socks. She put on the sweater. And she
23 left shortly after.

Page 192

1         But, yeah, she did. As a matter
2  of fact, that's one of the things that kind
3  of alarmed me.
4    Q.    How long had she been in the
5  house when she wrapped up in the covers on
6  your bed?
7    A.    Long enough for me to let her in
8  and go to get the sweater and the pair of
9  socks because that was in another room.
10   Q.    So, it's your testimony that
11 Jalonda entered the house?
12   A.    Uh-huh (affirmative).
13   Q.    Came in and got on your bed?
14   A.    Yeah.
15   Q.    And got under the covers?
16   A.    Yeah.
17   Q.    Almost immediately upon entering
18 the house?
19   A.    Yeah.
20   Q.    Okay. And you said you went to
21 another room. What room did you go to?
22   A.    The room where I had the sweater
23 hanging and the socks in the drawer.

Page 193

1    Q.    And that was in a separate room
2  in the apartment?
3    A.    Yes.
4    Q.    In what room was the bed?
5    A.    Right when you come in the door.
6    Q.    And you stated that at some
7  point during the night you hugged Ms.
8  Johnson. Was that before or after she was on
9  the bed?
10   A.    That was right before because
11 she was hysterical. She was crying, you
12 know. Just her reasoning. I told her it
13 will be okay. And I gave her the sweater. I
14 gave her the socks. I told her she should
15 talk to her sister. And that was it.
16   Q.    At any point during the night,
17 were both you and Ms. Johnson on the bed at
18 the same time?
19   A.    No.
20   Q.    At any point during the night,
21 did you have any physical contact with Ms.
22 Johnson other than the hug you've already
23 told me about?

49 (Pages 190 to 193)

FREEDOM COURT REPORTING

Page 194

1    A.    No, no.  I mean, I hugged her
2  and everything.  And that -- I mean, that was
3  pretty much it.
4        Q.    At any point during the night,
5  did you kiss Ms. Johnson?
6        A.    That was the whole sequence.  I
7  mean, I hugged her and told her it was going
8  to be okay, you know.  And I kissed her on
9  the forehead.
10       Q.    You kissed her on the forehead?
11       A.    Yeah.
12       Q.    At the time that you hugged her?
13       A.    Yeah.
14       Q.    And following that, she sat on
15  the bed while you went to get the sweater and
16  the socks, correct?
17       A.    Yeah.
18       Q.    Okay.
19       A.    Yes.
20       Q.    Is that the only time that you
21  kissed her?
22       A.    Yeah.
23       Q.    And that's the only place you

Page 195

1  kissed her?
2        A.    Yes.
3        Q.    At any point during the night
4  did you touch Ms. Johnson on her breasts?
5        A.    No.
6        Q.    You never kissed Ms. Johnson on
7  her breasts?
8        A.    Never.
9        Q.    At any point during the night,
10  did you touch Ms. Johnson's vagina?
11       A.    Never.
12       Q.    At any point during the night,
13  did Ms. Johnson touch your penis?
14       A.    Never.
15       Q.    At any point during the night,
16  did you remove any of Ms. Johnson's clothes?
17       A.    No.
18       Q.    Did she remove any of her
19  clothes?
20       A.    No.
21       Q.    At any point that night, did you
22  remove any of your clothes?
23       A.    No.

Page 196

1        Q.    Did she remove any of your
2  clothes?
3        A.    No.
4        Q.    Do you remember what Ms. Johnson
5  was wearing when she arrived at your house
6  that night?
7        A.    Not really.
8        Q.    Do you remember what you were
9  wearing that night?
10       A.    I'm sure I probably was wearing
11  some slacks and a shirt or something like
12  that.  I'm sure it was slacks.  I don't know
13  which ones.  I can't tell you.
14       Q.    And just for clarification, you
15  say that you're sure it must be slacks and a
16  shirt because that's your usual habit?
17       A.    Because I don't even have a pair
18  of jeans.
19       Q.    When did Ms. Johnson decide to
20  leave your home that evening?
21       A.    Shortly -- it was shortly after,
22  you know, she put on the sweater and the
23  socks.  Like I said, when I came back in from

Page 197

1  getting those garments, those articles, I
2  kind of got alarmed a little bit because she
3  was under my cover.  And I thought that was
4  kind of cozy.  But it was shortly after that.
5        Q.    When you gave Ms. Johnson the
6  socks -- you said you gave her a pair of
7  white socks, correct?
8        A.    Uh-huh (affirmative).
9        Q.    Did you also have on a pair of
10  socks?
11       A.    I'm sure I -- I'm sure I did.
12       Q.    After you gave Ms. Johnson the
13  socks, did you invite her to slide across the
14  floor with you?
15       A.    Do I look like a person that
16  would slide across the floor?
17       Q.    I'm asking you if that's what
18  you did.
19       A.    No.
20       Q.    Did Ms. Johnson slide across the
21  floor after you gave her the socks?
22       A.    She probably slid from the --
23  from that little small area towards the door.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 198

1    She probably did that.
2        Q.    And you didn't participate in
3    that with her?
4        A.    No.
5        Q.    After Ms. Johnson slid across
6    the floor, did she return to the bed?
7        A.    No.
8        Q.    What led up to the decision for
9    Ms. Johnson to leave your home that evening?
10       A.    Me.
11       Q.    You invited Ms. Johnson to
12   leave?
13       A.    Yeah.
14       Q.    What did you say?
15       A.    I mean, I -- first of all, I was
16   not in the best of mood. Okay. And, you
17   know, I had other things that I needed to
18   attend to.
19       Q.    So, what did you say to Ms.
20   Johnson?
21       A.    That she needs to go and talk to
22   her sister.
23       Q.    And when you said that, did you

Page 199

1    -- how did you get her out of the house, is
2    what I'm trying to get to?
3        A.    I mean, there was no -- there's
4    no major distance between where my bed area
5    is and the front door.
6        Q.    Okay.
7        A.    So, that immediate area right
8    there, it wasn't very difficult at all.
9        Q.    So, did you say to her, for
10   example, you need to leave or --
11       A.    No. I said, you know,
12   everything's going to be okay as I was
13   heading towards the door, opened the door.
14   Okay. It's going to be all right.
15       Just -- you need to talk to your
16   sister, and I hope everything's okay, you
17   know, blah, blah, blah. And that was it.
18       MR. MADISON: Do you mind if we
19   take another short break?
20       MS. MEADOWS: No. I was just
21   about to say I'm going to have to take one.
22       (Whereupon, the taking of the
23   deposition was recessed from approximately

Page 200

1    3:49 p.m. to approximately 4:00 p.m., after
2    which the following proceedings were had and
3    done:)
4        Q.    Is there anything else you feel
5    like you need to tell me about the incident
6    that took place on January 31st, 2005?
7        A.    I mean, not particularly. I'm
8    sure you pretty much have all of the details
9    available to you, you know. I mean, some
10   areas I remember, you know, vividly. Some
11   areas, you know, you kind of have to jog my
12   memory.
13       However, it was a very
14   unpleasant experience, you know. I don't
15   know if you have a copy of her letter that
16   she wrote to the University, but I'm sure
17   you'll find that there are vast
18   contradictions.
19       And the bottom line is it just
20   never happened.
21       Q.    Okay. Here is where I am,
22   Mr. Diop. And I don't know what your
23   attorney has explained to you, but what I'm

Page 201

1    trying to get to here is not what Jalonda
2    says happened. I've already talked to her.
3    I know what she says happened.
4        What I am most interested in is
5    what you say happened. I want to know what
6    the facts are from your perspective. What is
7    your side of the story?
8        So, what you need to tell me --
9        A.    Pretty much my side of the story
10   is this. You know, they came to me in a very
11   different posture, okay, with some ulterior
12   motives. All right. I never would have
13   imagined that their intentions were as such.
14   Okay.
15       However, this whole thing was
16   orchestrated towards an outcome that puts us
17   here currently. I never would have imagined
18   it. I never caused any harm to her, nor have
19   I had any kind of intentions of doing so.
20       Q.    Now, I just need some
21   clarification. When you say they had
22   ulterior motives --
23       A.    Because, I mean, her -- her

51 (Pages 198 to 201)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 202

1  parents, you know, were also involved in
2  this. I mean, this wasn't a single effort.
3      Q.    So, when you say "they," in this
4  context you mean Jalonda, her mother, Linda,
5  and her father --
6      A.    Eddie
7      Q.    -- Eddie?
8      A.    Yeah.
9      Q.    And what do you believe their
10 ulterior motives to be?
11     A.    Money.
12     Q.    Okay. Money --
13     A.    I think their intention was to
14 end up with Alabama State paying them money.
15 And the reason I say this is because this is
16 something that they've done before. This is
17 not just something they did with me. This is
18 something that they did when she was in high
19 school. This is something that they did with
20 her sister.
21     Q.    Okay.
22     A.    Okay. So, this -- so, they were
23 very sophisticated and knowledgeable of what

Page 203

1  they were doing.
2      Q.    Are you saying she made -- she
3  and/or her sister made substantially the same
4  allegations before?
5      A.    Oh, yeah.
6      Q.    Taking them separately so that
7  your attorney doesn't yell and scream at me,
8  who did Jalonda previously accuse of sexual
9  harassment?
10     A.    In high school.
11     Q.    Okay. Who --
12     A.    At Jefferson Davis High School.
13     Q.    Who did she accuse of sexual
14 harassment?
15     A.    One of -- one of her teachers or
16 coaches.
17     Q.    Do you know approximately what
18 year this was?
19     A.    2000, I think.
20     Q.    And it's in 2000 that the
21 accusation was made?
22     A.    Yeah. Around 2000, maybe 2002.
23 Between 2000 and 2002.

Page 204

1      Q.    And she accused a male faculty
2  member --
3      A.    Correct.
4      Q.    -- at Jeff Davis?
5      A.    Yes.
6      Q.    Were criminal charges brought
7  against this individual?
8      A.    To my knowledge, yes.
9      Q.    Do you know the outcome of that
10 criminal matter?
11     A.    I know that there was some kind
12 of a settlement.
13     Q.    I'm not talking about a civil
14 action.
15     A.    I don't -- no, no. Well, that
16 was definitely a result. Now, as far as, you
17 know, all of the ramifications that he had to
18 encounter, I'm -- I think that they were
19 pretty severe, but I cannot tell you
20 specifically.
21     Q.    Was this teacher terminated from
22 his employment?
23     A.    Yes.

Page 205

1      Q.    And that would have been
2  sometime between the year of 2000 and 2002?
3      A.    That's correct.
4      Q.    And the reason for his
5  termination was?
6      A.    Was this -- that incident that
7  related to Jalonda.
8      Q.    And you have no idea what the
9  faculty member's name was?
10     A.    It might have been -- the last
11 name might have been Holly or Hollis.
12     Q.    How did you come to discover
13 this information?
14     A.    Because lo and to my behold, a
15 lot of information Alabama State was already
16 aware of. They have a whole book on Mrs.
17 Johnson.
18     Q.    There is a book on --
19     A.    Yeah.
20     Q.    -- Jalonda Johnson?
21     A.    No. Linda Johnson.
22     Q.    On Linda Johnson?
23     A.    And during this time she

52 (Pages 202 to 205)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 206

1  evidently took off work and there was -- they
2  supposedly went through some emotional and
3  psychological distress as a result of this
4  incident.
5      Q.    And Linda Johnson's records
6  contain the information about this
7  allegation?
8      A.    Yes.
9      Q.    And you reviewed this book of
10 information on Linda Johnson?
11     A.    Yes.
12     Q.    How did you come to get that
13 information?
14     A.    Well, because it's something
15 that was kept in the vice president's office.
16     Q.    Which vice president?
17     A.    Leon Frazier.
18     Q.    And Dr. Frazier shared this
19 information with you?
20     A.    Uh-huh (affirmative).
21           MR. MADISON:  Is that a yes?
22           THE WITNESS:  Yes.
23           In addition to the fact that the

Page 207

1  sister supposedly made the same allegation
2  with her supervisor at -- I think Family
3  Dollar and accused him as being the father of
4  a child.  Well, they had blood tests and
5  everything where it ended up proving that he
6  was not.
7           Now, they're saying that this --
8  it's somebody that she went to prom with.
9  You know, so...
10     Q.    (By Ms. Meadows)  What is Ms.
11 Johnson's sister's name, do you know?
12     A.    You mean --
13     Q.    I mean Jalonda's --
14     A.    -- Jalonda's sister?
15     Q.    Right.
16     A.    I don't know her real name, but
17 I know they call her Londy.
18     Q.    Okay.  I thought they called
19 Jalonda Londy.
20     A.    Maybe they do.  Maybe they do.
21 Nee Nee.  That was her nickname.  Yeah.
22 You're right, though.  Yeah.
23     Q.    To your knowledge, did the

Page 208

1  Johnsons file any charges against the manager
2  at Family Dollar?
3      A.    I'm not sure.  I know that there
4  was -- I know that these same kind of actions
5  were initiated in that situation as well.  I
6  don't know, you know, how far they went.  I
7  hope they didn't ruin that man's life the way
8  they did me.  I hope and pray.
9      Q.    Do you know when they made the
10 allegations against the manager at Family
11 Dollar?
12     A.    I know the -- I know the DNA
13 test -- within the last year and a half or
14 two that's -- the results of that have come
15 out.
16     Q.    Sometime between 2006 and 2007?
17     A.    Between maybe 2005 and 2006.
18     Q.    How did you become aware of
19 their accusations against the manager at
20 Family Dollar?
21     A.    Well that's what I'm saying.
22 You know, there is a whole file.  I mean,
23 Mrs. Johnson has accused people at the

Page 209

1  University of assaulting her.  Even Stratford
2  Moore, she had charges against him for a kind
3  of brutality situation that happened at
4  Alabama State.  All of this stuff.  And I
5  wish they would have gave me a copy of it.  I
6  wanted it so bad.
7      Q.    And the information concerning
8  the sister is also in Mrs. Johnson's file --
9      A.    Yeah.
10     Q.    -- that you saw in Dr. Frazier's
11 office?
12     A.    They -- yeah.  In this -- no.
13 It's a notebook really.
14     Q.    This file, was it regularly kept
15 in Dr. Frazier's office, or did he have it
16 brought to --
17     A.    No.  I think -- I think he might
18 have had it brought.  I mean, I -- it may be
19 in part of her human resources file.  I'm not
20 really sure where it was kept.
21     Q.    Do you remember if the notebook
22 had like a cover page that said where it
23 originated?

53 (Pages 206 to 209)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 210

1     A.    I don't know.  No.  I mean, I
2  really can't tell you where it originated,
3  but I promise you it exists.
4     Q.    And I'm not disputing you at
5  this point.  I'm simply trying to figure out
6  where --
7     A.    Where it is.
8     Q.    -- it might be.
9     A.    We might not never find that
10 notebook.  I'll tell you that right now.
11    Q.    Okay.  But you've seen it?
12    A.    Yeah.
13    Q.    And you say that Dr. Frazier has
14 seen it?
15    A.    Just like I -- just like I saw
16 letters that were written supposedly from her
17 son saying that I assaulted him and that he
18 was a sister where he -- where they got the
19 gender and everything mixed up.  I'm telling
20 you.
21         Now, ask me if I was able to get
22 a copy of that.  No.
23    Q.    Where was this letter sent?

Page 211

1     A.    I anonymously got a copy of her
2  accusation saying that I raped her.
3     Q.    Okay.  I'm trying to --
4     A.    That wasn't -- none of this was
5  really made readily available even though it
6  exists.  The only reason you have it is
7  because I had got a copy.
8     Q.    What I'm trying to get to is the
9  letter about you assaulting her brother.  Who
10 was that sent to?
11    A.    Human resources.
12    Q.    That was sent to human
13 resources?
14    A.    Yeah.
15    Q.    Do you know when that was sent?
16    A.    I know around May.
17         MR. MADISON:  Of what year?
18         THE WITNESS:  2005.  I'm pretty
19 sure.
20    Q.    (By Ms. Meadows)  So, in --
21    A.    I'm almost sure.  As a matter of
22 fact, it was probably the first week of May
23 2005.  And the only reason that nothing

Page 212

1  became of it, because they had the gender and
2  everything messed up.  That's why it didn't
3  go any further.  Otherwise, he would have
4  probably...
5     Q.    And this was sent to human
6  resources prior to your termination in May of
7  2005?
8     A.    That's correct.
9     Q.    You saw a copy of this letter?
10    A.    Yeah.
11    Q.    Where did you see a copy of the
12 letter?
13    A.    In Dr. Frazier's office.
14    Q.    Okay.
15    A.    This -- that letter initiated
16 action going to the President for me to be at
17 least put on administrative leave.
18    Q.    In May of 2005?
19    A.    Yeah.  And they said that they
20 came to my office to use a fax machine.
21 Well, they had just bought a fax machine
22 three days -- three or so days before that
23 that was brand new.  No reason in the world.

Page 213

1     Q.    At your office where?
2     A.    At the physical plant.
3     Q.    In May 2005 at your office.
4  Tell me what the letter said.
5     A.    It was saying that they were
6  using -- they came to my office to use my fax
7  machine because theirs was not working.
8  Okay.  As a matter of fact -- maybe it was
9  April of --
10         But, anyway, it was around that
11 time because I know that that was what
12 initiated my administrative leave.  So,
13 within a week of me being placed on
14 administrative leave that was when that
15 letter was done.
16         They said that they came to my
17 office, him and his mother, to use the fax
18 machine, that I bowed up at him.  As a matter
19 of fact, better than yet I wrote a police
20 report because on that same day.  That was
21 another reason nothing could be done.  I gave
22 you a copy of that police report, too, that I
23 initiated.

54 (Pages 210 to 213)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 214

1    Q.    You initiated?
2    A.    Yeah. Because what they did --
3    it was really the other way around. He stood
4    in my doorway, you know. And I asked him,
5    you know, if he could move so I can go in my
6    office. He said this ain't my office, he
7    wasn't doing nothing. He balled up his fist
8    and everything and was in the process of
9    launching at me.
10        I went around through the
11    secretary's entrance into my office and
12    closed the door. I called the University
13    police.
14    Q.    And the officer came and took a
15    police report from you?
16    A.    Yes.
17    Q.    What is the brother's name?
18    A.    Cornelius or something like
19    that.
20    Q.    Approximately how old --
21    A.    Or Julius. He's older than me.
22    Q.    He's older than you?
23    A.    Yeah. Maybe around the same age

Page 215

1    or whatever.
2    Q.    So, somewhere in the
3    neighborhood of 40 to 45 years old?
4    A.    Yeah, I would say.
5    Q.    Okay. When did you first become
6    aware that Ms. Johnson had contacted the
7    police and accused you of raping her?
8    A.    The next -- well, I got a call
9    from -- I got a call from them that same
10    night.
11    Q.    They called you that night?
12    A.    Yes, they did, at 8:26 p.m. on
13    my personal phone and they asked me if I had
14    raped they daughter.
15        And I told her, I said, well,
16    Mrs. Johnson, I have no idea what you're
17    talking about about. If you can talk to your
18    daughter. I understand y'all had some
19    problems that night, but surely there's got
20    to be a mistake.
21        But then when I went to work the
22    next day, the detective called me on the job.
23    She told me -- she told me I needed to come

Page 216

1    down. And I said, surely, you-all don't
2    initiate any charges because somebody makes a
3    -- you know, false allegations like that, to
4    which she said this is a serious charge, you
5    know.
6        I contacted the chief of police
7    at the University. Okay. And Dr. Frazier.
8    Q.    You contacted the chief of
9    police and Dr. Frazier?
10    A.    Yeah. And I told them what
11    happened. They advised me to -- when I do
12    that, that I needed to go with an attorney.
13    Q.    They advised you that when you
14    go to the police department, you needed to go
15    with an attorney?
16    A.    Uh-huh (affirmative).
17    Q.    Okay. Let's back up to the
18    phone call from Mr. and Mrs. Johnson. What
19    time was that call again?
20    A.    At eight twenty -- 8:28 p.m.
21    Q.    What phone number were they
22    calling you from?
23    A.    334-613-1957. That was their

Page 217

1    home phone.
2    Q.    And for the record, you're
3    referring to your personal cellular phone --
4    A.    Yeah.
5    Q.    -- records, correct?
6    A.    Yes.
7    Q.    I am going to -- since we're
8    going to refer to those, I'm going to go
9    ahead and introduce those on the record, and
10    we'll mark those Exhibit 8.
11    A.    All right.
12    Q.    And we'll copy those before you
13    leave.
14        Okay. So, you became aware that
15    Ms. Johnson was accusing you of rape when her
16    parents called you to ask you if, in fact,
17    you had raped her, correct?
18    A.    They asked me if I raped they
19    daughter. I mean, and it -- it really took
20    me for a loop.
21    Q.    And prior to the call from her
22    parents, you were completely unaware that she
23    was accusing you of rape?

55 (Pages 214 to 217)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 218

1    A.    Yeah. I mean, I couldn't -- I
2    couldn't -- I mean, how you go from me giving
3    her a sweater and some socks and everything
4    to rape. That just...
5        Q.    Were you ever arrested on those
6    charges?
7        A.    Yeah.
8        Q.    When were you arrested?
9        A.    A year and a half later.
10       Q.    Can you give me a date of your
11   arrest?
12       A.    Maybe sometime in August of
13   2007, 2006. I know it was at least a year
14   and a half later. And then the judge threw
15   the thing out. Thank God.
16       Q.    Okay. I want to get to that.
17       A.    But the detective investigated
18   the case. I submitted to the DNA. I did my
19   very best to cooperate in every way.
20   Montgomery police never arrested me on those
21   charges.
22       Q.    The Montgomery police never
23   arrested you?

Page 219

1        A.    On those charges, no.
2        Q.    Who arrested you?
3        A.    I was actually on my way, as a
4    matter of fact, getting ready to come to
5    Montgomery, and I was stopped for speeding.
6        Q.    Uh-huh (affirmative).
7        A.    Birmingham police. They said I
8    had a warrant because of a Grand Jury
9    indictment.
10          So, they held me. I had to wait
11   until Montgomery came and picked me up. I
12   couldn't make no phone calls, none of that.
13   Couldn't eat. None of that. Until I got
14   back here to Montgomery.
15          I had no idea. As a matter of
16   fact, one of the first calls I made was to
17   the detective at Montgomery police that
18   investigated the case because I had been in
19   communications with her the entire time. She
20   was even surprised.
21       Q.    The Birmingham Police Department
22   informed you that the Grand Jury had issued
23   an indictment against you?

Page 220

1        A.    Correct.
2        Q.    And that they -- they told you
3    that there was a warrant for your arrest
4    because of that indictment, correct?
5        A.    That's correct.
6        Q.    And you subsequently appeared
7    before a judge on those charges?
8        A.    Yeah, yeah, yeah.
9        Q.    Do you remember when that was?
10       A.    It was in February when the
11   final disposition was made, February of 2007.
12       Q.    And is February 2007 the first
13   time you appeared before a judge?
14       A.    That was the first time. I
15   think -- the only court appearance I had
16   prior to that was to determine whether or not
17   I was going to hire an attorney or have a
18   court-appointed attorney. Other than that, I
19   hadn't been before the judge.
20       Q.    So, other than your initial
21   appearance --
22       A.    Right.
23       Q.    -- you went to court once?

Page 221

1        A.    As a matter of fact, I think
2    that was case management or something like
3    that.
4           MR. MADISON: Answer to her.
5        Q.    (By Ms. Meadows) He can't
6    answer the question for you.
7        A.    Oh, okay. Say that again.
8        Q.    So, other than your initial
9    appearance where you took care of issues like
10   whether you were going to retain your own
11   counsel or have someone appointed and some
12   other preliminary --
13       A.    Right.
14       Q.    -- administrative type matters
15   --
16       A.    That was the only time prior to
17   the February date I had even been in court.
18       Q.    Do you remember who your judge
19   was in February?
20       A.    Judge Hardwick.
21       Q.    Judge Hardwick?
22       A.    Uh-huh (affirmative).
23       Q.    And that was not a trial, was

56 (Pages 218 to 221)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 222

1  it?
2      A.    No.
3      Q.    That was a pretrial motion --
4      A.    Correct.
5      Q.    -- hearing?
6            And it was dismissed at that
7  time by Judge Hardwick?
8      A.    Yeah.  And that was -- continue.
9      Q.    Oh, I thought you were getting
10  ready to say something else.
11     A.    No.
12           (Whereupon, said document was
13           marked for identification as
14           Exhibit No. 9 to the deposition
15           of Anwar K. Diop.)
16     Q.    I'm going to show you Exhibit 9.
17  Do you recall receiving a copy of this
18  letter?
19     A.    Yes.
20     Q.    And is this a letter giving you
21  notice that Ms. Johnson filed a charge of
22  sexual harassment against you at Alabama
23  State?

Page 223

1      A.    Yes.
2      Q.    And this letter advises that a
3  committee is going to conduct an
4  investigation into her allegations, correct?
5      A.    Uh-huh (affirmative).
6            MR. MADISON:  Was that a yes?
7  Was that yes?
8            THE WITNESS:  Yes.
9            (Whereupon, said document was
10           marked for identification as
11           Exhibit No. 10 to the deposition
12           of Anwar K. Diop.)
13     Q.    (By Ms. Meadows)  Okay.  I want
14  you to take a look at Exhibit 10.  This
15  letter is also dated February 11, 2005,
16  correct?
17     A.    Yes, it is.
18     Q.    And does this letter request to
19  set up a meeting with you to discuss the
20  complaint filed by Ms. Johnson?
21     A.    Yes.
22     Q.    Do you recall attending that
23  meeting?

Page 224

1      A.    Yes.
2      Q.    And do you recall that during
3  that meeting Mr. Wesley was present?
4      A.    Mr. Wesley, yes.
5      Q.    And was Ms. Rudolph present?
6      A.    Yes.
7      Q.    And Ms. Brown?
8      A.    I don't really -- I can't really
9  -- I don't really recall Ms. Brown, but I do
10  remember Ms. Rudolph being present.
11     Q.    And you were also present?
12     A.    Yes.
13           (Whereupon, said document was
14           marked for identification as
15           Exhibit No. 11 to the deposition
16           of Anwar K. Diop.)
17     Q.    Okay.  I'm going to show you
18  Exhibit No. 11.  Although you don't recall
19  Ms. Brown being present, do you have any
20  reason to believe that Ms. Brown was not
21  present?
22     A.    I would have -- I would have --
23  I don't know.  I just cannot picture her

Page 225

1  being there.  I mean, I could be wrong.  I
2  just don't picture her being there, and I'm
3  -- I don't know.  I just -- I just don't
4  remember Ms. Brown being there.
5      Q.    Are you certain that Ms. Brown
6  was not there?
7      A.    No, I'm not.
8      Q.    So, if --
9      A.    I'm not.  I mean -- well, I
10  mean, I'm not -- if it says she was there,
11  she was there.
12     Q.    Okay.  Because that's what I'm
13  getting to.  If the notes taken at that
14  meeting reflect that Ms. Brown was present,
15  do you have any reason to believe that those
16  notes are inaccurate?
17     A.    No.  I just -- no, no, no.  I
18  just don't -- I just don't picture Ms. Brown
19  being there.  I can almost see myself sitting
20  at that table, and I really don't picture --
21  I don't remember Ms. Brown being there.
22           But I don't dispute it.  If the
23  notes say she was there, she was there.

57 (Pages 222 to 225)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 226

1    Q.    And like you said, you did
2  attend this meeting on the 11th?
3    A.    I did.
4    Q.    At about 4:00 o'clock that
5  afternoon?
6    A.    I did.
7    Q.    And during that meeting, you
8  discussed with Mr. Wesley, the Alabama State
9  University investigation process, correct?
10   A.    Which I was totally misinformed.
11   Q.    Tell me what you were told about
12  the investigation process in that meeting.
13   A.    That it was a committee that
14  would be established to investigate her
15  accusations, that this process was taken
16  seriously and that false accusations would
17  not be condoned, that it was not an
18  adversarial process, no attorneys would be
19  allowed, that it was a fact-finding
20  proceeding.
21   Q.    And which of those statements
22  were inaccurate?
23   A.    That it was a nonadversarial

Page 227

1  process, that it -- I was led to believe that
2  it had no real significant legal impact as
3  far as my employment is concerned.
4    Q.    Who told you that it would not
5  have any impact on your employment?
6    A.    Mr. Wesley. Otherwise, I would
7  have came with an attorney.
8    Q.    Mr. Wesley told you that the --
9    A.    He told me that this was purely
10  a fact-finding procedure, that it was
11  nonadversarial and it was an effort to either
12  validate or disvalidate the accusation made
13  by the student.
14   Q.    You stated --
15   A.    And that was just not correct.
16   Q.    You stated that if you had
17  known, you would have had your attorney
18  present?
19   A.    Absolutely.
20   Q.    Okay. So --
21   A.    Considering the repercussions.
22   Q.    Were you told then that you
23  could have an attorney?

Page 228

1    A.    I was told that I could not.
2    Q.    Were you --
3    A.    And it specifically -- it even
4  states that in the handbook.
5    Q.    Were you -- following that
6  meeting, did you review the handbook to
7  determine what the -- did you review the
8  handbook? Did you review the sexual
9  harassment policy?
10   A.    Yeah. Yes.
11   Q.    And after you reviewed the
12  policy, you believed that the EEO
13  investigation would not have any impact on
14  your employment status?
15   A.    Well, first I all, I knew the
16  EEOC committee would not come with the fact
17  finding to validate her accusation because I
18  knew it was utterly false.
19         Okay. Secondly, I thought that
20  the process would be fair and impartial and
21  that we would be similarly situated. And I
22  also felt that the University would
23  diligently pursue a false accusation as they

Page 229

1  did the initial accusation itself.
2    Q.    Okay.
3    A.    Which they did not?
4    Q.    So, your belief that the results
5  of the investigation would have no bearing on
6  your job was based upon your belief in the
7  falsity of the accusations?
8    A.    As well as the information that
9  I received from Mr. Wesley and the
10  information that I received from Dr. Frazier.
11   Q.    And you stated that after you
12  talked with them, you reviewed the policy?
13   A.    I reviewed -- I reviewed the
14  policy. And it said that false -- I mean,
15  accusations or if it was valid, that it would
16  be dealt with.
17         However, even when you deal with
18  the disciplinary actions that would result,
19  it's far short of what was done with me.
20   Q.    Okay. Is it your contention --
21   A.    And the committee came out and
22  said that they found no documentary evidence
23  to support her claim.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 230

```
1     Q.    Okay.
2     A.    Not some, a little.  They said
3  they found no evidence to support Ms.
4  Johnson's claim.
5     Q.    Okay.  What I'm directing your
6  attention to now is solely the policy.
7     A.    Okay.
8     Q.    We're not at the state of what
9  facts were found or not found.
10    A.    Okay.
11    Q.    I am asking you, based on the
12 policy, is it your contention that Alabama
13 State University cannot terminate an employee
14 for sexual harassment?
15          MR. MADISON:  Object to the
16 form.
17          THE WITNESS:  If I'm not
18 mistaken, for sexual harassment if there is
19 an offense, there are disciplinary actions.
20 I don't think it says terminable.
21    Q.    (By Ms. Meadows)  Are you saying
22 that you cannot be terminated for sexual
23 harassment?
```

Page 231

```
1     A.    There is guidelines for
2  disciplinary actions, and termination is not
3  one of those.
4     Q.    And you're saying that
5  termination is not a disciplinary action for
6  sexual harassment under the policy?
7     A.    Not --
8          MR. MADISON:  Object to the
9  form.  Go ahead.
10         THE WITNESS:  Not -- according
11 to what I read, no.
12    Q.    (By Ms. Meadows)  Okay.  I want
13 you to pick up Exhibit 5.
14    A.    And I hope -- is this the whole
15 book, too, by the way?
16    Q.    No, that's not the whole book.
17    A.    Now, what page am I --
18    Q.    Sixty-two.
19    A.    Well, we need to whole book in
20 here, don't we?
21         Okay.  What do you want me to
22 read?
23    Q.    I want you to read Section 6.5.
```

Page 232

```
1     A.    Okay.
2     Q.    And just read that first
3  paragraph.
4     A.    Hold up.  Hold on.
5          And will not hesitate to impose
6  the maximum sanction where warranted.
7  Deliberate false accusation of sexual
8  harassment will not be condoned and may
9  result in disciplinary action being taken
10 against anyone who knowingly makes a false
11 report.
12    Q.    Now --
13    A.    Now, that's 6.5.
14    Q.    -- based upon what you just
15 read, can an employee be dismissed for sexual
16 harassment under this policy?
17    A.    It says that it will not
18 hesitate sanction of dismissal where
19 warranted, meaning there are --
20    Q.    Okay.
21    A.    There is a subjective area
22 there.
23    Q.    And I want you to -- exactly.  I
```

Page 233

```
1  want you to answer my question.
2     A.    Okay.  Yeah.
3     Q.    Can an employee --
4     A.    Yes, yes, yes.
5     Q.    -- be terminated --
6     A.    Yes.
7     Q.    -- for sexual harassment?
8     A.    Yes.
9     Q.    So, when you read this, it did
10 not provide you with notice that if the
11 committee believed Ms. Johnson, you could be
12 in jeopardy of losing your job?
13         MR. MADISON:  Object to the
14 form.
15         THE WITNESS:  If the committee
16 believed her?
17    Q.    (By Ms. Meadows)  Right.
18    A.    I guess, yes.  But I guess I
19 specifically focused on the following
20 sentence.
21    Q.    And I understand that you
22 focused on --
23    A.    I really did.
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 234

1   Q.   -- your belief that she was
2   making a false accusation, but --
3       A.   But I knew she was lying.
4       Q.   -- that's not what I'm asking
5   you here.
6           MR. MADISON: Let her finish.
7       Q.   (By Ms. Meadows) What I am
8   asking you here is when you received this
9   notice, you were told this was serious?
10      A.   I was told that this initial
11  proceeding was fact-finding and that it was
12  intended to validate or disvalidate her
13  claim.
14      Q.   Okay.
15      A.   Now, my understanding was that
16  should her accusation had been correct, there
17  would have been some other proceeding that
18  would have followed. That just was my false
19  understanding.
20      Q.   That was your understanding?
21      A.   Right. And I was wrong.
22      Q.   And I want you to turn back to
23  Exhibit No. 9, which is your notice of

Page 235

1   allegations.
2       A.   Exhibit 9?
3       Q.   Exhibit 9.
4       A.   Which one is that?
5       Q.   It is the letter dated February
6   11th that is a couple of paragraphs long that
7   let's you know that an allegation of
8   harassment has been filed against you.
9       A.   Right. Yeah.
10      Q.   That second paragraph of Exhibit
11  9 states a committee will be formed to
12  conduct the investigation in accordance with
13  current policy. The committee will contact
14  you shortly. Every effort will be made to
15  conduct the investigation, compile the
16  findings and make recommendations to the
17  President as expeditiously as possible.
18      A.   Okay.
19      Q.   Now, based upon this --
20      A.   And that's -- that what I
21  thought. He said that it would be a
22  proceeding to determine facts or substantiate
23  them or not and then inform the President as

Page 236

1   to what their conclusions were.
2       Q.   Right.
3       A.   And that -- and that -- and I
4   had no problems with that.
5       Q.   And you didn't understand that
6   the recommendations that the committee would
7   make to the President would impact
8   potentially your future employment with the
9   University?
10      A.   No, I didn't. I just didn't.
11      Q.   Okay. This letter --
12      A.   I mean, maybe it was stupid on
13  my part because I really shouldn't have went
14  in there without an attorney in the first
15  place.
16      Q.   This letter also directs you to
17  Paragraph 6.5 of the handbook, correct?
18      A.   Uh-huh (affirmative).
19      Q.   Which we reviewed. But I want
20  you to turn over to Page 64, which is the
21  continuation of Section 6.5.3, investigating
22  reported incidents of sexual harassment.
23      A.   Okay.

Page 237

1       Q.   Read to yourself that paragraph.
2   It's at the top of the page.
3       A.   Now, technically -- well, okay.
4       Q.   Okay. Now, this paragraph
5   clearly speaks about the committee making
6   recommendations to the President, correct?
7       A.   And their policies by which you
8   can disagree.
9       Q.   We're going to get to that. And
10  it says here the President can approve or
11  disapprove the committee's decision --
12  recommendation, correct?
13      A.   Recommendation.
14      Q.   And it clearly talks about a
15  sanction being imposed by the President,
16  correct? Was that a yes?
17      A.   Yeah.
18      Q.   And a sanction -- a sanction in
19  my mind involves potential negative
20  consequences. Would you agree with that?
21      A.   Right.
22      Q.   And in an employee handbook the
23  word sanction to me would mean the potential

60 (Pages 234 to 237)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 238

1  for an adverse employment action. Do you --
2      A.   Possibly.
3      Q.   Do you agree that that's
4  possible?
5      A.   Yes.
6      Q.   And it says that if you are an
7  employee of the proper classification, you
8  may appeal, correct?
9      A.   Correct.
10      Q.   But if you are an employee of a
11  classification that does not have the right
12  to an appeal, you won't be able to appeal,
13  correct?
14          MR. MADISON: Object to the
15  form.
16      Q.   (By Ms. Meadows) Am I correct?
17      A.   That's correct.
18      Q.   All right. So, if you're an
19  employee who is not otherwise entitled to an
20  appeal, you don't get an appeal, correct?
21      A.   Correct.
22      Q.   So, we had gotten through
23  February 11th where you received notice of

Page 239

1  the appeal.
2          (Whereupon, said document was
3          marked for identification as
4          Exhibit No. 12 to the deposition
5          of Anwar K. Diop.)
6      Q.   Do you recall getting Exhibit
7  12, which is a notice of suspension with pay?
8      A.   Yeah.
9      Q.   And you received this on or
10  about February the 25th?
11      A.   Yes.
12      Q.   Is that a yes?
13      A.   Yes. As a matter of fact,
14  that's probably -- the week about that letter
15  would have been around the same -- would have
16  been around that same time frame.
17      Q.   That's what I want to know.
18      A.   Yeah.
19      Q.   So, around -- sometime in
20  February --
21      A.   Yeah.
22      Q.   -- is when the brother made the
23  accusation?

Page 240

1      A.   Yes. It would have been in that
2  same -- within the same week or so.
3      Q.   And he made the accusation that
4  you had assaulted him?
5      A.   Uh-huh (affirmative).
6      Q.   Is that a yes?
7      A.   Yes, ma'am.
8      Q.   And during that same time
9  sometime in mid to late February, you also
10  made a police report with University police
11  about this same incident?
12      A.   Yes.
13      Q.   Do you know who signed the
14  letter accusing you of assaulting the
15  brother?
16      A.   Well, I mean, it was alleged to
17  be a letter that he wrote.
18      Q.   Okay.
19      A.   But the reason that it was
20  disvalidated is because he got his own gender
21  incorrect.
22      Q.   What exactly did the letter say
23  as far as you recall?

Page 241

1      A.   It says I'm the sister of
2  Jalonda Johnson. And then he went on to
3  describe the incident in my office. And had
4  there not been that one error.
5      Q.   Now, even though this letter --
6  this notice that is Exhibit 12 states that
7  you are suspended pending the conclusion of
8  the investigation, you actually returned to
9  work prior to the investigation being
10  concluded, correct?
11      A.   Correct. A week or two,
12  something like that. But I was put -- given
13  some other duties as well.
14      Q.   When you returned to work, would
15  you say that it was somewhere around March
16  the 18th?
17      A.   Quite possible. It was two
18  months or so -- two months before.
19          (Whereupon, said document was
20          marked for identification as
21          Exhibit No. 13 to the deposition
22          of Anwar K. Diop.)
23      Q.   Okay. And when you returned to

61 (Pages 238 to 241)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 242

1  work, according to Exhibit 13, which is a
2  notice of temporary reassignment, you were
3  relocated to the Southern Normal campus in
4  Brewton, correct?
5      A.    Uh-huh (affirmative).
6      Q.    And did you continue to work at
7  Brewton until the conclusion of the
8  investigation?
9      A.    Yeah.
10     Q.    Okay. So --
11     A.    Really, it was probably a month
12  later.
13     Q.    Brewton was what? I'm sorry.
14     A.    I probably even -- probably even
15  -- weeks -- I worked weeks after the
16  investigation was concluded.
17     Q.    So, you worked at Brewton from
18  sometime around March the 18th up until --
19     A.    Until May, yeah.
20     Q.    Okay. Up until your
21  termination, correct?
22     A.    (Whereupon, the witness
23  indicated an affirmative response by nodding

Page 243

1  his head up and down.)
2      Q.    Is that a yes?
3      A.    Yes, ma'am.
4      Q.    And did you not return to your
5  duties on the Alabama State University campus
6  following your reassignment to the Brewton
7  campus?
8      A.    No, no. I mean, I used my
9  office from time to time.
10     Q.    When would you go to your
11  office?
12     A.    Whenever I had to deal with
13  reports and things like that on the main
14  campus.
15     Q.    Did you go to your office during
16  the regular workday?
17     A.    Yeah.
18     Q.    Did you see Mrs. Linda Johnson
19  while you were there?
20     A.    I don't recall. Maybe once or
21  twice. I know maybe once I did.
22     Q.    Did you have any interaction
23  with her when you saw her?

Page 244

1      A.    I asked her why. I asked her
2  why they would lie like that.
3      Q.    And what was her response?
4      A.    She said she believed her
5  daughter.
6      Q.    Did she say anything else?
7      A.    I don't recall. You know, she
8  wanted me to talk to her.
9      Q.    And did you talk to her?
10     A.    I mean, it was really hard to
11  talk to her, you know. I couldn't -- what
12  was I going to say to her?
13     Q.    Okay.
14     A.    You know, I told her, you know,
15  that I couldn't understand how they could do
16  that, you know. I've never treated any of
17  them, you know, in any kind of negative way.
18  And I just -- I just couldn't understand it.
19  I mean, I just -- that hurt me. I couldn't
20  understand it.
21     Q.    Okay.
22     A.    I still can't understand it.
23     Q.    How would you describe your

Page 245

1  relationship with Linda Johnson prior to
2  January 31st, 2005?
3      A.    I mean, I thought she was nice.
4  I know she came -- I know now that she came
5  and she misrepresented a lot of things to me,
6  and I think that she intentionally tried to
7  get close to me.
8      Q.    What specific things did she
9  misrepresent to you?
10     A.    Well, she informed me that she
11  was the assistant to the previous director.
12  That was not true.
13          She knew that I got a great deal
14  of hostility, I was getting no real support
15  and assistance with that job, and she came to
16  me as a person that would -- could help and
17  would be willing to help me in any way that
18  she can, way that she could.
19          And she -- and it just -- it
20  just wasn't true.
21     Q.    Okay.
22     A.    And that's one of the reasons
23  why my posture with her was -- was cordial,

62 (Pages 242 to 245)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 246

1  you know. I really thought she was nice. I
2  mean, I thought her efforts were genuine, but
3  it wasn't.
4      Q.    Did she misrepresent anything
5  else to you?
6      A.    I mean, I can't think of
7  anything, you know. But there were a few
8  things that just turned out to be not true.
9  I can't specifically...
10     Q.    You can't recall right now
11  specifically?
12     A.    Right.
13     Q.    Were those things related to the
14  job?
15     A.    Yeah. She even ordered some
16  supplies and said that I told her she could
17  order them one time. That's one of the
18  things that kind of alarmed me a little bit.
19          Just in hindsight looking back,
20  it was several things that I should have seen
21  coming.
22     Q.    The committee contacted you
23  prior to scheduling the hearing, correct?

Page 247

1      A.    Yeah. Ms. Brown contacted me.
2      Q.    And you were given advance
3  notice of the date of the hearing?
4      A.    About a week maybe.
5      Q.    And you were, of course, advised
6  that you had the right to be present during
7  the hearing, correct?
8      A.    Well, I thought it was a
9  hearing, but it wasn't really a hearing.
10     Q.    Right. It's more of an informal
11  investigation, correct?
12     A.    Right, which is what -- which,
13  you know, is why I guess I kind of didn't see
14  it as being -- I don't know. I just didn't
15  -- my understanding and the way I should have
16  regarded that whole proceeding should have
17  been totally different than what it was.
18          Because I never even got an
19  opportunity to, first of all, see the
20  accusation that she made even though I
21  requested it two or three times. I never got
22  an opportunity to question her.
23          Okay. I never even got an

Page 248

1  opportunity to be privy to any of the
2  questions and answers that were given by
3  anyone other than myself.
4      Q.    Okay.
5      A.    And I just -- that just seemed
6  like a very one-sided proceeding. Nor was I
7  allowed to have -- I wasn't even allowed to
8  call any witnesses.
9      Q.    You were not allowed to call
10  witnesses?
11     A.    No.
12     Q.    Who told you that you were not
13  allowed to call witnesses?
14     A.    I made the request with Mr.
15  Wesley.
16     Q.    You made a request for
17  witnesses?
18     A.    Yeah. And I even provided
19  names.
20     Q.    Did you give him a written
21  request for witnesses?
22     A.    Yes.
23     Q.    Who did you request to be your

Page 249

1  witnesses?
2      A.    One, I wanted Mrs. Johnson's
3  boss. I wanted the three people who were
4  present in my office that witnessed Jalonda
5  but into my office during a meeting. I
6  wanted the assistant to me during that time
7  who could attest to some of her sporadic
8  behavior.
9          I wanted the -- Mr. Nichols, who
10  was the night supervisor who was there
11  present when she was in a parking lot sitting
12  in her car at night, you know, when we were
13  meeting and just sitting there in the dark.
14  It was those individuals specifically.
15     Q.    Okay. And --
16     A.    And my neighbor who lived in the
17  same complex who came up with her the evening
18  that she came to my house and who was out
19  there when she left.
20     Q.    And what is the name of that
21  neighbor?
22     A.    Chad is his first name. I don't
23  remember his last name. But it's on record

63 (Pages 246 to 249)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 250

1  because I know -- if I'm not mistaken, I'm
2  pretty sure the detectives talked to him.
3      Q.    You're pretty sure what?
4      A.    That the detectives talked to
5  him.
6      Q.    I'm asking for --
7      A.    But these were people that I
8  requested to come before the committee.
9      Q.    Right.  And you submitted a
10 written request to Mr. Wesley?
11     A.    Yes.
12     Q.    Requesting these witnesses and
13 identifying them by name?
14     A.    Yes.
15     Q.    Do you have a copy of that
16 request you submitted to Mr. Wesley?
17     A.    I'll have to find it.
18     Q.    I'd like a copy of it --
19     A.    But it should be in my personnel
20 file.  But I will do -- I will diligently
21 pursue that letter.
22         MR. MADISON:  And then we'd like
23 to see a copy of the file that all of these

Page 251

1  things that Mrs. Johnson supposedly had in
2  her file.  You know, I think we made a
3  request for production on anything relative
4  to that.
5         THE WITNESS:  I did, and I never
6  --
7         MR. MADISON:  But, anyway --
8         THE WITNESS:  I never received
9  it.
10        MR. MADISON:  -- we'll address
11 that later.
12        THE WITNESS:  But I'll try to
13 find -- I should be able to come up with
14 something.
15     Q.    (By Ms. Meadows)  I'd like a
16 copy of the letter you actually submitted to
17 Dr. Wesley.
18     A.    Okay.  Well, his -- he's not a
19 doctor.
20     Q.    I mean, Mr. Wesley.  You're
21 correct.
22         How did Mr. Wesley inform -- did
23 Mr. Wesley inform you that you would not be

Page 252

1  allowed to call witnesses?
2      A.    No.  They just did not act on
3  it, period.  It was my understanding from Ms.
4  Brown that a few -- a subsequent date would
5  be established for that.  By the time I knew
6  it, the committee had made their -- had made
7  their conclusions.  They did not react on it
8  at all.
9      Q.    So, it's your contention that
10 just no date was ever scheduled for your
11 witnesses?
12     A.    That's correct.
13     Q.    Did you --
14     A.    Nor was I given the opportunity
15 to question my accuser.
16     Q.    Okay.
17     A.    Which the handbook specifically
18 states that I should be given that
19 opportunity.  It also states that I should be
20 given a copy of the accusation that was made.
21         It was never given to me.  As a
22 matter of fact -- as a matter of fact -- and
23 I know -- I will find this information.  When

Page 253

1  I made those requests and I personally took
2  it to Mr. Wesley, I stamped it with their
3  stamp and I wrote on there that he refused to
4  give me this information.  I have that.
5         Now, it's going to take me about
6  a day or so to get it, but I have that.
7      Q.    Okay.
8      A.    But it was an outright refusal
9  to give me my due process.  As a matter of
10 fact, he was even angry.  And I have that.
11 And I even time stamped it with human
12 resources time stamp.
13     Q.    Okay.
14     A.    They was requested.
15     Q.    And you were not present during
16 Jalonda's testimony?
17     A.    No, ma'am.
18     Q.    And you were not present during
19 Mrs. Linda Johnson's testimony?
20     A.    No, ma'am.
21     Q.    And you were not present during
22 Eddie Johnson's testimony?
23     A.    No.

64  (Pages 250 to 253)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 254

1  Q.   Did you present testimony at the
2  hearing?
3  A.   I answered questions.
4  Q.   The committee directed specific
5  questions to you, which you answered?
6  A.   Yes.
7  Q.   Did you submit any documents or
8  anything in your defense at that hearing?
9  A.   Oh, one other person I wanted to
10 have up before the committee was the
11 detective from Montgomery police.
12 Q.   Okay.
13 A.   Any documents that I submitted?
14 Q.   Yes.
15 A.   My phone records. I also asked
16 them to -- she made an accusation -- she made
17 -- she stated that she had the physical and
18 everything at Baptist Hospital. I requested
19 that that be investigated and proved that --
20 nothing became of that as well. I did
21 provide my phone records.
22 Q.   Was there anything else you
23 attempted to present to the committee?

Page 255

1  A.   I don't recall.
2  MR. MADISON: It doesn't sound
3  like it would have mattered too much.
4  THE WITNESS: No.
5  MS. MEADOWS: I'm going to
6  object to you testifying on the record.
7  MR. MADISON: I wasn't
8  testifying. I was making a statement.
9  MS. MEADOWS: And I'm going to
10 object to you making comments, derogatory
11 comments. That's inappropriate, and you know
12 it.
13 MR. MADISON: Well, no, I think
14 it's pretty accurate.
15 MS. MEADOWS: It is
16 inappropriate and conclusory, and you know
17 it.
18 MR. MADISON: I think that it's
19 obvious --
20 MS. MEADOWS: And it is
21 inappropriate in his deposition, and it's
22 going to --
23 MR. MADISON: -- that he wasn't

Page 256

1  provided much due process based upon his
2  testimony.
3  MS. MEADOWS: I don't know that
4  anything is obvious unless you assume he's
5  telling the truth, and I don't have to make
6  that assumption.
7  Q.   Was Jalonda present during your
8  testimony?
9  A.   No.
10 Q.   Did Jalonda ask you any
11 questions?
12 A.   No.
13 Q.   Did any representative for
14 Jalonda ask you any questions?
15 A.   The whole committee was her
16 representative.
17 Q.   Okay. And you say that based
18 upon?
19 A.   The nature of the questions and
20 how they were structured. And the
21 cooperation that I got from those individuals
22 on the committee.
23 Q.   What cooperation did you get

Page 257

1  from individuals on the committee?
2  A.   I didn't.
3  Q.   What did you ask the members of
4  the committee to do?
5  A.   First of all, to have an open
6  mind, to diligently -- you know, to pursue
7  the accusations that were made by Ms.
8  Johnson. I asked them to make this as fair
9  and impartial process as possible, none of
10 which was done. And I say that based upon
11 their conclusion.
12 Q.   And your conclusion about what
13 the committee did or did not do is based
14 solely on the conclusion that they reached,
15 correct?
16 A.   Yes, ma'am.
17 MR. MADISON: Object to the
18 form.
19 THE WITNESS: It's based upon
20 the treatment that I received. It's based
21 upon the cooperation or lack of that I
22 received throughout the process, in addition
23 to the recommendation as opposed to the

65 (Pages 254 to 257)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 258

1  finding of fact.
2         They made a recommendation
3  without finding any basis upon which to base
4  their recommendation. It was just
5  inconsistent.
6     Q.    (By Ms. Meadows) What treatment
7  did you receive from the committee?
8     A.    Very adversarial, very cold.
9  And it was clear that they were reaching for
10  a specific outcome.
11     Q.    I want you to give me a specific
12  example of something they did that mistreated
13  you.
14         MR. MADISON: Other than what
15  he's already testified to?
16         MS. MEADOWS: He hasn't
17  testified to anything specific. I want a
18  specific concrete example of mistreatment.
19         THE WITNESS: Making the
20  determination that there was no evidence to
21  support Ms. Johnson's claim but recommending
22  that I be terminated.
23     Q.    (By Ms. Meadows) Okay. Tell me

Page 259

1  something they did that mistreated you prior
2  to issuing their decision.
3     A.    Ignoring my requests for
4  witnesses and even the opportunity to
5  question my accuser.
6     Q.    You requested --
7     A.    Additionally, providing me
8  copies of the accusations that were made. I
9  made the statement that it's very hard to
10  defend myself against accusations and I don't
11  even know what they are. Basically, all that
12  said is she made an accusation of sexual
13  harassment/rape. That didn't tell me
14  anything.
15     Q.    Okay.
16     A.    Never was I provided it.
17     Q.    Did you at any point become
18  aware of the substance of Ms. Johnson's
19  allegations against you?
20     A.    Long after all of this -- the
21  proceedings and everything was over.
22     Q.    So, it was not until after --
23     A.    Way after.

Page 260

1     Q.    -- the recommendation?
2     A.    Yes. Way after.
3     Q.    And to your knowledge, the
4  committee issued its findings and decision on
5  April the 19th, 2005, correct?
6     A.    As far as I know.
7     Q.    You have no reason to disagree
8  that that's true?
9     A.    No.
10     Q.    And to the best of your
11  knowledge, these recommendations were --
12  their findings and recommendations were
13  conveyed to President Lee, correct?
14     A.    To the best of -- to my
15  knowledge, yes. But from what I -- I mean,
16  they may have in part.
17     Q.    I'm sorry. They may have been
18  in part what?
19     A.    As far as I know, they were, but
20  I do have reason to believe that they
21  weren't.
22     Q.    You have reason to believe that
23  Dr. Lee --

Page 261

1     A.    That they were not.
2     Q.    -- did not receive --
3     A.    That he did not receive the full
4  committee's report.
5     Q.    And you base that upon?
6     A.    The fact that the Board of
7  Trustees had no knowledge.
8     Q.    And how do you know the Board of
9  Trustees had no knowledge of it?
10     A.    Because I specifically asked.
11     Q.    Who did you specifically ask?
12     A.    Judge Wiggins, Catherine Wright.
13  What's the other man's name? It slips me the
14  other's name. But I personally talked with
15  them, and it was their understanding that I
16  had been indicted and charged with the
17  offense and that the committee had all kind
18  of evidence to support -- you know.
19     Q.    And on what date did the Board
20  members convey this information to you?
21     A.    After they refused -- after I
22  wasn't given an opportunity to appeal.
23     Q.    And when was that?

66 (Pages 258 to 261)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 262

1    A.    Probably a few months -- a few
2  months later. Maybe around July or August,
3  something like that.
4    Q.    And they told you that President
5  Lee had not received a copy of the
6  committee's recommendation?
7    A.    It was determined that a lot of
8  information was censored. Now, as to how
9  much, I can't really say.
10   Q.    What I'm asking you is did --
11   A.    No --
12   Q.    -- either or those three --
13   A.    -- they did not say that. They
14 did not say that.
15   Q.    Okay. Let me clarify my
16 question.
17   A.    I said I had reason to believe
18 that he may not have.
19   Q.    Let me clarify my question for
20 the record, please.
21         Did either of those three
22 trustees that you talked with tell you that
23 President Lee did not receive the committee's

Page 263

1  recommendation?
2    A.    No.
3    Q.    Did they tell you that they did
4  not see the committee's recommendation?
5    A.    They weren't privy to that
6  information.
7    Q.    They weren't privy to what?
8    A.    All they know is that I was
9  terminated, but it's my understanding that
10 the details of that were not --
11   Q.    That they did not see the
12 details --
13   A.    Correct.
14   Q.    -- of the recommendation?
15   A.    Correct.
16   Q.    And as we discussed based on the
17 policy, President Lee could either approve or
18 disapprove the committee's recommendation,
19 correct?
20   A.    That's correct.
21   Q.    So, as far as you know, is
22 President Lee obligated to accept the
23 committee's recommendation?

Page 264

1    A.    No.
2    Q.    President Lee approved your
3  termination on May 5th, 2005, correct?
4    A.    Correct.
5         MR. MADISON: Can we take
6  another break?
7         MS. MEADOWS: I really would
8  like to get through this little section if I
9  could.
10        THE WITNESS: Are we done after
11 that?
12        MR. MADISON: Well, I really
13 would like to go to the restroom, too.
14        MS. MEADOWS: Can I -- well, let
15 me introduce this document --
16        MR. MADISON: All right. Go
17 ahead.
18        MS. MEADOWS: -- and then we
19 will be done with this little section, and we
20 can take a break. This will be Exhibit 14.
21        (Whereupon, said document was
22        marked for identification as
23        Exhibit No. 14 to the deposition

Page 265

1  of Anwar K. Diop.)
2    Q.    Is this the notice of
3  termination that you received?
4    A.    Yeah.
5    Q.    Okay.
6    A.    But you know this is a
7  contradiction from the handbook, too. My
8  letter shouldn't come from human resources.
9  It's supposed to --
10   Q.    But this is the letter that you
11 received, correct?
12   A.    Yeah.
13   Q.    When did you receive this
14 letter?
15   A.    I picked it up from Dr. Frazier
16 that Monday, if the 6th is on a Monday.
17   Q.    Okay. The 6th was on a Friday,
18 but if I tell you that --
19   A.    I picked it up Monday.
20   Q.    That Monday was May 9th.
21   A.    That's when I picked it up.
22   Q.    And this notice informed you
23 that you were being terminated as a result of

67 (Pages 262 to 265)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 266

1  the investigation of the allegations made by
2  Jalonda Johnson, correct?
3      A.   That's correct.
4      Q.   And based upon this notice, is
5  it your understanding that you were being
6  terminated for disciplinary reasons?
7      A.   I was being terminated for
8  sexual harassment/rape, which is what it says
9  in this letter.
10     Q.   And is it your understanding
11 that that was a disciplinary action?
12     A.   It was -- that's what it says.
13     Q.   Right. I'm just asking you.
14 You were --
15     A.   And it says that I was
16 terminated for a charge that the committee
17 itself specifically stated that they found no
18 evidence to support.
19     Q.   Based upon this, it says that
20 you are being terminated for sexual
21 harassment and rape, correct?
22     A.   Correct.
23     Q.   Which is a disciplinary reason

Page 267

1  for your termination, correct?
2      A.   Yeah. They're saying the
3  committee's findings and recommendations
4  regarding sexual harassment and rape.
5      Q.   Right.
6      A.   And that the President has
7  approved termination of my contract as a
8  result of that.
9      Q.   And it states that the effective
10 date of your termination is what?
11     A.   July --
12     Q.   It is May 6th, 2005, correct?
13     A.   Right, right. Correct.
14     Q.   And it states that you will be
15 paid through June 6th, 2005, correct?
16     A.   Correct.
17     Q.   Giving you four weeks advance
18 pay --
19     A.   Right.
20     Q.   -- correct?
21     A.   More or less.
22     Q.   More or less four weeks of pay?
23     A.   It's some -- it's some kind of

Page 268

1  reason that that was done. I forgot what it
2  was.
3      Q.   Right. That's because your
4  termination was made effective immediately,
5  correct?
6      A.   Correct.
7      Q.   And you were not given --
8      A.   Instead of giving the notice,
9  right.
10     Q.   Right.
11     A.   There you go. That's what it
12 was.
13     Q.   You were not given advance
14 notice of termination?
15     A.   So, that -- that made up for the
16 advance notice, the fact that they kept me on
17 the payroll 30 more days.
18         MS. MEADOWS: Okay. We will
19 take a break.
20         (Whereupon, the taking of the
21 deposition was recessed from approximately
22 5:14 p.m. to approximately 5:25 p.m., after
23 which the following proceedings were had and

Page 269

1  done:)
2          (Whereupon, said document was
3          marked for identification as
4          Exhibit No. 8 to the deposition
5          of Anwar K. Diop.)
6      Q.   Now, Mr. Diop, at one point
7  during this you were represented by Mr.
8  Julian McPhillips, correct?
9      A.   Uh-huh (affirmative).
10     Q.   Is that a yes?
11     A.   Yes.
12     Q.   And Mr. McPhillips is an
13 attorney here in Montgomery, correct?
14     A.   Yes.
15     Q.   And Mr. McPhillips submitted on
16 your behalf an appeal dated May 13th, 2005?
17     A.   Yes.
18     Q.   Is that correct?
19     A.   Uh-huh (affirmative). Yes.
20         MS. MEADOWS: Okay. I'm going
21 to mark this notice of appeal as Exhibit 15.
22         (Whereupon, said document was
23         marked for identification as

68 (Pages 266 to 269)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 270

1      Exhibit No. 15 to the deposition
2      of Anwar K. Diop.)
3      Q.    Does this look like the request
4  that you submitted for consideration to the
5  Board of Trustees?
6      A.    Yes.
7            Yeah.  That brings another
8  issue.  She wasn't even a student.
9            MS. MEADOWS: I'm going to
10 submit to you what I'm going to have marked
11 as Exhibit 16.
12           (Whereupon, said document was
13           marked for identification as
14           Exhibit No. 16 to the deposition
15           of Anwar K. Diop.)
16     Q.    Does Exhibit 16 appear to you to
17 be a letter dated June 22nd, 2005, from
18 Attorney Fred D. Gray to Mr. McPhillips?
19     A.    Uh-huh (affirmative).
20     Q.    Is that a yes?
21     A.    Yes.
22     Q.    And is this letter regarding
23 your appeal to the Board of Trustees?

Page 271

1      A.    Yes.
2      Q.    And according to this letter,
3  does it say that your appeal was submitted to
4  the Board Of Trustees at the June 16th
5  meeting?
6      A.    Yeah.
7      Q.    Does it also say that after due
8  consideration of the appeal, the Board
9  sustained the action of the President?
10     A.    Yeah.
11     Q.    So, that means that your
12 termination was upheld, correct?
13     A.    Yes.
14     Q.    And your appeal was denied?
15     A.    Yes.
16     Q.    And to your knowledge -- well,
17 did Mr. McPhillips convey the contents of
18 that letter to you?
19     A.    Yeah.
20     Q.    And he acknowledged that he
21 received that letter shortly after it's
22 dated?
23     A.    Yes.

Page 272

1      Q.    Do you remember when Mr.
2  McPhillips told you that your appeal had been
3  denied?
4      A.    I don't remember the exact day,
5  no.
6      Q.    Do you have any reason to
7  dispute that he told you it was denied
8  sometime in June of 2005?
9      A.    No.
10           (Whereupon, said document was
11           marked for identification as
12           Exhibit No. 17 to the deposition
13           of Anwar K. Diop.)
14     Q.    Okay.  I'm going to show you
15 Exhibit 17.  Have you seen this document
16 before?
17     A.    Okay.
18     Q.    Have you seen the document
19 before?
20     A.    Yes, I think I have.
21     Q.    Okay.  Does this letter appear
22 to be a request for reconsideration by the
23 Board?

Page 273

1      A.    Yeah.
2      Q.    To whom is this letter
3  addressed?
4      A.    Fred Gray.
5      Q.    Go back to our handbook excerpts
6  at Exhibit 5.
7      A.    Okay.  What page is that?
8      Q.    It would be 59.  Here.  You can
9  --
10     A.    I've got it.  Fifty-nine.
11     Q.    Okay.  It is Section 6.3.2,
12 Appeals to the Board of Trustees.
13     A.    Uh-huh (affirmative).
14     Q.    I'm going to let you look at my
15 copy, and I want you to look at the
16 highlighted portion.
17     A.    Okay.
18     Q.    Under this provision the
19 employee is required to notify the President
20 of the University that he wishes to appeal to
21 the Board of Trustees, correct?
22     A.    Which I did personally.
23     Q.    Okay.  We're going to get to

69 (Pages 270 to 273)

Page 274

1  that. But according to this --
2       A.   Uh-huh (affirmative).
3       Q.   -- is that the requirement?
4       A.   Yes, because the President is
5  the secretary of the Board.
6       Q.   Okay. And the notice has to be
7  directed to the President, correct?
8       A.   Uh-huh (affirmative). So,
9  you're saying that's why it wasn't given
10  consideration?
11      Q.   The notice has to be addressed
12  to the President, correct?
13      A.   Yes.
14      Q.   To whom --
15      A.   Fred Gray.
16      Q.   -- is the August 25th letter
17  addressed?
18      A.   Fred Gray.
19      Q.   And to your knowledge, on August
20  25th, 2005, who was the President of Alabama
21  State University?
22      A.   Joe Lee.
23      Q.   Section 6.3.2 also requires that

Page 275

1  the notice of appeal has to be filed within
2  20 days of the adverse action, correct?
3       A.   And he would forward it to the
4  Board, yes.
5       Q.   And there's a 20-day time period
6  on that?
7       A.   Yes, yes.
8       Q.   You stated earlier that your
9  appeal was -- you received notice that your
10  appeal was denied in June --
11      A.   Yes. Now, can I --
12      Q.   -- of 2005?
13      A.   Can I make a statement as well?
14      Q.   Okay.
15      A.   The committee -- it's 20 days
16  after the termination, not the findings from
17  the committee.
18      Q.   Right.
19      A.   Okay.
20      Q.   I agree with that.
21      A.   All right.
22      Q.   And you received your original
23  notice of termination on May 9th, 2005,

Page 276

1  correct?
2       A.   Uh-huh (affirmative).
3       Q.   And you filed a notice of appeal
4  on May 13th, 2005, correct? That was --
5       A.   The initial appeal.
6       Q.   -- Exhibit 15.
7       A.   Okay.
8       Q.   You received notice that your
9  appeal had been denied on June 23rd, 2005?
10      A.   Okay.
11      Q.   Correct?
12      A.   Did the Board actually meet on
13  June 16th? Yeah. Are you sure?
14      Q.   Did you receive notice that your
15  appeal had been denied on June 23rd?
16      A.   I guess. I guess. If not,
17  shortly after.
18      Q.   June 23rd or some date close --
19      A.   Right.
20      Q.   -- to that?
21      A.   Yes.
22      Q.   Would you agree that there are
23  more than 20 days between June 26th and

Page 277

1  August 25th?
2       A.   Now, this is saying the initial
3  appeal within 20 days.
4       Q.   Okay.
5       A.   It doesn't speak to
6  reconsideration.
7       Q.   Okay. Is there a provision --
8       A.   Now, the reconsideration is what
9  was done on the 25th.
10      Q.   Turn to the provision on appeal
11  to the Board.
12      A.   That was on 25? Page 25, was
13  it?
14          MR. MADISON: Here you go.
15          THE WITNESS: Okay.
16      Q.   (By Ms. Meadows) Is there a
17  provision for reconsideration by the Board?
18      A.   I don't see that it's mentioned
19  here.
20      Q.   So, there is no provision for
21  reconsideration by the Board?
22      A.   This is a provision.
23      Q.   Where is that provision?

70 (Pages 274 to 277)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 278

1    A.    I don't see that it's in here,
2  but I think I do recall seeing it.  It was in
3  the handbook somewhere.
4    Q.    Well, we're going to pause and
5  go off the record and get the remainder of
6  the handbook and you can show me that
7  provision.
8    A.    Well, I mean, I would take me
9  some time to find it.  I would have to go all
10  the way through it, you know.
11    Q.    I've got time.  I'll make time.
12    A.    Well, can I just defer that
13  issue?
14        MR. MADISON:  Well, let her get
15  the handbook.
16        MS. MEADOWS:  No.  That's --
17  that's a question that I want answered today
18  --
19        THE WITNESS:  Okay.
20        MS. MEADOWS:  -- during this
21  deposition.
22        THE WITNESS:  All right.
23        MS. MEADOWS:  We're going off

Page 279

1  the record for a moment, Belinda.
2        (Whereupon, the taking of the
3  deposition was recessed from approximately
4  5:36 p.m. to approximately 5:39 p.m., after
5  which the following proceedings were had and
6  done:)
7        THE WITNESS:  Okay.  What is
8  your question?  What's the question?
9    Q.    (By Ms. Meadows)  You were going
10  to point me to the provision about
11  reconsideration by the Board of Trustees.
12    A.    I don't see it.  But it doesn't
13  say that it's not allowed either.
14    Q.    But there is nothing in there
15  that speaks --
16    A.    And if it was no basis for it,
17  why did they he acknowledge that -- why would
18  it even be given consideration of a response?
19    Q.    Again, I'm asking you the
20  questions today, Mr. Diop.
21    A.    Oh, okay.  You're right.
22    Q.    And my question to you is what
23  provision of the handbook --

Page 280

1    A.    I don't specifically see it.
2    Q.    -- allows you a reconsideration?
3    A.    I don't see that there.  It just
4  seems like it would be a good idea.
5    Q.    On September the 8th, 2005, Mr.
6  McPhillips sends again a request for
7  reconsideration by the Board of Trustees, and
8  on this attempt he addresses it to President
9  Lee, correct?
10    A.    Right.
11        MS. MEADOWS:  Okay.  I want to
12  mark this as Exhibit 18.
13        (Whereupon, said document was
14        marked for identification as
15        Exhibit No. 18 to the deposition
16        of Anwar K. Diop.)
17    Q.    And this is your request to be
18  reheard by the Board of Trustees, correct?
19    A.    Yes.
20        (Whereupon, said document was
21        marked for identification as
22        Exhibit No. 19 to the deposition
23        of Anwar K. Diop.)

Page 281

1    Q.    And I'm now going to show you
2  Exhibit 19.  This is a request for
3  reconsideration that you submitted, correct?
4    A.    Yeah, it's one of them.
5    Q.    And you submitted --
6    A.    I submitted about three or four.
7    Q.    And you submitted this request
8  to --
9    A.    Dr. Lee.
10    Q.    -- President Lee?
11    A.    Uh-huh (affirmative).
12    Q.    Is that a yes?
13    A.    Yes.
14    Q.    At some point did you receive
15  correspondence or -- hold on.  Let me strike
16  that.
17        At some point did you receive
18  notification that the Board had listened to
19  your request for reconsideration and
20  considered it during executive session?
21    A.    No.
22    Q.    You did not receive --
23    A.    No.

71 (Pages 278 to 281)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 282

1    Q.  -- notification that the Board
2  decided not to reverse its June 2005
3  decision?
4    A.  That they decided to reverse it?
5    Q.  That they decided not to reverse
6  the June 2005 decision?
7    A.  That they were upholding the
8  President's termination, is that what you're
9  asking?
10    Now, there is a letter saying
11  that they -- you know --
12    Q.  No.
13    A.  -- that they just did not agree
14  to answer the appeal. The appeal was denied.
15    MS. MEADOWS:  Let's mark this as
16  Exhibit 20.
17    (Whereupon, said document was
18    marked for identification as
19    Exhibit No. 20 to the deposition
20    of Anwar K. Diop.)
21    Q.  Read the second paragraph of --
22  well, first of all, let's identify Exhibit
23  20.

Page 283

1    Exhibit 20 is a letter dated
2  September 30th, 2005, from Julian McPhillips
3  written to Fred Gray; is that correct?
4    A.  Uh-huh (affirmative).
5    Q.  Is that a yes?
6    A.  Yes.
7    Q.  Okay. Please, read paragraph
8  two into the record.
9    A.  As you are aware, the request
10  for reconsideration did not go to the Board
11  of Trustees, which went in the Executive
12  Session, and the Board, as a body acting on
13  your recommendation (from what I've heard),
14  decided not to change its original ruling.
15    It said it did not go to the
16  Board.
17    Q.  Where do you see the word "not"
18  in that sentence?
19    A.  Oh, it said did go. The request
20  for reconsideration did go to the Board of
21  Trustees, which went in the Executive
22  Session, and the Board, as a body acting on
23  your recommendation --

Page 284

1    Well, that right there is -- is
2  not true. That can't be true because all of
3  the Board members are not on the executive
4  committee. So, how would they be privy as a
5  Board as a whole?
6    Q.  Okay. Again, is that what this
7  letter says?
8    A.  It says it went into executive
9  session.
10    Q.  Okay.
11    A.  Okay. Executive session is not
12  a session held -- convened by the full Board.
13    Q.  That is your understanding of
14  what an executive session is?
15    A.  I mean, that's been my -- that's
16  been my understanding when attending the
17  Board meeting --
18    Q.  Okay.
19    A.  -- that when they go into
20  executive session that is for the executive
21  committee. And it's behind closed doors.
22    Q.  So, based upon that statement
23  that they went into executive session, that's

Page 285

1  what leads you to believe that the Board --
2    A.  That it was not a full Board.
3    Q.  -- did not consider your
4  reconsideration?
5    A.  Not a full board. Maybe some
6  board members.
7    Q.  But that is your only basis for
8  saying that, is that you feel that the entire
9  Board did not convene to hear your
10  reconsideration?
11    A.  And when I've attended the Board
12  meeting and it says -- and they announce that
13  the Board is going into executive session,
14  then certain members convene to a private
15  area and it is closed.
16    Now, I mean, I could have
17  misinterpreted it, but that's been my --
18    Q.  That's been your understanding?
19    A.  Right.
20    Q.  And that understanding is what
21  you base your contention that the Board did
22  not reconsider your appeal on?
23    A.  No. My understanding is from my

72 (Pages 282 to 285)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 286

1   conversation with certain Board members that
2   they were not privy to the information that I
3   provided, which would have been the basis for
4   reconsideration.
5        If they weren't privy to that,
6   then what would they be considering?
7        Q.   Okay. Which Board members told
8   you they were not privy to your information?
9        A.   Catherine Wright specifically,
10  who was assistant chair.
11       Q.   Do you have a list of the Board
12  members? If you can give me that, I can tell
13  you specifically.
14       Q.   Somewhere -- well, you know
15  what, the Board has changed since then. So,
16  no, I'm not sure that I do.
17       A.   It wouldn't be --
18       MR. MADISON: Just off your
19  recollection, what do you recall?
20       THE WITNESS: The names?
21       MR. MADISON: Right.
22       THE WITNESS: I know Catherine
23  Wright. I know Wiggins. I know -- but it's

Page 287

1   one other Board member that I specifically
2   talked to.
3        Q.   (By Ms. Meadows) Did you have
4   any conversations with Joe Reed?
5        A.   Joe Lee, no. But I made an
6   attempt to. He never talked to me. I even
7   went to his house.
8        Q.   Did you have any conversations
9   with Chairman Elton Dean regarding this?
10       A.   I wrote him a letter.
11       Q.   No. I mean -- I'm talking about
12  Board members who told you that --
13       A.   I made an attempt to, but he was
14  actually -- actually, he was new to the Board
15  at that time as well. I'm talking about
16  people who were very familiar who had been
17  through this process from the beginning.
18       Q.   Okay. Listen -- my question --
19       A.   No.
20       Q.   Let me finish the question. My
21  question --
22       A.   Those are the only three people,
23  and the one name I cannot recall.

Page 288

1        Q.   And both Ms. Wright and Judge
2   Wiggins and one other Board member, whom you
3   cannot name, told you that they were not
4   present and did not receive -- well, back up,
5   that they did not receive information --
6        A.   They were not privy --
7        Q.   -- about your appeal?
8        A.   -- to all of the information
9   regarding my appeal.
10       Q.   What information --
11       A.   That's what was stated.
12       Q.   -- were they not privy to?
13       A.   Well, just the nature of the
14  whole proceeding itself and the -- you know,
15  what actions had been taken against me up to
16  that time.
17       Q.   Did they say that they did not
18  receive copies of your requests?
19       A.   I can't remember the specific
20  word -- you know, the specific statement as
21  regarding that one fact, but it was implied.
22       Q.   Which facts were they not privy
23  to?

Page 289

1        A.   That they did not receive my
2   information.
3        Q.   What information did they not
4   receive?
5        A.   My letter specifically stating
6   the reasons for my appeal.
7        Q.   Those three trustees told you
8   that they did not receive copies your letter
9   requesting appeal?
10       A.   They did not receive -- the only
11  letter that they actually received was the
12  letter that I mailed to them directly.
13       Q.   Okay. And what letter was that
14  that you mailed to them directly?
15       A.   From one of these appeals.
16       Q.   Would that be the September 18th
17  letter?
18       A.   I'm not sure. It may be.
19       Q.   Okay. And did they receive --
20       A.   Or a subsequent letter. But I
21  know the only letter that they actually
22  received was a letter that I mailed to them
23  directly because the previous attempts they

73 (Pages 286 to 289)

FREEDOM COURT REPORTING

Page 290

1    had not received at all.
2        Q.    And all three of them told you
3    that?
4        A.    Yeah.
5        Q.    And that one you only requested
6    -- that was your final attempt to request a
7    reconsideration, correct?
8        A.    As far as I know. I've done it
9    three or four times.
10       Q.    Do you have --
11       A.    At least to get that derogatory
12   information out of my file and for the record
13   to reflect that the accusation by Ms. Johnson
14   was false.
15       Q.    Do you --
16       A.    Now, I do have copies I'm sure.
17       Q.    That's my next question. You do
18   have copies of those requests?
19       A.    Yes.
20       Q.    On May 5th, 2005, you prepared a
21   document seeking a check request to initiate
22   payment to a local contractor in the Brewton
23   area, correct?

Page 291

1        A.    I'm not sure. I probably -- I
2    mean, I did a lot of stuff like that.
3        Q.    Do you recall processing a
4    request for payment for $28,050?
5        A.    Probably.
6        Q.    Okay. Do you recall indicating
7    that the contractor was being paid for work
8    on the dining hall in the boys dormitory at
9    the Southern Normal campus?
10       A.    The dining hall was probably one
11   aspect of their scope.
12       Q.    And the boys dormitory?
13       A.    The boys. The girls dormitory,
14   too.
15       Q.    Yes.
16       A.    Probably.
17       Q.    Do you remember which contractor
18   you would have done that for?
19       A.    There were several.
20       Q.    There were several different
21   ones?
22       A.    Yes.
23       Q.    Do you remember the identity of

Page 292

1    the contractor who was to do the excavation
2    work and install the handicap rails?
3        A.    No. And I'm not sure that that
4    was even a part of that pay request. As a
5    matter of fact, I'm almost sure it wasn't.
6        Q.    Did you have any invoices for
7    the contractor to substantiate the request
8    for $28,050?
9        A.    Absolutely. That's what the
10   basis of the documentation to support that
11   request was provided.
12       Q.    Where would that documentation
13   have been maintained?
14       A.    Probably in the comptroller's
15   office, fiscal affairs. And, actually, now
16   in the auditor general's office because I've
17   actually been called to the auditor general's
18   office about several things like that
19   specifically.
20       Q.    Okay. You have stated to other
21   sources that on May 11, 2005, you accompanied
22   the contractor in question to the bank to
23   cash that check. Do you recall making that

Page 293

1    statement to anyone?
2        A.    One of the contractors.
3             MR. MADISON: Object to the
4    form.
5        Q.    (By Ms. Meadows) Which
6    contractor was that?
7        A.    Maintenance Alternative, I
8    think. And one of the reasons was because we
9    had to wire some money to Brewton.
10       Q.    When did you wire the money to
11   Brewton?
12       A.    I don't know, but --
13            MR. MADISON: Object to the
14   form. I don't think he would have wired the
15   money. Alabama State would have wired the
16   money.
17            THE WITNESS: There is a -- the
18   auditor has a copy of the wire.
19       Q.    (By Ms. Meadows) Okay. And
20   this was on May 11, 2005, that the check was
21   cashed, correct?
22       A.    Something like that.
23       Q.    And you previously stated that

74  (Pages 290 to 293)

17249641-2df0-4c36-b999-32292148c606

Page 294

1   you gave the contractor who accompanied you
2   to the bank $12,000 of the money from the
3   check, correct?
4       A.   I don't know all of the
5   disbursements, but there is documentation for
6   it.
7       Q.   Is there documentation for what
8   you did with the remaining $16,050?
9       A.   It's documentation for every
10  penny.
11      Q.   Where would this documentation
12  be located?
13      A.   It should be attached to the
14  check request.
15      Q.   And if there is no documentation
16  attached to the check request, is there a
17  reason --
18      A.   Well, the auditors --
19          MR. MADISON:  I'm going to
20  object to the form.
21          Number one, I'm going to
22  instruct you not to answer any further
23  questions if there is an implication of some

Page 295

1   wrongdoing because we don't have any
2   documentation that you're referring to to
3   provide him to review to answer your
4   questions.
5          And, secondly, if there is an
6   investigation occurring right now which may
7   involve allegations of wrongdoing by Mr.
8   Diop, then I'm going to instruct him not to
9   answer any further questions regarding that
10  issue.
11          MS. MEADOWS:  Okay.  Are you
12  instructing him unconditionally or
13  conditionally?
14          MR. MADISON:  I'm instructing
15  him unconditionally.
16          MS. MEADOWS:  Okay.  I just
17  needed to clarify that.
18      Q.   Mr. Diop, are you going to take
19  your --
20          MR. MADISON:  And, furthermore,
21  I'll state that it's not relevant to these
22  proceedings because it had no basis or
23  relevance to the charges assessed against him

Page 296

1   for which he was terminated.
2       Q.   (By Ms. Meadows)  Mr. Diop, are
3   you going to accept your attorney's advice
4   and not answer questions regarding this
5   transaction?
6       A.   Absolutely.
7       Q.   Okay.  Can you identify for me
8   Paul Gray?
9       A.   Paul Gray.
10          MR. MADISON:  If that has
11  anything to do with these invoices, then I'm
12  going to instruct you not to answer any
13  further questions along those lines.
14          MS. MEADOWS:  John, I actually,
15  unlike some people, do adhere to an
16  attorney's decision not to question on that
17  line, and I have moved on.
18          MR. MADISON:  Okay.
19          MS. MEADOWS:  I have a totally
20  unrelated reason for asking him who Paul Gray
21  is.
22      Q.   Have you ever heard of Paul
23  Gray?

Page 297

1       A.   Not to my knowledge.
2       Q.   To your knowledge, is there any
3   reason he would be associated with the same
4   Social Security number as yourself?
5       A.   No.
6       Q.   You said that you attempted to
7   contact Trustee Joe Reed regarding this
8   matter?
9       A.   I never -- I never stated that.
10  I never stated that I tried to contact Joe
11  Reed.
12      Q.   I thought you told me earlier --
13      A.   Joe Lee.
14          MR. MADISON:  Joe Lee.
15      Q.   (By Ms. Meadows)  Oh, President
16  Lee?
17      A.   Yes.
18      Q.   Okay.  My question to you
19  earlier was did you attempt to contact
20  Trustee Joe Reed regarding your appeal
21  situation.
22      A.   Oh.  I may have -- I might have
23  sent him a letter.  I may have sent him the

75 (Pages 294 to 297)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 298

1  same letter that I sent to all of the other
2  Board members.
3      Q.    And other than attempting to
4  contact him like you did the other Board
5  members, you didn't have any contact with Joe
6  Reed?
7      A.    Not regarding this.
8      Q.    Do you have any personal
9  relationship with Joe Reed?
10     A.    No.
11     Q.    And you're not related to him in
12 any way?
13     A.    No.
14         MS. MEADOWS:  Okay.  I think I'm
15 done with my examination.
16 EXAMINATION BY MR. MADISON:
17     Q.    First of all, the handbook,
18 employee handbook, sets out provisions at
19 Pages 55, 56, 57 through 59 involving the
20 process that Alabama State University is
21 supposed to follow when the contract of an
22 employee is being cancelled for cause; isn't
23 that correct?

Page 299

1      A.    Yes.
2      Q.    Can you look at those provisions
3  -- well, let me just go ahead and --
4          First of all, there never has
5  been a hearing conducted on your termination
6  for cause, has there?
7      A.    No.
8      Q.    Have you ever been allowed to --
9  or has Alabama State ever provided you a
10 hearing where you could call witnesses to
11 examine and cross-examine those witnesses on
12 your behalf regarding your termination?
13     A.    No.
14     Q.    As a matter of fact, I believe
15 you testified earlier that you requested that
16 witnesses be allowed to be called and that
17 was refused?
18     A.    Yeah.
19     Q.    Now, that was not a hearing
20 officer that you appeared before.  It was an
21 EEOC committee; isn't that correct?
22     A.    Yes.
23     Q.    What does the handbook state is

Page 300

1  the proper procedure for initiation of a
2  complaint against an employee for
3  termination?  How it is to be handled?
4      A.    Well, that a hearing officer
5  would be selected, and it would be done by
6  selection from alphabetical name and that the
7  list would be compiled by the President.
8      Q.    And, furthermore, it says that
9  the person should be familiar with due
10 process procedures; isn't that correct?
11     A.    Yes.
12         MS. MEADOWS:  Object to the
13 form.
14     Q.    (By Mr. Madison)  I mean, is
15 that what it states?
16     A.    The handbook does state that
17 they should be --
18     Q.    And in paragraph eight it states
19 the following procedures that are supposed to
20 be followed for a hearing for termination for
21 cause, does it not?
22     A.    Yes.
23     Q.    And outline each one of those

Page 301

1  provision that you're supposed to be entitled
2  to there to protect your due process rights.
3      A.    The hearing officer may hold a
4  prehearing conference with parties and their
5  representatives to simplify the issues,
6  determine the facts, provide for exchange of
7  witness lists and documentary and/or other
8  evidence and achieve such other appropriate
9  prehearing objectives.
10     Q.    Were you provided any
11 opportunity to exchange witness lists?
12     A.    No.
13     Q.    And were you provided any
14 opportunity for appropriate prehearing
15 objectives or to determine or achieve those
16 as will make the hearing fair, effective and
17 expeditious?
18         MS. MEADOWS:  Object to the
19 form.
20         THE WITNESS:  No.
21     Q.    (By Mr. Madison)  Now, what does
22 paragraph two state what the procedures that
23 Alabama State University is supposed to

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 302

1  follow in conjunction with a termination
2  hearing?
3      A.    That a notice --
4          MS. MEADOWS:  Object to the
5  form.
6      Q.    (By Mr. Madison)  Go ahead.
7      A.    A notice of hearing setting
8  forth the time, place of hearing, setting
9  forth specific charges against the employee
10 and incorporating the written statement of
11 reasons required under Section C above shall
12 be served on the employee at least seven days
13 prior to the hearing.
14     Q.    Okay.  And let me stop you right
15 there.  Did you ever receive a copy of the
16 written compliant filed by the employee in
17 order for you to defend the charges asserted
18 against you?
19     A.    No.
20         MS. MEADOWS:  Object to the
21 form.
22     Q.    (By Mr. Madison)  Go ahead.
23     A.    No.

Page 303

1      Q.    And let me point you to
2  Paragraph 4 on Page 57.  What does that
3  provision state that you're entitled to as
4  part of any hearing?
5      A.    Throughout the hearing,
6  including any prehearing conferences, the
7  employee has the option of being represented
8  by any individual or counsel.
9          In addition, at the request of
10 the employee, a representative of any
11 employee organization or association shall be
12 permitted to attend all proceedings.
13     Q.    Were you provided the
14 opportunity to have counsel present before
15 the EEOC committee?
16     A.    No.  I was told that an attorney
17 would not be allowed.
18     Q.    Were you provided any other
19 hearing in conjunction with your termination
20 where you were allowed an attorney to be
21 present to aid you in the examination or
22 cross-examination of witnesses?
23     A.    No.

Page 304

1      Q.    Let me -- Paragraph 6 deals with
2  what?
3      A.    The employee shall be afforded
4  an opportunity to obtain necessary witnesses
5  and documentary or other evidence.  The
6  University shall cooperate with the hearing
7  officer and the employee in securing
8  witnesses and making available documentary or
9  other evidence.
10     Q.    And I understand your earlier
11 testimony was that you did, in fact, provide
12 a list of witnesses that you requested be
13 presented to that EEOC committee on your
14 behalf; is that correct?
15     A.    Yes.
16     Q.    And how many of those witnesses
17 did the EEOC committee permit to testify
18 before them?
19     A.    None.
20         MS. MEADOWS:  Objection to form
21 and foundation.
22     Q.    (By Mr. Madison)  Go ahead.
23     A.    None.

Page 305

1      Q.    Were you instructed by the EEOC
2  committee that they would not allow you to
3  have or present any witnesses on your behalf?
4          MS. MEADOWS:  Object to the
5  form.
6          THE WITNESS:  They never gave me
7  an opportunity.  I provided the list.  And
8  shortly thereafter, the whole proceeding had
9  been concluded and the committee had made a
10 finding.
11     Q.    (By Mr. Madison)  What does
12 Paragraph 7 state as to what your rights are
13 concerning witnesses at any hearing for your
14 termination?
15     A.    The employee and the University
16 shall have the right to confront and
17 cross-examine witnesses.
18         When the witnesses cannot or
19 will not appear but the hearing officer
20 determines that the interest of justice
21 requires admission of their statement, the
22 hearing officer shall identify the witnesses,
23 disclose their statements and, if possible,

77 (Pages 302 to 305)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 306

1    provide for interrogatories.
2        Q.    Were you provided the right to
3    confront and cross-examine witnesses?
4        A.    No.
5        Q.    Did ASU provide you or the EEOC
6    committee provide you the opportunity to
7    examine or cross-examine the person making
8    allegations against you?
9        A.    No.
10       Q.    Are you aware as to whether any
11   record of the -- or transcript of the
12   hearings or the EEOC committee's interviews
13   of the two -- two of you, I guess, were
14   provided to the Board of Trustees?
15           MS. MEADOWS: Object to the
16   form.
17           THE WITNESS: No.
18       Q.    (By Mr. Madison) Now, earlier
19   you were asked the question about a certain
20   letter, and you stated that the person
21   sending you the letter or the notice of the
22   hearing was not the person that the handbook
23   stated was supposed to provide you the notice

Page 307

1    with respect to the action taken against you;
2    is that correct?
3        A.    That's correct.
4           MS. MEADOWS: Object to the
5    form.
6        Q.    (By Mr. Madison) Who does the
7    handbook state or what was the procedure to
8    be followed in handling the notice of your
9    termination?
10       A.    That it should come from --
11          MS. MEADOWS: Object to the
12   form.
13          THE WITNESS: -- the President
14   and that any initiation of termination should
15   be done by my immediate supervisor and
16   concurred by all department heads, up to the
17   vice president, which my immediate supervisor
18   would have been the vice president.
19       Q.    (By Mr. Madison) Okay. And did
20   you receive your notice from your vice
21   president?
22       A.    No.
23       Q.    So, that would not have been in

Page 308

1    compliance with their own policies and
2    procedures?
3           MS. MEADOWS: Object to the form
4    --
5           THE WITNESS: That's correct.
6           MS. MEADOWS: -- and foundation.
7        Q.    (By Mr. Madison) Have you been
8    provided anything -- or were you provided at
9    the hearing or at the EEOC committee meeting
10   any evidence that Ms. Jalonda Johnson was a
11   student at the time that the allegations were
12   asserted against you?
13          MS. MEADOWS: Object to the
14   form.
15          THE WITNESS: There is a letter
16   specifically stating that she had withdrawn
17   from school prior to filing the accusation.
18       Q.    (By Mr. Madison) But were you
19   aware as to whether or not she was enrolled
20   as a student at the time?
21       A.    I was not aware of whether she
22   was a student at all. That had not been
23   conveyed to me.

Page 309

1        Q.    From the standpoint that you
2    were questioned regarding the procedures for
3    appeals, I -- and my recollection may not be
4    correct.
5           But earlier in the day I thought
6    your were questioned as to whether or not you
7    had no right to appeal; is that correct?
8           MS. MEADOWS: Object to the
9    form.
10       Q.    (By Mr. Madison) Do you recall
11   that?
12       A.    Ask that again.
13       Q.    Were you questioned earlier in
14   the day as to whether you even had a right to
15   appeal?
16          MS. MEADOWS: Object to the
17   form.
18          THE WITNESS: Yes, I was
19   questioned as to whether I had a right.
20       Q.    (By Mr. Madison) Okay.
21       A.    Because it didn't -- I didn't
22   seem to be given that opportunity.
23       Q.    Now, the three or four persons

78 (Pages 306 to 309)

17249641-2df0-4c36-b999-32292148c606

Page 310

1  you identified earlier today in your
2  testimony as having had their legal bills
3  paid, according to your understanding of
4  Alabama State University in their defense,
5  were those employees the same status as you?
6       MS. MEADOWS: Object to the
7  form.
8       Q.   (By Mr. Madison) To your
9  knowledge?
10      A.   Yes. You mean -- if you're
11 meaning were they executive level?
12      Q.   Right.
13      A.   Yes.
14      Q.   So, those persons would have
15 been the same classification under the
16 handbook as you would have been classified
17 as?
18      MS. MEADOWS: Object to the
19 form.
20      THE WITNESS: Yes, yes.
21      Q.   (By Mr. Madison) Now, would the
22 only -- and when I asked that question, I was
23 referring to the excerpt of the employee

Page 311

1  handbook at Page 23, which I believe you were
2  questioned about as an executive status
3  employee; is that correct?
4       MS. MEADOWS: Object to the
5  form.
6       THE WITNESS: Correct.
7       Q.   (By Mr. Madison) The permanent
8  employees, would those have pretty much
9  the tenured professors?
10      MS. MEADOWS: Object to the
11 form.
12      Q.   (By Mr. Madison) To your
13 knowledge?
14      A.   Yes.
15      Q.   The first sentence of the
16 executive status employee definition states
17 what?
18      A.   An employee who fills a
19 permanent senior-level staff position.
20      Q.   Now, did the EEOC committee
21 advise you at any time, any of the members of
22 that committee, that rape charges had been
23 asserted against you and that you had the

Page 312

1  right not to make any statements without the
2  presence of counsel?
3       MS. MEADOWS: Object to the
4  form.
5       THE WITNESS: No, never.
6       Q.   (By Mr. Madison) Was any -- I
7  think I've already asked you this, but how
8  many people -- I haven't asked you this.
9       How many people were on that
10 EEOC committee to your recollection?
11      A.   Three.
12      Q.   And were those the three persons
13 identified earlier as being on that sign-in
14 sheet?
15      A.   No.
16      Q.   All right. Who were the three
17 persons who were sitting on the committee
18 that you recall?
19      A.   Weaver was one last name. You
20 don't have the committee report by chance, do
21 you? I know Weaver was one name.
22      MR. MADISON: Let me see the
23 exhibits. Was that marked as an exhibit?

Page 313

1       MS. MEADOWS: No.
2       MR. MADISON: Okay. I thought
3  it was.
4       THE WITNESS: Wilson, Weaver and
5  Simmons. Wilson, Weaver and Simmons.
6       Another thing that handbook
7  says, that these names should be among the
8  faculty that's employed by the University,
9  and one of them is an adjunct who was the --
10 who was -- was not a full faculty member of
11 the University.
12      The other was a student who
13 wasn't currently enrolled, and the man was a
14 staff member.
15      Q.   (By Mr. Madison) And finding
16 one of the EEOC committee was what?
17      A.   The EEOC committee cannot
18 conclusively say that Ms. Johnson -- that Mr.
19 Diop raped Ms. Johnson. There was no
20 documentary evidence given to substantiate
21 this claim.
22      Q.   What does Paragraph 4 allude to?
23      A.   The EEOC committee -- the EEOC

79 (Pages 310 to 313)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 314

1  concludes that Mrs. Johnson was not fired
2  because of sexual harassment, but an improper
3  requisition for the transfer of funds. She
4  was allowed to work without a contract.
5      Q.    When you were questioned by the
6  EEOC committee, how did that work?
7          MS. MEADOWS: Object to the
8  form.
9          THE WITNESS: I was called into
10 a room, they were already assembled and they
11 asked me some questions.
12     Q.    (By Mr. Madison) Who else was
13 present besides the three members of that
14 committee?
15     A.    No one.
16     Q.    Were you placed under oath?
17     A.    No.
18     Q.    Was a transcript made that you
19 were aware of?
20     A.    Well, there was a recording of
21 the proceeding I do know.
22     Q.    Did you state on the record with
23 any of those three individuals that you had

Page 315

1  requested that you be allowed to --
2      A.    Yes.
3      Q.    -- to submit witnesses?
4      A.    Yes.
5      Q.    On your behalf?
6      A.    Yes, yes.
7      Q.    That would appear in the
8  recordings then --
9      A.    Yes.
10     Q.    -- if they have those?
11         MS. MEADOWS: You have those.
12         MR. MADISON: What?
13         MS. MEADOWS: You have those.
14         MR. MADISON: I've got those?
15         MS. MEADOWS: Yes.
16         MR. MADISON: I don't think so.
17     Q.    While you were employed as the
18 plant manager, did you ever have an
19 opportunity to file or submit with anybody
20 any concerns of any alleged wrongdoing by
21 employees of the physical plant?
22         MS. MEADOWS: Object to the
23 form.

Page 316

1          THE WITNESS: Yes.
2      Q.    (By Mr. Madison) And what was
3  it that you reported?
4      A.    I filed a police report against
5  Cornelius Johnson.
6      Q.    And what was that for?
7      A.    For assault.
8      Q.    Was there any other occasion
9  that you filed any complaints regarding any
10 misuse of ASU property while you were there?
11     A.    Yes.
12     Q.    Did you request an investigation
13 be performed?
14     A.    Yes.
15     Q.    And what was it that you
16 requested be investigated?
17     A.    The handling of material. It
18 was like Freon and other materials related to
19 electrical and plumbing.
20     Q.    And what was it that you
21 conveyed to your superiors that you were
22 concerned about?
23     A.    That there was no accountability

Page 317

1  of where certain materials went, that there
2  seemed to be several of the craft supervisors
3  that had private businesses, and it appeared
4  that they were using materials purchased by
5  the University for their private enterprises.
6      Q.    And you reported that to your
7  superiors?
8      A.    Yes.
9      Q.    Do you know if any investigation
10 was made of that?
11     A.    No.
12     Q.    Were there any particular
13 individuals that you reported?
14     A.    Plumbing, electrical supervisor.
15     Q.    Do you recall any specific
16 persons?
17     A.    I know Lasley was one, his last
18 name; Mr. Bibbs, I think his name; Mr.
19 Garnell was another one; McDuffy.
20     Q.    On Defendant's Exhibit 2 -- I'm
21 sorry. Defendant's Exhibit 4. Was there a
22 stated term for your employment?
23     A.    Yes.

80  (Pages 314 to 317)

17249641-2df0-4c36-b999-32292148c606

FREEDOM COURT REPORTING

Page 318

1    Q.    And what was the stated term or
2    period of time that you were to be employed
3    under that contract?
4    A.    From November through September.
5    Q.    November what?
6    A.    The 1st through September 30th.
7    Q.    And was that a full year?
8    A.    Yes.
9    Q.    Actually, it would have been
10   October.
11   A.    It would have been less.  Well,
12   it's a little bit less than a year.  Well,
13   November 1st.  Yeah, it's a little bit less
14   than a year.
15   Q.    And what was the amount of your
16   salary?
17   A.    $64,413.
18   Q.    What was represented to you when
19   you took your job as to the nature of the
20   position that you were taking as far as the
21   time that you be would be employed?
22   MS. MEADOWS:  Object to the
23   form.

Page 319

1    THE WITNESS:  That I was
2    director of physical plant, that the
3    contract, which was an annual contract and
4    renewed 30 days before termination, renewed
5    or either terminated.
6    MR. MADISON:  If can have just a
7    minute.  I don't think -- I want to take just
8    a minute just to --
9    MS. MEADOWS:  I'm glad you're
10   going to take a minute because I need to be
11   excused.
12   (Whereupon, the taking of the
13   deposition was recessed from approximately
14   6:27 p.m. to approximately 6:31 p.m., after
15   which the following proceedings were had and
16   done:)
17   MR. MADISON:  I think that's it
18   for me.
19   FURTHER EXAMINATION BY MS. MEADOWS:
20   Q.    What was the date that you
21   testified before the EEOC committee?
22   A.    February 11th or something.
23   Q.    No.  That was when you got the

Page 320

1    notice.  I'm talking about when you actually
2    met with the three committee members and they
3    questioned you.
4    A.    Oh, okay.  March 10th maybe.
5    Q.    Okay.  On March 10th, were you
6    aware that Ms. Johnson had filed criminal
7    charges against you?
8    A.    Yes.  I was aware of that in
9    February.
10   Q.    You testified earlier that you
11   conveyed concerns regarding the handling of
12   certain materials, correct?
13   A.    Yeah.
14   Q.    Okay.  How did you convey your
15   concerns?
16   A.    By me writing to my vice
17   president just to -- and this was an effort
18   to discontinue open purchase orders, which
19   was the initial basis for those kind of
20   conclusions.
21   Because there were open purchase
22   orders maybe in excess of $50,000-$60,000,
23   but our work order procedures and process

Page 321

1    didn't really tie a piece of material or part
2    to a specific job or task.
3    And after going and receiving
4    invoices for large amounts of things, I just
5    became suspicious.
6    Q.    And you conveyed your concern in
7    writing?
8    A.    Yes.
9    Q.    And in your writing you
10   requested that --
11   A.    That, first of all, open
12   purchase orders be discontinued and that we
13   be required to go through the purchase order
14   process.
15   Q.    And who did you say you
16   submitted that to by name?
17   A.    Leon Frazier.
18   Q.    In your correspondence to Mr.
19   Frazier, you actually wrote the names of Mr.
20   Lasley, Mr. Bibbs, Mr. Garnell and Mr.
21   McDuffy; is that correct?
22   A.    Mr. McDuffy?  Ms. McDuffy.
23   Q.    Ms. McDuffy.  I'm sorry.

81 (Pages 318 to 321)

17249641-2df0-4c36-b999-32292148c606

Page 322

1    A.    I actually referred to their
2  crafts and not their specific names.
3    Q.    So, you did not name the
4  specific individual.  You named the craft
5  that --
6    A.    In conversation I'm sure I did.
7    Q.    Okay.  I'm --
8    A.    Because I found that most of
9  them had private businesses.
10    Q.    And this was --
11    A.    In the same area that they were
12  supervising, you know, with the University.
13  So, yeah, in that respect I did.
14    Q.    And this was in an oral
15  conversation with Dr. Frazier?
16    A.    Yes.
17    Q.    Do you recall when that
18  conversation took place?
19    A.    Not specifically.  As a matter
20  of fact, I never thought I'd even have to
21  bring that one up.
22    Q.    Did you file a police report
23  over the missing materials?

Page 323

1    A.    No.
2    Q.    Did you ever ascertain that
3  materials were missing?
4    A.    Yes and no.
5    Q.    Explain.
6    A.    Well, one, it was very difficult
7  because of procedures, the current policies
8  in place.  And I just mentioned that it was
9  very difficult because there was no tie to a
10  specific task or project with the piece of
11  material.
12       In addition to that, there was
13  no centralized inventory or control.  So, it
14  was very easy to flouge numbers.
15       The only way that I became
16  suspicious is because I received invoices for
17  large amounts of things.  However, when I go
18  to identify these items on the shelf, they
19  were not there.
20    Q.    I'm going to direct you back to
21  Page 55 of the handbook.  Mr. Madison had you
22  read Section 6.3, some provisions from that.
23    A.    Uh-huh (affirmative).

Page 324

1    Q.    I want you to read for me the
2  first sentence of that.
3    A.    Section 6.3?
4    Q.    Yes.
5    A.    Cancellation of contract is the
6  term used to define those administrative
7  actions of the University that result in a
8  permanent employee suffering a loss of
9  employment or compensation or a temporary
10  employee suffering a loss of employment or
11  compensation prior to the expiration of a
12  temporary appointment.
13    Q.    And were you a permanent
14  employee or an executive employee?
15    A.    I was an executive employee.
16    Q.    Okay.
17    A.    But executive employee is
18  defined as a person that -- let me find that
19  as a matter of fact.  It's the same as a
20  permanent employee.
21    Q.    So, the handbook creates two
22  separate statuses for no reason?
23    A.    It's just redundancy.  And

Page 325

1  that's -- that occurs a lot in this book.
2    Q.    Okay.
3    A.    As a matter of fact, which is
4  why this is being discontinued.  Did you know
5  that?
6    Q.    Okay.  That's your testimony.
7       MR. MADISON:  Ms. Meadows may be
8  doing it.
9       THE WITNESS:  No, it is.  It's
10  true.  And this was done -- did you know it
11  was several years since this was written and
12  it hadn't even been updated or amended or
13  anything?
14       MS. MEADOWS:  I have nothing
15  further.
16       THE WITNESS:  Thank you.
17       MR. MADISON:  Concluded.
18       FURTHER DEPONENT SAITH NOT
19
20
21
22
23

82 (Pages 322 to 325)

FREEDOM COURT REPORTING

Page 326

```
 1        C E R T I F I C A T E
 2   STATE OF ALABAMA
 3   JEFFERSON COUNTY
 4        I hereby certify that the above
 5   and foregoing deposition was taken down by me
 6   in stenotype, and the questions and answers
 7   thereto were reduced to typewriting under my
 8   supervision, and that the foregoing
 9   represents a true and correct transcript of
10   the deposition given by said witness upon
11   said hearing.
12        I further certify that I am
13   neither of counsel nor kin to the parties to
14   the action, nor am I in any way interested in
15   the result of said cause.
16        Given under my hand and seal this
17   the 19th day of May, 2008.
18
19        _____
          Belinda S. Brewster, RPR
20        Alabama License #335
21
22
     My Commission Expires:
23   September 1, 2009
```

83 (Page 326)

17249641-2df0-4c36-b999-32292148c606



# NON ACADEMIC STAFF HANDBOOK

Exhibit

3

2)  Such hiring does not discriminate against other candidates for the vacant position.

3)  No officer or employee of the University shall be permitted to exercise direct supervision over persons related to him or her by family or marriage.  For purposes of this policy, persons related by family or marriage are defined as a spouse, parent, child, brother, sister, grandparent, grandchild, aunt, uncle, niece, nephew, in-laws and persons for whom the employee has been assigned legal responsibility in a guardianship capacity.

The President of the University or his/her designee must grant final approval in each case where the University is considering hiring more than one person related by family or marriage to work in the same department.

2.2.4 ALIENS.  An alien may be employed by the University provided he/she has legal proof of a right to work in the United States as indicated by an approved visa or work permit.

2.2.5  EMPLOYMENT OF  ATHLETIC COACH.  No individual may be employed in a head coaching capacity who has been officially sanctioned by the National Collegiate Athletic Association (NCAA) or an NCAA member conference for violating NCAA or conference rules.

2.2.6  REEMPLOYMENT OF FORMER EMPLOYEES.  A former employee who resigns from the University in good standing and is subsequently reemployed after 180 days will be considered a new employee for purposes of seniority and sick leave.  However, at the employee's option, accrued sick leave may be transferred to the Teachers' Retirement System of Alabama for service credit toward retirement if application is made within 180 days of resigning from the University.

A former employee who is reemployed after 180 calendar days may be reemployed in the same type of employment or in another type of employment for which he/she is qualified.

## 2.3 RECRUITMENT, SCREENING AND APPOINTMENT

The University actively and affirmatively places emphasis on the recruitment and screening of women and non-black applicants.  In addition, the University avails itself of the traditional channels of recruitment which include the Alabama State Employment Service, advertisements in newspapers and professional journals, campus newspapers and community and technical colleges.  All advertisements will display that the University is an "Affirmative Action/Equal Opportunity Employer."

25

Persons seeking employment at Alabama State University are referred to the Office of Personnel Services and Human Relations for securing applications and information on available positions.

Recruitment activities are centralized in the Office of Personnel Services and Human Relations. All available vacancies and new positions will be listed with the Office of Personnel Services and Human Relations immediately upon approval by the President.

Each available permanent position to be filled will be appropriately advertised, and a notice will be posted on the Office of Personnel Services and Human Relations bulletin board and in accessible locations for employees.

A work permit, if required by law, shall be secured by the applicant and filed in the Office of Personnel Services and Human Relations.

During initial screening, the Director of Personnel Services and Human Relations will delete all applicants who are not eligible or qualified based on announced criteria for the position.

Applicants for all administrative positions at the level of Director or equivalent and above will be screened and evaluated by a screening committee. The committee will be composed of the Director of Personnel Services and Human Relations, immediate supervisor and/or other persons appointed by the area Vice President. A technical consultant may be added when, in the opinion of the committee, circumstances warrant. The screening committee will submit the top three names to the area Vice President who will make recommendation to the President, and the President will make the final appointment subject to approval by the Board of Trustees.

No person is considered employed until a written contract is signed by both the President and the employee and has been approved by the Board of Trustees. No supervisor or officer is authorized to make an oral or written commitment of employment to any applicant. No contract shall be executed between the University and an employee that is inconsistent with the policies contained in this Handbook.

Objective criteria are the primary basis for selection. Each applicant is considered on the basis of his/her skills, knowledge and abilities.

Each applicant applying for a clerical/data entry position will be required to take a typing/data entry test administered via the Office of Personnel Services and Human Relations.

Any evaluation in terms of skills, knowledge and abilities used to determine the qualification of applicants seeking employment for a certain position shall also be used for the evaluation of all applicants seeking that position.

concerning the appropriateness of the contract cancellation. This recommendation, together with a written report from the President, shall be transmitted to the employee and to the Board of Trustees, which shall review the evidence, the Hearing Officer's recommendation and the President's report before making a final decision on the contract cancellation.

G) An employee with a probationary or permanent appointment whose contract is cancelled because of a medical disability shall be given a severance pay in an amount to be determined by the Board of Trustees, but in no event less than three months of current salary if the cancellation occurs during or at the end of the first year of service with the University  in no event less than six months of current salary if the cancellation occurs during or at the end of the second year of service with the University, and in no event less than 12 months of current salary if the cancellation occurs after the start of the third year of service with the University.

## 6.4  GRIEVANCES

A grievance is an allegation by an employee that there has been a violation of provisions of these policies by the University or its agents relating to salary, work hours or other terms and conditions of employment.

A grievance may be filed by an individual employee or any number of employees who believe that they have been adversely affected by the same action or actions; it may be directed against the action of one or more administrators.

Except as otherwise provided in this paragraph, all grievances shall be processed in accordance with the procedure set forth in Section 6.4.1. If a grievance includes an alleged violation of the University's Affirmative Action Plan, that aspect of the grievance must be reported and processed in accordance with the procedures set forth in the Plan. If the grievance deals with a matter that is subject to a separate appeal procedure that is specifically referenced in this Handbook, the employee must follow the procedure set forth in that section.

6.4.1 GRIEVANCE PROCEDURE. Grievances shall be filed and processed in accordance with the following procedure:

A) A grievance must be filed in writing within 21 days after the event giving rise to the grievance or within 21 days after the employee (s) filing the grievance knew or reasonably should have known of the event giving rise to the grievance. The written grievance shall indicate the action being grieved, the rule, regulation, practice or procedure allegedly violated, and the remedy being sought. The grievance initially must be filed with the director of the unit

61

SEXUAL HARASSMENT MAY CONSIST OF:

- Sexually suggestive language.

- Derogatory sexual comments.

- Unsolicited touching of the body.

- Patting or pinching.

- Physical sexual assault including rape.

- Outright solicitation of sexual intercourse.

- Subtle pressure for sexual favors or social encounters.

- Demands for sexual favors or social activity accompanied by threats or insinua-
  tions that failure to submit will adversely affect one's employment, wages, work
  conditions or academic advancement.

- Demands for sexual favors or social activity accompanied by implied or direct
  promises that submission will result in better job treatment or academic advance-
  ment.

6.5.2 REPORTING INCIDENTS OF SEXUAL HARASSMENT. An individual
who experiences sexual harassment shall immediately report that fact to the
Director of Personnel Services and Human Relations who also serves as the
University's Equal Employment Opportunity (EEO) Officer. The initial report may
be in oral or written form, but a formal investigation of the matter cannot begin until
the complaint is submitted in written form and signed by the complainant. If
charges of sexual harassment are formally filed against any officer of the University
at or above the level of an divisional vice president or the Director of
Communications and Public Affairs or the Director of Intercollegiate Athletics, the
EEO Officer shall within 10 days report that fact and the results of any preliminary
investigation to both the President and the Chairman of the Board of Trustees.

6.5.3 INVESTIGATING REPORTED INCIDENTS OF SEXUAL HARASS-
MENT. Prior to initiating an investigation, the Director of Personnel Services and
Human Relations will notify the accused person(s) of the sexual harassment
charge and of the impending investigation. The investigation will be non-adversari-
al; therefore, attorneys for neither side will be permitted. The investigation com-
mittee will be composed of three disinterested members. Two members will be
appointed by either of two divisional vice presidents. The third member will be
selected by the two members appointed by the vice presidents. If the two cannot
agree on naming a third member, the Director of Personnel Services and Human
Relations will name the third member. If the sexual harassment charge involves a
student, at least one member of the committee will be a student.

63

Year _2005_

2-16050-2430  8 1/204.50

092288

**PERSONNEL SERVICES**

**EMPLOYEE REPORT OF HOURS WORKED**

Name _Johnson_   _Jalinda_   _____  Payroll Number _____  4
    Last        First          Middle

Position _Data Entry_   _____  Social Security No. _____

College/Area _____   Department _Inventory Control_

The following is a true statement of hours worked under University Policies of the <u>Non-Academic Staff Handbook</u> for Alabama State
University during the pay period of _____ 19 ____

## HOURS WORKED

THE FIRST WORK WEEK BEGINS:
SUNDAY _01/23/2005_   AND ENDS SATURDAY _01/29/2005_

| DAY | A.M. | | | | P.M. | | | | TOTAL |
|-----|------|------|------|------|------|------|------|------|-------|
| | IN | OUT | IN | OUT | IN | OUT | IN | OUT | |
| SUNDAY | | | | | | | | | |
| MONDAY | 9:00 | 10:00 | | | | | 1:00 | 5:00 | 5 hrs. |
| TUESDAY | | | | | | | 12:00 | 5:00 | 5 hrs. |
| WEDNESDAY | | | | | | | 12:00 | 5:00 | 5 hrs. |
| THURSDAY | 9:00 | 10:00 | | | | | 1:00 | 5:00 | 5 hrs. |
| FRIDAY | | | | | | | | | |
| SATURDAY | | | | | | | | | |
| TOTAL HOURS FOR THE WEEK | | | | | | | | | 20 |

THE SECOND WORK WEEK BEGINS:
SUNDAY _1/31/2005_   AND ENDS SATURDAY _2/05/2005_

| DAY | A.M. | | | | P.M. | | | | TOTAL |
|-----|------|------|------|------|------|------|------|------|-------|
| | IN | OUT | IN | OUT | IN | OUT | IN | OUT | |
| SUNDAY | | | | | | | | | |
| MONDAY | 9:00 | 10:00 | | | | | 1:00 | 5:00 | 5 hrs. |
| TUESDAY | | | | | | | 1:00 | 1:10 | |
| WEDNESDAY | | | | | | | | | |
| THURSDAY | | | | | | | | | |
| FRIDAY | | | | | | | | | |
| SATURDAY | | | | | | | | | |
| TOTAL HOURS FOR THE WEEK | | | | | | | | | 5 |

_____   2/2/05   _Arthur G. Moore_   2/24/05
Employee's Signature   Date        Department Head Signature   Date

**TO THE CONTROLLER:**
   The above signed employee and supervisor individually certify that the days of actual performance of duty, days absent for reason of sickness, official holiday, officially-approved leave, annual leave, off-day, civic duty, military leave and/or bereavement leave as recorded hereon by him or her is correct and true.

Name of deceased _____   Relationship _____

   The below signed officer certifies that the information on this employee report has been checked carefully and to the best of my knowledge and belief is correct, except as noted above. The employee's record has been posted, as applicable, and due pay accordingly.

_____        _____
Director of Personnel Services        Date

   *Attach copy of official leave form or travel authorization, court summons, military orders (if appropriate), **CT/compensatory time

NOTE: Record accurate hours worked on this report daily, sign at the end of the pay period, then transmit to the Accounting Office, Councill Hall 22,
   no later than 9:00 a.m. Monday following the end of the pay period.

January 26, 2005

Mr. David McAdory
Human Resources System
Data Manager



Stratford Moore
Director of Inventory Control

RE: Hire a 20 hour Data Entry Clerk

Sir, I am requesting Ms. Jalonda Johnson, SSN: _____ ____ 'e hired to work 20 hours per week at an hour salary of $8.18 per hours for 36 weeks totaling $5,889.60.00.    Ms. Johnson will be responsible for filing, recording and tracking purchase orders. This contract will start January 25, 2005 and end September 30, 2005. Funds to pay Ms. Johnson will come from Account 2-16131-1220.

cc:   Mr. Willie Thomas
      Director of Internal Audit

**S. M.**

Exhibit

FEB 1'05  1:21:19

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| | | ☐ INCIDENT ☒ OFFENSE ☐ SUPPLEMENT | 2 CASE # 002319 | 3 SFX |
|---|---|---|---|---|

**4 ORI #** 0 0 1 3 0 1 0 0  **5 DATE AND TIME OF THIS REPORT** 0 2 0 1 0 5 0 1:00 ☐ AM ☐ PM MIL.  **5 AGENCY NAME** Montgomery Police Department   **7 # SUPPLEMENT ORIGINAL OFFENSE DATE**

**8 REPORTED BY** ☐ VICTIM OR   **9 ADDRESS (STREET, CITY, STATE, ZIP)**   **10 PHONE** ( )

**12 VICTIM (LAST, FIRST, MIDDLE NAME)** 1P 2S 3S  Johnson, Jalonda   **13 ADDRESS (STREET, CITY, STATE, ZIP)** 1190 Gibson Hills Dr. Montgomery Al 36116   **14 PHONE** (334) 613-1957

**15 EMPLOYER/SCHOOL** ASU   **16 OCCUPATION** Secretary   **17 ADDRESS (STREET, CITY, STATE, ZIP)** 1301 W Fifth St. Montgomery Al 36111   **18 PHONE** (334) 229-4413

**19** ☒ RESIDENT ☐ NON-RESIDENT  **20 INJURY** ☐ Y ☒ N  **21 RACE** ☐ W ☐ A ☒ B  **22 SEX** ☐ MALE ☒ FEMALE  **23 HGT** 5'06"  **24 WGT** 135  **25 DOB** 0 8 2 9 8 5  **26 AGE** 19  **27 WAS OFFENDER KNOWN TO VICTIM?** ☒ Y ☐ N  **28 VICTIM WAS (EXPLAIN RELATIONSHIP)** Acquaintance

**29 TYPE INCIDENT OR OFFENSE** ☒ FEL. ☐ MISD.  Rape   **31 DEGREE (CIRCLE)** (1) 2 3   **33 STATE CODE/LOCAL ORDINANCE** 08H 03

**34 TYPE INCIDENT OR OFFENSE** ☐ FEL. ☐ MISD.   **35 DEGREE (CIRCLE)** 1 2 3   **37 STATE CODE/LOCAL ORDINANCE**

**39 PLACE OF OCCURRENCE** Unk  Block Burton Ave Montgomery Al 36104   **38 SECTOR** 1 1 1

### EVENT

**40 POINT OF ENTRY** ☐ DOOR ☐ ROOF ☐ WINDOW ☐ OTHER   **41 METHOD OF ENTRY** ☐ FORCIBLE ☐ NO FORCE ☐ ATT. FORCIBLE   **42 ASSAULT** ☐ SIMPLE ☐ AGGR.   **43 TREATMENT FOR** ☐ Y ☐ N  **ASSAULT INJURY** ☐ Y ☐ N

**OCCURRED ON OR BETWEEN** 0 1 3 1 0 5   **49 TIME** 19:30 ☐ AM ☒ PM ☐ MIL.  **52 TIME** ☐ AM ☐ PM ☐ MIL.

**47 LIGHTING** ☐ NATURAL ☐ MOON ☐ ART. EXT. ☐ ART. INT. ☒ UNK.   **48 WEATHER** ☐ CLEAR ☐ CLOUDY ☒ RAIN ☐ FOG ☐ SNOW ☐ HAIL ☐ UNK.   **49 PREMISE** ☐ HWY.-ST.-ALLEY ☐ RAILROAD ☒ RESIDENCE ☐ CHURCH ☐ SCHOOL ☐ CONVENIENCE ☐ INDUSTRIAL ☐ SERVICE STA.  ☐ BANK ☐ DRUG STORE ☐ APT./TWN. HSE. ☐ SHOPPING CENTER ☐ PARKING LOT ☐ OTHER COMMER. ☐ OTHER

**54 VERIFY FOR** ☐ Y   **55 TREAT FOR** ☐ Y   **58 CIRCUMSTANCES HOMICIDE ASSAULT**   **57 CODE**

RAPE EXAM ☐ N   RAPE INJURY ☐ N   **LOCATION** RAPE

**59 WEAPON USED** ☐ FIREARM ☐ KNIFE ☐ HANDS, FISTS, VOICE ETC. ☐ OTHER DANGEROUS   **59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE** DESCRIBE:   ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN

### PROPERTY DESCRIPTION

**60 QUANTITY**  **61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.)**   **62 DOLLAR VALUE** STOLEN DAMAGED   **63 RECOVERED** DATE VALUE

Initial Unit 426/Coughlin

☐ CONTINUED IN NARRATIVE

### DOLLAR VALUE

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| | s | s | s | s | s |
| | R | R | R | R | R |
| | D | D | D | D | D |

| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS |
|---|---|---|---|---|
| s | s | s | s | s |
| R | R | R | R | R |
| D | D | D | D | D |

### VEHICLES

**75 CHECK CATEGORIES** ☐ STOLEN ☐ RECOVERED ☐ SUSPECTS VEH. ☐ VICTIMS VEH. ☐ UNAUTH. USE ☐ ABANDONED

| 76 #STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|

| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO | 87 ADDITIONAL DESCRIPTION |
|---|---|---|---|---|---|
| | | | | TOP: BOTTOM: | |

**STOLEN MTR. VEH ONLY** ☐ BUS. ☐ RBS. ☐ ROR.   **88 AREA STOLEN** ☐   **89 OWNERSHIP VERIFIED BY:** ☐ TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ Other   **90 WARRANT SIGNED** ☐ Yes ☐ No

**91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP)**   **92 PHONE** ( )

**MOTOR VEH. RECOVERY ONLY REQUIRED FOR 24N UCR CODE**   **93 STOLEN IN YOUR JURISDICTION?** ☐ Yes ☐ No WHERE?   **94 RECOVERED IN YOUR JURISDICTION?** ☐ Yes ☐ No WHERE?

TYPE OR PRINT IN BLACK INK   717   ACJIC-32 REV. 6-94

Exhibit

FEB 1 '05  1:21:24

002319

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 0 2 0 1 0 5 | 01:00 | AM PM MIL. | 96 CASE # | | | | 97 SFX | 98 OFFENDER ☐ CHECK IF MULTIPLE ☐ SUSPECT ☐ MISSING PERSON |
|---|---|---|---|---|---|---|---|---|---|

| 99 NAME (LAST, FIRST, MIDDLE) | 100 NICKNAME/ALIAS | | 101 RACE | 102 SEX | 103 DOB | 104 AGE |
|---|---|---|---|---|---|---|
| Diopp, Anwar | | | W ☐ A B ☒ O ☐ | ☒ M ☐ F | | 37 |

| 106 ADDRESS (STREET, CITY, STATE, ZIP) | 105 HGT | 107 WGT | 108 EYE | 109 HAIR | 110 COMPLEXION |
|---|---|---|---|---|---|
| Burton Ave Montgomery Al 36104 | 507 | 150 | Bro | Blk | Drk |

| 111 PROBABLE DESTINATION | 112 ARMED? ☐ Y ☒ N ☐ UNK. | 113 WEAPON |
|---|---|---|
| Director of Physical Plant for ASU | | |

| 114 CLOTHING | | 115 ☐ ARRESTED ☐ WANTED |
|---|---|---|
| Red Shirt/Brown Kaki Pants | ☐ SCARS ☐ MARKS ☐ TATTOOS | |

| 116 NAME (LAST, FIRST, MIDDLE) | 117 NICKNAME/ALIAS | 118 RACE | 119 SEX | 120 DOB | 121 AGE |
|---|---|---|---|---|---|
| N/A | | W ☐ A B ☐ O ☐ | ☐ M ☐ F | | |

| 122 ADDRESS (STREET, CITY, STATE, ZIP) | 123 HGT | 124 WGT | 125 EYE | 126 HAIR | 127 COMPLEXION |
|---|---|---|---|---|---|
| | | | | | |

| 129 PROBABLE DESTINATION | 128 ARMED? ☐ Y ☐ N ☐ UNK. | 130 WEAPON |
|---|---|---|
| | | |

| 131 CLOTHING | | 132 ☐ ARRESTED ☐ WANTED |
|---|---|---|
| | ☐ SCARS ☐ MARKS ☐ TATTOOS | |

**WITNESSES**

| 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|
| #1 N/A | SEX ☐ M ☐ F  RACE W ☐ A B ☐ | | ( ) | ( ) |
| #2 | SEX ☐ M ☐ F  RACE W ☐ A B ☐ | | ( ) | ( ) |
| #3 | SEX ☐ M ☐ F  RACE W ☐ A B ☐ | | ( ) | ( ) |
| #4 | SEX ☐ M ☐ F  RACE W ☐ A B ☐ | | ( ) | ( ) |

| WITNESS #1 SSN | WITNESS #2 SSN | WITNESS #3 SSN | WITNESS #4 SSN |
|---|---|---|---|
| | | | |

**NARRATIVE**

The victim stated that she was forcibly raped by the listed offender

| | ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | SFX |
|---|---|---|---|
| CONTINUED ON SUPPLEMENT ☐ Y ☒ N | | | |

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE _____

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | | 143 SFX | 144 CASE # | | 145 SFX | 146 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|---|---|

**ADMINISTRATION**

| 147 CASE STATUS | 148 CASE DISPOSITION: | ☐ EXCEPTIONAL CLEARANCE: | 149 REPORTING OFFICER |
|---|---|---|---|
| ☐ PENDING | | ☐ SUSPECT/OFFENDER DEAD | Det C.J. Coughlin    100# |
| ☐ INACTIVE | ☐ CLEARED BY ARREST (JUV.) | ☐ OTHER PROSECUTION | ID# |
| ☐ CLOSED | ☐ CLEARED BY | ☐ EXTRADITION DENIED | 150 ASSISTING OFFICER |
| ENTERED ☐ Y ACIC/NCIC ☐ N | ARREST (ADULT) | ☐ LACK OF PROSECUTION | ID# |
| DATE __ | ☐ UNFOUNDED | ☐ JUVENILE, NO REFERRAL | 151 SUPERVISOR APPROVAL    ID#  152 WATCH CMDR.    ID# |
| | ☐ ADM. CLEARED | ☐ DEATH OF VICTIM | |



# ALABAMA UNIFORM INCIDENT / OFFENSE REPORT SUPPLEMENT

*OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION*

| 1 ORI# | 2 AGENCY NAME | 3 DATE AND TIME OF REPORT | | 4 CASE # | 5 SFX |
|---|---|---|---|---|---|
| 0 0 3 0 1 0 0 | Montgomery Police Department | 0 8 3 0 0 5  14:55  ☐AM ☒PM ☒MIL | | 0 5 - 0 0 2 3 1 9 | |

**EVENT**

| 6 VICTIMS NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Johnson, Jalonda | 0 1 3 1 0 5 | ☐CONTINUATION  ☒FOLLOW-UP |

| 9 ORIGINAL INCIDENT / OFFENSE | 10 UCR CODE | 11 STATE CODE / LOCAL ORDINANCE |
|---|---|---|
| Rape 1st Degree | | |

| 12 NEW INCIDENT I OFFENSE | 13 UCR CODE | 14 STATE CODE / LOCAL ORDINANCE |
|---|---|---|
| | | |

| 15 HAS AN ARREST BEEN HAVE? | 16 DATE OF ARREST | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT | 19 PRIOR PREMISE |
|---|---|---|---|---|
| ☐YES ☒NO | M D Y | ☐YES ☐NO  WARRANT # | M D Y | YEAR WEAPON |

| 20 ☐DEFENDANT ☒SUSPECT | 21 ☐DEFENDANT ☐SUSPECT |
|---|---|
| NAME: Anwar Diopp | NAME: |

| RACE ☐W ☐A ☒B ☐I | SEX ☒M ☐F | DOB 0 7 1 4 6 7 | AGE 37 | RACE ☐W ☐A ☐B ☐I | SEX ☐M ☐F | DOB M D Y | AGE |
|---|---|---|---|---|---|---|---|

**NARRATIVE**

Show this case Exceptionally Cleared. This case will be presented to the Montgomery County Grand Jury.

| 22 LOCAL USE |
|---|
| U    U K |

| 23 STATE USE |
|---|
| |

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING / FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE GOODS | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24or UCR CODE | 35 MOTOR VEH. STOLEN IN YOUR JURISDICTION? ☐Yes ☐No  WHERE? | 36 RECOVERED IN YOUR JURISDICTION? ☐Yes ☐No  WHERE? |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | 43 ADDITIONAL CASES CLOSED NARRATIVE ☐Y ☐N |
|---|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44 CASE STATUS ☐PENDING ☐INACTIVE ☐CLOSED | 45 CASE DISPOSITION: ☐CLEARED BY ARREST (JUV) ☐CLEARED BY ARREST (ADULT) ☐UNFOUNDED ☐ADM. CLEARED | ☐EXCEPTIONAL CLEARANCE. ☐SUSPECT I OFFENDER DEAD ☐OTHER PROSECUTION ☐EXTRADITION DENIED ☐LACK OF PROSECUTION ☐JUVENILE, NO REFERRAL ☐DEATH OF VICTIM | 46 REPORTING OFFICER Cpl M.D. Hall | ID # 413 |
|---|---|---|---|---|
| ENTERED ACIC / NCIC ☐Yes ☐No  DATE | | | 47 ASSISTING OFFICER | ID # |
| | | | 48 SUPERVISOR APPROVAL    ID # | 49 WATCH CMDR.    ID # |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC-33 REV. 11-94

OFFICE OF THE

VICE PRESIDENT FOR

ADMINISTRATIVE SERVICES

RECEIVED

FEB 14 2005

PERSONNEL & HUMAN RELATIONS

February 7, 2005

**Hand-Delivered**

Mr. Eddie and Mrs. Linda Johnson

Dear Mr. & Mrs. Johnson:

This will acknowledge receipt of your letter dated February 3, which Mrs. Johnson delivered to this office at approximately 4:45 p.m. on Friday, February 4, 2005, and left with my Secretary.

In your letter you alleged that "Mr. Anwar Diopp" had "sexually raped" your daughter, whom you did not name, but described as a 19-year-old Freshman student at Alabama State University. You alleged that the sexual harassment and rape of your daughter occurred at the house of "Mr. Diopp," on January 31, 2005.

Additionally, you also alleged that after you declined Mr. Diop's assistance in getting campus employment for your daughter, which she had requested, she obtained employment in the Inventory Control Office, ( a unit which is not under my supervision), and "has been moved off her work-study job as of February 3, 2005," and "has not been compensated."

With regard to the sexual harassment and rape allegation, which report I regret, I note that you did not name your daughter, nor did you cite the source of the information upon which you made your report. Inasmuch as you cited the Alabama State University Non-Academic Handbook, Section 6.5.1 in connection with your report, I am sure that you are also aware of the same policy document Section 6.5.2 "Reporting Incidents of Sexual Harassment," which reads, "An individual who experiences sexual harassment shall immediately report the fact to the Director of Personnel Services and Human Relations... The initial report may be in oral or written form, but a formal investigation of the matter cannot begin until the complaint is submitted in written form and signed by the complainant."

Since you described your daughter as a 19-year-old full-time student, I urge that a proper report be made by the victim. I also urge that use be made of the counseling services available through Student Affairs.

I assure you that upon a proper report by the victim in accordance with ASU policy, should the ensuring investigation confirm your allegations or establish related

ALABAMA

STATE

UNIVERSITY

P.O. BOX 271

MONTGOMERY,

ALABAMA

36101-0271

334.229.6994

www.alasu.edu

Exhibit

7

*Mr.Eddie and Mrs. Linda Johnson*
*07 – February- 2005*
*Page -2-*

actionable facts, the university will move with firmness and dispatch to take warranted action.

You will recall that prior to your letter dated February 3, 2005, Mrs. Johnson had verbally reported to me that you and your daughter had agreed among yourselves to use the legal system external to the campus and to keep the matter totally out of the University system.   Now that you have formally introduced the matter into the University, I urge you to follow appropriate procedures so that a full and proper investigation can be made of the alleged crime and/or offense and appropriate action may be taken.

Sincerely,

Leon Frazier, Vice President
for Administrative Services

lc

personnell

# ALABAMA STATE UNIVERSITY

Montgomery, Alabama

## APPLICATION FOR EMPLOYMENT

Request for information Concerning Training and Professional



Affirmative Action/Equal Opportunity Employer

Position for which you are applying __Data Entry__

*Please be specific, applicant will be considered only for the position designated. One position per application.*

Area of your highest major/specialization _____

Name in full __Jolonda__        __R.__        __Johnson__
    First Name          MI       (Maiden)      Last Name

**(Check one)**    ( ) Dr.    ( ) Mr.    ( ) Miss    (X) Ms.    ( ) Mrs.

Social Security Number __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__    *Race __AA__    Sex: ( ) Male    (X) Female

Present Address __1190 Gibson Hills Dr.__
                            (Street)

__Montgomery__
              (City)

__Alabama__        __36116__
(State)                 (Zip Code)

__(334) 613-1957__

(Area Code) Telephone Number

Home Address __1190 Gibson Hills Dr.__
                         (Street)

__Montgomery Alabama__
             (City)

                    __36116__
(State)  __(334) 613-1957__  (Zip Code)

(Area Code) Telephone Number

*This information requested ONLY to assist the University in complying with provision of a federal court order



personnell                                          6  40 p m    08-30-2005

Name __Jalonda Johnson_____ Visa Status (Citizenship)_____
        (Please print or type)

Scholastic training: Give names of institutions attended as indicated below:

| 1. Institutions: Name and Address | Circle Highest Grade completed | Date Completed |
|---|---|---|
| a. Grammar or High School | 1 2 3 4 5 6 7 8 9 10 11 (12) | May 19, 2004 |
| | | |
| | | |

| b. Business, trade or Correspondence School Completed | Course(s) Studied | Date Started | Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| College of University | Quarter/Semester | Degree | Date Started | Date Completed |
|---|---|---|---|---|
| ASU | | — | | |
| | | | | |
| | | | | |

2. _____ Field of Study: _____

| | Major | Quarter/Semester Hours | Minor | Quarter/Semester Hours |
|---|---|---|---|---|
| Undergraduate Degree | | | | |
| Master's Degree | | | | |
| Doctorate Degree | | | | |

Total quarter/semester hours earned beyond highest degree _____

JOH 0006

Teaching/Administrative Experience (Start with most recent position):

| Rank and Teaching Field | | College or University | Reason for Leaving | Last Annual Salary |
|---|---|---|---|---|
| Dates  From | To | Description of Duties | | $ |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total years of experience: Teaching:     Below College_____     College_____     At ASU_____

Administrative:     Below College_____     College_____     At ASU_____

4. Business or Professional Experience

## Employment History

Beginning with your Present or most recent employment. Each time you changed jobs or your title changed (list as a separate period). Give complete information, especially about the kind of work you did. Be sure to include and describe your military experience, if any.

| Dates | | Occupation & Specific Duties | Employers Name & Address | Annual Salary | Reason for Leaving |
|---|---|---|---|---|---|
| From | To | | | | |
| 08\1 | 08\1 | Cashier | Winn-Dixie (Town Center) | 5.75\hr | School |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Show Other Experience By Using Additional Sheets

JOH 0007

personnell                                                          05.10:53 p,m    08-30-2005

5. Present Position_____

   Date of Appointment_____ Annual Salary S_____ Number of Months of Service per year_____

6. Have you ever failed to obtain reappointment?_____ If "yes" give date(s) and School(s)

7. Do you presently hold academic tenure?_____ If "yes" give date(s) and School(s)

8. List principal faculty committees on which you have served during the past five years. If an officer, indicate
   with an asterisk(*) and give dates.

9. Honors (honorary societies, scholarships, prize, etc):

10. List memberships in learned and professional societies:

11. Publications (please submit copies, if possible)

12. State how you learned of the position for which you are making application.

13. If you are hired by this institution, whom should we notify in case of an emergency?

   NAME __Linda Johnson__  Telephone Number __229-4413__ (d3-1957)

   RELATIONSHIP __Mother__  Alternate Telephone Number_____

   ADDRESS __1190 Gibson Hills Dr. Montgomery, Al 36116__
            Street            City              State      Zip Code

**NOTE: If additional space is required to fully respond to any question, please attach an additional sheet of
plain paper and indicate the question number to which the response pertains.**

This application will remain active for **TWO** calendar years following receipt in the office of Personnel and Human
Relations.

I hereby grant permission for Alabama State University to obtain any and all information deemed necessary to
process my employment application. This information includes, but not limited to, my past and present employment
status and my past and present credit record.

I CERTIFY THAT the information in this application is correct and true; is offered as inducement for employment;
and I understand that any critical data concerning my qualifications for the position that are withheld or false will
render any enrollment contract null and void.

Date __02-02-05__   Signature _____

Enclose resume, undergraduate and graduate transcripts, placement credentials and three current letters of
reference, if applicable, and send to:

Personnel and Human Relations
Alabama State University
915 South Jackson Street
Montgomery, AL 36101-0271

JOH 0008

personnell                                    05:16:21 p ™    08-30-2005

*APPLICANT DATA RECORD*

Feb. 02, 2005
_____
Date

    To help this Department evaluate our efforts as an Equal Opportunity Employer, we are requesting that you complete the following items of personal information. Your answers to these questions will be used only to study recruiting and employment patterns, and to furnish information for government reports. We appreciate your cooperation.

    This sheet will be separated from the employment application upon receipt, and will be maintained in a separate file. It will, in no way, affect consideration for possible employment with Alabama State University.

**PLEASE PRINT**

NAME: __Johnson_____, __Jalonda_____ __R.__
          Last Name              First Name        MI

ADDRESS: __1190 Gibson Hills Dr.  Montgomery, AL.  36116__
              Street           City         State    Zip

Social Security Number: __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_____

Marital Status:  ( ) Married  (X) Single    ( ) Divorce    ( ) Widowed

Race:  (X) Black  ( ) Caucasian  ( ) American Indian  ( ) Hispanic

    ( ) Asian/Pacific Islander  ( ) Non-Resident Alien  ( ) Other _____

Sex:  ( ) Male  (X) Female

Age: __19__    Birthdate: 08 / 29 / 85    Birth Place: __Montgomery, AL__

Veteran:  ( ) Yes  (X) No

United States Citizen: (X) Yes  ( ) No, indicate status _____

JOH 0009

personnel!                                                03:16:43 p.m    08-30-2005

## Form W-4 (2004)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2004 expires February 16, 2005. See Pub. 505, Tax Withholding and Estimated Tax.

**Note:** You cannot claim exemption from withholding if: (a) your income exceeds $800 and includes more than $250 of unearned income (e.g. interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the Personal Allowances Worksheet below. The worksheets on page 2 adjust your withholding allowances based on itemized deductions, certain credits, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the Personal Allowances Worksheet below. See Pub. 919, How Do I Adjust My Tax Withholding? for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2004. See Pub. 919 especially if your earnings exceed $125,000 (Single) or $175,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 to initiate a name change and obtain a social security card showing your correct name.

---

### Personal Allowances Worksheet (Keep for your records.)

A  Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . . . . . . .  A ____

B  Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.
}  B ____

C  Enter "1" for your spouse. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . . . .  C ____

D  Enter number of dependents (other than your spouse or yourself) you will claim on your tax return . . . . .  D ____

E  Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) .  E ____

F  Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit . .  F ____
Note: Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

G  Child Tax Credit (including additional child tax credit):
- If your total income will be less than $52,000 ($77,000 if married), enter "2" for each eligible child.
- If your total income will be between $52,000 and $84,000 ($77,000 and $119,000 if married), enter "1" for each eligible child plus "1" additional if you have four or more eligible children.  G ____

H  Add lines A through G and enter total here. Note: This may be different from the number of exemptions you claim on your tax return.  ▶ H ____

For accuracy, complete all worksheets that apply.
- If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.
- If you have more than one job or are married and you and your spouse both work and the combined earnings from all jobs exceed $35,000 ($25,000 if married) see the Two-Earner/Two-Job Worksheet on page 2 to avoid having too little tax withheld.
- If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below.

---

Cut here and give Form W-4 to your employer. Keep the top part for your records.

---

| **W-4** | **Employee's Withholding Allowance Certificate** | OMB No. 1545-0010 |
|---|---|---|

Department of the Treasury
Internal Revenue Service

▶ Your employer must send a copy of this form to the IRS if: (a) you claim more than 10 allowances or (b) you claim "Exempt" and your wages are normally more than $200 per week.

**2004**

1  Type or print your first name and middle initial   Last name   **2** Your social security number
    Jalonda  R.              Johnson          424 31 1886

Home address (number and street or rural route)   **3** ☒ Single ☐ Married ☐ Married, but withhold at higher Single rate
1190 Gibson Hills Dr                                Note: If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

City or town, state, and ZIP code                   **4** If your last name differs from that shown on your social security
Montgomery, Al. 36116                                   card, check here. You must call 1-800-772-1213 for a new card. ▶ ☐

5  Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2)  **5** 0

6  Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . . . . .  **6** $ ____

7  I claim exemption from withholding for 2004, and I certify that I meet both of the following conditions for exemption:
- Last year I had a right to a refund of all Federal income tax withheld because I had no tax liability and
- This year I expect a refund of all Federal income tax withheld because I expect to have no tax liability.
If you meet both conditions, write "Exempt" here . . . . . . . ▶  **7**

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.

Employee's signature
(Form is not valid unless you sign it.) ▶ _[signature]_                          Date ▶ 02-02-05

8  Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.)   **9** Office code (optional)   **10** Employer identification number (EIN)

JOH 0010

personnell

03:17:41 p m    08-30-2005

FORM
**A-4** REV. 1/00

ALABAMA DEPARTMENT OF REVENUE
**Employee's Withholding Exemption Certificate**

~~~~ NAME  Jalonde Richey Johnson    SOCIAL SECURITY NO. 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

~~~~ ADDRESS  1190 Gibson Hills Dr.    CITY Montgomery    STATE AL    ZIP CODE 32116

**EMPLOYEE:**
File this form with ~~~~ ~~~~ ~~~~ Other-
~~~~ ~~~~ Alabama income
~~~~ ~~~~ ~~~~ withheld
~~~~ ~~~~ ~~~~ with-
~~~~ ~~~~

If you had no Alabama income tax liability last year and you anticipate no Alabama income tax liability this year, you may claim "exempt" from Alabama withholding tax.
To claim exempt status, check this block, sign and date this form and file it with your employer. Employees claiming exempt status are not required to complete Lines 1 through 5. ☐

**HOW TO CLAIM YOUR WITHHOLDING EXEMPTIONS**

1. IF YOU ARE SINGLE, $1,500 personal exemption is allowed.
   (a) If you claim full personal exemption ($1,500) write a letter "S"
   (b) If you claim no personal exemption write the figure "0" (Note: If you claim no personal exemption on Lines 1 or 2, you cannot claim dependents on Line 3.) .............. **S**

2. IF YOU ARE MARRIED or SINGLE CLAIMING HEAD OF FAMILY, $3,000 personal exemption is allowed.
   (a) If you claim exemption for both spouses ($3,000), write the letter "M"
   (b) If you are single claiming head of family ($3,000), write the letter "H" (see "head of family" instructions on back of this form)
   (c) If you claim exemption for yourself only ($1,500) write the letter "S"
   (d) If you claim no personal exemption write the figure "0" (see note under 1(b).) ..................

3. If during the year you will provide more than one-half of the support of persons closely related
   to you (other than spouse) write the number of such dependents. (See instructions on other side.) ............ **0**

4. Additional amount, if any, you want deducted each pay period. ............................................. ▶ $

**THIS LINE TO BE COMPLETED BY EMPLOYER:**

5. TOTAL EXEMPTIONS (Example: Employee claims "S" on Line 2 and "1" on line 3. Employer should use column headed "1" in Withholding Tables) .......... **S-0**

**EMPLOYER**
Keep this certificate
with your records. If the
employee is believed to
have claimed too many
exemptions the Alabama
Department of Revenue
should be advised.

I certify that the withholding exemptions claimed on this
certificate do not exceed the amount to which I am entitled.    DATE  02-28-05    SIGNED ~~~~

STATE OF ALABAMA              )

COUNTY OF MONTGOMERY    )

### AFFIDAVIT OF WILLIE THOMAS

1. My name is Willie Thomas. I am over the age of 19 years, of sound mind and have personal knowledge of the facts contained herein.

2. In February 2005, I was employed as the Director of Internal Audit at Alabama State University. I have been employed in this position since 1999.

3. The budget for the department of Inventory Control for the fiscal year 2004-2005 did not allocate funds to pay a 20-hour per week employee in that department therefore; the department's budget did not have money available to pay any such personnel.

4. I am familiar with Ms. Jolanda Johnson's attempt to be employed as a 20-hour per week Data Entry Clerk in Inventory Control during the 2005 Spring Semester.

5. This position would have to be funded under the 2004-2005 budget which did not allocate funds for the position for which Ms. Johnson applied.

6. There was no prior approval for the department to exceed its budget. Therefore, Ms. Johnson's employment application had to be denied in accordance with the University's policy.

7. I was also told about the Request for Budget Adjustment which purports to request a transfer of funds from the Physical Plant budget to the Inventory Control budget to pay Ms. Johnson. I am also generally familiar with the processing of such requests. No Budget Adjustment could be made under any circumstances without a properly signed and approved request.

Exhibit

9

8. During the period between January and February 2005, I never received or reviewed a signed Request for Budget Adjustment between Physical Plant and Inventory Control. I first became aware of the unsigned Request during ASU's investigation of Ms. Johnson's sexual harassment complaint. I have never seen a signed copy of this Request.

**FURTHER AFFIANT SAYETH NOT.**

WILLIE THOMAS

**STATE OF ALABAMA**
**COUNTY OF MONTGOMERY**

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Willie Thomas, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this the 30th day of May, 2008.

NOTARY PUBLIC
My Commission Expires: 2/2/2012

**ALABAMA STATE UNIVESITY**
**BUDGET ADJUSTMENT REQUEST FORM**
**FISCAL YEAR 2004-2005**

DEPARTMENT                                                                                      DATE

TRANSFER FROM:

| Account Numbers | Description Object Code | Amount |
|---|---|---|
| 1.  2-17120-1220 | Staff Part time | $5,889.60 |
| 2. . | | |
| 3. . | | |
| 4. . | | |
| 5. . | | |
| | Total | $5,889.60 |

TRANSFER TO:

| Account Numbers | Description Object Code | Amount |
|---|---|---|
| 1  2-16131-1220 | Staff Part-Time | $5,889.60 |
| 2. . | | |
| 3. . | | |
| 4. . | | |
| 5. . | | |
| | Total | $5,889.60 |

JUSTIFICATION

Hire a Part-Time Data Entry Clerk.

SUBMITTED & CERTIFIED BY

_____                    _____
Cost Center Director                                               Date

_____                    _____
Dean or Director                                                    Date

_____                    _____
Vice President                                                       Date

SIGNATURE OF APPROVING AUTHORITY

_____                    _____
Vice President for Fiscal Affairs                              Date

_____                    _____
President of the University                                     Date

RECEIVED
APR 2
PERSONNEL &

Exhibit

10

STATE OF ALABAMA            )

COUNTY OF MONTGOMERY    )

### AFFIDAVIT OF DAVID L. McADORY

Comes Now, David L. McAdory and deposes and states as follows:

1. My name is David L. McAdory.  I am over the age of 19 years, of sound mind and have personal knowledge of the facts contained herein.

2. In February 2005, I was employed as the HRS Data Manger/Contracts Manager in the office of Personnel and Human Resources at Alabama State University.  I have been employed in this Department for 14 years as of the date of this statement.

3. As part of the regular duties of my job, I was responsible for preparing employment contracts for individuals hired by the University.

4. If there were any reason why a contract could not be approved, I would receive notice of the reason and instructions not to offer a contract to the prospective employee.

5. I would also inform the hiring department that the contract could not be issued and advise them of the reason for the denial.

6. I am familiar with Jolanda Johnson's application for employment as a Data Entry Clerk in the Inventory Control department.

7. When I received the request from Stratford Moore to hire Ms. Johnson, I checked with the budget office to see if there were funds available to pay the prospective employee and discovered that there was no money in the account.  I routinely do this whenever a department requests to hire a new employee because contracts cannot be approved if there are insufficient funds in the account to meet payroll for the prospective employee.

Exhibit

11

8. I then informed Mr. Moore that because there was no money in his account to hire an employee, he would have to request a transfer of funds into his account and the request would have to be approved by Mr. Willie Thomas, Director of Internal Audit, who was Mr. Moore's supervisor.

9. After obtaining this information, I immediately contacted Mr. Moore and informed him that he would not be allowed to hire Ms. Johnson because he did not have funds in his account to pay her. I also advised him that no contract could be issued unless he completed a Budget Adjustment to transfer the necessary money into his account and obtained prior approval from his supervisor for the request.

**FURTHER AFFIANT SAYETH NOT.**

DAVID L. McADORY

**STATE OF ALABAMA**
**COUNTY OF MONTGOMERY**

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that David L. McAdory, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and official seal this the _30th_ day of _May_, 2008.

NOTARY PUBLIC
My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 18, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

2650697     personnell                    06:11:34 p.m.     01-17-2006        2/2



OFFICE OF PERSONNEL
AND HUMAN RELATIONS

EXHIBIT
"G"
Blumberg No. 5192

## STATEMENT

January 17, 2006

I informed Mr. Stratford Moore that the Request for Contract for Ms. Jalonda Johnson, ~~........~~ be hired as a 20 hour Data Entry Clerk @ $8.18 per hour for 36 weeks, had not been approved by Mr. Willie Thomas, Director of Internal Audit and no money was in the account in which he had requested that the contract be paid. I informed Mr. Moore that a contract could not be accomplished until money had been placed into the account and Mr. Thomas had approved the request.

David L. McAdory
Office of Personnel and Human Relations
Human Resources System/Contract Manager

ALABAMA
STATE
UNIVERSITY
.O. Box 271
MONTGOMERY,
ALABAMA
101-0271
F 229 4667
.265.0697 FAX
~~ ~~

Exhibit
12

February 3, 2005


Dr. Leon Frazier
Vice President of Administrative Services
Alabama State University
915 South Jackson Street
Montgomery, AL  36104

Dear Dr. Frazier:

On Monday, January 31, 2005, Mr. Anwar Diopp, Director of Physical Plant, sexually raped our daughter. Our daughter is a current student at Alabama State University. She is a 19-year-old freshman.

On Monday evening approximately 6:30 p.m., Mr. Diopp, Director of Physical Plant called our daughter on her cell phone to ask her would she come over to his home because he needed someone to talk to about his grandmother who is dying. Since Mr Diopp had assisted her in getting a job in a friendly way, she felt out of fairness she would go and talk with him about his hardship and problem. But got there and became a victim of sexual harassment and rape.

Our daughter is a full-time student at Alabama State University and Mr. Diopp was hired as a full-time director and should have been orientated about the prohibited relationship between employees and students on campus or off campus.

Mr. Diopp helped our daughter secure a job in which contributed to befriending her and gaining her confidence. After doing so, he lied about his grandmother's health in a cunning deceptive way to get our daughter to his house to sexual harass and rape her

According to the Non-Academic Handbook 6.5.1 SEXUAL HARASSMENT DEFINED.


Unwelcome sexual advances, requests for sexual favor and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual employment or academic decisions, (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions or academic decisions affecting such individual or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile or offensive working or academic environment. Sexual harassment may be of a homosexual or heterosexual nature.

SEXUAL HARRASSMENT MAY CONSIST OF:

-**Physical sexual assault including rape.**

-Demands for sexual favors or social activity accompanied by implied or direct promises that submission will results in better job treatment or academic advancement.

Exhibit

IOH 0003

Our daughter went looking for a 20-hours work study position one day and she went to personnel requesting do they know of an office who needed a 20-hour student and she also inquire from her mother office and was told she could not work under her mother, so she took the liberty on her own to continue to seek for work. She went to the Inventory Control office and asked and was told he did not have funds for a 20-hour student and she went to Physical Plant and asked Mr. Diopp did he have a 20-hour slot or know someone who may have a 20 hour slot, and he told her he will help her get a job. Mr. Diopp came to my office and told me that he would get my daughter a job and I told him "No" that her father and I would support her. Mr. Diopp left my office and the next two days, Mr Moore came to my office and told me that he will hire my daughter in a 20-hour slot and the funds will come from Physical Plant. Mr. Diopp asked Mr. Moore how much do a 20-hour student make? Mr. Moore told him $5.15 per hour and Mr. Diopp said that he wanted her to make more than $5.15 per hour and Mr. Moore called Personnel to see how much can a work study student make. Mr. Moore was told $5.15 per hour. In order to make more, she would need to be classified as a Data Entry Clerk making 8.18 per hour

Mr. Diopp used his position and authority to manipulate our daughter, who is an Alabama State Student. Now that the crime has taken place, my daughter has been moved off her work-study job as of February 3, 2005 in which she was working successfully and has not been compensated. This incident has created emotional hurt and trauma not only to our daughter but the entire family.

Sincerely,

Mr. Eddie & Linda Johnson
Parents of the victim

IOH 0004

RECEIVED

PERSONNEL AND HUMAN
RELATIONS

February 10, 2005

Mr. Olan Wesley
Director of Personnel &
Human Resource
Alabama State University
915 South Jackson Street
Montgomery, AL 36104

Dear Sir:

My name is Jalonda Johnson and I am a student at Alabama State University. Mr. Anwar Diopp, Director of Physical Plant, has physically violated me by way of **rape**, which is in violation to The Sexual Harassment Law. I may be reached at 334 613-1957.

Sincerely,

Jalonda Johnson
Student

Exhibit

14



TO BUILD
MY CAREER.

THE WAY THE
WORLD THINKS

TO FOLLOW
MY DREAM.

THEY CHALLENGE
THE WAY I THINK

AND THEY'RE
STARTING
WITH ME.

TO LIVE
MY LIFE.

AND IS MAKING
THE WORLD

The Pilot
CALENDAR-PLANNER 2006-2008

ASU

udent Handbook

JOH 0064

Exhibit

15

- Counseling Center – 229-4382
- Office of the Assistant Vice President for Student Affairs – 229-5104
- Office of the Vice President for Student Affairs – 229-4241

implied or direct promises that submission will result in better job treatment or academic advancement; and

8. patting or pinching.

# UNIVERSITY POLICY ON SEXUAL HARASSMENT

Alabama State University is firmly committed to providing an environment that is free of discrimination. Sexual harassment is reviewed as a form of sex discrimination and as a most reprehensible offense, whether committed on or off campus. ASU will vigorously investigate and impose sanctions when investigation confirms that sexual harassment has occurred. The University is especially sensitive to this matter where students are involved and will not hesitate to impose the maximum disciplinary sanction where warranted. A deliberate false accusation of sexual harassment will not be condoned and will result in disciplinary action being taken against anyone who knowingly makes a false report.

# SEXUAL HARASSMENT DEFINED

Unwelcomed sexual advances, requests for sexual favor and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic decisions, (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions or academic decisions affecting such individual or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile or offensive working or academic environment or the assignment of better academic grades or favorable consideration for academic or social advancement. Sexual harassment may be of a homosexual or heterosexual nature and may consist of the following:

1. sexually suggestive language;
2. derogatory sexual comments;
3. unsolicited touching of the body;
4. outright solicitation of sexual intercourse;
5. subtle pressure for sexual favors or social encounters;
6. demands for sexual favors or social activity accompanied by threats or insinuations that failure to submit will adversely affect one's employment, wages, work conditions or academic advancement;
7. demands for sexual favors or social activity accompanied by

# REPORTING INCIDENTS OF SEXUAL HARASSMENT

A student who believes he or she has experienced sexual harassment shall immediately report the allegation to the vice president for Student Affairs or the Department of Police and Campus Security. A formal investigation of the matter will begin when a written compliant is filed. If charges of sexual harassment are formally filed against any officer of the University who serves at or above the level of an area vice president or the director of intercollegiate athletics, the EEO officer shall within 10 days report that fact and the results of any preliminary investigation to both the president and the chairman of the board of trustees.

# INVESTIGATING REPORTED INCIDENTS OF SEXUAL HARASSMENT

Prior to initiating an investigation, the director of Personnel Services and Human Relations will notify the accused person(s) of the sexual harassment charge and of the impending investigation. The investigation will be nonadversarial. Therefore, attorneys for neither side will be permitted. The investigation committee will be composed of three disinterested members. Two members will be appointed by either of two divisional vice presidents. The third member will be selected by the two members appointed by the vice presidents. If the two cannot agree on naming a third member, the director of Personnel and Human Relations will name the third member. If the sexual harassment charge involves a student, at least one member of the committee will be a student appointed by the vice president for Student Affairs. All correspondence should be in writing that requires a signature or use of certified mail.

The committee will interview and obtain relevant testimony from any and all persons who may have knowledge of the matter within 30 days of notification. Upon completion of the investigation, the committee will compile its findings, formulate recommendations and forward its report through the director of Personnel Services and Human Relations to the vice president for Student Affairs.

JOH 0065